# EXHIBIT A

# DEPARTMENT OF JUSTICE

## Bureau of Alcohol, Tobacco, Firearms, and Explosives

**27 CFR Parts 478 and 479**

**[Docket No. ATF 2021R–08F; AG Order No. 5589–2023]**

**RIN 1140–AA55**

### Factoring Criteria for Firearms With Attached "Stabilizing Braces"

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Department of Justice ("Department" or "DOJ") is amending the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to clarify when a rifle is designed, made, and intended to be fired from the shoulder. Specifically, under the Gun Control Act of 1968 ("GCA") and the National Firearms Act of 1934 ("NFA") the definition of "rifle" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in this preamble and in the amended regulations, indicate that the weapon is designed, made, and intended to be fired from the shoulder.

**DATES:**

*Effective date:* This rule is effective January 31, 2023.

*Compliance Date:* Any weapons with "stabilizing braces" or similar attachments that constitute rifles under the NFA must be registered no later than May 31, 2023.

**FOR FURTHER INFORMATION CONTACT:** Denise Brown, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–7070 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

I. Executive Summary
  A. Summary of Regulatory Action
  B. Summary of Costs and Benefits
II. Background
  A. Authority Under GCA and NFA
  B. "Stabilizing Brace" Device-Related Classifications
III. Notice of Proposed Rulemaking
  A. Definition of "Rifle"
  B. Application of Proposed ATF Worksheet 4999
IV. Analysis of Comments and Department Responses
  A. Comments Received in Support
  B. Comments Received in Opposition
V. Final Rule
  A. Definition of "Rifle"
  B. Options for Affected Persons
  C. Discussion of Tax Forbearance
VI. Statutory and Executive Order
  A. Executive Orders 12866 and 13563
  B. Executive Order 13132
  C. Executive Order 12988
  D. Regulatory Flexibility Act
  E. Small Business Regulatory Enforcement Fairness Act of 1996
  F. Congressional Review Act
  G. Unfunded Mandates Reform Act
  H. Paperwork Reduction Act of 1995

## I. Executive Summary

### A. Summary of Regulatory Action

This executive summary provides an overview of the relevant statutory definitions, a brief overview regarding the regulatory background prompting the issuance of a rule, a description of the earlier published notice of proposed rulemaking ("NPRM"), a description of this final rule after consideration of the comments received on the NPRM, and an overview of options for persons affected by this rule. Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms [1] with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule. Furthermore, this rule does not impose any new legal obligations on owners of "stabilizing braces" at all, as any obligations for these owners result only from the NFA and the GCA. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes.

The GCA definition of "firearm" is broad and includes "any weapon (including a starter gun) which will or is designed to, or that may be readily converted to, expel a projectile by the action of an explosive." 18 U.S.C. 921(a)(3)(A). This definition does not include an antique firearm. The GCA additionally provides definitions for the terms "rifle" and "short-barreled rifle." 18 U.S.C. 921(a)(7), (a)(8). A "rifle" is defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a

rifled bore for each single pull of the trigger." 18 U.S.C. 921(a)(7). A "short-barreled rifle" is defined as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. 921(a)(8). The GCA imposes specific controls on the interstate transport of "short-barreled rifle[s]" and requires Federal firearms licensees ("FFLs") to receive approval from the Attorney General prior to the sale of a "short-barreled rifle." 18 U.S.C. 922(a)(4), (b)(4).[2]

The GCA also defines the term "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. 921(a)(30). A pistol, which is a type of handgun, is defined under 27 CFR 478.11 and 479.11 as a weapon originally designed, made, and intended to fire a projectile from one or more barrels when held in one hand that has both a chamber as an integral part of, or permanently aligned with, the bore and a short stock designed to be gripped by one hand at an angle to and extending below the line of the bore.

The NFA defines the term "firearm" differently and more narrowly than does the GCA. Under the NFA, the term "firearm" includes "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length" (also known as "short-barreled rifle[s]" as that term is defined under the GCA). 26 U.S.C. 5845(a)(3)–(4); 18 U.S.C. 921(a)(8). The NFA defines the term "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C.

---

[1] Unless otherwise indicated, the term "firearm," as used in this rule, means "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." *See* 18 U.S.C. 921(a)(3)(A).

[2] The GCA, 18 U.S.C. 922(a)(4), makes it unlawful for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any "short-barreled rifle" except as authorized by the Attorney General consistent with public safety and necessity. Section 922(b)(4) makes it unlawful for any FFL to sell or deliver a "short-barreled rifle" to any person except as authorized by the Attorney General consistent with public safety and necessity.



5845(c). The section of the NFA's definition of "firearm" that includes a "rifle with a barrel or barrels less than 16 inches in length" and a "weapon made from a rifle" is nearly identical to the GCA's definition of "short-barreled rifle."

Firearms falling under the purview of the NFA must be registered in the National Firearms Registration and Transfer Record ("NFRTR") to a person[3] entitled to possess the firearm, 26 U.S.C. 5841; require approval by the Attorney General before their transfer or making, 26 U.S.C. 5812, 5822; and are subject to transfer and making taxes, 26 U.S.C. 5811, 5821. Additionally, any person engaged in the business of importing, manufacturing, or dealing NFA firearms must register with the Attorney General and pay a special (occupational) tax ("SOT"). 26 U.S.C. 5801, 5802. Generally, all "rifles," "weapon[s] made from a rifle," and "rifle[s] having a barrel or barrels of less than 16 inches in length" for purposes of the NFA are also "firearms" under the GCA.

In 2012, an FFL submitted the first "stabilizing brace" (or "brace" device) to ATF asking if the addition of their prototype "brace" device to a heavy pistol,[4] such as an AR–15 type pistol, would change that pistol's classification under Federal firearms laws.[5] The submitter described that the "brace" device was designed with the intent to assist people with disabilities so that they could fire these kinds of heavy pistols safely and comfortably, as they could be "difficult to control with the one-handed precision stance."[6] In response to this inquiry, ATF examined the submitted "stabilizing brace" device and found the sample "provide[d] the shooter with additional support of a

firearm while it is still held and operated with one hand" and that the device was not "designed or intended to fire a weapon from the shoulder." Accordingly, ATF concluded that the submitted "brace," when attached to a firearm, did "not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm," and therefore, "such a firearm would not be subject to NFA controls."[7]

Since then, the variety of available "stabilizing braces" or similar "brace" devices and pistols equipped with "braces" has grown significantly. In 2014, ATF began to see "braces" being used to fire weapons from the shoulder and new "brace" designs that included characteristics common to shoulder stocks. ATF's previous classifications had analyzed whether "brace" devices could effectively be used on the forearm for single-handed firing (as the manufacturer claimed). Additionally, for a period of time, many of ATF's classifications did not consider: (1) whether the firearm equipped with a specific "brace" model was designed or redesigned to be fired from the shoulder based on the objective design features of the weapon, or (2) how the firearm equipped with the "brace" was being used in the general community. The diversity of "brace" devices yielded a plethora of firearms with an attached "stabilizing brace" that possess objective design features indicative of firearms designed, made, and intended to be fired from the shoulder.[8] As explained in this rule, because a majority of these firearms with an attached "stabilizing brace" are configured as rifles and have a barrel or barrels of less than 16 inches in length, they fall under the purview of the NFA. Therefore, under the statute and regulations, individuals who attach a "stabilizing brace" to a firearm could find themselves making an NFA firearm without abiding by the registration and taxation requirements of the NFA.

Furthermore, ATF has made clear to makers and manufacturers that despite their purported intent with respect to the use or design of an accessory, the requirements of the NFA cannot be circumvented by attempting to configure a firearm with a purported "stabilizing brace" when the affixed device and configuration of the firearm includes features inherent in shoulder-fired weapons.[9] For these reasons, it is necessary for the Department to amend the regulatory definition of "rifle" to make clear to the public the objective design features and other factors that must be considered when determining whether a firearm equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") is a rifle designed, made, and intended to be fired from the shoulder. Although ATF will consider a manufacturer's stated intent as reflected in direct and indirect marketing materials or other information demonstrating the likely use of the weapon in the general community in assessing whether the firearm is or is not designed, made, and intended to be fired from the shoulder, the objective design features of the weapon may support or undermine that intent, and the stated intent will not necessarily be dispositive.

On June 10, 2021, the Department published an NPRM in the **Federal Register** titled, "Factoring Criteria for Firearms With Attached 'Stabilizing Braces'," 86 FR 30826. The NPRM proposed amending ATF's definitions of "rifle" in 27 CFR parts 478 and 479 to expressly state that the term may include firearms equipped with a "stabilizing brace," even though such firearms were already implicitly included in the definition by virtue of the fact that they were designed, made, and intended to be fired from the shoulder. The proposed amendment clarified that a firearm equipped with a "stabilizing brace" device falls under the definition of "rifle" if the weapon "has objective design features and characteristics that facilitate shoulder fire," as indicated on ATF Worksheet 4999, Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as "Stabilizing Braces"

---

[3] The NFA does not define the term "person;" however, the Internal Revenue Code provides that, "[w]hen used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof . . . [t]he term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. 7701(a)(1). NFA regulations similarly define the term "person" at 27 CFR 479.11.

[4] For purposes of the rule, ATF generally refers to the type of firearms that are typically equipped with a "stabilizing brace" as heavy pistols based on the manufacturer's stated intent. The use of the term "pistol" in this rule should not be interpreted as an official classification from ATF that any of these firearms are "pistols" under Federal law. The Department recognizes that, under the final rule titled "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (Apr. 26, 2022), these firearms incorporate a rifle receiver (e.g., AR–15 receiver).

[5] Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012).

[6] Id.

[7] Letter from ATF #2013–0172 (Nov. 26, 2012) (emphasis omitted).

[8] RecoiltV, *RECOILtv SHOT Show 2020: Angstadt Arms MDP9*, RECOIL Gun Magazine (Jan. 22, 2020), https://www.recoilweb.com/recoiltv-shot-show-2020-angstadt-arms-mdp9-156974.html; Gun Talk Media, *Brace or No Brace: Springfield's SAINT AR Pistol | Gun Talk*, YouTube (June 16, 2018), https://www.youtube.com/watch?v=vPAmDoC0vUE; TFB TV, *Ruger AR–556 Pistol: The New Budget Baseline*, YouTube (Oct. 18, 2019), https://www.youtube.com/watch?v=oFqd7JONpDU&t=2s; PersonalDefenseNet, *Shouldering an AR Pistol with a SIG Brace*, YouTube (June 21, 2017), https://www.youtube.com/watch?v=DvoZxDLa-SM; Military Arms Channel, *The NFA Nut Kicker!*, YouTube (Apr. 19, 2017), https://www.youtube.com/watch?v=eol8fvMfENc.

[9] *See generally* ATF Open Letter on the Redesign of "Stabilizing Braces," from Max Kingery, Acting Chief, Firearms Technology Criminal Branch, Firearms and Ammunition Technology Division, ATF (Jan. 16, 2015) ("2015 Open Letter"); Letter for Mark Barnes, Outside Counsel to SB Tactical, LLC from Marvin G. Richardson, Assistant Director, Enforcement Programs and Services, ATF, 90000:GM, 5000, *Re: Reversal of ATF Open Letter on the Redesign of "Stabilizing Braces"* (Mar. 21, 2017); Letter from ATF #309513 (Apr. 11, 2019); Letter from ATF #309921 (May 16, 2019); Letter from ATF #310678 (June 25, 2019).

(''Worksheet 4999''). *Id.* at 30851. The Department published for public comment the criteria ATF considers when evaluating the objective design features of firearms equipped with a ''stabilizing brace'' to determine whether the weapon is a ''rifle'' or ''short-barreled rifle'' under the GCA and a ''rifle'' or ''firearm,'' (*i.e.,* a short-barreled rifle) under the NFA. The NPRM also included the proposed Worksheet 4999, which assigned points to various criteria and provided examples of how the Worksheet 4999 would be used to evaluate firearms equipped with certain models of ''stabilizing braces.''

After careful consideration of the comments received regarding the complexity in understanding the proposed Worksheet 4999 and the methodology used in the Worksheet to evaluate firearms equipped with a ''brace'' device, this final rule does not adopt some aspects of the approach proposed in the NPRM, specifically the Worksheet 4999 and its point system. Instead, based on the comments received, the Department took the relevant criteria discussed in the NPRM and Worksheet 4999 that indicate when a firearm is designed, made, and intended to be fired from the shoulder and incorporated them into the rule's revised definitions of rifle. Because both the GCA and NFA define a ''rifle'' as a weapon ''designed or redesigned, made or remade, and intended to be fired from the shoulder,'' the Department believes that a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a ''stabilizing brace'') that provides surface area that allows the weapon to be fired from the shoulder is a rifle, provided the other factors described in this preamble and listed in the final regulatory text indicate the weapon is designed, made, and intended to be fired from the shoulder.

Accordingly, the Department amends the definition of ''rifle'' under 27 CFR 478.11 and 479.11 to expressly state that the term ''designed or redesigned, made or remade, and intended to be fired from the shoulder'' includes a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a ''stabilizing brace'') that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations and described in this preamble, indicate that the weapon is designed, made, and intended to be fired from the shoulder. The other factors are:

(1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

All of the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999.

The revised definition in this final rule clarifies, consistent with the best interpretation of the statutory provision, that firearms with an attached ''stabilizing brace'' can possess objective design features that make them ''rifles,'' as that term is defined under the NFA and GCA. If a firearm with an attached ''stabilizing brace'' meets the definition of a ''rifle'' based on the factors indicated in this final rule, then that firearm could also be a short-barreled rifle depending on the length of the attached barrel, thus subjecting it to additional requirements under the NFA and GCA. However, a firearm with an attached ''brace'' device is not a ''rifle'' as defined in the relevant statutes if the weapon is not designed, made, and intended to be fired from the shoulder. The rule, as proposed and finalized, does not ban ''stabilizing braces'' or prohibit firearms with an attached ''stabilizing brace,'' regardless of the firearm's classification.

This revised definition reflects the Department's understanding of the best interpretation of the statute, and it is immediately effective. *See* 5 U.S.C. 553(d)(2). In addition, because prior

ATF classifications of firearms equipped with a ''brace'' device did not all employ this correct understanding of the statutory terms, all such prior classifications are no longer valid as of January 31, 2023. While firearms equipped with ''stabilizing braces'' or other rearward attachments may be submitted to ATF for a new classification determination, a majority of the existing firearms equipped with a ''stabilizing brace'' are likely to be classified as ''rifles'' because they are configured for shoulder fire based on the factors described in this rule. Because many of these firearms generally have a barrel of less than 16 inches, they are likely to be classified as short-barreled rifles subject to regulation and registration under the NFA and GCA.

Consequently, many parties in possession of weapon and ''brace'' combinations that ATF did not specifically classify in the past as being subject to the NFA may have been violating the NFA by possessing an unregistered rifle with a barrel of less than 16 inches. In addition, where the Department is overruling ATF's previous classification letters, possessors of the firearms equipped with ''stabilizing braces'' that were at issue in those letters may also be in possession of unregistered NFA firearms. Prior to the publication of the NPRM and this rule to clarify the regulatory definition of a rifle, many parties did not register these firearms due to a variety of factors discussed in this rule. Therefore, in exercising its enforcement discretion, the Department provides affected persons options that they can choose from by May 31, 2023 to comply with the statutory requirements. For example, possessors of such weapons, whether an unlicensed individual or an FFL (regardless of SOT status), may register the firearms to comply with the statutory requirements. As discussed in section V.B of this preamble, ATF strongly encourages affected parties to use the eForms system (*https:// eforms.atf.gov*) to submit an electronic version of the appropriate NFA forms. Any penalties for failure to take the necessary action for these existing firearms to comply with Federal law would result only from conduct occurring after this time period to take action ends.

Provided the registration form is properly submitted and documented within the defined time period, the Department will consider individuals to be in compliance with the statutory requirements between the date on which a person's application is filed

and the date a person receives ATF approval or disapproval of the application. After the 120-day registration period following publication of this rule, registration of previously made or manufactured weapons with a "stabilizing brace" that constitute NFA firearms will not be permitted. The Department at that time may take enforcement action against any person in possession of an affected firearm that is a short-barreled rifle for which a registration has not been submitted.

Apart from registration, there are other options that are set out in section V.B. of this preamble that include modifying affected weapons to remove them from the definition of a short-barreled rifle, destroying the firearm, or surrendering the firearm to law enforcement. Registering the firearm or modifying the configuration of such a firearm within the defined time period will enable affected persons to lawfully retain possession of their firearm under Federal law. While possessors of such weapons will themselves be able to apply the factors outlined in the amended regulatory text, ATF is publishing information simultaneously with this rule that will inform the public of both (1) common weapon platforms with attached "stabilizing brace" designs and (2) examples of commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles. Additionally, an individual may contact ATF to receive a determination of whether their firearm equipped with a "stabilizing brace" is a rifle as defined by the GCA and NFA.

The Department has determined that, as a matter of its own enforcement discretion, it will not, as the NPRM suggested as an option, require individuals and FFLs without an SOT that timely register their affected weapons with a "stabilizing brace," which are in their possession as of the date this rule is published, to pay the $200 making tax usually due upon submission of such an application to register. Likewise, Type 7 FFLs (regardless of SOT status) that timely register the weapons with a "stabilizing brace" that qualify as an NFA firearm and that are still in their inventory—*i.e.,* that have not been sold or otherwise transferred—will not owe any making tax for these weapons. Furthermore, the Department has determined that, as a matter of its own enforcement discretion, it will not seek to collect retroactive taxes (*i.e.,* $200 making or $200 transfer tax) typically required for each weapon with a "stabilizing brace" that qualifies as an NFA firearm that

was manufactured or transferred at any time prior to the date of the publication of this final rule. *See* section V.C.

Notwithstanding the 120-day compliance period, discussed above, the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached "stabilizing brace" that constitutes a short-barreled rifle under the NFA. The Department believes that delaying enforcement of the relevant NFA provisions is not necessary to allow an equitable opportunity for compliance because all persons, through publication of this rule, have received notice that the NFA may in fact apply to their conduct. Further delaying enforcement also would be inconsistent with public safety. Therefore, ATF may enforce the NFA against any person or entity that—any time after the publication date of this rule—newly makes or transfers a weapon with an attached "stabilizing brace" that constitutes a short-barreled rifle under the NFA. For purposes of the Congressional Review Act, however, the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the **Federal Register**. *See* 5 U.S.C. 801(a)(3).

*B. Summary of Costs and Benefits*

In sum, ATF anticipates the cost of the rule is $266.9 million, annualized and discounted at seven percent. The total costs calculated for this rule take into account the various options, described above, that affected parties can choose from to come into compliance with the statutory requirements. The benefit of this rule is preventing manufacturers and individuals from violating the requirements of the NFA and GCA. Congress placed stricter requirements on the making and possession of short-barreled rifles, deeming them to be dangerous and unusual weapons and posing a significant danger to the public, as discussed below. This rule enhances public safety by reducing the further proliferation and criminal use of firearms with attached "stabilizing braces." Refer to the standalone Final Regulatory Impact Analysis, available on *www.atf.gov,* for a full discussion of the potential costs and benefits of the rule.

**II. Background**

*A. Authority Under the GCA and NFA*

The Attorney General is responsible for enforcing the GCA, as amended, and

the NFA, as amended,[10] and Congress has included provisions in these statutes that authorize the Attorney General to promulgate regulations as are necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).[11] Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), Establishment, Organization, and Functions, 37 FR 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations to implement the GCA and NFA. *See* 27 CFR parts 478, 479.

The ATF Director delegated the authority to classify firearms pursuant to the GCA and NFA to ATF's Firearms Technology Criminal Branch ("FTCB") and the Firearms Technology Industry Services Branch ("FTISB"). Both FTCB and FTISB fall under the Firearms and Ammunition Technology Division ("FATD"), Office of Enforcement Programs and Services.[12] FATD supports the firearms industry and the general public by, among other things, responding to technical inquiries and testing and evaluating firearms voluntarily submitted to ATF for a determination of a firearm's classification under the GCA or NFA. There is no requirement that members of the firearms industry or the public submit firearms to ATF for evaluation of the firearm's classification under Federal law.[13]

The statutory definitions of "firearm" under the GCA and the NFA are different.[14] The definition of "firearm" under the GCA is broad and encompasses almost all weapons defined as a "firearm" under the NFA

---

[10] NFA provisions still refer to the "Secretary of the Treasury." *See generally* 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this rule refers to the Attorney General throughout.

[11] *See also* section IV.B.1.a, *infra.*

[12] DOJ, Delegation of Authorities Within the Bureau of Alcohol, Tobacco, Firearms and Explosives, Delegation Order 1100.168C (Nov. 5, 2018).

[13] The only exception is in cases of a conditional import under an exception to the general importation restrictions under the GCA and NFA. *See* 18 U.S.C. 922(l); 26 U.S.C. 5844; 27 CFR 478.116; 479.113.

[14] 18 U.S.C. 921(a)(3) (GCA definition of firearm); 26 U.S.C. 5845(a) (NFA definition of firearm).

because they may expel a projectile by the action of an explosive. However, when Congress passed the NFA in 1934, it chose to regulate certain "gangster-type weapons" more stringently than other firearms because they were viewed as especially dangerous and unusual.[15] Congress chose to define such weapons as "firearms"; hence, the NFA's definition of "firearm" is narrower than the GCA's definition of "firearm" in that it captures only particular types of weapons, for example, machineguns, short-barreled rifles, and short-barreled shotguns.

A "firearm" under the NFA is subject not only to general GCA requirements but is further subject to making and transfer taxes and must be registered with ATF in the NFRTR. *See* 26 U.S.C. 5811–5812, 5821–5822, 5841, 5845. In addition to the NFA requirements, the GCA also imposes specific restrictions on the transportation, sale, and delivery of "short-barreled rifle[s]" and "short-barreled shotgun[s]." 18 U.S.C. 922(a)(4), (b)(4). These violations under the GCA are punishable by up to five years in prison and a fine of up to $250,000. *See* 18 U.S.C. 924(a)(1), 3571. Violations of the NFA are punishable by up to 10 years in prison and a fine of up to $10,000. 26 U.S.C. 5871.

Although it is not mandatory, many FFLs voluntarily submit classification requests to ATF because FATD's classification of a particular firearm allows industry members to plan, develop, and distribute products in compliance with the law. This can reduce their risk of incurring criminal or civil penalties, or the potential for costly corrective actions, including a possible

recall by the manufacturer. Classifications provide the submitter a written determination by ATF of how the laws and regulations apply to their specific firearm.

When FATD evaluates a submitted firearm sample, it examines the overall configuration, physical characteristics, other objective design features that are relevant under the statutory definitions of the NFA and GCA, and any other information that directly affects the classification of a particular firearm configuration as presented with that sample.[16] The numerous configurations, materials, and designs of modern firearms require thorough examination and consideration to ensure an accurate classification. Even though firearms may have a similar appearance (*e.g.,* shape, size, etc.), an ATF classification of a voluntarily submitted sample pertains only to the particular sample as originally configured when submitted because of the vast number of variations that are possible in respective submissions. *See* 27 CFR 478.92(c), 479.102(c). Any change in design, materials, or other features may affect a firearm's classification or have different implications under the GCA or NFA. In addition, a manufacturer's or maker's stated intent regarding a particular submission, while considered by ATF in its evaluation of a weapon, is not dispositive if the objective design features do not support that stated intent.[17]

## B. "Stabilizing Brace" Device-Related Classifications

Since 2012, ATF has analyzed how numerous "brace" devices affect a weapon's classification under the NFA and has also classified numerous firearms equipped with a "stabilizing brace" for industry, the public, and in criminal cases. Results of the classifications were mixed, but ATF classified the majority of these submissions as NFA firearms. On November 8, 2012, an FFL submitted the first firearm "stabilizing brace" to ATF asking if the addition of their prototype device to a heavy pistol, such as an AR-type pistol, would change that type of pistol's classification under Federal firearms laws.[18] The submitter described the "brace" device as designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, as these weapons can be "difficult to control with the one [-] handed precision stance." The requester included the prototype pictures below.

BILLING CODE 4410–FY–P

---

[15] Congress chose to regulate these firearms by taxing them. Therefore, the NFA is part of the Internal Revenue Code. Courts have recognized that NFA firearms are dangerous and unusual, and that possession of unregistered firearms poses a danger to the community. For a description of the relevant case law, see *infra* section IV.A.2.

[16] For instance, ATF regulations explain with respect to classifications of frames or receivers that "the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 27 CFR 478.12(c).

[17] *See Sig Sauer, Inc.* v. *Brandon,* 826 F.3d 598, 601 (1st Cir. 2016) (noting that, in the firearms classification context, it is appropriate for ATF to consider "a part's design features . . . as part of the

inquiry into" the intended use of that part). The court noted that "[s]uch an objective approach to ferreting out a party's intent is a very familiar one in the law. *See, e.g., United States* v. *Siciliano,* 578 F.3d 61, 77 (1st Cir. 2009) (noting that objective evidence is useful to 'buttress or rebut direct testimony as to intent'); *cf. Washington* v. *Davis,* 426 U.S. 229, 253, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) (Stevens, J., concurring) ('Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.'); *United States* v. *Gaw,* 817 F.3d 1 (1st Cir. 2016) ('[T]he law is long since settled that the prosecution may prove its case without direct evidence of a defendant's guilty knowledge so long as the array of circumstantial evidence possesses sufficient persuasive power.' (quoting *United States* v. *O'Brien,* 14 F.3d 703, 706 (1st Cir. 1994)))." *Id.* at 601–02.

[18] Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012).







**2012 submission of original "stabilizing brace" attached to an AR-type pistol**

Based on the information provided, ATF's FATD (then the Firearms Technology Branch) inspected the "brace" device and found that the particular sample was not "designed or intended to fire a weapon from the shoulder." [19] FATD also concluded that, because the submitted "stabilizing brace," when attached to a firearm, did not convert that weapon to be fired from the shoulder, the attachment of the submitted "stabilizing brace" would not alter the classification of a pistol or other firearm. [20] This conclusion indicated that an AR-type pistol with the attached "stabilizing brace" would not be subject to the provisions of the NFA. Later, Sig Sauer marketed a firearm equipped with a variation of the original "stabilizing brace" device, the SB15, which is pictured below. [21] The SB15 "brace" device is a product of the original brace manufacturer that was modified from the original "stabilizing brace" submitted to ATF for classification, discussed above. [22]

[19] Letter from ATF #2013–0172 (Nov. 26, 2012).

[20] The FATD classification used the term "convert." This is consistent with the legal inquiry of whether a firearm is "redesigned" to be fired from the shoulder. *See* 18 U.S.C. 921(a)(7); 26 U.S.C. 5845(c).

[21] These firearms with an attached SB15 "stabilizing brace were manufactured and sold by Sig Sauer. *See* Sig Sauer, *Pistols* (July 1, 2014), *https://web.archive.org/web/20140701212719/ http://sigsauer.com/CatalogProductDetails/pm400-11-fde-psb.aspx.*

[22] SB Tactical, *Pistol Stabilizing Brace* (Sept. 28, 2014), *https://web.archive.org/web/2014092 8204628/http://www.sb-tactical.com/.*



**SB15 "Brace" Device on AR-15 Style Firearm**

BILLING CODE 4410–FY–C

After this initial classification, ATF received additional inquiries specifically on whether the use of a "stabilizing brace" as a shoulder stock redesigns the firearm to be a short-barreled rifle under the NFA and GCA. In March 2014, ATF responded to an inquiry from an unlicensed person who asked if firing an AR-type pistol from the shoulder would cause the pistol to be reclassified as a short-barreled rifle subject to NFA controls.[23] In its response, FATD noted that it classifies firearms based on the "physical design characteristics," and that, while functionality indicates the intended design, it is not the sole criterion for determining the classification of a weapon.[24] FATD advised that it does not classify weapons based on how a particular individual uses a weapon and that merely firing an AR-type pistol from the shoulder did not reclassify it as a short-barreled rifle.[25] FATD further mentioned that some "brace" designs, such as the Sig Stability Brace, had not been classified as a shoulder stock and that, therefore, using those "braces" improperly would not constitute a design change or change the classification of the weapon.[26]

Also in 2014, an individual asked ATF to examine the SB15 "stabilizing brace" on a firearm commonly known as a "pistol grip firearm" with a smooth bore to verify that the firearm is not regulated under the NFA. On October 28, 2014, ATF concluded: (1) that a forward grip (an additional handgrip toward the front of the firearm in addition to the pistol grip) attached to a pistol redesigns the firearm to be fired with two hands and therefore the firearm is no longer a "handgun" or "pistol," and (2) that it would be classified as "any other weapon" pursuant to 26 U.S.C. 5845(e) under the NFA if its overall length is less than 26 inches or if it is actually concealed on the person.[27] The overall length of the submitted firearm was 27–1/4 inches and therefore ATF determined that, as submitted, the firearm was subject to regulation under the GCA but was not an NFA firearm, "provided the SigTac SB15 pistol stabilizing brace is used as originally designed and NOT used as a shoulder stock."[28] In essence, ATF's original analysis focused on whether the inclusion of the forward grip subjected the firearm to the NFA, but ATF did not consider how the classification would be affected if a "pistol grip firearm" without a forward grip were to incorporate a "stabilizing brace." Nevertheless, the addition of a "stabilizing brace" to these types of firearms does not assist with one-handed firing but rather redesigns the firearm by providing surface area for firing from the shoulder. Therefore, these types of firearms would fall within the purview of the NFA as short-barreled shotguns. 26 U.S.C. 5845(d). Because these types of firearms were never designed to be fired from one hand, this rule, as described in the NPRM, does not apply to firearms commonly referred to as pistol grip shotguns.[29] 86 FR at 30828–29. The 2014 classification described above and any classification that provides that a pistol grip shotgun is not an NFA firearm is no longer valid or authoritative as of January 31, 2023, and the firearm should be resubmitted to FATD for evaluation.

---

[23] Letter from ATF #301737 (Mar. 5, 2014).

[24] *Id.*

[25] *Id.*

[26] This and other ATF classification letters before 2018 referred to whether a "brace" had been classified as a shoulder stock. However, the proper inquiry as to whether a weapon is a "rifle" under the NFA and the GCA is not whether a particular component or accessory of the weapon is a stock, but whether the firearm, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. 5845(c). As this rule explains, ATF later corrected the standard it was applying by considering whether firearms configured with a "stabilizing brace" were intended to be fired from the shoulder. The focus on classifying an item as a "stock" was one of the issues that led to inconsistencies in ATF's classification of these firearms.

[27] Letter from ATF #302492 (Oct. 28, 2014).

[28] *Id.* (underlining omitted, capitalization in the original).

[29] FATD experts state that a "pistol grip shotgun" typically refers to a weapon with the following attributes: (1) overall length of over 26 inches; (2) 12-gauge, smooth-bore barrel under 18 inches; (3) utilizes a shotgun-type receiver that has never had a shoulder stock attached; and (4) fitted with a "bird's head" grip in lieu of a shoulder stock.



**2014 submission of pistol grip firearm equipped with a "stabilizing brace" and forward grip**

After the SB15 classification, ATF received newly designed "stabilizing brace" devices from other companies. One company in 2014 submitted a "Pistol Overmold Kit" with a "foam padded stabilizer tube" intended to accommodate a Glock-type pistol and requested a classification of the firearm to determine if it would be regulated under the NFA. The company likened its product to installing a receiver extension/buffer tube on an AR type pistol, a configuration that FATD had earlier decided was not a shoulder stock when installed on that type of firearm and did not result in a change of that pistol's classification. However, FATD concluded that the "foam padded stabilizer tube" served "no legitimate, functional purpose other than to extend additional contact surface rearward" on Glock-type pistols and therefore would result in the manufacture of a "short-barreled rifle." [30]



**2014 submission of Glock-type pistol with "foam padded stabilizer tube"**

In addition, FATD examined a "Pistol Overmold Kit" with an "adjustable stabilizer" also intended to incorporate a Glock-type pistol. FATD similarly concluded the "brace" device served no purpose but to extend the rearward surface of the firearm and that the "brace" device is not required for the cycle of operations (*i.e.,* to expel a projectile by the action of an explosive) of Glock-type pistols.[31] FATD therefore concluded the installation of the "adjustable stabilizer" would result in the manufacture of a short-barreled rifle regulated under the NFA.[32]

---

[30] Letter from ATF #302375 (Nov. 10, 2014).

[31] Letter from ATF #302531 (Nov. 13, 2014).

[32] *Id.*



**2014 submission of Glock-type pistol with "adjustable stabilizer"**

ATF continued to receive new designs of "stabilizing braces" from additional manufacturers. In September 2014, an FFL submitted a "Blade AR pistol stabilizer" device that incorporated a flexible stabilizing "fin" to rest against the inside of the shooter's forearm when in the firing position. According to the FFL, the "Blade AR pistol stabilizer" "stabilizes the firearm in the horizontal plane," and "[t]he friction created between the user's forearm and the fin then stabilizes the firearm in the vertical plane." [33] They further stated that "a user . . . can wrap a standard sling around the Blade AR and their forearm with the thumb of their firing hand to further stabilize their firearm in both the horizontal and vertical planes," as shown below. [34]

BILLING CODE 4410–FY–P



**"Blade AR Pistol Stabilizer" on AR-15**



**"Blade AR Pistol Stabilizer Accessory"** [35]

---

[33] Letter from ATF #302672 (Dec. 15, 2014).

[34] *Id.*

[35] As used in this rule, the term "accessory" is intended as a general term to describe the marketing of items commonly known as "stabilizing braces." Furthermore, use of that term in this rule does not affect any determinations whether such items are "defense articles" under the Arms Export Control Act ("AECA"). Please direct all inquiries as to possible liability for the firearms and ammunition excise tax, 26 U.S.C. 4181–4182, to the Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau.

Like other submitters, the FFL asked if the addition of this device would convert a firearm in a manner that would cause it to be classified as a ''rifle'' and thus a ''firearm'' regulated under the NFA. In response, ATF stated ''the submitted forearm brace, when attached to a pistol . . . is not a 'firearm' as defined by the NFA provided the Blade AR Pistol Stabilizer is used as originally designed [*i.e.,* for additional stabilizing support for single-handed firing] and NOT used as a shoulder stock.''[36]

Due to inconsistent advice regarding how the use of a ''stabilizing brace'' device affected a classification, and because FATD continued to receive questions regarding whether a ''brace'' device could be used from the shoulder, ATF issued a 2015 Open Letter to the public regarding the classifications of firearms equipped with these ''brace'' devices under the NFA.[37] The 2015 Open Letter advised that ''stabilizing braces'' designed to assist shooters with single-handed firing were not considered a shoulder stock and could be attached to a handgun without making an NFA firearm. The 2015 Open Letter also provided that a person who ''intends to use a handgun stabilizing brace as a shoulder stock on a pistol . . . having a rifled barrel under 16 inches'' is making a firearm subject to the NFA. The 2015 Open Letter further stated that ''any person who *redesigns* a stabilizing brace for use as a shoulder stock makes a[n] NFA firearm when attached to a pistol with a rifled barrel under 16 inches in length or handgun with a smooth bore under 18 inches in length.''[38]

In 2015, an attorney representing the original developer of the ''stabilizing brace'' asked for a determination on whether the attachment of a retractable stabilizing brace to a handgun with a barrel under 16 inches constituted a firearm under the NFA. The requester provided the diagram below as part of the determination request.



**2015 diagrams submitted of a "retractable pistol stabilizing brace" on a handgun**

On November 30, 2015, FATD responded by noting that prior devices ''were not configurable to a position or setting in which the device more closely resembled a buttstock or shoulder stock in form and function.'' FATD noted that this modified version was not similar to those prior other devices in which ATF found that the device did not convert the handgun to an NFA weapon.[39] FATD stated that ''modifying the length of that part [of a 'stabilizing brace'] serves to extend a contact surface rearward of the pistol grip,'' which is ''a feature commonly associated with butt stocks/shoulder stocks'' and shoulder-fired weapons. FATD advised that the ''Retractable Pistol Stabilizing Brace'' would likely be classified as a ''device similar in form and function to a buttstock when installed on a firearm[,] thus reconfiguring the firearm'' into a short-barreled rifle under the NFA. FATD further advised that the requester would need to submit a physical sample in order for ATF to issue a formal classification.[40]

In 2015, the submitter of the original ''stabilizing brace'' device requested an evaluation of the physical device installed on a SIG MPX firearm that could be adjusted forward to accommodate smaller shooters for a more comfortable fit on the shooter's forearm.

---

[36] Letter from ATF #302672 (Dec. 15, 2014) (emphasis omitted).

[37] *See* 2015 Open Letter, *supra* note 9.
[38] *Id.* (emphasis in the original).

[39] Letter from ATF #303984 (Nov. 30, 2015).
[40] *Id.*



**2015 submission of "adjustable stabilizing brace"**

In its evaluation, FATD noted that the raised ridges on the rear of the submitted sample "serve no functional purpose in the design of a pistol brace; however, the ridges [on the back] do provide a non-slip, gripping surface, a feature commonly associated with buttstocks/shoulder stocks as well as firearms designed and intended to be fired from the shoulder." [41]



**Ridges on rear of the "adjustable stabilizing brace"**

FATD determined that this would not be a "short-barreled rifle," provided the "brace" device is used as originally designed, not used as a shoulder stock, and the raised ridges are removed from the rear of the device. FATD's classification relied on the manufacturer's continued representation that the design of the "brace" was to assist disabled shooters when firing heavy pistols with one-hand—indeed, the stated intent was "[c]entral" to ATF's conclusion.[42]

On January 21, 2016, FATD classified a Smith and Wesson M&P pistol equipped with a "universal pistol brace," which was marketed so that shooters can use the "brace" either above or below the forearm for support and recoil mitigation.[43]



**2016 submission of the "universal pistol brace" on a Smith and Wesson M&P pistol**

[41] Letter from ATF #304296 (Dec. 22, 2015).   [42] Id.   [43] Letter from ATF #303907 (Jan. 21, 2016).

FATD found the "universal pistol brace" device useful to reduce recoil of the host weapon (a Smith and Wesson M&P pistol) when the shooter places the foam piece of the brace on top of the shooter's forearm.[44] However, FATD determined that the device, when assembled in an alternate configuration, incorporated buttstock design features, and that a firearm with the "brace" device installed in the alternate configuration depicted above had a length of pull of 14-1/16 inches. This letter defined length of pull as the "measurement found on shoulder[-]fired weapons, generally measured from the center of the trigger to the center of the buttplate/buttstock."[45] FATD reasoned that the length of pull of shoulder-fired weapons is approximately 13-1/2 to 14-1/2 inches. After finding that this configuration resulted in an overall length of approximately 18-1/2 inches and a barrel length of approximately 4-1/4 inches, FATD classified this firearm as a short-barreled rifle under the NFA.

The manufacturer subsequently redesigned the "universal pistol brace" device and resubmitted it to ATF. The second submission of the device in the alternate configuration now incorporated a length of pull of 12-1/8 inches, as depicted below. This evaluation also found that the foam portion of the "forearm brace" did not provide a surface area found on a shoulder stock assembly when attached to a pistol. FATD concluded that the device, when attached to a pistol-type firearm, did not design or redesign the host weapon to be fired from the shoulder.[46]



**2016 resubmission of "universal pistol brace" in an alternate configuration**

In 2016, another "brace" design reviewed by FATD was one that incorporated a folding clamp intended to provide support to the firing hand and designed to be attached to an AR-type buffer tube or similar receiver extension. This type of device is referred to as a counterbalance type "stabilizing brace" as discussed in section IV.B.3.b.viii of this preamble.

---

[44] Id.

[45] Id.

[46] Letter from ATF #304484 (June 7, 2016).



**Rear of the Folding Counterbalance Type Device**



**Folding Counterbalance Type Device Assembled on an AR-Type Firearm**

FATD found that this device, when assembled on an AR-type firearm, allows the shooter to extend the clamp so it is under the shooter's forearm while gripping the pistol grip for additional support. This "stabilizing brace" device did not design or redesign the firearm to be fired from the shoulder, and thus was not a "short-barreled rifle" under the NFA and GCA. But ATF noted that, if the firearm is fired from the shoulder, then the shooter designs or redesigns the firearm to be a rifle.[47] Subsequently, the same company on January 30, 2017, regarding length of pull. Specifically, FATD defined "length of pull" as "a measurement found on shoulder-fired weapons, generally measured from the center of the trigger to the center of the buttplate/buttstock." FATD added a retractability feature to the "stabilizing brace" that allowed it to extend toward the shooter.[48] On January 18, 2017, FATD determined that a pistol equipped with the adjustable feature would still not be subject to NFA controls.[49]

---

[47] Letter from ATF #304679 (Oct. 3, 2016).

[48] Although ATF had opined earlier that retractability was a feature commonly associated with shoulder stocks, *see* Letter from ATF #303984 (Nov. 30, 2015), ATF subsequently opined that a "stabilizing brace" could be adjustable, *see* Letter from ATF #304296 (Dec. 22, 2015).

[49] Letter from ATF # 304511 (Jan. 18, 2017). ATF also issued a clarifying letter to the same company on January 30, 2017, regarding length of pull. Specifically, FATD defined "length of pull" as "a measurement found on shoulder-fired weapons, generally measured from the center of the trigger to the center of the buttplate/buttstock." FATD research determined the average length of pull for a shoulder-fired weapon is approximately 13-½–14-½ inches and the installation of a stabilizing brace to a pistol resulting in a similar length of pull would be characteristic of a shoulder-fired weapon. Letter from ATF #304679A (Jan. 30, 2017).



**Counterbalance Type "Stabilizing Brace" on an AR-15 Type Receiver Collapsed**



**Counterbalance Type "Stabilizing Brace" on an AR-15 Type Receiver Extended**

BILLING CODE 4110–FY–C

As discussed above in this preamble, ATF stated in prior letters and in the 2015 Open Letter that using a "stabilizing brace" device as a shoulder stock would redesign a pistol with a barrel less than 16 inches to a short-barreled rifle subject to the provisions of the NFA. On January 5, 2017, counsel to SB Tactical, LLC, submitted to ATF a request to reverse the 2015 Open Letter, arguing that determinations based on the use of a "stabilizing brace" device

created ambiguity because the way the item is used does not alter the design. On March 21, 2017, ATF responded by letter that: "Although we stand by those conclusions [of the 2015 Open Letter], we agree the Open Letter may have generated some confusion concerning the analytical framework by which those conclusions were reached." [50]

ATF affirmatively concluded that incidental shouldering does not constitute a redesign of the firearm to be fired from the shoulder. The 2017 response letter also clarified:

---

[50] *See* Letter for Mark Barnes, Outside Counsel to SB Tactical, LLC, from Marvin G. Richardson, Assistant Director, Enforcement Programs and Services, ATF 90000:GM, 5000, *Re: Reversal of ATF Open Letter on the Redesign of Stabilizing Braces* (Mar. 21, 2017) (italics omitted) (made widely available to the public on various websites, for example, *https://vpc.org/wp-content/uploads/2019/08/Pistol-brace-ATF-letter-March-21-2017.pdf* and *https://www.thefirearmblog.com/blog/2017/04/24/breaking-news-update-atf-reversal-letter-sb-tactical/*).

[When] the shooter/possessor takes affirmative steps to configure the device for use as a shoulder-stock—for example, configuring the brace so as to permanently affix it to the end of a buffer tube, (thereby creating a length that has no other purpose than to facilitate its use as a stock), removing the arm-strap, or otherwise undermining its ability to be used as a brace—and then in fact shoots the firearm from the shoulder using the accessory as a shoulder stock, that person has objectively "redesigned" the firearm for purposes of the NFA. This conclusion is not based upon the mere fact that the firearm was fired from the shoulder at some point. Therefore, an NFA firearm has not necessarily been made when the device is not re-configured for use as a shoulder-stock—even if the attached firearm happens to be fired from the shoulder.[51]

After this letter, ATF reviewed the "Blade Pistol Stabilizer 2.0," a new device redesigned after the first "Blade Pistol Stabilizer." This new model included one attachment point for a strap or sling (as opposed to the first version's three attachment points) and a metal carbine buffer tube adjustment lever that enabled the operator to move the blade into four positions along the buffer tube. FATD reviewed both the initial Blade stabilizer and the Blade Pistol Stabilizer 2.0 without the sling or strap. For this submission, FATD examined the "length of pull" of the firearm and determined the maximum length of pull on an AR-type receiver with the "Blade Pistol Stabilizer 2.0" attached is 13-3/16 inches, which was just below the average length of pull for shoulder-fired weapons of 13-1/2 to 14-

1/2 inches. In a letter dated October 31, 2017, FATD concluded that the attachment of the "blade pistol stabilizer" to an AR-type firearm alone does not make an NFA weapon.[52] The letter noted that this classification letter applied only to the "Blade Pistol Stabilizer 2.0," as submitted, and that any alternations to the device's design could change this classification.[53]

By July 2018, FATD observed that SB Tactical had been marketing many of its "braces" as "ATF compliant" with the following blanket statement: "The Bureau of Alcohol, Tobacco, Firearms and Explosives has stated that the SB Tactical™ Pistol Stabilizing Brace is 'legal to own, legal to purchase and legal to install on a pistol.' BATFE has consistently stated that a pistol with a Pistol Stabilizing Brace attached remains a pistol under the Gun Control Act when used as designed."[54]

On July 18, 2018, FATD notified SB Tactical that it had only evaluated 2 out of approximately 20 of their manufactured "stabilizing brace" models and concluded that only 2 submitted samples had not been "designed or intended to be used as shouldering devices" such that attachment to a pistol did not convert that firearm to a short-barreled rifle. FATD also noted that any change in the submitted design could change its classification. Many of the other models sold by SB Tactical, which FATD had not evaluated, had been advertised as being based on shoulder stock designs.

ATF's letter specifically stated that "FTISB does not approve 'stabilizing braces' which are similar or based off shoulder stock designs."[55] The letter requested the manufacturer to cease false advertisement of products as "ATF approved," as a majority of them had not been evaluated by ATF, much less "approved."[56]

Moreover, toward the end of 2018, ATF recognized and informed requestors of classifications that, to effectively evaluate how an accessory affects the classification of a firearm under Federal law, FATD needed to examine the overall configuration of a firearm with the accessory (including purported "stabilizing brace") installed. ATF informed requestors that, except in cases of conditional import determinations, it would not issue a determination on an accessory alone unless it was attached to the submitted firearm.[57]

On March 3, 2020, FATD examined two firearms, each equipped with a different "stabilizing brace" model (SBL Mini and SBA3), for one requestor.[58] The first firearm equipped with an SBL Mini "brace" device was determined to be a pistol based on all the objective design features, including the design of the attached brace that wrapped almost completely around the shooter's forearm, the rear surface area of the device, and the firearm's shorter length of pull when compared against typical AR-type shoulder-fired weapons.[59]



**2020 submission of firearm with SBL Mini attached**

---

[51] *Id.*

[52] Letter from ATF #307364 (Oct. 31, 2017).

[53] *Id.*

[54] SB Tactical, *Pistol Stabilizing Braces* (Dec. 30, 2018), *https://web.archive.org/web/201812 30110445/https://www.sb-tactical.com/product-category/brace/.*

[55] Letter from ATF #308999 (July 18, 2018) (emphasis omitted).

[56] *Id.*

[57] *See, e.g.,* Letter from ATF #304547 (Dec. 17, 2018); Letter from ATF #304678 (Dec. 17, 2018); Letter from ATF #307644 (Dec. 17, 2018); Letter from ATF #308208 (Dec. 17, 2018); Letter from ATF #309044 (Dec. 17, 2018); Letter from ATF #309140

(Dec. 17, 2018); Letter from ATF #309515 (Dec. 17, 2018); Letter from ATF #309583 (Dec. 17, 2018); Letter from ATF #309742 (Dec. 17, 2018); Letter from ATF #309751 (Dec. 17, 2018); Letter from ATF #308318 (Dec. 17, 2018); Letter from ATF #309516 (Jan. 31, 2019); Letter from ATF #309807 (Feb. 1, 2019); Letter from ATF #304747 (Feb. 12, 2019); Letter from ATF #309861 (Feb. 12, 2019).

[58] Letter from ATF #311123 (Mar. 3, 2020); Letter from ATF #311127 (Mar. 3, 2020).

[59] Letter from ATF #311123 (Mar. 3, 2020). Both classifications provided:

This letter is not a final classification letter and does not constitute final agency action. However, it represents our current analysis based on the information we have, and we offer this letter for

your review in advance of issuing a final classification letter. If you have additional information you want to submit to ATF before it issues its final classification, you may send the information in writing within 10 days from the date of this letter. You may also, within the 10 day period, request an in-person meeting to present this additional information provided the meeting takes place within 10 days of the request. Please submit written comments or a request for an in-person meeting via email to *fire_tech@atf.gov.* If additional information is received, it will be included in the analysis when the final classification is sent to you.

Letter from ATF #311123 (Mar. 3, 2020); Letter from ATF #311127 (Mar. 3, 2020).

The second firearm equipped with an SBA3 "brace" device was determined to be a short-barreled rifle. FATD reviewed all the objective design features of the submitted firearm, including the similarity of the SBA3 to known shoulder stocks in form and function, the rear hardened surface area of the SBA3, the utilization of a standard AR-type Mil-Spec carbine receiver extension, and a "length of pull" useful for shouldering the firearm. FATD concluded that all these factors "combine to provide objective design features consistent with weapons designed and intended to be fired from the shoulder." [60]



**2020 submission of firearm with SBA3 attached**



**2020 submission of firearm with SBA3 attached in an extended position**

In June 2020, ATF classified another firearm equipped with a "proprietary Pistol Stabilizing Brace" that incorporated guide rails that are identical to the same rifle-type firearm the manufacturer sold as a short-barreled rifle (both of which are pictured below).[61] The guide rails permitted the adjustment of the "stabilizing brace" further rearward, the attached "stabilizing brace" provided a larger rear surface area compared to the traditional stock on the company's rifle-type firearm, and it had a length of pull of approximately 13-9/16 inches. Further, the Velcro straps and flaps of the "brace" design had been reduced in size from the SB15 "stabilizing brace" and were not long enough to wrap around the shooter's arm.[62] ATF's classification concluded that the objective design features of the accessory did not support the manufacturer's stated intent, but instead supported the conclusion that the accessory had been designed and intended to be used as a shouldering device and, therefore, the firearm with the "brace" device attached is designed, made, and intended to be fired from the shoulder.[63]

---

[60] Letter from ATF #311127 (Mar. 3, 2020).
[61] Letter from ATF # 314200 (June 15, 2020).
[62] *Id.*
[63] *Id.*



**Pistol with attached "stabilizing brace" (top) compared to rifle (bottom), both marketed by the same company**

On June 16, 2020, seven members of the House of Representatives wrote to DOJ and ATF leaders expressing a "deep[ ] concern[ ]" about ATF's "practice of relying on arbitrary, non-public standards to promulgate general firearms policy hidden from public scrutiny and awareness." [64] The congressional letter asked specific questions regarding the criteria ATF uses to determine whether a firearm is designed and intended to be fired from the shoulder; specific publications available for Americans to determine whether their firearms are designed and intended to be fired from the shoulder; and how many firearms equipped with stabilizing braces FATD had examined.[65]

By late 2020, ATF concluded that: (1) previous ATF classification determinations had led to confusion and there was a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a "stabilizing brace"; (2) manufacturers were adding to the confusion by labeling "stabilizing braces" that ATF had not evaluated as "ATF compliant"; and (3) as discussed in section IV.B.1.c of this preamble, these "braces" were being used with firearms extensively to create short-barreled rifles without following NFA requirements. As a

result, ATF first published a Notice in the **Federal Register** titled, "Objective Factors for Classifying Weapons with 'Stabilizing Braces'" on December 18, 2020. 85 FR 82516. However, the Department withdrew the Notice on December 31, 2020. Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of Guidance, 85 FR 86948.

### III. Notice of Proposed Rulemaking

On June 10, 2021, the Department published in the **Federal Register** an NPRM titled, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'," proposing changes to the definition of "rifle" in 27 CFR 478.11 and 479.11 to clarify when a firearm with an attached "stabilizing brace" falls under the definition of "rifle." 86 FR at 30826. The Department also proposed publishing the factors or criteria that ATF considers when it evaluates firearms equipped with a purported "stabilizing brace." The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a "rifle" or "short-barreled rifle" under the GCA and a "rifle" or "firearm," *i.e.,* a short-barreled rifle, subject to regulation under the NFA. The NPRM included the factors on a new, proposed worksheet, "ATF Worksheet 4999," that ATF proposed to rely on when making firearms classifications. That worksheet proposed assigning points to various criteria as an indicator of whether the "brace" device is suitable for shouldering and whether the firearm

overall is designed and intended to be fired from the shoulder. The comment period for the NPRM closed on September 8, 2021. *Id.* at 30826, 30828–29.

### A. Definition of "Rifle"

The Department proposed amendments to clarify the definition of "rifle" by adding at the end of the current definition a sentence stating that the "term shall include any weapon with a rifled barrel equipped with an accessory or component purported to assist the shooter stabilize the weapon while shooting with one hand, commonly referred to as a 'stabilizing brace,' that has objective design features and characteristics that facilitate shoulder fire, as indicated on Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as 'Stabilizing Braces,' ATF Worksheet 4999." *Id.* at 30851.

In the NPRM, the Department briefly discussed the history of the first forearm "brace" submitted to ATF in 2012, the purpose for which the "brace" was designed as described by the developer, and the inquiry to ATF on whether the addition of that "brace" device to a pistol, such as an AR–15 type pistol, would convert or alter the firearm's classification to a "rifle," and thus potentially a "firearm" under the NFA. *Id.* at 30827. As discussed in section II.B of this preamble, ATF concluded at the time that the addition of that prototype "stabilizing brace" device did not convert that weapon to be fired from the shoulder and that the weapon with the submitted "brace" device was not

[64] Letter for William Barr, Attorney General, and Regina Lombardo, Acting Director, ATF, from Matthew Gaetz, United States Representative, *et al.* (June 16, 2020), *https://gaetz.house.gov/sites/gaetz.house.gov/files/wysiwyg_uploaded/For%20Web%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%20DOJ-ATF%20pistol%20brace%20letter%20final.pdf.*

[65] *Id.*

"designed and intended to be fired from the shoulder."

The NPRM made clear that, after the addition of an accessory or component that is marketed as a "stabilizing brace" to a pistol, the resulting braced firearm may still be classified as a pistol. Classifying a firearm based on a limited or single factor (*e.g.*, the marketing label of the manufacturer that the item is a "stabilizing brace") "has the potential to be significantly overinclusive or underinclusive."[66] The NPRM explained the importance of properly classifying firearms subject to the NFA, given that short-barreled rifles are among the firearms considered "unusual and dangerous," and that firearms with "stabilizing braces" have been used in at least two mass shootings, with the shooters in both instances reportedly using the "brace" as a shoulder stock.[67] These incidents demonstrated the deadly efficacy of attaching certain types of "braces" to pistols to create short-barreled rifles. 86 FR at 30828.

The NPRM explained that, although ATF generally does not classify unregulated components or accessories alone under the GCA and NFA,[68] there are times when the addition of a component or an accessory to a firearm can affect the firearm's classification. This is because: (1) a component's or an accessory's likely use in the general community may be relevant in assessing whether the manufacturer's or maker's purported intent with respect to the design of a firearm is consistent with the manufacturer's or maker's actual intent;[69] and (2) the design of a component or an accessory may cause a firearm to fall within a particular statutory definition when attached to the firearm.[70] A "stabilizing brace," of which there are several variations, is one such component or an accessory that may change the classification of the firearm to which it is attached. *Id.*

The Department reiterated in the NPRM that it has been ATF's longstanding and public position that a firearm does not evade classification under the NFA merely because the firearm is configured with a device marketed as a "stabilizing brace."[71] When a purported "stabilizing brace" and an attached weapon's objective design features indicate that the firearm is actually designed and intended to be fired from the shoulder, such weapon may fall within the scope of the NFA as a short-barreled rifle, thus requiring registration and payment of tax. As described in section II.B of this preamble, ATF has evaluated on a case-by-case basis several models of "stabilizing braces" and has considered whether a particular firearm configured with a "stabilizing brace" has the objective features of a firearm designed and intended to be fired from the shoulder, thus subjecting it to the requirements of the NFA and GCA. The use of a "stabilizing brace" cannot be a tool to circumvent the NFA and GCA and the prohibition on the unregistered possession of short-barreled rifles.

In the NPRM, the Department explained that the objective design features of a firearm are relevant to determining whether the NFA's requirements apply, given that the purpose of the NFA is "to regulate certain weapons likely to be used for criminal purposes." *United States* v. *Thompson/Center Arms Co.,* 504 U.S. 505, 517 (1992); *see also id.* ("It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."). This is the case even when a manufacturer characterizes or markets a firearm accessory in a manner that suggests a use that does not correspond to its objective design. The characterization of an accessory by the manufacturer, including assertions in advertising, may be relevant, but is not dispositive. ATF considers the objective design features, the manufacturer's or maker's intent as reflected in marketing materials, and other information demonstrating likely use of the firearm in the general community in deciding whether the weapon is designed and intended to be fired from the shoulder. Where ATF's evaluation of a submitted sample demonstrates that the objective design features of the firearm, as configured, do not support the manufacturer's purported intent and, in fact, suggest a different intent, then ATF may conclude that the firearm ought not be classified on the basis of the manufacturer's purported intent, thus ensuring effective enforcement of Federal law. *See Sig Sauer, Inc.* v. *Brandon,* 826 F.3d 598, 601–02 (1st Cir. 2016) (objective design features could supersede a manufacturer's "asserti[on]" about the "intended use," as a different conclusion would allow easy circumvention of the NFA); *see also* 86 FR at 30828.

The Department also explained that, with the increase in production of rifled-barrel weapons with "stabilizing braces," ATF saw an increase in the requests for classifications of this kind of firearm design. As described above, ATF issued several letters examining "brace" devices and also particular firearms equipped with "stabilizing braces" for industry and in criminal cases. In its recent determinations, FATD discussed various objective features that are considered when evaluating whether a firearm that is equipped with a "stabilizing brace" is designed and intended to be fired from the shoulder. Recognizing the criticism from various parties that ATF had not widely published a definitive approach in the application of that criteria, the NPRM proposed a worksheet listing the criteria or factors that FATD considers when evaluating firearm samples that are submitted with an attached "stabilizing brace" or similar component or accessory. The worksheet, titled "Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as 'Stabilizing Braces,' ATF Worksheet 4999," was proposed to allow individuals or members of the firearms industry to evaluate whether a weapon incorporating a "stabilizing brace" that

---

[66] *Innovator Enters., Inc.* v. *Jones,* 28 F. Supp. 3d 14, 25 (D.D.C. 2014).

[67] *See, e.g.,* Cameron Knight, *Dayton Shooter Used a Modified Gun that May have Exploited a Legal Loophole,* USA Today (published Aug. 5, 2019, updated Aug. 6, 2019), *https://www.usatoday.com/story/news/nation/2019/08/05/dayton-shooter-used-gun-may-have-exploited-legal-loophole/1927566001/* (the firearm used in a shooting killing 9 people and wounding 14 had a "pistol brace" used to "skirt[ ]" regulation of short-barrel rifles); Melissa Macaya *et al., 10 Killed in Colorado Grocery Store Shooting,* CNN (updated Mar. 23, 2021), *https://www.cnn.com/us/live-news/boulder-colorado-shooting-3-23-21/h_0c662370eefaeff05eac3ef8d5f29e94* (reporting that the firearm used in a shooting that killed 10 was an AR–15 pistol with an "arm brace").

[68] ATF does, however, make these types of classifications under the AECA, 22 U.S.C. 2778, with respect to the permanent importation of "defense articles." Additionally, ATF provides classifications of barrels or ammunition as non-sporting for importability purposes under the GCA under 18 U.S.C. 922(l) and 925(d). The origin of certain firearms parts and accessories listed under 27 CFR 478.39 may also be considered by ATF in the enforcement of 18 U.S.C. 922(l).

[69] *Cf. Posters 'N' Things* v. *United States,* 511 U.S. 513, 521–22 (1994) (Whether an item is "primarily intended" for a specified use is an objective analysis that must focus on the "likely use" of that item in the general community, rather than the subjective intent of a particular person.).

[70] The NPRM provided examples of where attachment of an accessory can affect a firearm's classification. These included: the attachment of a forward secondary grip to a "pistol" where the resulting firearm would no longer be designed to be held and fired with a single hand, *see United States* v. *Black,* 739 F.3d 931, 934–36 (6th Cir. 2014); and a wallet holster where the handgun can be fired while inserted, thus changing the classification of these handguns into an "any other weapon" under 26 U.S.C. 5845(e), *see FFL Newsletter* 5–6 (Aug. 1997), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-%E2%80%93-august-1997/download.*

[71] 86 FR at 30828 & n.13.

they intended to submit to FATD or to offer for sale would be considered a "short-barreled rifle" subject to NFA requirements. The worksheet assigned points to various criteria, as further described below.

The NPRM explained that the proposed criteria and worksheet did not apply to firearms commonly referred to as "pistol grip shotguns," as they were never designed to be held and fired using one hand (e.g., Mossberg Shockwave, Remington Tac-14).[72] See also 86 FR at 30828–29.

As discussed in section II.B of this preamble, these firearms are specifically designed to be fired with two hands. ATF has always classified these weapons as "firearms" under the GCA, and not as "shotguns," because they do not incorporate a shoulder stock and are not designed and intended to be fired from the shoulder like a shotgun. Nor has ATF classified these weapons as "pistols," as they are not designed to be held and fired in one hand like a pistol. Thus, the addition of a "stabilizing brace" does not assist with single-handed firing, but instead provides surface area that allows for firing from the shoulder. Therefore, a "pistol grip shotgun" equipped with a "stabilizing brace" and a barrel of less than 18 inches is an NFA "firearm," i.e., a short-barreled shotgun.[73]

## B. Application of Proposed ATF Worksheet 4999

Similar to the Factoring Criteria for Weapons, ATF Form 4590 ("Form 4590"), which is used for the importation of pistols and revolvers, the proposed ATF Worksheet 4999 contained a point system assigning a weighted value to various characteristics of the fully assembled firearm, as configured when submitted for classification. Under the proposed worksheet, a firearm accumulating fewer than 4 points in Section II (Accessory Characteristics), and fewer than 4 points in Section III (Configuration of Weapon), would have been generally determined not to be designed to be fired from the shoulder, unless there was evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder. A firearm accumulating 4 points or more in Section II or Section III would have indicated that not only is the "brace" device more suitable as a shoulder stock

but also that the firearm's overall configuration with the "brace" attached was designed, made, and intended to be fired from the shoulder. See 86 FR at 30828–30.

The NPRM explained why certain prerequisites (i.e., weapon weight and overall length) would be considered first to determine if the host firearm would be a suitable weapon for a "stabilizing brace." The Department believed that these prerequisites would help ATF to determine if the host firearm could be immediately identified as a rifle, as defined by the applicable statutes. Moreover, as discussed, "stabilizing braces" were originally marketed as intended to assist persons with disabilities and others lacking sufficient grip strength to control heavy pistols. ATF had found the attachment of a "stabilizing brace" to a standard pistol that is light enough to hold with no additional assistance to be impractical and hence also to be a likely preliminary indicator that the attachment changes the firearm into a firearm designed and intended to be fired from the shoulder. Similarly, the attachment of a "stabilizing brace" to a firearm that is so heavy or difficult to control that the firearm cannot feasibly be held with one hand would also indicate the firearm is a rifle. For these types of heavy pistols, ATF reasoned that the purported "stabilizing brace" would have no design function other than to facilitate the firing of the weapon from the shoulder. Id. at 30829.

The proposed Worksheet 4999 assigned point values for the objective design characteristics or features that are common to rifles, features associated with shoulder stocks, and features limiting the ability to use the "stabilizing brace" as an actual "brace." These point values ranged from 0 to 4 points based upon the degree of the indicator, explained as follows:

- *1 point:* Minor Indicator (the weapon could be fired from the shoulder)
- *2 points:* Moderate Indicator (the weapon may be designed and intended to be fired from the shoulder)
- *3 points:* Strong Indicator (the weapon is likely designed and intended to be fired from the shoulder)
- *4 points:* Decisive Indicator (the weapon is designed and intended to be fired from the shoulder)

The point values associated with particular features or designs were based upon their relative importance in classifying the firearm under Federal law. Therefore, more points were assigned to design features that more strongly indicated the manufacturer or

maker's intent was to produce a shoulder-fired weapon.

The various factors on the Worksheet 4999 fell into two categories—Accessory Characteristics and Configuration of the Weapon. The NPRM explained the criteria that would be considered and why they were important in making classifications of firearms with attached "stabilizing braces." Id. at 30831–34. As stated above, if the total point value of the firearm submitted was equal to or greater than 4—in either Section II (Accessory Characteristics) or III (Configuration of a Weapon)—then the firearm, with the attached "stabilizing brace," would be determined to be "designed or redesigned, made or remade, and intended to be fired from the shoulder," or a "rifle" under the GCA and NFA. And, if the attached barrel was also less than 16 inches, the firearm would be classified as a "short-barreled rifle" under the GCA and come under the NFA definition of "firearm."

Section IV of the NPRM provided examples of how the factoring criteria in Worksheet 4999 would be implemented with respect to three weapons with common "stabilizing braces" attached. Id. at 30834–43. Under these examples, the NPRM showed that, in applying the factors of the weapons: (1) an AR-Type Firearm with SB-Mini Accessory would be classified as a pistol with an attached "stabilizing brace" because it garnered three points in each of Section II and III; (2) an AR-Type Firearm with SBA3 Accessory would be classified as a "short-barreled rifle" subject to the NFA because it garnered eight points in Section II and five points in Section III; and (3) an AR-Type Firearm with Shockwave Blade Accessory as configured would also be classified as a short-barreled rifle subject to the NFA because it garnered five points in Section II and 14 points in Section III.

In the NPRM, the Department also noted that ATF issued classifications to some makers or manufacturers without having had the benefit of evaluating the "brace" when attached to a firearm. The NPRM encouraged any maker or manufacturer who received a classification prior to the effective date of the final rule to resubmit the weapon with the attached "stabilizing brace" to ensure that the classification is consistent with the rule and to avoid any possible criminal or tax penalties for the continued manufacture, transfer, or possession of a NFA firearm. 86 FR at 30829.

As described above, FATD's classifications allow industry members to plan and develop products that comply with the law, thereby reducing their risk of incurring criminal or civil

---

[72] See section II.B of this preamble for discussion on "pistol grip shotgun" classification letter.

[73] As mentioned above, any classification that provides that a "pistol grip shotgun" is not an NFA firearm is no longer valid or authoritative and should be resubmitted to FATD for evaluation.

penalties or the need for corrective actions, including a recall by the manufacturer. The Department recognized that the proposed clarification of the relevant statutory terms in the NFA and GCA with respect to weapons with an attached "stabilizing brace" device might have practical effects on industry members and members of the public, as they might make or manufacture, or already own, firearms with a "stabilizing brace" attached. To assist affected persons and industry members, section V of the NPRM provided additional information in the preamble to aid them in complying with Federal laws and regulations. *Id.* at 30843–44.

## IV. Analysis of Comments and Department Responses

In response to the NPRM, ATF received over 237,000 comments. Submissions came from individuals, lawyers, government officials, and various interest groups. Of the comments reviewed, nearly 20,000 comments expressed support for the proposed rule, of which just under 18,000 were submitted by individuals as form letters, *i.e.,* identical text that is often supplied by organizations or found online and recommended to be submitted to the agency as a comment. There were over 217,000 comments opposed to aspects of the rule. Approximately 96,000 comments were submitted as form letters and, of these, just over 25,000 were submitted using the National Association for Gun Rights ("NAGR") form letter. The commenters' grounds for support and opposition, along with specific concerns and suggestions, are discussed below.

### A. Comments Received in Support

Many commenters generally supported the rule. These commenters explained that while "stabilizing braces" were originally developed to assist those with physical disabilities shoot a firearm, pistol braces are frequently used to effectively turn firearms into short-barreled rifles, making the firearms subject to registration requirements under the NFA.

Numerous commenters argued that the adoption of this rule would promote public safety. Other commenters indicated that they favored greater regulation of firearms in general. One commenter, a retired military servicemember with familiarity with firearms, stated that if the weapon does not fit in a holster at the waist or shoulder, or can be hidden in a pocket, then it is not a handgun. Another commenter similarly agreed and said "I

love the 2A! Love my guns! Never give them up! That being said, if you put it to your shoulder it's a rifle!"

Below, the Department sets forth and responds to the specific issues raised in comments that generally supported the NPRM.

### 1. Closes a Loophole and Prevents Circumventing the Law

#### Comments Received

Numerous commenters stressed that this rule would help close the "Arm Brace Loophole," pointing out that while "braces" may be useful in certain instances, problems arise when they are made to function as a buttstock. For instance, commenters agreed with ATF that there are individuals who are trying to circumvent the law by calling a collapsible stock a "brace" when in reality the "braces" are being used as buttstocks. Commenters stated that these types of firearms are an "attempt by many to create a short-barreled rifle under the guise of assisting shooters with disabilities." Another commenter stated that he has never understood selling "pistols" with attached "stabilizing braces" because "it was just a way to skirt the legislation already in place for short-barreled rifles." One commenter, who identified as a former gunsmith and licensee with experience in the firearms industry for over 15 years, stated that he has "never seen anyone utilize a brace in the manner that it was originally designed." The commenter also stated that he has "often found that the vast majority of 'brace' designs cannot be actually used as intended." The commenter pointed out several types of weapons with braces, such as the CZ Evo Scorpion pistol, which are "clearly [weapons] designed to be fired from the shoulder." The commenter strongly urged that all these weapons should be reclassified as NFA weapons, which is how he believes they should have been initially designated.

Numerous commenters opined that firearms companies are simply trying to circumvent the law through the use of "braces." One commenter stated that "while arm braces have enabled disabled shooters to operate large-format pistols with one hand, the gun industry has sidestepped this intended use to market pistols equipped with arm braces as an alternative to 'short-barreled rifles.'" Another commenter, a long-time shooting enthusiast, similarly opined that "[t]his whole thing has been a marketing tool to sell firearms to people that do not have enough knowledge to make informed purchasing decision."

Some commenters stated that this rule is long overdue. The commenters believed it is not hard for individuals to complete the NFA paperwork to register their short-barreled rifles and that it is not a significant cost on gun owners. One commenter indicated that gun owners who spend $1500 on an AR pistol should be able to afford the $200 tax to register it.

#### Department Response

The Department acknowledges the commenters' support of the proposed rule. The definitions of "rifle" under the GCA and NFA include a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder. 18 U.S.C. 921(a)(7), 26 U.S.C. 5845(c). The GCA and NFA do not ban or regulate "stabilizing brace" devices that are not attached to a firearm, and this rule does not have that effect, nor does it ban weapons equipped with a purported "stabilizing brace." The Department agrees that while some "stabilizing brace" devices may assist an individual with disabilities, or limited mobility or strength, in stabilizing a large and heavy pistol, many purported "stabilizing braces," when attached to a weapon, result in a firearm with objective design features indicating the "braced" weapon is designed, made, and intended to be fired from the shoulder. Accordingly, they may appropriately be classified as a rifle and possibly a short-barreled rifle, depending on barrel length. As a result, the Department agrees with the commenters above that a weapon attached with a purported "stabilizing brace" may fall within the purview of the NFA and, if so, must satisfy statutory requirements.

This rule amends the definition of "rifle" to clarify that the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations, indicate that the weapon is designed, made, and intended to be fired from the shoulder. These other factors are: (1) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles; (2) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component, or attachment (including an adjustable or telescoping attachment with the ability to lock into various

positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles; (3) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed; (4) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations; (5) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and (6) information demonstrating the likely use of the weapon in the general community.

For the reasons discussed in section IV.B of this preamble, the Department incorporated the relevant objective design features (as described in §§ 478.11(2)(i)–(iv) and 479.11(2)(i)–(iv) of the final regulatory text) directly from the NPRM and proposed Worksheet 4999. In addition, as explained below, the Department has incorporated the factors described in §§ 478.11(2)(v)–(vi) and 479.11(2)(v)–(vi). Although the factors in these paragraphs are not objective design features of the weapon, the NPRM observed that evidence other than objective design features would sometimes play a role in classifying a weapon. For example, the NPRM stated that certain weapons, based on their point totals on the proposed worksheet, would not be classified as rifles "unless there [was] evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder." 86 FR at 30829. The Department believes that the final rule should likewise account for the possibility that factors other than objective design features may affect a weapon's classification, and the final rule accordingly includes §§ 478.11(2)(v)–(vi) and 479.11(2)(v)–(vi).

The Department also agrees with commenters that the procedure to register short-barreled rifles, which include in certain instances firearms with "stabilizing braces," is through an ATF Form 1, Application to Make and Register a Firearm ("Form 1"), with the approval of the Attorney General, or, for SOT holders, an ATF Form 2, Notice of Firearms Manufactured or Imported ("Form 2"). *See* 26 U.S.C. 5822; 27 CFR 479.62, 479.68. Usually, each maker submitting a Form 1 must pay a $200 making tax on each NFA firearm

made.[74] *See* 26 U.S.C. 5821. As described in sections IV.B.8.e, IV.B.9.b–c, and V.C of this preamble, however, the Department will exercise its enforcement discretion not to enforce the making tax on any individual or entity for weapons affected by this rule that are currently in the possession of the individual or entity, provided the individual or entity registers the firearm by May 31, 2023. *See* 26 U.S.C. 7805(b) (1994) (granting discretion to determine retroactive effect of regulations relating to the internal revenue laws). Individuals and FFLs without an SOT would submit an electronic version of Form 1 ("E-Form 1") for the affected short-barreled rifles with an attached "stabilizing brace" in their possession as of the date this rule is published. Type 7 FFLs with an SOT, in contrast, would submit an electronic version of Form 2 ("E-Form 2") for the affected short-barreled rifles with an attached "stabilizing brace" in their inventory as of the date this rule is published.

Provided the registration form is properly submitted and documented within the defined time period, the Department will consider individuals and entities to be in compliance with the statutory requirements between the date on which a person's application is filed and the date a person receives ATF approval or disapproval of the application. After the 120-day registration period following the publication of this rule, registration of previously made or manufactured weapons with "stabilizing braces" that constitute NFA firearms will not be permitted. Any person in possession of a short-barreled rifle for which an E-Form 1 or E-Form 2 has not been submitted to ATF within the defined time period will be in violation of the NFA, and ATF may take enforcement action. Individuals or entities that do not wish to register their firearms may refer to section V.B of this preamble for other options.

2. Enhances Public Safety

Comments Received

Comments submitted by the attorneys representing the cities of Boulder, Colorado, and Dayton, Ohio, noted that short-barreled rifles are uniquely dangerous because they "combine the power of shoulder-mounted rifles with the concealability of handguns" and that "stabilizing braces" are functionally equivalent to shoulder stocks. The commenters observed that "the Dayton

and Boulder shooters' pistol braces allowed them to better hide their weapons and better deploy them to attack dozens of innocent victims." This rule, the commenters argued, "would be a positive step in helping cities like Boulder and Dayton protect their citizens . . . from devasting attacks" from firearms with an attached "stabilizing brace."

Numerous commenters likewise opined that dangerous people have manipulated the use of "stabilizing braces" on pistols to create assault-style pistols that make the firearm more dangerous because it can be easier to conceal, and to shoot more bullets faster. They argued that the rise of these weapons and the ease in which they can be acquired greatly impacts public safety.

Similarly, other commenters, including former law enforcement officers, voiced support for the rule and reclassification of weapons with an attached "stabilizing brace" as NFA firearms because they are effectively short-barreled rifles, which, as evidenced by their use in the Boulder and Dayton mass shootings, "are unusually dangerous because they can be easily concealed like a handgun but have the firepower and accuracy of a rifle." Commenters agreed this rule change was a good measure because "[m]ore and more often these braces are showing up on crime gun and it is alarming."

Several commenters approved of the fact that the rule addresses the threat to public safety "while still allowing for disabled shooters to utilize arm braces." One commenter stated that "[e]nacting this rule will continue to enable disabled shooters to purchase and use these devices, but will better protect the American public from gun violence."

Department Response

The Department acknowledges the commenters' support and agrees this rule will benefit public safety. Short-barreled rifles have been recognized by Congress and the courts as the type of uniquely dangerous weapons appropriately regulated under the NFA. Courts have recognized the dangerousness and uniqueness of NFA firearms, and that the possession of unregistered NFA firearms poses a danger to the community. *See United States* v. *Jennings,* 195 F.3d 795, 799 (5th Cir. 1999) (Congress determined that the unregistered possession of the particular firearms regulated under the NFA should be outlawed because of "the virtual inevitability that such possession will result in violence."); *United States* v. *Cox,* 906 F.3d 1170,

---

[74] Submission of a Form 2, in contrast, does not require an accompanying tax payment. Thus, for weapons registered on a Form 2, there is no tax payment for ATF to forbear from collecting.

1184 (10th Cir. 2018) (explaining the Supreme Court's conclusion that "'the historical tradition of prohibiting the carrying of dangerous and unusual weapons' supported limiting the Second Amendment's protection to weapons 'in common use at the time' of ratification" (quoting *District of Columbia* v. *Heller*, 554 U.S. 570, 626–27 (2008)); *United States* v. *Gonzalez*, No. 2:10–cr–00967, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011) ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" (quoting S. Rep. No. 90–1501, at 28 (1968))).

Short-barreled rifles specifically are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy. *See United States* v. *Marzzarella*, 614 F.3d 85, 90–95 (3d Cir. 2010) (explaining that a long gun with a shortened barrel is both dangerous and unusual because "its concealability fosters its use in illicit activity," and "because of its heightened capability to cause damage"), *abrogated on other grounds as stated in Frein* v. *Pennsylvania State Police*, 47 F.4th 247, 253 (3d Cir. 2022); *United States* v. *Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("[A] sawed-off shotgun can be concealed under a large shirt or coat . . . . [T]he combination of low, somewhat indiscriminate accuracy, large destructive power, and the ability to conceal . . . makes the sawed-off shotgun useful for only violence against another person, rather than, for example, against sport game."); *Bezet* v. *United States*, 276 F. Supp. 3d 576, 611–12 (E.D. La. 2017) ("Prior to the enactment of the NFA, Congress recognized that the country struggled to control the violence wrought by 'gangsters, racketeers, and professional criminals.' . . . Similarly to the GCA, the NFA was adopted by Congress to establish a nationwide system to regulate the sale, transfer, license, and manufacturing of certain 'dangerous weapons' such as 'machine guns, sawed-off shotguns, sawed-off rifles, and other firearms, other than pistols and revolvers, which may be concealed on the persons, and silencers.' . . . [T]he NFA targets 'certain weapons likely to be used for criminal purposes.'" (footnotes omitted.)), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Many firearms with "stabilizing braces" include a barrel of less than 16 inches

and the objective design features of a firearm designed and intended to be fired from the shoulder. These types of firearms are those that Congress sought to regulate, as confirmed by Federal courts.

The Department also acknowledges that firearms equipped with "stabilizing braces" have been used in two mass shootings, with shooters in both instances reportedly shouldering the "brace" as a shoulder stock, demonstrating the weapons' efficacy as "short-barreled rifles."[75] The compact size of these firearms also assists with concealability of a firearm with a large destructive power. Since 2014, the FTCB reports that there have been approximately 104 Federal criminal classifications where firearms equipped with a "stabilizing brace" have been received by FATD for classification as a part of criminal investigations. Further, since 2015, ATF reports that approximately 63 firearms with "stabilizing braces" have been traced in criminal investigations.[76] ATF has approximately 105 firearms cases or investigations involving "stabilizing brace" devices.[77]

*B. Comments Received in Opposition*

A majority of commenters opposed the proposed rule or any new regulation or registration requirements for firearms equipped with an attached "stabilizing brace." Commenters broadly argued that ATF should not make any changes from previous determinations regarding "stabilizing braces," thus allowing owners of such attachments to continue using these items in their current configurations. As discussed below, many of the commenters that opposed the rule raised various concerns about the Department's proposed amendments to ATF regulations and the factors in the proposed Worksheet 4999. Commenters raised constitutional and statutory authority concerns and also concerns with denying persons with disabilities the use of a "stabilizing brace" to assist with shooting a firearm. They further argued that the rule punishes law-abiding citizens and does not advance

[75] *See supra* note 67.

[76] This information is drawn from the Firearms Tracing System (FTS) database maintained by ATF's National Tracing Center's (NTC) covering January 1, 2015, through November 1, 2022. The number of traced firearms equipped with a "stabilizing brace" device may be underreported because this information is captured in FTS when the user entering the firearm information makes observations and enters relevant terms like "brace" or "stabilizing brace" in the "Additional Markings" field of FTS.

[77] This information is from ATF's Office of Strategic Intelligence (OSII) covering January 1, 2015, through November 1, 2022.

the Department's public safety goals. Commenters also questioned ATF's initial analysis regarding the costs of the rulemaking.

1. Statutory Concerns

a. Lack of Statutory Authority To Issue a Rule on "Stabilizing Braces"

Comments Received

Numerous commenters asserted that ATF is overstepping its authority and changing the scope of the law on its own. Commenters also stated that ATF is in the executive branch and not the legislative branch, and therefore it should not be creating new laws, which is allegedly what the proposed rule achieves. A few other commenters stated that while DOJ has some leeway in making recommendations to Congress, only Congress has the authority to make changes to the law.

Commenters further asserted that ATF has no statutory authority to regulate or impose NFA controls on accessories such as secondary grips, sights and scopes, or peripheral accessories, including "stabilizing braces." Another commenter argued that ATF's proposed criteria are "in support of a non-statutory analysis about whether a weapon can be more easily fired with one hand or two hands" and that this is inconsistent with the NFA and GCA's obligation that the agency regulate weapon that are "intended to be fired from the shoulder." For example, the commenter argued that several factors of Section III of proposed Worksheet 4999 violated the statute because they allowed ATF to assign points based on the presence of certain "peripheral accessories" or "bipod/monopod accessories"; these accessories, according to the commenter, are not considered suitable for shouldering, and their inclusion on Worksheet 4999 was contrary to the plain text of the statute.

Commenters asserted that not only is ATF beyond the scope of its authority under the GCA in issuing this rule but also that ATF has limited authority to promulgate regulations that are necessary to enforce the provisions of the GCA and NFA. These commenters believed the change proposed by this rule "has the power of a Federal law that the American public did not get to vote on." Further, commenters argued that "ATF is without authority to amend, supplement, reinterpret or rewrite the laws that Congress enacts, even to implement what the *agency perceives* to have been Congress' intent when passing the law. Rather it is ATF's responsibility to implement the law *as it is written*." (Emphases in the original.) At least one commenter noted that if the

intent of Congress is clear, the agency must not interpret the law in a way other than the original intent of Congress and that ATF cannot "simply add to the clear unambiguous definition of 'rifle' provided by Congress."

Department Response

The Department does not agree that the rule exceeds the authority provided under law; the rule is interpreting the language of the statute as written. Moreover, as explained in section II.A of this preamble, the Attorney General is responsible for enforcing the GCA and NFA, and Congress provided authority to the Attorney General to promulgate regulations as are necessary to enforce the provisions of these laws. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a). Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR at 11696–97. Accordingly, the Department and ATF have promulgated regulations to implement the GCA and NFA. *See* 27 CFR parts 478, 479. "Because [section] 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n* v. *Brady*, 914 F.2d 475, 479 (4th Cir. 1990). Like reasoning applies to 26 U.S.C. 7805(a), which states in similar language that "[the Attorney General] shall prescribe all needful rules and regulations for the enforcement of this title." And courts have long recognized that regulatory agencies do not establish rules to last forever. "They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Am. Trucking Ass'n* v. *Atchison, Topeka, and Santa Fe Ry. Co,* 387 U.S. 397, 416 (1967).

In the original GCA implementing regulations, ATF provided regulatory definitions for terms that Congress did not define in the statute. Internal Revenue Service, Department of the Treasury, 33 FR 18555 (Dec. 14, 1968) (*e.g.*, "business premises", "curios or relics", "frame or receiver", "state of residence"). Since 1968, ATF has occasionally added definitions to the implementing regulations. *See, e.g.,* Implementation of Public Law 104208, Omnibus Consolidated Appropriations Act of 1997 (96R–034P), 63 FR 35520 (June 30, 1998) (implementing

definition of "misdemeanor crime of domestic violence" and terminology used in the statutory definition that was undefined such as "a person who is cohabiting with or has cohabited with the victim as a spouse"). As is the case with the GCA, ATF has provided regulatory definitions for terms in the NFA that Congress did not define, such as "manual reloading," "responsible person," "single function of the trigger," "automatically," and "frame or receiver." *See* Miscellaneous Amendments, 26 FR 2407 (Mar. 22, 1961) (defining "manual reloading"); Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm, 81 FR 2658 (Jan. 15, 2016) (adding the definition for the term "responsible person"); Bump-Stock-Type Devices, 83 FR 66514 (Dec. 26, 2018) (defining the terms "single function of the trigger" and "automatically"); Definition of "Frame or Receiver" and Identification of Firearms, 87 FR 24652 (Apr. 26, 2022) (revising and clarifying the definition of "frame or receiver"). These definitions were necessary to implement the statutes.

This rule is similar to these other examples, and, contrary to commenters' suggestions, it is not creating a new law; instead, it simply clarifies the definition of "rifle" under 27 CFR 478.11 and 479.11, as necessary to implement existing law—*i.e.*, the NFA and GCA. Although Congress defined the term "rifle" in the NFA, *see* 26 U.S.C. 5845, Congress did not further define the key phrase from that definition: "designed or redesigned, made or remade, and intended to be fired from the shoulder." Given the wide variety of configurations of weapons and "stabilizing braces," this rule is "necessary" or "needful" to clarify the meaning of this phrase. *See* 18 U.S.C. 926; 26 U.S.C. 7805(a). This rule supplies that necessary clarity by providing the objective design features and other factors that ATF will use to discern whether a firearm is designed, made, and intended to be shoulder fired, and this rule represents the Department's best interpretation of the relevant statutory language.

If a pistol with an attached "stabilizing brace" is found to be a "rifle," then such firearm could also be considered a "short-barreled rifle" under the NFA and GCA, depending on the overall length of the weapon or length of the attached barrel, thus subjecting it to additional requirements as an NFA weapon. 26 U.S.C. 5845(a)(3)–(4); 18 U.S.C. 921(a)(8); *cf. Thompson/Center Arms Co.,* 504 U.S. at

513 n.6 ("The inclusion of the rifle stock in the package brings the Contender [pistol] and carbine kit within the 'intended to be fired from the shoulder' language contained in the definition of rifle in the statute. See 26 U.S.C. 5845(c). The only question is whether this combination of parts constitutes a short-barreled rifle.").[78] A firearm does not evade classification as an NFA weapon simply because it is configured with a compatible attachment, such as a "stabilizing brace," that may serve a function other than as a shoulder stock to effectuate shoulder fire. As described in section II.B of this preamble, ATF recognized at the end of 2018 that it was necessary to evaluate the actual firearm at issue with the "brace" device attached.[79]

This rule makes clear that the configuration of a pistol with an attached "stabilizing brace" can possess objective design features that, along with the direct or indirect marketing materials from the manufacturer or other information showing likely use by the general community, demonstrate the firearm is configured to be fired from the shoulder, making it a "rifle." Section IV.B.3 of this preamble discusses further the factors necessary to determine when a weapon is a rifle as defined by the NFA and GCA. By incorporating the objective design features and other factors into the amended regulatory definition of "rifle," the Department is implementing the statutory definition of "rifle" so the industry and public receive notice and may avoid potential legal hazards when installing a "brace" or other device on a firearm. Contrary to commenters'

---

[78] The Supreme Court in *Thompson/Center* concluded that the "mere possibility" that a pistol and accompanying kit might be "use[d] to assemble a regulated firearm" did not establish that the "combined packaging" of the kit and pistol brought the package within the scope of "making" a short-barreled rifle. 504 U.S. at 513. The Department is not adopting such an approach. This rule does not require regulation of a pistol based on the "mere possibility" that a "stabilizing brace" may be attached and the resulting firearm fired from the shoulder. Rather, the rule requires a consideration of objective design features and other factors to determine whether the "braced" weapon is designed, made, and intended to be fired from the shoulder.

[79] *See supra* note 57 and accompanying discussion. Additionally, on April 26, 2022, the Department published the final rule titled "Definition of 'Frame or Receiver' and Identification of Firearms," in which ATF codified in its regulations at 27 CFR 478.92(c) instructions to the public that any requests for a determination on how an items affects the classification of a firearm under the GCA or NFA must include the firearm sample with all accessories and attachments relevant to the classification. 87 FR at 24743. Prior to the publication of that final rule, FATD had been conveying this information through the classification process.

assertions, the Department is not regulating the manufacture, sale, or possession of "stabilizing braces" themselves—that is, "stabilizing braces" when not attached to or associated with particular weapons. Accordingly, the rule does not create any new law; instead it simply implements the relevant statutes based on the Department's best interpretation of those statutes.

b. Lack of Authority Regarding Tax Collection

Comments Received

One commenter argued that ATF "is claiming authority to reclassify [pistols] that it doesn't have." (Emphasis omitted). In particular, the commenter asserted that the proposed rule violates 26 U.S.C. 4181–4182, 5811, which impose a 10 percent tax on pistols and a $200 tax on short-barreled rifles, all monies that have already been collected. Because ATF is not "grandfather[ing] current pistols," the commenter asserted that "ATF would have to undo that tax, because something cannot be a Pistol and [a short-barreled rifle]." The commenter argued that ATF would have to go back a decade to collect taxes due on short-barreled rifles and that the agency "has no authority to undo that tax" because, according to the commenter, only Congress can change the tax code and only for that calendar year. (Emphasis omitted).

Department Response

The Department disagrees with the commenter who argued that the proposed rule violates 26 U.S.C. 4181–4182, 5811, which impose excise and making taxes on pistols and short-barreled rifles. As discussed above, the Attorney General delegated the administration and enforcement of the NFA to the Director of ATF. The Internal Revenue Code ("IRC"), 26 U.S.C. 6201, provides the Secretary of the Treasury with the legal authority to determine and assess the amount of taxes owed by a taxpayer. Section 7801(a)(2)(A) of the IRC grants this same authority to the Attorney General with respect to enforcing the provisions of the NFA (i.e., chapter 53 of title 26). This section states in relevant part that "[t]he administration and enforcement of [as relevant here, chapter 53 of title 26] shall be performed by or under the supervision of the Attorney General; and the term 'Secretary' or 'Secretary of the Treasury' shall, when applied to those provisions mean the Attorney General." Therefore, ATF has authority consistent with the IRC to classify

firearms and assess the appropriate tax liability of the manufacture, making, or transfer of the item under the NFA.

The Department also disagrees with the commenter's argument that the Department is "chang[ing]" the tax code. The Department acknowledges that firearms equipped with "stabilizing brace" devices that are designed or redesigned, made or remade, and intended to be fired from shoulder, i.e., "rifles", or "firearms (other than pistols or revolvers)" incur an 11 percent excise tax, and that pistols and revolvers incur a 10 percent excise tax when the firearm is sold by a large manufacturer [80] to a purchaser. 26 U.S.C. 4181, 4182; 27 CFR 53.2. Manufacturers who sold 50 or more such rifles in a calendar year and did not pay tax under 26 U.S.C. 5811 (the NFA transfer tax) may be required to pay that excise tax in accordance with Federal regulations under Chapter 32 of the IRC. However, any determination that a particular weapon is a "rifle" within the meaning of the tax code does not change the tax code itself. It simply classifies an item for purposes of the tax code. Moreover, the Department notes that excise taxes are administered and collected by the Alcohol and Tobacco Tax and Trade Bureau, which is a part of the Department of the Treasury.

c. Administrative Procedure Act ("APA")

i. APA—Change in ATF Position

Comments Received

Numerous commenters asserted that the proposed rule is another "flip flop" by the agency and arbitrary and capricious in violation of the APA. Commenters said that ATF has long held the position that the NFA does not apply to pistols equipped with "stabilizing braces," even if the "braces" are used to secure the weapons to the shoulder. Numerous commenters outlined the history and positions ATF has taken with respect to pistols with attached "stabilizing braces," claiming

that ATF has been very inconsistent in its approach. For example, one commenter questioned why ATF first officially recognized that a "stabilizing braces" configured on an AR–15 style pistol did not create a "rifle," but then, starting in 2012, provided 10 letters going back and forth on whether a "stabilize brace" attached to a firearm did create a "rifle." Specifically, multiple commenters noted that, in 2020, ATF said that "stabilizing braces" do not turn an AR-pistol into a short-barreled rifle. Commenters stated that now, after numerous years, ATF's proposed rule would make all previously produced combinations of "braces" and firearms rifles rather than pistols.

Another commenter believed that ATF arbitrarily changed its interpretation because it stated in the NPRM that "stabilizing braces" are marketed "to support single-handed firing." 86 FR at 30827. Because of this statement in the NPRM, the same commenter remarked that "ATF apparently believes that a stabilizing brace can *never* be used on a 'firearm' that is designed to be operated by two hands." (Emphasis in the original.) The commenter argued that a "stabilizing brace" can be used to support two-handed, non-shouldered fire.

Department Response

The Department acknowledges that the variations of "stabilizing brace" designs, the manufacturer's purported intent for "brace" devices, the changes in ATF's classification process, and the inconsistencies in ATF's analysis of "braces" attached to firearms may have led to confusion regarding the application of the NFA and GCA to firearms equipped with a purported "stabilizing brace."

The Department agrees with commenters, including SB Tactical, that the analyses in some of ATF's prior opinions regarding incidental firing from the shoulder and the use of "stabilizing brace" devices on firearms have been inconsistent. Furthermore, as discussed below, ATF acknowledges that its classifications issued between 2012 and 2020 did not properly or consistently evaluate whether firearms equipped with those devices were "rifles" as defined in the NFA and GCA. Specifically, ATF's analysis placed improper weight on whether the "stabilizing brace" at issue could be used as a "brace" to support single-handed fire rather than whether the overall configuration of the firearm with

---

[80] For purposes of excise tax, the term "Manufacturer," as defined in 27 CFR 53.11, includes any person who produces a taxable article from junk material or from new or raw material by processing, manipulating, or changing the form of an article or by combining or assembling two or more articles. The term also includes a "producer" and an "importer." The person for whom the taxable article is manufactured or produced, and not the person who actually manufactures or produces it, will be considered the manufacturer where a person manufactures or produces a taxable article for another person who furnishes materials under an agreement whereby the person who furnished the materials retains title thereto and to the finished article.

the attached ''brace'' is designed and intended to be fired from the shoulder, as required by the statutory definition of the term ''rifle.''

Nevertheless, the Department disagrees that any prior inconsistencies or changes by ATF make this rule arbitrary and capricious under the APA. Despite inconsistencies in ATF's prior classifications, each classification letter referenced ATF's practice of considering the physical design characteristics or features when looking at a ''stabilizing brace'' device on a firearm.[81] The Department acknowledges that this rule is a change in position from some of ATF's previous classifications or positions, but the intent of this rule is to resolve prior inconsistencies and ensure consistent application of the statutory definition of ''rifle'' to firearms equipped with ''stabilizing braces'' or other rearward attachments. As discussed below, the prevalent shouldering of these firearms further demonstrates that a majority of firearms equipped with ''stabilizing braces,'' currently or previously available on the market, incorporate rifle characteristics. Therefore, it is necessary for the Department to issue this rule to clarify the statutory definition of ''rifle'' and to inform the public of the best interpretation of the definition, which will guide the proper legal and factual analysis to be conducted in evaluating whether a firearm is designed, made, and intended to be fired from the shoulder. As a result, and to ensure consistency moving forward, ATF's prior classifications pertaining to ''stabilizing brace'' devices, or firearms equipped with a ''stabilizing brace,'' are no longer valid or authoritative as of May 31, 2023.[82]

When an agency changes course, the agency must ''provide [a] reasoned explanation for its action.'' *F.C.C.* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). The agency, however, has no heightened burden in prescribing regulations that displace inconsistent previous regulatory actions. *Id.* at 514– 15. Federal courts recognize that it is within ATF's discretion to reclassify and rectify a firearms classification error provided the agency's interpretation is consistent with the statute and legislative history. *Akins* v. *United States,* 312 Fed. App'x 197, 200 (11th Cir. 2009) (holding the reclassification of the Akins Accelerator as a machinegun was not arbitrary and capricious).[83] Accordingly, the Department recognizes it is within ATF's authority to replace its prior inconsistent legal classifications, provided the change is reasonably explained and the new position is permissible under the statute.

From 2012 to 2018, ATF issued several classifications of ''stabilizing braces'' concluding that the ''brace'' did not redesign a firearm to be fired from the shoulder.[84] These pre-2018 classifications looked at whether the ''stabilizing brace'' brought a firearm within the purview of the NFA in part by placing improper weight on the manufacturer's stated intent to install the ''brace'' on heavy pistols (*e.g.,* AR-type, AK-type, CZ Scorpion) to stabilize the arm to support single-handed fire, rather than whether objective design features and other evidence, as listed in this rule, indicated that the firearm equipped with the ''brace'' had been designed and intended to be fired from the shoulder. ATF's classification letters after 2018, while appropriately focusing on objective design features, continued to place improper weight on whether the ''stabilizing brace'' at issue could be used as a ''brace'' to support single-handed fire, even if the overall configuration of the firearm equipped with the ''brace'' indicated the weapon was designed or redesigned, made or remade, and intended to be fired from the shoulder. In other words, ATF now concludes that it incorrectly reviewed and classified the weapons with purported ''stabilizing braces'' in those classifications, with an inappropriate reliance on the manufacturer's assertions that a ''stabilizing brace'' was intended to assist with single-handed firing without regard to whether the objective features of the firearm indicate that it is designed and intended to be fired from the shoulder.[85] This resulted in inconsistencies in ATF classifications and an incorrect public perception that a firearm equipped with a ''stabilizing brace'' never falls within the purview of the NFA, regardless of the objective design features of the firearm. The Department accordingly clarifies for the public and the firearms industry that the term ''designed or redesigned, made or remade, and intended to be fired from the shoulder'' includes a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a ''stabilizing brace'') that provides surface area that allows the weapon to be fired from the shoulder, provided that other factors, as listed in the final regulatory text, also indicate that the weapon with such surface area is designed, made, and intended to be fired from the shoulder.

The Department also acknowledges the commenters' concerns that ATF changed its interpretation when it indicated in the NPRM that ''a stabilizing brace can be used only to support single-handed firing.'' Indeed, the Department agrees that the ability to fire with a single hand is not in part of the GCA or NFA definition of ''rifle.'' Hence, in prior classifications, ATF

---

[81] For example, a 2014 letter provided that ''FTB classifies weapons based on their physical design characteristics.'' Letter from ATF #301737 (Mar. 5, 2014). In the 2015 Open Letter, ATF noted that it had previously looked at the objective design features in classifying a ''stabilizing brace,'' even as it also considered the manufacturer's or makers' stated intent. Similarly, in a 2017 letter to counsel for SB Tactical, ATF clarified that if a shooter takes ''affirmative steps to configure the device for use as a shoulder stock—for example, configuring the brace so as to permanently affix it to the end of a buffer tube, (thereby creating a length that has no other purpose than to facilitate its use as a stock), removing the arm-strap, or otherwise undermining its ability to be used as a brace—and then in fact shoots the firearm from the shoulder using the accessory as a shoulder stock, that person has objectively 'redesigned' the firearm for purposes of the NFA.'' Letter from ATF #30736 (Oct 31, 2017).

[82] The Department has similarly announced in a different final rule that certain classifications of frames or receivers were no longer authoritative. *See* 87 FR at 24741.

[83] *See also Guedes* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 356 F. Supp. 3d 109, 127 (D.D.C. 2019), *judgment entered,* 762 F. App'x 7 (D.C. Cir. 2019) (''So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating [an] earlier decision should be altered or abandoned.'' (alteration omitted) (quoting *New England Power Generators Ass'n* v. *FERC,* 879 F.3d 1192, 1201 (D.C. Cir. 2018))); *Aposhian* v. *Barr,* 374 F. Supp. 3d 1145, 1153 (D. Utah 2019) (concluding that ATF's change in policy with regard to bump stocks was permissible under the statute and was supported by good reasons when ATF explained that prior position was not based on substantial or consistent legal and where new interpretation was both permissible and best interpretation of the statute), *aff'd,* 958 F.3d 969 (10th Cir. 2020), *reh'g en banc granted, judgment vacated,* 973 F.3d 1151 (10th Cir. 2020), *vacated sub nom. Aposhian* v. *Wilkinson,* 989 F.3d 890 (10th Cir. 2021), *and opinion reinstated sub nom. Aposhian* v. *Wilkinson,* 989 F.3d 890 (10th Cir. 2021).

[84] ATF classified the following brace devices prior to August 2018:

SB Tactical SB15 (marketed by SIG)
SB Tactical PSB Brace
Shockwave Blade Version 1
Shockwave Blade Version 2
Shockwave Blade with KAK Tube
Gear Head Works Tailhook Version 1
Gear Head Works Tail Hook Version 2
Safe Pistol Arm Brace
Strike Industries Stabilizer
Three Versions of Strike Industries Stabilizers
Strike Industries Stabilizer/Blade
Trinity Force AR Pistol Stabilizer
Bicep Brace Version 3
Accu Pistol Brace Version 2
Forearm BraceBP15 ''AR15-type'' Pistol Stabilizing Brace Version 2
Minimal Arm Brace
Buffer Tube Adaptor for AK w/SB15

Additionally, in 2020 ATF classified a Ruger 556 pistol with a SB Tactical SBL Mini ''stabilizing brace attached as a pistol and not a rifle.

[85] *See supra* note 26.

erroneously concluded that the incorporation of a ''stabilizing brace'' that allowed single-handed firing, as stated by the manufacturer, precludes the firearm from being designed, made, and intended to be fired from the shoulder. This interpretation by ATF incorrectly read into the GCA and NFA a requirement that, for a firearm to be a rifle, it must exclusively be designed, made, and intended to be fired from the shoulder; in other words, ATF did not recognize that a firearm equipped with an accessory or rearward attachment like a ''stabilizing brace'' may be a rifle, regardless of whether the firearm includes a feature that might permit an alternate use of one-handed firing. It is similarly incorrect to focus on whether a ''stabilizing brace'' can be used, in some circumstances, to support two-handed, non-shouldered fire.

Indeed, courts have likewise held that a firearm does not need to be designed and intended exclusively to be fired from the shoulder to constitute a short-barreled rifle under the law. *See United States* v. *Rose,* 695 F.2d 1356, 1358 (10th Cir. 1982) (holding that a firearm with a collapsible stock is a short-barreled rifle and rejecting the defendant's claim that the weapon must have been designed or redesigned to fire exclusively from the shoulder). The Tenth Circuit stated that, ''[a]lthough the Uzi could be fired from several positions, testimony indicated that the Uzi is an effective shoulder weapon,'' and the Uzi's ''collapsible stock[ ] permitted [it] to be fired from the shoulder.'' *Id.* The Uzi was accordingly ''redesigned or intended to be used as a rifle within the meaning of'' the statutory definition. *Id.* Similarly, in a case involving a firearm with a 14–1/2 inch barrel that could be fired with one hand or from the shoulder, a defendant argued that, because the firearm lacked any sights and was not necessarily advantageous to fire the weapon from the shoulder, the firearm should not be regulated as a ''rifle'' under the NFA. *Sipes* v. *United States,* 321 F.2d 174, 178–79 (8th Cir. 1963),

*overruled on other grounds.*[86] The Eighth Circuit concluded the weapon was still a rifle. *Id.* ''That it had no sights or that it could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition.'' *Id.* at 178. This reasoning is plainly applicable here. A ''stabilizing brace'' device cannot remove a firearm from the definition of a rifle solely because the purported purpose or effect of the device is to facilitate one-handed firing, even if the device does allow one-handed firing as a possible alternative means of using the weapon.

Due to the past inconsistences and misapplication of the statutory definition as pointed out by commenters, the Department is within its statutory authority and under an obligation to reconsider and rectify its past classifications. Moreover, the fact that many of these ''stabilizing brace'' devices are designed and intended to be the equivalent of a shoulder stock, or that firearms equipped with ''stabilizing brace'' devices are in fact designed and intended to be fired from the shoulder, is abundantly evident in publications and consumer and marketing material issued by firearms manufacturers. For instance, ATF identified multiple online articles after its evaluation of SB Tactical's SB15 that cited the SB15 ''brace'' as a method to circumvent the NFA, in that the ''brace'' functions well as a shoulder stock. The articles also included pictures of individuals shooting firearms, equipped with the SB15, from the shoulder.[87] ATF

identified one article posted on SB Tactical's website, dated December 23, 2014, which discussed an award for SB Tactical's CEO as the most influential personality of the year for inventing the SB15. The article states: ''It's no secret that Bosco's brace can also be used as a shoulder stock by people with two good arms. With Bosco's brace, all Americans are able to modify an AR–15-style pistol into what's effectively [a short-barreled rifle]—without additional ATF infringement on their gun rights.'' [88]

SB Tactical has posted articles that explained how short-barreled rifle performance could be obtained from a pistol equipped with a ''stabilizing brace.'' [89] In 2016, SB Tactical also presented a YouTube video advertisement describing shooting techniques for a pistol attached with their ''brace'' device.[90] As shown below, the video included demonstrations of multiple ''stabilizing brace'' models that ATF had not evaluated.

BILLING CODE 4410–FY–P

---

[86] Specifically, *Haynes* v. *United States* rejected the government's argument which cited *Sipes* for the proposition that two separate offenses occur for failure to register a firearm and subsequent possession of the firearm under 26 U.S.C. 5841 and 5851. 390 U.S. 85, 91 n.7 (1968).

[87] Alex C. *Gun Review: Sig SB15 Pistol Stabilizing Brace Review,* The Firearm Blog (Aug. 18, 2013), *https://www.thefirearmblog.com/blog/2013/08/18/sig-sb15-pistol-stabilizing-brace-review/* (''If you are like me, you remember seeing the Sig SB15 a while back and thinking 'hey they hacked the NFA'. Of course we all know how it is supposed to be used, but let us get real and look at this objectively: Sig made an 'arm brace' and got ATF approval for said arm brace. The arm brace slides over a pistol buffer and looks like a stock . . . but it is an arm brace.''); Ryan Cross, *Sig Sauer SB15 Pistol Stabilizing Brace,* Firearms Insider Community (Sept. 14, 2014), *http://www.firearmsinsider.tv/gun-gear-reviews/*

*category/Sig+Sauer* (''So basically if you have an AR Pistol and you install this arm brace, it lets you legally own something that is similar to an SBR in handling/shouldering terms, without filling a Form 4, paying for a tax stamp, and waiting between 8–12 months for your stamp and approved paperwork, AND not being able to transport the firearm between states without notification of [law enforcement officers].''); Dave Higginbotham, *Sig Sauer P556, Short Barrel Rifle Performance from a Pistol—New Gun Review,* Gun America Digest (May 30, 2014), *https://www.gunsamerica.com/digest/sig-sauer-p556-short-barrel-rifle-performance-pistol-new-gun-review-2/.*

[88] Nick Leghorn, *TTAG 2014 Editor's Choice Award—Most Influential Personality of the Year: Alex Bosco,* SB Tactical (Dec. 22, 2014), *https://web.archive.org/web/20150206045745/http://www.sb-tactical.com/ttag-2014-personality-of-the-year-alex-bosco/* (emphasis in the original).

[89] David Higginbotham, *SIG SAUER P556, SHORT BARREL RIFLE PERFORMANCE FROM A PISTOL,* SB Tactical (Jun. 16, 2014), *https://web.archive.org/web/20150307044415/http://www.sb-tactical.com/sig-sauer-p556-short-barrel-rifle-performance-from-a-pistol-2;* David M Fortier, *Shotgun News July 20th 2014—Always wanted a Short Barrel Rifle but won't jump through the hoops? Here's your solution,* SB Tactical (July 22, 2014), *https://web.archive.org/web/20150306211245/http://www.sb-tactical.com/shotgun-news-july-20th-2014.*

[90] SB Tactical, *Pistol Stabilizing Brace Shooting Techniques,* YouTube (July 29, 2016), *https://www.youtube.com/watch?v=FoTHRWsCz64.*



**SB Tactical video describes this technique as "strap the brace to your arm."**



**SB Tactical describes this technique as "cheek welding."**



**SB Tactical describes this technique as sternum mounting.**



**SB Tactical describes this technique as locking the pistol out on a fully tensioned sling.**

BILLING CODE 4410–FY–C

In demonstrating these various firing techniques of a firearm equipped with its "stabilizing brace" models, the manufacturer's video clearly shows it informed the public about and marketed its "brace" devices for uses that go far beyond the original design and intent of the "brace" as explained to ATF with the sample it submitted for evaluation. Further, the online marketing material showcasing these various shooting techniques highlight key objective design features, as described in this rule, that are consistent with a rifle that is designed, made, and intended to be fired from the shoulder. Even though the "brace" manufacturer notably did not include footage of a firearm with its "stabilizing brace" being fired from the shoulder, the video clearly demonstrates shooting of firearms equipped with its "stabilizing braces" from the sternum. This firing technique involves the shooter pressing the rear surface area against the shooter's body (on the

sternum near the shoulder) to operate the firearm. Were the shooter to merely shift the firearm a few inches, the rear surface area provided by the "stabilizing brace" would effectively allow for firing from the shoulder. This technique indicates to the general community the ease and practicality of shouldering firearms equipped with "stabilizing braces." Similarly, the video also demonstrates shooters using a "cheek welding" firing technique where the objective design features of a rifle are also evident. Based on the rear surface area provided by the "stabilizing brace" and the alignment of the sights, as seen in the video, the shooter can easily shoulder fire the weapon.

Further, at least one firearms manufacturer advertised the SB47, a later version of the SB15 "brace," as a shoulder stock and stated that no short-barreled rifle NFA tax stamp

is required.[91] SB Tactical also posted an advertisement that the SB47 is "ATF approved for everybody[;] the SB47 does not require any special permits doctors [sic] notes or SBR tax stamp!"[92] Notably, the SB47 was not the same design as the original brace. The SB47 design was to be attached to an AK-type pistol rather than an AR-type pistol. SB Tactical posted a review of the SB47 where the reviewer generally stated that his first impression was that a firearm equipped with a SB47 is a short-barreled rifle, even though he stated that the reason for creating the SB15 and SB47 was to assist disabled veterans.[93]

[91] Century International Arms Inc., *SB47 Stabilizing Brace* (Sept. 6, 2013), *https://web.archive.org/web/20130906231317/http://centuryarms.biz/proddetail.asp?prod=OT1648.*

[92] SB Tactical, *SB47* (Mar. 17, 2015), *https://web.archive.org/web/20150317032957/http://www.sb-tactical.com/products/sb47/.*

[93] SB Tactical, *Gear Review: SB Tactical SB–47 Stabilizing Brace* (Mar. 15, 2014), *https://*

Continued

Numerous videos also demonstrate individuals using the SB15 and SB47 "stabilizing brace" from the shoulder.[94] Notably, some of these videos referenced a 2014 ATF letter in which FATD stated that using "braces" improperly (*i.e.,* shouldering them) would not constitute a design change.[95] In at least one video, an individual generally stated that it was lawful to shoulder the firearm and he knew what the "stabilizing brace" was for, *i.e.,* shouldering, but had not said it publicly until now because he did not want to be "that guy" prior to the 2014 letter.[96] These online materials demonstrate a general recognition by the firearms industry and certain firearms owners that a firearm equipped with an SB15 or SB47 "brace" included objective design features that indicated the firearm is a rifle designed and intended to be fired from the shoulder, even though such weapons had not been manufactured or transferred in accordance with the requirements of the NFA (depending on the barrel length). Numerous other online materials for "stabilizing braces," including for Shockwave Blade, Strike Industries, and Gear Head Works Tailhook, display individuals using firearms marketed as pistols but shouldered as short-barreled rifles.[97]

Additionally, other publications and online videos are available regarding the use of various "braces" to fire from the shoulder, further demonstrating that firearms equipped with these "braces" were and are being used extensively as short-barreled rifles.[98]

*On & Video],* PewPew Tactical (June 2, 2021), *https://www.pewpewtactical.com/best-ar-pistol-braces/* ("It might look and function like a rifle, but thanks to the fact that AR–15 pistols don't come built with a stock, they're legally classified as pistols—giving them a full pardon from inconvenient NFA restrictions." (emphasis omitted)); FocusTripp, *Best AR–15 Pistol Brace Under $40—Foxtrox Mike VS KAK Shockwave Blade VS Trinity Force,* YouTube (June 15, 2019), *https://www.youtube.com/watch?v=IJQG4liOlRk;* Hoplopfheil, *Shockwave Blade Brace 1.0 vs 2.0 Comparison,* YouTube (Jan. 27, 2020), *https://www.youtube.com/watch?v=W5-C6efbN_s;* Tactical Hyve, *Navy SEAL "Coch" Talks About His AR Pistol Setup,* YouTube (Sept. 16, 2020), *https://www.youtube.com/watch?v=Zfjdavuh3vc;* AtlanticFirearms, *Draco AK47 Pistol with Brace at Atlantic Firearms,* YouTube (Aug. 9, 2019), *https://www.youtube.com/watch?v=JzxTs1-MwKI;* KB32 Tactical, *AR15 Pistol 10.5 Inch 100 Yard Test!! How'd She Do????,* YouTube (May 20, 2017), *https://www.youtube.com/watch?v=Pab-p6fcwL0;* 704 Tactical, *Strike Industries AR Pistol Stabilizer Brace,* YouTube (Jun. 4, 2020), *https://www.youtube.com/watch?v=Slf_IBxIzLg;* WorkTheTrigger, *Strike Industries Pistol Stabilizing Brace,* YouTube (May 19, 2020), *https://www.youtube.com/watch?v=BbldU84PQZU;* Jeremy S., *Gear Review: Gear Head Works Tailhook Pistol Braces (New Release),* The Truth About Guns (Dec. 31, 2016), *https://www.thetruthaboutguns.com/gear-review-gear-head-works-tailhook-pistol-braces/* ("From the rear, if you're thinking 'gosh, that looks like it would be a great stock' you're darn right. As my CZ Scorpion Evo is a registered SBR I could legally shoulder the Tailhook and, I gotta say, the flat back and solid aluminum build make for as good of a shoulder stock as anything."); sootch00, *Gear Head Works Tail Hook AR Pistol Brace,* YouTube (Mar. 16, 2017), *https://www.youtube.com/watch?v=FWXXMwa-Xk8;* Military Arms Channel, *B&T GHM9 9mm Pistol with Tailhook Brace!,* YouTube (Jan. 9, 2018), *https://www.youtube.com/watch?v=BnEk9PkMu84.*

[98] TFB TV, *Testing the Upgraded FS1913 Folding Brace,* YouTube (May 12, 2020), *https://www.youtube.com/watch?v=-_VAJordA68* (individual testing a Ruger PC Charger with SBTactical FS1913 folding brace); Pew Pew Tactical, *Best AR–15 Pistol Braces: Truck Guns Ahoy!,* YouTube (July 2, 2019), *https://www.youtube.com/watch?v=uu2piCz8ThI* (stating that a firearm with a pistol brace is an alternative to building a short-barreled rifle and obtaining a tax stamp and reviewing the SB Mini, Shockwave Blade, SBM4, SBA4, SBA3, and the SBPDW while firing all the firearms from the shoulder); JPRifles, *SBA3 Pistol Stabilizing Brace—New Product Showcase—FEBRUARY 2019,* YouTube (Feb. 1, 2019), *https://www.youtube.com/watch?v=4qaJpDzOyjQ* (reviewing the SBA3 stabilizing brace demonstrating fired from the shoulder only); Ballistic Staff, *CZ Scorpion Micro Folder: CZ Finally Adds Folding Brace to Popular Pistol,* Athlon Outdoors Network (Feb. 5, 2020), *https://www.ballisticmag.com/cz-scorpion-micro-folder-pistol/* (reviewing folding brace on CZ Scorpion pistol); ClassicFirearms, *You Can Have A Brace On A Glock?! (Recover 20/20 Brace),* YouTube (July 28, 2021), *https://www.youtube.com/watch?v=se BxysheK_4* (firing a Glock pistol with a "stabilizing brace" from the shoulder); Mrgunsngear Channel, *SB Tactical SBPDW Review: Best Adjustable Brace For AR–15 Pistols?,* YouTube (Feb. 24, 2018),

The firearms industry's and community's prevalent use of the firearms as rifles, as highlighted in these videos, underscores why the Department has concluded that the assessment of whether a firearm falls within the statutory definition of a "rifle" should incorporate the objective design features of the firearm. Also, the recognition by firearms manufacturers and owners that "stabilizing brace" devices circumvented the NFA strongly supports the Department's decision to re-evaluate its analysis of firearms equipped with "stabilizing braces." Accordingly, the Department has determined the best approach is not to focus solely on stated intent or on the possibility that weapons with a "brace" might, in some circumstances, be fired with one hand. Rather, it is appropriate and necessary for the Department to clarify through this rulemaking the objective design features and other factors that indicate when a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") is designed, made, and intended to be fired from the shoulder.

Lastly, the Department notes that neither the rule nor the relevant statutes ban "stabilizing braces" or the use of "stabilizing braces" on pistols. Indeed, this rule does not impose any new legal obligations on owners of "stabilizing braces" at all, as any obligations for these owners result only from the NFA and the GCA. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statues. Hence, an individual may continue to use such a device but may be subject to certain requirements depending on the firearm's objective design features and other factors, as explained in this final rule.

web.archive.org/web/20150307044345/ http:// www.sb-tactical.com/ gear-review-sb-tactical-sb-47-stabilizing-brace-3 ("I had seen this piece of equipment online and immediately thought it was an SBR work-around."); *id.* (stating that the original "brace" device "was designed to allow a veteran who lost the ability to do the things he loved, recapture that joy," but acknowledging the "brace" device is "being misused as a[n] SBR stock").

[94] Tactiholics, *ATF Compliant Sig SB15 Stabilizing Brace: Get One!—Tacitoholics™,* YouTube (Nov. 19, 2014), *https://www.youtube.com/watch?v=rPaIYGJhwbc;* BigDaddyHoffman1911, *AK 47 Pistol with SB–47 Brace,* YouTube (July 27, 2014), *https://www.youtube.com/watch?v=zx-5IiM7iw0;* The Late Boy Scout, *The Awesome M85 AK Pistol with SB–47 Stabilizing Brace,* YouTube (Sept. 29, 2014), *https://www.youtube.com/watch?v=CKE2ELSJtak;* Jordan Winkler, *Century Arms C39V2 AK Pistol w/ SB Tactical Brace Review,* YouTube (May 10, 2017), *https://www.youtube.com/watch?v=l0w8sp4318M.*

[95] In the letter, FATD advised that it does not classify weapons based on how an individual uses a weapon and that firing the pistol from the shoulder did not reclassify it as a short-barreled rifle. FATD further mentioned that some "brace" designs, such as the Sig Stability Brace, had not been classified as a shoulder stock and that therefore, using those "braces" improperly would not constitute a design change or change the classification of the weapon. Letter from ATF #301737 (Mar. 5, 2014).

[96] Military Arms Channel, *Shouldering a Handgun with a Sig SB15 Brace,* Military Arms Channel (Apr. 7, 2014), *https://www.youtube.com/ watch?v=qNMLO18kl98.*

[97] Foghorn, *Gear Review: Shockwave Technologies Blade Pistol* Stabilizer, The Truth About Guns (Oct. 9, 2015), *https://www.thetruth aboutguns.com/gear-review-shockwave-technologies-blade-pistol-stabilizer/;* Brandon Harville, *7 Best AR–15 & AK Pistol Braces [Hands-*

*https://www.youtube.com/watch?v=c9ueVMFK-q0* (demonstrating SBPDW being fired from the shoulder); ClassicFirearms, *Manufacturer Review SB Tactical,* YouTube (Feb. 14, 2022), *https://www.youtube.com/watch?v=mC3M8T4lLSM* (reviewing SBA3, SBA4, SBPDW brace while firing from the shoulder and citing prior ATF letter which approves incidental shouldering); Mrgunsngear Channel, *SB Tactical SBA3 vs. SBA4: Which Is The Best AR–15 Pistol Brace?,* YouTube (Dec. 5, 2019), *https://www.youtube.com/watch?v=PWBHs2W8bxQ* (comparing the SBA3 and SBA4 while firing from the shoulder); Fire Mountain Outdoors, *SB Tactical PDW pistol brace overview* YouTube (Jan. 23, 2018), *https://www.youtube.com/watch?v=zPERkIXY2dM* (demonstrating the SBPDW as intended and shouldered); TheGunCollective, *I SWEAR IT'S NOT A STOCK—FLUX Defense Glock Pistol Brace,* YouTube (May 17, 2019), *https://www.youtube.com/watch?v=4PL5fUYA_sg* (firing a Glock with a "stabilizing brace" from the shoulder).

ii. APA—Private Classification Letters

Comments Received

Commenters said ATF's position is not clear because of the varying interpretations and different responses that ATF had provided through private letter classifications. They also stated that this past inconsistency results in the agency undermining its own legitimacy when it makes "a capricious and arbitrary change . . . after millions of Americans have legally purchased ['stabilizing braces'] with the understanding that ATF had approved them." Similarly, another commenter stated that it is difficult for the public to rely on ATF classifications for guidance because of the "vast variations in submissions" and the fact that "if even the smallest detail is changed (such as adding different sights, or a different optic), the entire firearm's classification could be inadvertently changed." (Quotation marks and emphasis omitted.)

Department Response

The Department does not agree with commenters that publishing this rule is arbitrary or capricious even if it results in prior classifications being no longer valid. As discussed above, ATF makes classifications based on the configuration of a particular firearm, as submitted to ATF, because attempting to make more general classifications may result in the erroneous application of the relevant statutes. There are many variations in firearms because of differences in weight, length, rear surface area, adjustability of a rearward attachment, length of pull, and sights or scopes, for example. Because private letter classifications are dependent on the specific configuration of the firearm, there may be different classifications for each unique firearm submitted, even if the weapons are outwardly similar. Moreover, some individuals and manufacturers were using ATF classification letters from a different device and applying that classification to a new device. This rule informs the public of the best interpretation of and the proper inquiry under the statutes by identifying relevant objective design features and other factors that are to be considered when determining how the statutory provisions apply to firearms equipped with "stabilizing braces" or other attachments. As discussed in this rule and the NPRM, ATF's review of the objective characteristics of the device is supported by Federal courts. *See Brandon,* 826 F.3d at 601–02. Additionally, ATF is publishing information simultaneously with this rule that will inform the public of both

(1) common weapon platforms with attached "stabilizing brace" designs and (2) examples of commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles.

iii. APA—Reliance by Public

Comments Received

According to many commenters, ATF has approved the use of "a shooting support with a pistol" since at least 2006, and further, that pistol-braced firearms and pistol-brace accessories have been widely available and approved by ATF for sale since at least 2012. Commenters stated that millions of citizens were relying on ATF's guidance when making their purchase and took ATF at its word when the agency approved the installation of so-called "stabilizing braces" onto firearms in 2012. Another commenter contended that the proposed rule represented a clear change in position for ATF on "stabilizing braces." The commenter went on to say that "the Supreme Court recently made clear that an agency action may be 'arbitrary and capricious' because it fails to account for the reliance interests of those affected by the action." *See Dep't of Homeland Sec.* v. *Regents of the Univ. of California,* 140 S. Ct. 1891, 1913–15 (2020) ("*Regents*"). The commenter argued that the proposed rule could put millions of otherwise law-abiding Americans in danger of Federal criminal prosecution.

Department Response

The Department disagrees that the rule is arbitrary in that it failed to account for the reliance interests of those affected by the action. *See Regents,* 140 S. Ct. at 1913–15. In *Regents,* the Supreme Court considered the recission of the Deferred Action for Childhood Arrivals programs and explained that, when an agency changes course from longstanding polices, reliance interests should be taken into account. *Id.* at 1913 (citing *Encino Motorcars* v. *Navarro,* 579 U.S. 211, 222 (2016)). The Supreme Court further clarified that the agency was not required to consider all policy alternatives but was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns. *Id.* at 1915.

While the Department acknowledges previous inconsistencies and the resulting confusion regarding ATF's private and public guidance on firearms equipped with "stabilizing brace" devices, ATF never declared that the marketing of a device as a "stabilizing

brace" when equipped on a firearm removes that firearm from the ambit of the NFA. Additionally, ATF's private classification letters were limited to the particular firearm configured with the particular device that it received from an individual, and its analysis was based on the objective design features of that device or firearm in addition to consideration of the individual's purported intent. Therefore, an individual's reliance on a classification for another person's device or firearm transfers the agency's specific analysis to a different context and hence is misplaced. Similarly, an individual's reliance on the statements of a "stabilizing brace" manufacturer or a firearms manufacturer—especially statements that may misrepresent the government's position—does not represent reliance on a government policy and hence is misplaced. The Department also notes that commenters are mistaken in their assertion that ATF has approved the use of "a shooting support with a pistol" since at least 2006. ATF's first response to an inquiry about "stabilizing" braces was in 2012, as described in section II.B of this preamble.

As it pertains to an individual's reliance on prior classification letters, ATF has notified the public that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in law or regulations." [99] As previously discussed, ATF has discretion to correct its erroneous interpretations and rectify a firearms classification error, as occurred in many of ATF's "stabilizing brace" classifications. Thus, because of ATF's inherent discretion to correct its erroneous interpretations, and because ATF has explicitly provided notice that it has such discretion, any potential reliance interest is reduced.

Moreover, contrary to the assumption of commenters, this rule bans nothing. The Department has provided several courses of conduct that a person in possession of a firearm that is regulated by the NFA may select, including registration of the device in the NFRTR within a defined time period, which would permit an individual to lawfully possess the firearm. Additionally, the individual may reconfigure the firearm to remove it from the scope of the NFA (*e.g.,* the removal and replacement of a barrel of less than 16 inches with a longer barrel) and maintain possession of the firearm. These alternatives

---

[99] ATF, National Firearms Handbook, sec. 7.2.4.1 (2009), *https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.*

demonstrate that the Department has considered the reliance interests of individuals and that any impact of this rule on individuals' perceived reliance interests will be minimal.

It is true that "the APA requires an agency to provide more substantial justification when . . . its prior policy has engendered serious reliance interests that must be taken into account." *Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 106 (2015) (quoting *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515, (2009)). But in light of the options provided for compliance with the relevant statutes, the alleged reliance interest is minimal. The only interest identified is the avoidance of the NFA's making and transfer taxes, but these taxes will not be applied retroactively. Thus, any potential reliance interests are minimal because, in its enforcement discretion, the Department has determined that individuals and FFLs will not be required to pay these taxes. And any interest in avoiding the minor burden associated with registration of a rifle is also not significant. That is both because of the minimal time and expense required for registration and because possession of an unregistered rifle violates the law. *See Regents,* 140 S. Ct. at 1914 (noting that the Department of Homeland Security could have properly found that "reliance interests in benefits that [the agency] views as unlawful are entitled to no or diminished weight"). After carefully considering possible reliance interests, the Department thus finds that any reliance interests are outweighed by the need to properly and consistently apply the relevant statutes.

Moreover, an individual's reliance on ATF's prior positions cannot outweigh the effective enforcement of Federal firearms laws pursuant to the best interpretation of the plain language of the relevant statutes. Here, the Department seeks to inform the public of the objective criteria and other factors it will consider to determine when a firearm is designed, made, and intended to be fired from the shoulder so that the Department can effectively enforce the NFA and GCA and protect public safety. As discussed in this preamble, the NFA and GCA regulate short-barreled rifles by imposing additional tax, interstate-transportation, and interstate-transfer restrictions because Congress deemed them to be dangerous and unusual weapons. If certain firearms equipped with "stabilizing brace" devices are short-barreled rifles under the statutory definition, then the Department cannot permit the proliferation of the weapons in circumvention of the NFA.

### iv. APA—Lack of Data

Comments Received

Several commenters highlighted a lack of data to justify the rule and said that ATF "provides no proof that these weapons are being fired from the shoulder." For example, one commenter stated the rule did not provide any analysis on the frequency with which pistol-braced firearms or short-barreled shotguns are being used in crime in order to justify the rule.

Department Response

The Department disagrees that there is a lack of data to justify the rule. Because, as discussed above, short-barreled rifles are among firearms historically considered by Congress to be unusual and dangerous, the agency is required to implement the NFA and ensure that firearms are properly classified and regulated. As discussed in the NPRM, there have been at least two mass shooting incidents where the shooters reportedly shouldered their weapons by using purported "stabilizing braces" as stocks,[100] killing a total of 19 people.[101] The Department need not wait for such incidents to become more frequent before taking steps to stop them. *See, e.g., Stilwell* v. *Off. of Thrift Supervision,* 569 F.3d 514, 519 (DC Cir. 2009) ("[A]gencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee.") Further, as mentioned in section IV.A.2.a of this preamble, ATF has traced numerous firearms equipped with a "stabilizing brace" in connection with crimes in recent years, suggesting that weapons with "brace" devices are being used to commit crimes even apart from highly publicized incidents such as those in Boulder and Dayton.

[100] *See, e.g.,* Emily Davies, Tim Craig, and Hannah Natanson, *Ex-girlfriend Says Dayton Shooter Heard Voices, Talked about 'dark, evil things',* The Washington Post (Aug. 5, 2019) *https://www.washingtonpost.com/national/police-chief-it-seems-to-defy-believability-that-dayton-shooter-would-kill-his-own-sister/2019/08/05/920a895c-b79e-11e9-b3b4-2bb69e8c4e39_story.html* ("Dayton police spokeswoman Cara Zinski-Neace said Monday that Betts had modified his weapon so that he could stabilize it on his shoulder while firing. Betts had a 'pistol version' of an AR–15-style rifle, she said, not designed to be shouldered. But Betts added a brace."); Melissa Macaya et. al., *10 killed in Colorado grocery store shooting,* CNN (updated Mar. 23, 2021), *https://www.cnn.com/us/live-news/boulder-colorado-shooting-3-23-21/h_0c662370eefaey1ff05eac3ef8d5f29e94* (reporting that the firearm used in a shooting that killed 10 was an AR–15 pistol with an "arm brace").

[101] *See supra* note 67.

### d. Violates the Americans with Disabilities Act ("ADA") or the Rehabilitation Act of 1973

Comments Received

Many commenters asserted that this rule violates the ADA or the Rehabilitation Act of 1973 and deprives thousands of gun owners who have disabilities from the joy of shooting their lawfully owned firearms. Specifically, commenters stated that "ATF is prohibited from making such discriminatory rules under [ the ADA]" and that section 504 provides in part that "no qualified individual with a disability . . . shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that . . . is conducted by any Executive agency. Several other commenters stated that "stabilizing braces" were first made and submitted for classification to assist persons with disabilities, and that ATF did not consider the impact the rule would have on disabled Americans. Another commenter stated that ATF's rulemaking, *i.e.,* the purported "activity" conducted by an Executive agency, "discriminates against disabled persons by arbitrarily limiting design characteristics [of 'braced' pistols] that enhance the effectiveness of the brace design for the disabled person." The commenter stated that there is no evidence that any of the restrictions—weight, adjustability, sights, overall length, length of pull—were determined after consideration of the needs of the disabled community and that these restrictions would adversely impact the disabled community, deny them the benefit of the product intended for them, and discriminate against them in violation of the ADA.

Other commenters said this rule would limit the future availability of "stabilizing braces" to the disabled community if the effect of the rule is to reclassify millions of "stabilizing brace"-equipped pistols as being subject to the NFA.

Department Response

The Department disagrees with commenters that the rule would violate the ADA. As an initial matter, the ADA applies to State and local governments; it does not apply to the Executive Branch of the Federal Government. *See* 42 U.S.C. 12131(1) (defining "public entity" as any State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government; and the National Railroad Passenger Corporation, and any commuter authority). Accordingly,

because ATF is a Federal agency that is not subject to the ADA, the commenters' assertion that this regulation would violate the ADA is incorrect. In addition, commenters' ADA objections to the rule are misplaced because the rule does not itself ban or regulate any particular devices; instead, the rule articulates the Department's best interpretation of the relevant statutory provisions, which are the source of any restrictions or regulations on certain firearms.

In contrast to the ADA, the Rehabilitation Act of 1973 does apply to the Federal Government. However, this rule likewise does not violate that Act. Section 504 of the Rehabilitation Act prohibits the discrimination "solely by reason of disability" in Federally conducted programs and activities. 29 U.S.C. 794(a). The Rehabilitation Act "requires that people who are disabled within the meaning of the Act have meaningful access to the federal government's programs or activities." *National Ass'n of the Deaf* v. *Trump*, 486 F. Supp. 3d 45, 57 (D.D.C. 2020) (quotation marks omitted). The "relevant inquiry is whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Id.* (quotation marks omitted). As applied here, the classification of a firearm is not a "program or activity" as defined in section 794(b) of the Act. *See* 29 U.S.C. 794(b) (listing covered programs and activities). Second, no one is legally entitled to violate the NFA. Third, as explained below, neither the statute nor the rule denies or impedes anybody meaningful access to anything.

This rule does not restrict the use of a "stabilizing brace." A weapon with a "stabilizing brace" may be possessed without any NFA restrictions if that weapon falls outside the NFA's definition of "firearm," (*e.g.*, the weapon is not designed, made, and intended to be fired from the shoulder); thus, even after issuance of this rule, persons with disabilities will be able to purchase and use certain "stabilizing braces" without regulation under the NFA. Moreover, even a weapon with a "stabilizing brace" that falls within the definition of "firearm" in the NFA may be possessed and used if the statutory requirements are followed. All individuals who possess such a firearm may register that firearm in the NFRTR. There are other options available, discussed in section V.B of this preamble, for all individuals affected by the NFA's restrictions so they can continue to use a "stabilizing brace" while remaining in compliance with the law.

Finally, persons with disabilities are not denied benefits or subject to discrimination under this rule "solely by reason of their disability." This rule articulates the Department's best interpretation of the relevant statutory provisions, and ATF interprets and uniformly applies those provisions to every person. Notably, it appears that no commenter provided any specific information to suggest that this rule, or the NFA's requirements, would cause qualified individuals with disabilities, solely by reason of their disability, to be excluded from the participation in, subjected to discrimination under, or denied the benefits of any program or activity of ATF. Accordingly, there is nothing in the record to suggest that this rule would raise concerns under the Rehabilitation Act of 1973, and the Department disagrees that this rule "adversely impact[s] the disabled community, or [denies] them the benefit of the product intended for them."

### 2. Definition of "Rifle"

#### Comments Received

The Attorney General of Ohio stated that DOJ's interpretation of "rifle" was arbitrary and had no basis in the statutory text. Another commenter argued that the definitions of "rifle" in the GCA and NFA are inconsistent and that ATF's interpretation in the NPRM confuses the existing regulations by introducing arbitrary and subjective factors. Thus, the commenters stated that ATF's claim of having proposed this rule to "clarify when a rifle is intended to be fired from the shoulder" is impossible to decipher. One commenter also stated that ATF's claim of clarifying when a rifle is intended to be fired from the shoulder is misleading to the public, and, thus, the public would misunderstand the purpose of the rule. The same commenter stated that there was no need for this purported amendment of the statutory definition of "rifle," as the rule should focus on approving or disapproving "stabilizing braces." Another commenter noted that the term "peripheral accessories"—a term used in the proposed regulatory text—lacked a proper definition.

#### Department Response

The Department respectfully disagrees with the characterization that this interpretation of the term "rifle" is arbitrary and without statutory basis. Congress, in drafting the GCA and NFA, purposefully defined "rifle" broadly. Specifically, the GCA defines the term "rifle" as "a weapon designed or redesigned, made or remade, and

intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 18 U.S.C. 921(a)(7). The NFA defines the term "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. 5845(c). Despite slightly different wording, both statutes share a common focus in defining the term "rifle" in that whether a weapon is a rifle depends primarily on whether it is designed, made, and intended to be fired from the shoulder. This rule provides a clear explanation and guidance to both individual owners and manufacturers regarding the objective design features and other factors that indicate whether a firearm equipped with a "stabilizing brace" or other rearward attachment is a "rifle" designed, made, and intended to be fired from the shoulder.

Likewise, the Department disagrees with commenters that it is misleading the public when it claims that the purpose of the rule is to clarify when a rifle is designed, made, and intended to be fired from the shoulder. Due to inconsistent advice regarding how the use of a "stabilizing brace" device affected a classification and the resulting public confusion on the proper application of the NFA and GCA to firearms with "stabilizing braces," as described in the NPRM and this final rule, the Department seeks to inform the industry and public on the best interpretation regarding when "a firearm is designed . . . , made . . . , and intended to be fired from the shoulder" within the meaning of the relevant statutory terms.

Also, the Department disagrees that there is no need to clarify the term "rifle" and that ATF should focus on only approving or disapproving "stabilizing braces." As described earlier, the GCA and NFA regulate "firearms" and generally do not regulate the classification or use of individual components or accessories, standing alone. Accordingly, ATF generally does not classify components or accessories, unconnected to a particular firearm, under the GCA and NFA. However, components or accessories, when attached to a firearm, can affect the classification of a firearm because: (1) a component or an accessory's likely use

in the general community may be relevant in assessing the manufacturer's or maker's purported intent with respect to the design of a firearm; and (2) the design of a component or an accessory may result in a firearm falling within a particular statutory definition. Two examples would be: (1) the attachment of a secondary forward grip to a "pistol," where the resulting firearm would no longer be designed to be held and fired with a single hand; and (2) a wallet holster where the handgun can be fired while inserted, thus changing the classification of these handguns into an "any other weapon." *See* 26 U.S.C. 5845(e). A "stabilizing brace," of which there are many variations, is another example of an attachment that may affect the classification of the firearm to which it is attached. The question, however, remains whether the firearm as configured with the "brace" device is designed, made, and intended to be fired from the shoulder, even if the "stabilizing brace" has an alternate use that effectuates single-handed firing.

The rule's amendment to the definition of "rifle" does not use the term "accessory," and therefore the definition of that term is irrelevant to this rule. Nonetheless, if the term "accessory" is relevant, the Department maintains it would not be necessary to further provide a definition for this term.[102]

### 3. ATF Worksheet 4999

#### a. General Opposition to Worksheet 4999

##### Comments Received

There was general dissatisfaction with the proposed Worksheet 4999. Several commenters claimed that the worksheet was designed in such a way that the average person would not know if their handgun with an attached "stabilizing brace" was an NFA firearm without first obtaining a determination from FATD. Many commenters stated that they found the worksheet not only to be confusing and overly complex to determine if their firearm with a "brace" device is a rifle, but also that the worksheet was "rife with factual errors." The Ohio Attorney General argued that "the brace itself is not a 'weapon,'" so it "cannot be a rifle on its own," and another commenter stated "ATF has clearly approached this problem solely from the standpoint of a short-barreled rifle and has not

examined what features are useful for a pistol." Generally, commenters did not understand the reasoning behind Worksheet 4999, with one commenter stating that "[i]f the act of shouldering a pistol does not make it a [short-barreled rifle], why does it matter whether the stabilizing brace design encourages, discourages, or prevents shouldering?" They also claimed that the worksheet, which followed a complex, mathematical formula, was a radical departure from the GCA's definition of "rifle." One commenter said that ATF "make[s] a weak argument on how to objectively categorize pistols with braces versus [short-barreled rifles]."

One commenter argued that the proposed rule and Worksheet 4999 focused on factors that assess grip rather than factors that assess shouldering. By focusing on grip, the commenter argued, ATF's reasoning is "divorced from statutory text." The commenter argued that it unreasonable and unfair for ATF to adopt a rule that weighs indicia that braced pistols may be fired with two hands as evidence that the braced pistols are NFA firearms or GCA short-barreled rifles.

##### Department Response

As stated in the NPRM, the proposed Worksheet 4999, including the points assigned to each criterion, was intended to facilitate the evaluation by individuals or members of the industry of whether a weapon incorporating a purported "stabilizing brace" created a rifle and, possibly, a short-barreled rifle under the GCA and NFA. Worksheet 4999 was intended to ensure uniform consideration and application of the statutory definition of those terms. Based on the comments received, the Department agrees that the proposed Worksheet 4999 and point system did not achieve these intended purposes. The Department acknowledges commenters' concerns that the proposed worksheet was confusing and complex but disagrees that the worksheet was "rife with factual errors." The background section, above, highlights the objective characteristics considered in ATF's prior evaluations, including the weight of the firearm, the length of pull, the adjustability of the device attached to the firearm, the existence of a forward grip, and other accessories. The Department acknowledges in this rule that it had incorrectly included in the proposed regulatory changes some design characteristics that are not indicative of whether a firearm is designed and intended to be fired from the shoulder. As described in this rule, the relevant inquiry under the NFA and

GCA for the definition of "rifle" is whether the firearm is designed, made, and intended to be fired from the shoulder.

In this regard, the Department agrees with commenters like SB Tactical who argued that the NPRM and the worksheet improperly assessed gripping the firearm with one hand rather than assessing factors for shouldering the firearm because gripping with one hand is not relevant to the statutory inquiry of "rifle." Indeed, the Department agrees that the proposed analysis in the NPRM, vis-à-vis Worksheet 4999, continued to use the analysis from prior classifications that placed improper weight on whether the "stabilizing brace" at issue could be used as a "brace" to support single-handed fire, even if the objective design features of the firearm equipped with the "brace" indicated the weapon had been designed, made, and intended to be fired from the shoulder. In light of the comments, the final rule identifies and selects from the NPRM only those features that are relevant in determining whether a firearm is designed, made, and intended to be fired from the shoulder under the GCA and NFA. Therefore, design characteristics from the proposed Worksheet 4999 (*e.g.,* stabilizing support or configuration, presence of hand stops and secondary grips, and presence of a bipod) are not included in this rule because they are not relevant to determine whether a firearm is designed, made, and intended to be fired from the shoulder.

The Department also agrees with commenters that a "stabilizing brace" itself is not a weapon, and therefore the Department updates the regulation to reflect how the ATF now classifies a firearm for purposes of the GCA and NFA—*i.e.,* by assessing the firearm with the attached "brace" device as a whole. The Department disagrees that "ATF has clearly approached this problem solely from the standpoint of a short-barreled rifle and has not examined what features are useful for a pistol." After careful review and consideration, ATF recognizes that many prior classifications incorrectly weighed the utility of the purported "stabilizing brace" to allow for effective one-handed firing. The Department has determined, however, that the best interpretation of the statutory definitions requires an assessment that goes beyond the effectiveness of a "stabilizing brace" device for single-handed firing. The Department's interpretation of the statutes, as reflected in this rule, focuses on the objective design features of the firearm and the attached "stabilizing brace" to ensure that applying that

---

[102] Regarding the use of the term "accessory" in this rule, *see supra* note 35. For purposes of the AECA, ATF has consulted the definition of "accessory" found in 22 CFR 121.8, which is part of the International Traffic in Arms Regulations administered by the Department of State.

interpretation properly classifies firearms that are designed, made, and intended to be fired from the shoulder as "rifles," even if such weapons might also be capable of one-handed fire. Because the Department has determined that the best interpretation of the statute calls for an assessment of whether the manufacturer's stated intent is consistent with the objective design features of the firearm, this rule also includes consideration of marketing or promotional materials and likely use of the weapon in the general community among the factors to be considered in determining whether a weapon is designed and intended to be fired from the shoulder.

In clarifying the definition of "rifle," this rule states that the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed below, indicate that that the weapon is designed, made, and intended to be fired from the shoulder:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

The Department believes that the rule's final regulatory text reflects the best interpretation of the statutory text.

The objective design features in this rule are taken from the NPRM and also

can be identified on the proposed ATF Worksheet 4999, as discussed below.

(1) *Final Rule:* Surface area that allows the weapon to be fired from the shoulder.

Because both the GCA and NFA define a "rifle" as a weapon "designed . . . , made . . . , and intended to be fired from the shoulder," the Department believes that a weapon equipped with a "brace" or other rearward attachment must first satisfy the requirement that it have surface area that allows for the weapon to be fired from the shoulder. A firearm that does not have surface area that allows for the weapon to be fired from the shoulder cannot qualify as a rifle.

The NPRM discussed the objective design feature of "surface area" and explained that some "stabilizing braces" provide larger, more substantial surface area to shoulder the firearm, while some "stabilizing braces" may provide less surface area. 86 FR at 30832. The NPRM discussed this factor in the context of the proposed Worksheet 4999, which included relevant subsections under Section II (Accessory Characteristics) and Section III (Configuration of Weapon). These subsections assessed points for the surface area provided by a "brace" device to shoulder a weapon and the attachment method of the "brace" on a firearm. The NPRM explained that the attachment method of the "stabilizing brace" provides insight as to how the firearm is intended to be used because material that extends the rear of the firearm toward the shooter serves as surface area that allows for shouldering the weapon and increases a firearm's length of pull. *Id.* at 30831, 30833. Accordingly, this rule incorporates these concepts from the NPRM and proposed worksheet—the attachment method of the accessory and the surface area—under the objective design feature of "surface area" so that an assessment of whether a weapon that is equipped with an accessory or rearward attachment provides surface area that allows the weapon to be fired from the shoulder shall be the first step in determining that a weapon is rifle designed, made, and intended to be fired from the shoulder. In making the determination of whether surface area "allows" for shoulder firing, ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area. Instead, ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon. If the firearm includes surface area that can be used for shoulder firing the weapon, the weapon potentially qualifies as a "rifle"; in

contrast, if the weapon does not include such surface area, then it does not qualify as a "rifle." To assess whether a potential rifle is in fact a rifle, ATF would then consider the other factors described below.

(2) *Final Rule:* Weight and length consistent with the weight and length of rifles.

This rule identifies weight and length as one of several objective design features in considering whether a firearm is designed, made, and intended to be fired from the shoulder. This factor is drawn from the NPRM, where the Department considered weight and length as a prerequisite for whether a "stabilizing brace" would be effective in stabilizing a firearm or whether the firearm would be too heavy to be fired from one hand. *Id.* at 30831, 30834. The NPRM stated that a firearm equipped with a "stabilizing brace" that was of a certain weight and within a length range equipped with a "stabilizing brace" would be a rifle because otherwise the firearm would be too heavy to be held by one hand. *Id.* Section I of the worksheet included the conditions for meeting the weight and length requirements. *Id.* at 30831. The weight of the firearm was again considered in Section III of the worksheet under peripheral accessories, where points were assessed if the weapon as configured weighed over 120 ounces. *Id.* at 30834. However, in response to comments pointing out that these lengths and weights were not necessarily dispositive of whether a firearm is intended to be fired from the shoulder, this rule considers the weight and length of a firearm equipped with a "brace" device against the weight and length of similarly designed rifles as a factor that can confirm whether a firearm, which has a rearward attachment that provides surface area for shouldering, is in fact a rifle.

(3) *Final Rule:* A length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component, or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles.

The rule incorporates length of pull as an objective design feature from the NPRM because, as explained in the NPRM, it is a common measurement of firearms that describes the distance between the center of the firearm's trigger and the rear center of the shoulder stock. *Id.* at 30833. A shoulder-fired weapon generally will have a length of pull that allows the placement