of the firearm's shouldering device against the shooter's shoulder while also ergonomically allowing the shooter to engage the firearm's trigger. The NRPM provided length of pull measurements consistent with shoulder-fired weapons and the Worksheet 4999 included a Length of Pull subsection under Section III (Configuration of Weapon). *Id.* at 30831. The NPRM also explained that the attachment method of the "stabilizing brace" provides insight as to how the firearm is intended to be used because material that extends the rear of the firearm towards the shooter serves as a shouldering device by increasing a firearm's length of pull. *Id.* at 30833. The Worksheet 4999 assessed two points for "Extended AR-type Pistol Buffer Tube," "Inclusion of Folding Adapter to extend length of pull," and "Use of 'spacers' to extend length of pull." *Id.* at 30831.

The length of pull feature encompasses the inclusion on the weapon of an adjustable or telescoping attachment with the ability to lock in various positions. This feature was described in the NPRM, which noted that adjustability is a characteristic commonly associated with shoulder stocks and a significant indicator that the device is designed and intended to be shouldered. *Id.* at 30832. Section II (Accessory Characteristics) of the worksheet included a subsection for adjustability. *Id.* at 30830. Additionally, Section III (Configuration of Weapon) of the worksheet assessed one point for a weapon that incorporates an "AR-type Pistol Buffer Tube with Adjustment Notches (KAK-type)," "Adjustable Rifle Tube," and "Adjustable PDW-type guide rails." *Id.* at 30831. An adjustable or telescoping attachment with the ability to lock into various positions along the rear of the firearm allows an individual to adjust a firearm's surface area toward the shooter and permits the shooter to place pressure on the rear of the device when firing the weapon without the device or attachment sliding forward.

This rule therefore clarifies that the objective design feature to be considered is length of pull that is consistent with similarly designed rifles, as measured from the center of the trigger to the center of the shoulder stock or other rearward accessory. This consideration necessarily includes whether the accessory is an adjustable or telescoping attachment with the ability to lock into various positions because an adjustable length of pull allows a shooter to exercise better control, improve accuracy, and maintain comfort when shooting based on the shooter's body or shooting preferences.

(4) *Final Rule:* Sights or scopes with eye relief that require shouldering of the firearm in order to be used as designed.

The final rule draws from the NPRM the concept that certain installed sights or scopes are indicators of intended use of firearm with an attached "stabilizing brace." *Id.* at 30834. The worksheet identified some types of sights that are only partially usable when firing the weapon with one hand. Sights that can only be used effectively when the weapon is shouldered were assigned more points on the worksheet. *Id.* For example, the Worksheet 4999 assessed one point for the "Presence of Rifle-type Back-up/Flip-up Sights/Or no sights"; two points for the "Presence of Reflex Sight with FTS Magnifier w/Limited Eye Relief'; and four points for the "Presence of a Sight/Scope with Eye Relief Incompatible with one-handed fire." *Id.* at 30831. For the final regulatory text, rather than list some specific types of sights or scopes, as attempted in the worksheet, the Department determined that the relevant inquiry for this objective design feature is whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed. Sights or scopes that cannot be used without shouldering the weapon indicate that the firearm is designed, made, and intended to be fired from the shoulder.

(5) *Final Rule:* Necessary for the cycle of operations of the firearm.

The rule provides that ATF may also consider whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, component, or other rearward attachment that is necessary for the cycle of operations (*i.e.,* to expel a projectile by the action of an explosive). This consideration is drawn from the NPRM and the proposed Worksheet 4999, which assessed two points for "Extended AR-type Pistol Buffer Tube," "Inclusion of Folding Adapter extending length of pull," and "Use of 'Spacers' to extend length of pull." *Id.* at 30831. These extensions provide additional material to the firearm that is not required for the cycle of operations and, therefore, can be an indicator the firearm is designed, made, and intended to be fired from the shoulder. In contrast, material on a firearm that extends the rear surface area of the firearm toward the shooter but is required for the cycle of operations, such as an AR-type pistol with a standard 6 to 6–½ inch buffer tube, may be an indicator that the firearm is not designed, made, and intended to be fired from the shoulder.

Even if a weapon is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows shouldering of the weapon, under the rule, whether the accessory, component, or other rearward attachment is necessary for the cycle of operations needs to be considered in determining whether a firearm is designed, made, and intended to be fired from the shoulder.

(6) *Final Rule:* Consideration of marketing or promotional materials and likely use of the weapon in the general community.

In addition, the NPRM discussed how ATF looks to a weapon's objective design features that can confirm or undermine the manufacturer's stated intent. *Id.* at 30827. The NPRM also provided, that "regardless of the points accrued" on the Worksheet 4999, "efforts to advertise, sell, or otherwise distribute 'short-barreled rifles' as such will result in a classification as a 'rifle'. . . because there is no longer any question that the intent is for the weapon to be fired from the shoulder." *Id.* at 30834; *see also id.* at 30829 (noting that certain firearms would not be classified as rifles "unless there [was] evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder"). The rule, therefore, clarifies that marketing or promotional materials indicating the intended use of the weapon and any information demonstrating how the weapon with the attachment is likely to be used by the general community shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder. These factors are considered in conjunction with the objective design features of the firearm equipped with a "stabilizing brace" to determine whether the firearm is designed, made, and intended to be fired from the shoulder.

The remainder of this section explains the comments received on the proposed Worksheet 4999 and point system and elaborates on the objective design features and other factors relevant in the determination of whether a weapon is a rifle. The Department also notes that, because prior ATF classifications of firearms equipped with a "brace" device did not all employ this correct understanding of the statutory terms, all such prior classifications are no longer valid as of May 31, 2023. Manufacturers that wish to sell firearms equipped with a "stabilizing device" may submit to FATD their firearm sample equipped

with its attachments for an evaluation and analysis consistent with this rule.

b. Worksheet 4999 Criteria and Point System

Comments Received

In addition to general opposition to the proposed Worksheet 4999, numerous commenters critiqued the factoring criteria, claiming they were either arbitrary or too complicated to understand. Despite ATF's statements in the NPRM regarding the purpose of the worksheet, commenters questioned whether the worksheet could provide uniform consideration and application because it contains ambiguous terms that are subject to interpretation and no measurable standards for many of the criteria. Numerous commenters argued that, under the proposed worksheet, "no pistol-braced firearms would count as a pistol," especially when applying Section II. The commenters claimed it was evident that ATF intended to classify everything with a barrel length under 16 inches as an NFA firearm. Similarly, some commenters claimed that most "braced" pistol firearms would fail the criteria on the worksheet and that the highly subjective factors would allow ATF to arbitrarily weigh points in favor of regulation under the NFA. One company expressed concern that its product would be classified as an NFA firearm under the proposed rule based merely on weight and length characteristics.

Other commenters stated that, although ATF purported to be publishing objective factoring criteria, the ATF Worksheet 4999 was subjective and that the new, design-based "features" such as weight and length, length of pull, or type and caliber, looked like they were designed and intended to derive a predetermined outcome. One commenter chastised ATF by stating "[i]t is clear that ATF can distinguish between a stock and a brace and is wrapping the application of braces into the 'stocked pistol' route to [a short-barreled rifle] despite their understanding and creation of the issue."

Numerous commenters also asserted that points were arbitrarily assigned without justification or explanation. Commenters asked questions such as how ATF determined that 4 points would be the standard to pass or fail the worksheet and believed that ATF's analysis, or lack thereof, of the factors was incorrect; and why did ATF not explain "why it is appropriate to use a rifle measurement when analyzing pistols." At least one commenter suggested that ATF should abandon the point-based worksheet and replace it with "specific product guidelines on which specific stabilizing braces are effectively substitute shoulder stocks so that private citizens can easily determine whether any in their possession (or that they plan to purchase) would be lawful as-is or if an NFA stamp must be obtained."

In addition to comments that the points assigned were arbitrary, numerous commenters also raised other issues on certain criteria as they did not agree with how ATF characterized the factors and the associated issues.

Department Response

The Department agrees with commenters that the factoring criteria with a point system as proposed in the Worksheet 4999 were not easily understood or applied. The Department also agrees that some of the terms from the NPRM and worksheet were ambiguous and subject to interpretation. The Department also acknowledges that the NPRM's explanation for the assessment of points for specific factors was not as clear to the public as it had intended. However, the Department disagrees with the commenter who asserted that design features do not include a standard measurement. Likewise, the Department maintains the proposed factors were taken from prior ATF classifications pertaining to "stabilizing braces" and are consistent with the NFA and GCA.

Nevertheless, after careful review and consideration of the comments, the objective design features of rifles, and the administrative record, the Department does not adopt the proposed Worksheet 4999 and point system in this rule. The Department concluded the proposed Worksheet 4999 is unworkable first because Section II of the worksheet improperly considered the design of the "brace" separately from the configuration of the firearm. Further, Section III of the worksheet focused more on certain factors concerning the effectiveness of the "brace" in firing with a single hand rather than concentrating on rifle characteristics. The Department agrees that the proper inquiry in determining whether the firearm is designed, made, and intended to be fired from the shoulder should look at objective design features common to rifles. The Department recognizes that, even if a "stabilizing brace" may be used to support single-handed fire, this does not preclude a firearm from being designed, made, and intended to be fired from the shoulder under the relevant statutory provisions.

Because the Department recognizes that proposed Worksheet 4999 was flawed and that some of the terminology used was ambiguous, and that the factors indicated in Worksheet 4999 could have been applied subjectively based on the ambiguous terminology, the Department believes the objective design features adopted in this rule provide a more definitive method to determine when a firearm is designed, made, and intended to be fired from the shoulder. Additionally, this rule clarifies and simplifies the criteria from the Worksheet by describing clear and unambiguous objective design features that can be readily assessed. These assessments are summarized briefly here and discussed further below:

First, the weight and length of a firearm are quantifiable, easily measured metrics. ATF will measure the weight and length of the firearm while it is equipped with the "stabilizing brace" affixed to it. How ATF will evaluate the weight or length of firearms equipped with a "stabilizing brace" as compared to similarly designed rifles is described in section IV.B.3.b.i of this preamble.

Second, length of pull is a quantifiable and easily assessed measurement, and section IV.B.3.b.ix of this preamble provides a robust discussion on length of pull, how it is measured, the adjustability or telescoping ability of the "brace" on the firearm, and how it will be compared to other similarly designed rifles.

Third, the standard for sights or a scope that require shouldering to be used as designed can be measured by testing the sights or scope from the shoulder versus use with one hand. If the sights or scope can be used only while shouldering the firearm, this feature supports a conclusion that the firearm is a rifle. For further discussion, refer to section IV.B.3.b.xi of this preamble.

For these reasons, the Department agrees with the commenter who suggested that the point-based worksheet be abandoned; however, the Department does not find it administratively feasible to replace the worksheet with that commenter's suggestion of an exhaustive list of "braces." The rule provides clarification that a firearm designed, made, and intended to be fired from the shoulder includes a weapon that provides surface area that allows the weapon to be shouldered, provided the other factors discussed in this preamble and listed in the amended regulations also indicate the weapon is designed, made, and intended to be fired from the shoulder. The Department believes this final rule

allows for easier application by the firearms industry and individual firearm owners as compared to the approach in the NPRM and ATF's current approach. Also, ATF is publishing information simultaneously with this rule to inform members of the public of how they might be impacted based on (1) common weapon platforms with attached "stabilizing brace" designs and (2) examples of commercially available firearms with "stabilizing braces" that are short-barreled rifles. For such weapons, action such as registration in the NFRTR will need to be taken as discussed in section V.B of this preamble. Additionally, ATF will inform the public as new weapon systems and "stabilizing braces" or other devices become available.

### i. Weight and Length Prerequisites

Comments Received

Many commenters did not agree with or understand ATF's rationale regarding weight and length as prerequisites before applying Worksheet 4999's factors to evaluate a firearm equipped with a "stabilizing brace." Commenters disputed ATF's statement from the NPRM that pistols that fall below the weight and length threshold are easily fired one-handed, and they asserted that the minimum and maximum weights seemed to be arbitrary prerequisites because the effectiveness of a "stabilizing brace" is related to balance, not its overall weight. Other commenters opined that it was not reasonable to have a minimum weight and length and that weapon weight does not have a bearing on the use of a "stabilizing brace." ' Another commenter stated that, according to the length and weight prerequisites, "our product, the Micro RONI® with Arm Support, [is] NFA regulated (requiring registration and tax payment)." Finally, one commenter stated that weight should not be a factor because there is no "bright line" size or weight of a gun below which a "stabilizing brace" would never be useful.

Commenters also disagreed with the proposed minimum and maximum length requirements. One commenter stated that weapons over 26 inches may be fired from the hip using two hands and that ATF has historically recognized that weapons over 26 inches provide an appropriate platform for a brace. Likewise, the same commenter stated there are firearms under 12 inches that have a recoil higher in foot pounds than some AR15 pistols for which a "brace" would be needed. Another commenter disagreed with the overall length requirement and incorrectly asserted that "if two AR-type pistols equipped with a stabilizing brace have the same weight, but one has an overall length of 24 [inches] and the other has an overall length of 27 [inches], the latter would automatically be a short-barreled rifle" when "[i]n fact, the stabilizing brace would be more useful on the longer pistol because it will tend to be more 'front heavy'." In essence, this commenter did not understand why ATF concluded that only "handguns" may utilize a stabilizing brace. They argued that if a firearm is over 26 inches in length and features a secondary forward grip, the stabilizing brace would still be useful to allow single-handed shooting "*when the user decides to do that*." (Emphasis in the original.)

The same commenter was troubled with the application of the weight factor, as it seemed to vary from section-to-section in Worksheet 4999 and as written, appeared to the commenter to "stack the deck in favor of disqualification." The commenter provided the example that in "Section I (where a lighter weight will reclassify a pistol as a short-barreled rifle) 'accessories' are removed," whereas "in Section III (where a heavier weight will reclassify a pistol as a short-barreled rifle) 'accessories' are not removed."

### Department Response

The Department agrees with commenters that weight and length should not be used as prerequisites to determine whether use of a "stabilizing brace" on a given firearm effectively creates a rifle. The Department also agrees that there should not be an upper weight threshold of 120 ounces because there is no bright-line size of a gun for which a "stabilizing brace" would be useful. The Department, however, disagrees with the assertion that weight and length of a firearm are irrelevant to whether a firearm is designed, made, and intended to be fired from the shoulder. The purpose for using weight and length as prerequisites was to evaluate whether a "stabilizing brace" in fact could be practically used with heavy pistols. However, as previously discussed, the Department recognizes that focusing on whether a "stabilizing brace" can practically or effectively be used on a firearm for single-handed fire is not the correct inquiry. When a firearm equipped with a "stabilizing brace" has surface area that allows the firearm to be shoulder fired, it is helpful to compare the characteristics of that firearm to similar firearms that are designed, made, and intended to be fired from the shoulder to determine if the first firearm is a rifle. If the weight or length of the firearm in question is consistent with the weight or length of similarly designed rifles, then this would be an indicator that shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed, made, and intended to be used this way.

To further inform the public of examples of weights and lengths consistent with rifles, ATF's FATD weighed a variety of rifles, traditional and modern, from the National Firearms Collection.[103]

| Manufacturer | Model | Caliber | Barrel length | Weight (pounds) |
|---|---|---|---|---|
| COLT | SMG | 9x19mm | 9½″ | 5.3 |
| COLT | AR-15 | .223 REM | 16″ | 6 |
| Q | HONEY BADGER | .300 BLK | 7″ | 4.4 |
| LWRC | M6 | .223 REM | 10½″ | 6 |
| SIG SAUER | MCX | .223 REM | 16″ | 7.9 |
| SIG SAUER | MCX RATTLER | .300 BLK | 6″ | 6 |
| MAXIM DEFENSE | MDX | .223 REM | 7″ | 5.1 |
| MAXIM DEFENSE | PDX | .223 REM | 6″ | 6 |
| LRB ARMS | M15SA | .223 REM | 7″ | 5.1 |
| BCI DEFENSE | SQS15 | .223 REM | 8″ | 4.6 |
| H&K | MK16 | .223 REM | 14″ | 6.6 |

---

[103] The National Firearms Collection is a firearms and ammunition collection for research that houses more than 12,000 firearms.

| Manufacturer | Model | Caliber | Barrel length | Weight (pounds) |
|---|---|---|---|---|
| Z-M WEAPONS | LR300 | .223 REM | 16½″ | 7.1 |
| OLYMPIC ARMS | M.F.R. | .223 REM | 16″ | 7.9 |
| ARSENAL | AKS-74U | .223 REM | 8½″ | 5.7 |
| ARSENAL | SAS M-7 | 7.62x39mm | 16″ | 6.8 |
| YUGOSLAVIA | AK-47 | 7.62x39mm | 16″ | 5.7 |
| ZASTAVA | AK-47 | 7.62x39mm | 16″ | 6.8 |
| IRAQ | TABUK | 7.62x39mm | 12″ | 7.9 |
| RUSSIAN | KRINK | 7.62x39mm | 8″ | 5.5 |
| MAGUA INDUSTRIES | MINI-BERYL | .223 REM | 8″ | 7.1 |
| H&K | MP5K | 9x19mm | 4½″ | 5.5 |
| H&K | MP5 | 9x19mm | 9″ | 4.2 |
| H&K | UMP | .45 ACP | 8″ | 4.4 |
| BOBCAT WEAPONS | BW-5 | 9x19mm | 9″ | 5.6 |
| HK | USC | .45 ACP | 16⅛″ | 6 |
| S.W.D. | CM-11 | 9x19mm | 17⅛″ | 6.2 |
| S.W.D. | M-11/NINE | 9x19mm | 5½″ | 4.2 |
| M.A.C. | M10 | .45 ACP | 5⅞″ | 6 |
| MAC PMF | M11 | .380 ACP | 5⅛″ | 3.3 |
| JERSEY ARMS | AVENGER | .45 ACP | 6⅜″ | 6.2 |
| RPB | M10 | 9x19mm | 5⅞″ | 6.2 |
| IMI | UZI | 9x19mm | 10″ | 5.5 |
| IMI | MINI UZI | 9x19mm | 8″ | 5.5 |
| IMI | MICRO UZI | 9x19mm | 5¼″ | 3.7 |
| IMI | MICRO UZI | 9x19mm | 5⅜″ | 4.4 |
| IWI | UZI PRO | 9x19mm | 6¾″ | 4.4 |
| LWRC | SMG45 | .45 ACP | 8¾″ | 6 |
| SIG SAUER | MPX | 9x19mm | 3½″ | 4 |
| SIG SAUER | MPX | 9x19mm | 4½″ | 5.3 |
| SIG SAUER | MPX | 9x19mm | 5½″ | 5.7 |
| B&T | APC9 | 9x19mm | 7″ | 6 |
| B&T | TP9 | 9x19mm | 6″ | 3.5 |
| BERETTA | CX4 STORM | 9x19mm | 16¾″ | 5.7 |
| BERETTA | CX4 STORM | .40 S&W | 18″ | 5.1 |
| DBX | 5.7DBX | 5.7x28mm | 8″ | 3.7 |
| CZ | EVO SCORPION | 9x19mm | 8″ | 5.3 |
| CZ | EVO SCORPION | 9x19mm | 9″ | 6.7 |
| CZECH | SKORPION | .32 ACP | 4½″ | 3.1 |
| GRAND POWER | STRIBOG SP9A1 | 9x19mm | 8″ | 6 |
| INTRATEC | MP9 | 9x19mm | 5⅛″ | 3.7 |
| INTRATEC | TEC-KG9 | 9x19mm | 4¼″ | 5.3 |
| CALICO | M900 | 9x19mm | 16″ | 5.1 |
| RUGER | PC CARBINE | 9x19mm | 16¼″ | 7.5 |
| RECOVER TACTICAL | PI-X | 9x19mm | 4½″ | 4.2 |
| FN | P90 | 5.7x28mm | 12″ | 5.9 |
| FN | PS90 | 5.7x28mm | 18½″ | 6.6 |
| HK | MP7 | 4.6x30mm | 8″ | 4.4 |
| KRISS | VECTOR | .45 ACP | 6″ | 6.4 |
| KRISS | VECTOR | .45 ACP | 16″ | 7.3 |
| HI-POINT | 4095 | .40 S&W | 17⅝″ | 6.6 |
| KEL-TEC | SUB2000 | 9x19mm | 16⅛″ | 4 |
| STEYR | MP40 | 9x19mm | 9¾″ | 7.5 |
| STEN | MK11 | 9x19mm | 7¾″ | 5.7 |
| FB | MSBS | .223 REM | 17″ | 7.3 |
| IWI | CARMEL | .223 REM | 13½″ | 6.8 |
| FN | SCAR-16 | .223 REM | 14″ | 7.5 |
| FN | SCAR PDW-P | .223 REM | 7½″ | 6.6 |
| FN | FS2000 | .223 REM | 19″ | 7.7 |
| CZ | BREN 805 | .223 REM | 11″ | 7.9 |
| REMINGTON | 700 | .308 WIN | 12½″ | 7.1 |
| HK | HK93 | .223 REM | 13″ | 8.4 |
| STEYR | AUG | .223 REM | 21½″ | 8.4 |
| STEYR | AUG | 9x19mm | 16¾″ | 7.7 |
| WINCHESTER | 1894 | .30 W.C.F. | 15″ | 6 |
| GERMANY | STG44 | 7.92 KURTZ | 16¼″ | 9.9 |
| RUGER | MINI-14 | .223 REM | 18½″ | 7.1 |
| KEL-TEC | SU-16 | .223 REM | 18½″ | 5.1 |
| BERETTA | RX4 STORM | .223 REM | 12½″ | 7.1 |
| INLAND | M2 CARBINE | .30 CAL | 18″ | 4.9 |
| US | M2 CARBINE | .30 CAL | 18″ | 4.6 |
| BROWNING | BUCKMARK | .22LR | 18″ | 4.9 |
| MAUSER | C96 | 7.63x25mm | 5½″ | 3.1 |
| DWM | LUGER | 9x19mm | 7⅞″ | 2.9 |
| DWM | LUGER | 9x19mm | 4¾″ | 3.1 |

| Manufacturer | Model | Caliber | Barrel length | Weight (pounds) |
|---|---|---|---|---|
| MAUSER | C96 | .30 Mauser | 5⅝″ | 3.5 |
| MAUSER | C96 | 9x19mm | 5⅝″ | 3.3 |
| GERMANY | STECHKIN | .380 ACP | 5⅝″ | 3.3 |
| UNITED KINGDOM | MK6 | .455 WEB | 6″ | 5.5 |
| STAR | 1911 | .38 Super | 5″ | 4 |
| BROWNING/FN | HI-POWER | 9x19mm | 4¾″ | 3.3 |
| BERETTA | 93R | 9x19mm | 6¼″ | 3.1 |
| CAA | MCK CL | 9x19mm | 4″ | 2.9 |
| CAA | MCK GEN 2 | 9x19mm | 4″ | 3.7 |
| FIRE CONTROL UNIT | X-01 | 9x19mm | 3⅞″ | 3.7 |
| RECOVER TACTICAL | 20/20N | 9x19mm | 4½″ | 2.2 |
| FAB DEFENSE | KPOS G2 | 9x19mm | 9″ | 3.7 |
| ACCURATE PISTOL SYSTEMS | GLOCK 17 | 9x19mm | 4½″ | 2.9 |
| ENDO TACTICAL | GLOCK 17 | 9x19mm | 4½″ | 2.6 |
| TAC STOCK | GLOCK 17 | 9x19mm | 4½″ | 2 |
| CALICO | M-100 | .22LR | 17⅞″ | 4.6 |
| UMAREX | HK 416D | .22LR | 16¼″ | 6.6 |
| ISSC | MK22 | .22LR | 16½″ | 6.6 |
| GSG | GSG-522 | .22LR | 16⅝″ | 6.2 |
| DAISY MFG | N/A | .22LR | 16¼″ | 3.3 |
| HENRY | LEVER ACTION | .22LR | 16⅛″ | 5.1 |
| REMINGTON | MODEL 597 | .22LR | 20″ | 5.3 |
| SPRINGFIELD | M6 SURVIVAL | .22LR | 18¼″ | 3.6 |
| ITHACA | M6 SURVIVAL | .22LR | 14¼″ | 3.7 |
| CHARTER ARMS | AR-7 | .22LR | 16⅛″ | 2.6 |
| RUGER | 22-Oct | .22LR | 18⅝″ | 5.1 |
| KSA | CRICKET | .22LR | 16¼″ | 2.9 |

Similarly, ATF's FATD measured the length of numerous rifles available in the National Firearms Collection to provide an example of lengths of rifles.

| Manufacturer | Model | Caliber | Barrel length | Overall length |
|---|---|---|---|---|
| COLT | SMG | 9x19mm | 9½″ | 27″ |
| COLT | AR-15 | .223 REM | 16″ | 33″ |
| Q | HONEY BADGER | .300 BLK | 7″ | 24″ |
| LWRC | M6 | .223 REM | 10½″ | 28″ |
| SIG SAUER | MCX | .223 REM | 16″ | 33½″ |
| SIG SAUER | MCX RATTLER | .300 BLK | 6″ | 32¼″ |
| MAXIM DEFENSE | MDX | .223 REM | 7″ | 23¼″ |
| MAXIM DEFENSE | PDX | .223 REM | 6″ | 22″ |
| LRB ARMS | M15SA | .223 REM | 7″ | 24½″ |
| BCI DEFENSE | SQS15 | .223 REM | 8″ | 23½″ |
| H&K | MK16 | .223 REM | 14″ | 30¼″ |
| Z-M WEAPONS | LR300 | .223 REM | 16½″ | 35″ |
| OLYMPIC ARMS | M.F.R. | .223 REM | 16″ | 36½″ |
| ARSENAL | AKS-74U | .223 REM | 8½″ | 27″ |
| ARSENAL | SAS M-7 | 7.62x39mm | 16″ | 34¾″ |
| YUGOSLAVIA | AK-47 | 7.62x39mm | 16″ | 34¼″ |
| ZASTAVA | AK-47 | 7.62x39mm | 16″ | 34¾″ |
| IRAQ | TABUK | 7.62x39mm | 12″ | 31½″ |
| RUSSIAN | KRINK | 7.62x39mm | 8″ | 26″ |
| MAGUA INDUSTRIES | MINI-BERYL | .223 REM | 8″ | 26″ |
| H&K | MP5K | 9x19mm | 4½″ | 21½″ |
| H&K | MP5 | 9x19mm | 9″ | 26″ |
| H&K | UMP | .45 ACP | 8″ | 27¾″ |
| BOBCAT WEAPONS | BW-5 | 9x19mm | 9″ | 26¾″ |
| HK | USC | .45 ACP | 16⅛″ | 34¾″ |
| S.W.D. | CM-11 | 9x19mm | 17⅛″ | 30⅝″ |
| S.W.D. | M-11/NINE | 9x19mm | 5½″ | 22⅛″ |
| M.A.C. | M10 | .45 ACP | 5⅞″ | 19⅛″ |
| MAC PMF | M11 | .380 ACP | 5⅛″ | 18½″ |
| JERSEY ARMS | AVENGER | .45 ACP | 6⅜″ | 22½″ |
| RPB | M10 | 9x19mm | 5⅞″ | 22″ |
| IMI | UZI | 9x19mm | 10″ | 25¾″ |
| IMI | MINI UZI | 9x19mm | 8″ | 23¾″ |
| IMI | MICRO UZI | 9x19mm | 5¼″ | 19¼″ |
| IMI | MICRO UZI | 9x19mm | 5⅝″ | 19¼″ |
| IWI | UZI PRO | 9x19mm | 6¾″ | 21¼″ |
| LWRC | SMG45 | .45 ACP | 8¾″ | 24½″ |

| Manufacturer | Model | Caliber | Barrel length | Overall length |
|---|---|---|---|---|
| SIG SAUER | MPX | 9x19mm | 3½″ | 18¾″ |
| SIG SAUER | MPX | 9x19mm | 4½″ | 21¾″ |
| SIG SAUER | MPX | 9x19mm | 5½″ | 22″ |
| B&T | APC9 | 9x19mm | 7″ | 23¼″ |
| B&T | TP9 | 9x19mm | 6″ | 20½″ |
| BERETTA | CX4 STORM | 9x19mm | 16¾″ | 30½″ |
| BERETTA | CX4 STORM | .40 S&W | 18″ | 29½″ |
| DBX | 5.7DBX | 5.7x28mm | 8″ | 23″ |
| CZ | EVO SCORPION | 9x19mm | 8″ | 26″ |
| CZ | EVO SCORPION | 9x19mm | 9″ | 30¼″ |
| CZECH | SKORPION | .32 ACP | 4½″ | 20½″ |
| GRAND POWER | STRIBOG SP9A1 | 9x19mm | 8″ | 24½″ |
| INTRATEC | MP9 | 9x19mm | 5⅛″ | 21″ |
| INTRATEC | TEC-KG9 | 9x19mm | 4¼″ | 21½″ |
| CALICO | M900 | 9x19mm | 16″ | 37″ |
| RUGER | PC CARBINE | 9x19mm | 16¼″ | 35⅝″ |
| RECOVER TACTICAL | PI-X | 9x19mm | 4½″ | 25½″ |
| FN | P90 | 5.7x28mm | 12″ | 19½″ |
| FN | PS90 | 5.7x28mm | 18½″ | 26″ |
| HK | MP7 | 4.6x30mm | 8″ | 23″ |
| KRISS | VECTOR | .45 ACP | 6″ | 24½″ |
| KRISS | VECTOR | .45 ACP | 16″ | 35¼″ |
| HI-POINT | 4095 | .40 S&W | 17⅝″ | 32¼″ |
| KEL-TEC | SUB2000 | 9x19mm | 16⅛″ | 29¼″ |
| STEYR | MP40 | 9x19mm | 9¾″ | 32″ |
| STEN | MK11 | 9x19mm | 7¾″ | 30″ |
| FB | MSBS | .223 REM | 17″ | 34″ |
| IWI | CARMEL | .223 REM | 13½″ | 28½″ |
| FN | SCAR-16 | .223 REM | 14″ | 32½″ |
| FN | SCAR PDW-P | .223 REM | 7½″ | 27″ |
| FN | FS2000 | .223 REM | 19″ | 29″ |
| CZ | BREN 805 | .223 REM | 11″ | 30″ |
| REMINGTON | 700 | .308 WIN | 12½″ | 31¾″ |
| HK | HK93 | .223 REM | 13″ | 34″ |
| STEYR | AUG | .223 REM | 21½″ | 31¼″ |
| STEYR | AUG | 9x19mm | 16¾″ | 26″ |
| WINCHESTER | 1894 | .30 W.C.F. | 15″ | 33″ |
| GERMANY | STG44 | 7.92 KURTZ | 16¼″ | 36¾″ |
| RUGER | MINI-14 | .223 REM | 18½″ | 37¾″ |
| KEL-TEC | SU-16 | .223 REM | 18½″ | 37½″ |
| BERETTA | RX4 STORM | .223 REM | 12½″ | 33½″ |
| INLAND | M2 CARBINE | .30 CAL | 18″ | 36″ |
| US | M2 CARBINE | .30 CAL | 18″ | 37½″ |
| BROWNING | BUCKMARK | .22LR | 18″ | 33½″ |
| MAUSER | C96 | 7.63x25mm | 5½″ | 25″ |
| DWM | LUGER | 9x19mm | 7⅞″ | 26″ |
| DWM | LUGER | 9x19mm | 4¾″ | 22″ |
| MAUSER | C96 | .30 Mauser | 5⅝″ | 24⅝″ |
| MAUSER | C96 | 9x19mm | 5⅝″ | 25″ |
| GERMANY | STECHKIN | .380 ACP | 5⅝″ | 21″ |
| UNITED KINGDOM | MK6 | .455 WEB | 6″ | 23¾″ |
| STAR | 1911 | .38 Super | 5″ | 23″ |
| BROWNING/FN | HI-POWER | 9x19mm | 4¾″ | 21⅛″ |
| BERETTA | 93R | 9x19mm | 6¼″ | 22½″ |
| CAA | MCK CL | 9x19mm | 4″ | 23″ |
| CAA | MCK GEN 2 | 9x19mm | 4″ | 22¾″ |
| FIRE CONTROL UNIT | X-01 | 9x19mm | 3⅞″ | 20½″ |
| RECOVER TACTICAL | 20/20N | 9x19mm | 4½″ | 19″ |
| FAB DEFENSE | KPOS G2 | 9x19mm | 9″ | 23½″ |
| ACCURATE PISTOL SYSTEMS | GLOCK 17 | 9x19mm | 4½″ | 21¼″ |
| ENDO TACTICAL | GLOCK 17 | 9x19mm | 4½″ | 23½″ |
| TAC STOCK | GLOCK 17 | 9x19mm | 4½″ | 21⅝″ |
| CALICO | M-100 | .22LR | 17⅞″ | 35⅝″ |
| UMAREX | HK 416D | .22LR | 16¼″ | 35¼″ |
| ISSC | MK22 | .22LR | 16½″ | 33¼″ |
| GSG | GSG-522 | .22LR | 16⅜″ | 33¾″ |
| DAISY MFG | N/A | .22LR | 16¼″ | 32¼″ |
| HENRY | LEVER ACTION | .22LR | 16⅛″ | 33⅛″ |
| REMINGTON | MODEL 597 | .22LR | 20″ | 38½″ |
| SPRINGFIELD | M6 SURVIVAL | .22LR | 18¼″ | 32″ |
| ITHACA | M6 SURVIVAL | .22LR | 14¼″ | 27⅞″ |
| CHARTER ARMS | AR-7 | .22LR | 16⅛″ | 35⅛″ |
| RUGER | 22-Oct | .22LR | 18⅝″ | 36¾″ |

| Manufacturer | Model | Caliber | Barrel length | Overall length |
|---|---|---|---|---|
| KSA .......................................................... | CRICKET ................................................... | .22LR ....................... | 16¼″ | 30⅛″ |

Although the above weights and lengths for rifles are not themselves determinative, the Department also notes that many heavy pistols have the receiver of a rifle with the stock removed and that the firearm with a pistol grip is a variant of a rifle.[104] These heavy pistols are often lighter or shorter than the rifle version but reach the same weight and length of their rifle predecessor when equipped with a "stabilizing brace" device. Many firearms that incorporate "stabilizing brace" devices are variants of rifles (*e.g.,* AR and AK-type pistols), which often incorporate receivers that accept cartridges primarily designed for rifles. For a firearm marketed as a pistol that is a variant of a rifle, ATF would compare the weight and length of the firearm with an attached "stabilizing brace" (or other device attached) against the original rifle design. For a firearm that is not a variant of a rifle (*e.g.,* a Glock-type pistol), the weight and length of the firearm with an attached "stabilizing brace" (or other device attached) would be compared to the weight or length range of variants designed, made, and intended to be fired from the shoulder (*e.g.,* a Glock-type pistol with a shoulder stock or installed into a carbine conversion kit). When a firearm with an attached "brace" device has a weight or length comparable to rifles, that weight or length is an indication that the firearm is designed, made, and intended to be fired from the shoulder.

The Department agrees with one commenter's concerns regarding the outcome under the proposed Worksheet 4999 in a scenario in which two firearms with an attached "brace"

device weigh the same and one is 25 inches in length and the other is 27 inches in length. The latter firearm under the worksheet would have been classified as a rifle when equipped with a "stabilizing brace," not a short-barreled rifle as asserted by the commenter, on the basis that a firearm with an overall length exceeding 26 inches would be impractical and inaccurate to fire one handed due to the imbalance of the weapon, and thus would need to be shouldered. Notably, the weight and length prerequisites in the worksheet were considered in the context of whether the firearm is practical to fire with a single hand rather than whether the firearm is designed and intended to be fired from the shoulder. The rule no longer focuses on whether the overall length of the firearm (*i.e.,* 12 to 26 inches) is suitable for installing a "stabilizing brace" device. Rather, the Department believes the statute is best interpreted to include consideration of the weight or length of a firearm with a "stabilizing brace" and a rear surface area that allows firing from the shoulder as one of the objective design features indicating whether the weapon is designed, made, and intended to be fired from the shoulder.

While at least one commenter expressed concern that the proposed worksheet "stack[ed] the deck in favor of disqualification" and would result in many pistol-braced firearms being classified as rifles, the Department recognizes that, under the best interpretation of the statutory terms, a majority of firearms equipped with a "stabilizing brace" currently or previously available on the market likely have the requisite design features indicating that the firearm is designed or redesigned, made or remade, and intended to be fired from the shoulder. As previously discussed in section IV.B.1.c.i of this preamble, many firearms owners and industry members use firearms equipped with "stabilizing braces" as shoulder fire weapons to effectively circumvent the requirements of the NFA. Therefore, it is necessary for the Department to apply clear and consistent standards to properly regulate these firearms.

ii. Weight and Length Prerequisite— Inclusion of Accessories

Comments Received

Several commenters stated that the worksheet was confusing because it did not clearly explain whether the "stabilizing brace" and other accessories were to be attached to the firearm when measuring the relevant lengths and weights. One commenter opined that the worksheet provided that overall length would have been measured "with all non-operational accessories removed," and it was unclear what "non-operational accessories" meant in this context, especially given the worksheet's definition of accessory, which seemed to include only stabilizing braces. The same question was raised when it came to determining the minimum weight, as the commenter said it is unclear how the firearm would be weighed, *i.e.,* with only the "stabilizing brace" removed or whether other accessories (*e.g.,* sights, forward pistol grip, bipod, *etc.*) should be removed as well.

Department Response

The Department notes that, in not adopting Worksheet 4999 and the associated point system, this rule addresses commenters' concerns regarding the different ways ATF was to weigh or measure the firearm (*i.e.,* either with or without accessories, including "stabilizing braces"). In considering whether a firearm's weight and length are consistent with that of rifles, FATD, under the final rule, will weigh a submitted firearm sample with all of the accessories attached and an empty magazine. Additionally, the overall length of the firearm will be measured with the "stabilizing brace" attached and fully extended, with the firearm to be measured from the rearmost point of the butt plate or grip. The Sporting Arms and Ammunition Manufacturers' Institute, Inc. ("SAAMI") identifies the overall length of a firearm as: "The dimension measured parallel to the axis of the bore from the muzzle to a line at right angles to the axis and tangent to the rearmost point of the butt-plate or grip."[105] Similarly, ATF will apply the overall length standard that it uses to measure a weapon made from a shotgun

---

[104] ATF Final Rule 2021R–05F revised the definition of the term "frame or receiver" to provide that a "receiver" means "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (*i.e.,* bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure." 87 FR at 24735. The rule also defined the term "'variant' and variants thereof" [to] mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver." *Id.*

[105] SAAMI, *Glossary,* Sporting Arms and Ammunition Manufacturers' Institute, Inc., *https://saami.org/glossary/overall-length/* (last visited Jan. 6, 2023).

or a rifle for purposes of 27 CFR 479.11 to measure the overall length for rifles. This standard is "the distance between the extreme ends of the weapon measured along a line parallel to the center line of the bore." 27 CFR 479.11.

### iii. Weight and Length Prerequisites—Shooting Orientation

*Comments Received*

At least one commenter argued that ATF wrongly identified the weight factor, stating "if I had a pistol that weighed more than 7–1/2 pounds, I would want a stabilizing brace. And I would probably fire from a bench rest (setting the front of the gun on a sandbag) or from another supported position such as prone (perhaps using a bipod) or seated (resting an elbow on a knee). All of these are well-known shooting positions."

### Department Response

The Department disagrees that the method in which a "stabilizing brace" may be used, in isolated circumstances or by a single individual, is relevant to examining whether a firearm is designed, made, and intended to be fired from the shoulder. The Department has determined that the definition of "rifle" in the relevant statutes should not be based solely on how a single individual plans to use a weapon. For instance, one commenter provided an example of using a brace on a pistol that weighs more than 7–½ pounds; the commenter said he would want to fire it from a bench rest or a prone or seated position. In fact, rifles designed, made, and intended to be fired from the shoulder can be fired from a bench rest, as well as from a prone or seated position, as demonstrated below.[106] The individual's personal intent to fire the weapon from a bench rest thus does not preclude a conclusion that the weapon in question is nonetheless designed, made, and intended to be fired from the shoulder.

**BILLING CODE 4410–FY–P**

---

[106] *See* Lou Patrick, *Bench Rest Shooting Fundamentals,* Shoot On, *https://shoot-on.com/bench-rest-shooting-fundamentals/* (last visited Dec. 12, 2022); Keith Wood, *How to Shoot Your Best from a Benchrest,* RifleShooter (Aug. 5, 2014), *https://www.rifleshootermag.com/editorial/boost-benchrest-shooting-skills/83631*; Dave Campbell, *Back to Basics: Shooting Support,* NRA American Rifleman (July 13, 2018), *https://www.americanrifleman.org/content/back-to-basics-shooting-support/*; Frank Galli, *Long Range Shooting: Precision Marksmanship Fundamentals,* RECOIL—Firearm Lifestyle Magazine (*recoilweb.com*), (Jan. 7, 2021), *https://www.recoilweb.com/long-range-shooting-precision-marksmanship-fundamentals-163796.html*.



*NRA American Rifleman*
An individual shooting rifle from seated position.



*Shoot On*
An individual shooting a rifle from a bench rest position.



*RECOIL – Firearm Lifestyle Magazine (recoilweb.com)*
An individual shooting a rifle from the prone position.

BILLING CODE 4410–FY–C

The Department has determined that making classifications based solely on the way a particular individual uses a firearm equipped with a "stabilizing brace" would not effectively implement the statutory scheme. Doing so would lead to the absurd result that a firearm is not designed, made, and intended to be fired from the shoulder simply because one user happens to fire it with one hand, regardless of whether other evidence of the weapon's purpose—principally, its objective design features as described in this final rule—indicate it was designed, made, and intended to be fired from the shoulder.

iv. Weight and Length Prerequisites—Shooters' Physical Abilities

Comments Received

Other commenters stated that weight limits, whether minimum or maximum, were arbitrary because "[s]ome people are stronger than others" and the rule did not account for the physical abilities or limitations of those individuals with disabilities. Another commenter agreed: "Using weight and length as determinative factors will create a subjective and overbroad control because the ability to handle any firearm varies among users[.]" Another commenter, who argued the four-pound minimum was arbitrary, stated that ATF provided no analysis showing the distribution of shooters the agency believes can "easily" fire a "traditional" pistol with one hand, nor did it address pistols lighter than the AR15 pistol that are more in need of a "brace" device to control a firearm's recoil. Similarly, other commenters claimed that ATF "[f]ail[ed] to acknowledge the need for . . . lighter weight, smaller size firearms as teaching tools and practical firearms for those with advanced physical challenges." Regarding the weight threshold, one commenter stated that the "excessively high lower limit on weight will tend to affect the old, the neurologically impaired, and smaller, weaker individuals." Another commenter pointed out that "a firearm that is considered heavy and long by a small statured person could just as easily be considered light and short by a larger framed person."

Department Response

The Department disagrees that any minimum or maximum weight is arbitrary because of the subjective sizes or disabilities of individuals. Neither the GCA nor the NFA classifies firearms based upon a particular individual shooter's strength, height, disability, or other personal trait—and neither does ATF. Although ATF considers a maker's

or manufacturer's purported intent as reflected in marketing and promotional materials, or other information demonstrating the likely use by the general community, the statute calls for an assessment of whether the maker's or manufacturer's stated intent is consistent with the firearm's objective design features. Although the Department acknowledges that there may be certain individuals who, because of their particular physical characteristics, may find it easier to or harder to fire certain weapons with one hand, the fact that a weapon, in certain circumstances, is capable of one-handed fire does not preclude a conclusion that the weapon is designed, made, and intended to be fired from the shoulder. The statutory definition of "rifle," in other words, does not turn on potential alternate uses of the weapon in question, as explained above.

In response to commenters concerned about the use of "stabilizing braces" on smaller firearms by persons with physical or neurological disabilities, the Department notes that an individual may still possess and use a firearm equipped with a "stabilizing brace," but the firearm could be subject to the NFA. In addition, such a person may be able to purchase a "stabilizing brace" that, when attached to the weapon in question, does not make the weapon a "rifle" based on the objective design features and other evidence, as listed in this rule. As earlier discussed in section IV.B.1.d of this preamble, a person with a disability who is in possession of a firearm is not exempt from complying with the applicable provisions of the NFA.

v. Accessory Design

Comments Received

A commenter said Section II (Accessory Design) of Worksheet 4999 relied on the interpretation of the vague criteria. Numerous other commenters stated that it was unclear what "known stock design" means and questioned how individuals are supposed to know every single stock design to determine if the accessory is suitable as a "brace" or device.

Department Response

The Department agrees the criteria to evaluate an attachment or purported "stabilizing brace" design on the proposed Worksheet 4999 could be confusing. Section II of the proposed worksheet analyzed the design of the "stabilizing brace" device separately from the overall configuration of the firearm. The Department agrees with commenters' concerns that the question

of whether a shoulder stock design is "known" would be difficult for individuals to answer. Therefore, the design factors—"Not based on a known shoulder stock design"; "Incorporates shoulder stock design feature(s)"; and "Based on a known should stock design"—are not included in the objective design features of a rifle in this rule. For this and other reasons discussed herein, the rule does not adopt the proposed worksheet or the point system. Moreover, the objective design features under the final rule no longer include the effectiveness of the "brace" device in assisting with one-handed firing of the firearm, but instead involve consideration of whether the firearm, as configured with an accessory, component, or other rearward accessory (like a "stabilizing brace") is designed, made, and intended to be fired from the shoulder, as required by the statutory definition of a rifle. As noted above, ATF is simultaneously publishing information with this rulemaking that will inform the public of (1) commonly sold pistol weapon platforms with attached "stabilizing brace" designs and (2) examples of commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles. Additionally, an individual may contact ATF to receive a determination whether their firearm equipped with a "stabilizing brace" is a rifle as defined by the GCA and NFA.

vi. Rear Surface Area

Comments Received

Commenters pointed out that one problem with the NPRM's criterion related to "rear surface area"—*i.e.*, "Device incorporates features to prevent use as a shouldering device," "Minimized Rear Surface lacking features to discourage shouldering," "Rear Surface useful for shouldering the firearm," and "Material added to increase Rear Surface for shouldering"—is that ATF provided no metric for quantifying the surface area. They felt that ATF had not provided adequate information regarding what amount of material is "minimal" or "added" for consideration of whether the rear surface area is useful for shouldering. A commenter argued that ATF failed to provide a reasonable explanation for its determination that the SB Tactical SBA3 device has material added to the rear surface area. The commenter asserted that the criterion seemed subjective and would not assist the public or industry to determine if a firearm is "designed or intended to be fired from the shoulder"

without actual metrics. The commenter also stated that it was unclear what "feature" a "stabilizing brace" could incorporate to make it "difficult" to use as a shouldering device—particularly given that a "stabilizing brace"-equipped firearm that "could possibly be shouldered" would accrue one point under Worksheet 4999. According to the commenter, with no specific metrics, use of words like "possibly," "sufficient," and "clearly designed," as used in the NPRM when discussing this feature, rendered any determination completely subjective.

Department Response

After considering the comments, the Department agrees that many of the criteria listed on Worksheet 4999 were open to subjective interpretation and application. For example, the Department agrees that the NPRM did not provide adequate information to define the meaning of "minimal" or "added" material with respect to the rear surface area of a "stabilizing brace." Specifically, the Department did not provide a particular metric to quantify the rear surface area to indicate when the firearm would accrue the number of points assigned. For example, the criteria "Minimized Rear Surface lacking features for discourage shouldering," "Rear Surface useful for shouldering the firearm," and "Material added to increase Rear Surface Area" were insufficiently clear when used in the NPRM or worksheet to describe the rear surface area of the "stabilizing brace." Therefore, as previously discussed, the Department is not adopting Worksheet 4999 or its point values for this rule.

Nevertheless, because both the GCA and NFA define a "rifle" as a weapon designed, made, and intended to be fired from the shoulder, surface area remains a relevant consideration because having a rear surface area is necessary to shoulder a weapon. Therefore, the Department has concluded that any surface area provided by an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") must be considered prior to the other listed objective design features in this rule. In a rifle configuration, a rear surface area is often provided by a "stock," "shoulder stock," or "butt stock," as demonstrated below:

**BILLING CODE 4410–FY–P**



**Parts of the "Colt Sporter Rifle" in the Colt Safety and Instruction Manual**[107]



**Parts of the "Colt AR-15 Semiautomatic Rifles and Carbines" in the Colt Safety and Instruction Manual**[108]

[107] Colt's Manufacturing Company, Inc., *Colt Safety and Instruction Manual: Colt Sporter Rifles* (1993), *https://s3.us-east-2.amazonaws.com/ media.connecteddatasolutions.com/downloads/ sporter+rifles.pdf.*

[108] Colt's Manufacturing Company, Inc., *Colt Safety and Instruction Manual: Colt AR-15 Semiautomatic Rifles* (1995), *https://s3.us-east-2.amazonaws.com/media.connecteddata tasolutions.com/downloads/ar-15_semiautomatic_ rifle_%26_carbine.pdf.*



**Parts of the "Winchester Model 70 Bolt-Action Rifle" in the Winchester Owner's Manual**[109]



**Parts of the "M&P 15-22 Rifle" in the Smith & Wesson Safety and Instruction Manual**[110]

[109] Winchester Repeating Arms, *Winchester Model 70 Bolt-Action Rifle Owner's Manual* 9 *https://www.winchesterguns.com/content/dam/winchester-repeating-arms/support/owners-manuals/2021/20-WRA-338_Model%2070_OM_WEB.pdf* (last visited Dec. 12, 2022).

[110] Smith & Wesson, *Safety & Instruction Manual M&P 15–22 Rifle* 12 (2019), *https://www.smith-wesson.com/sites/default/files/owners-manuals/M%26P_1522_Rifle_111519_3005746.pdf.*



| POSN | NOMENCLATURE |
|------|-------------|
| 1 | Buttstock |
| 2 | QD Sling Cup |
| 3 | Upper Receiver |
| 4 | M-LOK Handguard |
| 5 | Pivot Pin |
| 6 | Magazine |
| 7 | Magazine Release Button |
| 8 | Grip |
| 9 | Ambidextrous Selector |
| 10 | Takedown Pin |
| 11 | Flash Hider |
| 12 | Barrel |
| 13 | MIL-STD 1913 Rail |
| 14 | Bolt Catch |
| 15 | Charging Handle |
| 16 | QD Sling Cup |
| 17 | Trigger |
| 18 | Ambidextrous Magazine Catch |

**Parts of the "SIG MPX" in the Sig Saur Operator's Manual**[111]



**Parts of the Q "Honey Badger SD Short-Barrel Rifle with Silencer"**[112]

[111] Sig Sauer Inc., *Sig MPX Operator's Manual: Handling & Safety Instructions* 26–27 *https://* *www.sigsauer.com/media/sigsauer/resources/ operators-manual-mpx-1811295-01-rev03-lr.pdf* (last visited Dec. 12, 2022).

[112] Live Q or Die, LLC., *Honey Badger SD, liveqordie.com, https://liveqordie.com/honey-badger-sd/* (last visited Dec. 12, 2022).

Recently, many heavy pistols, and some rifle variants, have been manufactured or made in combination with "stabilizing braces" (rather than a shoulder stock) to create a surface area on the rear of the weapon with the attached "brace" device.



**Parts of the "M&P 15-22 Pistol" in the Smith & Wesson Safety and Instruction Manual**[113]



| NUMBER | NOMENCLATURE |
|---|---|
| 1 | Pivoting Contour Brace (PCB) |
| 2 | Upper Receiver |
| 3 | Ejection Port |
| 4 | MIL-STD 1913 Rail |
| 5 | Barrel |
| 6 | Pivot Pin |
| 7 | Magazine Release Button |
| 8 | Bolt Release |
| 9 | Pistol Grip |
| 10 | Takedown Pin |
| 11 | QD Sling Cup |
| 12 | Stock Button |
| 13 | Bolt Catch |
| 14 | Charging Handle |
| 15 | Ambidextrous Fire Control Selector |
| 16 | Trigger |
| 17 | Magazine |
| 18 | Ambidextrous Magazine Catch |

**Parts of the "SIG MPX Copperhead" in the Sig Sauer Operator's Manual**[114]

[113] Smith & Wesson Inc., *Safety & Instruction Manual M&P 15–22 Pistol* 12 (2020), *https://www.smith-wesson.com/sites/default/files/* owners-manuals/M_P1522_Pistol_Manual_101520_3013615_web.pdf.

[114] Sig Sauer Inc., *SIG MPX Copperhead Operator's Manual: Handling & Safety Instructions* 26–27, *https://www.sigsauer.com/media/sigsauer/resources/OPERATORS_MANUAL_MPX_COPPERHEAD_1811291-01_REV02_LR.pdf* (last visited Dec. 12, 2022).



Parts of the "Q Honey Badger Pistol"[115]

Notably, the definition of rifle does not include the term "stock," nor does it include the term "stabilizing brace." However, a "stabilizing brace" device may—like a shoulder stock on a rifle—provide surface area for a firearm that allows shouldering of the weapon, and, therefore, the inclusion of such rear surface area reflects an objective intent that the device is to be fired from the shoulder. For example, a review of the "SIG MPX Copperhead" in Ballistic Magazine demonstrated how the surface area of a "stabilizing brace" may be used to shoulder the weapon. The Department notes that this firearm is marketed as a pistol.



*Ballistic Magazine* provides an example of the use of the rear surface of a "stabilizing brace" for shouldering the firearm.[116]

As previously discussed, the appropriate inquiry is whether the firearm, as configured, is designed, made, and intended to be fired from the shoulder. For example, the manufacturer of the above referenced "SIG MPX Copperhead" listed the "stabilizing brace," the pivoting contour brace, as the "stock" type. This terminology demonstrates that the manufacturer recognizes the similar functions of a traditional shoulder stock and this "stabilizing brace."

---

[115] Live Q or Die LLC., *Honey Badger Pistol,* liveqordie.com, *https://liveqordie.com/honey-badger-pistol/* (last visited Dec. 12, 2022).

[116] Greg Lickenbrock, *SIG Copperhead: First Look at the Ultra Compact SIG Sauer MPX 9mm,* Ballistic Magazine (Oct. 16, 2019), *https://* www.ballisticmag.com/sig-sauer-mpx-copperhead-first-look/.



**Comparison of "SIG MPX Copperhead" pistol models**[117]

For further comparison, below are images showing shoulder stocks next to "stabilizing brace" devices. Each image shows that the stock and a "stabilizing brace" device both provide surface area to shoulder the firearm.

[117] Sig Sauer Inc., *SIG MPX Copperhead* (Apr. 24, 2022), *https://web.archive.org/web/ 20220424154840/https://www.sigsauer.com/sig-mpx-copperhead.html.*



**The Q Honey Badger Rifle with a stock (left) and the Q Honey Badger Pistol with a "stabilizing brace" (right)**[118]



**Surface area of SBA3 "stabilizing brace" (left) compared to known AR-15 stock (right)**

The Department does not believe it is appropriate or necessary to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon. Under the final rule, any device or extension on the rear of the firearm that provides any surface area that allows for shouldering of the weapon is to be considered first before considering other objective design features. In making this determination, ATF will not attempt to precisely measure or quantify the surface area or

make the determination based on the existence of any minimum surface area. Instead, ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon. As described, this feature of the weapon will be considered in conjunction with other objective design features, including whether this surface area is necessary for the cycle of operations of the firearm.

The Department acknowledges that a majority of firearms equipped with a "stabilizing brace" have surface area that allows a user to shoulder fire the weapon, but this does not mean that all such weapons would be classified as

"rifles." Rather, if the weapon has such a surface area, then the weapon would be examined to determine if other factors listed in the rule —*e.g.,* sights or a scope with eye relief that require shouldering of the firearm or length of pull consistent with rifles—indicate that the firearm is designed, made, and intended to the be fired from the shoulder. In addition, it is possible for a firearm with an attached rearward device to be designed without including a surface area that allows shouldering. For example, an elastic strap that wraps around the shooter's wrist and buffer tube on an AR-type firearm is an

[118] Jeremy S., *Gun Review: Honey Badger by Q (SBR and Pistol),* The Truth About Guns (Jan. 3, 2019), *https://www.thetruthaboutguns.com/gun-review-honey-badger-by-q-sbr-and-pistol/.*

attachment that does not provide surface area to shoulder fire a weapon.

Next, the Department agrees that the NPRM did not articulate what features would prevent the shouldering of a "stabilizing brace." In contrast to surface area that allows the firearm to be fired from the shoulder, as exemplified in the firearms pictured above, a weapon may include a feature intended specifically to prevent shooting the firearm from the shoulder. The Department therefore clarifies that a firearm is not designed, made, and intended to be fired from the shoulder if the firearm includes a design feature that prevents shouldering. A potential example of such a feature is a permanently attached protrusion that would dig into a shooter's shoulder should the firearm be fired from the shoulder.

### vii. Adjustability

#### Comments Received

A majority of the commenters disagreed with the NPRM's characterization of the "adjustability" factor for "stabilizing braces" and the associated points. One commenter disagreed with ATF's assessment of adjustability in Section II, noting that it was limited to two entries in Section II—one is "[n]ot adjustable, fixed design," and one for "[a]djustable or telescoping attachment designed for shouldering." The commenter stated that these two entries under "Adjustability" indicated that these were the only two possibilities, which the commenter asserted was misleading because there was actually a third possibility: adjustable or telescoping, but not for shouldering.

Similarly, other commenters stated that the proposed rule's wording presumed that an adjustable or telescoping brace was designed for shouldering when in fact adjustability, in their opinion, does not itself facilitate shouldering. Other commenters argued that ATF should not give a telescoping attachment two points because braces adjust for varying arm lengths and do not necessarily correlate with shouldering the "stabilizing brace." Many commenters wrote of their different statures—tall or petite—as the reason they needed the "stabilizing brace" to be adjustable so that they had better support when shooting the firearm. Another commenter stated, "[g]iven the wide variety of forearm circumferences, adjustability is a must" because "[t]o operate effectively, a cuff-type stabilizing brace must fit snugly over the shooter's forearm." One commenter observed that the NPRM acknowledged that, when it comes to rifle stocks, generally, taller shooters require a longer length of pull and shorter shooters require a shorter length of pull, but stated that the NPRM failed to make a similar recognition when it comes to users of stabilizing braces because the NPRM asserted that less variation exists between shooters when a pistol is involved because a shooter merely requires a device that reaches from the back of the firearm to the forearm.

Ruger argued that adjustability is doubly penalized because it automatically accrues three points under Section II under "Adjustability" for "adjustable or telescoping attachment designed for shouldering" and one point under "Accessory Design" for being identified as a "shoulder stock design feature." The commenter argued that the fact "[t]hat the same feature is both a minor and a moderate indicator of the same 'intended use' aptly demonstrates the arbitrary nature of the factoring criteria." The commenter argued that a

disqualifying feature should appear in either Section II or Section III, where accrual of four or more points for each section no longer qualifies it as a brace-equipped pistol, but not in both sections.

#### Department Response

The Department agrees with commenters' concerns regarding the "adjustability" factor for "stabilizing braces" and the associated points on the proposed Worksheet 4999. Specifically, the Department agrees with commenters' concern regarding the "double penalty" that would result from considering the "stabilizing brace" device's adjustability in evaluating both the "Adjustability" and the "Accessory Design" factors. The same commenter also expressed concern regarding the same feature receiving different points in the factoring criteria and the arbitrary nature of that assessment. The Department agrees and, as mentioned, does not adopt the adjustability factor as proposed because it primarily focused on evaluating the effectiveness of a "stabilizing brace" device itself rather than the overall configuration of the firearm.

However, the Department disagrees with commenters who stated that adjustability is not an objective design feature indicating a firearm is designed, made, and intended to be fired from the shoulder. The adjustability of an attachment that uses a rifle receiver extension with the ability to lock in various positions provides fixed horizontal support. Horizontal support means that an individual can place pressure on the rear of the device when firing the weapon without the device or attachment sliding forward. This feature is common with adjustable shoulder stocks.



**The use of a rifle receiver extension provides *horizontal support* for use as a shouldering device.**

The examples below illustrate buffer tubes with adjustment notches that allow a device to lock into place. The ability to lock any device into various positions on the rear of the firearm provides horizontal support, as described above, and allows the device to move rearward toward the shooter to adjust the length of pull to shoulder the weapon.[119] Therefore, an adjustable or telescoping attachment that extends rearward toward a shooter and has the ability to lock into various positions is an important objective design feature to consider because it provides horizontal support and allows length of pull to be adjusted. Adjustability in the context of length of pull allows the shooter to exercise better control, achieve better accuracy, and better maintain comfort when shooting based on the shooter's body or shooting preferences. For these reasons, in the final rule, when a firearm equipped with a ''brace'' device has surface area that allows the firearm to be shoulder fired, it is appropriate to also examine adjustability when considering the length of pull of the firearm, discussed below, to determine if the firearm is designed, made, and intended to be fired from the shoulder.



**AR-type Pistol Buffer Tube (KAK tube) with Adjustment Notches**



**Adjustable Rifle Buffer Tube (top) compared to a Standard Pistol Receiver Extension (bottom)**

BILLING CODE 4410–FY–C

The Department also disagrees with commenters that said it must consider the variations among shooters, including different forearm circumference, arm length, and height, in weighing the adjustability factor. As previously discussed, beginning in 2012, ATF misinterpreted the statutory definition of rifle because it improperly relied on the purported intent of ''stabilizing brace'' device manufacturers and users and incorrectly concluded that, if the firearm can be fired with one hand using a ''stabilizing brace,'' then it cannot be designed, made, and intended to be fired from the shoulder. While ATF may consider the purported intent or use of the device, the best interpretation of the statute calls for an assessment of whether the maker or manufacturer's stated intent is consistent with the objective design features of overall configuration of the weapon; this interpretation ensures that purported intent or use cannot be easily used to circumvent the NFA's requirements. A firearm's classification does not change even if the firearm can be used in more than one manner by a particular shooter. Thus, the final regulatory text incorporates in the definition of ''rifle'' an adjustable or telescoping attachment with the ability to lock into various positions along the buffer tube or other attachment method as an objective design feature to be considered when examining length of pull on a firearm that has a surface area that allows the weapon to be fired from the shoulder.

viii. Stabilizing Brace Support

Comments Received

Commenters raised questions about Section II of Worksheet 4999 regarding evaluation of ''Stabilizing Support.'' One commenter stated that assigning

---

[119] *See* Wing Tactical, *Fixed* vs. *Adjustable Stocks* (Sept. 11, 2015), *https://www.wingtactical.com/ blog/fixed-vs-adjustable-stocks/* (''AR–15 Adjustable Stock-Keep this in mind: A fixed stock can't ever get any shorter. But a collapsible or adjustable stock can almost always get longer . . . . [A]djustable stocks are perfect for shooters who don't always fit the 'average joe' arm length, because they can always adjust to the proper length-of-pull. What's more, these kinds of stocks are also helpful when you're shooting in groups with people taking turns on the same rifle. It's important to remember that adjustable stocks might not be as durable as the more rigid fixed stocks.'' (emphasis omitted)); Magpul, PRS® GEN3 Precision-Adjustable Stock, *https://magpul.com/firearm-accessories/stocks/ar15-m4-m16-sr25-m110-ar10/ prs-gen3-precision-adjustable-stock.html?mp_global_color=118* (last visited Dec. 12, 2022) (''The PRS GEN3 is a field precision stock for AR15/M16 and AR10/SR25 platforms, featuring tool-less length of pull and cheek piece height adjustment. With solid adjustments for length of pull and cheek piece height via aluminum detent knobs, the PRS GEN3 (Precision Rifle/Sniper) stock provides a stable interface and is intended for semi-automatic sniper or varmint type rifles. Offering a nearly universal fit, it is optimized for rifle-length receiver extensions but will also mount to many mil-spec carbine and A5-length tubes[.]'').

points based upon ATF's assessment of whether a "stabilizing brace" is "effective" as a brace was misguided because, although an effective brace might provide some indication of whether a weapon is or is not to be shoulder fired, ATF has no grounds for assuming that an ineffective or a poorly functioning "brace" indicates that a weapon is intended to be fired from the shoulder, is useful for shouldering, or was created to circumvent the NFA. The same commenter stated that the ATF should provide specific metrics (*e.g.*, a specific number of inches) to determine when a "fin-type" design has an arm strap of suitable length or when a "cuff-type" design is capable of "fully" wrapping around the arm.

Similarly, with regard to "cuff-type" designs, a few commenters faulted ATF for assigning in the NPRM different numbers of points to the SB Mini and SBA3 "stabilizing brace" devices based on whether they "partially" wrapped around a shooter's arm even though, according to the commenters, the two devices utilize similar arm cuff sizes. The commenters asserted that because "partially" means "to some extent," they did not understand why the SB Mini "partially" wraps around the forearm but the SBA3 does not. The difference in point accumulation and how to apply the standard to different brace models was unclear because how much of the shooter's forearm is encircled would depend on the shooter.

Similarly, another commenter believed that ATF confused "stabilizing support" regarding the "cuff-type" braces. The commenter asserted that this criterion was "completely subjective and will vary significantly from person to person," asking "how can this be an objective, measurable standard? A brace that may fully wrap around a small person's arm may not wrap around the arm of a bodybuilder, for example." The commenter also asked, "why is a cuff- or fin-type design with a strap made of elastic material more like a stock than one without elastic material?" Another commenter stated it was unclear for cuff-type "stabilizing braces" how much of the cuff must engage the arm for it to "partially wrap around the shooter's forearm."

The same commenter critiqued ATF's approach to examining "braces" with a counterbalance design, stating that the "folding feature" makes good sense because it allows the counterbalance arm to be streamlined for ease of carry.

Department Response

The Department agrees with commenters' concerns regarding the assessment of points on Worksheet 4999 for "cuff-type" brace device designs that "partially" or "fail" to wrap around the arm. Specifically, the Department agrees that terms like "partially" and "fail" were not sufficiently defined and that it would be difficult to make a uniform determination on whether a "cuff-type" brace partially or fails to wrap around a particular shooter's arm. In the NPRM, the Department explained that stabilizing support is a vital characteristic to consider in determining a firearm's classification because it provides evidence of the purported purpose of the attached device. However, the Department re-evaluated this position and determined that an analysis of whether the "brace" device provides stabilizing support for single-handed fire is distinct from whether a firearm, as configured with the "brace" device, is designed, made, and intended to be fired from the shoulder. While the purported intent of the device manufacturers may be considered, the way the "brace" device is or can be used is not determinative as to whether the firearm is designed and intended to be fired from the shoulder. Therefore, stabilizing support is not a relevant objective design feature and therefore is not incorporated into this rule.

Although stabilizing support is not adopted as an objective design feature, the Department responds to commenters who opined that a folding counterbalance design [120] makes good sense for ease of carry. While the folding design may make the firearm easier to carry, the Department disagrees with the notion that this purpose would indicate the firearm is not designed and intended to be fired from the shoulder. A counterbalance design includes a folding feature that provides a rear surface area on the "stabilizing brace" when closed (or folded), as demonstrated below. As previously discussed, a surface area that allows shouldering of the weapon remains an objective design feature that a firearm is designed, made, and intended to be fired from the shoulder.

BILLING CODE 4410–FY–P

---

[120] A counterbalance design is a design that uses the weight of the firearm as a lever to push the "stabilizing brace" into the forearm to provide stability during single-handed firing. This design does not typically include straps because the "stabilizing brace" contacts the side and bottom of the shooter's arm and is held in place by the weight of the firearm, using the shooter's hand as a fulcrum. *See, e.g.,* US Patent 10,690, 442 B2 Dec. 6, 2018.



**Counterbalance-type device**



**Rear of counterbalance-type device when folded**

BILLING CODE 4410–FY–C

ix. Length of Pull

Comments Received

Commenters asserted that the proposed length of pull "scale" makes little sense and "discounts the fact that: (1) shooters have different length forearms; (2) shooters may prefer the brace to be mounted to their forearm in different locations; and (3) a brace-equipped pistol's design and weight balance will necessitate a brace's varied position on a forearm." Other commenters further noted that ATF provided no explanation for its "length of pull" ranges, and they asserted that this concept is not found in any statute or regulation, but rather appeared to be a creation of ATF bureaucrats. Another commenter stated that length of pull is

normally associated with "rifles" and shotguns with stocks. Because "braces" are not stocks, the commenter argued that the entire section was invalid from the premise. A comment from the congressional Second Amendment Caucus agreed with other commenters that length of pull concept is "not found in any statutes, nor is it defined in any of the agency's regulations . . . . ATF opines that '[l]ength of pull is a common measurement of firearms that describes the distance between the trigger and the center of the shoulder stock.' But a 'firearm' or 'pistol' does not have a stock, even if it uses a stabilizing brace, and ATF fails to explain why it is appropriate to use a rifle measurement when analyzing pistols." (Citation omitted.)

Commenters also argued that the length of pull measurements were arbitrary and subjective because they were based on having the accessory in the "Rear most 'Locked Position.' " One of these commenters stated that it was unclear what the term "locked position" meant and also unclear how length of pull would be measured if there was no locked position. The commenter found ATF's examples confusing and stated that approximate measures from the examples were not useful. Another commenter stated that "length of pull" in the proposed worksheet was ambiguous.

The Gun Owners of America argued that ATF should have described the length of pull based on how a firearm with an attached device is "actually configured," not how it "theoretically"

could be configured in the rear-most, locked position. "Confusingly, the NPRM appears to admit as much, claiming that a brace 'will accrue more points the further it is positioned rearward,' indicating that it should be measured the way it is actually configured." Another commenter asserted that braces are more effective when they interact with a user's forearm close to the elbow to provide optimum leverage, and that users with longer forearms should not be penalized by ATF's length determinations.

One commenter provided a detailed discussion of "length of pull" and "rear surface area." He suggested that the "Department should change the worksheet into a two-tiered approach. As the first step, ask whether the combination of 'length of pull' and 'rear surface area' make the braced pistol suitable for firing from the shoulder." (Emphasis omitted.) The commenter stated that if the answer is "no" then the braced pistol should be approved. On the other hand, if "yes," then additional features should be considered, and additional points possibly awarded. The commenter suggested that other features need not be considered "unless the length of pull, and rear area surface are suitable for firing from the shoulder." To reiterate this point, the same commenter stated that, "[o]n the proposed worksheet, the 'rear surface area' criterion is independent of the 'adjustability' and 'length of pull' criteria. This is not appropriate; in the case of these three criteria, each criterion must be examined in the context of the others." (Citation omitted.) Another commenter stated that, if not removed as a factor, then "length of pull" should be revised so that zero points are assigned to a firearm with a "length of pull" less than 13–1/2 inches, consistent with ATF's prior findings.

*Department Response*

The Department agrees with commenters that the length of pull "scale" in Worksheet 4999 is confusing but disagrees that the scale must account for length of shooting preferences of different shooters. The Department also disagrees that length of pull is a concept or standard that is ambiguous, subjective, or the creation of ATF. Length of pull is a well-known standard in the firearms industry. SAAMI references length of pull as well as other features when discussing "stock dimensions"[121] and defines length of

pull as "[t]he distance from the center of the trigger to the center of the buttplate or recoil pad."[122] *The NRA Firearms Sourcebook* also defines "length of pull" as the distance between the center trigger and the center of buttplate or recoil pad the shoulder stock.[123] This standard is also commonly recognized by industry; specifically, firearm manufacturers, such as Ruger, Mossberg, LWRC International, CZ–USA, Browning, and Remington, all reference length of pull in their advertising of firearms or firearms accessories.[124] Therefore, it is reasonable for the Department to consider lengths of pull consistent with rifles as an objective design feature indicating that a firearm is designed to be fired from the shoulder.

The Department disagrees that measuring length of pull in the "rear most" locked position is arbitrary. A length of pull on a rifle appropriately adjusted for the shooter (*i.e.,* size or shooting preferences) allows a shooter to exercise better control, improve accuracy, and maintain comfort when shooting based on the shooter's body or shooting preferences.[125] For the reasons discussed herein and in section IV.B.3.b.vii of this preamble, whether there is an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube,

receiver extension, or other attachment method is considered when examining a firearm's length of pull to determine if the firearm is designed, made, and intended to be fired from the shoulder.

How ATF would measure the length of pull under this rule would depend on the type of "brace" device attached to the weapon. First, for devices with fixed material or a device in a fixed position on the rear of the firearm, the length of pull of a firearm would be measured from the device's fixed position to the center of the trigger. This is the position by which an individual may shoulder the firearm. Second, for devices that are not fixed and instead have a mechanism to lock into place in various locations along a buffer tube or receiver extension, ATF would measure length of pull with the device in the rearmost locked position. As earlier discussed, the benefit of an adjustable stock, "stabilizing brace," or other shouldering device that can lock into position along a buffer tube or receiver extension is that it adjusts the length of pull of the firearm and offers horizontal support (*i.e.,* to use against the shoulder) based on shooter's preferences.[126]

The Department has chosen to use the rearmost locked position for such devices because the Department believes that this measurement will best indicate whether the firearm is designed, made, and intended to be fired from the shoulder. The fact that an adjustable stock, "stabilizing brace," or other shouldering device might, in certain configurations, be appropriate for firing without shouldering the weapon does not preclude a conclusion that the weapon with the device is still designed, made, and intended to be fired from the shoulder. To the contrary, if the device in the rearmost locked position results in a length of pull that is consistent with shoulder-fired weapons, that length of pull is a design feature that—in combination with other features—could indicate that the weapon is designed, made, and intended to be fired from the shoulder. The possibility for non-shoulder firing with the device in other positions does not preclude this conclusion because, as explained above, the potential alternate uses of a weapon do not eliminate the

---

[121] SAAMI, *Glossary,* Sporting Arms and Ammunition Manufacturers' Institute, Inc., *https://*

[122] SAAMI, *Glossary,* Sporting Arms and Ammunition Manufacturers' Institute, Inc., *https:// saami.org/glossary/stock-dimensions/* (last visited Dec. 13, 2022).

[123] Michael E. Bussard and Stanton L. Wormley, Jr., NRA Firearms Sourcebook 137 (2006).

[124] Ruger, *Ruger Precision Rifle, https:// www.ruger.com/products/precisionRifle/ specSheets/18084.html* (last visited Dec. 12, 2022); O.F. Mossberg & Sons, Inc., *Mossberg International 817, https://www.mossberg.com/mossberg-international-817-38191.html* (last visited Dec. 12, 2022); LWRC International, *LWRCI UCIW Stock Kit, https://www.lwrci.com/LWRCI-UCIW-Stock-Kit-__p_38.html* (last visited Dec. 12, 2022); CZ USA, *CZ 1012, https://www.cz-usa.com/products/cz-1012/* (last visited Dec. 12, 2022); Browning, *X-Bolt Mountain Pro LR Burnt Bronze- Bolt- Action Rifle, https://www.browning.com/products/firearms/ rifles/x-bolt-mountain-pro-ir.html* (last visited Dec. 22, 2022); Remington, *Model 700 SPS Tactical AAC-SD, https://www.remarms.com/rifles/bolt-action/model-700/model-700-sps-tactical-aac-sd* (last visited Dec. 22, 2022).

[125] *See* Tyler Hughes, *Length of Pull: A Complete Guide for Fitting Your Rifle to Your Body (ballisticmag.com),* Ballistic Magazine (June 24, 2021), *https://www.ballisticmag.com/length-of-pull-guide/;* Suzanne Wiley, *The Shooter's Log: What is Length of Pull and Why Does It Matter,* Cheaper Than Dirt (July 10, 2013), *https://blog.cheaper thandirt.com/length-pull-matter/;* Frankie Chan, *What is Length of Pull on an AR–15?,* Wing Tactical (Mar. 9, 2022), *https://www.wingtactical.com/blog/ what-is-length-of-pull-on-an-ar15/;* Savage Arms, *Fitment: Why Rifle Fit Matters* (Mar. 5, 2020), *https://savagearms.com/blog?p=fitment-why-rifle-fit-matters.*

[126] *See* Savage Accuracy, *Understanding Length-of-Pull,* YouTube.com (Oct. 31, 2017), *https:// www.youtube.com/watch?v=Ler-d3MDLA0&t=109s;* Vickers Tactical, *BCM Training Tip: Buttstock Length,* YouTube.com (Mar. 30, 2018), *https:// www.youtube.com/watch?v=cifL2QYHp3I;* Viking Tactics, *Tactical Tip of the Day: Proper Buttstock Length,* YouTube.com (Feb. 8, 2019), *https:// www.youtube.com/watch?v=ER-s6pSCxjc;* Brownells, Inc, *The Magpul PRS Gen3 AR15/M16 Stock,* YouTube.com (Feb. 26, 2018), *https:// www.youtube.com/watch?v=obFCK3g19wI.*

likelihood that the weapon—in addition to these alternate uses—is designed, made, and intended for shoulder firing. ATF accordingly will examine length of pull with the device in the rearmost position to determine whether shoulder firing is the designed and intended use, even if the device in other positions might not be amenable to such firing.

Therefore, it is appropriate for ATF to consider the longest possible length of pull on a device that can adjust and lock into place along a buffer tube or receiver extension.

Finally, for a firearm that includes a device that is movable but cannot be affixed into various positions along the buffer tube or receiver extension, length

of pull would be measured with the device collapsed. This is because the device would collapse toward the receiver of the firearm if a shooter were to press his or her shoulder against it. The chart below summarizes these three methods of measuring length of pull depending on the type of stock or other device used to shoulder the firearm.

| | |
|---|---|
| Fixed non-adjustable stock, "stabilizing brace," or other device | Measure the distance between the center of the trigger and the rear center of the device in the fixed position. |
| Adjustable stock, "stabilizing brace," or other device with the ability to lock into various positions along the buffer tube or other attachment method. | Measure the distance between the center of the trigger and the rear center of the device in the rearmost locked position. |
| A stock, "stabilizing brace," or other device that is movable but cannot be in a fixed position or made stationary along the buffer tube. | Measure the distance between the center of the trigger and the rear center of the device with the device collapsed. |

Like the industry, FATD measures the length of pull from the center of the trigger to the rear center of the stock, "stabilizing brace," or other shouldering device. FATD previously determined the standards for length of pull by a review of industry publications and by measuring the length of pull of various rifles.[127] FATD determined the average "length of pull" is between 13½ and 14½ inches for rifles. ATF's own analysis is consistent with the *NRA Firearms Sourcebook,* which also provides that the average length of pull

found on shoulder-fired weapons is approximately 13½ to 14½ inches.[128] However, many more modern and common rifles are equipped with shouldering devices that result in shorter length-of-pull-measurements. For example, AK-types usually have a length of pull between 12½ to 13½ inches. For those firearms that are a variant of a rifle,[129] ATF would compare the length of pull between a firearm with a "stabilizing brace" or other attached device against that rifle configuration. For example, the length

of pull of an AK-type pistol equipped with a "stabilizing brace," which has a length of pull of over 12½ inches, would be compared to AK-type rifles. Similarly, a Glock-type pistol with a "stabilizing brace" would be compared to a Glock-type pistol equipped with a stock.

FATD measured the length of pull of various rifles from the National Firearms Collection as displayed in the chart below.

| Manufacturer | Model | Caliber | LOP |
|---|---|---|---|
| COLT | SMG | 9x19mm | 13″ |
| COLT | AR–15 | .223 REM | 13″ |
| Q | HONEY BADGER | .300 BLK | 13″ |
| LWRC | M6 | .223 REM | 13⅝″ |
| SIG SAUER | MCX | .223 REM | 13¼″ |
| SIG SAUER | MCX RATTLER | .300 BLK | 12¼″ |
| MAXIM DEFENSE | MDX | .223 REM | 11⅞″ |
| MAXIM DEFENSE | PDX | .223 REM | 12″ |
| LRB ARMS | M15SA | .223 REM | 13″ |
| BCI DEFENSE | SQS15 | .223 REM | 11¾″ |
| H&K | MK16 | .223 REM | 14″ |
| Z–M WEAPONS | LR300 | .223 REM | 13⅝″ |
| OLYMPIC ARMS | M.F.R. | .223 REM | 15″ |
| ARSENAL | AKS–74U | .223 REM | 13½″ |
| ARSENAL | SAS M–7 | 7.62x39mm | 13″ |
| YUGOSLAVIA | AK–47 | 7.62x39mm | 12¾″ |
| ZASTAVA | AK–47 | 7.62x39mm | 13¼″ |
| IRAQ | TABUK | 7.62x39mm | 12⅞″ |
| RUSSIAN | KRINK | 7.62x39mm | 12⅝″ |
| MAGUA INDUSTRIES | MINI–BERYL | .223 REM | 12¼″ |
| H&K | MP5K | 9x19mm | 12⅝″ |
| H&K | MP5 | 9x19mm | 13″ |
| H&K | UMP | .45 ACP | 14⅝″ |
| BOBCAT WEAPONS | BW–5 | 9x19mm | 13¾″ |
| HK | USC | .45 ACP | 14¼″ |
| S.W.D. | CM–11 | 9x19mm | 14″ |
| S.W.D. | M–11/NINE | 9x19mm | 16⅞″ |
| M.A.C. | M10 | .45 ACP | 13⅞″ |
| MAC PMF | M11 | .380 ACP | 13¼″ |
| JERSEY ARMS | AVENGER | .45 ACP | 16½″ |
| RPB | M10 | 9x19mm | 16½″ |
| IMI | UZI | 9x19mm | 15½″ |
| IMI | MINI UZI | 9x19mm | 16″ |
| IMI | MICRO UZI | 9x19mm | 14″ |
| IMI | MICRO UZI | 9x19mm | 14⅛″ |

[127] *See supra* notes 121–123 and accompanying discussion.

[128] *See supra* note 123.

[129] *See* 87 FR at 24693 (discussing variants).

| Manufacturer | Model | Caliber | LOP |
| --- | --- | --- | --- |
| IWI | UZI PRO | 9x19mm | 14¾″ |
| LWRC | SMG45 | .45 ACP | 12½″ |
| SIG SAUER | MPX | 9x19mm | 11″ |
| SIG SAUER | MPX | 9x19mm | 13¼″ |
| SIG SAUER | MPX | 9x19mm | 12½″ |
| B&T | APC9 | 9x19mm | 13¼″ |
| B&T | TP9 | 9x19mm | 15½″ |
| BERETTA | CX4 STORM | 9x19mm | 13¾″ |
| BERETTA | CX4 STORM | .40 S&W | 13¼″ |
| DBX | 5.7DBX | 5.7x28mm | 11″ |
| CZ | EVO SCORPION | 9x19mm | 14½″ |
| CZ | EVO SCORPION | 9x19mm | 14½″ |
| CZECH | SKORPION | .32 ACP | 13¾″ |
| GRAND POWER | STRIBOG SP9A1 | 9x19mm | 13½″ |
| INTRATEC | MP9 | 9x19mm | 12½″ |
| INTRATEC | TEC–KG9 | 9x19mm | 13½″ |
| CALICO | M900 | 9x19mm | 16½″ |
| RUGER | PC CARBINE | 9x19mm | 13½″ |
| RECOVER TACTICAL | PI–X | 9x19mm | 15¼″ |
| FN | P90 | 5.7x28mm | 13⅝″ |
| FN | PS90 | 5.7x28mm | 13⅜″ |
| HK | MP7 | 4.6x30mm | 14¼″ |
| KRISS | VECTOR | .45 ACP | 12½″ |
| KRISS | VECTOR | .45 ACP | 12½″ |
| HI–POINT | 4095 | .40 S&W | 14⅝″ |
| KEL–TEC | SUB2000 | 9x19mm | 13¼″ |
| STEYR | MP40 | 9x19mm | 12½″ |
| STEN | MK11 | 9x19mm | 11½″ |
| FB | MSBS | .223 REM | 13¼″ |
| IWI | CARMEL | .223 REM | 14¾″ |
| FN | SCAR–16 | .223 REM | 14¼″ |
| FN | SCAR PDW–P | .223 REM | 14½″ |
| FN | FS2000 | .223 REM | 14¾″ |
| CZ | BREN 805 | .223 REM | 13½″ |
| REMINGTON | 700 | .308 WIN | 13½″ |
| HK | HK93 | .223 REM | 13¾″ |
| STEYR | AUG | .223 REM | 14¾″ |
| STEYR | AUG | 9x19mm | 15″ |
| WINCHESTER | 1894 | .30 W.C.F. | 13″ |
| GERMANY | STG44 | 7.92 KURTZ | 14″ |
| RUGER | MINI–14 | .223 REM | 13⅓″ |
| KEL–TEC | SU–16 | .223 REM | 13⅝″ |
| BERETTA | RX4 STORM | .223 REM | 13½″ |
| INLAND | M2 CARBINE | .30 CAL | 13⅛″ |
| US | M2 CARBINE | .30 CAL | 14⅝″ |
| BROWNING | BUCKMARK | .22LR | 15″ |
| MAUSER | C96 | 7.63x25mm | 16¼″ |
| DWM | LUGER | 9x19mm | 17¾″ |
| DWM | LUGER | 9x19mm | 16½″ |
| MAUSER | C96 | .30 Mauser | 16⅛″ |
| MAUSER | C96 | 9x19mm | 16⅜″ |
| GERMANY | STECHKIN | .380 ACP | 15¾″ |
| UNITED KINGDOM | MK6 | .455 WEB | 16¼″ |
| STAR | 1911 | .38 Super | 12⅝″ |
| BROWNING/FN | HI–POWER | 9x19mm | 16⅜″ |
| BERETTA | 93R | 9x19mm | 16½″ |
| CAA | MCK CL | 9x19mm | 16″ |
| CAA | MCK GEN 2 | 9x19mm | 15¾″ |
| FIRE CONTROL UNIT | X–01 | 9x19mm | 13⅞″ |
| RECOVER TACTICAL | 20/20N | 9x19mm | 15″ |
| FAB DEFENSE | KPOS G2 | 9x19mm | 15¾″ |
| ACCURATE PISTOL SYSTEMS | GLOCK 17 | 9x19mm | 17″ |
| ENDO TACTICAL | GLOCK 17 | 9x19mm | 19½″ |
| TAC STOCK | GLOCK 17 | 9x19mm | 17¾″ |
| CALICO | M–100 | .22LR | 18¼″ |
| UMAREX | HK 416D | .22LR | 14⅝″ |
| ISSC | MK22 | .22LR | 14″ |
| GSG | GSG–522 | .22LR | 13¾″ |
| DAISY MFG | N/A | .22LR | 13⅜″ |
| HENRY | LEVER ACTION | .22LR | 12¾″ |
| REMINGTON | MODEL 597 | .22LR | 14″ |
| SPRINGFIELD | M6 SURVIVAL | .22LR | 11″ |
| ITHACA | M6 SURVIVAL | .22LR | 11½″ |
| CHARTER ARMS | AR–7 | .22LR | 15″ |

| Manufacturer | Model | Caliber | LOP |
|---|---|---|---|
| RUGER ......................................................... | 22-Oct ............................................ | .22LR ................................................ | 13½″ |
| KSA ........................................................... | CRICKET ....................................... | .22LR ................................................ | 11⅞″ |

The Department disagrees with commenters who stated it is not appropriate to use a rifle measurement when analyzing pistols. The Department has determined that, to best implement the relevant statutes, ATF should not simply assume that a firearm should be classified in accordance with the manufacturer's stated intent. Rather, based on the best reading of the relevant statutory provisions, ATF will examine the firearm for characteristics (e.g., length of pull) consistent with whether a firearm is designed, made, and intended to be fired from the shoulder. The objective design features of the firearm may support or undermine a manufacturer's stated intent regarding whether the firearm is or is not designed, made, and intended to be fired from the shoulder. Therefore, after considering whether the firearm has surface area that allows for shouldering, it is reasonable for the Department to consider length of pull consistent with similar rifles as a design feature indicating that a firearm is designed to be fired from the shoulder.

For similar reasons, the Department disagrees with the commenters that suggested measuring length of pull for weapons with "stabilizing braces" was an invalid concept because the weapons do not have "stocks." Although some measures of length of pull may refer to a "stock," the purported "stabilizing brace" on a firearm is often similar to a shoulder stock in construction and intended purpose, and the Department accordingly believes that length of pull can appropriately be measured for such weapons. The mere fact that a manufacturer may call a device a "stabilizing brace" does not prevent measurement of a length of pull when the device is, in reality, similar to a shoulder stock.

The Department acknowledges the suggestion of one commenter that Worksheet 4999 should have used a two-tiered approach that combines the length of pull and rear surface area, and, if this combination indicates the firearm is suitable to be fired from the shoulder, then to proceed to other characteristics. While the Department does not adopt the commenter's exact suggestion, the Department has determined that a two-tiered approach is a reasonable and clear method to evaluate whether the overall configuration of a firearm equipped with a "stabilizing brace" is

designed, made, and intended to be fired from the shoulder. After consideration of the comments, the rule states that the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided that other factors, such as length of pull, indicate that the firearm is designed, made, and intended to be fired from the shoulder.

x. Attachment Method

Comments Received

One commenter questioned why ATF would assign any points to items such as KAK-style and rifle-style buffer tubes and PDW-type guide rails that ATF has previously "approved" for use on pistols. The commenter had the same questions with respect to folding adapters and how ATF determines what a "modified shoulder stock" is under the "Attachment Method" category in Section III. Another commenter noted that the use of "folding adapters" serve the same functional purpose for brace-equipped pistols as they do for folding rifle stocks, i.e., the user can fire the pistol without the device extended by folding the stabilizing brace or stock out of the way. The commenter further stated that, "[j]ust as a rifle with its stock folded does not suddenly become a non-rifle, a pistol with its brace folded does not suddenly become a non-pistol." Similarly, commenters disagreed with ATF's assignment of various "attachment methods," i.e., "extended" tubes, "folding adapter[s]," and "spacers," that were each assessed two points, on the theory that each "increases the 'length of pull.'" Commenters believed that the factors under "Attachment Method" would create a double penalty for: (1) the attachment method that increases the length of pull and (2) the resulting longer length of pull itself, which would already be accounted for under "Length of Pull."

One commenter argued that the factor examining "aim-point" not only is vague and has nothing to do with shouldering but is also duplicative of the analysis conducted under the "Peripheral Accessories" section. Another commenter asked for

clarification on the factor "Attachment method creates an unusable aim-point (slant)" under the "Attachment Method" category. The commenter stated that the Department would need to evaluate a number of shooting positions to determine whether the aim-point is unusable without firing from the shoulder. For example, the commenter stated that when a firearm is fired from either a bench rest or the prone position, the firearm is not fired from the shoulder, yet the elevation of the firearm in relation to the user's body may be quite similar to a shoulder-mounted firearm. This, according to the commenter, would make aim-point unusable for freehand shooting from a standing position, but very usable from a bench rest or from the prone position." Another commenter criticized the lack of explanation for how certain methods of attachment would affect other criteria that ATF already identified as indicative of an intent to fire a weapon from the shoulder. The commenter asserted that attachment method has nothing to do with a device's ability to be fired from the shoulder and that a final rule should not consider attachment method.

Department Response

The Department agrees with commenters' concerns regarding the assessment of duplicate points for "attachment method" and "length of pull." The Department does not adopt the point system from Worksheet 4999. Rather, under this final rule, if a weapon equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") has surface area that allows it to be fired from the shoulder, then the other objective design features and other factors listed in this rule are to be considered in determining whether the firearm is designed, made, and intended to be fired from the shoulder.

One objective design feature ATF may consider is whether the attachment is required for the cycle of operations of the weapon, which could indicate the firearm is not designed and intended to be fired from the shoulder. For example, an AR-type pistol with a standard 6- to 6½-inch buffer tube may not be designed, made, and intended to be fired from the shoulder even if the buffer tube provides surface area that allows the firearm to be shoulder fired.

On an AR-type pistol, the buffer tube encases a spring that drives the bolt forward when the bolt is driven into the buffer tube by the gas from the initial shot. The picture below displays the internal function of an AR–15 type rifle. The AR-type pistol is a variant of the rifle with the stock removed and has the same receiver and buffer tube function of the rifle version.

BILLING CODE 4410–FY–P



**Internal function of an AR-type rifle**



A. Flash Suppressor/Compensator
B. Forearm Hand Guard
C. Upper Receiver w/Picatinny Rail
D. Charging Handle
E. Pistol Buffer Tube
F. Safety Selector
G. Grip
H. Trigger
I. Trigger Guard
J. Lower Receiver
K. Bolt release lever
L. Magazine release
M. Forward Assist
N. Ejection Port Cover
O. Ambidextrous Latch Plate
P. Magazine

**"PA-15 Pistol" in Palmetto State Armory product manual**[130]

In contrast, if the buffer tube, receiver extension, or other component is not required for the cycle of operations of the weapon, ATF may conclude it serves no purpose but to extend the rear surface area of the weapon toward the shooter to provide surface area for shouldering and to increase the overall length of pull, which in turn provides a shooter a better aim-point on the firearm and horizontal stabilization to shoulder-fire the firearm. For example, a "brace" device or other rearward attachment on AK-type pistol serves only to extend the surface of the firearm rearward. Similarly, the CZ Scorpion EVO3 S1 (pictured below) does not incorporate a buffer tube or material beyond the bottom of the pistol grip, unlike the AR-type rifle. Instead, a folding "brace" is added to the firearm in addition to the material required for the operation of the firearm.

---

[130] Palmetto State Armory, *Product Manuals–PA–15 Pistol*, https://palmettostatearmory.com/help-center/product-manuals/pa15-pistol.html#safety (last visited Dec. 12, 2022).



**CZ Scorpion EVO3 S1 (AK style variant) without an extension**[131]



**CZ Scorpion EVO 3 S1 w/ Flash Can and Folding Arm Brace (Discontinued)**[132]

Another example is the HK SP5 firearm, which functions with no material beyond the pistol grip of the firearm. But a "stabilizing brace" can be attached to additional material such as PDW-type guard rails, as demonstrated below. This attachment extends the rear surface of the firearm, and the PDW-type guard is additional material that also has no purpose in the cycle of operations on a HK SP5 firearm. The fact that this excess material is not necessary to the cycle of operations would be an objective design feature suggesting that the firearm with the "stabilizing brace" is designed, made, and intended to be fired from the shoulder.

[131] CZ USA, *CZ Scorpion Evo 3 S1 Pistol, https://cz-usa.com/product/cz-scorpion-evo-3-s1-pistol-2/* (last visited Dec. 12, 2022).

[132] CZ USA, *CZ Scorpion Evo 3 S1 Pistol w/Flash Can and Folding Brace-Discontinued, https://cz-usa.com/product/cz-scorpion-evo-3-s1-pistol-w-flash-can-and-folding-brace/* (last visited Dec. 12, 2022)

 

**Heckler & Koch (H&K) SP5 pistol (left) and Adjustable PDW type guard rail with a "stabilizing brace" device on HK SP5 (right)**[133]

The Department acknowledges that ATF previously "approved" KAK-style and rifle-style buffer tubes and PDW-type guide rails for use on pistols and that ATF specifically permitted these types of extensions to attach a "stabilizing brace" device onto the rear of a weapon.[134] The Department also acknowledges but disagrees with commenters that did not believe folding adapters should be considered because the purpose of a folding adapter is to fold out of the way the "brace" or shoulder stock on a firearm. As discussed, the addition of an accessory to the rear of the firearm can also add material that provides surface area for shouldering and can extend the length of pull to effectuate shoulder fire. For these reasons, the Department disagrees with these commenters and maintains that these types of rearward attachments, like the folding adapter pictured below, are additional material that, when added to the end of a firearm, may indicate that the firearm is designed, made, and intended to be fired from the shoulder.

[133] Heckler & Koch USA, *SP5K–PDW–Heckler & Koch, https://hk-usa.com/product/pistols/* (last visited Dec. 12, 2022); SB Tactical, *HKPDW,*™

*https://www.sb-tactical.com/product/hkpdw/* (last visited Dec. 12, 2022).

[134] Letter from ATF #304296 (Dec. 22, 2015) (PDW rails); Letter from ATF #306285 (Oct 31, 2017) (KAK tube).



**Folding adapter**



**Folding adapter attached to a pistol with a purported "stabilizing brace"**

BILLING CODE 4410–FY–C

Likewise, an extended AR-type pistol buffer tube, which is a longer buffer tube than the standard buffer tubes required for the operation of the firearm, or the inclusion of spacers that extend the length of pull, are also examples of the addition of material to the rear of a firearm that provides surface area for shouldering and extends the length of pull to effectuate shoulder fire.

xi. Peripheral Accessories and "Stabilizing Brace" Modifications/ Configurations

Comments Received

Some commenters were troubled with the inclusion of "accessories" in the evaluation process because, in their opinion, ATF only has the authority "to regulate firearms and ammunition in interstate commerce." Commenters stated that ATF appeared to be not concerned about the impact the worksheet would have on AR–15 enthusiasts who enjoy trying new or different components, *i.e.,* sights, optics, or telescoping arms to ensure the best fit. Specifically, commenters stated that, because of such changes, "their 'score'

on" Worksheet 4999 would change with each new combination, thereby likely resulting in a new register or destroy decision tree."

The congressional Second Amendment Caucus disagreed with ATF's statements from the NPRM. The commenter read the NPRM as indicating that, simply by adding peripheral accessories such as a hand stop or sights, a person may inadvertently "void" ATF's prior classification of a weapon with an attached "stabilizing brace" as not being a "rifle" under the NFA. That person would then be in possession of an unregistered short-barreled rifle. The commenter stated that it would be "unjustifiable" for a firearm's classification to change "simply because a person has customized it with individualized accessories." (Emphasis omitted.)

Another commenter suggested that the worksheet should be revised to say that no points would be awarded for a hand stop unless the length of pull and rear surface area of the stabilizing brace are suitable for firing from the shoulder, and, if so, then two points would be awarded for the secondary grip, and, if

not, the worksheet does not apply to the secondary grip, but the firearm may be classified as an NFA "any other weapon." Under this proposal, no points should be assigned for the "no sights" feature. The same commenter also stated that, if the physical size and configuration of a stabilizing brace do not allow for shouldering at all, then the presence of a hand stop is irrelevant and does not indicate that the gun will be fired from the shoulder.

Another commenter wanted additional information on Worksheet 4999 because it was unclear if the only "accessory" that had to be removed to make the initial determination regarding weight and length prerequisites is an attached stabilizing brace or whether other accessories (*e.g.,* sights, fore-end, pistol grip, bipod, etc.) would have to be removed as well.

Commenters did not understand how a "sighting" accessory could transform a pistol with a "brace" into an NFA weapon and disagreed with Worksheet 4999 for including a "sighting" factor. Many commenters disagreed with the notion that any form of sight or even the absence of sights might make a pistol a

rifle or that pistols with certain sights or other accessories could become short-barreled rifles. Many commenters said optics do not change the function of a brace and should not be considered in the evaluation of a pistol or rifle. Commenters stated that sights can be seen very easily when firing with one hand and that their use should be assigned zero points.

Another commenter put it a slightly different way. The commenter found it "unclear how the presence or absence of sights would be determinative of whether the firearm is a pistol or short-barreled rifle," and the commenter asserted that "attributing the same points to a firearm equipped with a set of rifle-type sights as the same firearm with no sight installed makes little sense." The commenter continued, stating it is "nonsensical that lacking sights could make a firearm a short-barreled rifle under the Rule." "End users are free to choose what optics or sights to put on their firearm if none are included from the factory, and many of those optic and sight choices would result in accrual of zero points." One commenter questioned why the presence of no sights (which would have accrued one point on the worksheet) would indicate a firearm was made to be shouldered.

Another commenter stated any person can shoot a firearm one handed with a sight or scope, so this factor, according to the commenter, would have automatically given every firearm with a sight or scope 4 points, thereby making every firearm a short-barreled rifle by ATF's proposed factoring criteria. One organization raised a question about ATF's purported prohibition of various types of sights, which, the commenter claimed, ATF erroneously asserted "must be fired from the shoulder in order to use the sight."

Another commenter, who identified as a National Guard Instructor, suggested that ATF include a list of acceptable style of optics for the factor "Presence of a Sight/Scope with Eye Relief Incompatible with one-handed fire," as listed on Worksheet 4999. Doing so, according to the commenter, would help people know what standards ATF proposed to use when using the worksheet to determine if a firearm is classified as a rifle or short-barreled rifle subject to the NFA.

A few commenters wrote about the "bipod" factor on the proposed Worksheet. One commenter argued that it was nonsensical to accrue points for presence of a bipod because alternate shooting positions should be encouraged for safety purposes. The commenter stated that attachment of a bipod allows the shooter to choose to rest the forward portion of the firearm on a solid surface for stability. If a suitable solid surface is not available, the user should have the ability to use an equipped stabilizing brace for stability. Another commenter argued that the "[w]orksheet should not award points for the presence of a bipod or monopod unless length of pull and rear surface area are both suitable for firing from the shoulder. And then, only one point should be assigned." (Emphasis omitted.)

Finally, at least one commenter argued that the factors under the section of the worksheet titled "Stabilizing Brace" Modifications/Configurations were arbitrary. For example, the commenter stated that ATF did not define when a strap is "too short" to function for the "cuff-type" or "fin-type" design and that this feature was duplicative of the "stabilizing support factor" in Section II of the proposed worksheet. The commenter argued generally that other factors in this part conferred too much discretion on ATF and that the factors were arbitrary and therefore the entire part examining "Stabilizing Brace" Modifications/Configurations should be removed.

### Department Response

The Department agrees that ATF's authority under the GCA and NFA is to regulate firearms and ammunition; however, the Department disagrees that ATF is prohibited from considering components or peripheral accessories attached to a firearm in the evaluation process of a firearm. ATF's FATD considers the configuration of the firearm, which includes whether certain accessories added by either the manufacturer or the individual affect the classification of a firearm. In the NPRM, the Department included on the Worksheet 4999 accessories that may impact whether a firearm is designed, made, and intended to be fired from the shoulder. After considering the comments, the Department has determined that the presence of sights or scopes with eye relief that require shouldering of the firearm to be used is an objective design feature indicating a firearm is designed, made, and intended to be fired from the shoulder. As explained below, the Department agrees with commenters and does not consider hand stops, secondary grips, or bipod or monopods to be objective design features indicating that a firearm is designed and intended to be fired from the shoulder.

The Department disagrees that it has not considered the interests of AR–15 enthusiasts by including accessories in the analysis of whether a firearm is designed, made, and intended to be fired from the shoulder. The NPRM and proposed Worksheet 4999 would not have prevented AR–15 enthusiasts from altering their firearms, and individuals may continue to install accessories on a firearm under this final rule. However, if the firearm falls within the purview of the NFA (*i.e.,* designed, made, and intended to be fired from the shoulder with a barrel less than 16 inches) then the firearm must be registered in the NFRTR. The Department agrees that an unintended consequence of the proposed worksheet and the point system was that the addition or removal of a single peripheral accessory could redesign the firearm to be fired from the shoulder or remove the firearm from the purview of the NFA. Therefore, the Department does not adopt the proposed Worksheet 4999 and, as discussed, several of the peripheral accessories listed in the worksheet are not considered objective design features in the final rule.

The Department agrees that two factors—the presence of a hand stop and secondary grip—are not relevant objective design features because they only are relevant if firearm has a length of pull consistent with rifles and rear surface area indicating the firearm is suitable to be fired from the shoulder. In other words, the objective design features of length of pull and rear surface area already take into account these types of peripheral accessories, including secondary grips. Additionally, the secondary grip may be a factor indicating that a firearm is not a pistol (*i.e.,* a firearm designed, made, and intended to be fired with one hand), but it is not a factor indicating that the firearm is designed, made, and intended to be fired from the shoulder.

For the same reasons that secondary grip and hand stop are not included, the Department also agrees that the presence of a bipod or monopod is not an objective design feature of a firearm designed and intended to be fired from the shoulder; this feature can be a characteristic of both a rifle and a pistol and itself is not an objective design feature of a rifle. Therefore, a bipod or monopod is not included as an objective design feature in the rule.

Similarly, the Department agrees that optics on a firearm should not transform a firearm into a rifle by themselves, and the Worksheet 4999 was not intended to make optics a transformative characteristic. However, the Department disagrees with any notion that the optics on a firearm are irrelevant to the question of whether a firearm is a rifle within the meaning of the relevant

statutes. The presence of sights or a scope on a firearm that requires the firearm to be shouldered in order for the sights or scope to be used as designed indicates that the firearm is designed, made, and intended to be fired from the shoulder. In applying the statutory definition, ATF intends to examine the sights or scope on a submitted firearm sample as compared to those sights or scopes featured on a rifle to determine whether the sights or scope on the firearm being evaluated must be shouldered to use the sights or scope as designed.

The alignment of sights and optics is an important feature of a weapon designed, made, and intended to be fired from the shoulder. The industry recognizes the importance of the sights or aiming device in shouldering a firearm. SAAMI defines "shoulder" as, in relevant part, the "[a]ct of placing a shotgun or rifle to a shooter's shoulder, in order to properly align the sights and fire at a target." [135] The American Rifleman states that "[a] rifle stock is a device that provides an interface between the shooter and the rifle. Its foremost purpose is to allow the shooter a repeatable point of contact in relation to the rifle's aiming device." [136] The final rule also refers to the "eye relief" of any attached sights or scopes. "Eye relief" is the distance between the eye and the scope or sight that is required to provide the best image of the object being targeted.[137] If sights or a scope requires the firearm to be shouldered in order for the shooter to use the sights or scope to view the target, then the firearm is more likely to be designed, made, and intended to be fired from the shoulder because firing from other positions would impair the use of the sight or scope.

Therefore, some of the sights listed on Worksheet 4999 are relevant to the question of whether a particular configuration is a rifle within the meaning of the relevant statutes. For instance, back-up or flip-up sights that can only be effectively used when the firearm is shouldered are an indicator that a firearm is designed, made, and intended to be fired from the shoulder. Similarly, the presence of a reflex sight with flip-to-the side magnifier that has limited eye relief (*i.e.,* the sight is unusable unless aimed and fired from the shoulder) is a design incorporated on firearms designed, made, and intended to be fired from the shoulder.



**Example of firearm with thermal scope with eye relief that requires shouldering of the firearm in order to be used as designed.**

The Department acknowledges that Worksheet 4999 incorrectly considered and assigned points for the lack of sights to determine if a firearm is a rifle designed, made, and intended to be fired from the shoulder. As discussed, the Department notes that the correct inquiry for purposes of determining whether a firearm equipped with a "brace" is designed, made, and intended to be fired from the shoulder is to consider whether the sight or scope has an eye relief that requires shouldering in order to be used as designed. Therefore, the Department believes it is not necessary to provide a list of acceptable style optics that are compatible with one-handed fire, as requested in the comments.

Lastly, the Department agrees with the commenter that it should not examine "stabilizing brace" modifications or configurations, and this characteristic should not be considered in the final rule. As discussed above, ATF evaluates and classifies firearms based upon the firearm's objective design features and other factors in light of the statutory and regulatory definitions. This rule clarifies the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided that other factors—such as the presence of sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed—also indicate the weapon is designed, made, and intended to be fired from the shoulder

[135] SAAMI, *Glossary*, Sporting Arms and Ammunition Manufacturers' Institute, Inc., *https://saami.org/glossary/shoulder/* (last visited Dec. 13, 2022).

[136] Dave Campbell, *Back to the Basics: Rifle Stock Components & Designs*, The American Rifleman (Feb. 15, 2017), *https://www.americanrifleman.org/content/back-to-basics-rifle-stock-components-designs/*.

[137] R.A. Steindler, New Firearms Dictionary 112 (1985) (defining "eye relief" as the "distance required between the eye and ocular lens of a telescopic sight that gives the user the best image of the object viewed").

c. Regulating Intent

Comments Received

Commenters were concerned that ATF was presuming the intentions of both users and manufacturers of "stabilizing braces." One commenter said the proposed definition would define the intent of the manufacturer or designer of the firearm based solely upon objective features. The commenter further elaborated, stating, ATF contends that the intent of manufacturers or makers may not be as stated, but "[c]onversely, a manufacturer or designer may have all genuine intents and purposes of having a firearm not be shot from the shoulder, but have their firearm classified as a 'rifle' on the basis that it met the point requisite! Both of these results ignore the Congressional intent of the meaning of the term 'rifle'." Other commenters said it was unclear what additional evidence ATF would consider in determining if a manufacturer "expressly intended to design the weapon to be fired from the shoulder." Finally, other commenters contended that, although ATF said that the manufacturer's stated intent should play a role, the worksheet did not take such intent into account because it focused only on design features.

Department Response

The Department disagrees that the definition, as proposed and finalized, defines the intent of a manufacturer or designer based solely upon objective features. As stated, ATF considers the manufacturer's or designer's stated intent, but the Department has determined that the relevant statutes would not be properly implemented by simply assuming that the firearm should be classified entirely in accordance with that stated intent; doing so would permit circumvention of the NFA solely based on the manufacturer's or maker's words. Such an absurd result would be inconsistent with the best understanding of the relevant statutory definitions, which encompass weapons designed, made, and intended to be fired from the shoulder—not merely weapons that the manufacturer expressly states are to be fired from the shoulder. Put another way, Federal regulation of only those "rifles" the manufacturer wanted to market as such would leave other items completely unregulated regardless of their objective design features, and regardless of whether those other items pose the exact same dangers as the weapons marketed as "rifles." Hence, to properly apply the relevant statutory definition, the Department has determined that the

classification of a firearm should include an evaluation of whether its objective design features indicate it is designed, made, and intended to be fired from the shoulder. ATF, as stated in this rule, may consider a manufacturer's stated intent or marketing materials, as well as evidence of likely use in the general community, but ATF would take these considerations into account in conjunction with the objective design features of the weapon.

To assess the manufacturer's or maker's intent when following the process described in this final rule, ATF's FATD considers both: (1) the marketing of the attachment (e.g., indirect marketing through persons that manufacture or sell "stabilizing braces" but not firearms) and the direct marketing from the firearm manufacturer regarding the firearm to which the attachment or "brace" is assembled, and (2) information demonstrating the likely use of the weapon by the general community, including both the manufacturer's stated intent when submitting its item for classification and use by members of the firearms industry, firearms writers, and in the general community. Cf. Posters 'N' Things v. United States, 511 U.S. 513, 521–22 (1994) (explaining that whether an item is "primarily intended" for a specified use is an objective analysis that must focus on the "likely use" of that item in the general community, rather than the subjective intent of a particular person).

FATD in the past has found that manufacturers or makers often assert that a device is a "stabilizing brace" or that a firearm is a "pistol" when submitting a firearm for classification, but then advertise these products later as devices that permit customers to fire their "pistols" from the shoulder, e.g., to make a short-barreled rifle without complying with the requirements of the NFA (examples provided below). Such production and advertising are far from, and not consistent with, the incidental use of a "brace" as a shouldering device. Instead, the manufacturer's own marketing materials directly contradicted the purpose they stated to ATF when submitting the firearm and indicated that the firearm, in reality, is intended to be fired from the shoulder. Thus, in considering intent under this final rule, ATF will consider both the stated intent upon submission to ATF and the marketing materials associated with the "stabilizing brace." Additionally, FATD under the final rule may also examine information demonstrating the likely use of the weapon in the general community, such

as the proposed use by the manufacturer or use by members of the firearms industry, firearms writers, and in the general community. These sources provide insight into the ways that manufacturers market their products and whether the firearm equipped with a "stabilizing brace" as configured is designed, made, and intended to be shoulder fired.

By considering direct or indirect marketing or promotional materials available through videos, advertisements, or other sources, ATF can verify the manufacturer's purported intent regarding the use the weapon. Indirect marketing materials can include statements from accessories manufacturers for the accessories that a firearms manufacturer attaches or incorporates into its firearm, such as a "brace" manufacturer that advertises that a "stabilizing brace" is a method to circumvent the NFA. Such an advertisement would not be published by the firearms manufacturer itself but might still be referenced by the manufacturer of the "stabilizing brace," and it would still be considered relevant in the assessment of whether a weapon is a rifle. Additionally, ATF can look to other available information, including the manufacturer's own statements, to assess the general community's likely use of the weapon to resolve the intended use of the device.

Below is an example of how ATF would consider these materials and information for an AR-type firearm with an SBA3 "stabilizing brace" device. In evaluating a firearm equipped with an SBA3 "brace" device, FATD will consider the firearm manufacturer's or maker's direct and indirect marketing and promotional materials, which may include the direct or indirect materials of the accessory (or "brace") maker whose product is used by the manufacturer or maker of the firearm. Even though, as earlier discussed, the maker of the SBA3 stated to ATF that an SBA3 "stabilizing brace" was "intended to assist those with limited strength or mobility while shooting from the one-handed pistol precision stance or one-handed supported stance," [138] the maker of the SBA3 also included material on its website that stated "stabilizing braces" are a way to avoid NFA controls and to "Stiff Arm the Establishment." [139] The Department

---

[138] Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012).

[139] See, e.g., SB Tactical (June 3, 2017), https://web.archive.org/web/20170603230920/https://www.sb-tactical.com/; SB Tactical (May 2, 2019), https://web.archive.org/web/20190502221627/https://www.sb-tactical.com/.

believes it would be appropriate for ATF to consider this indirect marketing material from the brace manufacturer, along with the weapon's objective design features, when making a classification.

BILLING CODE 4410–FY–P



**SB Tactical's Homepage from June 2017 to May 2019 (background picture since changed but the phrase "*Stiff-Arm the Establishment*" was visible during that entire timeframe)**

In considering information demonstrating the likely use of the firearm equipped with an SBA3 "stabilizing brace" in the general community, ATF would also consider information such as the firearms magazines that similarly exhibited the use of this "stabilizing brace" as a shoulder stock.[140]

---

[140] James Tarr, *POF Revolution Pistol Review*, Guns and Ammo (Apr. 1, 2019), *https:// www.gunsandammo.com/editorial/pof-revolution-pistol-review/359137;* Tom Beckstrand, *BCM Recce-11 MCMR Pistol Review*, Guns and Ammo (Oct. 28, 2019), *https://www.gunsandammo.com/editorial/ bcm-recce-11-mcmr-pistol-review/369026.*

In the following examples, with images, the firearms were being sold as pistols while it was evident that they were designed, made, and intended to be rifles.



**Firearms writer utilizing the SBA3 accessory as a shoulder stock (Firearms News, September 2018, Issue 18) to fire a Patriot Ordnance Factory (POF) "Revolution," 7.62 NATO caliber firearm with long-distance scope—Note this firearm is being sold as a "pistol" while clearly designed, made, and intended to be a "rifle"**



**Guns & Ammo (September 2019, page 36) covering the Bravo Company Manufacturing (BCM) Recce-11 MCMR 5.56 NATO caliber firearm with long-distance scope and SBA3 "stabilizing brace"—Note this firearm is being sold as a "pistol" while clearly designed, made, and intended to be a "rifle"**

Additionally, ATF would review other advertisements displaying the SBA3 accessory as a shoulder stock. These include:

---

[141] *King of Compact Hammers*, Guns and Ammo (June 2019).

[142] Ballistic Staff, *RipBrace: CMMG Teams with SB Tactical for Retractable AR Pistol Brace*, Ballistic Magazine (Nov. 8, 2018), *https://* www.ballisticmag.com/cmmg-ripbrace-retractable-brace/.