

**Advertisement for Highlander "Pistol" with attached SBA3 "stock" (advertisement ran in Guns & Ammo June/July 2019)**[141]



**Webpage advertising the SBA3 accessory as a "stock"**



**Ballistic magazine of the *"RipBrace"* version of the SBA3 accessory, advertising the ability to quickly extend the *"stock"***[142]

The manufacturers' advertisements of the SBA3 attached to these types of firearms and their use by the industry and public as a rifle designed, made,

and intended to be fired from the shoulder demonstrate the actual intended use of the item. Thus, in considering a manufacturer's assertion to ATF that the firearm is designed and intended to be fired with one hand with the assistance of a "stabilizing brace," FATD would be able to look to the manufacturer's direct and indirect materials, as well as information demonstrating likely use in the general community, to assist in determining whether the firearm is or is not configured to be fired from the shoulder. As evidenced by online videos,[143] marketing materials from manufacturers of various models of "stabilizing braces," [144] and even comments on the NPRM, firearms with attached "stabilizing braces" are being used to evade regulation under the NFA. Thus, the final rule adopts the best interpretation of the relevant statutes by examining a firearm's objective design features, along with direct and indirect marketing materials and other information to determine whether a firearm is designed, made, and intended to be fired from the shoulder.

### 4. Constitutional Concerns

#### a. Violates the Second Amendment

**Comments Received**

Commenters opposed to the NPRM broadly opined that ATF should not be allowed to violate their Second Amendment rights and that this rule is a "slap in the face" to millions of Americans who own and use pistol braces. Other commenters argued the rule would ban pistols that are protected by the Second Amendment. Commenters argued that the rule "attacks" the Second Amendment. Thousands of commenters cited *District of Columbia* v. *Heller,* 554 U.S. 570 (2008), and argued that the rule unlawfully infringes on the Second Amendment rights of millions of citizens to keep and bear arms in common use. Other commenters stated the term "infringed" in the Second Amendment means "to limit or undermine" and "actively break the terms of a law or agreement," and that in return for the colonies giving power to the creation of a Federal government, the government agreed not to infringe on the rights of people to keep and bear arms. Commenters argued that with this rule, ATF is infringing on the rights of people to keep and bear arms under the Second Amendment. Another commenter stated that the right to install a stabilizing brace to assure safe

[143] *See supra* notes 96–98.
[144] *See supra* notes 90–94.

and accurate use and operation of a weapon, particularly for defense of self and property, is a "core value" protected by the Second Amendment.

Department Response

The Department disagrees with commenters that this regulation violates the Second Amendment. *Heller* and subsequent judicial decisions support the Department's view that weapons regulated by the NFA, such as short-barreled rifles, fall outside the scope of the Second Amendment. The Supreme Court in *Heller,* 554 U.S. at 570, held the Second Amendment protects an individual right to bear arms for traditional, lawful purposes such as self-defense. At the same time, the Court recognized that the rights established under the Second Amendment are not absolute or unlimited. *Id.* at 595. *Heller* specifically recognized an "important limitation on the right to keep and carry arms," *i.e.,* that the right is limited to "the sorts of weapons . . . 'in common use at the time.'" *Id.* at 627. The Court stated that this limitation is supported by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* The Court rejected the "startling" position that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624. *Heller* thus made clear that machineguns and short-barreled shotguns are "weapons not typically possessed by law-abiding citizens for lawful purposes," and thus fall outside the scope of the Second Amendment as historically understood. *Id.* at 625; *see also id.* at 627 (accepting that M–16 rifles are dangerous and unusual weapons that may be banned).

Indeed, after *Heller,* lower courts similarly held that short-barreled shotguns and short-barreled rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment because of the danger presented. *United States* v. *Cox,* 906 F.3d 1170, 1186 (10th Cir. 2018) ("we take our cue from *Heller* and conclude that the possession of short-barreled rifles falls outside the Second Amendment's guarantee"); *United States* v. *Gilbert,* 286 Fed. App'x 383, 386 (9th Cir. 2008) (approving jury instructions that an individual does not have a Second Amendment right to possess a short-barreled rifle, and observing that, "[u]nder *Heller,* individuals still do not have the right to possess machineguns or short-barreled rifles"); *Marzzarella,* 614 F.3d at 90–95 (explaining that a long gun with a shortened barrel is both dangerous and

unusual, because "its concealability fosters its use in illicit activity," and "because of its heightened capability to cause damage" and that the Second Amendment does not provide protection for all types of weapons); *Gonzalez,* 2011 WL 5288727, at *5 ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" (quoting S. Rep. No. 90–1501, at 28)). Thus, *Heller* and subsequent judicial decisions support the Department's view that the weapons regulated by the NFA, such as short-barreled rifles, were not historically protected by the Second Amendment and thus fall outside the scope of the Second Amendment. Nothing in the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n* v. *Bruen,* 142 S. Ct. 2111 (2022), changes this analysis.[145] *See id* at 2162 (Kavanaugh, J. concurring) (reiterating *Heller's* finding that "dangerous and unusual weapons" are outside of the Second Amendment's protections).

Further, the Department also notes that neither the rule nor the NFA bans the possession of the relevant firearms. In regulating short-barreled rifles, Congress only requires the registration of the firearms in the NFRTR and the payment of a making or transfer tax, neither of which prohibits a person's ability to possess these weapons. This rule does no more than clarify the Department's understanding of the best meaning of the relevant statutory provisions.

[145] The Supreme Court's decision in *Bruen* abrogated several circuit court decisions applying a "'two-step' framework for analyzing Second Amendment challenges." *Id.* at 2125. At the first step, courts asked whether the "challenged law regulates activity falling outside the scope of the [Second Amendment] right as originally understood." *Id.* at 2126 (quotation marks omitted). If so, then the law did not violate the Second Amendment. But if the law did regulate activity within the amendment's scope, then courts applied a means-end test similar to the strict or intermediate scrutiny used to evaluate laws burdening First Amendment rights. *Id.* at 2126–27. The Court in *Bruen* largely approved of the first step, which "is broadly consistent with *Heller,*" *id.* at 2127, but specifically disapproved of the second step, *see id.* Thus, although *Bruen* abrogates previous decisions applying the means-end test, the Department does not believe the case casts doubt on courts' prior conclusions that, based on historical tradition, the Second Amendment does not extend to dangerous and unusual weapons. *See, e.g., Marzzarella,* 614 F.3d at 94 ("the Supreme Court has made clear the Second Amendment does not protect . . . types of weapons" such as "machine guns or short-barreled shotguns—or any other dangerous and unusual weapon").

b. Violates the Fourth Amendment

Comments Received

Numerous commenters stated that gun-owning Americans will see this rule as a step toward gun confiscation. One commenter stated that ATF has allowed the legal production and sale of these pistols with "stabilizing braces" for years and, as such, their abrupt removal from the legal use violates the Fourth Amendment.

Department Response

The Department disagrees that this rule violates the Fourth Amendment. The commenters appear to misunderstand the scope and intent of the rule and it is unclear how a "search" or "seizure" could result from this rule. The rule acknowledges that firearms with an attached "stabilizing brace" that meet the definition of "firearm" as defined under the NFA are subject to the registration, transfer, and taxes imposed by the NFA and to additional requirements under the GCA. The Department is not aware of any precedent supporting the view that determinations that certain weapons fall within the purview of the NFA violate the Fourth Amendment. A seizure in "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower* v. *County of Invo,* 489 U.S. 593, 596 (1989). This rule does not violate the Fourth Amendment, as it makes clear that it does not require the Government to seize or confiscate "stabilizing braces" or firearms with an installed "stabilizing brace." First, the Department reiterates that firearms with an attached "stabilizing brace" that fall outside the purview of the NFA may continue to be possessed by individuals. Second, the public may continue to possess, transfer, or sell "stabilizing brace" devices. Lastly, if a firearm with an attached "stabilizing brace" is a short-barreled rifle under the NFA, an owner of any such firearm may comply with the options set forth in the rule to lawfully possess the firearm. *See* section V.B of this preamble.

c. Unconstitutional Taking Under the Fifth Amendment

Comments Received

Commenters believed that ATF should not take action against citizens who have already or in the future will purchase "stabilizing braces." Several commenters stated that citizens have spent millions of dollars in taxes and converting firearms and will now be required to destroy or surrender their personal property without compensation. Commenter believed this rule will unjustly deprive owners of

their property without compensation, as they claimed they would be forced to dispose of the "brace"; they asked if ATF is planning to compensate individuals for every "stabilizing brace" that must be removed. Similarly, some commenters contended that the rule needs to be amended to reimburse owners for their purchases, as they were made in good faith.

Another commenter stated that the proposed rule would be like "forced labor, the taking of property without just compensation or due process, and a little extortion." At least one commenter argued that each of ATF's suggested remedies provided to avoid committing felonies by retaining previously authorized "brace" devices creates significant tension with the constitutional protections provided by the Due Process Clauses of the Fifth and Fourteenth Amendments, and that each of the alternatives the government provides "qualify as a Government taking under the [Fifth] Amendment." In particular, the commenter said that "the Government commits a regulatory taking by taking uses of the property that once had greater utility."

Department Response

The Department disagrees that this rule constitutes a taking under the Fifth Amendment, which prohibits the Government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. As an initial matter, this rule itself cannot violate the Takings Clause because the owners of weapons affected by the rule do not have a protectable property interest in the unregulated possession of weapons covered by the NFA. "[T]o have a cause of action for a Fifth Amendment taking, the plaintiff must point to a protectable property interest that is asserted to be the subject of the taking." *Palmyra Pacific Seafoods, LLC* v. *United States,* 561 F.3d 1361, 1364 (Fed. Cir. 2009). However, the "government does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property] owner's title.' " *Cedar Point Nursery* v. *Hassid,* 141 S. Ct. 2063, 2079 (2021) (quoting *Lucas* v. *S.C. Coastal Council,* 505 U.S. 1003, 1028–29 (1992)). Or, as the Federal Circuit recently explained in a similar context, where there is a "preexisting federal statutory prohibition on possession or transfer of" an item, and where that prohibition is "subject to a valid implementation by the Attorney General," individuals "lack[ ] a property right in what they allege was taken." *McCutchen* v. *United States,* 14 F.4th 1355, 1365 (Fed. Cir. 2021).

Here, the NFA provides preexisting Federal statutory requirements regarding the transfer and making of certain kinds of rifles; and this final rule sets forth the Attorney General's interpretation of those statutory requirements. The rule makes clear that weapons with an attached "stabilizing brace" that, based on their objective design features and other evidence, are designed, made, and intended to be fired from the shoulder and have a barrel of less than 16 inches or an overall length of less than 26 inches are short-barreled rifles under the NFA. Because the rule merely clarifies when a weapon meets the NFA's longstanding definition, owners would not be able to establish a cognizable property interest sufficient for takings purposes. *See id.* at 1364–65 (holding that possessors of bump stocks failed to establish a cognizable property interest in continued possession in light of limitations from preexisting Federal firearm statutes that inhered in the title to their property).

In addition, the NFA's regulations on firearms—and enforcement actions taken under that statutory authority—do not constitute Fifth Amendment takings because the Takings Clause does not apply to public safety regulations such as the NFA. As the Supreme Court has articulated, "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler* v. *Kansas,* 123 U.S. 623, 668– 69 (1887). The Federal Circuit also has recognized that, under Supreme Court precedent, there are certain exercises "of the police power that ha[ve] repeatedly been treated as legitimate even in the absence of compensation to the owners of the . . . property." *Acadia Tech., Inc.* v. *United States,* 458 F.3d 1327, 1332–33 (Fed. Cir. 2006). A restriction on "contraband or noxious goods" and other dangerous articles imposed by the government to protect public welfare "has not been regarded as a taking for public use for which compensation must be paid." *Id.* at 1332.

Applying these principles, courts have rejected arguments that restrictions on the possession of dangerous firearms, like NFA firearms, are takings requiring just compensation. In *Akins* v. *United States,* 82 Fed. Cl. 619 (2008), the Court of Federal Claims rejected takings claims after ATF reconsidered its prior classification decisions regarding the Akins Accelerator. In 2002 and 2004, ATF provided a letter to the

manufacturer of the Akins Accelerator that stated the device is not a machinegun as defined by the NFA. *Id.* at 621. In 2006, ATF tested the Akins Accelerator for another individual and determined the device to be a machinegun for purposes of the NFA and 18 U.S.C. 922(o). *Id.* Generally, section 922(o) prohibits the possession of machineguns manufactured after May 19, 1986, with limited exceptions. Because it constituted a machinegun under the NFA, an individual could not possess or transfer the Akins Accelerator, and the plaintiff alleged a regulatory and physical taking in violation of due process. *Id.* The court explained that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Id.* at 622 (quoting *AmeriSource Corp.* v. *United States,* 525 F.3d 1149, 1153 (Fed. Cir. 2008)). In fact, courts have upheld the authority of the government to seize property through the lawful exercise of its authority, without compensation, including bump stocks. *See Maryland Shall Issue* v. *Hogan,* 353 F. Supp. 3d 400, 408–17 (D. Md. 2018) (rejecting takings claim arising from State ban on bump stocks), *aff'd,* 963 F.3d 356 (4th Cir. 2020); *see also Bennis* v. *Michigan,* 516 U.S. 442, 452 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain.").[146]

Even under a takings analysis, the NFA's regulation of firearms would not constitute a physical taking, *see Horne* v. *Department of Agriculture,* 576 U.S. 350, 361 (2015), or a *per se* regulatory taking, *see Lucas* v. *S.C. Coastal Council,* 505 U.S. 1003, 1017 (1992). The statute will not compel individuals to abandon, surrender, or destroy their "stabilizing brace" devices or firearms with "stabilizing braces" attached.[147]

An individual may register the firearm in accordance with the provisions of the NFA or remove any offending characteristics to remove the firearm from the purview of the NFA (*e.g.,* the removal and replacement of a barrel of less than 16 inches with a longer barrel). *See* section V.B of this preamble. Nor does the rule preclude all uses of the "stabilizing brace" or firearms with "stabilizing braces" attached. *See Lucas,* 505 U.S. at 1017–18 (applying the *per se* rule where all use of property is prohibited). "Stabilizing braces" may continue to be affixed on a short-barreled rifle so long as the firearm is registered, transferred, and taxed in accordance with the NFA. In fact, there are just over 641,000 short-barreled rifles registered in the NFRTR.[148]

Accordingly, if a court conducted a takings analysis, the rule would be analyzed and upheld under the multi-factor test for regulatory takings claims identified by the Supreme Court in *Penn Central Transportation Co.* v. *City of New York,* 438 U.S. 104, 124 (1978). A court applying that analysis would consider: (1) the economic impact of the regulation on the claimant, (2) its interference with investment-based expectations, and (3) the character of the governmental action. *Id.* at 124.

First, the economic impact of the rule on affected individuals will be minimal. As just explained, the rule does not require individuals to abandon, surrender, or destroy their firearms with attached "stabilizing braces"; at most, the final rule will require compliance with certain tax and registration requirements, but the Department has ameliorated the financial impact of the NFA's taxes by forbearing from the collection of past making taxes from individuals and FFLs.

Second, an individual's "reasonable investment-backed expectations are greatly reduced in a highly regulated field." *Branch* v. *United States,* 69 F.3d 1571, 1581 (Fed. Cir. 1995); *see also McCutchen* v. *United States,* 145 Fed. Cl. 42, 56 (2019), *aff'd on other grounds,* 14 F.4th 1355 (Fed. Cir. 2021) ("The firearms industry is the quintessential 'highly regulated field,'" and "[a]nyone who enters the firearms industry has to be aware that shifting public sentiments, evolving research concerning firearms availability and public safety, and events like [a] . . . mass shooting may lead to rule changes that render unlawful what was once permissible.").

And the Supreme Court has made clear that an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless." *See Lucas,* 505 U.S. at 1027–28. Here, the weapons potentially affected by this rule are dangerous articles that are highly regulated by the NFA and GCA, and ATF's history of often classifying weapons with attached "stabilizing braces" as short-barreled rifles, *see* section II.B of this preamble, indicated to firearm owners the potential for future regulations that would affect individuals' "stabilizing braces."

Finally, a restriction "directed at the protection of public health and safety . . . is the type of regulation in which the private interest has traditionally been most confined and governments are given the greatest leeway to act without the need to compensate those affected by their actions." *Rose Acre Farms, Inc.* v. *United States,* 559 F.3d 1260, 1281 (Fed. Cir. 2009). The character of the current governmental action—*i.e.,* a regulation to promote public safety—thus weighs in favor of a conclusion that the rule will not result in a taking.

### d. Unconstitutionally Vague Under the Fifth Amendment

*Comments Received*

Commenters argued that the proposed regulations violate the Due Process Clause of the Fifth Amendment. Commenters argued that the proposed rule was "impossibly vague and arbitrary" and that none of the factors were based in Federal statute. Commenters asserted that the rule only serves "to make criminal via regulation that which the statute does not make criminal, complicate, confuse, make ambiguous and otherwise obfuscate and obstruct the industry from engaging in lawful commerce." Specifically, one commenter stated that clarity is an essential element of the Fifth Amendment and cited to the Supreme Court case *F.C.C.* v. *Fox Television Stations,* 567 U.S. 239 (2012) ("*Fox*"). The commenter argued that the definition of "rifle" would be "incomprehensible," as it would now include "firearms that are not intended by the manufacturer or designer to be fired from the shoulder[ ]" and, further, that the weighted factors were also unintelligible. The commenter asserted that this ambiguity would deprive market participants and the public of notice about what the law is. Similarly, commenters stated that the proposed rule, as written, produced confusion that would make it more difficult for

---

[146] The court in *McCutchen* suggested there may be limits on the scope of the police power, thus leaving open the possibility that, in a future case, an exercise of that power might constitute a taking. *See McCutchen,* 14 F.4th at 1363–64. Regardless of the merit of this proposition, *McCutchen* still indicates that the final rule does not constitute a taking because, as explained earlier, individuals do not have a cognizable property interest in unregulated ownership of NFA firearms.

[147] *See Yee* v. *City of Escondido, Cal.,* 503 U.S. 519, 527 (1992) ("[T]he Takings Clause requires compensation if the government authorizes a compelled physical invasion of property."); *L.L. Nelson Enterprises, Inc.* v. *Cnty. of St. Louis, Mo.,* 673 F.3d 799, 806 (8th Cir. 2012) ("When a person voluntarily surrenders liberty or property, the State has not *deprived* the person of a constitutionally-protected interest."); *Hinesburg Sand & Gravel Co.* v. *Chittenden Solid Waste Dist.,* 959 F. Supp. 652,

657 (D. Vt. 1997) ("A fundamental requirement for any taking is that the challenged governmental action create legal compulsion.").

[148] Source: National Firearms Act Division (as of November 2, 2022).

law abiding citizens and businesses to comply with the regulation.

Several commenters stated the rule and the criteria ATF would rely on were subjective, arbitrary and capricious, or vague, such that that an average person could not understand the rule well enough to avoid committing a felony or understand what is required. One commenter questioned what would happen if a vendor who sold firearms equipped with a "stabilizing brace" did not resubmit the firearm and "brace" to ATF to inquire about their classification and asked how the owners of such firearms would be made aware of the new classification.

Department Response

The Department disagrees with commenters that the rule is unconstitutionally vague but agrees that some of the criteria on the worksheet would have been difficult for users to apply. For the reasons discussed in section IV.B.1–3 of this preamble, the rule does not adopt the proposed Worksheet 4999 or the point system. Rather, the Department is incorporating into the definition of "rifle" a list of objective design features and other factors, all of which were part of the NPRM, to better clarify when a firearm equipped with a "stabilizing brace" or other rearward attachment is designed, made, and intended to be fired from the shoulder. Knowledge of the proper inquiry and factors that ATF considers when making a classification will allow members of the firearm industry and the public to evaluate whether a weapon incorporating a "stabilizing brace" or other rearward attachment is, in fact, a short-barreled rifle subject to the NFA. The Department does not believe the listed factors are complicated, confusing, or ambiguous. The Department carefully considered the many comments it received in deciding how best to define the relevant factors. In the final regulatory text, the Department selected the critical objective design features and other factors that are necessary for determining whether a firearm is designed, made, and intended to be fired from the shoulder.

The Department disagrees with commenters that the definition of "rifle" now includes other firearms that are not intended by the manufacturer or designer to be fired from the shoulder. Under the best reading of the term "rifle" in the GCA and NFA, the term should be applied to weapons without regard for whether, when equipped with a "stabilizing brace," they can be fired with a single hand in certain circumstances or by a particular individual. *See United States* v. *Alvarez-Sanchez,* 511 U.S. 350, 356 (1994) ("When interpreting a statute, we look first and foremost to its text."). Accordingly, the Department has concluded that ATF will examine the objective design features of each weapon and other factors to determine whether a firearm is designed, made, and intended to be fired from the shoulder. The listed criteria in this rule are mentioned and discussed in the NPRM. The Department provides further discussion on each of the factors in sections IV.B.2 and IV.B.3 of this preamble.

The Department believes the rule provides sufficient notice under the Due Process Clause of the Constitution. As an initial matter, to the extent that the commenters believe that Due Process Clause is implicated by the rule because the rule itself imposes criminal or civil restrictions, the commentators are mistaken. The relevant legal restrictions are found in the NFA and GCA, and this rule does not alter, amend, or add to those restrictions; instead, the rule informs the public of the best interpretation of the relevant statutory provisions.

The Department recognizes that clarity of legal restrictions is an essential element of the Fifth Amendment. *See Fox,* 567 U.S. 239. The Supreme Court has explained that "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id.* at 253 (citing *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.")). The question is "whether the text of the statute and its implementing regulations, read together, give ordinary citizens fair notice with respect to what the statute and regulations forbid, and whether the statute and regulations read together adequately provide for principled enforcement by making clear what conduct of the defendant violates the statutory scheme." *United States* v. *Zhi Yong Guo,* 634 F.3d 1119, 1123 (9th Cir. 2011) (citing *City of Chicago* v. *Morales,* 527 U.S. 41, 56 (1999)). However, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned* v. *City of Rockford,* 408 U.S. 104, 110 (1972); *see also Ward* v. *Rock Against Racism,* 491 U.S. 781, 794 (1989) ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

The Supreme Court has held that a regulatory scheme similar to the statutory and regulatory scheme discussed in this final rule is not facially unconstitutional under the void for vagueness doctrine. *See Vill. Of Hoffman Ests.* v. *Flipside, Hoffman Ests., Inc.,* 455 U.S. 489 (1982). A local ordinance in that case required a business to obtain a license if it sold "any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs, as defined by Illinois Revised Statutes." *Id.* at 492. The vagueness challenge to the ordinance "focuse[d] on the language 'designed or marketed for use.' " *Id.* at 500. As relevant to this final rule, the Court held that the phrase "designed for use" as used in the ordinance encompassed any "item that is principally used with illegal drugs by virtue of its objective features," and that this understanding of the term was "sufficiently clear" to withstand the vagueness challenge. *Id.* at 501. By similar reasoning, the final rule is sufficiently clear because, like the ordinance at issue in *Flipside,* it defines the relevant item on the basis of whether the objective features of the item (here, a weapon with an attached "stabilizing brace") in consideration with other evidence listed in this rule indicate that the firearm is designed, made, and intended for a particular purpose (here, firing from the shoulder).

The Eleventh Circuit has reached a similar conclusion about a similar scheme. *See High Ol' Times, Inc.* v. *Busbee,* 673 F.2d 1225 (11th Cir. 1982). The Georgia statute at issue in that case "define[d] a 'drug related object' as any object 'which is designed or marketed as useful primarily for' use with controlled substances." *Id.* at 1230. The court construed the phrase "designed for use" to mean the intended use of the item "as manifested by the objective physical characteristics of the item." *Id.* at 1230–31. The court then rejected a vagueness challenge to the statute, citing *Flipside* for the proposition that the standard was sufficiently clear. *Id.* at 1231. Again, then, the use of the objective physical features of an item to determine the item's intended use—just as this final rule requires—was not unconstitutionally vague. Courts have applied similar reasoning in other contexts, including the regulation of firearms. *See, e.g., United States* v. *Kuzma,* 967 F.3d 959, 969–70 (9th Cir.), *cert. denied,* 141 S. Ct. 939 (2020) (rejecting a vagueness challenge to the phrase "designed to shoot . . . automatically" in the definition of

''machine gun'' after explaining the inquiry turns on the relevant item's ''specific configuration of objective structural features''); *id.* at 970 (''By focusing on whether a device has a specific configuration of *objective* features that, absent a minor defect, would give it the capacity to shoot automatically, the phrase a 'weapon which . . . is designed to shoot . . . automatically' provides both sufficient notice as to what is prohibited and sufficient guidance to prevent against arbitrary enforcement.'' (emphasis in the original)); *United States* v. *Biro,* 143 F.3d 1421, 1427 (11th Cir. 1998) (rejecting a vagueness challenge to a statute because the ''objective characteristics'' of the items at issue indicated they were ''' primarily useful for the purpose of the surreptitious interception' of oral communications'').

The Department also believes that the meaning of the particular objective design features incorporated in this rule would be readily ascertainable. The final regulatory text first directs an individual to examine whether the firearm includes an accessory, component, or other rearward attachment (*e.g.,* a ''stabilizing brace'') that provides surface area that allows the weapon to be fired from the shoulder. This language would thus give an individual fair notice that surface area is the first particular characteristic of the weapon the individual needs to evaluate. *Cf. United States* v. *Lim,* 444 F.3d 910, 916 (7th Cir. 2006) (NFA regulation of short-barreled shotgun not unconstitutionally vague as to the minimum length of the barrel, since the statute gave defendant fair notice of the particular characteristic that had to be measured). Next, the individual would need to identify whether the firearm incorporates other objective characteristics listed in this rule, including weight and length of the firearm as compared to the length of similarly designed rifles; sights and scopes with eye relief that require shouldering of the firearm; or length of pull consistent with similarly designed rifles (including whether there is an adjustable or telescoping attachment with the ability to lock into various positions). The rule also includes as relevant factors the intended and actual use of the firearm, including the manufacturer's direct or indirect marketing or promotional materials and information demonstrating the likely use of the weapon in the general community. An individual would be able to determine the meaning of the terms used in the rule based on publicly available information regarding firearms, practical application through the use of the firearm (*e.g.,* use of scopes), and the examples provided in this preamble. *Cf. United States* v. *Catanzaro,* 368 F. Supp 450, 454 (Dist. Ct. 1973) (rejecting a vagueness challenge where standard firearms reference books could be used to help give meaning to statutorily defined terms).

In addition, by going through this rulemaking process, the Department has provided notice and opportunity to comment regarding the best interpretation of the statutory definition and how, in future enforcement and classification determinations, ATF intends to evaluate whether any particular weapon configuration constitutes a ''rifle.'' The promulgation of this rule through notice-and-comment procedures reduces vagueness concerns by providing fair notice of the definition of a ''rifle.'' *See Guedes* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 920 F.3d 1, 28 (D.C. Cir. 2019); *see also Guedes* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 520 F. Supp. 3d 51, 71 (D.D.C. 2021).

Next, to the extent that an individual is unsure about whether a particular firearm with a particular attached ''stabilizing brace'' constitutes a rifle, that individual is free to request a classification determination from ATF for additional clarity. Moreover, ATF is publishing information simultaneously with this rule to inform members of the public of how they might be impacted based on (1) common weapon platforms with attached ''stabilizing brace'' brace designs and (2) examples of commercially available firearms with ''stabilizing braces'' that are short-barreled rifles. For individuals with such firearms equipped with a ''stabilizing brace,'' actions such as registration in the NFRTR will need to be taken as discussed in section V.B of this preamble. ATF will inform the public as new weapon platforms and ''stabilizing braces'' or other devices become available.

### e. Ex Post Facto Clause

#### Comments Received

Numerous commenters asserted that the rule creates an unconstitutional Ex Post Facto law in violation of Article 1, Section 9 of the Constitution. The commenters argued that customers bought ''stabilizing brace'' products in good faith for almost a decade. They stated that this rule is a ''clear example of criminalizing activity (possessing a certain configuration of firearm) at [the] federal level (reinterpretation of the NFA) that was not prohibited beforehand.'' Similarly, other commenters deemed the proposed rule a ''retroactive law,'' as they believed it would retroactively declare possession of braces and braced pistols to be a serious crime even though ATF had, over the past 10 years, permitted the entry of these products into the marketplace via multiple guidance letters. Another commenter argued that the proposed rule imposes impermissible retroactive regulatory obligations, which is not favored in Federal law. To issue a retroactive rule, the same commenter argued, there needs to be an express grant of statutory authority under the NFA, which the Department does not have except in a narrow set of circumstances that are not applicable here. The commenter also cited to *United States* v. *Cash,* 149 F.3d 706, 707 (7th Cir. 1998), where the court stated, ''the Secretary cannot give retroactive application to tax regulations.''

#### Department Response

The Department disagrees that the rule violates the Ex Post Facto Clause. In *Calder* v. *Bull,* 3 U.S. (3 Dall.) 386, 390 (1798), Justice Chase set out four types of laws that violate the Ex Post Facto Clause: (1) ''Every law that makes an action, done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action;'' (2) · ''Every law that *aggravates* a crime, or makes it *greater* than it was, when committed;'' (3) ''Every law that *changes the punishment,* and *inflicts a greater punishment*'' and (4) ''Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.''* (Emphases in the original.)

Citing *Calder,* the Supreme Court has explained that a ''law must be retrospective—that is, it must apply to events occurring before its enactment— and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime'' to be considered as falling within the ex post facto prohibition. *Lynce* v. *Mathis,* 519 U.S. 433, 441 (1997) (citation and quotation marks omitted). This rule does not meet the definition of any of the four types of laws that the Supreme Court has held violate the Ex Post Facto Clause. Indeed, the rule does not itself impose any liability on any individual or otherwise regulate primary conduct. Instead, the present rule describes the proper application of the phrase ''designed . . . , made . . . , and

intended to be fired from the shoulder,'' as used to define a ''rifle'' in the GCA and NFA. *See* 18 U.S.C. 921(a)(7); 26 U.S.C. 5845(c). The rule does not impose liability independent of already preexisting requirements for short-barreled rifles under those statutes, *i.e.,* interstate transportation, registration, transfer and making approval, and transfer and making tax. *See* 18 U.S.C. 922(a)(4); 26 U.S.C. 5811–5812, 5821–5822, 5841.

In any event, courts have consistently recognized that regulating the continued or future possession of a firearm that is already possessed does not implicate the Ex Post Facto Clause because such a regulation does not criminalize past conduct. *See, e.g., United States* v. *Pfeifer,* 371 F.3d 430, 436–37 (8th Cir. 2004); *United States* v. *Mitchell,* 209 F.3d 319, 322 (4th Cir. 2000); *United States* v. *Brady,* 26 F.3d 282, 290–91 (2d Cir. 1994); *United States* v. *Gillies,* 851 F.2d 492, 495–96 (1st Cir. 1988) (Breyer, J.); *United States* v. *D'Angelo,* 819 F.2d 1062, 1065–66 (11th Cir. 1987); *see also Samuels* v. *McCurdy,* 267 U.S. 188, 193 (1925) (rejecting Ex Post Facto Clause challenge to statute that prohibited the post-enactment possession of intoxicating liquor, even when the liquor was lawfully acquired before the statute's enactment).

Moreover, the rule expressly provides options for unlicensed individuals and FFLs to comply with the requirements of the NFA if they are currently in possession of firearms equipped with a ''stabilizing brace'' and a barrel length of less than 16 inches that are short-barreled rifles. The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties. Additionally, in an exercise of its enforcement discretion, the Department has determined that individuals and FFLs will not be liable for paying past making and transfer taxes for weapons of the sort described in this rule that are NFA firearms. For a further discussion on tax forbearance, see sections IV.B.8.e, IV.B.9.b–c, and V.C of this preamble.[149]

[149] With respect to the commenter that cited *United States* v. *Cash,* 149 F.3d 706, 707 (7th Cir. 1998), ATF notes that the court's statement that ''the Secretary cannot give retroactive application to tax regulations'' referred to the current version of 26 U.S.C. 7805(b). As discussed below, however, the pre-1996 version of section 7805(b) applies to this rule, and that version lacks the restriction on retroactive liability. Indeed, under the pre-1996 version, ''there is a presumption that every regulation will operate retroactively, unless the Secretary specifies otherwise.'' *UnionBancal Corp.*

### f. Equal Protection Clause

Comments Received

Numerous commenters stated that the rule has a disparate impact on women and persons with disabilities and thus violates the Equal Protection Clause. Additionally, at least one commenter cited to *Harper* v. *Virginia Board of Elections,* 383 U.S. 663 (1966), in which the Supreme Court held that a State's conditioning the right to vote on the payment of a fee or tax violates the Equal Protection Clause of the Fourteenth Amendment. The commenter said that the Court held that, where ''fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.'' *Id.* at 670. The commenter went on to state that, ''[if] this is such a legal certainty, how is the imposition of taxes, registration, and other requirements on [the] individual practice of the Second Amendment right . . . not also a violation of the Equal Protection Clause of the Fifth Amendment where the Federal Government is concerned?''

Department Response

The Department disagrees that the rule violates the Equal Protection Clause. As an initial matter, the rule itself does not require the payment of any fees or taxes, nor does the rule itself directly regulate firearms. Instead, the rule does no more than articulate the best interpretation of the relevant statutory provisions.

Moreover, it is well established the ''Equal Protection Clause forbids only intentional discrimination.'' *Horner* v. *Ky. High School Athletic Ass'n,* 43 F.3d 265, 276 (6th Cir. 1994). Even if ''a neutral law has a disproportionately adverse effect . . . , it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.'' *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U.S. 256, 272 (1979); *see also Soto* v. *Flores,* 103 F.3d 1056, 1067 (1st Cir. 1997) (''It is a truism that under Equal Protection Clause jurisprudence, a showing of disproportionate impact alone is not enough to establish a constitutional violation.''). ''Discriminatory intent'' requires that the ''decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' the law's differential treatment of a particular class of persons.'' *SECSYS, LLC* v. *Vigil,*

v. *Comm'r,* 113 T.C. 309, 327 (1999), *aff'd,* 305 F.3d 976 (9th Cir. 2002).

666 F.3d 678, 685 (10th Cir. 2012) (Gorsuch, J.) (alteration and some quotation marks omitted) (citing *Feeney,* 442 U.S. at 279). Consequently, ''when the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required. This is so because many laws, perhaps most and often unavoidably, affect some groups of persons differently than others even though they involve no *intentional* discrimination.'' *Id.* (Emphasis in the original.)

Both the NFA and this final rule are generally applicable to all persons. Neither the NFA nor this rule creates discrete, objectively identifiable classifications of similarly situated individuals that are intentionally treated differently under its provisions. *See San Antonio Indep. Sch. Dist.* v. *Rodriguez,* 411 U.S. 1, 60 (1973) (Stewart, J., concurring); *Tex. Entertainment Ass'n* v. *Hegar,* 10 F.4th 495, 513 (5th Cir. 2021); *Corey Airport Servs., Inc.* v. *Clear Channel Outdoor, Inc.,* 682 F.3d 1293, 1296–97 (11th Cir. 2012) (''[N]o valid equal protection claim exists'' in the absence ''of a discrete and identifiable group to which [the plaintiff] belonged and which the [government] treated in a discriminatory, prejudicial manner'' under a ''governmental classification'').

Moreover, contrary to commenters' assertions, the Department doubts that this rule will have a disparate impact on women and persons with disabilities. The Department has no evidence that women or persons with disabilities are disproportionately affected by the rule's definition of rifle, and commenters have not provided any. In any event, the rule does not prohibit ownership of a firearm equipped with a ''stabilizing brace''; instead, it only requires lawful registration in the NFRTR of those combinations of firearms and ''braces'' that meet the statutory definition of an NFA ''firearm.'' And even assuming that this rule does impact some groups differently, the rule—as just stated—runs afoul of the Equal Protection Clause only ''if that impact can be traced to a discriminatory purpose.'' *Feeney,* 442 U.S. at 272. Here, there is no such purpose.

Next, even if the NFA or this rule did implicate equal protection principles, the Department disagrees that the NFA's regulatory scheme violates the Equal Protection Clause. If a ''classification 'impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class,' [a court will] subject the classification to strict scrutiny. Otherwise, [courts] will uphold the classification if it is 'rationally related to

a legitimate state interest.'" *Mance* v. *Sessions,* 896 F.3d 699, 711 (5th Cir. 2018) (citing *NRA* v. *ATF,* 700 F.3d 185, 211–12 (5th Cir. 2012)). As discussed above, there is a fundamental right to own firearms, but the Court in *Heller* noted the right is not absolute or unlimited. 554 U.S. at 595. In *Heller,* the Supreme Court specifically recognized an "important limitation on the right to keep and carry arms," and the Court stated that this limitation is supported by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627. Because this regulation does not implicate the right protected by the Second Amendment as described by the Court in *Heller,* a court would likely review this regulation under a rational basis test. Under rational basis review, a classification "is accorded a strong presumption of validity." *Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993). "The firearm regulatory scheme . . . is consonant with the concept of equal protection embodied in the Due Process Clause of the Fifth Amendment if there is some rational basis for the statutory distinctions made . . . or . . . they have some relevance to the purpose for which the classification is made." *Lewis* v. *United States,* 445 U.S. 55, 65 (1980) (quotation marks omitted). There is clearly a rational basis for requiring accurate classifications and regulation of weapons. Congress, when enacting the NFA, was concerned "mainly with clearly identifiable weapons which were the cause of increasing violent crime and which had no lawful uses." *United States* v. *Posnjak,* 457 F.2d 1110, 1116 (2d Cir. 1972). If a "stabilizing brace" has such a transformative effect on a pistol that the weapon's overall configuration becomes a short-barreled rifle, then the NFA applies. Hence, the NFA's regulation of firearms, and its application of those statutory requirements to weapons equipped with a "stabilizing brace," has a more than rational basis.

The Department disagrees with the commenters that cited *Harper* v. *Virginia State Board of Elections,* where the Supreme Court held that a "State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes affluence of the voter or payment of any fee an electoral standard." 383 U.S. at 666. The Court in *Harper* held that, "[t]o introduce wealth or the payment of a fee as a measure to a voter's qualifications is to introduce a capricious or irrelevant factor." *Id.* at 668. *Harper* is distinguishable because Congress passed the NFA to regulate dangerous and unusual weapons, and

the Supreme Court in *Heller* recognized that there is no fundamental right to the possession of such weapons. 554 U.S. at 627. Thus, unlike the fee imposed to vote in *Harper,* the taxes imposed under the NFA do not infringe on an individual's fundamental right. Rather, the NFA tax is a rational mechanism to control the making and transfer of dangerous and unusual firearms that are concealable and capable of more damage than other firearms. *See Marzzarella,* 614 F.3d at 90–95.

5. General Impact of the Rule

a. Punishes Law-Abiding Citizens

Comments Received

Related to the Ex Post Facto law comments, many commenters believed that this rule will make millions of law-abiding Americans felons overnight. Commenters stated the new rule would make each and every "stabilizing brace" worthless and possession of such a "brace" would become a felony if not registered. Commenters also stated that, if promulgated, the rule would impact at least three million law-abiding citizens and threaten millions of citizens with prison, harsh fines, and forfeiture of firearms or make them felons. One commenter claimed that the rule would "have the effect of creating an altogether new crime—one that may sweep up law-abiding gun owners based on actions they already took in full conformity with the law as it existed at the time." Another commenter believed the proposed rule would needlessly subject tens of millions of Americans' personally identifiable information ("PII") to the NFRTR, "which would further endanger each individual from a data privacy and security perspective."

Department Response

The Department disagrees with the assertions that this rule is intended to or will make felons of law-abiding citizens. This rule does not itself impose any new restrictions; instead, this rule articulates the best interpretation of the relevant statutory terms. Nothing in this rule changes those underlying statutory requirements. Nor does this rule affect "stabilizing brace" devices alone. Further, the Department disagrees with the comment that three million law-abiding citizens will be subject to harsh fines and forfeiture of firearms. Commenters with these objections failed to recognize that nothing in the rule or the relevant statutes prevents an individual from continuing to possess or use a "stabilizing brace" on heavy pistols or rifles. This rule only serves to clarify that certain weapons equipped with "stabilizing braces" are short-

barreled rifles regulated under the NFA, thus requiring registration, transfer and making approval, and the payment of a making or transfer tax.

Furthermore, this rule also provides options for individuals who are in possession of a firearm equipped with a "stabilizing brace" that is an unregistered short-barreled rifle, as that statutory term is properly understood. The options for current unlicensed possessors include the removal and replacement of the offending feature (the barrel less than 16 inches); submission of an ATF E-Form 1 by May 31, 2023, to register the firearm as a short-barreled rifle; removal of the "stabilizing brace" so that it cannot be reattached to the firearm; turning the firearm into a local ATF office; or destroying the firearm. For a detailed discussion of the options available for individuals to comply with the statute, see section V.B of this preamble. In an exercise of the Department's enforcement discretion, it has determined that any criminal liability for failure to take the necessary action to comply with Federal law for weapons that have already been made will result only for conduct occurring after the time period to register ends. Additionally, in lieu of criminal prosecution, the Department may, for conduct occurring after the 120-day period, pursue forfeiture of the firearm pursuant to 26 U.S.C. 5872.

The Department also disagrees this rule needlessly harms citizens by risking exposure of PII. The NFA requires that the registry of NFA firearms in the NFRTR include the identification of the firearm, date of registration, and identification and address of person entitled to possession of the firearm. *See* 26 U.S.C. 5841. The information in the NFRTR is confidential, and ATF officers or employees and other persons are prohibited by law from disclosing confidential NFA tax information. *See* 26 U.S.C. 6103. This provision of Federal law applies to all officers and employees of the United States and other persons with access to excise tax returns or tax return information. Further, regulations also generally prohibit disclosure of ATF records or information, and, if records are to be disclosed, the regulations specify disclosure methodology and requirements. *See* 27 CFR 70.803. Criminal penalties for disclosing this information include a fine, imprisonment up to one year, or both, and dismissal from employment. 18 U.S.C. 1905. The regulations also provide for criminal penalties and

dismissal for violations. *See* 27 CFR 70.803(g).

b. Purchasers Unaware of Legal Issues

Comments Received

Commenters believed it was unfair that ATF would go back on its word after a decade in which millions of weapons with an attached "stabilizing brace" were bought and sold and now try to crack down on them. Commenters felt manufacturers have been working with the ATF for years to try to be compliant. The commenters believed that ATF, on the other hand, has just kicked the issue down the road without giving manufacturers and law-abiding Americans straight answers about the use of "stabilizing braces." Commenters claimed ATF not only advised that "braces" were legal, but at one point informed the public that shouldering accidently was legal. Several commenters argued that owners of firearms with an attached "stabilizing brace" were not aware of the legal issues when they made the purchases in the past 10 years. Some commenters stated that they purposefully chose the firearm with a "stabilizing brace" because ATF recognized them as pistols. Commenters

stated that Americans do not want to go to jail just because a product that was legal is suddenly declared illegal based on an arbitrary decision by ATF leadership.

Department Response

The Department agrees that there has been confusion generated from inconsistent classifications since the initial "stabilizing brace" classification and subsequent classifications after 2012 but disagrees with commenters' implication that ATF "approved" all "stabilizing braces" for use on AR-style pistols (or other similarly heavy pistols). While firearm manufacturers are not required to submit a firearm to ATF for classification under Federal law prior to marketing those firearms, many do so because it helps them to anticipate how their firearm will be regulated under the law. As discussed earlier, ATF received and responded to several classification requests for how a "stabilizing brace" device impacts a firearm's classification under Federal law.

Additionally, after the initial response in 2012, ATF observed the marketing of various new "stabilizing braces" that had additional features such as

adjustability, greater surface area, and increased length of pull. As an example, one "brace" manufacturer sold at least 18 models of "stabilizing brace" products as "ATF compliant," when in fact ATF provided classifications for only 2 "brace" models for this manufacturer. Further, ATF specifically requested that this manufacturer stop marketing these additional models as ATF compliant beginning in July 2018.[150] While the Department recognizes there have been inconsistencies in firearms classifications that have generated confusion over time, ATF has never taken the position that any "stabilizing brace" may be equipped on a firearm without evaluating the objective design features of the firearm. Such a position would lead to the illogical result that anything that purports to be a "stabilizing brace" makes a firearm a pistol regardless of the objective design features of the firearm. For example, were ATF to accept this position, a large .50 caliber firearm, as pictured below, would fall outside the definition of a "rifle" solely because of the attached "stabilizing brace."



**SBA3 "Stabilizing Brace" Attached to a .50 BMG Rifle**

Based on the relevant statutory provisions, FATD classifies firearms based on the objective design characteristics of a particular firearm configuration as presented, as well as other evidence listed in this rule that may reflect the intended use of the weapon. And FATD has consistently noted that a "stabilizing brace" could design or redesign a firearm to be fired from the shoulder based on the objective features of the firearm as configured. Further, in December 2018, ATF determined that firearms equipped with "stabilizing braces" must be classified based on the overall configuration of the weapon.[151] As set forth in this rule, each firearm equipped with a "stabilizing brace" device will be classified based on the objective design features described in this rule, the manufacturer's direct and indirect marketing materials, and information

demonstrating likely use by the general community. This evidence will be used to verify the manufacturer's purported intent regarding the use of the weapon.

The Department recognizes that some purchasers may have been unaware of the legal issues when first acquiring a "brace" and affixing it to their firearm or acquiring a firearm equipped with a "stabilizing brace." However, in light of marketing materials, industry reviews, and general public use of firearms equipped with "stabilizing braces,"[152] many users of firearms equipped with "stabilizing braces" likely are aware of the legal controversies surrounding these devices. *See* section IV.B.1.c, and IV.B.3.c of this preamble. At the same time, ATF also put out an Open Letter in 2015 and a response letter regarding the 2015 Open Letter in 2017, which were widely available to the public and discussed the use and impact of

"stabilizing braces" on a firearm's classification under the NFA. These actions put the public on notice that there were questions within the firearms industry and community regarding classification issues related to firearms with "stabilizing braces."

Furthermore, the NPRM published in June 2021 provided notice to the public that the Department would be resolving the confusion surrounding how ATF evaluates whether a firearm equipped with a "stabilizing brace" is a rifle or short-barreled rifle under the NFA and GCA. And this rule informs the public of the best interpretation of the relevant statutory definitions in determining whether a firearm with a "stabilizing brace" is designed, made, and intended to be fired from the shoulder. The rule further informs the public of options for individuals currently in possession of a firearm with a "stabilizing brace" that is

[150] Letter from ATF #311123 (Mar. 3, 2020); Letter from ATF #308999 (July 18, 2018).

[151] *See supra* section II.B and note 57.

[152] *See supra* notes 87–94 and 96–98.

a short-barreled rifle. For example, so long as an affected person files the relevant E-Form 1 by May 31, 2023, the Department will permit a safe harbor period between the date on which a person's application for registration is filed and the date a person receives ATF approval or disapproval of the application. Provided the registration form is properly submitted and documented, the Department, in an exercise of its discretion, will refrain from any enforcement of the NFA's provisions during this time period. Any penalties for non-compliance with NFA regulations would only be assessed on individuals who possess or transfer unregistered short-barreled rifles in the future. These penalties may include criminal penalties, tax liability, or forfeiture of the firearm.

c. Political Motivation

Comments Received

Many commenters believed that the rationale for the proposed rule was politically motivated. As one commenter said, the current presidential administration feels it has the "political cover to take action in this manner." Another commenter stated that this is "not the proper way to conduct administrative guidance, where something is legal, then suddenly illegal, based on shifting political winds." Furthermore, other commenters said the only thing that has changed is the "political climate," not the law the ATF is interpreting. One commenter stated that the "lack of data or even rational arguments simply proves that this entire rule is politically motivated." Another commenter stated that "[t]he Biden Administration, via the [ATF], is once again taking aim at the Second Amendment." One commenter stated that the proposed rule was "political posturing" dressed up as a regulation that ATF should not issue. The commenter thought ATF should try to more effectively carry out its existing responsibilities and refrain from inhibiting the freedom of the people. Other commenters thought the proposed rule made ATF look foolish and partisan.

Department Response

The Department disagrees that the rationale for this rule is improper or politically motivated in the pejorative sense apparently used by some commenters. The Department notes that both the previous administration and this administration took and continue to take actions to notify the public of the factors considered in the classification of firearms equipped with a "stabilizing

brace." *See* section II of this preamble. Moreover, "Presidential administrations are elected to make policy. And as long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Guedes* v. *ATF,* 920 F.3d 1, 34 (D.C. Cir. 2019) (alteration and quotation marks omitted). Thus, even if a rule is "politically motivated" to the extent that a presidential administration's policies can inform which problems an agency seeks to most urgently address, that fact does mean the rule is motivated by, for example, animus towards the Second Amendment, as some comments seemed to suggest.

Next, as stated in the NPRM, ATF's publicly known position is that a firearm does not evade classification of the NFA merely because the firearm is configured with a device, including a device marketed as a "stabilizing brace." The use of a "stabilizing brace" cannot be used as a tool to circumvent the NFA's registration, transfer, and tax requirements or the GCA's interstate transportation restrictions surrounding short-barreled rifles. The Department considers this rulemaking necessary to clarify the best interpretation of when a weapon is designed, made, and intended to be fired from the shoulder in light of the proliferation of various "stabilizing brace" models that, when assembled on firearms, design the firearm to be fired from the shoulder, as well as the misuse and misapplication of ATF classification letters as earlier discussed. Further, the Department is responding to past criticism that ATF has not more widely published criteria and for not publishing a definitive approach. *See, e.g.,* Letter for William Barr, Attorney General, and Regina Lombardo, Acting Director, ATF, from Matthew Gaetz, United States Representative, *et al.* (June 16, 2020). Lastly, the Department disagrees that it provided no data to justify this rulemaking. The NPRM noted that firearms equipped with a "stabilizing brace" have been used in at least two mass shootings, with the shooters in both instances reportedly using the "brace" as a shoulder stock. 86 FR at 30828. This rule, in section IV.A.2 of this preamble, also notes the prevalence of firearms with "stabilizing braces" being connected to criminal investigations.

d. Need for "Stabilizing Braces"

i. Disabled Persons/Elderly/Different Body Shapes

Comments Received

Many commenters stressed that "stabilizing braces" are commonly used by millions of law-abiding Americans for various reasons. Commenters disagreed with the characterization that heavy or large pistols could be fired with one hand, asserting that the inability to do so is one reason that "stabilizing braces" are a popular accessory to add onto pistols. One commenter questioned ATF's claim that in the NPRM that pistols that fall below the weight and length threshold are easily fired one-handed. Another commenter said the rule did not accurately reflect the difficulty in aiming different weapons and did not account for the range of weapons different people can and cannot aim with one hand.

Numerous other commenters pointed out the use and need of "braces" by persons with disabilities or with limited mobility or strength. Some commenters described the devices as being used to assist in shooting large pistols safely by distributing the weight of the pistol to the firearm. Others also described the device as becoming "an extension of the user's forearm such that the user may actually release his or her grip from the handgun to relax." (Emphasis omitted.) Commenters also felt that this rule "ignored the features of "stabilizing braces" that are beneficial to the disabled community because it would make the devices less available to such individuals. One commenter, a former firearms instructor, stated that he taught for years the proper use of "braces" for those who were disabled or for those with less mobility. He thought that ATF missed the mark when classifying the "braced" firearms as short-barreled rifles if the brace was used correctly. Another commenter appeared to claim that the "brace" has safety benefits when he stated that attachments can protect a shooter's off hand from being placed in front of the barrel and do not, in and of themselves, redesign a pistol to be fired with more than one hand.

In contrast, one commenter claimed that he was part of the team that designed and submitted the first "stabilizing brace," and that their intent had nothing to do with assisting disabled individuals. Rather, the commenter claimed their intent was to provide for a proper means of firing a large frame pistol with one hand and that the "brace" was not intended to attach to the shooter's body.

Numerous other commenters also stated ATF had not considered the variations in the size and shape of the human body. In particular, some commenters claimed the rule ignored that individuals are physically unique and would require different settings to optimize support and comfort. One commenter protested the lack of an exemption for disabled and smaller-sized persons who, according to the commenter, have clear and legitimate needs for use of stabilizing braces.

Department Response

The Department disagrees that the rule will prevent people from acquiring "stabilizing braces" or restrict the use of "stabilizing braces" on firearms to assist or aid the shooter in single-handed firing of heavy pistols. To the extent the objective design features and other evidence, as listed in this rule, regarding a particular "stabilizing brace" device attached to a weapon do not indicate that the weapon is designed, made, and intended to be fired from the shoulder, that configuration is not a firearm within the meaning of the NFA (and also not a "short-barreled rifle" under the GCA); hence, the weapon is not subject to those statutes' restrictions. Additionally, a firearm equipped with a "stabilizing brace" may include a barrel of more than 16 inches in length and thus not be regulated as a "short-barreled rifle." Accordingly, even if variations in strength and body type, as discussed by commenters, may make the use of a "stabilizing brace" more beneficial to certain individuals, those individuals may still be able to obtain "stabilizing braces" and affix them to a firearm without making a short-barreled rifle under the NFA and GCA. And, to the extent that any particular configuration does fall within the scope of the NFA and the GCA, possession of that weapon remains legal so long as the owner of the weapon complies with the statutes' restrictions. However, a "stabilizing brace" device cannot be used to circumvent the NFA by permitting the possession of unregistered short-barreled rifles. This rule does not provide any additional restrictions on the use of a "stabilizing brace" on any rifle configurations beyond those provided by the relevant statutes. All individuals may register their firearm with an attached "stabilizing brace" that is a short-barreled rifle in the NFRTR or modify the firearm so it no longer constitutes a short-barreled rifle.

ii. Shooting Accuracy and Safety

Comments Received

Many commenters stated that stabilizing braces make shooters more accurate. A commenter stated that, by putting a brace on a regular size pistol, one-handed shooting can be made more accurate and enjoyable. One commenter stated that, although braces were originally developed for use by disabled persons, "[b]oth disabled and non-disabled persons now use stabilizing braces as an additional point of support to ensure firearm safety and accuracy in operation of pistols and shotguns." Likewise, another commenter asserted that braced pistols are more accurate and less dangerous than unbraced pistols, and that the attachment of a "brace" device makes it less likely that the pistol will be used for violence. One commenter contended that the rule does not take into account the actual intent of the person with the firearm, who may want a brace on a light-weight pistol because the person is weak, wishes to use it for accuracy, or for some other reason.

In addition, many commenters disagreed with ATF's repeated characterization that pistols are fired using only one hand. Commenters indicated that it is typical for shooters to hold a pistol with two hands and that people are taught to shoot this way or may need to shoot that way depending on their shooting ability. Another commenter said "[j]ust because a handgun is statutorily defined as a firearm intended to be fired by the use of a single hand does not exclude other firearm types from using a stabilizing brace which *can* be fired in that manner." (Emphasis in the original.)

Department Response

The Department acknowledges that some individuals typically use two hands to hold and shoot pistols and that holding a pistol with two hands can make shooting more accurate or enjoyable. The fact that the "stabilizing brace" makes firing a standard pistol more accurate or more enjoyable is irrelevant. Regardless of a particular individual's intent to fire a firearm with one hand, the relevant inquiry under the best interpretation of the statutory provisions is whether the objective design characteristics and other evidence associated with a firearm configured with the "stabilizing brace" indicate that the firearm is designed, made, and intended to be fired from the shoulder. Again, this rule does not regulate or prevent the use of "stabilizing brace" devices themselves but outlines factors that ATF will consider when determining if a firearm equipped with a "stabilizing brace" is a rifle or short-barreled rifle regulated by the NFA and GCA.

e. State Prohibitions of Short-Barreled Rifles

Comments Received

Some commenters pointed out that some States prohibit the possession of short-barreled rifles, and they asserted that owners of "braced" firearms classified as short-barreled rifles would, as a result, be forced to relinquish their firearms.[153] A commenter claimed ATF failed to address situations where attachment of a 16-inch or longer barrel may not remedy the unlicensed possessors being in violation of State law because the resulting firearm with a 16-inch barrel would be a prohibited "assault weapon" under State law. Such comments suggested that classifying a "braced" weapon as a short-barreled rifle could result in a situation in which the individual may not retain the firearm, nor could they modify the firearm with a longer barrel. Retaining the firearm would amount to illegal possession of a short-barreled rifle banned by State law; and modifying the weapon would result in possession of an assault weapon banned by State law. Additionally, some individuals, according to commenters, may not have the ability to reconfigure a "braced" weapon to also comply with State or local laws. In such scenarios, individuals would likely have no other option but to turn the firearm in to ATF or local law enforcement.

Department Response

The Department disagrees that it is required to provide additional options for individuals who may be in violation of State law. The Attorney General is

---

[153] Commenters concerned about the application of State law seemed to assume at times that the Federal definition of "rifle," as clarified in this rule, would change the way in which State laws are applied to their firearms. This is not necessarily the case. Even when a State law uses the same word—such as "rifle"—as does Federal law, the States' specific definitions and interpretations of the words in their statutes may differ from Federal definitions and Federal interpretations of Federal law. *Cf. Molina* v. *I.N.S.,* 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.) (observing that nothing "prevent[s] federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state"). Hence, this rule may have no effect on how States determine what sort of weapons are "rifles" for purposes of State law. Nonetheless, the Department acknowledges the concerns raised by commenters, and, in order to ensure a comprehensive consideration of the possible effects of this rule, the Department has accounted for commenters' concerns in its final regulatory impact analysis and in finalizing this rule.

responsible for both the criminal and regulatory enforcement of the GCA and NFA as delegated to ATF. Therefore, ATF uses Federal law, specifically the GCA and NFA, to govern the classification and regulation of firearms. Although the Department has considered the potential federalism implications of this rule under Executive Order 13132 (Federalism), as discussed in section VI.B of this preamble, it has determined that the rule will not have significant federalism implications. Moreover, that Executive Order focuses on the "direct" effects of Federal law on the relationship and distribution of power between the States themselves and the Federal Government, not whether a change in Federal law may have incidental effects for individuals as a consequence of State laws where those individuals reside. Accordingly, the Department is not required to further account for how its firearm classification affects State laws.

In this rule, the Department provides several options to current unlicensed possessors of firearms equipped with a "stabilizing brace" and a barrel length of less than 16 inches that are properly classified as a short-barreled rifle under the NFA. These options, discussed in section V.B of this preamble, are provided so that persons in possession of a short-barreled rifle may comply with Federal law. The Department recognizes that a State may pass a law or have laws that further restrict the possession of certain firearms, including those that fall under the purview of the NFA. The Department understands that abandonment of the firearm may be the only option available for some individuals to come into compliance with State law, but the options discussed in this rule will allow many individuals to avoid this outcome. For example, an individual may remove any offending characteristics to remove the firearm from the purview of the NFA (*i.e.,* permanent removal of the "stabilizing brace" or the removal and replacement of a barrel of less than 16 inches with a longer barrel). Making these kinds of modifications will bring a firearm outside the scope of the NFA. Thus, in States where firearms laws are coextensive with the NFA, individuals will be able to continue possessing the firearms.

The Department also acknowledges that some States may regulate a firearm with 16-inch or longer barrel as an assault weapon under State law. However, the Department still believes there are methods available for individuals to comply with these States' laws. For example, an individual can

remove the "stabilizing brace" such that it cannot be reattached, and the individual could possess the resulting pistol consistent with the requirements of their State law. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally received as a "short-barreled rifle" would cause the firearm to become a "weapon made from a rifle" as defined by the NFA. However, the Department, in its enforcement discretion, will allow individuals to reconfigure the firearm to a pistol, so long as the reconfiguration is completed within 120 days after this rule is published. This reconfiguration may bring the firearm into compliance with State law even if the State restricts possession of short-barreled rifles. It may also be possible for the individual to consider other modifications to the firearm that are not included within this rule that would bring the firearm into compliance with State law.

In a narrow set of circumstances in which the individual cannot remove the "brace" device and maintain the pistol, or make other modifications to the firearm, then the firearm may be prohibited under State law and must be either destroyed or disposed of in compliance with State law. The Department notes that commenters did not appear to submit information indicating the frequency with which such circumstances would arise, and ATF's experience indicates that these circumstances would be extremely limited. The Department thus believes that the important public safety benefits of this rule, as discussed more fully in the accompanying Regulatory Impact Analysis ("RIA"), outweigh any interest in retaining the firearm for the few individuals who might find themselves in such circumstances. Information regarding the application of State law to a particular weapon would be within the jurisdiction of the State agency responsible for the enforcement of the State firearms laws or other State legal authority.

6. NFA Wait Times

Comments Received

Commenters raised a variety of issues related to the NFA registration and tax requirements. Regarding the imposition of NFA registration, many commenters expressed concern over the burden of completing paperwork, which may necessitate submission of sensitive personal information for property they have already lawfully purchased. Additionally, many commenters expressed concern with the timeframe to receive approval, which ranges from

many months to even a year. Some commenters did not think that ATF has the capability to handle the volume of NFA applications this rule will generate. To relieve such a burden, commenters recommended expediting the processing of applications for the impacted firearms, with some recommending expediting processing of any NFA applications to within 30 days. One commenter recommended that there be a grace period to ensure that firearms with attached "stabilizing braces" are not confiscated while in the process of receiving approval from ATF.

Department Response

The Department acknowledges that this rule will likely increase NFA registrations as individuals decide to register the weapons that they previously treated as pistols, but which, as this rule clarifies, are actually short-barreled rifles. These firearms were sold or otherwise transferred to persons without complying with the tax, registration, and transfer provisions of the NFA. The Department disagrees that, by allowing possessors of short-barreled rifles equipped with a "stabilizing brace" to register their firearm, this rule creates additional overly burdensome paperwork for individuals. ATF will be using the Form 1, which is already used as the application to make and register an NFA firearm. Furthermore, ATF has plans to increase and adjust its resources to accommodate the increase in applications.

Moreover, affected parties who wish to register their NFA firearm should use ATF's eForms system in order to comply with Federal law.[154] Individuals will need to create an ATF eForms account on *https://eforms.atf.gov* to submit the E-Form 1 electronically. The eForms system will have instructions and will guide the applicant through the application process. While using the eForms system is a convenient and easy way for persons to submit their E-Form 1 applications, the Department cannot expedite the E-Form 1 applications received on this rule because of the need to continue processing existing NFA applications, as well as the required National Instant Criminal Background Check System checks that must be conducted on the applicant to verify the individual is not prohibited

---

[154] For purposes of this rule, ATF advises that affected parties use the eForms system to lessen the administrative burden in registering firearms affected by this rule. However, ATF will still accept a paper submission of a Form 1 so long as it is postmarked by May 31, 2023.

from possession of an NFA firearm under Federal law.[155]

The Department notes that NFA processing times continue to decline as efficiencies and technology improve. ATF is also currently applying additional overtime resources and will be providing an increased level of support and effort to ensure the processing of eForm applications. Nevertheless, due to the anticipated volume, there still may be a significant waiting period before a person receives final approval and registration of their short-barreled rifle in the NFRTR. However, so long as an affected individual submits an E-Form 1 application by May 31, 2023, the Department will, in its enforcement discretion, allow these persons to temporarily possess their firearms equipped with "stabilizing braces" that are unregistered short-barreled rifles until they receive a response from ATF on their application. After the submittal of the E-Form 1, individuals will receive a receipt; the receipt should be maintained until the individual receives a tax stamp. *See* section V.B of this preamble below.

After the 120-day period, registration of preexisting short-barreled rifles equipped with a "stabilizing brace" will no longer be permitted. Any person in possession of an affected short-barreled rifle for which a registration has not been submitted to ATF within the defined time period is in violation of the NFA, and ATF may take enforcement action.

ATF will similarly allow Type 7 FFLs with an SOT to submit an E-Form 2 to register the firearms in their possession before May 31, 2023. *See* section V.B– C of this preamble for further discussion on the options for affected parties.

### 7. Other Priorities and Efficiencies

#### Comments Received

Some commenters stated that ATF should focus on other priorities besides the current rulemaking. Several commenters opined that alcohol and tobacco have taken far more lives than the "rifles" in question, and that should ATF focus on these issues. Other commenters, while thanking ATF and DOJ employees for their work, opined that ATF should "stay out of [their] lives" and focus on prosecuting actual criminals who are committing crimes.

#### Department Response

The Department disagrees that it should withdraw the current rulemaking and focus only on other enforcement priorities. The Attorney General is responsible for both the criminal and regulatory enforcement of the GCA and NFA as delegated to ATF. *See* section IV.B.1.a of this preamble. The NFA requires that all "firearms" as defined by statute, including short-barreled rifles, must be registered in the NFRTR. Due to the misconception that any firearm equipped with a "stabilizing brace" is a pistol, and due to incorrect classifications involving these firearms in the past, a number of these firearms equipped with a "brace" device that are short-barreled rifles are not registered in the NFRTR in violation of Federal law. Therefore, this rule is directly within and a part of ATF's enforcement authority and priorities. Further, although other matters may also fall within the scope of ATF's authority, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts* v. *E.P.A.,* 549 U.S. 497, 527 (2007). The Department has determined in exercising this discretion that the public safety benefits accruing from this final rule make it appropriate to issue the final rule instead of withdrawing it to focus on other issues.

### 8. Economic Comments

#### a. Need for Federal Regulatory Action

#### Comments Received

One commenter suggested that ATF publish "only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need" (quotation marks omitted), and that ATF's negative externality explanation was "odd." This commenter asserted that ATF did not clearly identify the problem that it is trying to address with this regulation, and that there is no statute that specifically prohibits firearms with attached "braces." Finally, this commenter stated that ATF should analyze whether the existing laws and regulations contributed to the problem this regulation is trying to address, and whether a statutory amendment would better achieve the intended goal of the rule. Another commenter stated that ATF failed to include an analysis of the cause of the problem, failed to include a cost-benefit analysis of the proposed solution, and did not draft a regulation that is narrowly tailored to address the relevant problem.

#### Department Response

The Department reiterates that publishing this rule is necessary to ensure the public's awareness of the Department's best interpretation of the relevant statutory provisions and to ensure that all forms of short-barreled rifles are being regulated under the NFA and GCA, regardless of whether they result from the firearms being configured with typical shoulder stocks or with purported "stabilizing braces."

The Department agrees that there may be confusion about ATF's statement regarding the externality of the rule; therefore, the final regulatory analysis does not discuss externalities. For more details regarding the need for regulation, please refer to sections IV.A.2 and IV.B.1.c of this preamble.

The Department believes Congress intended for ATF to regulate certain weapons under the NFA that Congress deemed unusually dangerous. While there are no existing statutes or regulations that explicitly regulate firearms equipped with "stabilizing braces," such weapons may nonetheless fall within the scope of the NFA and GCA. ATF is updating its regulations to make clear that firearms equipped with an accessory such as a "stabilizing brace" or other rearward attachment with the objective design features of a firearm designed, made, and intended to be fired from the shoulder are properly captured under the NFA and GCA definition of "rifle." Furthermore, the NFA regulates short-barreled rifles by requiring registration of the firearm and payment of NFA taxes. The rule will ensure that firearms equipped with "stabilizing braces" that are designed, made, and intended to be fired from the shoulder and that have a barrel of less than 16 inches will be properly classified as short-barreled rifles under the NFA or GCA. The Department declines to analyze whether a change in statute would better achieve the goals of this rulemaking because such as change is beyond the Department's authority.

The Department disagrees with commenters' assertion that ATF did not analyze the cause of the problem, did not provide a cost-benefit analysis of the proposed solution, and did not adopt a solution narrowly tailored to address the problem. When the NPRM was published, ATF simultaneously provided a standalone preliminary RIA that discusses, in detail, the costs and benefits of the rule.[156] The rule is

---

[155] The National Instant Criminal Background Check System ("NICS") is managed by the Federal Bureau of Investigation. When ATF submits a request for a NICS check, the FBI is responsible for issuing a "Proceed," "Delayed," or "Denied" determination. 28 CFR 25.1, 25.6.

[156] The RIA is available on *Regulations.gov* at *https://www.regulations.gov/docket/ATF-2021-0002/document* and on ATF's website at *https://*
Continued

narrowly tailored because ATF has selected for consideration under the final rule—after the benefit of extensive public comment—only those factors (including objective design features, marketing materials, and information from the general community) that indicate a weapon with an attached "stabilizing brace" is designed, made, and intended to be fired from the shoulder. Based on the careful attention given to selecting the appropriate factors, ATF does not believe the rule will sweep in weapons that are not in fact "rifles" as that term is defined in the NFA.

b. Population

Comments Received

Several commenters were confused by the difference in population numbers— the 3 million estimated "arm braces" versus the 1.4 million individuals affected. They stated that ATF's cited population of 1.4 million individuals in possession of "braces" was too low. Another commenter suggested the cost estimate was incorrect because the population of firearms impacted by the proposed rule was too low. Many commenters pointed out a discrepancy regarding the number of pistol-braced firearms projected to be impacted by the proposed rule. These commenters additionally stated that the proposed rule used an estimated circulation of 3 to 7 million pistol braces, while a recently published Congressional Research Services ("CRS") report had an estimate suggesting there may be between 10 and 40 million braces with some arguing that the number of braces and pistol-braced firearms would be "upwards of 40,000,000." Another commenter suggested ATF's intentional use of the lower estimate of 3 million was "self-serving." One commenter implied that, if ATF were to use the 3 to 7 million range, then the midpoint (5 million) should be the number used. One commenter believed that ATF likely underestimated the number of FFLs engaged in the buying and selling of "brace" devices, thereby suggesting that the impact to the industry would be greater than what was stated in the proposed rule. Finally, a commenter stated that ATF's analysis assumed that "every stabilizing brace in existence is covered by the NPRM" (emphasis omitted), and the commenter thus worried the rule will ban all existing "stabilizing braces."

Department Response

The Department disagrees with the commenters regarding the estimated population of individuals affected by this rule and the number of "brace" devices and firearms with an attached "stabilizing brace" currently in circulation. ATF estimates that there are 3 million "stabilizing braces" and firearms with an attached "stabilizing brace" currently in circulation. While ATF estimated in the NPRM that the number of "brace" devices is between 3 million to 7 million, ATF anticipates that the more accurate figure is closer to 3 million. This estimate is based on anecdotal commentary from the manufacturers, information gleaned from ATF field offices throughout the United States, and subject matter experts' conclusion that—based on the number of pistols manufactured during the same time period and the popularity of the "brace" devices over the years— manufacturers may have inflated their sales estimates in recent years. In particular, "stabilizing braces" have only been on the market since 2012 and became more popular only in the last few years, so there has not been enough time for as many of them to be sold as reported in some estimates.

The Department disagrees that there is a 1:1 ratio between the number of individuals affected and the number of "stabilizing braces" or firearms equipped with a "stabilizing brace" in circulation. The Pew Research Center reports that, of people who own firearms, two-thirds own multiple firearms; and, as evidenced by the number of bump-stock-type devices turned in by each individual after a previous ATF rulemaking, individuals can and are likely to purchase more than one firearm or, in this case, more than one "stabilizing brace" or firearm with an attached "stabilizing brace." [157] After publication of the Bump-Stock-Type Devices final rule in December 2018, [158] individual owners turned in between 1 and 63 bump-stock-type devices. Overall, ATF found that people turned in to ATF an average of 2 bump stocks. Therefore, the number of individuals affected by this rule is likely lower than the number of "stabilizing braces" or firearms equipped with a "stabilizing brace" currently in circulation.

It should be noted that the original maker of the "stabilizing brace" marketed it in 2012 and 2013 to assist

persons with disabilities or limited mobility to shoot a heavy pistol with a single hand. The demand and production for "stabilizing braces" did not appear to take off until 2017, when numerous other models were produced that were marketed to shoulder fire a firearm and several manufacturers sold firearms equipped with a purported "stabilizing brace." This relatively recent rise in popularity suggests that "brace" devices and firearms equipped with a "stabilizing brace" have not been around long enough to warrant larger figures, as discussed further in this section below.

ATF is aware that the CRS report provided higher numbers of "stabilizing braces," but it also provided no basis for its unofficial estimate. [159] To determine whether this estimate was suitable for purposes of ATF's RIA, ATF compared CRS's figures against those provided in the report on *Firearms Commerce in the United States: Annual Statistical Update 2021*. [160] This report provides an estimate of the number of firearms (including pistols, revolvers, rifles, shotguns, and miscellaneous firearms) manufactured in the United States, as reported by manufacturers. According to the report, ATF estimates that a total of 65.1 million firearms, with just under 27 million pistols, were manufactured in the United States between 2013 and 2019. [161] Although the most recent report is not yet final, ATF's estimates that 12 million firearms were manufactured in 2020. [162] Therefore, ATF now estimates that, between 2013 to 2020, a total of 77.1 million firearms, of which 32.4 million pistols, were manufactured in the United States.

If there was a population of 10 to 40 million "stabilizing braces," as suggested by CRS, this range would be too high. Using the high end of the range would mean there are at least as many "brace" devices or firearms with an attached "brace" device as there were pistols manufactured in the U.S. between 2013 to 2020 (*i.e.,* 32.4 million pistols). And even at the low end of the CRS estimate, it would mean nearly a third of the pistols manufactured between 2013 to 2020 are equipped with a "stabilizing brace." Because "stabilizing braces" are only used on a subset of pistols, not on all pistols, and

---

[157] The Demographics of Gun Ownership, Pew Research Center (June 22, 2017), *https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/*.

[158] 83 FR at 66514.

[159] William J. Krouse, Congressional Research Service, Handguns, Stabilizing Braces, and Related Components 2 (updated Apr. 19, 2021), *https://crsreports.congress.gov/product/pdf/IF/IF11763*.

[160] ATF, Firearms Commerce in the United States: Annual Statistical Update 2021, *https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download*.

[161] *See id.* at 2.

[162] This estimate comes from ATF's OSII.

because not all pistols manufactured are pistols equipped with a "stabilizing brace" or are the type of pistol for which a person would attach a "stabilizing brace," ATF's subject matter experts concluded that using the CRS estimate was not appropriate for this analysis. Further, anecdotal commentary from industry that ATF received as it was preparing the preliminary RIA for the NPRM also suggested to ATF that the CRS estimate is much too high. Therefore, ATF does not adopt the CRS figures.

ATF is also choosing not to use the mid-point estimate of 5 million as suggested by Sig Sauer. Based on the historical number of pistols produced, an estimate of 5 million would suggest that there was just under one firearm with an attached "stabilizing brace" produced for every six pistols manufactured (or approximately 16 percent of all pistols). Additionally, based on information gleaned from field offices throughout ATF, only a subset of FFLs may carry "braces" or firearms with an attached "brace," and of those that do carry these items, they carry in their inventory only an average of seven "braces" or firearms with a "brace" device.[163] ATF's survey, as described in footnote 163, suggests that a ratio of one firearm with a "stabilizing brace" produced for every six pistols would still be too high. ATF thus concluded that, based on its experience, an estimate of 5 million was too high. ATF also considers that choosing to use 3 million rather than 5 million is reasonable because "stabilizing braces" did not become more popular until recent years, and hence manufacturers likely did not have sufficient time to produce numbers in the range of the higher estimates suggested by commenters or CRS as discussed in the paragraphs above.

ATF agrees that it may have not accounted for all "stabilizing braces" being used by persons with disabilities; however, ATF disagrees that this oversight indicates that the rule

prohibits any "stabilizing braces," including those used by persons with disabilities. For purposes of the final RIA analysis, ATF incorporates this public comment and estimates that a portion of the existing "stabilizing braces," including some that may have been purchased by persons with disabilities, will not, when attached to a firearm, result in a weapon designed and intended to be fired from the shoulder. That portion of existing "braces" will not be affected by the rule.

Under the statutory provisions, companies may still produce "stabilizing braces," and individuals may continue to possess and use them to assist with one-handed shooting. In publishing the NPRM and this rule, ATF made every effort to make clear that neither the rule nor the statutes prevent persons with disabilities from possessing a "stabilizing brace" that aids in stabilizing the arm to shoot a pistol with one hand. The rule only articulates—based on the best interpretation of the relevant statutes—how to determine which of those firearms configured with a "stabilizing brace" fall within the definition of "rifle." Rifles with barrel lengths of less than 16 inches are short-barreled rifles subject to NFA registration and taxation requirements, but they are not illegal to possess so long as those requirements are followed.

*c. RIA Scenarios 1 and 2: Turn in Firearm to ATF or Destroy Whole Firearm*

Comments Received

Several commenters suggested that the number of bump-stock-type devices that were turned into ATF after issuance of the bump-stock regulation demonstrates the expected level of compliance for this final rule regarding "braces." These commenters contended that, because the number of bump stocks turned in to ATF was low, a regulation is an ineffective means of removing devices from the market. One commenter echoed the ATF's subject matter experts' opinion that this scenario (*i.e.*, turning in or destroying the firearm) was the least likely to occur upon promulgation of the final rule. Several commenters suggested that the cost associated with turning in a firearm with an attached "stabilizing brace" will be $200 for the brace itself and $1,000 to $2,500 for the firearm. The commenter also suggested that a small percentage of the population (five percent) may opt to turn in the whole firearm or destroy the firearm.

Department Response

The Department disagrees that the number of bump-stock-type devices that were turned in to ATF demonstrates the level of compliance expected for a given rule. Under the Bump-Stock-Type Devices rule, a person could comply in ways other than turning in bump stock-type devices to ATF. ATF did not anticipate that many people would turn in bump stock-type devices to ATF, and, in fact, many did not.

Neither the relevant statutes nor this rule suggests that "stabilizing brace" devices themselves are considered a firearm. And, therefore, they do not need to be turned in to ATF. One means of complying with the relevant statutory requirements is to turn in the whole firearm that is equipped with a "stabilizing brace." Although ATF finds this to be an unlikely scenario, ATF concurred with the commenter that ATF should account for a small percentage of persons who opt to turn in or destroy the whole firearm because some "stabilizing braces" may be attached to a firearm in such a way that removal may not be feasible. However, ATF did not incorporate the percentage as suggested by the commenter because the percentages were based on the assumption that ATF would charge a $200 NFA tax on all items currently in circulation. Because ATF will forbear the NFA tax on all individuals and most FFLs[164] in possession of short-barreled rifles equipped with a "stabilizing brace" so long as they submit an E-Form 1 within 120 days from this rule's publication date, ATF estimated percentages for these scenarios by using: (1) the percentage from the bump-stock turn in, and (2) the percentage of individuals or FFLs residing or located in States that do not allow for personal ownership of NFA weapons. For more details on the percentage attributed to destroying or turning in firearms to ATF, please refer to the standalone final RIA on the docket.

*d. RIA Scenario 3: Convert Firearm Into Long-Barreled Rifle*

Comments Received

Multiple commenters proffered various cost estimates for Scenario 3 regarding converting a firearm into a long-barreled rifle. A commenter stated that the proposed rule failed to consider

---

[163] Based on an informal survey of ATF's 25 field divisions, 11 of the field divisions provided an estimated number of FFLs dealing in firearms with an attached "stabilizing brace," along with an estimated number of affected firearms per FFL. Based on the responses, ATF estimated that approximately 10,420 FFLs from the 11 field divisions deal in firearms with attached "brace" devices and, of these FFLs, they may have carried between 1 to 52 firearms with an attached "stabilizing brace," with the majority of FFLs having under 20 such firearms in their inventory. Therefore, for the purposes of the final RIA, ATF used the NPRM estimate of 25 percent of FFLs dealing in firearms with an attached "stabilizing brace" and used the survey average of 7 firearms for inventory, which is higher than the 3 used in the NPRM.

[164] Type 7 FFL SOTs in possession of short-barreled rifles equipped with a "stabilizing brace" at the time this rule is published may register the firearms in their possession through an E-Form 2 (rather than an E-Form 1). Because registration via the E-Form 2 does not require the separate payment of a making tax, there is no tax for ATF to "forbear" from collecting for these weapons.

any labor or expense involved in rebuilding or retrofitting firearms with longer barrels or obtaining necessary parts to do so, specifically in reference to those individuals without gunsmithing knowledge. Another commenter similarly stated the analysis of converting a firearm into a long-barreled rifle was incorrect because it did not account for gunsmithing costs and because installing a longer barrel onto an AR-patterned firearm requires special tools. The commenter elaborated that not all pistols with a ''stabilizing brace'' are AR patterns, and, for those, additional parts and gunsmithing costs may be involved. One commenter contended that the cost estimates in the RIA failed to include the labor expense for gunsmith services and suggested an estimate of $750 per firearm.

One commenter provided an estimated percentage of the population that may fall under this scenario (10 percent) and further suggested that the cost to convert a pistol into a rifle will be $800. When converting a firearm with an attached ''stabilizing brace'' to a long-barreled rifle under the GCA, one commenter stated, ATF only considered the cost of a new barrel and handguard; that commenter suggested that ATF also should include the cost to re-barrel the firearm, which they estimated to cost anywhere from $50 to $250. This commenter also suggested that ATF consider the lost value of the existing barrel and handguard. By including all these cost elements, this same commenter suggested that the actual cost to convert a firearm into a long-barreled rifle is more in the range of $870 to $1070. One commenter estimated that it would cost about $600 to convert a firearm into a long rifle. Another commenter estimated the cost to re-barrel a firearm to be in the range of $55 to $350 (plus shipping cost to a gunsmith at $25 each way). Lastly, a commenter suggested that some barrels and handguards could cost as much as $1,000 to replace.

One commenter reflected on the likelihood of the various compliance scenarios and suggested that converting a firearm with an attached ''stabilizing brace'' to a rifle may be more likely to occur if the overall cost is cheaper than the NFA tax. This commenter also stated that the conversion cost provided by ATF was too low. On a separate note, one commenter stated that, while ATF complied with all the necessary economic requirements and determinations, the cost evaluation and impacts of the proposal were a secondary consideration behind ATF's apparent policy aims.

**Department Response**

With respect to comments asserting that the costs evaluation and impacts of the rule were secondary, the Department disagrees that the regulatory analysis did not account for the cost to individuals to remove firearms from the purview of the NFA. The Department considered the cost to purchase a new barrel and handrails based on the market prices of the items. While the cost analysis did not consider the labor and expense to alter firearms, this is not an indication that the cost evaluation or impacts of the proposal was a secondary consideration.

The Department agrees that a labor cost to convert the firearm into a long-barreled rifle was not included separately; however, ATF included this cost under the market prices for gunsmithing services, which were incorporated in the final RIA as suggested by public commenters for labor costs associated with converting the firearm into a long-barreled rifle. While the Department concurs that there may be a range in costs for the barrel and handguards, the Department kept the prices the same in the final RIA, as the overall cost is between the range of the low and high costs as suggested by the commenters.

**e. RIA Scenario 4: Apply To Register Under NFA**

**Comments Received**

Many commenters claimed that the rule would be a huge financial stress on Americans, and that many of those impacted by the financial burden would have difficulty individually affording the payment of a $200 tax to keep possession of a firearm that was already possessed and fully legal at the time of purchase. One commenter estimated that 10 percent of the population may fall under this scenario, as they stated that the demand for short-barreled rifles is smaller than for firearms with an attached ''stabilizing brace.'' Furthermore, this commenter suggested that the administrative cost would be $75 in addition to the $200 registration cost.

Some commenters suggested that there are additional costs, beyond the $200 NFA tax, that must be included when establishing the cost to register a firearm with an attached stabilizing brace as an NFA weapon. At least one commenter in the industry also argued that, even if ATF waived the NFA tax due upon registration, the owner would still have costs for the time and effort required to register. One commenter suggested that there are financial implications, which ATF did not take

into consideration, for owners who will need to modify their firearm to be compliant with 18 U.S.C. 922(r) prior to the NFA registration. Several commenters suggested that ATF did not include the cost to mark the registered firearms. One commenter suggested that it would cost an additional $30 to $50 to disassemble and re-assemble a firearm in order to mark the firearm. One commenter contended that ATF did not include the cost of getting fingerprinted or the travel costs to engrave the firearm or obtain fingerprints; the individual suggested that the minimum cost to register a firearm under the NFA would be approximately $326 per firearm. One commenter stated that considering the NFA tax a transfer payment, and not a societal cost, was ''specious.''

Another commenter provided a counter estimate that this scenario would provide a payment to ATF of over $600 million, ''nearly 50% of ATF annual operating budget.'' Likewise, a commenter stated that, if ATF's estimated figure of 3 million pistol-braced firearms is accurate, then the expected financial burden on the taxpayers amounts to $600,000,000 at a minimum for each firearm with an attached ''stabilizing brace'' to be registered. One commenter suggested that this scenario would be as likely as Scenario 3 (Convert a firearm with attached ''stabilizing brace'' into a long-barreled rifle). Another commenter noted that, for those individuals who decide to submit an application to register a short-barreled rifle under the NFA, the NPRM estimated that the proposed rule would add a burden of an additional 3,020,148 hours in addition to the ''existing annual hourly burden [which] is 102,808 hours.'' 86 FR at 30849. The commenter also stated that ''a standard work year is 2,000 hours, meaning that ATF seeks to impose a paperwork burden on the American public equivalent to approximately 1,500 years of productivity or the entire working lives of 38 persons. This would be an unwarranted and unjustified infringement of time and effort for citizens to exercise a fundamental right.'' (Emphases omitted.)

**Department Response**

The Department disagrees that all the firearms at issue in this rulemaking were legal at the time of purchase and lawfully possessed. ATF became aware that many short-barreled rifles equipped with a ''stabilizing brace'' had been sold by various manufacturers as pistols without the submission or receipt of a voluntary classification request from ATF or potentially relying on other

classification letters for other firearms equipped with "stabilizing braces." Further, ATF notes that many of these "brace" devices alone may have been marketed and sold as a way to add an attachment so that the individual could create a firearm with the "stabilizing brace" that is designed and intended to fire from the shoulder. As short-barreled rifles, these firearms equipped with a "stabilizing brace" must be registered, they must receive transfer or making approval, and they incur a $200 transfer or making tax, which is imposed on the transferor or maker, respectively. 26 U.S.C. 5811, 5821. These unregistered short-barreled rifles have been transferred in violation of the NFA, and further possession of any such unregistered firearm continues to be a violation of the NFA.

Although the Department disagrees that these unregistered firearms were legal at the time of purchase and lawfully possessed, the Department understands that consumers and dealers believed them not to be subject to the NFA when purchasing and selling them. In the NPRM, the Department had proposed that individuals and most non-SOT FFLs (*e.g.,* Type 1 dealers and Type 7 manufacturers) register and pay the $200 making tax. However, the Department concurs with many of the public comments regarding forbearance of the $200 NFA making tax for firearms equipped with a "stabilizing brace" that are short-barreled rifles currently in their possession. Therefore, the Department is not collecting the NFA making taxes for weapons that are affected by this rule and currently in the possession of individuals, Type 1 FFL dealers, Type 7 FFL manufacturers without an SOT,[165] and Type 8 FFL importers provided they submit an E-Form 1 application to register the firearm by May 31, 2023. Likewise, Type 7 FFL manufacturers with an SOT will need to file a E-Form 2 for the firearms with an attached "stabilizing brace" that fall under the purview of the NFA that are currently in their possession by May 31, 2023 in order to comply with Federal law. Type 7 FFLs that do not currently have a Class 2 Manufacturer SOT but that have been engaged in the business and choose to continue to be engaged in the business of manufacturing firearms with an attached "stabilizing brace" that fall under the purview of the NFA will need to obtain an SOT and also file an E-

Form 2 to register the firearms in their inventory that are subject to NFA regulations by May 31, 2023.

Because many commenters requested a "tax waiver" as their preferred method (second to grandfathering), and because the Department is no longer requiring that the $200 NFA making tax be paid upon registration during the 120-day window for compliance, the Department estimates that a significantly higher number of individuals than originally anticipated will opt to register their short-barreled rifle equipped with a "stabilizing brace." Due to the decision to forbear tax, as discussed above, the Department assumes a different percentage of the population will comply with this scenario (and other scenarios), as suggested by one commenter. Therefore, the Department disagrees with commenters that suggested all individuals will register under the NFA. There may be individuals who still opt for the other scenarios such as disposal or converting their firearm into a long-barreled rifle. For instance, there may be individuals who live in States that do not allow for the ownership of NFA weapons; therefore, the Department still accounts for other individuals choosing from the remaining scenarios.

The Department concurs that there are other costs associated with completing a Form 1 under the NFA, and, accordingly, it incorporated most of these costs under Scenario 4 (Apply to Register Under the NFA). However, ATF is not accounting for the cost to engrave NFA markings on the firearm, nor is ATF considering the cost to disassemble and re-assemble a firearm in order to mark the firearm. For purposes of NFA registration, affected firearms that include the markings required by the GCA can be registered with the original marking if the firearm has already been marked in accordance with 27 CFR 478.92 and 479.102. If the affected firearm is a "[p]rivately made firearm" ("PMF") as defined in 27 CFR 478.11 and 479.11 without GCA markings, the applicant will be required to mark the firearm in accordance with section 479.102 for NFA registration.[166] "Stabilizing brace" devices, however, were originally designed for heavy pistols, and indeed most "stabilizing braces" are attached to heavy pistols that are variants of rifles. ATF thus estimates that this rule will affect very few PMFs, so ATF did not include the cost to mark any PMFs in its analysis. Nevertheless, the cost to retroactively serialize a PMF to comply with NFA marking requirements is approximately

$30 to $65 per PMF.[167] Given the small number of PMFs affected by this rule and given the small cost to mark any PMFs that are affected by this rule, ATF does not believe that including any estimate for this cost would significantly affect its final RIA.

While the Department agrees with the commenter that registering firearms with attached "stabilizing braces" under the NFA will impose a time burden, the Department disagrees that it is an unwarranted and unjustified burden. This rule does not change the process to register an NFA firearm or the typical time required to complete each registration. Although more individuals will need to complete the process, the Department has concluded that the public safety benefits of this rule justify the burden on these individuals.

The Department disagrees with the assertion that the treatment of the NFA tax as a transfer payment, as opposed to a societal cost, is "specious." According to the Office of Management and Budget ("OMB") Circular A–4, "transfer payments" are payments that are distributed from one group to another group within the U.S. and do "not affect total resources available to society."[168] In this case, transfer payments are distributed from the general public to the U.S. Government. These distributed resources essentially continue to circulate among the total resources available to the U.S. society.

The Department disagrees that this rule will amount to $600 million in payments to ATF because the Department is providing tax forbearance; therefore, the commenter's concern about payments to the government is moot. The Department will not seek retroactive collection of taxes from individuals or FFLs for the NFA making and/or transfer taxes owed as a result of not having timely submitted a Form 1 or Form 2;[169]

---

[165] A Type 7 FFL manufacturer without an SOT that will not engage in the business of manufacturing firearms with an attached "stabilizing brace" that fall under the purview of the NFA after the publication of this rule may file an E-Form 1 application.

[166] *See* 87 FR at 24664–66.

[167] Tar Heel State Firearms, SBR/SBS Laser Engraving, *https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232* (last visited Dec. 12, 2022); Capitol Armory, NFA LaserEngraving, *https://www.capitolarmory.com/sbr-sbs-nfa-firearm-laser-engraving-form1.html* (last visited Dec. 12, 2022); Accubeam, NFA Trust & Manufacturing Engraving, *https://www.accubeam.com/services/nfa-trust-gun-engraving/* (last visited Dec. 12, 2022); Veritas Machining LLC, SBS and SBR Laser Engraving, *https://www.veritasmachiningllc.com/nfaweapons* (last visited Dec. 12, 2022).

[168] OMB, Circular A–4 38 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

[169] Type 7 FFL SOTs may manufacture NFA firearms without payment of the making tax pursuant to 27 CFR 479.68 provided that the firearm is reported and registered as required by Part 479. Section 479.103 generally requires a Type 7 FFL SOT to register firearms manufactured on an
Continued

however, even if the Department were to collect taxes retroactively, any payment of money for NFA taxes is directly deposited in the General Fund of the United States Treasury Department and is not retained by the Department or ATF. Congress appropriates ATF's budget annually.

The Department disagrees with the commenter who suggested that there will be financial implications resulting from the removal and replacement of imported parts for owners who imported pistols and added a "stabilizing brace." The commenter incorrectly interpreted 18 U.S.C. 922(r) as requiring the removal and replacement of imported parts to comply with section 922(r). Section 922(r) generally makes it unlawful "for any person to assemble from imported parts any semiautomatic rifle," and 27 CFR 478.39 provides that a person may not assemble a semiautomatic rifle using more than 10 of the imported parts listed in the relevant paragraphs of the regulation. The criminal violation under 18 U.S.C. 922(r) is for the "assembl[y]" of the semi-automatic rifle; therefore, modification of this kind of firearm through the removal of the relevant parts would not cure the 922(r) violation because the "assembl[y]" has already occurred. Nevertheless, for the purposes of the costs outlined in the standalone RIA, ATF assumes this group may use another scenario, such as destroying the firearm or turning it in to ATF, by using the population derived from bump-stock-type devices as a proxy.

f. RIA Scenario 5: Cost To Dispose of "Stabilizing Braces"

Comments Received

One commenter suggested that simply disposing of the "stabilizing brace" in this scenario would be very likely. However, the commenter suggested that individuals would likely separate the "stabilizing brace" from the firearm without permanently disposing of the "stabilizing brace" altogether, and then reattach the "stabilizing brace" onto a firearm when convenient. This same commenter suggested that a scenario in which individuals destroy the entire firearm would be unlikely. One commenter suggested that 70 percent of the population would fall under this scenario and that the cost for this scenario should be $250 for the value of the "stabilizing brace" and $250 in

ATF Form 2 by the close of the next business day after the manufacture. Firearms of the sort discussed in this rule were manufactured and subsequently transferred by Type 7 FFL SOTs without the timely submission of a Form 2 by the close of the next business day after manufacture.

diminished value of the firearm, for a total of $500 per firearm. One commenter suggested that ATF should estimate loss of future "stabilizing braces" on current trends rather than historical sales, and that the future trend of sales for firearms with attached "stabilizing braces" is higher than ATF estimated. Several commenters suggested that the disposal cost for this scenario ranges between $200 for only the "stabilizing brace" and $1000 for the firearm with the attached "stabilizing brace." One commenter suggested that ATF include the cost of replacing the buffer tube with a pistol tube.

Department Response

The Department disagrees that there should be an additional diminishment in the value of the firearm due to the loss of the "stabilizing brace" in the amount of $250 above the $250 value of the "brace" itself. This would constitute double counting the value of the "stabilizing brace." The Department recognizes that some owners may perceive that removal of the "brace" from the firearm as diminishing their value from owning that firearm. The Department, however, cannot reasonably estimate the diminished valuation to such owners because those perceived valuations are subjective and vary from owner to owner.

Because "braces" themselves are not regulated, the Department has not collected information about them that allows it to precisely calculate their popularity. Nonetheless, as explained above, the Department estimates that between 3 and 7 million "stabilizing brace" devices were manufactured over the course of eight years, and the Department will continue to use historical data as a means to project future trends. There is not enough information to support what "current trends" are for the demand of purported "stabilizing braces." Based on public comments, the Department concurs that there may be some individuals who opt to turn in or destroy the whole firearm; therefore, the Department uses the cost of the whole firearm under those scenarios.

With respect to the cost of replacing the buffer tube with a pistol tube, the rule does not require such a replacement. The Department also finds it unlikely that these individuals will purchase a pistol tube; therefore, the cost for a pistol tube was not included in the final analysis.

g. Other Costs

Comments Received

Many commenters believed the initial RIA underestimated the costs, specifically the annualized costs of the proposed rule. One commenter suggested that the cost for this rule ranges from $600 million to $40 billion, and that "more than 20,000 [special] agents would be needed" to enforce this rule. One commenter suggested that the annualized cost cited in the NPRM does not account for the total cost of the rule over the course of the next 10 years. The commenter went on to contend that this rule would cost well over $100 million, and that ATF should refrain from finalizing the rule until ATF can publish an accurate cost analysis. One commenter estimated that the total cost of the rule would be closer to $465 million. Many commenters suggested that ATF's cost analysis was inaccurate, calculating the cost of the rule to be the total number of "stabilizing braces" multiplied by each scenario rather than breaking out the total population among the different scenarios. One commenter suggested that the total cost of the rule is greater than the estimated annualized cost of $250 million. Many commenters stated the proposed rule would cost the gun industry and firearm owners tens, if not hundreds, of millions of dollars in conversions, taxes, and destruction of personal property.

At least one commenter stated that ATF's RIA skirted the issue of individuals and entities losing money on their "stabilizing brace" investments. According to the commenter, this rulemaking results in those law-abiding Americans forfeiting their investment in "stabilizing braces" and firearms sold with "stabilizing braces" installed at the factory. At a minimum, the commenter stated, the rule results in the loss of $708 million to law abiding Americans (*i.e.*, $236 per "stabilizing brace" * 3 million sold). Another commenter, assuming the CRS's population of "stabilizing braces" is accurate, stated that the NPRM would destroy economic value and waste American productivity and that the proposed rule's estimated economic impact was too low. Similarly, several commenters suggested that this rule will destroy the entire firearms industry and estimated that this rule will directly affect 150,000 employees and indirectly affect 188,000 individuals, having a total economic impact of $63.4 billion.

One commenter reasoned that, using an estimated number of 5 million stabilizing braces currently in circulation, the estimated cost for this rule was $2.8 billion and this cost did

not account for increased government costs such as increased classifications, NFA registrations, and enforcement actions that the commenter anticipated ATF would need to incur upon implementation of this final rule. One commenter stated that this rule "attempts to seize[,] waste, and obliterate an unfathomable percentage of the total annual US firearms commerce." Similarly, a few commenters suggested that government or enforcement costs were not taken into consideration in the cost-benefit analysis, such as the cost of additional "ATF personnel, equipment, facilities, data infrastructure, prosecution, and incarceration fees." One commenter suggested that this rule will cost $2.65 trillion to imprison all owners of firearms with attached "stabilizing braces."

Another commenter suggested that ATF should have to include the cost for lawsuits challenging the rule. One commenter suggested that this rule would affect taxes that are used to restore and conserve land, along with State and local taxes. Another commenter also asserted that the cost estimated for the rule was fundamentally flawed because the alternatives discussed provided for someone who presently owns a firearm with a "stabilizing brace" caused a cost to the private sector.

Other commenters argued that the financial burden would disproportionally impact lower income persons, including Blacks and Hispanics. Additionally, one commenter said that the proposed rule is "classist and racist" because it makes firearm ownership more expensive through additional taxation. This same commenter further stated the rule was "blatantly ableist, and in bad faith based on antiquated assumptions." And lastly, one commenter suggested that implementing this rule will reduce the ability to hunt feral hogs and claimed that feral hogs cause approximately $52 million in damages every year.

Department Response

The Department partially concurs with the commenters regarding the overall costs that may be incurred following the rule but disagrees with other aspects of the comments. Many of the commenters conflated the annualized cost of the rule with the 10-year undiscounted cost of the rule. In the NPRM, the Department estimated that the 10-year undiscounted cost would be $1.1 billion, which is higher than the majority of the estimates suggested by the commenters, but not as high as $40 billion as suggested by one

commenter. While one commenter requested that precise numbers be presented prior to the publication of the rule, the Department is unable to provide numbers to the level of precision requested by the commenter. The Department now provides revised estimates for the final RIA based on information provided by public comments; however, as the Department consistently states, these are estimates and these numbers cannot be determined with as much precision as some commenters would like.

The Department partially disagrees with the estimate that "more than 20,000 [special] agents would be needed." ATF does not anticipate needing to add or otherwise require additional law enforcement personnel or taking criminal enforcement actions against persons who currently possess previously made weapons with attached "stabilizing braces" during the 120-day period to come into compliance with Federal law. Nonetheless, ATF concurs that there may be additional costs to implement Federal law as clarified by this rule because ATF anticipates adding staff to assist with the processing of NFA applications. Thus, ATF added those additional administrative costs into its analysis, but no additional cost was associated with law enforcement personnel.

As for classifications, "stabilizing brace" companies have submitted their items for classifications prior to this rule for new designs, and companies will remain free to do so after the implementation of this rule. This rule will not change the classification process, so the costs of this process will remain the same. ATF provides several solutions for owners of "braces" to come into compliance.

The Department disagrees that this rule will "destroy the entire firearm industry," along with the commenters' estimated 150,000 employees directly affected and 188,000 indirectly affected individuals, or that the rule will have a total economic impact of $63.4 billion. The majority of the firearms industry does not engage in manufacturing, selling, or purchasing "stabilizing braces" or firearms with an attached "stabilizing brace." Furthermore, the firearms with attached "stabilizing braces" do not constitute the entire firearms industry. Most firearms have been sold and are sold without "braces" or are purchased without the intent to attach a "brace." Firearms that will be affected by this rule are only a small subset of the whole firearms industry. While this rule will have an effect on the firearms industry, it will not adversely impact the industry as a

whole; therefore, the estimated impact on the entire firearm industry was not considered as part of the final analysis.

Most firearms currently on the market are and will remain outside the purview of the NFA; they should not be affected by this rule. The rule may, however, affect a small subset of manufacturers and retailers, and ATF has accordingly updated the Initial Regulatory Flexibility Analysis ("IRFA") to account for these businesses in the Final Regulatory Flexibility Analysis ("FRFA").

As for lawsuits challenging this rule and taxes to restore and conserve land, along with State and local taxes, ATF does not account for the cost of lawsuits, taxes, and land conservation because doing so would require far too much speculation for any estimates to be useful. In addition, ATF does not account for the tax impact of the rule because, as described above, the firearms industry as a whole will be largely unaffected by this rule. As a result, ATF expects the industry will continue to make the relevant tax contributions for conservation, as well as to State and local governments.

The Department disagrees this rule will disproportionately affect lower income individuals or certain minorities. As discussed in section IV.B.4.f of this preamble, the NFA tax is a rational mechanism to control the making and transfer of dangerous and unusual firearms that are concealable and capable of more damage than other firearms. The rule, which remedies ATF's past misinterpretation of the relevant statutory definitions, provides every individual—no matter their race, gender, or disability—the opportunity to remedy violations of the NFA and maintain possession of their firearms so long as the person is not prohibited from firearm possession.

ATF concurs that this rule could possibly have an effect on hunting feral hogs, but notes that this rule does not ban the purchase or use of NFA items; rather, the rule only requires that NFA registration and taxation requirements be satisfied for items that fall within the rule's scope. Under this rule, short-barreled rifles continue to be regulated by the NFA, but so long as an individual complies with the NFA's requirements, those rifles would remain available for use in feral hog hunting. To the extent that complying with the NFA's requirements would impose a financial burden on individuals engaged in such hunting, the Department believes the public safety benefits of the rule outweigh that burden.

h. Benefits

Comments Received

Many commenters questioned ATF's assertion that this rule will improve public safety and believed that there is no evidence to demonstrate that Americans will be safer if this rule goes into effect. Commenters asserted that criminals are not going to care about this rule and that this rule will do nothing to prevent or mitigate actual criminal activity. Commenters stated that ATF has arbitrarily decided that an AR-pistol is a "gangster type weapon," even though, in the opinion of the commenters, criminals actually prefer handguns to rifles. Another commenter stated that ATF was only speculating that the proposal would reduce criminal use of firearms.

Many commenters claimed that such "braces" are rarely used in the commission of crimes and that the rule will have no benefit to public safety. Specifically, numerous commenters stated that the purpose of the NFA is "to regulate certain weapons likely to be used for criminal purposes." In these commenters' opinion, there is no reason to believe firearms with an attached "stabilizing brace" are likely to be used for criminal purposes. The commenters went on to say that, since ATF approved the first "stabilizing brace" in 2012, there has not been any notable spike in homicide, violent crime, or crime involving stabilizing braces. They argued that there is not a correlation, let alone a causal link, between the presence of "braced" firearms and higher crime rates, and there is no evidence to suggest that regulating "braced" firearms under the NFA will reduce crime rates. Some commenters, like the Ohio Attorney General, acknowledged that the Department noted examples of weapons with "stabilizing braces" being used in at least two mass shootings, but many commenters considered those two instances to be misuses of the "stabilizing brace" in criminal acts. The commenters argued that, considering the millions of "braces" in use, such examples provide insufficient evidence to suggest that regulating "braced" firearms under the NFA will reduce crime rates. Another commenter went as far as to classify the resulting "reduced ability for self[-]defense" to be "the most damaging and life[-]threatening form of discrimination." Another commenter believed that the proposed rule would destroy the value of "braces," which would lead to legal owners selling them in order to recoup their losses, thus making them "more readily available to criminals seeking to

make a short-barreled rifle for malicious purposes."

Commenters questioned the idea that a "stabilizing brace" makes a gun more lethal. According to a commenter, the proposed rule was based on the proposition that adding a "stabilizing brace" to pistols makes them "especially dangerous to the community." Numerous commenters did not believe that ATF had substantiated its claims that "brace"-equipped pistols are especially dangerous or unusual. Commenters questioned how these firearms are more dangerous than "other common pistols." Some commenters suggested that a short-barreled rifle is not more concealable than other firearms. Likewise, a commenter stated, "I don't see how a brace on a regular-sized pistol makes the gun especially dangerous or unusual as it doesn't increase the power or lethality of a 'regular pistol.'" Another commenter argued that it is not a fact that stabilizing braces are more effective when firing the firearm. Or, as many commenters stated, "even if the user shouldered the stock pistol, it [does] not magically turn that pistol into a[n] SBR." Conversely, some commenters contended that it was actually safer or less lethal to use a "stabilizing brace." Collectively, these commenters stated that a "stabilizing brace" does not make the gun "more scary" because the brace allows a person to shoot the gun "more safely for the shooter as well as [the] people around you."

Department Response

The Department disagrees with commenters that the rule has no value or that there is no benefit to the rule. The perception that the rule serves no function to enhance public safety is directly opposed to the purpose and intent of the NFA. Congress passed that statute for the express purpose of regulating specific firearms, like short-barreled rifles, which Congress determined posed a greater risk to public safety as "gangster-type" weapons of an especially unusual and dangerous nature. This rule makes clear that a firearm cannot evade classification under the NFA if it has objective design features that indicate (or if there are marketing materials or other information demonstrating likely use in the general community that indicate) it is designed, made, and intended to be fired from the shoulder and has a barrel length of less than 16 inches. Therefore, the Department emphasizes that the risk posed to public safety by these weapons was identified by Congress, and this rule acts to

implement the NFA. The rule is necessary to effectuate the laws passed by Congress to address congressional concerns for risks imposed to public safety by firearms as defined under the NFA.

As for reducing the ability for self-defense, the Department disagrees. There are various firearms that are available for self-defense under the GCA and will continue to be available. Furthermore, this rule does not ban the use of firearms with an attached "stabilizing brace." Individuals can and will continue to be able to use such firearms for personal defense. Individuals have various means of complying with the relevant statutory requirements and will not need to sell any firearms that they may possess. See section IV.A.2 of this preamble for additional Departmental response regarding public safety.

i. IRFA/FRFA

Comments Received

Some commenters suggested that this rule will "harm millions of jobs" and "shut down dozens of small businesses." Various commenters suggested that this rule will affect the American economy and, in particular, all manufacturers that sell firearms with an attached "stabilizing brace" and FFL dealers that deal in firearms with an attached "stabilizing brace." One commenter suggested that FFL dealers would not be able to convert firearms with attached an "stabilizing brace" without obtaining an SOT and would have to otherwise dispose of their inventory of firearms with attached "stabilizing braces." Another commenter suggested that this would increase the burden on small businesses by adding additional tracking and reporting requirements.

Department Response

While ATF agrees that the rule will affect a number of small businesses and a small number of jobs, ATF disagrees with the magnitude of impact suggested by some commenters. There are only a few companies that manufacture "stabilizing braces," and for most of them, "braces" or firearms with an attached "stabilizing brace" are not their primary source of revenue. In the IRFA, ATF calculated an estimated impact to FFL Type 1 dealers, as well as an estimated impact on FFL Type 7 manufacturers. For the FRFA, ATF provides a revised impact analysis illustrating with more detail the estimated impacts to Type 1 and Type 7 FFLs, along with manufacturers of "stabilizing braces."

While ATF updated the population in the FRFA, it did not receive sufficient information in the public comments as to the actual impact; therefore, the revised analysis did not include any such additional information.

In the IRFA, ATF estimated the number of businesses that will go out of business. The FRFA provides a more detailed analysis on the anticipated number of businesses that will go out of business, the anticipated loss of revenue, and the anticipated number of jobs affected. However, the overall effect that the rule will have on small businesses is anticipated to be small. While the Department acknowledges that most businesses in the firearms industry are small, most firearms with attached ''stabilizing braces'' are a subset of the inventory of firearms sold by these businesses. Therefore, this rule's clarification of Federal law will affect, at most, a small portion of the businesses' inventories, with the extent of the impact depending on how they choose to comply after publication of this rule. It is unlikely that all businesses that deal in firearms with attached ''stabilizing braces'' will shut down as suggested by commenters.

As for additional tracking and reporting requirements, ATF has already accounted for the additional paperwork associated with Form 1 and 2 applications for NFA items. There may be additional paperwork should Type 7 FFL manufacturers opt to obtain an SOT, but doing so is not required, and, due to ATF's decision to forbear taxes as discussed in this preamble, it is deemed unlikely that FFLs will apply for an SOT.[170] No additional paperwork was required.

### j. Other Executive Orders

#### Comments Received

At least one commenter objected to ATF's determination under Executive Order 13132 (Federalism) that the rule will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. This commenter contended that if the rule costs more than $100 million, the rule should be null and void.

### Department Response

The Department concurs with the commenter that this rule will have costs more than $100 million in any given year but disagrees that the rule implicates Executive Order 13132. This rule will not have a substantial direct effect on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Although some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it require any State to change its laws.

Should States or political subdivisions of the States (for example, local police departments) possess weapons with ''stabilizing braces'' that constitute unregistered short-barreled rifles, these firearms must be registered in the NFRTR. ATF estimates, however, that this rule will not affect many States or political subdivisions, so ATF did not include in the FRFA the cost of registering such firearms under the NFRTR by State or local governments. In addition, ATF notes that it may take 30 minutes to complete an Application for Registration of Firearms Acquired by Certain Governmental Entities (''Form 10''), with a loaded wage rate of $49.67, making the per application burden $25.[171] [172] [173] This small cost confirms that the rule will not have a substantial direct effect on States or localities. Finally, there is no dollar threshold under Executive Order 13132, nor is there a threshold that makes a rule ''null and void.''

### 9. Considerations on Options To Comply

#### a. No Change Alternative

##### Comments Received

Many commenters wanted ATF to allow weapons with ''stabilizing braces'' to continue to be possessed and sold without compliance with the NFA. Many commenters stated their support for the no-change alternative and possibly grandfathering all existing stabilizing braces. These commenters also expressed a strong aversion to registering the firearms under the NFA, but nonetheless favored the waiver of the $200 NFA tax, as opposed to banning these items, if such registration was required.

##### Department Response

The Department acknowledges commenters' suggestion that the $200 NFA tax for the transfer or making of an NFA firearm be waived if registration is required. For the Department's response on this, see the discussion in section IV.B.8.e of this preamble. The Department considered but cannot adopt the ''no change'' alternative because it would result in the status quo—the manufacturing, making, and possession of unregistered NFA firearms. The NFA, clarified in this rule, regulates all firearms equipped with a ''stabilizing brace'' that are short-barreled rifles because they have a barrel or barrels less than 16 inches in length and have the features listed in this rule indicating they are designed, made, and intended to be fired from the shoulder, or because the manufacturer's direct or indirect marketing material or use by the general community indicates they are designed, made, and intended to be fired from the shoulder. As mentioned, the NFA's requirements cannot be avoided merely because a firearm is configured with a device marketed as a ''stabilizing brace.'' Thus, as short-barreled rifles, the NFA requires these firearms to be registered and the appropriate taxes be paid for the making and transfer of the weapon. The Department did not need to consider classifying or banning ''stabilizing braces'' alone without an attached pistol because, under the GCA and NFA, ATF regulates ''firearms'' as defined by those statutes. ''Brace'' devices alone are not firearms.

#### b. Grandfathering in Firearms With Attached ''Stabilizing Braces''

##### Comments Received

Many commenters contended that firearms with attached ''stabilizing braces'' should be grandfathered in

---

[170] In the absence of the forbearance, some Type 7 FFLs may have found it more economical to pay the costs required to become an SOT holder than to pay the costs to register each of the weapons affected by this rule that they have in their inventory. Because ATF is no longer requiring payment of the making tax for weapons held in Type 7 FFLs' current inventory, ATF expects that becoming an SOT will no longer be a more economical option.

[171] Average wage rate for Police and Sheriff's Patrol Officers is $34.02. BLS, Occupational Employment and Wage Statistics, (May 2021), *https://www.bls.gov/oes/2021/may/oes333051.htm*.

[172] ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416. This figure comes from the following calculation: (BLS Series ID CMU2010000000000D,CMU2010000000000P (Private Industry Compensation = $37.15))/(BLS Series ID CMU2020000000000D,CMU2020000000000P (Private Industry Wages and Salaries = $26.23)) = 1.416. *See* BLS, BLS Data Finder 1.1, *https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D* (last visited Dec. 14, 2022). The exact number may differ slightly because of fluctuations in the compensation and wage and salary rates in the time since ATF performed the calculations.

[173] The Employee Cost Index of 1.031 accounts for wage increases in 2022. BLS, Employment Cost Index March 2022 (Apr. 29, 2022), *https://www.bls.gov/news.release/archives/eci_04292022.pdf*.

under the new rule. One commenter declared that it was a violation of law that no grandfather clause was provided whatsoever, while another commenter believed that the lack of any grace period or grandfathering made it clear the rule was not intended to prevent violent crimes and was only intended to harm law abiding Americans. Similarly, one commenter questioned how ATF was able to reject grandfathering millions of existing braces that were lawfully purchased by gun owners who followed ATF guidance. Other commenters also claimed that, without a grandfather provision, many law-abiding citizens may become liable for prosecution. One commenter opined that owners of firearms equipped with stabilizing braces are faced with a choice of evils: (1) permanently removing the stabilizing brace from their firearm; (2) attaching a 16-inch or longer barrel to their firearm; or (3) destroying their firearm. One manufacturer took issue with ATF's "assumption" that grandfathering existing firearms would be impractical because of ATF's concerns that manufacturers could claim that newly produced rifles with an attached "stabilizing brace" were grandfathered in order to evade NFA regulation.

Department Response

The Department disagrees that it must provide individuals a grandfather clause for currently possessed firearms equipped with "stabilizing braces" that are short-barreled rifles under the NFA, or that it must compensate firearm possessors for either the firearm or for the "brace" devices. For the Department's response on compensation, refer above to section IV.B.4.c of this preamble.

The NFA requires that a rifle with a barrel or barrels less than 16 inches, *i.e.,* a short-barreled rifle, be registered in the NFRTR. The NFA makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the [NFRTR]." 26 U.S.C. 5861(d). Further, section 5861(c) makes it unlawful for an individual to receive or possess a firearm made in violation of the provisions of the NFA. An individual in possession of a short-barreled rifle (such as a weapon with a "stabilizing brace" that falls within the scope of the NFRTR) not registered in the NFRTR would be in violation of sections 5861(c) and 5861(d). A grandfather provision that would prospectively excuse currently possessed NFA firearms from registration would allow continued violations of the NFA indefinitely. Accordingly, for possessors to continue

to possess these firearms and to be able to transfer these short-barreled rifles in the future without being in violation of the NFA, it is necessary for possessors to register in the NFRTR those firearms equipped with a "stabilizing brace" that are short-barreled rifles. As discussed above, so long as affected persons register their short-barreled rifles equipped with a "stabilizing brace" by May 31, 2023, the Department will forbear the NFA making tax that would have been owed and, in its enforcement discretion, will allow these persons to temporarily possess their unregistered NFA firearm until they receive a response from ATF on their application. Section V.B of this preamble discusses options under the rule and sections IV.B.9.c and V.C of this preamble discuss the Department's decision to forbear the making tax upon registration.

The Department also cannot have a grandfather clause because providing one would inappropriately exempt individuals from future compliance with provisions of the NFA. The Department can, in its enforcement discretion, permit the registration of firearms possessed at the time of publication of this rule and forbear the NFA tax due upon registration. In addition, the Department has determined that a limited exercise of its discretion to allow individuals to come into compliance with Federal law is appropriate in light of the prior confusion regarding the scope of the NFA and its application to firearms equipped with "brace" devices. However, this decision is not a prospective exemption for individuals from the requirements of the NFA. The Department has determined that a prospective, indefinite exercise of its enforcement discretion (as embodied in a grandfathering provision for current possessors) is not appropriate because current possessors will have time to acquaint themselves with ATF's clarified regulations and take action to comply with the statute.

c. Tax Forbearance for Registration of Short-Barreled Rifles With an Attached "Stabilizing Brace"

Comments Received

Commenters claimed this proposal would be the largest registration scheme imposed by the executive branch in American history and would force the registration or destruction of millions of privately owned firearms. Commenters similarly suggested forgiveness of the NFA taxes but were not optimistic of such an approach because ATF

previously rejected forgiveness of the NFA tax.

Some commenters thought that, if the tax is forgiven, more people will comply with the rule. One commenter expressed concern that the proposed rule required that individuals pay the $200 making tax. They argued that the proposed rule was inconsistent with the statute because it equated possession of firearms with the making of the firearms. Furthermore, the commenter claimed the proposed rule failed to provide guidance as to what constitutes the date of manufacture for firearms that already exist and are subject to the NFA. The commenter also claimed that the proposed rule failed to advise on whether individuals must dispossess themselves of their firearms until their Form 1s are approved. Another commenter stated that "[t]o retroactively make these braced pistols illegal without grandfathering them has the same effect as directly levying a tax upon the citizens." Likewise, another commenter expressed concern that ATF has proposed to impose the tax in the present, regardless of when the firearm was made, and regardless of when the firearm was transferred. One commenter took issue with ATF's position to not forgive the tax upon registration for fear that individuals could register all pistols in their possession as short-barreled rifles with the intent of using other stocks or "brace" devices on those firearms.

Department Response

The Department disagrees with commenters that asserted the rule would result in the largest registration in the country's history or the destruction of millions of privately owned firearms. While numerous firearms equipped with "stabilizing braces" are short-barreled rifles based on their objective design features, the Department has provided multiple options for affected persons, which include alternatives that do not require registration or destruction of the firearm.

The Department agrees with the commenter who stated that requiring an individual already in possession of a firearm to pay the making tax is inconsistent with Federal law. As described earlier, the NFA imposes a $200 making tax and $200 transfer on NFA firearms. *See* 26 U.S.C. 5811, 5821. The making tax is imposed on the person making the firearm. 26 U.S.C. 5821(b). The population of individuals who possess short-barreled rifles equipped with a "stabilizing brace" includes (1) individuals who made the firearms by adding a purported "stabilizing brace" on the firearm, and

(2) individuals who purchased and received a firearm equipped with a purported "stabilizing brace" from an FFL or another individual. These latter persons who purchased or received the short-barreled rifle equipped with a "stabilizing brace" from an FFL or another individual are not "makers" who have incurred a tax liability.

Accordingly, the Department agrees with commenters and will forbear the making tax on those individuals who did not make the firearm. In addition, even for individuals who did "make" the firearm, the Department believes it is appropriate to forbear the making tax because of the clarification in ATF's analysis of firearms equipped with a "stabilizing brace" device. This forbearance will also help ameliorate the increased administrative burdens on ATF's NFA Division, which otherwise would be tasked with making determinations of whether an individual is in fact a "maker" who should incur the making tax. Refer to the discussion in sections IV.B.8.e. and V.B. of this preamble on the way affected parties must register their NFA firearms to come into compliance with Federal law and not be subject to the penalties for being in possession of an unregistered short-barreled rifle.

The Department acknowledges that, in the NPRM's discussion of alternatives, it did not offer to forbear the NFA tax out of concern that individuals and entities could register all pistols in their possession as short-barreled rifles and then attempt to use other stocks on these firearms or with the intent of later obtaining a "stabilizing brace." 86 FR at 30847. The Department still has concerns that allowing tax-exempt registration could induce individuals to register other firearms with the later intent of creating a short-barreled rifle. Nevertheless, after careful consideration of the comments, the Department has decided to forbear the making tax when individuals and entities register their affected firearms within a defined period of time for the reasons discussed above in section IV.B.8.e of this preamble. The Department also notes that the ATF Form 1 requires individuals to sign under the penalty of perjury that the description of the firearm, including the type of firearm, is true, accurate, and complete, and that the making and possession of the firearm described in the application would not constitute a violation of Title 18 U.S.C., Chapter 44; Title 26, U.S.C., Chapter 53; or any provisions of State or local law. Any false statement knowingly made on the ATF Form 1 regarding registration pursuant to this rule is a violation of 26

U.S.C. 5861(l). A firearm involved in a violation of section 5861(l) may be seized, and the violation subjects the person to possible conviction, which is punishable by a fine up to $10,000, or imprisonment up to 10 years, or both. *See* 26 U.S.C. 5871, 5872. Furthermore, a willful false statement to an agency of the Federal government may also be a violation of 18 U.S.C. 1001, which is punishable by a fine or imprisonment up to five years, or both. The options for persons in possession of short-barreled rifles equipped with a "stabilizing brace" device to come into compliance with the NFA are outlined in section V.B of this preamble.

d. Other Suggested Alternatives

Comments Received

ATF received several suggestions from commenters on what other actions could be taken apart from pursuing this rulemaking. These included suggestions that ATF fund recalls of firearms with "brace" devices or efforts to replace noncompliant "stabilizing braces" with compliant ones. Commenters opined that short-barreled rifles and shotguns should be removed from the purview of the NFA. One commenter suggested requiring prescriptions to demonstrate that an individual in fact needs a "stabilizing brace" attached to their firearm. Another commenter questioned why ATF did not consider classifying "stabilizing braces" without a pistol attached.

Department Response

The Department acknowledges commenters' suggestions that ATF engage in a buyback of firearms with an attached "stabilizing brace" or that the agency require some proof that an individual demonstrate they need a "stabilizing brace" before acquiring the device. The Department has decided not to adopt such suggestions. Buying firearms with attached "stabilizing braces" would be costly and administratively burdensome, and the Department has provided other options for owners of such devices to consider instead. Requiring proof of a disability or other "need" for a "stabilizing brace" would require medical judgments that are beyond the scope of ATF's expertise. Finally, with respect to the suggestion that short-barreled rifles and shotguns be removed from the scope of the NFA, doing so is not within the Department's authority and therefore is beyond the scope of this rule.

**V. Final Rule**

*A. Definition of "Rifle"*

The rule provides an amendment to the definition of "rifle" in §§ 478.11 and 479.11. In issuing this final rule, the Department has revised the proposed regulatory text in the NPRM to account for the comments received. The rule does not adopt the Worksheet 4999 as proposed in the NPRM. The rule does, however, adopt from the NPRM and proposed Worksheet 4999 several of the objective design features that indicate a firearm is designed, made, and intended to be fired from the shoulder and incorporates these features into the definition of "rifle." The final regulatory text for the definition of "rifle" reflects the best interpretation of the relevant statutory provisions. All previous ATF classifications involving "stabilizing brace" attachments for firearms are superseded as of May 31, 2023. As such, they are no longer valid or authoritative, and cannot be relied upon. However, firearms with such attachments may be submitted to ATF for re-classification.

This final rule's amended definition of "rifle" clarifies that the term "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided that other factors, as listed in the rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder. These other factors are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

*B. Options for Affected Persons*

Persons in possession of short-barreled rifles equipped with a "stabilizing brace" device have until May 31, 2023 to come into compliance with the NFA's requirements. The options are as follows:

Current Unlicensed Possessors

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm, thus removing it from the scope of the NFA.

2. Submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1") by May 31, 2023.[174] The possessor may adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the individual must mark the firearm as required. Proof of submission of the E-Form 1 should be maintained by all possessors.

To transfer an affected firearm to another individual after the date this rule is published, it must be registered in the NFRTR, and the individual must submit and receive approval on an Application for Tax Paid Transfer and Registration of Firearm, ATF Form 4; otherwise, the transfer is a violation of the NFA. *See* 26 U.S.C. 5861(e).

3. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally received as a "short-barreled rifle" results in the production of a "weapon made from a rifle," as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

4. Turn the firearm into your local ATF office.

5. Destroy the firearm. ATF will publish information regarding proper destruction on its website, *www.atf.gov*.

Federal Firearms Licensed Manufacturers or Importers Under GCA and Qualified as an SOT (Class 1 Importer and Class 2 Manufacturer) Under the NFA

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm thus removing it from the scope of the NFA.

2. For short-barred rifles equipped with a "stabilizing brace" that are currently in the possession of FFL SOT manufacturers or importers, they may register them by completing and submitting through the eForms system a Notice of Firearms Manufactured or Imported, ATF Form 2 ("E-Form 2") by May 31, 2023.

To transfer an affected firearm to an individual after the date this rule is published, it must be registered in the NFRTR, and the FFL SOT manufacturer or importer must submit and receive approval on an Application for Tax Paid Transfer and Registration of Firearms, ATF Form 4; otherwise, the transfer is a violation of the NFA. *See* 26 U.S.C. 5861(e). Similarly, to transfer an affected firearm to another FFL SOT, it must be registered in the NFRTR, and the FFL SOT must transfer the firearm on an Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupation Taxpayer (National Firearms Act), ATF Form 3.

3. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally manufactured as a "short-barreled rifle" results in the production of a "weapon made from a rifle" as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

4. Turn the firearm into your local ATF office.

5. Destroy the firearm. ATF will publish information regarding proper destruction on its website, *www.atf.gov*.

Federal Firearms Licensees Not Having Paid SOT as a Class 1 Importer or Class 2 Manufacturer Under the NFA

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm thus removing it from the scope of the NFA.

2. For short-barred rifles equipped with a "stabilizing brace" that are currently in the possession of FFLs that do not have an SOT (Class 1 Importer or Class 2 Manufacturer), they may submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1") by May 31, 2023. The possessor may adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the individual must mark the firearm as required. Proof of submission of the E-Form 1 should be maintained by all possessors.

To transfer an affected firearm to an individual after the date this rule is published, it must be registered in the NFRTR, and the non-SOT FFL must submit and receive approval on an Application for Tax Paid Transfer and Registration of Firearm, ATF Form 4; otherwise, the transfer is a violation of the NFA. *See* 26 U.S.C. 5861(e). Furthermore, if the FFL wishes to continue to engage in the business of dealing short-barreled rifles equipped with "stabilizing brace" devices that are NFA firearms, the FFL must become an SOT holder under 26 U.S.C. 5801.

Any FFL without an SOT that is engaged in the business of manufacturing short-barreled rifles equipped with a "stabilizing brace" device should become a Class 2 SOT if they will continue to engage in the business of dealing and manufacturing NFA firearms. Once they obtain their SOT under 26 U.S.C. 5801, they must register their NFA firearms in the NFRTR by completing and submitting the E-Form 2 by May 31, 2023.

3. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally manufactured or received as a "short-barreled rifle" results in the production of a "weapon made from a rifle" as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

4. Turn the firearm into your local ATF office.

5. Destroy the firearm. ATF will publish information regarding proper destruction on its website, *www.atf.gov*.

Certain Governmental Entities

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the

[174] ATF strongly advises that affected parties use the eForms system to lessen the administrative burden in registering firearms affected by this rule.

firearm, thus removing it from the scope of the NFA.

2. Submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1") by May 31, 2023. The government entity may adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the government entity must mark the firearm as required. Proof of submission of the E-Form 1 should be maintained by all possessors.

To transfer an affected firearm after the date this rule is published, it must be registered in the NFRTR, and the government entity must submit and receive approval on an Application for Tax Exempt Transfer and Registration of Firearm, ATF Form 5; otherwise, the transfer is a violation of the NFA. *See* 26 U.S.C. 5861(e).

3. Alternatively, a government entity may submit through the eForms system an Application for Registration of Firearms Acquired by Certain Governmental Entities, ATF Form 10 ("E-Form 10") by May 31, 2023. The government entity may adopt the markings on the firearm for purposes of the E-Form 10 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the government entity must mark the firearm as required. Pursuant to 27 CFR 479.104, any subsequent transfer of a firearm registered on an E-Form 10 is restricted to other governmental entities for official use. Proof of submission of the E-Form 10 should be maintained by all possessors. Because of the anticipated number of submissions in response to this rule, a government entity may wish to submit an E-Form 10 because it will be easier for ATF to distinguish from an E-Form 1 and will allow ATF to more quickly respond to law enforcement needs. However, note that, pursuant to 27 CFR 479.104, any subsequent transfer of a firearm registered on an E-Form 10 is restricted to other governmental entities for official use, *i.e.,* the firearm may not be transferred to a non-government entity.

To transfer an affected firearm after the date this rule is published, it must be registered in the NFRTR and the government entity must submit and receive approval on an Application for Tax Exempt Transfer and Registration of Firearms, ATF Form 5; otherwise, the transfer is a violation of the NFA. *See* 26 U.S.C. 5861(e).

4. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally received as a "short-barreled rifle" results in the production of a "weapon made from a rifle" as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

5. Turn the firearm into your local ATF office.

6. Destroy the firearm. ATF will publish information regarding proper destruction on its website, *www.atf.gov.*

*C. Discussion of Tax Forbearance*

The Department is forbearing the following NFA taxes on persons in current possession of firearms equipped with a "stabilizing brace" as described below:

1. Individuals and FFLs that are not Class 1 (Importer) and Class 2 (Manufacturer) SOT holders in possession of firearms equipped with a "stabilizing brace" that are subject to the provisions of the NFA as of the date this rule is published will not be subject to the $200 making tax so long as they timely submit an E-Form 1 by May 31, 2023.

2. FFLs that are SOT Class 1 (Importer) and Class 2 (Manufacturer) holders in possession of firearms equipped with a "stabilizing brace" that are subject to the provisions of the NFA as of the date this rule is published must timely register their affected firearms on an E-Form 2 by May 31, 2023. Because the E-Form 2, as noted above, does not require an accompanying NFA tax payment, ATF will not collect any taxes for registration of these weapons.

In addition, the Department will forbear from collecting any transfer tax for the transfer of a weapon with a "stabilizing brace" that is an NFA firearm for any transfer that occurred before the effective date of this final rule.

With respect to the Department's authority to seek taxes retroactively from individuals and FFLs (regardless of SOT status), the Departments notes that Congress in 1996 amended 26 U.S.C. 7805(b) to generally prohibit regulations relating to the internal revenue laws from applying retroactively "to any taxable period before" the date on which such regulation is filed with the **Federal Register**; in the case of a final

rule, the date on which any related proposed or temporary rule was filed with the **Federal Register**; and the date on which any notice substantially describing the expected contents of any temporary, proposed, or final rule is made public.

When Congress made this 1996 amendment, however, it stated that "[t]he amendment . . . shall apply with respect to regulations which relate to statutory provisions enacted on or after the date of the enactment of this Act." Taxpayer Bill of Rights 2, Public Law 104–168, sec. 1101(b), 110 Stat. at 1452, 1469. Because the NFA was enacted in 1934 (*i.e.,* before the 1996 amendment), the pre-1996 version of 26 U.S.C. 7805 applies. That section provides: "[T]he Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." 26 U.S.C. 7805(b) (1994). Section 7805(b) did not include other restrictions on retroactive regulations. Thus, the Department has broad discretion regarding the retroactivity of taxes in this rule. However, the Department believes it is appropriate to forbear this retroactive tax liability. Doing so is appropriate because of past public confusion about what sorts of weapons are in fact NFA firearms and because attempting to collect past making or transfer taxes would impose a substantial administrative burden on ATF to determine which individual or entity did in fact make or transfer the NFA firearm in question.

## VI. Statutory and Executive Order Review

*A. Executive Orders 12866 and 13563*

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic benefits, environmental benefits, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

OMB has reviewed this rule and determined that this rule is a "significant regulatory action" that is economically significant under section 3(f) of Executive Order 12866, because the rule will have an annual effect on the economy of $100 million or more.

As required by OMB Circular A–4,[175] ATF has prepared an accounting statement showing the classification of expenditures associated with the final rule.

This rule sets forth standards for evaluating "stabilizing braces" in conjunction with how they modify a firearm. This rule clarifies the definition of "rifle" by providing that the term "designed or redesigned, made or remade and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows shouldering of the weapon, provided that other factors, as listed in the rule, indicate the weapon is designed, made,

and intended to be fired from the shoulder.

Not only will this rule impact how ATF evaluates new firearms with certain attached accessories, it will also affect ATF's evaluation of existing firearms with attached "stabilizing braces." Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule. Should individuals and FFLs be in possession of a firearm with an attached "stabilizing brace" such that the firearm constitutes a firearm under the NFA in addition to the GCA, the affected

persons or FFLs will need to choose one of the following options. The options as presented in the final RIA are:
• *Scenario 1:* Turn in the entire firearm with the attached "stabilizing brace" to ATF;
• *Scenario 2:* Destroy the whole firearm;
• *Scenario 3:* Convert the short-barreled rifle into a long-barreled rifle;
• *Scenario 4:* Apply to register the weapon under the NFA; or
• *Scenario 5:* Permanently remove and dispose of, or alter, the "stabilizing brace" from the firearm such that it cannot be reattached.

Table 1 provides the OMB Accounting Statement, which illustrates the primary, minimum, and maximum estimated costs and benefits of this rule.

TABLE 1—OMB ACCOUNTING STATEMENT

| Category | Primary estimate | Minimum estimate | Maximum estimate | Units | | | Notes |
| | | | | Dollar year | Disc (%) | Period covered (years) | |
|---|---|---|---|---|---|---|---|
| **Benefits** | | | | | | | |
| Annualized monetized benefits ($ Millions/year) .............. | N/A<br>N/A | N/A<br>N/A | N/A<br>N/A | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| Annualized quantified ......................................................... | N/A<br>N/A | N/A<br>N/A | N/A<br>N/A | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| Qualitative ........................................................................... | —To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>—To enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders. | | | | | | |
| **Costs** | | | | | | | |
| Annualized monetized costs ($ Millions/year) ..................... | $266.9<br>245.6 | $266.9<br>245.6 | $581.9<br>529.8 | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| Annualized quantified ......................................................... | N/A<br>N/A | N/A<br>N/A | N/A<br>N/A | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| Qualitative (unquantified) ................................................... | N/A. | | | | | | |
| **Transfers** | | | | | | | |
| Federal Annualized Monetized ($ Millions/year) ................. | N/A<br>N/A | N/A<br>N/A | N/A<br>N/A | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| From/To ............................................................................... | From: Individuals and FFLs. | | To: Federal Government. | | | | |
| Other Annualized monetized transfers ($ Million/year) .......... | N/A<br>N/A | N/A<br>N/A | N/A<br>N/A | 2021<br>2021 | 7<br>3 | 10<br>10 | |
| From/To ............................................................................... | From: N/A. | | To: N/A. | | | | |
| **Effects** | | | | | | | |
| State, local, and/or Tribal governments ................................ | The rule will not impose an intergovernmental mandate or have significant or unique effects on small governments, or have federalism or Tribal implications. | | | | | | |
| Small businesses ................................................................. | Approximately 4 manufacturers of "stabilizing braces" will be significantly affected by more than 10 percent of their revenue. May affect 13,210 Type 1 FFLs and 3,881 Type 7 FFLs. Type 1 FFLs may experience a range of costs from $243 to a cost of $2,919. Most will not incur a significant effect. Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell "stabilizing braces." | | | | | | |
| Wages ................................................................................. | N/A. | | | | | | |

---

[175] OMB, Circular A–4 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

TABLE 1—OMB ACCOUNTING STATEMENT—Continued

| Category | Primary estimate | Minimum estimate | Maximum estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|
| | | | | Dollar year | Disc (%) | Period covered (years) | |
| Growth ................................................ | N/A. | | | | | | |

Table 2 summarizes the affects that this rule would have on the industry and public.

TABLE 2—SUMMARY OF AFFECTED POPULATION, COSTS, AND BENEFITS

| Category | Affected populations, costs, and benefits |
|---|---|
| Affected Population ....................................... | • 5 Manufacturers of affected "stabilizing braces."<br>• 3,881 Manufacturers of short-barreled rifles that have a "stabilizing brace" attachment.<br>• 13,210 Dealers of short-barreled rifles that have a "stabilizing brace" attachment.<br>• 1.4 million firearm owners who have pistols with "stabilizing braces" attached and those who intend to purchase them in the future. |
| Societal Costs (annualized) ........................... | • $263.6 million at 7%.<br>• $242.4 million at 3%. |
| Government Costs (Annualized 7 Percent) ............... | • $3.3 million. |
| Unquantified Benefits .................................. | • To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>• To enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders. |

For details regarding the costs and benefits of this rule, please refer to the standalone final RIA on the docket.

Need for Federal Regulatory Action

One of the reasons the Department is issuing rule is that individuals and affected entities affix purported "stabilizing braces" to firearms to circumvent the requirements of the NFA, which requires registration and taxes to be paid on the making and transfer of NFA weapons. Congress chose to regulate these items more stringently, finding them to be especially dangerous to the community if not regulated since they are used for violence and criminal activity. *See Gonzalez,* 2011 WL 5288727, at *5 ("Congress specifically found that 'short-barreled rifles' are primarily weapons of war and have no appropriate sporting use or use for personal protection." (quoting S. Rep. No. 90–1501, at 28). Therefore, if persons can circumvent the NFA by effectively making unregistered "short-barreled rifles" by attaching an accessory such as a "stabilizing brace," these dangerous, easily concealed weapons could more easily proliferate and hence pose an increased public safety problem.

*B. Executive Order 13132*

This rule will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Although some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it require any State to change its laws. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*C. Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

*D. Regulatory Flexibility Act ("RFA")*

The RFA establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." Public

Law 96–354, sec. 2(b), 94 Stat. 1164, 1165 (1980).

Under the RFA, the agency is required to consider if this rule will have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule will have such an impact. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

Under the RFA (5 U.S.C. 604(a)), the FRFA must contain:

• A statement of the need for, and objectives of, the rule;

• A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule,

including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

• A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency that affect the impact on small entities was rejected.

ATF estimates that this final rule will have a significant impact on a substantial number of small businesses. Therefore, ATF has prepared a FRFA. For more details regarding the impacts to small businesses, please refer to the standalone RIA located on the docket.

*E. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is likely to have a significant economic impact on a substantial number of small entities under the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Public Law 104–121, title II, 110 Stat. 847, 857, 5 U.S.C. 601 *et seq.* Accordingly, the Department prepared an IRFA for the proposed rule and prepared a FRFA for the final rule. 5 U.S.C. 603–04. Furthermore, a small business compliance guide will be published as required by SBREFA.

*F. Congressional Review Act*

Pursuant to the legislation known as the Congressional Review Act, *see* Public Law 104–121, sec. 251, 110 Stat. 847, 868 (1996), 5 U.S.C. 801 *et seq.,* OMB's Office of Information and Regulatory Affairs has concluded that this rule satisfies the definition of 5 U.S.C. 804(2). This rule is projected to have an effect of over $100 million on the economy in at least one year of the final rule.

*G. Unfunded Mandates Reform Act of 1995 ("UMRA")*

This rule will not result in the expenditure by State, local, and Tribal governments, in the aggregate, of $100 million or more (adjusted for inflation) in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the UMRA, Public Law 104–4, 109 Stat. 48. However, based on the analysis presented in the RIA, the Department concludes that the rule would impose a Federal mandate on the private sector in excess of $100 million in expenditures in any one year. The RIA constitutes the written statement containing a qualitative and quantitative assessment of the anticipated costs, benefits, and alternatives required under section 202(a) of the UMRA. *See* 2 U.S.C. 1532.

*H. Paperwork Reduction Act of 1995*

This rule will call for collections of information under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. 3501–20. As defined in 5 CFR 1320.3(c), "collection of information" comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions. The estimate of the paperwork burden discussed in the RIA covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Under the provisions of this rule, there would be a one-time increase in paperwork burdens of NFA applications. This requirement would be added to an existing approved collection covered by OMB control numbers 1140–0011 and 1140–0012. For details regarding this collection of information, please refer to the standalone Executive Orders 12866 and 13563 on the docket.

Disclosure

Copies of the final rule, proposed rule, and comments received in response to the proposed rule will be available through the Federal eRulemaking portal, *www.regulations.gov* (search for RIN 1140–55), and for public inspection by appointment during normal business hours at: ATF Reading Room, Room 1E–063, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–8740

List of Subjects

*27 CFR Part 478*

Administrative practice and procedure, Arms and munitions, Exports, Freight, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

*27 CFR Part 479*

Administrative practice and procedure, Arms and munitions, Excise taxes, Exports, Imports, Military personnel, Penalties, Reporting and recordkeeping requirements, Seizures and forfeitures, and Transportation.

Authority and Issuance

For the reasons discussed in the preamble, 27 CFR parts 478 and 479 are amended as follows:

**PART 478—COMMERCE IN FIREARMS AND AMMUNITION**

■ 1. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 847, 921–931; 44 U.S.C. 3504(h).

■ 2. In § 478.11, amend the definition of "rifle" by adding paragraphs (1) and (2) to read as follows:

**§ 478.11  Meaning of terms.**

\*    \*    \*    \*    \*

*Rifle.* \* \* \*

(1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.

(2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:

(i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) The manufacturer's direct and indirect marketing and promotional

materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community.

\*     \*     \*     \*     \*

## PART 479—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

■ 3. The authority citation for 27 CFR part 479 continues to read as follows:

**Authority:** 26 U.S.C. 5812; 26 U.S.C. 5822; 26 U.S.C. 7801; 26 U.S.C. 7805

■ 4. In § 479.11, amend the definition of "rifle" by adding paragraphs (1) and (2) to read as follows:

### § 479.11   Meaning of terms.

\*     \*     \*     \*     \*

*Rifle.* \*  \*  \*

(1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.

(2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:

(i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community.

\*     \*     \*     \*     \*

Dated: January 13, 2023.

**Merrick B. Garland,**

*Attorney General.*

[FR Doc. 2023–01001 Filed 1–30–23; 8:45 am]

**BILLING CODE 4410–FY–P**