# EXHIBIT B



# Factoring Criteria for Firearms with Attached "Stabilizing Braces"

**27 CFR Parts 478 and 479**
**Docket No. 2021R-08F; AG Order No.     -**
**RIN 1140-AA55**
**Final Rulemaking**
*Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis*

**January 2023**

*Prepared by:*
Office of Regulatory Affairs
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Washington, D.C.

This page left intentionally blank

Table of Contents

Abbreviations...........................................................................................................8

Executive Summary.................................................................................................9

OMB A4 Accounting Statement..............................................................................12

1.      Introduction ...............................................................................................14

   1.1    Statutory Authority ..............................................................................16

   1.2    Need for Federal Regulatory Action .......................................................17

2.      Population...................................................................................................18

   2.1    Type 1 FFL dealers...............................................................................23

   2.2    Type 7 FFL manufacturer and "brace" manufacturer...............................24

   2.3    Individuals...........................................................................................25

   2.4    State and local governments..................................................................26

3.      Cost to Turn Firearms with Attached "Stabilizing Braces" in to ATF............28

   3.1    Population .............................................................................................30

   3.2    Costs ...................................................................................................31

4.      Destroy the Whole Firearm..........................................................................36

   4.1    Population .............................................................................................37

   4.2    Costs ...................................................................................................37

5.      Convert Firearm into Long-Barreled Rifle.....................................................39

   5.1    Population .............................................................................................39

   5.2    Costs ...................................................................................................43

6.      Apply to Register Under the NFA..................................................................46

   6.1    Population Under NFA ...........................................................................47

   6.2    Cost to Apply Under the NFA .................................................................48

7.      Cost to Permanently Remove and Dispose of or Alter a "Stabilizing Brace" such that it Cannot be Reattached and Forgone Future Sales...................................................55

   7.1    Population Under Permanent Removal or Alteration of "Stabilizing Brace"...............55

   7.2    Cost to Permanently Remove and Dispose of or Alter "Stabilizing Braces" Such that it Cannot Be Reattached ...........................................................................57

   7.3    Future Revenue of "Stabilizing Braces" Lost from Loss of Production.......................59

8.      Summary of the Overall Cost of the Rule ....................................................62

   8.1    Primary (low estimate) cost of the final rule...........................................62

   8.2    Transfers from Industry to Public ...........................................................63

8.3      Government Costs .................................................................................................... 63

8.4      Combined Private Societal and Government Costs .................................................... 65

8.5      High Cost of the Final Rule ...................................................................................... 66

9.       Benefits .................................................................................................................... 68

10.      Analysis of Alternatives Considered ........................................................................ 71

10.1     This Final Rule—Factoring Criteria for Firearms with Attached "Stabilizing Braces." 72

10.2     Alternative 1—No change alternative. ...................................................................... 72

10.3     Alternative 2—Specific quantifiable standards with set metrics. ............................. 72

10.4     Alternative 3—Grandfather all existing firearms with an attached "stabilizing brace." 73

10.5     Alternative 4—Guidance documents. ....................................................................... 73

10.6     Alternative 5—NPRM weighted criteria. .................................................................. 74

10.7     Alternative 6—No tax forbearance. .......................................................................... 74

11.      Final Regulatory Flexibility Act .............................................................................. 76

11.1     Findings ................................................................................................................... 76

11.1.1   "Stabilizing Brace" Manufacturers .......................................................................... 77

11.1.2   Destroy the Whole Firearm ...................................................................................... 78

11.1.3   Convert to Rifle ........................................................................................................ 78

11.1.4   Apply under NFA ...................................................................................................... 79

11.1.5   Accessories Retailers ............................................................................................... 80

11.1.6   Other entities ............................................................................................................ 80

11.2     Final Regulatory Flexibility Analysis ...................................................................... 81

11.2.1   A statement of the need for, and objectives of, the rule. ........................................... 82

11.2.2   A statement of the significant issues raised by the public comments in response to
the initial regulatory flexibility analysis, a statement of the assessment of the agency of such
issues, and a statement of any changes made to the proposed rule as a result of such
comments. .............................................................................................................................. 84

11.2.3    The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments. ................ 84

11.2.4    A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available. ................................... 85

11.2.5    A description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record .................................................................................... 85

11.2.6    A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected .. 86

12.    Collection of Information ........................................................................... 87
Appendix A Fingerprint Costs ............................................................................ 90
Appendix B Market Value of Firearms with Attached "Stabilizing Brace" .............................. 91
Appendix C States with Short-Barreled Rifle and Other Weapons Restrictions ........................ 93

# Table of Tables

Table ES–1  Summary of Affected Population, Costs, and Benefits.........................................10

Table 3–1  Leisure Wage Rate for Individuals .......................................................................32

Table 3–2  Retail Wages .........................................................................................................33

Table 3–3  Time and Miles Traveled to an ATF Office ..........................................................34

Table 4–1  Cost to Destroy a Firearm with Attached "Stabilizing Brace"..............................37

Table 5–1  Calculation to Determine the Number of "Stabilizing Braces" Held by Type 7 FFL

Manufacturers .......................................................................................................................41

Table 5–2  Wage Categories Used for Gunsmithing Activities ...............................................44

Table 6–1  Wage Categories used for Type 1 FFL Responsible Persons..................................51

Table 6–2  Wage Categories used for Type 7 FFL Responsible Persons..................................52

Table 7–1  Individuals and FFLs and Number of Firearms with "Stabilizing Braces" Affected

Across All Scenarios ..............................................................................................................56

Table 8–1  Societal Cost of Final Rule Per Scenario..............................................................62

Table 8–2  Private Societal 10-year cost of rule .....................................................................62

Table 8–3  Government 10-year cost of rule ...........................................................................65

Table 8–4  Combined Private Societal and Government 10-year cost of rule...........................65

Table 8–5  High Cost of Final Rule Per Scenario ...................................................................66

Table 8–6  High 10-year cost of rule ......................................................................................67

Table 10–1  Summary of Cost and Benefits of the Alternatives...............................................71

Table 11–1  Size Distribution of Affected Entities .................................................................76

Table 11–2  Top Seven Industries Affected by This Rule ........................................................77

Table 11–3  Economic Impact of "Stabilizing Brace" Manufacturers......................................77

Table 11–4  Percent Impact to Destroy the Whole Firearm......................................................78

Table 11–5  Percent Impact to Convert Firearm with "Brace" into Long-Barreled Firearm.......79

Table 11–6  Percent Impact for FFLs Applying Under NFA.....................................................79

Table 11–7  Estimated  Number of Small Entities Affected by this Rule.................................85

# Abbreviations

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| BLS | Bureau of Labor Statistics |
| CFR | Code of Federal Regulations |
| DOT | Department of Transportation |
| FATD | Firearms and Ammunition Technology Division |
| FFL | Federal Firearms License |
| FRFA | Final Regulatory Flexibility Analysis |
| GCA | Gun Control Act |
| IRFA | Initial Regulatory Flexibility Analysis |
| NAICS | North American Industry Classification System |
| NFA | National Firearms Act |
| NPRM | Notice of Proposed Rulemaking |
| OMB | Office of Management and Budget |
| RFA | Regulatory Flexibility Act |
| RIA | Regulatory Impact Analysis |
| § | Section symbol |
| SBA | Small Business Administration |
| SOT | Special Occupational Tax |
| U.S. | United States |
| U.S.C. | United States Code |

# Executive Summary

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic benefits, environmental benefits, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget ("OMB") has reviewed this final rule and determined that this rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866 because, as discussed, the final rule will have an annual effect on the economy of $100 million or more.

This final Regulatory Impact Analysis ("RIA") provides supporting documentation for the regulatory evaluation in the preamble of the final rule for the Factoring Criteria for Firearms with Attached "Stabilizing Braces" [2021R-08].

This rule sets forth standards for evaluating "stabilizing braces" in conjunction with how they modify a firearm. This rule clarifies the definition of "rifle" by providing that the term "designed or redesigned, made or remade and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows shouldering of the weapon, provided other factors, as described in the final rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder.

Not only will this rule impact how new firearms with certain firearm attachments (or accessories) are to be evaluated, it will also affect existing firearms with attached "stabilizing braces."  Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule.  Should individuals and Federal firearms licensees ("FFLs") be in possession of a firearm with an attached "stabilizing brace" that constitutes a short-barreled rifle under the National Firearms Act of 1934 ("NFA") and the Gun Control Act of 1968 ("GCA"), the affected persons or FFLs will need to choose one of the following options.  The options as presented in the final RIA are:

- Turn in the entire firearm with the attached "stabilizing brace" to ATF;

- Destroy the whole firearm;

- Convert the firearm into a long-barreled rifle;

- Apply to register under the NFA; or

- Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached.

Table ES–1 summarizes the affects that this final rule will have on the industry and public.

Table ES–1  Summary of Affected Population, Costs, and Benefits

| Category | Affected Populations, Costs, and Benefits |
|---|---|
| Affected Population | <ul><li>5 Manufacturers of affected "stabilizing braces"</li><li>3,881 Manufacturers of short-barreled rifles that have a "stabilizing brace" attachment</li></ul> |

| | |
|---|---|
| | • 13,210 Dealers of short-barreled rifles that have a "stabilizing brace" attachment<br>• 1.4 million firearm owners who have pistols with "stabilizing braces" attached and those who intend to purchase them in the future |
| Societal Costs (Annualized) | • $263.6 million at 7%<br>• $242.4 million at 3% |
| Government Costs (Annualized 7 percent) | • $3.3 million |
| Unquantified Benefits | • To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>• To enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders. |

# OMB A4 Accounting Statement

OMB has determined that this is an "economically significant" rule within the definition of Executive Order ("EO") 12866 because estimated annual costs or benefits exceed $100 million in any year. As required by OMB Circular A-4 (available at http://www.whitehouse.gov), ATF has prepared an accounting statement showing the classification of expenditures associated with the final rule.

Agency/Program Office: ATF
Rule Title: Factoring Criteria for Firearms with Attached "Stabilizing Braces"
RIN#: 1140-AA55
Date: January 2023

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|
| | | | | Dollar Year | Disc | Period Covered | |
| **Benefits** | | | | | | | |
| Annualized monetized benefits ($ Millions/year) | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| Annualized quantified | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| Qualitative | - To prevent manufacturers and individuals from circumventing the requirements of the NFA. - To enhance public safety by reducing the criminal use of firearms that are easily concealable from the public and first responders. | | | | | | |
| **Costs** | | | | | | | |
| Annualized monetized costs ($ Millions/year) | $266.9 | $266.9 | $581.9 | 2021 | 7% | 10 years | |
| | $245.6 | $245.6 | $529.8 | 2021 | 3% | 10 years | |
| | N/A | N/A | N/A | 2021 | 7% | 10 years | |

12

| | | | | | | |
|---|---|---|---|---|---|---|
| Annualized quantified | N/A | N/A | N/A | 2021 | 3% | 10 years |
| Qualitative (unquantified) | N/A | | | | | |
| **Transfers** | | | | | | |
| Federal Annualized Monetized ($ Millions/year) | N/A | N/A | N/A | 2021 | 7% | 10 years |
| | | N/A | N/A | 2021 | 3% | 10 years |
| From/To | From: Individuals and FFLs | | | To: Federal Government | | |
| Other Annualized monetized transfers ($ Million/year) | N/A | N/A | N/A | 2021 | 7% | 10 years |
| | | N/A | N/A | 2021 | 3% | 10 years |
| From/To | From: N/A | | | To: N/A | | |
| **Effects** | | | | | | |
| State, local, and/or Tribal governments | The rule will not impose an intergovernmental mandate or have significant or unique effects on small governments, or have federalism or Tribal implications | | | | | |
| Small businesses | Approximately 4 manufacturers of "stabilizing braces" will be significantly affected by more than 10 percent of their revenue. May affect 13,210 Type 1 FFL dealers and 3,881 Type 7 FFL manufacturers. Type 1 FFLs may experience a range of costs from $243 to $2,919. Most will not incur a significant effect. Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell firearms with attached "stabilizing braces" | | | | | |
| Wages | N/A | | | | | |
| Growth | N/A | | | | | |

13

# 1. Introduction

This analysis provides an assessment of the impacts to society and government from final changes detailed in the rule on Factoring Criteria for Firearms with Attached "Stabilizing Braces."  The RIA does not attempt to precisely replicate the regulatory language of the final rule; the regulatory text, not the text of this analysis, is legally binding.

In 2012, a company developed an "stabilizing brace," asserting that their device would help persons with disabilities or limited arm strength or mobility to fire heavy pistols[1] with a single hand.  ATF examined the submitted "brace" device itself and found the sample "stabilizing brace" "provide[d] the shooter with additional support of a firearm while it is still operated with one hand" and that the device was not "designed or intended to fire a weapon from the shoulder."

In recent years, there has been an increase in the production of firearms with attached "stabilizing braces" that possess objective design characteristics that are indicative of firearms designed and intended to be fired from the shoulder (*i.e.*, rifles).[2]  Many of these firearms with attached "stabilizing braces" fall under the purview of the NFA because the firearm has a barrel or barrels of less than 16 inches in length.  Individuals who attach a "stabilizing brace" to their firearm could find themselves making an NFA firearm without abiding by the registration and taxation requirements of the NFA.  Additionally, ATF has made clear that "stabilizing brace"

---

[1] For purposes of this rule and discussion, ATF generally refers to the type of firearms that are typically equipped with a "stabilizing brace" as heavy pistols based on the manufacturer's stated intent.  The use of the term "pistol" in this rule should not be interpreted as an official classification from ATF that any of these firearms are "pistols" under Federal law.  The Department recognizes that, under the final rule titled "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (Apr. 26, 222), these firearms incorporate a rifle receiver (*e.g.*, AR-15 receiver).

[2] The rule makes clear that weapons with an attached "stabilizing brace" that have a barrel of less than 16 inches or an overall length of less than 26 inches are short-barreled rifles under the NFA if their objective design features and other evidence indicate the firearm is designed, made, and intended to be fired from the shoulder.

devices may not be used as an attempt to circumvent the NFA; however, companies continued to manufacture, market, and sell "stabilizing braces" as "stocks" that could be used to circumvent the NFA.

This rule sets forth standards for evaluating "stabilizing braces" in conjunction with how they modify a firearm. This rule clarifies the definition of "rifle" by providing that the term "designed or redesigned, made or remade and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows shouldering of the weapon, provided that other factors, as listed in the final rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder.

This rule will impact both how ATF evaluates new firearms with certain attached firearm accessories and how ATF evaluates existing firearms with attached "stabilizing braces." Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule. If a firearm with an attached "stabilizing brace" contains the objective design features that indicate (or if there are marketing materials or other information from the general community that indicate) that it is intended to be fired from the shoulder and the firearm has a barrel length of less than 16 inches, then it is a short-barreled rifle under the NFA and must be registered in the National Firearms Registration and Transfer Record ("NFRTR"). Thus, not only will this rule impact how new firearms with certain attachments or accessories are evaluated, it will also affect existing firearms with attached "stabilizing braces." Should individuals or FFLs be in possession of a firearm with an attached "stabilizing brace" such that

the firearm constitutes a short-barreled rifle under the NFA and the GCA, affected persons or FFLs would need to choose one of the following options:

- Turn the entire firearm with an attached "stabilizing brace" into ATF;

- Destroy the whole firearm;

- Convert the firearm into a long-barreled rifle;

- Apply to register under the NFA; or

- Permanently remove and dispose of, or alter, the "stabilizing brace" from the firearm such that it cannot be reattached.

## 1.1   Statutory Authority

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.[3]  Congress has included provisions in these statutes that authorize the Attorney General to promulgate regulations as are necessary to enforce the provisions of the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A)(ii), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972).  Accordingly, the Department of Justice ("Department") and ATF have promulgated regulations to implement the GCA and NFA. *See* 27 CFR parts 478, 479.  "Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion

---

[3] NFA provisions still refer to the "Secretary of the Treasury." However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General.  26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1).  Thus, for ease of reference, this notice refers to the Attorney General throughout.

to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475,

479 (4th Cir. 1990).  And courts have long recognized that regulatory agencies do not establish

rules to last forever.  "They are neither required nor supposed to regulate the present and the

future within the inflexible limits of yesterday."  *Am. Trucking Ass'n* v. *Atchison, Topeka, and*

*Santa Fe Ry. Co*, 387 U.S. 397, 416 (1967).  For more details regarding the statutory authority of

ATF, please refer to section IV.B.1.a in the final rule.

## 1.2   Need for Federal Regulatory Action

One of the reasons the Department is issuing rule is that individuals and affected entities

affix purported "stabilizing braces" to firearms to circumvent the requirements of the NFA,

which requires registration and taxes to be paid on the making and transfer of NFA weapons.

Congress chose to regulate these items more stringently, finding them to be especially dangerous

to the community if not regulated since they are used for violence and criminal activity.  *See*

*United States v. Gonzalez*, No. 2:10-cr-00967, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011)

("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have

no appropriate sporting use or use for personal protection." (quoting S. Rep. No. 90-1501, at 28

(1968))).  Therefore, if persons can circumvent the NFA by effectively making unregistered

"short-barreled rifles" by attaching an accessory such as a "stabilizing brace," these dangerous,

easily concealed weapons could more easily proliferate and hence pose an increased public

safety problem.

# 2. Population

This rule does not regulate "stabilizing brace" devices themselves, and individuals may retain possession of them.  The rule also does not ban the use of "stabilizing brace" devices on firearms.  However, this final rule amends the definition of "rifle" under 27 CFR 478.11 and 479.11 to clarify that the definition of "rifle" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in the amended regulations, indicate that the weapon is designed, made, and intended to be fired from the shoulder.  As a result, for those firearms with an attached "stabilizing brace" that constitute NFA weapons, ATF anticipates that future sales of those "braces" or firearms with an attached "stabilizing brace" would diminish significantly, if not completely.

This rule would affect both future and past retail purchases of "stabilizing braces" and firearms with attached "stabilizing braces."  Based on anecdotal evidence from the manufacturers of "stabilizing braces," the manufacturers have sold between 3 million and 7 million "stabilizing brace" devices between the years 2013 to 2020.  Subject matter experts estimate that the manufacturers likely inflated their sales estimates in recent years, and therefore ATF estimates the number of "stabilizing braces" sold to be 3 million, rather than the midpoint of 5 million or the high end of 7 million.  This estimate is based on the number of firearms with a "stabilizing brace" in circulation, as described below.  Nonetheless, ATF has also calculated the anticipated costs of this rule using an estimate of 7 million "stabilizing braces" to account for uncertainty regarding the full cost of the rule.

Commenters stated that a recently published Congressional Research Service ("CRS") report had an estimate suggesting there may be between 10 and 40 million "braces," with some

arguing that the number of "braces" and pistol-"brace" combinations would be "upwards of 40,000,000."[4]  One commenter implied that, if ATF were to use the 3 to 7 million range, then the midpoint (5 million) should be the number ATF uses.  Furthermore, public comments have pointed out that ATF assumed that the entire estimated number of "stabilizing braces" were assumed to have been deemed a "stock" and that ATF did not take into account any firearms with attached "stabilizing brace" that, when attached to a weapon, did not create a weapon designed, made, and intended to be fired from the shoulder.

To determine whether the CRS estimate was suitable for purposes of ATF's RIA, ATF compared CRS's figures against those provided in the report on *Firearms Commerce in the United States: Annual Statistical Update 2021*.[5]  This report provides an estimate of the number of firearms (including pistols, revolvers, rifles, shotguns, and miscellaneous firearms) manufactured in the United States, as reported by manufacturers.  According to the report, ATF estimates that a total of 65.1 million firearms, with just under 27 million pistols, were manufactured in the United States between 2013 and 2019.[6]  Although the most recent report is not yet final, ATF estimates that 12 million firearms were manufactured in 2020.[7]  Therefore, ATF now estimates that, between 2013 to 2020, a total of 77.1 million firearms, of which 32.4 million pistols, were manufactured in the United States.

If there was a population of 10 to 40 million "stabilizing braces," similar components, or "stabilizing braces attached to firearms," as suggested by CRS, this range would be too high:

---

[4] William J. Krouse, Congressional Research Service, Handguns, Stabilizing Braces, and Related Components (updated Apr. 19, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11763.

[5] ATF, Firearms Commerce in the United States: Annual Statistical Update 2021, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

[6] *See id.* at 2.

[7] ATF Office of Strategic Intelligence and Information ("OSII").

Using the upper end of the range would mean there are at least as many "brace" devices or firearms with an attached "brace" device as there are pistols that were manufactured in the U.S. between 2013 to 2020 (*i.e.*, 32.4 million pistols).  And even at the low end of the CRS estimate, it would mean nearly a third of the pistols manufactured between 2013 to 2020 are equipped with a "stabilizing brace."  Because "stabilizing braces" are only used on a subset of pistols, not on all pistols, and because not all pistols manufactured are pistols equipped with a "stabilizing brace"[8] or a type of pistol for which a person would attach a "stabilizing brace," ATF's subject matter experts concluded that using the CRS estimate was not appropriate for this analysis.  Further, ATF notes that the CRS report did not provide a source or methodology for how it obtained its estimate of 10 to 40 million.  Moreover, anecdotal commentary specifically from industry, information gleaned from ATF field offices throughout the United States, and the conclusions of internal subject matter experts all indicate that—based on the number of pistols manufactured during the same time period and the popularity of the "brace" devices over the years— manufacturers may have inflated their sales estimates in recent years.

ATF also is choosing not to use the 5 million estimate suggested by Sig Sauer.  Based on the historical number of pistols produced, an estimate of 5 million would suggest that there was just under 1 firearm with a "stabilizing brace" produced for every 6 pistols (or approximately 16 percent of all pistols).  Additionally, based on information gleaned from field offices throughout ATF, ATF estimates that only a subset of FFLs sold firearms with a "stabilizing brace" and, of those that sold them, the FFLs may carry in their inventory on average only 7 firearms with an

---

[8] Note that this estimate is based on the assumption that a "stabilizing brace" device is designed for use on pistols as claimed by "brace" manufacturers

attached "stabilizing brace" for their entire inventory of firearms.[9]  This survey as described in

footnote 10 indicates that a ratio of 1 firearm with a "stabilizing brace" produced for every 6

pistols  would still be too high.  ATF thus concluded that, based on its experience, an estimate of

5 million was too high.  ATF also considers that choosing to use 3 million rather than 5 million is

reasonable because "stabilizing braces" did not become more popular until recent years, and

hence manufacturers likely did not have sufficient time to produce numbers in the range of the

higher estimates suggested by commenters or CRS and as discussed in the paragraphs above.

ATF estimates there may be "stabilizing braces," including some that may have been

purchased by persons with disabilities, that will not be affected by the rule.  Therefore, based on

anecdotal estimates from the Firearms and Ammunition Technology Division ("FATD") that

there may be approximately 1 percent of "stabilizing braces" that, when attached to the firearm,

would not result in a firearm that is designed and intended to be fired from the shoulder, ATF

modified the estimated number of firearms with a "stabilizing brace" from a total of 3 million to

2,970,000.

In 2012, ATF received its first submission of a "stabilizing brace" to determine if it

changed the classification of a "pistol."  Since then, "stabilizing braces" have been modified and

sold in such a way that, when they are affixed to certain weapons, these firearms constitute an

NFA firearm, *i.e.*, a short-barreled rifle.  Dividing the estimated number of firearms with

"stabilizing braces" (2,970,000 to 6,930,000 "braces") by 8 years, ATF estimates that the future

---

[9] Based on an informal survey of ATF's 25 field divisions, 11 of the field divisions provided an estimated number of FFLs dealing in firearms with an attached "stabilizing brace," along with an estimated number of affected firearms per FFL.  Based on the responses, ATF estimated that approximately 10,420 FFLs from the 11 field divisions deal in firearms with attached "brace" devices and, of these FFLs, they may have carried between 1 to 52 firearms with an attached "stabilizing brace," with the majority of FFLs having under 20 such firearms in their inventory.  Therefore, for the purposes of the final RIA, ATF used the NPRM estimate of 25 percent of FFLs dealing in firearms with attached "stabilizing braces" and used the survey average of 7 firearms for inventory, which is higher than the 3 used in the NPRM.

number of firearms with "stabilizing braces" would range from 371,250 to 866,250 per year.

Because ATF is here considering the estimated population of firearms with "stabilizing braces"

to be 2,970,000, the annual number relevant here is 371,250.   However, ATF will also undertake

future enforcement actions regardless of the publication of the rule.   ATF estimates that these

enforcement actions will reduce the future number of firearms with "stabilizing braces" by an

amount equal to the number of firearms with "stabilizing braces" sold through FFLs (124,192

from Type 7 FFL manufacturers and 92,470 from Type 1 FFL dealers), making the estimated

future number of firearms with "stabilizing braces" affected by this rule 154,588.

Overall, ATF anticipates that this rule would affect (1) the manufacturers of these

"stabilizing braces"; (2) Type 1 FFL dealers who sell either "stabilizing braces" or the completed

firearm with an attached "stabilizing brace;" (3) Type 7 FFL manufacturers who attach these

"stabilizing braces" to their firearms and sell them as a completed firearm with a "stabilizing

brace"; and (4) individuals who have either purchased these "stabilizing braces" and attached

them to existing firearms or have purchased a firearm with an attached "stabilizing brace."

Based on estimates from FATD, ATF estimates that 25 percent of Type 1 and Type 7

FFLs would be affected by this rule.   Based on ATF licensing numbers, there are 52,840 Type 1

FFL dealers, of which 13,210 may be affected.   Based on the same licensing numbers, there are

15,524 Type 7 FFL manufacturers, of which 3,881 may be affected.   No comments were

received regarding the number of affected FFLs; therefore, these numbers remain the same as

stated in the notice of proposed rulemaking ("NPRM").   *See* Factoring Criteria for Firearms With

Attached "Stabilizing Braces", 86 FR 30826, 30840 (June 10, 2021).

2.1   Type 1 FFL dealers

This rule would affect dealers who sell either "stabilizing brace" devices or firearms equipped with a "stabilizing brace" that are subject to regulation under the NFA.  Based on ATF licensing numbers, there are 52,840 Type 1 FFL dealers; however, ATF anticipates that not all FFLs sell firearms equipped with a "stabilizing brace" or sell "stabilizing braces" as a firearms accessory.  Because "stabilizing braces" are not themselves regulated under the GCA or NFA, ATF does not know exactly the number of FFLs that deal in these items.  Therefore, for the purposes of this analysis, ATF estimates that 25 percent, or 13,210, of Type 1 FFL dealers may deal in "stabilizing braces" or firearms with an attached "stabilizing brace."  This percentage was based on an estimate from FATD and was presented in the Initial Regulatory Impact Analysis during the NPRM, and no comments were received regarding this percentage.  Therefore, ATF retained this estimate as the best available information gathered regarding the population of FFLs dealing in these items.

Based on information gleaned from the disposal of bump-stock-type devices, which was an option under Final Rule 2018R-22F, ATF estimated in the NPRM that FFLs may have in inventory an average of 3 firearms.  *See, e.g.*, 86 FR at 30846.  However, because there are more firearms with an attached "stabilizing brace" than there were bump-stock-type devices, ATF uses for purposes of this analysis a different methodology to estimate the number of firearms with "stabilizing braces" that an FFL may have in inventory.  Based on a survey of field offices throughout ATF, ATF for this final rule estimates that a Type 1 FFL may carry in its inventory approximately 7 firearms with an attached "stabilizing brace."

2.2   Type 7 FFL manufacturer and "brace" manufacturer

The rule would affect Type 7 FFL manufacturers that purchased "stabilizing braces" and attached them to firearms, thereby manufacturing (and subsequently transferring) firearms equipped with "stabilizing braces" that may constitute short-barreled rifles. Based on ATF licensing numbers, there are 15,524 Type 7 FFL manufacturers. However, not all Type 7 FFL manufacturers manufacture and sell firearms with an attached "stabilizing brace." For the purposes of this analysis, ATF estimates that 25 percent, or 3,881, Type 7 FFL manufacturers may have been manufacturing and selling complete firearms equipped with a "stabilizing brace." There is a subcategory of Type 7 FFL manufacturers that have paid a special (occupational) tax ("SOT"). Based on ATF licensing numbers, of the total number of Type 7 FFLs, there are 7,057 Type 7 FFLs with an SOT. We estimate 25 percent of them (1,764) may have been manufacturing firearms equipped with "stabilizing braces" subject to the NFA. Therefore, for the purposes of this analysis, the estimated 3,881 Type 7 FFL manufacturers affected by this rule consist of 2,117 Type 7 FFLs without an SOT and 1,764 Type 7 FFLs with an SOT.

As described in more detail below, Type 7 FFL manufacturers without an SOT may use ATF's eForms system to complete an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1"), for each and every firearm affected by this rule that they currently have in their inventory; upon their doing so, the Department will forbear the NFA making tax typically due upon submission of a Form 1.

While this topic is primarily discussed in the Final Regulatory Flexibility Analysis ("FRFA") chapter of the RIA, this rule would indirectly and significantly affect "brace" manufacturers. "Brace" manufacturers are companies that manufacture "stabilizing braces." Based on an Internet search, ATF estimates that there are at least five manufacturers of

"stabilizing braces."  ATF anticipates that, if many currently available firearms with attached

"stabilizing braces" are considered short-barreled rifles under the NFA as a result of the rule,

then the demand for these items would be significantly affected.  Because "stabilizing brace"

devices alone will continue to be an unregulated product, these "brace" manufacturers may

continue to sell firearm accessories, but four may lose their business activities altogether due to

this rule's impact on demand.  The remaining business—in addition to "braces"—also

manufactures other firearm accessories; thus, although this business may incur a significant loss

of revenue, it may be able to remain in business.

## 2.3   Individuals

This rule would affect all individuals who currently own a firearm with an attached

"stabilizing brace" that is subject to regulation under the NFA, as well as individuals who intend

to purchase a firearm and attach a "stabilizing brace" to the firearm that would be subject to NFA

regulations.  Based on information gleaned from the disposal of bump-stock-type devices, which

was an option under Final Rule 2018R-22F,[10]  ATF estimates that individual owners may own

between 1 and 63 firearms.[11]  However, the mean ownership is approximately 2, which ATF

uses for purposes of this analysis.  Because there may be approximately 3 million firearms with

---

[10] 83 FR 66514 (Dec. 26, 2018) (effective date March 26, 2019).  ATF notes that there is a difference between bump-stock-type devices and firearms with an attached "stabilizing brace" because the bump-stock-type devices themselves are regulated under the GCA and NFA.  Specifically, bump-stock-type devices are machineguns as defined by the GCA and NFA.  Unlike "stabilizing braces," bump-stock-type devices cannot be possessed by individuals under Federal law and therefore must be destroyed or turned into ATF.  *See* 18 U.S.C. 922(o).  However, ATF still uses the bump-stock-type device number to estimate the number of firearms with an attached "stabilizing brace" that individuals may possess because both bump-stock-type devices and "braces" are seen by many individuals as ways to circumvent the restrictions of the NFA and generally appeal to the same population of firearms owners.

[11] ATF anticipates that the demand for firearms with an attached "stabilizing brace" would have been similar to the demand for bump-stock-type devices since the demand for both items stems from the desire to circumvent the NFA.  Therefore, the information obtained from the disposal of bump stocks was used as a source of information for "stabilizing braces."

an attached "stabilizing brace" currently in circulation, ATF uses 1.4 million individuals.[12]  For more details on how 1.4 million individuals were derived from 3 million firearms with attached "stabilizing braces," please refer to chapter 7 of this RIA.

ATF received estimates from commenters that the number of individuals is equal to the number of firearms with "stabilizing braces" in circulation.  ATF disagrees with this assessment. The Pew Research Center states that, of people who own firearms, two-thirds own multiple firearms.[13]  And, as evidenced by the number of bump-stock-type devices turned in as a result of the bump-stock rule, individuals can and are likely to purchase more than one firearm or, in this case, more than one "stabilizing brace" or firearm with an attached "stabilizing brace."  After publication of the Bump-Stock-Type Device final rule in December 2018, individual owners turned in between 1 and 63 bump-stock-type devices.  Overall, ATF found that people turned into ATF an average of 2 bump-stock-type devices.  Individuals in possession of a firearm with an attached "stabilizing brace" device may have acquired a firearm configured with a "brace" device or may have attached a "brace" device to a pistol.  Therefore, ATF estimates that the number of individuals in possession of a firearm with an attached "stabilizing brace" that are affected by this rule is lower than the number of firearms equipped with a "stabilizing brace" currently in circulation.

## 2.4    State and local governments

Although some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it

---

[12] 1,376,699 individuals affected = (2,970,000 firearms with attached "stabilizing brace" - (13,210 Type 1 FFL Dealers * 7 firearms with attached "stabilizing brace") – (3,881 Type 7 FFL Manufacturers * 32 firearms with attached "stabilizing brace")) / 2 firearms with attached "stabilizing brace" per individual.

[13]  The Demographics of Gun Ownership, Pew Research Center (June 22, 2017), https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/.

require any State to change its laws.  Should a State or a political subdivision of a State (for example, a local police department) possess unregistered firearms equipped with "stabilizing braces" that constitute unregistered short-barreled rifles under the NFA, these firearms must be registered in the NFRTR.  ATF estimates that this rule will not affect many States or political subdivisions.

## 3. Cost to Turn Firearms with Attached "Stabilizing Braces" in to ATF

As stated before, there are five means of complying with Federal law after this rule is published. One way of complying is to allow individuals and FFLs to turn in firearms with attached "stabilizing brace" devices that are subject to the NFA to ATF. Turning in the firearm to ATF will mean that the individual or FFL will need to turn in the whole firearm, *i.e.*, the firearm with the attached "stabilizing brace," to ATF.

Public comments suggested that the loss of the firearm should be included in the analysis. ATF concurs that there may be a small number of individuals or FFLs that choose to turn in their whole firearm to ATF. These may include individuals who imported pistols and who may end up losing the value of their firearm if the firearm is a semi-automatic rifle. This is due to the restriction of 18 U.S.C. 922(r), which makes it unlawful for any person to assemble from imported parts any semiautomatic rifle which is identical to any rifle that is prohibited from importation because it is non-sporting. *See* 18 U.S.C. 925(d)(3), 27 CFR 478.39. It may also include individuals and FFLs whose States generally restrict the possession of short-barreled rifles or other weapons based on the characteristics of certain rifles (commonly referred to as "assault weapon" restrictions under State law[14]) so that individuals can generally not possess their firearm except under limited circumstances. [15]

---

[14] There is no definition of "assault weapon" under Federal law, but for purposes of this analysis ATF will refer to these restrictions on weapons with certain features as being restrictions on "assault weapons." This is neither an adoption or affirmation of the definition of "assault weapon" from any State, but only an effort to categorize these States' feature-based restrictions for purposes of this analysis.

[15] ATF notes in these States there may be limited exceptions for individuals to continue to possess short-barreled rifles or rifles with specific characteristics that are generally prohibited from possession under State law. Additionally, ATF is aware that individuals may also modify their firearm to fall within the confines of State law in certain circumstances, but ATF is unable to account for every variable and feature-based restriction under each State law. Finally, commenters concerned about the application of State law seemed to assume at times that the Federal

ATF estimates the population under this scenario to be similar in proportion to the number of individuals and FFLs who turned in bump-stock-type devices during the implementation of the rule 1140-AA52 Bump-Stock-Type Devices,[16] as well as percentages derived from the populations of States that have general restrictions on the possession of both short-barreled rifles and "assault weapons" restrictions.  The population derived from the number of individuals and FFLs who turned in bump-stock-type devices would serve as a proxy for individuals and FFLs who would turn in firearms with "stabilizing arm braces" voluntarily and those who may decide that their firearm does not conform with 18 U.S.C 922(r), as implied by the commenter regarding compliance with 18 U.S.C. 922(r).[17]

ATF's review of State laws found there are eight States that generally restrict, with limited exception, the possession of both short-barreled rifles and "assault weapons." Specifically, a rifle may include specific characteristics that would bring it within the State's weapons restrictions based on its objective design characteristics regardless of whether the barrel is greater than 16 inches.  Based on this information, ATF assumes that individuals residing

---

definition of "rifle," as clarified in this rule, would change the way in which State laws are applied to their firearms. This is not necessarily the case. Even when a State law uses the same word—such as "rifle"—as does Federal law, the States' specific definitions and interpretations of the words in their statutes may differ from Federal definitions and Federal interpretations of Federal law.  *Cf. Molina v. I.N.S.*, 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.) (observing that nothing "prevent[s] federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state").  Hence, this rule may have no effect on how States determine what sort of weapons are "rifles" for purposes of State law.  Nonetheless, the Department acknowledges the concerns raised by commenters, and, in order to ensure a comprehensive consideration of the possible effects of this rule, the Department has accounted for commenters' concerns in this regulatory analysis.

[16] 83 FR 66514.

[17] As stated in the final rule, the Department disagrees that there will be financial implications resulting from the removal and replacement of imported parts for owners who imported pistols and added a "stabilizing brace."  The commenter incorrectly interprets 18 U.S.C. 922(r) as requiring the removal and replacement of imported parts to comply with section 922(r). Section 922(r) generally makes it unlawful "for any person to assemble from imported parts any semiautomatic rifle," and 27 CFR 478.39 provides that a person may not assemble a semiautomatic rifle using more than 10 of the imported parts listed in the regulation. The criminal violation under section 922(r) is for the assembly of the semi-automatic rifle; therefore, modification of this kind of firearm through the removal of the relevant parts would not cure the 922(r) violation because the violation occurred at the time of the initial assembly.

within these States would not be able to own a firearm with an attached "stabilizing brace" because it would constitute a short-barreled rifle.  Furthermore, they would not be able to convert the firearm into a long-barreled rifle because the State may consider the converted rifle an "assault weapon."  For more details regarding these States and the number and percentages of individuals and Type 1 FFL dealers by State, please refer to appendix C.

## 3.1   Population

Based on information gleaned from individuals and FFLs who turned in bump-stock-type devices, ATF estimates that individuals may have an average of 2 firearms with an attached "stabilizing brace."  Based on a survey of field offices throughout ATF, ATF estimates that an FFL may have approximately 7 firearms with an attached "stabilizing brace."  For more detailed information about individuals and Type 1 FFL dealers, please refer to chapter 2.

Overall, under the bump-stock-type devices rule, individuals turned in 0.105 percent of the total number of bump-stock-type devices that were estimated to be in circulation, and FFLs turned in 0.0065 percent of the total number of bump-stock-type devices.[18,19]  Furthermore, 26.546 percent of individuals living in the U.S. reside in States that restrict possession of both short-barreled rifles and "assault weapons."  For purposes of this analysis, ATF divided the proportion of individuals living in States that have general restrictions on short-barreled rifles and "assault weapons" evenly (13.385 percent) between this scenario to turn in firearms with an attached "stabilizing brace" and destroying the whole firearm (chapter 4).[20]  Similarly, ATF estimates that 10.06 percent of Type 1 FFL dealers are located in these same States with prohibitions on both short-barreled rifles and "assault weapons," which, for purposes of this

---

[18] 0.105 percent = (546 bump-stock-type devices turned into ATF / 520,000 bump-stock-type devices in total).

[19] 0.0065 percent = (34 bump-stock-type devices turned into ATF / 520,000 bump-stock-type devices in total).

[20] 13.385 percent = 26.55 percent ÷ 2 scenarios used for compliance.

analysis, are divided evenly (5.03 percent) between this scenario and destroying the whole firearm (chapter 4).[21]  Combining these percentages, ATF estimates that 13.385 percent of individuals and 5.04 percent of Type 1 FFL dealers may end up choosing to turn in to ATF the whole firearm with an attached "stabilizing brace" that is subject to the NFA regulations.[22, 23]

Using these percentages, ATF anticipates that approximately 184,267 individuals may turn in an estimated 368,534 firearms with an attached "stabilizing brace" and approximately 665 FFLs may turn in an estimated 4,655 firearms with an attached "stabilizing brace."[24, 25, 26, 27]

## 3.2   Costs

In the NPRM, ATF did not estimate anyone undertaking this scenario, and most comments also indicated that affected persons would not choose this scenario.  However, other comments suggested incorporating a low percentage of individuals falling under this scenario.  ATF concurs because there were a small number of individuals and FFLs who turned in bump-stock-type devices and there may be individuals who choose this route due to their State's restrictions.  ATF did not use the suggested percentages as provided by one commenter; rather, ATF used percentages based on people and FFLs turning in bump-stock-type devices to ATF and on information regarding States that have general restrictions on short-barreled rifles and "assault weapons."  Furthermore, in light of comments received regarding wages when ATF published

---

[21] 5.0365 percent = 10.06 percent ÷ 2 scenarios used for compliance.

[22] 13.385 combined percent individuals = 0.105 percent estimated from bump-stock-type devices turned in + 13.28 percent residing in States with both NFA weapons and "assault weapon" restrictions.

[23] 5.0365 combined percent FFLs = 0.0065 percent estimated from bump-stock-type devices turned in + 5.03 percent FFLs located in States with both NFA weapons and "assault weapon" restrictions.

[24] 184,267 individuals = 1,376,669 individuals * 13.385 percent individuals.

[25] 368,534 firearms with attached "stabilizing brace" = 184,267 individuals * 2 firearms per individual.

[26] 665 Type 1 FFL dealers = 13,210 affected Type 1 FFL dealers * 5.0365 percent.

[27] 4,655 firearms with attached "stabilizing brace" = 665 Type 1 FFL dealers * 7 firearms with "brace" per FFL.

the rulemaking on the Definition of Frame or Receiver and Identification of Firearms NPRM,[28]
ATF updated the wages to account for inflation during the year 2021.

In order to estimate the leisure wage of an individual traveling to a local ATF office and
turning in the whole firearm(s), ATF updated the leisure wage rate as described by the
Department of Transportation ("DOT") based on the methodology found in DOT's guidance on
the costs for leisure time.[29]  DOT uses the median household income as the base for income
from the U.S. Census.  Therefore, ATF uses the median income of a household from the U.S.
Census, published September 2021.[30]  Table 3–1 outlines the leisure wage.

Table 3–1  Leisure Wage Rate for Individuals

| Median Household Income (2021) | $67,521 |
|---|---|
| DOT's Travel Time | 2,080 |
| DOT's Value of Travel Time Savings | 50% |
| Leisure Wage | $16 |

In order to comply with this scenario, individuals or FFLs would need to drive to their
local ATF office and turn in the firearm for disposal.  The costs for this scenario include the lost
wage, including leisure wage, for time traveled, along with mileage costs.  ATF accounts for the
mileage that individuals and FFLs took to drive to an ATF field office.  The General Services
Administration ("GSA") provides a cost for milage, which is $0.625 per mile.[31]

---

[28] 87 FR 24652 (Apr. 26, 2021); *see also* https://www.regulations.gov/docket/ATF-2021-0001/document.

[29] https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-valuation-travel-time-economic.

[30] https://www.census.gov/library/publications/2021/demo/p60-273.html

[31] https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates

ATF estimates the potential wage rates that would be used by individuals and FFLs driving to an ATF field office.  For the purposes of this analysis, ATF groups all FFLs turning in the firearms with an attached "stabilizing brace."  Also, because FFLs may have various employees to turn in firearms with attached "stabilizing braces," ATF uses some possible wage rates from the Bureau of Labor Statistics ("BLS") and uses the average wage rate as the wage rate for FFLs.  ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416.[32]  Based on the updates made to the RIA as published with the Definition of "Frame or Receiver" and Identification of Firearms final rule, ATF added an Employee Cost Index of 1.031 to account for wage increases in 2022.[33,34]  Table 3–2 shows the estimated wage rates.

Table 3–2  Retail Wages

| Wage Series | Series Code | Unloaded Wage Rate | Loaded Wage Rate | Employee Cost Index | Source |
|---|---|---|---|---|---|
| Minimum wage rate | Minimum Wage | $7.25 | $10 | $11 | https://www.bls.gov/opub/reports/minimum-wage/2021/home.htm |
| Packers and Packagers, Hand | 53-7064 | $14.88 | $21 | $22 | https://www.bls.gov/oes/2021/may/oes537064.htm |
| Retail Salespersons | 41-2031 | $15.35 | $22 | $22 | https://www.bls.gov/oes/2021/may/oes412031.htm |
| Building Cleaning Workers, All Other | 37-2019 | $18.52 | $26 | $27 | https://www.bls.gov/oes/2021/may/oes372019.htm |
| Average | | | | $20 | |

\* Note, numbers may not average due to rounding.

[32] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D, CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

[33] 87 FR 24652 *see* https://www.regulations.gov/docket/ATF-2021-0001/document

[34] https://www.bls.gov/news.release/archives/eci_04292022.pdf.

Based on information gleaned from individuals and FFLs who turned in bump-stock-type devices to ATF, the average miles traveled by an individual to turn in bump stocks was 35.48 miles with an average travel time of 0.78 hours. FFLs traveled an average of 31 miles with an average travel time of 0.65 hours. Table 3–3 reiterates the time and miles traveled, along with the government cost for miles traveled in a personal vehicle.

Table 3–3  Time and Miles Traveled to an ATF Office

| Item Type | Time Travel | Miles Traveled | Source |
|---|---|---|---|
| Travel Time Individual | 0.78 | 35.48 | Bump-stock-type devices turned in |
| Travel Time FFL | 0.65 | 30.74 | Bump-stock-type devices turned in |
| Per Diem for miles traveled | | $0.625 | https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates |

The average value of a firearm with an attached "stabilizing brace" is $1,246. To see the market prices gathered in order to determine the average price of a firearm with attached "stabilizing brace," please refer to appendix B. The individual opportunity cost of time is $12.[35] The individual cost for miles traveled is $22.[36] The individual cost to travel to an ATF field office and turn in 2 firearms with an attached "stabilizing brace" is $2,526.[37] The Type 1 FFL dealer opportunity cost of time is $13.[38] The Type 1 FFL dealer cost for miles traveled is $19.[39]

---

[35] $12 opportunity cost of time = $16 leisure wage * 0.78 hours traveled.

[36] $22 cost for miles traveled = $35.48 miles * $0.625 per diem per mile traveled.

[37] $2,526 = ($12 opportunity cost of time) + ($22 cost for miles traveled) + (2 firearms * $1,246 average value of firearm with attached "stabilizing brace").

[38] $13 opportunity cost of time = $20 loaded hourly wage rate * 0.65 hours traveled.

[39] $19 cost for miles traveled = $30.74 miles * $0.625 per diem per mile traveled.

34

It would cost an FFL $8,754[40] to turn in 7 firearms with an attached "stabilizing brace" to a local ATF field office. The total cost of this scenario to turn in to ATF firearms with an attached "stabilizing brace" is $471.3 million.[41]

---

[40] $8,754 = ($13 opportunity cost of time) + ($19 cost for miles traveled) + (7 firearms * $1,246 average value of firearm with attached "stabilizing brace").

[41] $471.3 million = (184,267 individuals * $2,526) + (665 FFLs * $8,754).

# 4. Destroy the Whole Firearm

As stated before, there are five means of complying with Federal law after this rule is published. One means of complying allows individuals and FFLs to destroy all their firearms with an attached "stabilizing brace" that fall under the purview of the NFA. ATF concurs with commenters that there may be a small number of individuals or FFLs that choose to destroy their whole firearm. The population derived from the number of individuals and FFLs who turned in bump-stock-type devices would serve as a proxy for individuals and FFLs who would turn in firearms with "stabilizing arm braces" voluntarily and those who may decide that their firearm does not conform with 18 U.S.C 922(r) as implied by the commenter regarding compliance with 18 U.S.C 922(r). Other individuals and FFLs choosing this route may be those whose States generally restrict possession of short-barreled rifles and "assault weapons." ATF estimated the population under this scenario by using (1) the number of individuals and FFLs who turned in bump-stock-type devices during the implementation of the rule 1140-AA52, Bump-Stock-Type Devices,[42] and (2) the percentage of the population that is located in States that have general restrictions on the possession of both short-barreled rifles and "assault weapons." As mentioned above in chapter 3, ATF's review of State laws found that there are eight States that generally restrict, with limited exception, the possession of both short-barreled rifles and "assault weapons." For more details regarding these States and the number and percentages of individuals and Type 1 FFL dealers by State, please refer to appendix C.

---

[42] 83 FR 66514.

4.1    Population

Because ATF does not maintain records on firearm ownership or inventories to determine who would destroy their entire firearm, ATF used the same population numbers and methodology as those who turn their whole firearm with attached "stabilizing brace" in to ATF. Using the same information, ATF anticipates that approximately 184,267 individuals may destroy an estimated 368,534 firearms with an attached "stabilizing brace" and approximately 665 FFLs may destroy an estimated 4,655 firearms with a "stabilizing brace."[43, 44, 45, 46]

4.2    Costs

Individuals and FFLs currently in possession of firearms with an attached "stabilizing brace" that are subject to the NFA would need to destroy the firearms themselves or turn the firearm in to their local ATF office.  For costs related to turning in the firearm to ATF, please see chapter 3 above.  Options for destroying the firearm include melting, crushing, or shredding in a manner that renders the firearm with an attached "stabilizing brace" incapable of ready restoration.  Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least 1/4 inch of material for each cut and completely severing design features critical to the functionality of the firearm.  ATF uses the same wages categories as under chapter 3.  Table 4–1 illustrates the opportunity cost of time to destroy a firearm with an attached "stabilizing brace" that is subject to NFA regulations.

Table 4–1  Cost to Destroy a Firearm with Attached "Stabilizing Brace"

| | | | Opportunity Cost of Time |
|---|---|---|---|
| Cut with saw or torch | Incremental Cost | Hourly burden | |

---

[43] 184,267 individuals = 13.385 percent * 1,376,669 total affected firearms with attached "brace."

[44] 368,534 firearms with attached "stabilizing brace" = 184,267 individuals * 2 firearms with attached "stabilizing brace."

[45] 665 Type 1 FFL dealers = 13,210 affected Type 1 FFL dealers * 5.0365 percent.

[46] 4,655 firearms with attached "stabilizing brace" = 655 Type 1 FFL dealers * 7 firearms with "brace" per FFL.

| Individual | $16 | 0.25 | $4.00 |
| FFL | $20 | 0.25 | $5.00 |

As stated in chapter 3, above, the average value of a firearm with attached "stabilizing brace" is $1,246. The per individual cost for this scenario to destroy the whole firearm is $2,500 and the per FFL cost is $8,757, making the total cost for this scenario $466.5 million.[47, 48, 49]

---

[47] $2,500 Per individual cost to destroy firearms = 2 firearms * ($4 time to destroy a firearm + $1,246 price of a firearm with attached "stabilizing brace.")

[48] $8,757 Per FFL cost to destroy firearms = 7 firearms * ($5 time to destroy a firearm + $1,246 price of a firearm with attached "stabilizing brace.")

[49] $466.5 million = (184,267 individuals * $2,500 per individual cost) + (665 FFLs * $8,757 per FFL cost).

# 5. Convert Firearm into Long-Barreled Rifle

Another scenario is for individuals and FFLs to convert or reconfigure their firearms equipped with "stabilizing braces" that are subject to the NFA so that the firearms are removed from the scope of the NFA. These firearms would then be regulated only under the CGA. Under this scenario, individuals and FFLs may convert the firearms into long-barreled rifles.

## 5.1 Population

While ATF received comments on the estimated percent of populations that fall under each category, these percentages were based on the assumption that there would be taxes imposed for persons in possession of firearms with "stabilizing braces" that are subject to the NFA. However, the Department has decided it will forbear the making tax that is usually due upon submission of an application to register an NFA firearm when submitting a Form 1. ATF thus expects that any person or entity for whom a Form 1 would be appropriate (*i.e.*, any individual or any entity that lacks an SOT[50]), would be more likely to retain and register the firearm than ATF originally anticipated. The estimated percentages of individuals and FFLs used in this scenario will accordingly differ from both the NPRM's estimates and the public comment estimates. For more information regarding tax forbearance, refer to chapter 6 below.

Based on public comments, there may be individuals who reside in States that generally restrict possession of short-barreled rifles but do not have general restrictions on "assault weapons."[51] Individuals residing in these States would be able to convert their firearm with an attached "stabilizing brace" into a long-barreled rifle. ATF's review of State laws found that

---

[50] Type 7 FFL manufacturer who are SOT holders, as discussed elsewhere in this RIA, would use a Form 2 rather than a Form 1.

[51] States typically provide exemptions for law enforcement or government personnel, but generally restrict availability of short-barreled rifles for personal use.

there are three States that prohibit possession of short-barreled rifles but do not have general restrictions on possession of "assault weapons."  For purposes of this RIA, ATF assumes that the proportion of people living in States that generally restrict possession of short-barreled rifles (but not "assault weapons") is the percentage of people choosing to convert their firearm into a long-barreled rifle.  Based on States that generally restrict possession of short-barreled rifles (but not "assault weapons") for personal use, ATF estimates 4.5 percent of affected individuals (1,376,669 individuals) will choose to convert their firearm with an attached "stabilizing brace" into a long-barreled rifle.  Therefore, the estimated number of individuals who will convert their firearms with an attached "stabilizing brace" into long-barreled rifles is 61,950.[52]  The number of firearms associated with individuals under this scenario is estimated to be 123,900.[53]  Please refer to appendix C for the list of States that generally have restrictions on the possession of short-barreled rifles (but not "assault rifles") and their populations relative to the whole United States.

Because FFLs are businesses and businesses prefer to avoid a loss of revenue, ATF assumes most FFLs will either choose to convert their inventory of firearms with attached "stabilizing braces" into long-barreled rifles to remove the firearms from the purview of the NFA or apply to register the firearms with an attached "stabilizing brace" under the NFA, as discussed in chapter 6.

As for Type 1 FFL dealers, only a portion of Type 1 FFLs retain gunsmithing staff, and ATF estimates that only those FFL dealers with staff that have gunsmithing capabilities will choose to convert their firearms with an attached "stabilizing brace" into a long-barreled rifle.

---

[52] 61,950 individuals = 1,376,669 affected individuals * 4.5 percent.

[53] 123,900 firearms with attached "stabilizing brace" = 61,950 individuals * 2 firearms.

Based on a survey of field offices throughout ATF, ATF estimates that approximately 27.56 percent (3,274) of Type 1 FFL dealers may retain staff that can perform gunsmithing activities.[54] By multiplying the number of Type 1 FFLs under this scenario by 7 firearms with attached "stabilizing brace" in inventory, the number of firearms that will be converted into long-barreled rifles by Type 1 FFL dealers is 22,918.[55]

    For the purposes of this analysis, ATF estimates that Type 7 FFL manufacturers may have in their inventory 32 firearms with an attached "stabilizing brace" that are subject to the NFA.[56]  ATF estimated this number by taking the average of the total number of estimated firearms with "stabilizing braces" sold over the eight years of their production to come up with an average of 371,250 firearms with "stabilizing braces" per year.  Because firearms equipped with "stabilizing braces" were sold to individuals, Type 1 FFL dealers, and Type 7 FFL manufacturers, ATF split the average production among the 3 groups.  As stated in chapter 2, above, ATF estimates that this rule would affect 3,881 Type 7 FFL manufacturers.  ATF divided the remaining number of firearms with "stabilizing braces" (123,750) evenly among these Type 7 manufacturers to derive an estimated 32 firearms with an attached "stabilizing brace" per Type 7 FFL manufacturer.  To summarize the analysis, Table 5–1 illustrates the analysis to derive 32 firearms per Type 7 FFL manufacturer.

Table 5–1  Calculation to Determine the Number of "Stabilizing Braces" Held by Type 7 FFL Manufacturers

| Total "Stabilizing Braces" Manufactured | 2,970,000 |
|---|---|

[54] 3,274 Type 1 FFLs = (13,210 Type 1 FFLs affected – 665 Type 1 FFLs who turn firearm into ATF – 665 FFLs who destroy firearms) * 27.56 percent.

[55] 22,918 firearms with attached "stabilizing brace" = 3,274 Type 1 FFLs * 7 firearms.

[56] ATF estimates that Type 7 manufacturers would have more in inventory than Type 1 FFLs because they are producing firearms for sale to a greater number of Type 1 FFLs.  Furthermore, ATF estimates that bump-stock-type devices were primarily sold to only individuals and Type 1 FFLs because ATF is not aware of Type 7 manufacturers who dealt with bump-stock-type devices in their manufacturing.

| | |
|---|---|
| 8 Years of Manufacturing | 8 |
| Annual Number of "Stabilizing Braces" Held by Entity or Individual | 33.33% |
| Estimated Type 7 FFL Manufacturers Affected | 3,881 |
| Estimated "Stabilizing Braces" Held by Type 7 FFL Manufacture | 32 |

As mentioned above, FFLs, as business entities, prefer to avoid a loss of revenue. Therefore, assuming that FFLs will choose a method that allows them to continue to sell their inventory rather than lose their inventory, ATF assumes that Type 7 FFLs manufacturers will either convert their firearms into a long-barreled rifle or register their firearms with attached "stabilizing brace" as a short-barreled rifle in accordance with the NFA.  Type 7 FFLs are capable of choosing either scenario as likely options because all Type 7 FFL manufacturers retain the staffing capabilities to remanufacture their existing inventory.  Because there is no known information as to which scenario a given Type 7 FFL manufacture may chose, ATF assumes an even distribution between the two scenarios, *i.e.*, 50 percent of Type 7 FFLs will convert their firearms with an attached "stabilizing brace," while 50 percent of Type 7 FFLs will apply to register their firearms with an attached "stabilizing brace" under the NFA.  Based on this even distribution between the two scenarios, ATF anticipates a total of 1,940 Type 7 FFLs— *i.e.*, 1,058 Type 7 FFL manufacturers without an SOT and 882 Type 7 FFL manufacturers with an SOT—will convert their firearms with attached "stabilizing braces" into long-barreled rifles.[57] By multiplying the number of Type 7 FFL manufacturers under this scenario by 32 firearms with an attached "stabilizing brace" in inventory, the number of firearms that will be converted into long-barreled rifles by Type 7 FFL manufacturers is 62,080.[58]  The total number of firearms with

---

[57] 1,940 Type 7 FFLs = ((3,881 Type 7 FFLs affected – 1,764 Type 7 FFLs with SOT affected) * 50 percent) + (1,764 Type 7 FFLs with SOT affected * 50 percent).

[58] 62,080 firearms with attached "stabilizing brace" = 1,940 Type 7 FFLs * 32 firearms with attached "stabilizing brace."

an attached "stabilizing brace" that will be converted into long-barreled rifles is estimated to be 208,898.[59]

## 5.2   Costs

ATF estimates the cost to convert an existing firearm with an attached "stabilizing brace" from a short-barreled rifle into a long-barreled rifle.  To do so, ATF anticipates that the conversion requires a long barrel and handrails.  The average cost of a long barrel is $200.[60]  The average cost for handrails is $164.[61]

In the NPRM, the Department requested information regarding re-barreling a firearm. The comments received stated that ATF did not estimate the labor cost of re-barreling a firearm and that ATF should estimate the amount to send the firearm to a gunsmith and have a gunsmith re-barrel the firearm.  ATF concurs and adds the cost for a gunsmith to re-barrel the firearm at an

---

[59] 208,898 firearms = 123,900 firearms owned by individuals + 22,918 firearms in Type 1 FFL inventory + 62,080 firearms in Type 7 FFL inventory.

[60] https://www.brownells.com/rifle-parts/barrel-parts/rifle-barrels/ar-15-6mm-arc-barrels-heavy-profile-prod135844.aspx (accessed July 8, 2022); https://www.hinterlandoutfitters.com/mossberg-92062-rifled-barrel-wsights-gauge-slug-p-13798.html (accessed July 8, 2022); https://www.hinterlandoutfitters.com/mossberg-90831-ulti-barrel-wparkerized-finish-accu-chokes-gauge-ulti-slug-p-13809.html (accessed July 8, 2022); https://www.hinterlandoutfitters.com/mossberg-93356-model-stand-barrel-cylinder-borebead-front-sight-p-13748.html (accessed July 8, 2022); https://www.hinterlandoutfitters.com/carl-87004-barrel-p-76645.html (accessed July 8, 2022); https://www.gunpartscorp.com/category/barrels/rifle-barrels/colt/lightning-cf-rifle (accessed July 8, 2022); https://www.midwayusa.com/product/1017600744 (accessed July 8, 2022); https://www.midwayusa.com/product/1023207522 (accessed July 8, 2022).

[61] https://www.aeroprecisionusa.com/ar15-atlas-r-one-m-lok-handguard (accessed July 8, 2022); https://ar15discounts.com/products/aim-sports-inc-ar-15-free-float-m-lok-handguard/ (accessed July 8, 2022); https://ar15discounts.com/products/dirty-bird-ar-15-smrs-handguard-slim-m-lok-rail-system-gen-2/ (accessed July 8, 2022); https://ar15discounts.com/products/aero-precision-enhanced-m-lok-free-float-handguard-gen-2/ (accessed July 8, 2022); https://www.odinworks.com/O2_Lite_M_LOK_Forend_p/f-12-ml-o2.htm (accessed July 8, 2022); https://seekinsprecision.com/noxs-mlok-rail-1-1.html (accessed July 8, 2022); https://www.odinworks.com/category-s/2018.htm?searching=Y&sort=2&cat=2018&show=30&page=1&f-15.2%E2%80%9D=2138 (accessed July 8, 2022); https://www.odinworks.com/O2-Lite-M-LOK-Forend-p/f-17-ml-o2.htm (accessed July 8, 2022).

average rate of $203 per firearm.[62]   The per individual cost for this scenario, based on each individual having two firearms that would be converted to long-barreled rifles, is $1,134.[63]

However, ATF estimates that costs of sending firearms to a gunsmith will likely be incurred by an individual and not a Type 1 or Type 7 FFL.  For the purposes of this RIA, ATF assumes that FFLs choosing this option are only those FFLs that currently have gunsmithing capabilities; therefore, ATF added an hourly wage rate for labor.  Table 5–2 demonstrates the possible wage categories that may apply to a gunsmith.

Table 5–2  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21.35 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2021/may/oes514022.htm |
| $19.23 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2021/may/oes514031.htm |
| $18.98 | $20 | $28 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2021/may/oes514199.htm |
| Average Wage | $29 | | | |

ATF assumes that an FFL that undertakes conversion of a firearm with attached "stabilizing brace" will have a gunsmith on staff.  FATD estimates that it will take a few minutes

---

[62] https://shawsheenfirearms.com/services/ (accessed July 8, 2022);
https://www.brownells.com/userdocs/miscellaneous/shoppricesurvey.pdf (accessed July 8, 2022);
https://mcgowenbarrel.com/rebarreling-services/ (accessed July 8, 2022).

[63] $1,134 per individual cost = ($200 barrel + $164 handguards + $203 re-barreling service) * 2 firearms.

44

for a gunsmith to re-barrel the firearm, which, for the purposes of this RIA, ATF estimates to be 15 minutes (0.25 hours), making the hourly burden per firearm $7.[64]  Including the average cost of a long barrel and handguards, the cost for each Type 1 dealer is estimated to be $2,597, and the cost for each Type 7 manufacturer is estimated to be $11,872.[65,66]  The total cost for this scenario is $101.8 million.[67]

---

[64] $7 hourly burden for a gunsmith to re-barrel a firearm with attached stabilizing brace = $29 hourly wage rate * 0.25 hours.

[65] $2,597 per Type 1 FFL cost = ($7 hourly burden + $164 handguards + $200 long barrel) * 7 firearms.

[66] $11,872 per Type 7 FFL cost = ($7 hourly burden + $164 handguards + $200 long barrel) * 32 firearms.

[67] $101.8 million = ((61,950 individuals * $1,134 per individual cost) + (3,274 Type 1 FFLs * $2,597 per Type 1 FFL cost) + (1,940 Type 7 FFLs * $11,872 per Type 7 FFL cost)).

# 6. Apply to Register Under the NFA

As stated before, there are five means of complying with Federal law after this rule is published.  One option, discussed here, is for individuals and FFLs to keep firearms with attached "stabilizing braces" that are subject to the NFA and apply to register them under the NFA.  Based on public comments, the Department has decided to forbear the NFA tax that is required upon application to make and register an NFA weapon.  Affected persons in possession of firearms with attached "stabilizing braces" that are short-barreled rifles under the NFA and GCA will have 120 days from the publication of the final rule to register their firearm without paying the $200 making tax.  ATF strongly encourages that all applications be submitted electronically.  After 120 days, registrations of affected firearms will no longer be permitted.  As of the date of the rule's publication, any subsequent making, sales, or transfers of firearms equipped with a "stabilizing brace" that are NFA firearms must comply with the NFA's requirements.

Individuals, Type 1 FFL dealers, Type 7 FFL manufacturers without an SOT, and Type 8 importers should use ATF's eForms system to complete an E-Form 1 for each and every firearm affected by this rule.  Type 7 FFL manufacturers without an SOT may also complete an E-Form 1 application to register the affected firearms in their inventory as of the date of the final rule's publication.  However, should non-SOT Type 7 FFL manufacturers opt to continue manufacturing and transferring firearms with attached "stabilizing brace" in the future, these FFLs will need to apply for an SOT.  Upon obtaining an SOT, they would then complete on the eForms system a Notice of Firearms Manufactured or Imported, ATF Form 2 ("E-Form 2") to register all of their affected firearms in inventory.  After registering their affected firearms on either an E-Form 1 or E-Form 2, FFLs would then be able to sell their existing inventory of

firearms with an attached "stabilizing brace" as NFA weapons in accordance with NFA requirements to individuals who wish to purchase them.  As mentioned above, the Department is not collecting the making tax so long as firearms equipped with "stabilizing braces" that are currently in the possession of the affected parties are registered within the defined period.

6.1   Population Under NFA

Based on public comments, ATF assumes most persons will choose this option, and ATF thus estimates that, for purposes of this analysis, the majority (60 percent) of individuals will opt to file an E-Form 1 under the NFA.  This amounts to 826,001 individuals who own 1.65 million firearms with attached "stabilizing braces."[68, 69]

Because Type 1 FFL dealers can file E-Form 1 applications without paying the NFA making tax within the defined time period, ATF assumes that those Type 1 FFL dealers who have not chosen to turn in their inventory to ATF, destroy their inventory, or convert their inventory into long-barreled rifles will choose this scenario.  For purposes of this analysis, this suggests that 8,606 Type 1 FFL dealers will file E-Form 1 applications under the NFA.[70]  By multiplying the number of Type 1 FFL dealers under this scenario by 7 firearms with an attached "stabilizing brace" in inventory, the number of firearms affected is 60,242.[71]

As stated in chapter 5 above, ATF assumes 50 percent of Type 7 FFL manufacturers will convert their firearms with an attached "stabilizing brace" and 50 percent of Type 7 FFL manufacturers will choose this scenario to register their firearms under the NFA.  Based on this

---

[68] 826,001 individuals = 1,376,669 total affected individuals * 60 percent.

[69] 1,652,002 firearms with attached "stabilizing braces" = 826,001 individuals * 2 firearms.

[70] 8,606 Type 1 FFLs = 13,210 Type 1 FFLs affected - 665 Type 1 FFLs who turn firearm into ATF - 665 FFLs who destroy firearms - 3,274 FFLs who convert to rifle.

[71] 60,242 firearms with attached "stabilizing braces" = 8,606 Type 1 FFLs * 7 firearms with attached "stabilizing brace."

even distribution between the two scenarios, ATF anticipates a total of 1,941 Type 7 FFLs—*i.e.*, 1,059 Type 7 FFL manufacturers without an SOT and 882 Type 7 FFL manufacturers with an SOT—will register their affected firearms under the NFA.[72, 73]  By multiplying the number of Type 7 FFL manufacturers under this scenario by 32 firearms with an attached "stabilizing brace" in inventory, the number of firearms affected is 62,112.[74]

Finally, should a State or political subdivisions of a State (for example, local police departments) possess firearms with attached "stabilizing braces" that qualify as NFA firearms, the firearms must be registered in the NFRTR.  However, ATF estimates that this rule will not affect many States or political subdivisions.

The total number of firearms with an attached "stabilizing brace" that would be registered in the NFRTR under this scenario would be 1.77 million.[75]

## 6.2   Cost to Apply Under the NFA

Individuals, Type 1 FFL dealers, and Type 7 FFL manufacturers without an SOT will need to file a E-Form 1 should they opt to retain their firearms with an attached "stabilizing brace."  The Department has decided to forbear the NFA making tax that is typically required upon submission of a Form 1 to make and register an NFA weapon.

Based on the collection of information OMB 1140-0011, ATF estimates that it takes 2.33 hours to fill out a E-Form 1, making 4.66 hours the total burden in hours for an individual filling

---

[72] 1,059 Type 7 FFLs without SOT = ((3,881 Type 7 FFLs affected – 1,764 Type 7 FFLs with SOT affected) * 50 percent).

[73] 882 Type 7 FFL with SOT = 1,764 Type 7 FFLs with SOT affected * 50 percent.

[74] 62,112 firearms with attached "stabilizing braces" = 1,941 Type 7 FFLs * 32 firearms with attached "stabilizing brace."

[75] 1.77 million firearms with attached "stabilizing braces" = (826,001 individuals * 2 "stabilizing braces") + (8,606 Type 1 FFLs * 7 firearms with attached "stabilizing braces") + (1,941 Type 7 FFLs * 32 firearms with attached "stabilizing braces").

out two E-Form 1 applications.  Note, however, that the actual burden may be smaller because most, if not all, the information can be quickly duplicated.

As stated above in chapter 3, ATF followed DOT's methodology and updated an individual's leisure wage, estimating it to be $16 per hour.  The cost for an individual to fill out two E-Form 1 applications to register two firearms with an attached "stabilizing brace" is $75.[76] In addition to filing out an E-Form 1 for an NFA registration, individuals will need to include digital fingerprints and upload a passport photo.  The average cost for a digital set of fingerprints is $22.[77]  The average cost for a passport photo is $16.[78, 79]  Using the same wage rates and travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy Whole Firearm), ATF estimates that completing the forms takes 2 trips—one to obtain photographs and one to obtain fingerprints—making the total trip cost $20.[80, 81]  The total cost per individual to submit two E-Form 1 applications is $133.[82]

Commenters suggested that the firearm will also need to be engraved with the required marks of identification by an FFL and that costs will be incurred to dissemble and re-assemble the firearm in order to mark it.  ATF disagrees.  The final rule allows the current possessor of the firearm to adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is currently marked in accordance with 27 CFR 478.92 and 479.102.  Individuals who have attached a "stabilizing brace" to a "privately made firearm" ("PMF"), as defined in 27 C.F.R.

---

[76] $75 = ($16 leisure hourly wage * 2.33 hours) * 2 applications.

[77] For a list of sources for fingerprinting costs, please refer to Appendix A at the end of the RIA.

[78] https://www.cvs.com/photo/passport-photos?algSearch=passport%20pho&fromSrc=serp.

[79] https://photo.walgreens.com/store/passport-photos.

[80] $6 cost for miles traveled = 10-mile trip * $0.625 per diem per mile traveled.

[81] $20 travel costs = 2 * ($6 mileage + ($16 leisure wage * 0.25 travel time)).

[82] $133 individual cost to apply under NFA = ($16 leisure wage * 2.333 NFA applications * 2 firearms with attached "stabilizing brace") + $16 photograph + $22 fingerprints + $20 travel times).

478.11 and 479.11, without marking the PMF would be required to serialize the firearm in accordance with section 479.102 of the NFA in order to register the firearm.  For the purposes of this analysis, ATF estimates that this rule will not affect many PMFs because PMFs generally are not the sort of weapon to which a "stabilizing brace" is attached; hence, ATF did not include serialization costs in this analysis.  Nevertheless, ATF notes that the cost to retroactively serialize a PMF to comply with NFA markings is approximately $30 to $65 per PMF.[83]

As indicated in chapter 3, ATF estimates that Type 1 FFL dealers may have in their inventory an average of 7 firearms with attached "stabilizing braces" that are subject to the NFA. Based on the collection of information OMB 1140-0011, ATF estimates that it takes 0.33 hours for an FFL to fill out an E-Form 1.  For purposes of filling out an E-Form 1, ATF assumes that a responsible person[84] would fill out the form.  ATF reviewed ATF's databases on responsible persons by FFL type and attempted to compare wage titles between the responsible persons' listed job titles and occupations listed on the BLS wage rates.  ATF adds a load rate of 1.416 to the hourly wage to account for fringe benefits like health insurance.[85]  Based on the updates made to the RIA as published with the Definition of Frame or Receiver and Identification of Firearms final rule, ATF added an Employee Cost Index of 1.031 to account for wage increases

---

[83] https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232; https://www.capitolarmory.com/sbr-sbs-nfa-firearm-laser-engraving-form1.html; https://www.accubeam.com/services/nfa-trust-gun-engraving/; SBS and SBR Laser Engraving | Veritas Machining | United States (veritasmachiningllc.com); (accessed Sept. 30, 2022).

[84] As described on ATF From 7/7CR, a responsible person is a sole proprietor, or, "in the case of a Corporation, Partnership, or Association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms."

[85] A loaded wage rate is hourly wage rate, including fringe benefits such as insurance.  The load rate is based on the average total compensation $37.15 (CMU2010000000000D) year 2022 / average wages and salaries $26.23 (CMU2020000000000D) year 2022. https://data.bls.gov/cgi-bin/surveymost?cm.

in 2022.[86]  Table 6–1 shows the BLS codes used for the various job titles listed under the

responsible persons.

Table 6–1  Wage Categories used for Type 1 FFL Responsible Persons

| Job Category | Wage Rate | Loaded Wage Rate | Wage Rate with Employee Cost Index | Source |
|---|---|---|---|---|
| 11-2022 Sales Managers | $68.46 | $97 | $100 | https://www.bls.gov/oes/2021/may/oes112022.htm |
| 11-3061 Purchasing Managers | $64.71 | $92 | $94 | https://www.bls.gov/oes/2021/may/oes113061.htm |
| 1-4199 Metal Workers and Plastic Workers, All Other | $18.98 | $27 | $28 | https://www.bls.gov/oes/2021/may/oes514199.htm |
| 33-9099 Protective Service Workers, All Other | $20.27 | $29 | $30 | https://www.bls.gov/oes/2021/may/oes339099.htm |
| 41-2011 Cashiers | $12.87 | $18 | $19 | https://www.bls.gov/oes/2021/may/oes412011.htm |
| 41-2031 Retail Salespersons | $15.35 | $22 | $22 | https://www.bls.gov/oes/2021/may/oes412031.htm |
| 43-5071 Shipping, Receiving, and Traffic Clerks | $18.37 | $26 | $27 | https://www.bls.gov/oes/2021/may/oes435071.htm |
| 43-6014 Secretaries and Administrative Assistants, Except Legal, Medical, and Executive | $19.75 | $28 | $29 | https://www.bls.gov/oes/2021/may/oes436014.htm |
| 53-7064 Packers and Packagers, Hand | $14.88 | $21 | $22 | https://www.bls.gov/oes/2021/may/oes537064.htm |
| Weighted Average | | | $83 | |

* Note: Date accessed: Apr. 25, 2021.

ATF used the weighted average across all Type 1 FFL dealers to determine an average

wage rate of $83 (loaded wage rate with Employee Cost Index) to fill out seven E-Form 1

application, making the cost per Type 1 FFL dealer to fill out seven E-Form 1 applications

[86] https://www.bls.gov/news.release/archives/eci_04292022.pdf.

$194.[87]  Using the travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy

Whole Firearm) ATF estimates that completing the forms takes 2 trips—one to obtain

photographs and one to obtain fingerprints—making the total cost of the trip $54.[88]  Including

the cost for fingerprints and photo, the per Type 1 FFL dealer cost to submit seven E-Form 1

applications is $286.[89]

Type 7 FFL manufacturers without an SOT may also file an E-Form 1 to register their

existing inventory, provided they will not continue to be engaged in the business of

manufacturing NFA firearms.  ATF used the same review of ATF's database and compared

wage titles between the job titles of responsible persons for Type 7 FFL manufacturers to the

listed BLS wages in order to determine the average wage rate of a Type 7 FFL manufacturer

filling out a E-Form 1.  Table 6–2 provides the different wage categories used.

Table 6–2  Wage Categories used for Type 7 FFL Responsible Persons

| Job Category | Wage Rate | Loaded Wage Rate | Wage with Employee Cost Index | Source |
|---|---|---|---|---|
| 11-3051 Industrial Production Managers | $56.62 | $80 | $83 | https://www.bls.gov/oes/2021/may/oes113051.htm |
| 11-3071 Transportation, Storage, and Distribution Managers | $50.76 | $72 | $74 | https://www.bls.gov/oes/2021/may/oes113071.htm |
| 17-3027 Mechanical Engineering Technicians | $30.47 | $43 | $44 | https://www.bls.gov/oes/2021/may/oes173027.htm |
| 43-6014 Secretaries and Administrative Assistants, Except Legal, Medical, and Executive | $19.75 | $28 | $29 | https://www.bls.gov/oes/2021/may/oes436014.htm |

---

[87] $194 cost to complete application = $83 average loaded hourly wage * 0.333 hours * 7 firearms.

[88] $54 travel costs = 2 * ((10-mile trip * 0.$625 per diem per mile traveled) + ($83 loaded wage with Employee Cost Index * 0.25 travel time).

[89] $286 Type 1 FFL cost to apply under NFA = $194 Form 1 applications + $16 photo + $22 fingerprints + $54 travel time.

| | | | | |
|---|---|---|---|---|
| 51-4199 Metal Workers and Plastic Workers, All Other | $18.98 | $27 | $28 | https://www.bls.gov/oes/2021/may/oes514199.htm |
| 51-9199 Production Workers, All Other | $17.42 | $25 | $25 | https://www.bls.gov/oes/2021/may/oes519199.htm |
| Weighted Average | $44 | | $65 | |

*Note: date accessed Apr. 25, 2021.

ATF used the weighted average across all Type 7 FFL manufacturers to determine an average of $65 (loaded wage rate and Employee Cost Index) to fill out 32 E-Form 1 applications. Using the travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy Whole Firearm) ATF estimates completing the forms takes 2 trips—one to obtain photographs and one to obtain fingerprints—making the total trip cost $44.[90,91,92] Including the fingerprints and photographs, this makes the total cost per Type 7 FFL without an SOT to submit 32 E-Form 1 applications $775.[93,94]

As an alternative to using the E-Form 1, these Type 7 FFL manufacturers without an SOT also have the option to file for an SOT, obtain an SOT, and register their firearms using an E-Form 2. The costs to do so, however, were not included in this analysis because doing so is not required and is a more expensive option. ATF believes that Type 7 FFL manufacturers without an SOT will most likely not apply and pay for an SOT because they can submit E-Form 1s to register the affected firearms that are in their possession as of the date of the rule and, because of the Department's decision to forbear taxes, are not liable to pay the making taxes for those firearms. However, should any Type 7 FFL without an SOT decide to remain in the business of

---

[90] $6 milage cost = 10-mile trip * $0.625 per diem per mile traveled.

[91] $22 hourly burden per trip = $6 milage cost + ($65 loaded wage with Employee Cost Index * 0.25 travel time).

[92] $44 travel costs = $22 * 2 trips.

[93] $693 Cost to complete application = $65 loaded hourly wage rate * 0.333 hours to complete application * 32 firearms.

[94] $775 = $693 time to submit applications + $22 fingerprints + $16 photograph + $44 travel time.

manufacturing firearms with an attached "stabilizing brace" that qualify as NFA firearms, these FFLs will need to obtain an SOT before registering their inventory on an E-Form 2.

Those Type 7 FFL manufacturers that already have an SOT may file an E-Form 2 to register their existing affected inventory. Based on the collection of information OMB 1140-0012, ATF estimates that it takes 0.5 hours to fill out an E-Form 2. Using the same wage rate as Type 7 FFL manufacturers without an SOT, ATF estimates that the cost for each Type 7 FFL manufacturer with an SOT to submit an E-Form 2 is $33.[95]

ATF estimates that this rule will not affect many States or political subdivisions, so ATF did not include the cost of registering such firearms under the NFRTR. However, ATF notes that it may take 30 minutes to complete an Application for Registration of Firearms Acquired by Certain Governmental Entities ("Form 10"). Using a loaded wage rate of $49.67,[96,97,98] the cost per government entity, such as a local police department, to submit a Form 10 is $25.[99]

Overall, the total societal cost to this scenario is a one-time cost of $113.2 million.[100]

---

[95] $33 for Type 7 FFL with SOT to file E-Form 2 application = $65 average, loaded hourly wage with employee cost index * 0.5 hours. In contrast to the E-Form 1, the E-Form 2 can be used for multiple weapons and does not require obtaining a new set of fingerprints or a photo. Thus, ATF did not multiply the cost to file a single E-Form 2 by the number of firearms in inventory, nor did ATF include the costs for fingerprints and a photo.

[96] Average wage rate for Police and Sherriff's Patrol Officers is $34.02. https://www.bls.gov/oes/2021/may/oes333051.htm

[97] ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416. BLS Series ID CMU2010000000000D,CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D,CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

[98] Employee Cost Index of 1.031 to account for wage increases in 2022. https://www.bls.gov/news.release/archives/eci_04292022.pdf

[99] $25 for Government Entity to apply under NFA = $49.67 average, loaded hourly wage with employee cost index * 0.5 hours.

[100] $113.2 million = (8,606 Type 1 FFL dealers * $286 per Type 1 FFL dealer cost) + (1,059 Type 7 FFL manufacturers without an SOT * $775 per Type 7 FFL manufacturer without SOT cost) + (882 Type 7 FFL manufacturer with SOT * $33 per Type 7 FFL manufacturer cost) + (826,001 individuals * $133 per individual cost).

# 7. Cost to Permanently Remove and Dispose of or Alter a "Stabilizing Brace" such that it Cannot be Reattached and Forgone Future Sales

This section addresses the loss in retail value of "stabilizing braces" that are permanently removed and disposed of or altered so that they cannot be attached to firearms and the lost value of forgone future sales.

7.1    Population Under Permanent Removal or Alteration of "Stabilizing Brace"

As stated in the population chapter above, ATF uses the low number of 3 million firearms with "stabilizing braces," less the 1 percent (30,000) estimated to be sold to assist persons with one-handed firing of pistols where the firearm is not a short-barreled rifle under the NFA. ATF thus uses 2,970,000 as the primary estimated number of firearms with "stabilizing braces" currently in circulation.

The fifth option to comply with the rule is to permanently remove and dispose of or alter the "stabilizing brace" such that it cannot be reattached, thus converting the firearm back to its original pistol configuration and thereby removing it from regulation as a "firearm" under the NFA. For purposes of this analysis, ATF estimates that zero FFLs will choose this scenario as ATF assumes they will choose to find a means to sell their inventory of firearms or dispose of the firearm. As discussed above, ATF anticipates some FFLs will either turn in their inventory of firearms with an attached "stabilizing brace" to ATF or dispose of the whole firearms. To determine the number of individuals who would choose this scenario, the "remaining" number of firearms with "stabilizing braces" that have not been accounted for were estimated to belong to individuals who affixed a "stabilizing brace" on to a pistol. ATF estimates that the number of

individuals choosing this scenario is 120,184.[101]  The number of firearms with an attached

"stabilizing brace" owned by individuals under this scenario is 240,368.[102]

      In order to simplify the different populations for each scenario provided in the rule, Table

7–1 shows a line-by-line estimate of the individuals, FFLs, and firearms with "stabilizing braces"

across all five scenarios.  Scenario 5 is removal of the "stabilizing brace."

Table 7–1  Individuals and FFLs and Number of Firearms with "Stabilizing Braces" Affected
Across All Scenarios

| Scenario 1: Turn into ATF | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
|---|---|---|
| Individuals | 184,267 | 368,534 |
| Type 1 FFLs | 665 | 4,655 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 373,189 |
| | | |
| Scenario 2: Destroy Whole Firearm | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 184,267 | 368,534 |
| Type 1 FFLs | 665 | 4,655 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 373,189 |
| | | |
| Scenario 3: Convert into Rifles | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 61,950 | 123,900 |
| Type 1 FFLs | 3,274 | 22,918 |
| Type 7 FFLs | 1,940 | 62,080 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 208,898 |

---

[101] 120,184 individuals removing "brace" = 1,376,669 total affected individuals – 184,267 individuals who turned in firearms to ATF – 184,267 individuals who destroyed whole firearm – 61,950 individuals who converted their firearms into rifles – 826,001 individuals who applied under the NFA.

[102] 240,368 firearms with attached "stabilizing brace" = 120,184 individuals * 2 firearms.

| | | Number of Firearms with "Stabilizing Braces" Affected |
|---|---|---|
| Scenario 4: Apply under NFA | Individuals/FFLs | |
| Individuals | 826,001 | 1,652,002 |
| Type 1 FFLs | 8,606 | 60,242 |
| Type 7 FFLs | 1,941 | 62,112 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 1,774,356 |
| | | |
| Scenario 5: Permanently Remove and Dispose of or Alter "Stabilizing Brace" Such that it Cannot be Reattached | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 120,184 | 240,368 |
| Type 1 FFLs | 0 | 0 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 240,368 |
| **Total of Number of Firearms with "Stabilizing Braces" Affected** | | **2,970,000** |
| | | |
| Future Foregone: | | 154,588 |

ATF estimates that 120,184 individuals and no FFLs would permanently remove or alter the "stabilizing brace" from their firearm such that it cannot be reattached, thus bringing the pistol back to its original configuration and out of the purview of the NFA. The number of affected firearms with a "stabilizing brace" in this scenario is 240,368.

7.2   Cost to Permanently Remove and Dispose of or Alter "Stabilizing Braces" Such that it Cannot Be Reattached

Individuals affected could permanently remove or alter the "stabilizing braces" that they had originally attached such that it cannot be reattached to the firearm. This would be a loss of the value of the "stabilizing brace." Because ATF has no way to determine how these affected "stabilizing braces" have been purchased, ATF uses the direct retail sales of these "stabilizing

braces" as a proxy for the cost that individuals, FFL dealers, and FFL manufacturers incur for "stabilizing braces" purchased.  There are numerous types of "stabilizing braces" that would be affected by this final rule.  We assume that the lost value to owners of a "stabilizing brace" would be at least as much as the cost of a new "stabilizing brace."  While the Department recognizes that some owners may perceive that removal of the "brace" from the firearm diminishes the value of owning that firearm, the Department cannot reasonably estimate the diminished valuation to such owners because those perceived valuations are subjective and vary from owner to owner.

The average cost for a "stabilizing brace" is $270.[103]  Prior to the publication of ATF's proposed guidance document in December 2020 regarding "stabilizing braces,"[104] the retail price of a firearm with an attached "stabilizing brace" may have ranged from $549 to $1,980.[105]  On the other hand, a short-barreled rifle may retail anywhere from $1,295 to $5,795, plus the $200 NFA tax.[106]  ATF estimates that the majority of individuals and FFLs would be inclined to retain the firearm regardless of whether they retain the "stabilizing brace."  Furthermore, most commenters suggested that losing the entire firearm was an unlikely scenario.  However, there were some commenters requesting ATF estimate the cost of the loss of the entire firearm.  As stated in Scenarios 1 (Turn in Firearm to ATF) and 2 (Destroy the Whole Firearm), ATF incorporated the cost of the loss of the whole firearm under those scenarios.  ATF now estimates the cost for those individuals who opt to retain the firearm but to permanently remove and

---

[103] https://www.sb-tactical.com/product/sba3/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/sbm47/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/hkpdw/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/tac13-sba3/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/czpdw/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/fs1913/ (accessed Apr. 22, 2021).

[104] 85 FR 82516 (Dec. 18, 2020).

[105] https://www.pewpewtactical.com/best-ar-15-pistols/ (accessed May 23, 2021).

[106] https://www.capitolarmory.com/class-3-nfa/sbr-short-barrel-rifle.html (accessed May 23, 2021).

dispose of or alter the "stabilizing brace" such that it cannot be reattached. ATF estimates that the cost to permanently remove and dispose of or alter the 240,368 "stabilizing braces" involved in this scenario would be $64.9 million. [107]

7.3    Future Revenue of "Stabilizing Braces" Lost from Loss of Production

After publication of this rule, ATF does not anticipate a similar or increased demand for firearms with attached "stabilizing braces." This is because a majority of firearms equipped with "stabilizing braces" that are currently or were previously available on the market incorporate rifle characteristics and, because of their barrel length, are short-barreled rifles under the NFA. No additional NFA taxes were considered in this analysis because ATF is anticipating a decrease in future demand for firearms with an attached "stabilizing brace." Because the rule will affect future demand for these types of firearms, ATF also calculated the loss in revenue from future production. One commenter suggested using "current trends" rather than historical purchases. However, because there is no information regarding current trends in purchasing rates, ATF uses historical information.

ATF uses the production of "stabilizing braces over the course of eight years to estimate the expected lost value of firearms equipped with "stabilizing braces" or the individual "stabilizing brace" devices for firearms that are "short-barreled rifles" subject to NFA regulations. This lost value would be equal to the consumer and producer surplus from these forgone sales, which would be equal to the area under purchasers' demand curves (and above the market price) and above producers' costs curves (and below the market price). Lacking data on producers' costs, this might be proxied with an estimate of the expected reduction in future sales revenues from firearms with "stabilizing braces" devices.

---

[107] $64.9 million = 240,368 firearms with "stabilizing braces" * $270 average cost of a "brace."

In order to determine the reduction in future sales, ATF must establish an estimate of future sales. ATF considered basing its estimate of future sales in the absence of the final rule on recent sales averages; however, ATF expects that, even without a rule, sales of "stabilizing braces" would fall in the future. This is because ATF has conducted and would continue to conduct enforcement actions, including criminal actions, against existing FFLs that manufacture firearms that do not comply with the law. In the absence of this rule, ATF estimates that these enforcement actions against existing FFLs, which would ultimately impact individuals in possession of firearms with an attached "stabilizing brace," would change the market perception of firearms with "stabilizing braces" and affect the overall demand for these items, regardless of the implementation of the rule.

Dividing the estimated number of firearms with "stabilizing braces" (2,970,000 "braces") by 8 years, ATF estimates that the future number of firearms with "stabilizing braces" would be about 371,250 a year. However, in light of future enforcement actions taken, regardless of this rulemaking, ATF estimates the future number of firearms with "stabilizing braces" will be less than the current annual number of firearms with "stabilizing braces" by an amount equal to the amount sold through FFLs (124,192 from Type 7 FFL manufacturers and 92,470 from Type 1 FFL dealers), making the estimated future number of firearms with "stabilizing braces" 154,588 sold to individuals.[108]

Because diminished demand may affect demand for the entire firearm and not simply the "brace" device itself, ATF assumed a 50 percent even distribution between the value of the "brace" device and the whole firearm. The average value of the "stabilizing brace" is $270 and

---

[108] 154,588 future "stabilizing braces" = 371,250 annual firearms with "stabilizing braces" – (13,210 Type 1 FFL * 7 firearms with "stabilizing braces") – (3,881 Type 7 FFL * 32 firearms with "stabilizing braces").

the average value of a firearm with attached "stabilizing brace" is $1,246, which would mean a

loss of $117.2 million in sales per year. [109]

---

[109] $117.2 million = (154,588 * 50 percent * $270) + (154,588 * 50 percent * $1,246).

# 8. Summary of the Overall Cost of the Rule

As stated in chapter 2 (Population), there may be a range between 3 and 7 million "stabilizing braces" already purchased by the public. This chapter reviews the overall potential costs depending on the estimated number of firearms with attached "stabilizing braces," with ATF's primary (low estimate) of 3 million and a high estimate of 7 million firearms with attached "stabilizing braces."

## 8.1 Primary (low estimate) cost of the final rule

This section summarizes the total private societal costs for individuals and industry of this final rule as described throughout this RIA. In order to simplify the expected costs of this rule, ATF summarizes each of the scenarios and frequency of the scenarios. Table 8–1 shows the total private societal costs for each scenario.

Table 8–1  Societal Cost of Final Rule Per Scenario

| Scenario | Cost | Frequency |
|---|---|---|
| Turn in to ATF | $471,279,852 | one-time |
| Destroy Whole Firearm | $466,490,905 | one-time |
| Convert into Rifle | $101,785,677 | one-time |
| Apply Under NFA | $113,169,280 | one-time |
| Loss in Existing Firearms with "Stabilizing Braces" and "Brace" Devices | $64,899,360 | one-time |
| Foregone Revenue | $117,177,704 | annual |

Based on the above information, ATF shows the total private societal 10-year cost of the rule using a primary estimate of 3 million firearms with attached "stabilizing braces." Table 8–2 shows the 10-year cost.

Table 8–2  Private Societal 10-year cost of rule

| Year | Undiscounted | Discounted |
|---|---|---|

|  |  | 3% | 7% |
|---|---|---|---|
| 1 | $1,217,625,074 | $1,182,160,266 | $1,137,967,359 |
| 2 | $117,177,704 | $110,451,224 | $102,347,545 |
| 3 | $117,177,704 | $107,234,198 | $95,651,911 |
| 4 | $117,177,704 | $104,110,872 | $89,394,309 |
| 5 | $117,177,704 | $101,078,517 | $83,546,083 |
| 6 | $117,177,704 | $98,134,482 | $78,080,452 |
| 7 | $117,177,704 | $95,276,196 | $72,972,385 |
| 8 | $117,177,704 | $92,501,162 | $68,198,491 |
| 9 | $117,177,704 | $89,806,953 | $63,736,907 |
| 10 | $117,177,704 | $87,191,217 | $59,567,203 |
| Total | $2,272,224,410 | $2,067,945,087 | $1,851,462,645 |
| Annualized |  | $242,426,250 | $263,606,628 |

Using a primary (low) estimate of 3 million firearms equipped with "stabilizing braces," the annualized private societal cost of this final rule would be $242.4 million and $263.6 million, at 3 percent and 7 percent respectively.

8.2   Transfers from Industry to Public

Based on public comments, the Department has decided to forbear all NFA taxes for all firearms encompassed by this rule for all makings and transfers that occurred prior to the date of the rule's publication. As a result, there will be no transfers from the industry to the government as a result of this rule.

8.3   Government Costs

In addition to the private societal costs to this rule, there would be government costs associated with this rule to handle the processing of NFA applications received. ATF's National Firearms Act Division anticipates having to hire 10 additional staff 2 years earlier than originally planned. These 10 employees will be a mix between GS-6 and GS-7s. Because they will be hired as new employees and because ATF does not know the precise number of GS levels to be hired, ATF assumes an even mix (5) of employees at each GS level and assumes all will be hired

63

at a step 1.  The base salary for the locality pay area of Washington-Baltimore-Arlington – DC-MD-VA-WV-PA for a GS-6 is $45,574, and the base salary for a GS-7 is $50,643.

To account for things like fringe benefits, ATF uses the Congressional Budget Office's ("CBO") report to account for the difference in benefits between workers in the industry versus workers in the Federal government.  In a comparison of compensation from 2011 through 2015, CBO estimated that, although total compensation differed by varying degrees between the private sector and Federal government depending on workers' education attainment, "[o]verall, the [F]ederal government paid 17 percent more in total compensation [including benefits] than the private sector, after accounting for certain observable characteristics of workers."[110]  Based on information from BLS, ATF estimates that the 2021 load factor for all of private industry is 1.425; therefore, the estimated Federal load rate was calculated to be 1.67.[111]

Assuming a load rate of 1.67, the loaded salaries for additional staff are $76,109 for a GS-6 and 84,574 for a GS-7, making the total yearly government cost for 10 additional staff to be $481,085 for the first 2 years.[112, 113]

In anticipation of a significant increase in NFA applications, ATF plans to use additional resources to maintain the server and information technology to support the workload.  ATF estimates an up-front cost of $2.2 million to upgrade the NFA application system and handle actions related to the tax forbearance and an annual cost of $2.85 million to maintain the level of

---

[110] Congressional Budget Office, Comparing the Compensation of Federal and Private-Sector Employees, 2011–2015, at 3 (2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52637-federalprivatepay.pdf.

[111] 1.67 Federal load rate = 1.4247 industry load rate * 1.17 factor in additional compensation.

[112] GS-6 $76,109 = $45,574 * 1.67.

[113] GS-7 $84,574 = $50,643 * 1.67.

applicants.  Combined, the first-year cost is $5.5 million.  Table 8–3 shows the 10-year government cost to implement this rule.

Table 8–3  Government 10-year cost of rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |
| 1 | $5,531,085 | $5,369,985 | $5,169,238 |
| 2 | $3,331,085 | $3,139,867 | $2,909,499 |
| 3 | $2,850,000 | $2,608,154 | $2,326,449 |
| 4 | $2,850,000 | $2,532,188 | $2,174,251 |
| 5 | $2,850,000 | $2,458,435 | $2,032,011 |
| 6 | $2,850,000 | $2,386,830 | $1,899,075 |
| 7 | $2,850,000 | $2,317,311 | $1,774,837 |
| 8 | $2,850,000 | $2,249,816 | $1,658,726 |
| 9 | $2,850,000 | $2,184,288 | $1,550,211 |
| 10 | $2,850,000 | $2,120,668 | $1,448,795 |
| Total | $31,662,170 | $27,367,542 | $22,943,093 |
| Annualized | | $3,208,311 | $3,266,580 |

Other government actions were not accounted for in this analysis because these actions will be budget neutral.  For instance, ATF does not anticipate needing to add or otherwise require additional law enforcement personnel to impose civil or criminal penalties after the period to comply ends.

8.4   Combined Private Societal and Government Costs

This section summarizes the combined total costs of under this final rule as described throughout this RIA.  In order to simplify the expected costs of this rule, ATF summarizes each of the scenarios and frequency of the scenarios.  Table 8–4 shows the combined private societal and government costs for each scenario.

Table 8–4  Combined Private Societal and Government 10-year cost of rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |

| 1 | $1,223,156,159 | $1,187,530,252 | $1,143,136,597 |
|---|---|---|---|
| 2 | $120,508,789 | $113,591,092 | $105,257,043 |
| 3 | $120,027,704 | $109,842,352 | $97,978,360 |
| 4 | $120,027,704 | $106,643,060 | $91,568,561 |
| 5 | $120,027,704 | $103,536,952 | $85,578,094 |
| 6 | $120,027,704 | $100,521,312 | $79,979,527 |
| 7 | $120,027,704 | $97,593,507 | $74,747,222 |
| 8 | $120,027,704 | $94,750,978 | $69,857,217 |
| 9 | $120,027,704 | $91,991,241 | $65,287,118 |
| 10 | $120,027,704 | $89,311,884 | $61,015,998 |
| Total | $2,303,886,580 | $2,095,312,630 | $1,874,405,737 |
| Annualized | | $245,634,561 | $266,873,208 |

The combined private societal and government annualized cost of under this final rule would be $245.6 million and $266.9 million, at 3 percent and 7 percent respectively.

## 8.5  High Cost of the Final Rule

This section summarizes the total costs of this final rule based on the methodology described above, but on the assumption that the current population of "stabilizing braces" is 7 million rather than 3 million.  ATF summarizes each of the scenarios and the frequency of the scenarios.  Table 8–5 shows the costs for each scenario.

Table 8–5  High Cost of Final Rule Per Scenario

| Scenario | Cost | Frequency |
|---|---|---|
| Turn in to ATF | $1,189,880,980 | one-time |
| Destroy Whole Firearm | $1,081,102,130 | one-time |
| Convert into Rifle | $242,058,964 | one-time |
| Apply Under NFA | $261,296,059 | one-time |
| Loss in Existing Firearms with "Stabilizing Braces" and "Brace" Devices | $149,727,420 | one-time |
| Foregone Revenue | $218,634,488 | annual |

Based on the above information, ATF shows the 10-year cost under this final rule using a high estimate of 7 million firearms with attached "stabilizing braces." Table 8–6 shows the 10-year cost, including the aforementioned government costs.

Table 8–6  High 10-year cost of rule

| Year | Undiscounted | Discounted | |
| | | 3% | 7% |
|---|---|---|---|
| 1 | $2,929,596,638 | $2,844,268,581 | $2,737,940,783 |
| 2 | $221,965,573 | $209,223,841 | $193,873,328 |
| 3 | $221,484,488 | $202,689,682 | $180,797,317 |
| 4 | $221,484,488 | $196,786,099 | $168,969,455 |
| 5 | $221,484,488 | $191,054,465 | $157,915,379 |
| 6 | $221,484,488 | $185,489,772 | $147,584,466 |
| 7 | $221,484,488 | $180,087,157 | $137,929,408 |
| 8 | $221,484,488 | $174,841,900 | $128,905,989 |
| 9 | $221,484,488 | $169,749,418 | $120,472,886 |
| 10 | $221,484,488 | $164,805,260 | $112,591,483 |
| Total | $4,923,438,115 | $4,518,996,175 | $4,086,980,494 |
| Annualized | | $529,764,211 | $581,894,076 |

Using a high estimate of 7 million firearms equipped with "stabilizing braces," the annualized high cost under this final rule would be $529.8 million and $581.9 million, at 3 percent and 7 percent respectively.

67

# 9. Benefits

The purpose of this rule is to put forward ATF's best interpretation of "rifle" to clarify when a rifle is "designed or redesigned, made or remade, and intended to be fired from the shoulder." The rule sets forth factors that that are to be considered in determining whether firearms with an attached "stabilizing brace" are "rifles" or "short barreled rifles" under the GCA or NFA. Congress placed stricter requirements on the making and possession of short-barreled rifles because it found that, as uniquely dangerous weapons, they pose a significant risk of crime and a danger to the public. This danger arises from the fact that short-barreled rifles are more easily concealable than long-barreled rifles but still have more destructive power than other weapons. Because these types of weapons are subject to a more complex regulatory scheme (*i.e.*, requiring approval by the Attorney General prior to their making or transfer and registration in the NFRTR), they are generally more difficult and less attractive for criminals to obtain and use.

ATF estimates that NFA weapons are less likely to be used due to the registration and tax processes involved with acquiring NFA weapons. Based on trace data between the years 2018 to 2021, there have been approximately 1.9 million traces on both GCA firearms and NFA weapons. Of weapons traced, NFA weapons, not including short-barreled rifles, are less likely to be used in criminal activities. Because trace data does not distinguish between short-barreled rifles and long-barreled rifles, ATF used NFA weapons (other than short-barreled rifles) as a proxy to make a comparison between the likely use of short-barreled rifles versus long-barreled rifles in crimes.[114] In order to make proxy comparisons between the likelihood of GCA firearms

---

[114] NFA weapons (other than short-barreled rifles) such as "any other weapon," "destructive devices," "silencers," "machine guns," and tear gas launchers are items that are tracked in ATF's trace database.

and NFA weapons used in crime, ATF used the ATF's Annual Firearms Manufacturing and
Exportation Report ("AFMER") to estimate a population of GCA firearms currently in
circulation (i.e., pistols and rifles in the Table 9–1).[115]  And to estimate the population of NFA
weapons in circulation, ATF used information from the NFRTR on all approved registrations of
NFA weapons for the same time period.[116]  Table 9–1 illustrates the comparisons of traces
among pistols, rifles, and other NFA weapons.

Table 9–1  Comparison of Traces Between GCA firearms versus NFA weapons

| Weapon Type | Number in Circulation From 2018 to 2021 years | Traces by Weapon Type from 2018 to 2021 | Percent found in Traces |
|---|---|---|---|
| Pistols | 20,352,712 | 1,246,631 | 6.13% |
| Rifles (including SBRs) | 22,365,873 | 259,492 | 1.16% |
| NFA Weapons (Not including SBRs) | 8,119,469 | 11,464 | 0.14% |

Based on Table 9–1, NFA weapons, other than short-barreled rifles, are used in 0.14
percent of crimes where a firearm is found versus 6.13 percent of pistols.

Congress passed the NFA for the express purpose of regulating specific firearms, such as
short-barreled rifles, which Congress determined posed a greater risk to public safety as
"gangster" type weapons of an especially unusual and dangerous nature.  Therefore, the
Department emphasizes that the risk to public safety posed by these weapons was identified by
Congress, not ATF, and this rule acts to serve the interests of Congress, as expressed in the NFA.
Therefore, by providing clarity to the public and industry on how ATF interprets and enforces

---

[115] The AFMER contains information for GCA firearms that were manufactured per year as reported by
manufacturers.  The AFMER contains manufacturing data for pistols, rifles, and miscellaneous firearms (i.e.,
firearm receivers).  This was considered the best available information for the manufacturing of long-barreled rifles.

[116] The population of rifles in Table 9–1 includes all firearms (not including pistols) from the AFMER report and
short-barreled rifles that are registered and approved in the NFRTR.

the NFA, as described throughout the final rule, the rule is intended to enhance public safety in a manner determined by Congress.

Lastly, as discussed in the rule, firearms equipped with "stabilizing braces" have been used in at least two mass shootings, with shooters in both instances reportedly shouldering the "brace" as a shoulder stock, demonstrating the weapons' efficacy as "short-barreled rifles."[117] The compact size of these firearms also assists with concealability of a firearm with a large destructive power. Since 2014, the Firearms Technology Criminal Branch reports that there have been approximately 104 federal criminal classifications where firearms equipped with a "stabilizing brace" have been received by FATD for classification as a part of criminal investigations. Further, since 2015, ATF reports that approximately 63 firearms with "stabilizing braces" have been traced in criminal investigations.[118] ATF has approximately 105 firearms cases or investigations involving "stabilizing brace" devices.[119] For more information, please see section IV.A.2 in the final rule for further details.

---

[117] *See, e.g.,* Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole* USA Today (published Aug. 5, 2019, updated Aug. 6, 2019), https://www.usatoday.com/story/news/nation/2019/08/05/dayton-shooter-used-gun-may-have-exploited-legal-loophole/1927566001/ (the firearm used in a shooting killing 9 people and wounding 14 had a "pistol brace" used to "skirt[]" regulation of short-barrel rifles); Melissa Macaya *et al.,* *10 killed in Colorado grocery store shooting,* CNN (updated Mar. 23, 2021), https://www.cnn.com/us/live-news/boulder-colorado-shooting-3-23-21/h_0c662370eefaeff05eac3ef8d5f29e94 (reporting that the firearm used in a shooting that killed 10 was an AR-15 pistol with an "arm brace").

[118] This information is drawn from the Firearms Tracing System ("FTS") database maintained by ATF's National Tracing Center's covering January 1, 2015, through November 1, 2022. The number of traced firearms equipped with a "stabilizing brace" device may be underreported because this information is captured in FTS when the user entering the firearm information makes observations and enters relevant terms like "brace" or "stabilizing brace" in the "Additional Markings" field of FTS.

[119] This information is from ATF's OSII covering January 1, 2015, through November 1, 2022.

# 10.   Analysis of Alternatives Considered

This chapter outlines the alternatives considered by the Department prior to and during this rulemaking.  Table 10–1 provides a summary outline of the alternatives, along with the benefits and drawbacks of each alternative.

Table 10–1  Summary of Cost and Benefits of the Alternatives

| Summary | 7% Annualized Discounted Costs | Benefits |
|---|---|---|
| Preferred Alternative | $266.9 million | - To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>- To enhance public safety by reducing the criminal use of such firearms, which are easily concealable from the public and first responders. |
| Alternative 1: No Change | $0 | $0 |
| Alternative 2: Specific Quantifiable Standards with Set Metrics | Less than Preferred Alternative | Less than Preferred Alternative since it does not account for non-quantifiable features. |
| Alternative 3: Grandfather all existing firearms with stabilizing arm brace | $117.2 million | Similar but not identical to the Preferred Alternative due to these firearms not being registered as per the NFA. |
| Alternative 4: Guidance documents | $164.2 million | Less than the Preferred Alternative because not as clear as amended regulations and non-FFLs may be less aware of guidance and hence continuing selling firearms outside the purview of the NFA. |
| Alternative 5: NPRM Weighted Criteria | Same as the Preferred Alternative, but potential for greater public confusion | Same as Preferred Alternative but may be more confusing to individuals and FFLs in terms of compliance. |
| Alternative 6: No Tax Amnesty | $293.0 million | Similar but not identical to the Preferred Alternative |

A discussion of the costs follows in the sections below.

10.1  This Final Rule—Factoring Criteria for Firearms with Attached "Stabilizing Braces."

This alternative allows individuals and entities that currently have firearms with attached "stabilizing braces" to submit an application to register their affected firearms in the NFRTR within 120 days from the date the rule is published without paying the $200 making tax.  In this scenario, there will be fewer transfer payments than if the Department had not provided this tax forbearance.  Overall, under this final rule, more individuals and FFLs will apply to register their affected firearms under the NFA.  This alternative also clarifies the criteria to be applied by ATF in determining whether a firearm with attached "stabilizing brace" falls under the GCA or the NFA.

10.2  Alternative 1—No change alternative.

Some commenters requested that there be no change made.  Making no change would have no costs or benefits because it would maintain the existing status quo.  This alternative was considered and not implemented because the NFA requires regulation of short-barreled rifles, and ATF has determined that the best reading of the statutory definition of rifle includes many weapons with purported "stabilizing braces."  Currently, many persons could be in possession of firearms regulated under the NFA without complying with NFA requirements.

10.3  Alternative 2—Specific quantifiable standards with set metrics.

This alternative would provide specific, defined parameters in terms of defining a "stabilizing brace" or a stock (such as by using length only) and establishing set metrics for the standard.  This alternative would be easier for the public to apply to their firearms than the weighted criteria as presented in the NPRM.  Where this was feasible, the Department has incorporated quantifiable standards into the factors that in this final rule so that the public may

72

easily apply and follow them.  The Department considered and incorporated, where appropriate, this alternative as requested by commenters.  Some of factors included in this final rule, however, do not lend themselves to readily quantifiable standards, and yet still may be probative of whether a weapon is designed and intended to be fire from the shoulder.  Hence, the Department determined that it would not be appropriate to rely solely on specifically quantified standards with established metrics.

10.4   Alternative 3—Grandfather all existing firearms with an attached "stabilizing brace."

This alternative would grandfather all existing firearms with an attached "stabilizing brace."  The Department cannot have a grandfather clause that prospectively excuses individuals from compliance with the provisions of the NFA.  For more details as to why the Department cannot provide grandfathering, please refer to section IV.B.9.b in the final rule.

10.5   Alternative 4—Guidance documents.

This alternative would publish a guidance document that would be similar to open letters that ATF has issued in the past and would not, in contrast to the current rule, amend ATF's current definitions of "rifle."  While this alternative might have been faster than issuing the current interpretive rule, it would not have fully met the objectives outlined in this rule.  The Department is seeking to correct prior misapplication of the statutory definitions by parties who are in possession of firearms equipped with a "stabilizing brace."  Thus, the Department believes that amending the regulatory definitions themselves is necessary to provide additional clarity.  Further, the Department determined that issuing another open letter or issuing enforcement actions against FFLs would only affect the regulated community but not individuals or entities not regulated by ATF.  Entities outside the regulatory regime under ATF will continue to manufacture, market, and sell such firearms as firearms falling outside the purview of the NFA.

73

The Department thus believes its current approach both provides more clarity and allows for more public participation than would have been involved in issuing a more abbreviated guidance document.

10.6   Alternative 5—NPRM weighted criteria.

This alternative would clarify that a "rifle" includes any weapon with a rifled barrel equipped with an accessory or component purported to assist the shooter to stabilize the weapon while shooting with one hand, commonly referred to as a "stabilizing brace," that has objective design features and characteristics that facilitate shoulder fire as described in ATF Worksheet 4999 as described in the NPRM.  Based on public comments, the Department rejected a weighted criteria in the final rule because the criteria included a point system that would be difficult for users to apply.  In addition, the NPRM alternative included certain criteria that focused on the effectiveness of a "stabilizing brace" for operating a firearm with one hand, rather than whether the firearm is designed and intended to be fired from the shoulder.

10.7   Alternative 6—No tax forbearance.

This alternative would require individuals and entities that currently have firearms with attached "stabilizing braces" to apply and register their affected firearms under the NFA and pay the $200 making tax.  The private social costs of this alternative would be similar but not identical to the Preferred Alternative as more individuals would choose to dispose the "stabilizing brace" rather than register their firearms with attached "stabilizing brace" and pay the $200 tax.  Similar to this final rule, the bulk of the cost to this alternative would be the forgone future revenue and the loss in property for individuals not applying under the NFA.  This alternative was rejected because individuals and Type 1 FFL dealers who currently possess firearms with attached "stabilizing brace" may not have been the makers of said firearm, and

under the NFA it is the maker or manufacturer who incurs the NFA tax liability for the making of a NFA firearm.  *See* 26 U.S.C. 5821.

# 11.   Final Regulatory Flexibility Act

In accordance with the Regulatory Flexibility Act ("RFA"), ATF prepared a Final

Regulatory Flexibility Analysis ("FRFA") that examines the impacts of the rule on small entities

(5 U.S.C. 601 *et seq*.).  The term "small entities" comprises small businesses, not-for-profit

organizations that are independently owned and operated and are not dominant in their fields,

and governmental jurisdictions with populations of fewer than 50,000 people.

11.1   Findings

ATF performed an FRFA of the impacts on small businesses and other entities from the

Factoring Criteria of Firearms with Attached "Stabilizing Braces" final rule [2021R-08].  ATF

performed this assessment using the cost information discussed in chapters 3 through 8.

ATF estimates that, based on public response to this rule's clarification of the status of

certain firearms with attached "stabilizing braces," at least five manufacturers of "stabilizing

braces" would be potentially affected.  Based on a review of their websites, it is anticipated that

four of them would go out of business.  ATF also anticipates that this rule would affect 17,091

FFLs (13,210 Type 1 FFLs and 3,881 Type 7 FFLs), many of whom would be considered small

businesses.  Based on an Internet search of entities that sell "stabilizing braces" or firearms

equipped with a "stabilizing brace," ATF found 91 entities dealing in either "braces" or firearms

equipped with a "stabilizing brace."  Table 11–1 shows the size distribution by entity type.

Table 11–1  Size Distribution of Affected Entities

| Company Type | Size Small | Size Not Small |
|---|---|---|
| "Stabilizing Brace" Manufacturers | 5 | 0 |
| Type 7 FFL | 43 | 2 |
| Type 1 FFL | 21 | 7 |
| Accessories Retailers | 13 | 1 |

| | | |
|---|---|---|
| Total Small Companies | 82 | |

Of the 91 entities found, 82 were deemed small based on the size standards set by the

Small Business Administration ("SBA").  Table 11–2 illustrates the top seven industries affected

by this rule, based on the entities found.

Table 11–2  Top Seven Industries Affected by This Rule

| NAICS | Industry Affected | Number of Entities | Percent of Entities |
|---|---|---|---|
| 451110 | Sporting Goods Stores | 38 | 46.34% |
| 332994 | Small Arms, Ordnance, and Ordnance Accessories Manufacturing | 20 | 24.39% |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | 9 | 10.98% |
| 999990 | Undefined | 5 | 6.10% |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | 3 | 3.66% |
| 339999 | All Other Miscellaneous Manufacturing | 3 | 3.66% |
| 811490 | Other Personal and Household Goods Repair and Maintenance | 2 | 2.44% |
| All Other NAICS | All Other NAICS | 2 | 2.44% |

11.1.1  "Stabilizing Brace" Manufacturers

As stated above, four manufacturing entities are likely to discontinue their business

activities after ATF's interpretation of the NFA and GCA is published.  Table 11–3 shows the

average revenue of the affected entities and the average number of employees they retain.

Table 11–3  Economic Impact of "Stabilizing Brace" Manufacturers

| Complete Impact (100%) | | | |
|---|---|---|---|
| Number of Companies | Average Revenue | Average Employees | Number Small |
| 4 | $65,846.00 | 5 | 4 |
| Partial Impact (Unknown %) | | | |
| Number of Companies | Average Revenue | Average Employees | Number Small |
| 1 | $1,360,000.00 | 1 | 1 |

On average, this rule will result in an estimated overall loss of $263,384 in revenue and 20 jobs.

## 11.1.2  Destroy the Whole Firearm

Based on the information provided in chapter 4, ATF estimates that the FFL cost to destroy their inventory of firearms with attached "stabilizing brace" is $8,757.  Using this figure, ATF compared the cost of this scenario against the revenues of FFLs.  Table 11–4 illustrates the percent impact that this scenario will have on FFLs.

Table 11–4  Percent Impact to Destroy the Whole Firearm

| Percent Impact | FFL |
|---|---|
| 0%<X≤1% | 15 |
| 1%<X≤3% | 3 |
| 3%<X≤5% | 1 |
| 5%<X≤10% | 1 |
| 10%<X | 1 |

Based on the table above, FFLs will experience a range of impacts.

## 11.1.3  Convert to Rifle

Based on the information provided in chapter 5, ATF estimates that the per retailer (primarily Type 1 FFL) cost to convert their inventory of firearms with attached "stabilizing brace" is $2,597.  For a firearm manufacturer's (Type 7 FFL) inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $11,872.  Using these figures, ATF compared the cost of this scenario against the revenues of firearm manufacturers (Type 7 FFLs) and dealers (primarily Type 1 FFL).  Table 11–5 illustrates the percent impact that this scenario will have on retailers and manufacturers.

78

Table 11–5  Percent Impact to Convert Firearm with "Brace" into Long-Barreled Firearm

| Percent Impact | Retailers | Manufacturers |
|---|---|---|
| 0%<X≤1% | 18 | 22 |
| 1%<X≤3% | 2 | 14 |
| 3%<X≤5% | 0 | 0 |
| 5%<X≤10% | 1 | 4 |
| 10%<X | 0 | 3 |

Based on the table above, FFLs will experience a range of impacts.

## 11.1.4  Apply under NFA

Based on the information provided in chapter 6, ATF estimates that the per Type 1 FFL dealer cost to register their inventory of firearms with attached "stabilizing brace" as an NFA weapon is $286.  For a Type 7 FFL manufacturer with an SOT inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $33.  For a Type 7 FFL manufacturer without an SOT inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $775.  Using these figures, ATF compared the cost of this scenario against the revenues of Type 1 FFL dealers, Type 7 FFL manufacturer with an SOT and Type 7 FFL manufacturer without an SOT.  Table 11–6 illustrates the percent impact that this scenario will have on FFLs.

Table 11–6  Percent Impact for FFLs Applying Under NFA

| Percent Impact | Type 1 FFL | Type 7 FFL w/ SOT | Type 7 FFL no SOT |
|---|---|---|---|
| 0%<X≤1% | 18 | 43 | 43 |
| 1%<X≤3% | 2 | 0 | 0 |
| 3%<X≤5% | 0 | 0 | 0 |
| 5%<X≤10% | 1 | 0 | 0 |
| 10%<X | 0 | 0 | 0 |

Based on the table above, FFLs will experience a range of impacts.

## 11.1.5  Accessories Retailers

ATF determined that the economic impact to entities dealing only in "stabilizing braces" as part of their inventory of accessories or other non-firearm items (as opposed to dealing in firearms themselves) would not be significant.  This rule only affects a "stabilizing brace" once it is attached to a firearm.  Entities may continue to sell "stabilizing braces" so long as they are not attached to a firearm.  In addition, although this rule will likely affect the demand for "stabilizing braces," these "braces" constitute only a small fraction of the goods sold by accessories dealers, and this decrease in demand is not expected to significantly affect them.

## 11.1.6  Other Entities

There may be some government entities that qualify as small entities and may be affected by this rule.  ATF, however, estimates that this rule will not affect many States or political subdivisions, and that the number of such subdivisions qualifying as small entities will be even smaller, so ATF did not include the cost of registering such firearms under the NFRTR. However, ATF notes it may take 30 minutes to complete a Form 10.  Using a loaded wage rate of $49.67,[120, 121, 122] the cost per government entity, such as a local police department, to submit a Form 10 is $25.[123]

---

[120] Average wage rate for Police and Sherriff's Patrol Officers is $34.02. https://www.bls.gov/oes/2021/may/oes333051.htm

[121] ATF uses a loaded wage rate to account for fringe benefits such as insurance.  The load rate used for this rule is 1.416. BLS Series ID CMU2010000000000D,CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D,CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cmu]&s=popularity:D.

[122] Employee Cost Index of 1.031 to account for wage increases in 2022. https://www.bls.gov/news.release/archives/eci_04292022.pdf

[123] $25 for Government Entity to apply under NFA = $49.67 average, loaded hourly wage with employee cost index * 0.5 hours.

11.2  Final Regulatory Flexibility Analysis

The RFA establishes that agencies must try to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation.  To achieve this principle, agencies must solicit and consider flexible regulatory proposals and explain the rationale for their actions to assure that such proposals are given serious consideration.[124]

Under the RFA, the agency is required to consider what, if any, impact this final rule would have on small entities.  Agencies must perform a review to determine whether a rule will have such an impact.  Because the agency has determined that it will have a significant impact on a substantial number of small entities, the agency has prepared a FRFA as described in the RFA.

Under section 604(b) of the RFA, the FRFA must contain:

- a statement of the need for, and objectives of, the rule;

- a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments;

- the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

- a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

---

[124] Regulatory Flexibility Act, Pub. L. 96-354, sec. 2(b), 94 Stat. 1164 (1980).

- a description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

- a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

11.2.1  A statement of the need for, and objectives of, the rule.

One of the reasons the Department is issuing this rule is that individuals and affected entities have possessed, manufactured, or made NFA firearms—i.e., a rifle with a barrel or barrels less than 16 inches in length—without compliance with the registration and tax requirements of the NFA.  Specifically, they have made weapons that, when equipped with "stabilizing braces," are designed, made, and intended to be fired from the shoulder and thus meet the definition of a "rifle" under the GCA and NFA.  Many of these firearms incorporate a barrel of less than 16 inches in length, which requires registration in the NFRTR and a tax payment for the making and transfer of these firearms.  Short-barreled rifles have been recognized by Congress and the courts as the type of uniquely dangerous weapons appropriately regulated under the NFA.  *See United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) (Congress determined that the unregistered possession of the particular firearms regulated under the NFA should be outlawed because of "the virtual inevitability that such possession will result in violence"); *United States v. Cox*, 906 F.3d 1170, 1184 (10th Cir. 2018) ("[T]he historical

tradition of prohibiting the carrying of dangerous and unusual weapons" supported limiting the Second Amendment's protection to weapons "in common use at the time" of ratification. (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008)); = *Gonzalez*, 2011 WL 5288727, at *5 ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." (quoting S. Rep. No. 901501, at 28)).

The compact size of these firearms assists with concealability of a firearm with a large destructive power, and these are firearms Congress specifically intended to regulate.  If persons can circumvent the NFA by effectively making unregistered short-barreled rifles by using an accessory such as a "stabilizing brace," these weapons can continue to proliferate and could pose an increased public safety problem.  ATF has made clear to makers and manufacturers that their purported intent for the use or design of an accessory such as a "stabilizing brace" cannot be used to circumvent the requirements of the NFA when the affixed device and configuration of the firearm includes features inherent in shoulder-fired weapons.  For these reasons, it is necessary for the Department to clarify the definition of "rifle" by informing the public of the objective design features and other factors that will be considered when evaluating a firearm equipped with a "stabilizing brace" or other rearward attachment to determine if the firearm, as configured, is designed, made, and intended to be fired from the shoulder.  These objective design features may support or undercut a manufacturer's stated intent regarding whether the firearm is or is not designed, made, and intended to be fired from the shoulder.  For more details, please refer to section IV.A.2 in the final rule.

11.2.2 A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments.

Commenters suggested that Form 1 applications are for makers of NFA firearms; and because they bought their firearms configured with a "stabilizing brace," they should not be assessed the $200 NFA tax.  The Department concurred with this argument and is forbearing from collecting the $200 NFA making tax so long as parties submit a registration within 120 days after the final rule is published.  The Department is also forbearing from collecting any transfer tax that should have been paid with the transfer of firearms of the sort described in this rule for all transfers that occurred prior to the date of the publication of the final rule. Commenters also suggested including other costs that were not accounted for in the NPRM.  The Department concurred in part and incorporated some of the costs commenters suggested where possible.  Commenters suggested that this rule will close hundreds of businesses.  The Department concurred that there may be some small businesses that will be significantly affected and provided a more complete analysis on the impacts to small businesses.

11.2.3 The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

The Chief Counsel for Advocacy of the SBA did not file comments in response to the proposed rule.

11.2.4  A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

This rule will affect a significant number of small businesses.  Table 11–7 provides an estimated number of entities affected by the rule, most of which are considered small businesses under the SBA size standards.

Table 11–7  Estimated  Number of Small Entities Affected by this Rule

| Company Type | Estimated Number |
|---|---|
| "Stabilizing Brace" Manufacturers | 5 |
| Type 7 FFL | 3,881 |
| Type 1 FFL | 13,210 |
| Accessories Retailers | 13 |

Of these entities affected by the rule, the majority fall under the industry code for Sporting Goods Stores and Small Arms, Ordinance, and Ordinance Accessories Manufacturing, while others may fall under various other industry standards.  For more details regarding the industries affected, please refer to Table 11–2 above.

11.2.5  A description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

The Department estimates that most entities will file an E-Form 1 or E-Form 2 application under the NFA.  Please see chapter 6 regarding recordkeeping requirements.  However, if the entity does not choose to register its inventory of firearms with attached "stabilizing braces" under the NFA, then it will not need to file paperwork.  Should entities opt to convert their inventory of firearms with attached "stabilizing braces" into long-barreled rifles,

they may use existing employees with gunsmithing capabilities, but ATF notes that converting a firearm into a long-barreled rifle does not require any professional skills.

11.2.6  A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

The Department provides five means by which entities may comply with the final rule. Furthermore, the Department is also forbearing the tax for certain[125] entities to register their current inventory of firearms with attached "stabilizing braces" under the NFA, provided they submit the registration within 120 days of the date of the rule's publication.

---

[125] The only entities that would not receive the "forbearance" for registration of their current inventories would be SOT holders that file an E-Form 2 to register.  Because the E-Form 2 does not require submission of an accompanying NFA tax, there is no tax for ATF to "forbear" from collecting for these entities.

# 12.  Collection of Information

This rule would call for collections of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–20).  As defined in 5 CFR 1320.3(c), "collection of information" comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions.  The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow.  The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Under the provisions of this final rule, there is a one-time increase in paperwork burdens of NFA applications.  This requirement would be added to an existing approved collection covered by OMB control number 1140-0011 and 1140-0012.

TITLE:  Application to Make and Register a Firearm

OMB Control Number:  OMB 1140-0011

FINAL USE OF INFORMATION:  The ATF Form 1 (5320.1) is required to register an NFA firearm by any person, other than a qualified manufacturer, who wishes to make and register an NFA firearm.  The implementing regulations are in 27 CFR 479.61–479.71. Under the provisions of 26 U.S.C. 5822, no person can make an NFA firearm until he or she has applied for and received approval from the Attorney General (delegated to ATF).  Subject to certain exceptions, the making of an NFA firearm is subject to a tax of $200 (26 U.S.C. 5821).  The use of this information is to ensure that applicants are in compliance with relevant laws.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently, there is a total of 25,716 respondents to this information collection.  Of these 25,716 respondents, 477 of them are FFLs, 21,879 of them are trusts and legal entities, and 3,360 of them are individuals.  For the purposes

of this final rule, ATF estimates 8,606 Type 1 FFL dealers, 1,059 Type 7 FFLs manufacturers

without an SOT, and 826,001 individuals will submit a response due to this final rule.  For the

purposes of this final rule, the numbers of trusts and legal entities were not calculated.

FREQUENCY OF RESPONSE:  Currently, one time.  For this final rule, 2 to 32 times,

depending on the number of firearms.

BURDEN OF RESPONSE:  Currently, one time.  For this final rule, 2 to 32 times, depending on

the number of firearms.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The existing burden is 102,808 hours, with an

additional 1,746,132 hours due to this final rule.

TITLE:  Notice of Firearms Manufactured or Imported

OMB Control Number:  OMB 1140-0012

FINAL USE OF INFORMATION:  The Notice of Firearms Manufactured or Imported—ATF

Form 2 (5320.2) is required of (1) a person who is qualified to manufacture NFA firearms, or (2)

a person who is qualified to import NFA firearms, to register manufactured or imported NFA

firearm(s).  In general, under the provisions of 26 U.S.C. 5822, no person can make an NFA

firearm until he or she has applied for and received approval from the Attorney General of the

United States (delegated to ATF).  Subject to certain exceptions, the making of an NFA firearm

is subject to a tax of $200.  Section 5841(b) provides that each manufacturer and importer shall

register each firearm manufactured or imported.  Section 5841(c) provides that each

manufacturer shall notify the Attorney General about the manufacture of a firearm, as provided

by the regulations.  These provisions further state that each importer must obtain authorization as

required by regulations, prior to importing a firearm.  Section 5852(c) exempts a qualified

manufacturer from payment of the making tax for manufactured firearms.  The final use of this information is to ensure that applicants are in compliance with relevant laws.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently, there are 14,384 FFLs with an SOT.  For the purposes of this final rule, ATF estimates 882 Type 7 FFL manufacturers with an SOT will submit a response due to this final rule

FREQUENCY OF RESPONSE:  One time.

BURDEN OF RESPONSE:  Currently, respondents will respond one time.  This final rule may require a second response to incorporate a change in inventory.

ESTIMATE OF TOTAL ANNUAL BURDEN:  Currently, the burden in hours is 7,192.  This final rule would add an additional burden of 441 hours.

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted a copy of this final rule to OMB for its review of the collections of information.

.

# Appendix A Fingerprint Costs

Appendix A provides the list of digital fingerprint cards used to determine costs to apply

under the NFA.

| | | |
|---|---|---|
| Goshen County Sheriff's Office | $5.00 | Questions/Answers (goshensheriff.org) |
| Muscogee County Sheriff's Office | $5.00 | FAQ (columbusga.gov) |
| Idaho Falls PD | $10.00 | Finger Printing | Idaho Falls, ID (idahofallsidaho.gov) |
| Middletown PD | $10.00 | Services - Middletown Police Department (middletownkypd.org) |
| South Sound 911 | $10.00 | Fingerprints - South Sound 911 |
| Minnehaha County Sheriff's Office | $12.50 | Minnehaha County, South Dakota Official Website - Sheriff's Office - Fingerprinting |
| Arkansas Livescan | $15.00 | Arkansas Live Scan - An Arkansas-Based Digital Fingerprinting Company |
| Ramsey County Sheriff | $15.00 | Fingerprinting | Ramsey County |
| Kingsguard | $20.00 | KINGSGUARD - Livescan, Fingerprints, Fingerprinting Services |
| Accelerated Fingerprints | $25.00 | Accelerated Fingerprints® - Las Vegas Fingerprinting Services |
| Fingerprint Technologies | $25.00 | Services & Prices — Fingerprint Technologies (fingerprints4all.com) |
| Shelburne Police Department | $25.00 | Fingerprinting | Shelburne, VT - Official Website (shelburnevt.org) |
| Fingerprinting Services & Investigations | $30.00 | Digital Fingerprinting Services, Investigative Services | Portland, OR |
| DigitScan | $35.00 | Home - Arizona Fingerprints And More |
| Maryland Mobile Fingerprinting | $35.00 | Ink Fingerprinting - Maryland Mobile Fingerprinting |
| WOVO Identity Solutions | $35.00 | Fingerprinting on Card Services | Colorado Fingerprinting Services (wovois.com) |

# Appendix B Market Value of Firearms with Attached "Stabilizing Brace"

Appendix B provides the list of firearms with "stabilizing brace" used to determine the

average cost of a firearm with "brace."

| | | |
|---|---|---|
| Angstadt Arms | $1,379.00 | https://angstadtarms.com/product/udp-9-pistol-with-sba3-brace/ |
| BG Defense | $1,699.00 | https://bgdefense.com/product/type-a-sipr-10-5-gen3-pistol-sb-tactical-a3-brace/ |
| Bereli | $1,049.00 | https://www.bereli.com/saint-victor-5-56-ar-15-pistol-b5-low-capacity/ |
| Charlie's Custom Clones | $2,349.99 | Mk18 Folding Daniel Defense Pistol in FDE with SB-Tactical brace and Law Tactical folder in FDE | For Sale at CCC (charliescustomclones.com) |
| Atlantic Firearms | $1,189.99 | https://atlanticfirearms.com/zastava-arms-zpap92-1-5mm-ak-pistol-w-folding-brace |
| Gun Broker | $1,324.89 | https://www.gunbroker.com/item/920335752 |
| Omaha Outdoors | $2,079.99 | Sig Sauer MCX TACOPS 30 RD 300 Blackout 6.75" Pistol PCB Brace - Omaha Outdoors |
| Omaha Outdoors | $2,529.00 | Sig Sauer MCX Rattler Pistol 5.56 NATO 5.5" 30 RD M-LOK PCB Folding Brace - Omaha Outdoors |
| Atlantic Firearms | $1,187.00 | Zastava ZPAP92 Alpha Tactical Pistol For SALE - AtlanticFirearms.com |
| Atlantic Firearms | $1,284.99 | Zastava ZPAP92 Tactical Pistol Package On SALE - AtlanticFirearms.com |
| Classic Firearms | $943.99 | 9mm AR / AK Pistols For Sale at Classic Firearms |
| Gun Zone | $799.00 | https://gunzonedeals.com/product/grand-power-stribog-sp9a1-gen2-301-non-reciprocating-with-folding-sb-tactical-brace-and-hb-industries-mount#product_detail |
| Gun Zone | $1,089.00 | FDE Stribog SP9A1 30+1 Non-Reciprocating With FDE A3 Tactical Aluminum Side Folding Brace And Tailhook - Flat Trigger | GunZoneDeals.com Inc. |
| Gun Zone | $887.00 | Black Multi-Cam Stribog SP9A1 30+1 Non-Reciprocating With A3 Tactical Aluminum Side Folding Brace And Tailhook | GunZoneDeals.com Inc. |
| Gun Zone | $1,049.00 | https://gunzonedeals.com/product/grand-power-stribog-sp9a3-delayed-roller-blowback-9mm-pistol-with-a3-tactical-aluminum-folding-brace-and-tailhook-for-sale-gunprodeals.com#product_detail |
| Armory Weapons | $869.00 | https://armoryweapons.com/product/ak-15-pistol-mm47-762x39/ |
| Gun Buyer | $729.00 | https://www.gunbuyer.com/ati-300blk-omni-hybrid-10-5-f-atigomx30010mp4bfde-d.html |

91

| | | |
|---|---|---|
| ak47gunssilencers | $779.00 | DRACO AK47 PISTOL WITH BRACE , ROMANIAN \| ak47gunssilencers |
| Gun Buyer | $2,999.00 | F1 Custom UDP9 Rocket Pop 9mm 8.3" Barrel 30+1 - Gunbuyer |
| Guns Atlantic | $749.99 | PSA AK-P MOE SBA3 PISTOL BLACK - PALMETTO STATE ARMORY 5165450735 \| Guns Atlantic |
| Armory Weapons | $749.00 | https://armoryweapons.com/product/psa-ak-p-rail-moe-sba3-pistol-black-palmetto-state-armory-5165490401/ |
| Guns Atlantic | $699.00 | https://gunsatlantic.com/product/psa-ak-p-red-wood-triangle-side-folding-pistol/ |
| Palmetto State Armory | $949.99 | PSA AK-V 9mm MOE SBA-3 Pistol, Black \| Palmetto State Armory |
| Gun Buyer | $839.99 | S&W M&P 15 Pistol w/SBA3 Brace 223Rem/5.56 NATO 7.5" Barrel 30+1 - Gunbuyer |
| Guns Atlantic | $1,210.00 | SA VZ 58 PISTOL 762B 12"- CZECHPOINT \| Guns Atlantic |
| Express Ammunition Shop | $449.99 | SMITH & WESSON M&P15-22 22LR 7" BARREL 25+1 13321 - Express Ammunition Shop |
| Guns Atlantic | $1,235.00 | VZ 58 PISTOL 762B CZECHPOINT W/ BRACE \| Guns Atlantic |
| Sportsmans Outdoor Superstore | $1,774.99 | Sig Sauer MPX Pistols for Sale \| Sportsman's Outdoor Superstore (sportsmansoutdoorsuperstore.com) |
| Average Cost of Firearm | $1,246 | |

# Appendix C States with Short-Barreled Rifle and Other Weapons Restrictions

Appendix C provides the population and percent populations by State as well as numbers of FFLs by State.  This appendix also marks which States have general restrictions on both short-barreled rifles (SBRs) and "assault weapons" and States that have general restrictions on SBRs but not "assault weapons."

| State | General Restrictions on Both SBR and Assault Weapons | General Restriction on SBR but not on Assault Weapons | Population | Percent of US Population | Number of Type 1 FFL Dealers | Percent of FFLs |
|---|---|---|---|---|---|---|
| Alabama | -- | -- | 5,024,279 | 1.52% | 852 | 1.63% |
| Alaska | -- | -- | 733,391 | 0.22% | 852 | 1.63% |
| Arizona | -- | -- | 7,151,502 | 2.16% | 1309 | 2.50% |
| Arkansas | -- | -- | 3,011,524 | 0.91% | 840 | 1.61% |
| California | X | -- | 39,538,223 | 11.93% | 1791 | 3.42% |
| Colorado | -- | -- | 5,773,714 | 1.74% | 1442 | 2.76% |
| Connecticut | X | -- | 3,605,944 | 1.09% | 418 | 0.80% |
| Delaware | -- | X | 989,948 | 0.30% | 122 | 0.23% |
| District of Columbia | X | -- | 689,545 | 0.21% | 5 | 0.01% |
| Florida | -- | -- | 21,538,187 | 6.50% | 2272 | 4.34% |
| Georgia | -- | -- | 10,711,908 | 3.23% | 1355 | 2.59% |
| Hawaii | X | -- | 1,455,271 | 0.44% | 97 | 0.19% |
| Idaho | -- | -- | 1,839,106 | 0.55% | 719 | 1.37% |
| Illinois | -- | X | 12,812,508 | 3.87% | 1250 | 2.39% |
| Indiana | -- | -- | 6,785,528 | 2.05% | 1272 | 2.43% |
| Iowa | -- | -- | 3,190,369 | 0.96% | 1196 | 2.29% |
| Kansas | -- | -- | 2,937,880 | 0.89% | 937 | 1.79% |
| Kentucky | -- | -- | 4,505,836 | 1.36% | 1047 | 2.00% |
| Louisiana | -- | -- | 4,657,757 | 1.41% | 929 | 1.78% |
| Maine | -- | -- | 1,362,359 | 0.41% | 421 | 0.80% |
| Maryland | X | -- | 6,177,224 | 1.86% | 530 | 1.01% |
| Massachusetts | X | -- | 7,029,917 | 2.12% | 320 | 0.61% |
| Michigan | -- | -- | 10,077,331 | 3.04% | 1885 | 3.60% |

93

| | | | | | | |
|---|---|---|---|---|---|---|
| Minnesota | -- | -- | 5,706,494 | 1.72% | 1247 | 2.38% |
| Mississippi | -- | -- | 2,961,279 | 0.89% | 1885 | 3.60% |
| Missouri | -- | -- | 6,154,913 | 1.86% | 176 | 0.34% |
| Montana | -- | -- | 1,084,225 | 0.33% | 821 | 1.57% |
| Nebraska | -- | -- | 1,961,504 | 0.59% | 636 | 1.22% |
| Nevada | -- | -- | 3,104,614 | 0.94% | 400 | 0.76% |
| New Hampshire | -- | -- | 1,377,529 | 0.42% | 369 | 0.71% |
| New Jersey | X | -- | 9,288,994 | 2.80% | 313 | 0.60% |
| New Mexico | -- | -- | 2,117,522 | 0.64% | 481 | 0.92% |
| New York | X | -- | 20,201,249 | 6.09% | 1787 | 3.42% |
| North Carolina | -- | -- | 10,439,388 | 3.15% | 1842 | 3.52% |
| North Dakota | -- | -- | 779,094 | 0.24% | 448 | 0.86% |
| Ohio | -- | -- | 11,799,448 | 3.56% | 1994 | 3.81% |
| Oklahoma | -- | -- | 3,959,353 | 1.19% | 1057 | 2.02% |
| Oregon | -- | -- | 4,237,256 | 1.28% | 1150 | 2.20% |
| Pennsylvania | -- | -- | 13,002,700 | 3.92% | 2494 | 4.77% |
| Rhode Island | -- | X | 1,097,379 | 0.33% | 68 | 0.13% |
| South Carolina | -- | -- | 5,118,425 | 1.54% | 891 | 1.70% |
| South Dakota | -- | -- | 886,667 | 0.27% | 473 | 0.90% |
| Tennessee | -- | -- | 6,910,840 | 2.09% | 1159 | 2.22% |
| Texas | -- | -- | 29,145,505 | 8.79% | 4957 | 9.47% |
| Utah | -- | -- | 3,271,616 | 0.99% | 692 | 1.32% |
| Vermont | -- | -- | 643,077 | 0.19% | 279 | 0.53% |
| Virginia | -- | -- | 8,631,393 | 2.60% | 1395 | 2.67% |
| Washington | -- | -- | 7,705,281 | 2.32% | 911 | 1.74% |
| West Virginia | -- | -- | 1,793,716 | 0.54% | 658 | 1.26% |
| Wisconsin | -- | -- | 5,893,718 | 1.78% | 1341 | 2.56% |
| Wyoming | -- | -- | 576,851 | 0.17% | 535 | 1.02% |
| US Population | | | 331,449,281 | 100.00% | 52320 | 100.00% |
| Total | 8 | 3 | | | | |

To summarize, 4.5 percent of the U.S. population lives in States with restrictions on short-barreled rifles but not "assault weapons," and 26.55 percent of the U.S. population lives in States with general restrictions on the possession of both short-barreled rifles and "assault

weapons."  This latter percentage was divided two-ways (13.28 percent), to account for one half choosing to turn in firearms to ATF and the other half destroying the whole firearm.

Approximately 10.06 percent of Type 1 FFL dealers are located in States with bans on both NFA weapons and "assault weapons."  This percentage (10.06 percent) was divided evenly (5.03 percent) between choosing to turn in firearms to ATF and destroying the whole firearm.