# EXHIBIT P

1

```
 1                       UNITED STATES DISTRICT COURT

 2                        DISTRICT OF CONNECTICUT

 3   _____
     UNITED STATES OF AMERICA )
 4          Government        )      NO: 3:18CR288(JCH)
                             )      September 24, 2019
 5    vs.                     )      9:33 a.m.
     MOHAMMADREZI KAMALI      )
 6          Defendant.        )
     _____ )      141 Church Street
 7                                   New Haven, Connecticut

 8

 9                        SENTENCING HEARING

10

11

12

13   A P P E A R A N C E S:

14   For the Government :  Lauren Clark
                           U.S. Attorney's Office
15                         157 Church St., 25th Floor
                           New Haven, CT 06510
16
     For the Defendant :   Tracy Hayes
17                         Federal Public Defender's Office -
                           265 Church St., Suite 702
18                         New Haven, CT 06510-7005

19

20

21

22

23

24

25
```

2

```
 1          THE COURT:  We're here this morning in the

 2   matter known as the United States of America versus

 3   Mohammadrezi Kamali, Case Number 318CR288.  If I can have

 4   appearances please.

 5          MS. CLARK:  Good morning, Your Honor.  Lauren

 6   Clark on behalf of United States.  With me at counsel

 7   table is ATF Special Agent Macksoud.

 8          THE COURT:  Good morning to both of you.

 9          MR. HAYES:  Good morning, Your Honor.  Tracy

10   Hayes on behalf of Mr. Mohammadrezi Kamali.

11          THE COURT:  Good morning to all of you.  We're

12   here this morning in connection with the sentencing of

13   Mr. Kamali following his plea of guilty to one count of

14   dealing in firearms without a license in violation of

15   federal law.

16          Before we begin, I would like to confirm, Mr.

17   Kamali, that you had an opportunity to read the

18   Presentence Report which was prepared by our probation

19   officer in connection with your case.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.  And you were able to

22   discuss it with counsel before today?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Thank you.  I guess we'll start with

25   objections to the Presentence Report -- I apologize.
```

1          I should start by stating on the record my

2   understanding of my obligation here today that before

3   imposing a sentence upon Mr. Kamali for his conviction,

4   that I consider a number of factors set forth by the law

5   in a section of the law known as 3553(a).

6          I'm mindful of all of those sections.  I have a

7   list of them in front of me.  I will be mindful of all of

8   them.  I suspect we'll spend more time on some than

9   others and some will become more important in my decision

10  and I will consider all as they apply here.

11         For example, I don't think there's any

12  restitution issues in this case.

13         So we'll start first with the guidelines and

14  before we can do that, we have to determine if there's

15  any objection to the PSR.

16         For the Government, are there any objections to

17  the facts as set forth in the Presentence Report to

18  the extent that they could be relevant to sentencing

19  issues?

20         MS. CLARK:  No, Your Honor.  Not as the PSR has

21  been prepared by the probation office.

22         Although I will note that I understand Attorney

23  Hayes filed recently some additional objections that I

24  had not had an opportunity to respond to in writing.

25         THE COURT:  When were they filed?

4

```
1          MS. CLARK:  I believe September 6.

2          THE COURT:  I saw a lengthy letter from Attorney

3   Hayes in preparing for the sentencing that I would

4   characterize as objections to the PSR.

5          Is that what you are referring to or something

6   else I should have been reviewing?

7          MS. CLARK:  It looks to be a Second Addendum to

8   the PSR that was submitted on September 9, 2019.  That

9   makes certain objections as to the characterization of

10  the firearms as they are included in the PSR.

11         So to the extent the Court will be hearing

12  argument on those, I request an opportunity to address

13  those.

14         THE COURT:  Sure.  You have had an opportunity,

15  though, to read the Second Addendum I assume?

16         MS. CLARK:  I have, Your Honor.

17         THE COURT:  But as the PSR stands including the

18  Second Addendum, does the Government have objections to

19  any of the facts as set forth by the probation officer in

20  the PSR?

21         MS. CLARK:  No, Your Honor.

22         THE COURT:  Okay.  And the defense, objection to

23  facts?

24         MR. HAYES:  Your Honor, I believe that our

25  letter that I filed that's set forth in the PSR addendum
```

1   lists not only facts that we wanted to have either

2   clarified, changed and also just objections in general to

3   the base offense level, the offense level and things of

4   that nature.

5          THE COURT:  How do you propose we proceed,

6   Attorney Hayes, so we're able to complete this proceeding

7   in a reasonable time period?  I mean by way of an

8   organized consideration of the issues.  Your letter is

9   nine pages long.  Do you wish me to go through each line

10  of it?

11         MR. HAYES:  I think that's important for today's

12  purposes.

13         THE COURT:  That's fine.  Please add that Mr.

14  Kamali has been diagnosed with severe alcohol use

15  disorder based on using the money -- planned on using the

16  money obtained from the offense conduct to purchase

17  alcohol.  You want me to add that to the PSR?

18         MR. HAYES:  Yes.  That's important.

19         THE COURT:  Where?  What paragraph?

20         MR. HAYES:  Your Honor, the Court could add that

21  in perhaps paragraph 5 of 6.

22         THE COURT:  I don't think that's offense

23  conduct.  His diagnosis which I need to confirm in the

24  psychological evaluation, it seems to me belongs under

25  substance abuse or some other paragraph having to do with

6

1    his personal characteristics.

2         MR. HAYES:  The Court could definitely add it

3    there, Your Honor.

4         THE COURT:  Let's start with that.  You cite to

5    page 21.  I don't see "severe."  Have I missed that?  I

6    see in my opinion to a reasonable degree of medical

7    certainty, Mr. Kamali suffers from a psychiatric

8    condition alcohol abuse disorder.  Can you tell me where

9    the word "severe" is in that paragraph or --

10        MR. HAYES:  I'm looking at the second paragraph,

11   Your Honor, where it indicates that his manual dexterity,

12   alcohol consumption and impulsivity both played a role in

13   what led to this --

14        THE COURT:  Where does it say he suffers from

15   severe alcohol use disorder?

16        MR. HAYES:  Your Honor, I'm not sure if it says

17   severe.  It does say alcohol disorder, drug disorder.

18        THE COURT:  Why would you suggest I add the word

19   "severe" to that?

20        MR. HAYES:  If the Court does not add "severe,"

21   there's an alcohol disorder that we're asking the Court

22   to add.

23        THE COURT:  Actually the probation officer in

24   paragraph 76 has already reported in the second sentence

25   that he was diagnosed with severe alcohol use disorder.

1   Do you know where the word "severe" comes from, Officer

2   Murphy?

3           THE PROBATION OFFICER:  It was from the initial

4   evaluation from the Perceptions program.  It is a

5   different evaluation.  And the statement that we're

6   talking about regarding the objections in the addendum I

7   had added that in the acceptance of responsibility

8   section because that's what he's saying was part of the

9   contributing factor as to why he committed the offense.

10          THE COURT:  Acceptance of responsibility I heard

11  that.  Then I couldn't understand.

12          THE PROBATION OFFICER:  That's Mr. Kamali. What

13  he's saying in regard to why he committed the offense.

14          THE COURT:  I see.

15          THE PROBATION OFFICER:  So I took the position

16  that it was part of his acceptance of responsibility.

17          THE COURT:  Where will I find that?

18          THE PROBATION OFFICER:  I wrote that on the

19  first page of the second addendum.  It would be then

20  added into paragraph 45 of the PSR if the Court agrees.

21          THE COURT:  The Court, though, I am going to

22  rely on the Yale Psychiatric Evaluation.  That's much

23  more thorough than Preceptions and her diagnosis is

24  Alcohol Use Disorder with capital initials.  Therefore, I

25  would like the PSR amended at paragraph 76 to take out

1   the word "severe" and to capitalize Alcohol Use Disorder,

2   so the report recognizes that he has a formal diagnosis.

3           MR. HAYES:  Your Honor, I'm sorry.  The Court is

4   aware that we've filed in our sentencing submission the

5   Exhibit B does have that assessment.  The early on

6   assessment of Mr. Kamali and that's where the person who

7   evaluated him indicated that he had a severe alcohol use

8   disorder.

9           THE COURT:  Okay.  Anything further to add on

10  this first objection to Part A in the first paragraph of

11  your letter of September 9?

12          MR. HAYES:  No, Your Honor.

13          THE COURT:  The Court directs the probation

14  officer to delete the word "severe" in paragraph 76,

15  capitalize the first initial of Alcohol Use Disorder and

16  the Court agrees with the judgment of the probation

17  officer that inserting the remaining portion of the

18  defendant's objection in the acceptance section.

19  Otherwise, therefore, to some extent I guess the

20  objection has been sustained but otherwise it is

21  overruled.  Your next objection, sir.

22          MR. HAYES:  Thank you, Your Honor.  On page 4,

23  paragraph 6, it indicates that to the extent that the

24  paragraph suggests that Mr. Kamali had to comply with

25  certain requirements of the NFA in connection with

1   the undercover agent's purchase of the six firearms.

2         We're asking that the paragraph be revised to

3   clarify that the requirements did not apply to that

4   firearm specifically, the semiautomatic 300 Blackout

5   caliber firearm.  That's the one in question.

6         THE COURT:  Obviously you set forth for several

7   pages your argument about this that occupies a number of

8   pages in your sentencing memo, so I guess let's turn to

9   that issue.

10        I read the Second Addendum but more

11  appropriately read the sentencing memorandums of both of

12  the defense and the Government on this issue.

13        Is there anything that you want to be heard

14  further, sir, on what I will call the Blackout weapon?

15        MR. HAYES:  Thank you, Your Honor.  I don't

16  believe so.

17        THE COURT:  My understanding is that you object

18  that it does not fall into the scope of 5845(a) because

19  he cut off a few inches from the stock at the end, and

20  therefore, it isn't designed to be shot from the

21  shoulder.  And second that there's a kind of mens

22  rea aspect here which he didn't possess.

23        MR. HAYES:  That's correct.  May I add this:

24  When the Court indicated that -- what I want the Court to

25  at least have a sense of Mr. Kamali ordered parts, so he

1   did not order one box with all these pieces, meaning the

2   stock, the barrel, the receiver and all of the other

3   pieces.  There were different parts that he bought.  Even

4   before he assembled this to any gun or any firearm, he

5   cut what would be the barrel, the length of the barrel.

6   He cut what would have been the shoulder stock to make a

7   brace, then he put this together to make the overall

8   firearm.  There's no prohibition against doing anything

9   like that.

10          In fact, Mr. Kamali learned that from watching

11   YouTube videos and reading what would be letters from ATF

12   and others that are online and we cited to cases but

13   more appropriately --

14          THE COURT:  What cases?

15          MR. HAYES:  A recent case from the District of

16   Ohio and in that case, Your Honor, it indicated to the

17   Court are -- I want to get the cite.  So *United States v.*

18   *Wright*.  In my sentencing filing on page 11.

19          THE COURT:  I need a copy of that, Patrick.  I

20   don't believe I have it up here on the bench.  Thank you.

21   Go ahead.

22          MR. HAYES:  Thank you, Your Honor.

23          THE COURT:  It is not at page 11.  I'm sorry.

24   I'm in the wrong memo.  I apologize.

25          MR. HAYES:  It is cited as 18CR162 and it was

1   before the Honorable Judge James G. Carr.

2          THE COURT:  I know him well.

3          MR. HAYES:  The Northern District of Ohio and in

4   that case the defendant was --

5          THE COURT:  Did you attach a copy?  No wonder I

6   don't have it up here.  How can I access that?  You are

7   citing the docket.  That's perfectly fine.  I don't have

8   access to that docket.  I don't think -- I would have

9   read it if you attached it.  I don't believe it was

10  attached.

11         MR. HAYES:  I did not.  My filing might have

12  been lengthy to begin with, but I did not.  In that

13  matter, the defendant was acquitted.

14         What was at issue was the mens rea what the

15  Court had indicated earlier.  Did Mr. Wright intend to

16  possess and have this type of firearm, the same type of

17  firearm that we have in this case.  What was relied on by

18  Mr. Wright was expert testimony from Rick Vasquez.  He's

19  a retired agent from the ATF.  Agent Vasquez, Mr. Vasquez

20  now, has his own agency.  He's an expert.  He

21  typically doesn't testify, but he did at this particular

22  trial.  He indicated that no.  That it doesn't meet the

23  definition.  It is the same type of firearm that we have

24  in this case.  He also indicated that others like Mr.

25  Kamali rely on YouTube videos, rely on letters from the

 1    ATF.

 2            THE COURT:  Let's deal with the mens rea.  I

 3    didn't understand that to be guilty of this crime Mr.

 4    Kamali by making this particular weapon.  In other words,

 5    that this weapon counts in the crime, that he had to know

 6    he was violating the law.  I thought he had to know that

 7    he had in his possession and was selling a device which

 8    had characteristics -- which characteristics are illegal.

 9    I didn't think he had to know that it did violate the

10    law.  Another specific intent or mens rea.  I don't think

11    you cited me any cases that suggested that this crime had

12    a specific mens rea.

13            In other words, I've had a lot of defendants who

14    said -- securities defendants, I didn't think I couldn't

15    say this to the person buying my bonds.  Everybody does

16    it.  It is puffing.  If it's a lie, it is fraud, right?

17            A lot of people don't think they are violating

18    the law, but if they say or do things which violate the

19    law and they know they are saying or doing things, those

20    things even though they don't know they are violating the

21    law, I believe they are guilty certainly of this crime.

22    There may be other crimes that have specific intent, but

23    I don't think this one does.

24            MR. HAYES:  It is not even that he did not have

25    that specific intent.

1          THE COURT:  He doesn't need it in this offense I
2    don't believe.  The Government is going to tell me if I'm
3    wrong.  I will count on them to do that.
4          My understanding of this crime is you don't need
5    a specific intent.  You need to know that you had
6    something in your hands and you transferred it and what
7    you had, in fact, as a matter of fact, violates the law.
8          He doesn't have to know specifically that, you
9    know, just because he cuts off an inch or two from the
10   back of the firearm, it's still illegal.
11         MR. HAYES:  So I guess, Your Honor, this is as I
12   see it.  If one just has a firearm that has an
13   obliterated serial number, that's unlawful.  No matter
14   what that's unlawful.  We're not talking about this
15   firearm in this case, but in general.
16         THE COURT:  Understood.  Go ahead.
17         MR. HAYES:  But so in this case, this particular
18   weapon is not unlawful.  It is just not.  It doesn't meet
19   the definition of NFA.
20         THE COURT:  What did you mean by unlawful?
21         MR. HAYES:  I'm using what the Court -- the
22   Court's view of it.  So the firearm itself, the weapon
23   itself, not only did he think that he put together this
24   firearm that did not meet the definitions of NFA, didn't
25   meet any of the requirements, it was not unlawful to

14

1    possess this firearm or make this firearm.

2          THE COURT:  Right.  But his crime is selling

3    firearms without a license.  So the question is is it a

4    firearm within certain definitions of the statute.

5          MR. HAYES:  But it doesn't meet those

6    definitions.  So he pled guilty to not necessarily that

7    firearm.

8          THE COURT:  I understand that.  We're doing a

9    guidelines calculation and in order to do that, I have to

10   deal with your objection to this as a matter of fact and

11   as a matter of law and that's what I'm trying to do.

12         I guess we're getting -- we're tripping each

13   other up.  I don't know.  I'm not sure I'm following your

14   argument.  I guess I will tell you what I think.  I think

15   that his reasonable reliance argument which is I think

16   how you put it in your memo.  I don't think it is the

17   Government's burden to prove or show that the defendant

18   knew it was illegal to possess such a firearm under the

19   NFA.  They only have to show that the firearm he

20   possessed had characteristics that made it subject to

21   regulation or law.  And he knew that this firearm had a

22   barrel of under 16 inches.  He knew what the stock looked

23   like.  We're going to argue and have a debate over

24   whether that stock makes it a rifle or a pistol.  That's

25   a different question.  He knew what it looked like.

1    If I conclude what that looks like and how it

2    functions that makes it a rifle, then he knew the

3    characteristics that makes it unlawful under my

4    conclusion.  The fact that he misunderstood the law or

5    attempted to circumvent it by a little adjustment or

6    whatever thinking that would get him out from underneath

7    it, I don't think that's a defense.

8    MR. HAYES:  We're saying it does not fit under

9    the --

10    THE COURT:  That's a different argument.  You

11    put forth two arguments.  I'm trying to address your

12    second one.  What I call the mens rea.  Probably a

13    misnomer but your reasonable reliance argument.  So don't

14    squirrel me over to your first argument in response to

15    what I'm trying to get you to answer your second

16    argument.  What's your response to the second point as I

17    have just summarized it?

18    MR. HAYES:  When the Court -- I believe the

19    agent brought the weapon today.  When the weapon is put

20    together, it doesn't appear to be one that should be shot

21    from the shoulder.

22    THE COURT:  But that's your first argument.  I

23    would like to put to rest what is your second argument,

24    your reasonable reliance argument.  My understanding, if

25    this case went to trial over this firearm, that the

1    Government need not prove the defendant knew it was

2    illegal to possess it.  It merely must establish that the

3    defendant knew that the firearm possessed by him had

4    characteristics and those characteristics make it subject

5    to regulation.

6         *U.S. V. Kavoukian*, 354 F.3d, 117 at 120, Second

7    Circuit 2003, concluding that the jury was properly

8    instructed.  It must find beyond a reasonable doubt the

9    device possessed the characteristics that make it a

10   silencer and the defendant knew the device had those

11   characteristics.  Not that the defendant knew that the

12   device was an illegal silencer under the law.  That's not

13   the requirement.  We'll talk about the stock and is it a

14   rifle in a minute.  I just wish you would rest your

15   second argument at this time.

16        MR. HAYES:  When I reviewed the case the Court

17   just cited, one, that's a silencer.  So I think that's a

18   little different than what we're looking at in this case.

19   I'm not sure is a silencer lawful to possess at any point

20   if you are not some type of law enforcement agent.  I'm

21   not sure.  Perhaps some type of recreation perhaps you

22   can.  What I do know is the characteristics in this case

23   that Mr. Kamali relied on, as the Court said, when you

24   look at this firearm and you see the characteristics, it

25   is unlawful to have it.  But it is not unlawful to have

```
 1   it.  That's really what we're saying.  It is not.  No way
 2   does --
 3            THE COURT:  That's your first argument.  So are
 4   you abandoning your second argument?
 5            MR. HAYES:  I'm not, Your Honor.
 6            THE COURT:  Then make it.  Don't keep going back
 7   to your first argument.  Make your second argument.
 8            Is Judge Sand wrong in his model instruction
 9   35-99 where he basically quotes the Kavoukian standard as
10   applied to a weapon meaning yes, maybe a silencer, maybe
11   a rifle, maybe a pistol, whatever it is, whatever is
12   regulated by the National Firearm Act, Judge Sand thinks
13   the Kavoukian standard applies and I do, too.
14            MR. HAYES:  I guess the confusing part for me,
15   Your Honor, this does not apply to any of those
16   definitions.  It doesn't.
17            THE COURT:  What doesn't apply?
18            MR. HAYES:  The firearm in this case does not
19   meet that definition.
20            THE COURT:  So you are unable to make your
21   second argument without making your first argument.  You
22   have no basis for your second argument except that this
23   doesn't qualify under the statute.  Is that a fair
24   statement?
25            MR. HAYES:  That's how we look at it.  Perhaps
```

1    if I heard some more from the Government's response.

2          THE COURT:  No.  No.  You need to make your

3    argument, sir.  What is the basis for your argument of

4    your client's reasonable reliance for a reason that this

5    weapon shouldn't count?

6          MR. HAYES:  The basis for his reasonable

7    reliance, Your Honor, is what I cited to the YouTube

8    videos.  I cited to the letters that he reviewed.  Even

9    when he sold the weapon, he gave the agent a letter and

10   that letter says this type of firearm with the brace that

11   fits your forearm doesn't meet that standard.  Doesn't

12   meet the NFA standard.  What's considered I guess a ghost

13   gun, if you will.  It falls outside of the NFA standard.

14   So that's --

15         THE COURT:  Is that it?  I don't want to cut you

16   off.  I'm asking do you have anything further on this

17   issue of your second grounds?

18         MR. HAYES:  So when I cited to the *United States*

19   *versus Wright* case, that's the same.  That was basically

20   the same argument.

21         THE COURT:  You cited to something. I don't know

22   what it is.  That I can't see.

23         MR. HAYES:  I understand that, Your Honor.  The

24   only thing I can inform the Court that was the argument.

25   I had conversation with the agent, spoke with the defense

 1    attorney.  It is the same argument we're making here.

 2           THE COURT:  Does the Government wish to address

 3    the second argument made by the defense?

 4           MS. CLARK:  Your Honor summarized the cases that

 5    we had cited and the Sand jury instructions we understand

 6    to be the standard here for what is the mens rea here.

 7           I think the Court has it correct that it really

 8    means does the defendant understand the characteristics

 9    of the firearm and do those characteristics fit into that

10    definition.

11           The fact that they may have Googled or YouTubed

12    something and believed that he was circumventing the NFA

13    by doing certain things to the firearm is irrelevant and

14    so I think the Court has that correct.  I don't have

15    anything further to add on that.

16           THE COURT:  Let's address your first argument,

17    sir.

18           MR. HAYES:  May I reply?

19           THE COURT:  Of course.

20           MR. HAYES:  I understand what the Government

21    indicated.  I understand that the Court doesn't want to

22    hear the issue of intent.

23           THE COURT:  I didn't say that, sir.  I have

24    listened to you now for 10, 15 minutes on the issue of

25    intent.  Please don't say that on the record.

1              MR. HAYES:  I'm sorry, Your Honor.  I will move

2     on.  I apologize.

3              THE COURT:  Go ahead.  If you want to rebut the

4     Government or answer on this argument, go right ahead.

5              MR. HAYES:  I don't understand the difference

6     from what we're saying here.  Regarding the

7     characteristics and how the gun was put together was made

8     and sold.

9              THE COURT:  That's why I kept asking you.  As I

10    read your memo, I think you try to make two arguments for

11    Mr. Kamali.  That's fine.  You can make as many arguments

12    as you want.  If you make two separate arguments, I want

13    to address each one separately.  I've asked you do you

14    press it by itself, and I have heard you and I have given

15    you the opportunity to address it by itself and that's

16    fine.  I don't know what else I can do.

17             But I asked you at the beginning, are you making

18    two separate arguments and you said yes.  So I wanted to

19    hear the second argument.  So if you want to address that

20    further, go right ahead.

21             MR. HAYES:  Your Honor, I cannot add anymore

22    other than I believe that I have addressed the issue of

23    the characteristics and his reasonable reliance.  That's

24    what we see in other cases.  That's what we see

25    specifically in the *United States versus Wright* case, and

```
 1   I think that's different than the case or cases that the
 2   Government cited.
 3           THE COURT:  I have had handed up the transcript
 4   that you apparently cited and it's a ruling by Judge Carr
 5   on the Motion in Limine in which he allows there to be
 6   testimony along the lines of what you recounted that Mr.
 7   Kamali did.  I don't understand how that then changes the
 8   law.  What does the judge charge the jury?  Did he charge
 9   different than the Sand and Kavoukian cases in this
10   circuit.  He is in Ohio.  Maybe they have a different
11   standard in Ohio.  I wouldn't think so.  The fact he let
12   evidence in.  He said to the Government, look, you
13   shouldn't be arguing with me on this.  It might be
14   reversible error.  Let him testify.  I'll charge, then
15   we'll let the jury decide.
16           The fact that the jury acquitted the man.  I
17   don't know all the evidence in the case.  You haven't put
18   it in front of me.  The acquittal doesn't mean this
19   testimony is so relative and probative.  All it tells me
20   is the judge allowed testimony about what he did and what
21   he understood.  I might argue it is not relevant, but I
22   might let it in, too, because I would be concerned it
23   would be a basis for reversal, if I didn't.  But I would
24   charge per Kavoukian and the Sand instruction.  If I did
25   then I think that, yeah, it is what it is and it is not
```

22

 1   what this testimony is about.  But I don't see how that

 2   ruling on a Motion in Limine tells me that your second

 3   argument prevails because he researched and read a letter

 4   and did Google searches and cut off a little bit off the

 5   butt or whatever it is called.  I'm not a gun expert.

 6   That somehow he skirted the law and he wasn't in

 7   possession of a firearm covered by the statute.

 8          That's not my understanding of how we decide if

 9   he violated the law.  We decide based on what the firearm

10   is and did he know that it had the characteristics that

11   make it what it is.

12          MR. HAYES:  The Government is saying that's what

13   it is.  We're not saying that's what it is.

14          THE COURT:  That's fine.  That's your first

15   argument.  I'm trying to find out do you have a second

16   argument.  If so, the basis for that argument.

17          MR. HAYES:  Again just our reliance on what Mr.

18   Kamali viewed, on our own agent who viewed all of the

19   documents, all of the discovery and came helped us reach

20   the same conclusion, Your Honor.  That's all I have.

21          THE COURT:  Thank you.  On your first argument

22   that it is not a firearm, obviously I read the memo and

23   the objection which is similar to the memo but on this

24   point, is there anything you want to address the Court

25   further or to add?

23

```
 1              MR. HAYES:  No.

 2              THE COURT:  Okay.  Why isn't this a rifle having

 3   a barrel of less than 16 inches?  You don't dispute the

 4   barrel was 14 and a half or thereabouts?

 5              MR. HAYES:  No, I don't.

 6              THE COURT:  You didn't think it is a rifle

 7   because it isn't intended to be fired from the shoulder?

 8              MR. HAYES:  That's correct.

 9              THE COURT:  That's your argument?

10              MR. HAYES:  Yes.

11              THE COURT:  I have a picture of this weapon.  It

12   is attached to the Government's memorandum I believe and

13   it is Exhibit 1 of Exhibit 9, page 32 of 37 ECCMF.  And I

14   guess I would like to ask you how would I hold it without

15   it in my hand?

16              MR. HAYES:  I'm sorry.  So it is not.  Again it

17   is not.  When the Court said not hold it in its hand.

18              THE COURT:  What happens to the really long

19   thing sticking out the back of the weapon when I go to

20   fire it?

21              MR. HAYES:  That's the brace.

22              THE COURT:  It looks awfully long.  Where is it

23   going to brace into?  The crook of my elbow?

24              MR. HAYES:  Yes.

25              THE COURT:  How long is the piece behind the
```

1    pull of the trigger?  It looks a lot longer than my arm.

2    Maybe a man's arm is longer.

3            MR. HAYES:  So, Your Honor, just I think I'm not

4    sure the length of that piece.  Let me say this.

5            THE COURT:  Do you know that it fits within the

6    crook of my arm or your arm?

7            MR. HAYES:  I believe so because the whole

8    length of the firearm itself.

9            THE COURT:  I've got to be able to put my finger

10   on the trigger, so we have a starting point with the

11   trigger and my hand on the butt going down in a vertical

12   direction and from that distance back to the end of this

13   device.  Maybe I'm miscomprehending it's relative size

14   from the picture.  I'm asking you what is your basis of

15   your belief that it would fit if I had my finger on the

16   trigger?  It would fit in here such that I'm bracing it

17   on my arm.

18           MR. HAYES:  The basis of my belief is, one, from

19   my client.  Two, from my expert and just from my research

20   of this type of firearm.  As the Court can see what would

21   be the brace at the end of that on page 32.

22           THE COURT:  I'm looking at it.

23           MR. HAYES:  Originally it has a pad right where

24   you place that.  It adds some length to it.  So you place

25   that on your shoulder.  So it is cut so that it is not --

1   that padding is cut or reduced, removed, so that you can

2   place it on your arm not on your shoulder.  So it is not

3   intended to be shot from the shoulder.  If one does, the

4   intent is that it should be shot and made for your arm,

5   forearm, if you will.

6          On page 37 of 37, that shows what would be the

7   stock part and you can see what's -- you can see that

8   something is removed.

9          THE COURT:  Yeah.  I'm aware something was cut

10  off.  My question is you argue it is a pistol brace now.

11  Where do I find the definition of pistol brace?  I have a

12  recollection I read something about it, but I can't find

13  it right now and I would like to.  Is that the letter

14  from the ATF?

15         MR. HAYES:  Yes, it is.

16         THE COURT:  Tell me what pistol brace is opposed

17  to a shoulder?

18         MR. HAYES:  In the letter, I'm looking at page 3

19  of 9 the first paragraph.

20         THE COURT:  I have your unredacted memo, so I

21  don't have docketing numbers at the top.  I have what you

22  provided Chambers.  I have a letter Exhibit E.  Tell me

23  what exhibit it is.

24         MR. HAYES:  The Court said Exhibit E?

25         THE COURT:  That's what I turned to.  If it is

1   something else I should turn to, let me know.  This talks

2   about braces.  Where it says ATF has concluded attaching

3   a brace to a handgun, it's a forearm brace, does not make

4   it a short barrel rifle because the configuration it

5   submitted and approved and it is not intended to and

6   cannot comfortably be fired from the shoulder.

7           Alternatively points out if the thing is long

8   enough to go on the shoulder, then that's what it is.  It

9   is a shoulder stock.  I don't know if that's what you are

10  relying on when I asked you where would I be best

11  educated as to what a shoulder stock is.  It is not in

12  the statute as a foreman pistol brace.  It is not in the

13  statute I don't think.

14          MR. HAYES:  It is not.  It is called a shooter's

15  aid.

16          THE COURT:  So where do I find that he had this

17  view what he was doing was a pistol brace?  Therefore, it

18  isn't qualifying.  What's your authority?

19          MR. HAYES:  Well, the ATF.

20          THE COURT:  Where?

21          MR. HAYES:  Looking at Exhibit E.

22          THE COURT:  So I was in the right place.

23          MR. HAYES:  Yes.  Not the first but what would

24  be the second page.

25          THE COURT:  I'm at the second page.

1          MR. HAYES:  This refers to a letter from the

2     Department of Justice to Mark Barnes, the top, the ATF

3     determined the arm-stabilizing brace marketed as a

4     shooter's aid.

5          So I'm reading it.  To assist in shooting large

6     buffer tube, to equip pistols, was not a shoulder stock

7     and therefore, could be attached to a firearm without the

8     act of constituting the making of an NFA firearm.

9          THE COURT:  I understand that.  You have to

10    continue to read.  If, in effect, this thing that's

11    attached can be used on your shoulder, then it is a short

12    barrel rifle.  Look at the end of the sentence of the

13    paragraph there and then in the third paragraph, he does

14    the same thing.  If it is just a pistol brace, it is not

15    a rifle.  But if you can use it on your shoulder, then it

16    becomes a rifle.

17         MR. HAYES:  Then it is not intended for that

18    use.  If I then use it on my shoulder, really using it

19    unlawfully.  I've now redesigned it.  I have done

20    something to this gun that puts it within that purview of

21    the NFA.

22         THE COURT:  Who has done something with the gun?

23         MR. HAYES:  If I have taken this what would be

24    the brace, Your Honor, and now using it to be shot from

25    my shoulder, I am changing the design of the weapon.

 1    That's not the intent.  The intent is to brace for your

 2    arm, for your forearm.

 3            THE COURT:  Look at the last sentence of the

 4    first paragraph.  The ATF also advised, however, because

 5    the stabilizing brace was not designed as a shoulder

 6    stock, use of this device as a shoulder stock would

 7    constitute a redesign of the firearm, resulting in the

 8    classification of that firearm as a short barrel rifle.

 9            MR. HAYES:  Right.  But that's not the -- that's

10    not how it was designed is what I'm relying on.  It is

11    designed to be shot with shooter's aid resting on your

12    forearm or the crook of your arm.  Not to be shot from

13    the shoulder.  That's what we're relying on.  If I take

14    that same firearm and place it on my shoulder and use it

15    to shoot from my shoulder, I'm using it in a way that it

16    is not designed, so now I'm again putting it in that

17    purview.

18            THE COURT:  I understand your argument.

19    Anything further?

20            MR. HAYES:  No.  All I'm saying is that other

21    than you have the length, the brace, nothing really

22    changes, whether or not you shoot it from your forearm or

23    shoulder.  It is designed and made to be shot from your

24    forearm.  It is a brace.

25            THE COURT:  How much was cut off the end of

1   this, back of this weapon that otherwise would have been

2   a shoulder-designed firearm?

3           MR. HAYES:  I'm not sure.  It really doesn't

4   meet the length requirement.

5           THE COURT:  What length requirement?  You mean

6   Section 4 of the statute?

7           MR. HAYES:  So, Your Honor, this particular

8   brace there was about two to three, three and a half

9   inches cut off.  That's why we see the end of it without

10  any padding.

11          THE COURT:  Okay.  Anything else you wish to

12  present to the Court in this argument?

13          MR. HAYES:  So and I'm sorry again if that

14  letter that you referred to in Exhibit E from Mark

15  Barnes, to Mark Barnes, it says I'm looking at it again

16  page 2 what would be the bottom of the last paragraph,

17  the last sentence.  This is what I was drawing my

18  conclusion from.  Therefore, an NFA firearm has not

19  necessarily been made when the device is not reconfigured

20  for use as a shoulder stock even if the attached firearm

21  happens to be fired from the shoulder.  That's what I'm

22  relying on.  That's been my research all along.

23          THE COURT:  What tells me when you take two or

24  three inches of what otherwise would be a rifle falling

25  under 83 of 5845(a), what tells you that taking two or

1   three inches off the end of it, all the sudden makes it

2   an arm brace instead of a shoulder brace?

3          MR. HAYES:  Your Honor, we don't receive this.

4   We don't receive the rifle and start modifying it.

5   That's something totally different.  That's not what

6   happened here.  We received parts.  What would be the

7   butt what the Court is referring to the padding, if you

8   will, the two or three inches is cut off from the

9   padding, then that's made to what would be the shooter's

10  aid or arm brace, the stabilizing brace.  Then the entire

11  firearm is put together into this what we have.

12         THE COURT:  All right.  Thank you.  Attorney

13  Clark, your response.

14         MS. CLARK:  Thank you, Your Honor.  As we

15  briefed this extensively, I believe the issue that

16  Attorney Hayes is raising whether or not the firearm was

17  intended to be fired from the shoulder.

18         THE COURT:  No.  He's also making this argument

19  that it was built not as a rifle because it came in parts

20  and he altered one of the parts before he made it.  But I

21  actually think (c) when it defines a rifle, it means a

22  weapon made and intended to be fired from the shoulder,

23  so I think the only issue is was it intended to be fired

24  from the shoulder.

25         MS. CLARK:  We would agree, Your Honor.  I think

 1  that the exercise of acquiring different parts, if we

 2  were looking at the characteristics of this firearm as

 3  disassembled, this may be relevant.  We know Mr. Kamali

 4  assembled into a firearm with certain characteristics.

 5  To be held responsible for being in possession of the

 6  firearm, you look at the firearm he handed over.

 7          THE COURT:  How is it that when I look at it, I

 8  would conclude it is intended to be fired from the

 9  shoulder if he cutoff a couple of inches, make the butt

10  rough, and said it is now short enough or fits into my

11  arm?

12          MS. CLARK:  So the Court is correct in that the

13  NFA doesn't specifically define the term "shoulder stock"

14  and it doesn't define the term "pistol brace" so Attorney

15  Hayes is correct.  We defer then to what the agency

16  considered both of these devices.  The ATF they clearly

17  distinguish between what is marketed as a pistol brace

18  and what is marketed as a shoulder stock.  They are

19  two different devices with different usage.  They look

20  different.  It is based upon the incorporation of those

21  two pieces either a shoulder stock or a pistol brace that

22  one can infer whether or not the firearm was intended to

23  be fired from the shoulder.

24          The crux of the argument seems to be he's

25  claiming what's attached to this Blackout firearm is, in

1   fact, a pistol brace.  But he doesn't provide any support

2   for that.

3          The ATF letters correctly state that a pistol

4   brace, if it was incorporated onto this firearm, would

5   not result in a weapon that would constitute a FNA

6   violation.  He didn't attached a pistol brace to this

7   firearm.  He attached a rifle stock.  Then he attempted

8   to modify that rifle stock to claim it was something else

9   entirely, the pistol brace.  That does not work.  Why

10   doesn't it work?  Well, for one.

11          THE COURT:  Can I stop you?  You are going to go

12   down the line and in 10 minutes from now I will forget my

13   question.  You make the statement he didn't attach a

14   pistol brace.  He attached a rifle stock.  How do I know

15   that?  How do you know that?  How do I know that what's

16   in this picture of the back end of the weapon is a rifle

17   stock and not a pistol brace?  What makes it one or the

18   other?

19          MS. CLARK:  We had analysis done by an expert at

20   ATF who prepared a report who concluded based upon the

21   evaluation of that firearm, along with the other

22   firearms, that this firearm, the 300 Blackout caliber

23   firearm included and incorporated a rifle stock that had

24   been modified by cutting off the very end.  That was his

25   opinion rendered in the report.  There are accompanying

1    photos and he also rendered an opinion about the other

2    firearms that were sold by Mr. Kamali to the undercover.

3    Those also had rifle stocks.

4            The firearm themselves are here today to the

5    extent the Court wants to compare a completely intact

6    rifle stock with one that's slightly modified by Mr.

7    Kamali on this particular firearm.

8            In addition when ATF did a search of Mr.

9    Kamali's home, they found receipts for unattached rifle

10   stocks.  These are parts that ATF agents know can be

11   purchased from a manufacturer.  They are marketed as a

12   rifle stock.  They are labeled as a rifle stock.  If you

13   go on the websites from the companies, you click on rifle

14   accessories, there will be a section specifically

15   purchasing rifle stocks. So these parts are available.

16   These are the parts that he's buying to --

17           THE COURT:  The part on Exhibit 9 of the

18   expert's report which is the weapon we're discussing,

19   does it have a brand or any marking on the rear portion

20   of the weapon that you can trace to advertising on the

21   Internet of it as a rifle stock?

22           MS. CLARK:  Your Honor, after conferring with

23   the agent, I do not believe there are identifying marks.

24   That's part of the allure that Mr. Kamali talked about

25   extensively with the undercover that there's no way to

34

```
 1   trace.
 2          THE COURT:  Did you take the receipts for rifle
 3   stocks and try to find them on the Internet from the
 4   seller's website or whatever other information would be
 5   on the receipt?
 6          MS. CLARK:  Your Honor, again the exhibits that
 7   were collected during the search do include photos of the
 8   matching rifle stock.  In light of the fact there was an
 9   expert report, I did not separately bring those
10   images from the search.  But I do have an agent that can
11   testify in Mr. Kamali's home they collected as part of
12   that search, rifle stocks that match the rifle stock that
13   was on the firearm purchased and then sold by Mr. Kamali.
14          THE COURT:  Can I confirm what's marked Exhibit
15   9 to your memo of page 32 to 37 is the weapon we're
16   talking about, the 300 Blackout?
17          MS. CLARK:  That's correct, Your Honor.
18          THE COURT:  I guess I should have asked defense
19   counsel this, but I realized looking at it, how would I
20   have been able to brace the end of that in the crook of
21   my arm which I think is what you are telling me is a
22   pistol brace, correct?
23          MS. CLARK:  My understanding --
24          THE COURT:  By crook of my arm, I mean in here
25   or against here. If it has so much stuff below what I
```

1    will call the barrel.  I'm not using the right terms.  I

2    don't mean the firing barrel that has a circular portion

3    and then it has got stuff below that.  How do I fit that

4    in the crook of my arm?

5              MS. CLARK:  As I mentioned in my memo, Mr.

6    Kamali knows the distinction between the parts.  The

7    first firearm he sold actually had a pistol brace.

8              THE COURT:  Is that in a picture?

9              MS. CLARK:  It is, Your Honor.

10             THE COURT:  What one is it?

11             MS. CLARK:  It is on Exhibit Number 1 I believe

12    and that would be at page Photo Number One on the

13    exhibits to the ATF report.

14             THE COURT:  I'm looking at the ATF report.  It

15    is signed at page 7.  The next page.  I see.  Is that it?

16             MS. CLARK:  Yes, Your Honor.

17             THE COURT:  That's CMECF 8 of 37.

18             MS. CLARK:  The ATF expert in this case opined

19    that what's attached to this is in fact a marketed pistol

20    brace.

21             THE COURT:  What does a shooter do with the

22    thing at the back?  Where does he brace that or she?  It

23    goes along the inside of your forearm?

24             MS. CLARK:  It can be.  There are certain pistol

25    braces that actually Velcro around your forearm.  Some of

36

1    them look more flat like this one where it would rest up

2    against the forearm between the forearm and the body.

3           THE COURT:  The thing at the back of this weapon

4    that's like long, you know, perpendicular to the firearm

5    itself, where does that go?  If I'm shooting this holding

6    it in my hand as a pistol, where does that long piece

7    that seems like it doesn't.  I don't know.  You tell me

8    where does it go.

9           MS. CLARK:  I have an agent here.  If you would

10   like to hear directly from him.  My understanding it

11   would go depending on the size of the shooter against the

12   body or beyond the body to permit the shooter to

13   stabilize the firearm without it being against a

14   shoulder.

15          THE COURT:  We compare that to Exhibit 9.

16   Obviously the first difference is the length which was my

17   questioning of defense counsel.  Do you have the Blackout

18   in the courtroom?

19          MS. CLARK:  Yes, I do.

20          THE COURT:  Is it disabled?

21          MS. CLARK:  It has been disabled and rendered

22   safe.

23          THE COURT:  Would you take it out and display it

24   for me please.

25          MS. CLARK:  Yes, Your Honor.

1          I have it here.  For the purposes of the record,

2     I can note that it would be labeled Government Exhibit 1.

3          THE COURT:  Sure.  For the purpose of the

4     sentencing hearing.

5          MS. CLARK:  May I publish it to the Court?

6          THE COURT:  Show it to defense counsel as well.

7     I would ask if your agent would put it up against the end

8     of it on his shoulder and show me where if his hand fits

9     into the firearm area, the pull area.

10         AGENT MACKSOUD:  (Complying.)

11         THE COURT:  Turn around so counsel can see.  If

12    you pivot so he can see what I saw from the side.

13         AGENT MACKSOUD:  (Complying.)

14         THE COURT:  Are you lefty, sir?

15         AGENT MACKSOUD:  Yes.

16         THE COURT:  Looks funny to me that it is in your

17    left hand.

18         MR. HAYES:  I ask the Court to have the witness

19    also hold it.

20         THE COURT:  If you can do it as if treating it

21    like it is a pistol, what happens to that back stock?

22    Can you turn around?  You can come forward, Attorney

23    Hayes, if you want to see what I'm seeing.  Put it again

24    up on your shoulder.

25         AGENT MACKSOUD:  (Complying.)

1          THE COURT:  Wouldn't you usually put your right

2     hand on the pins coming out of the barrel?

3          AGENT MACKSOUD:  Yes, normally, I would.

4          THE COURT:  All right.  Thank you.

5          I interrupted your first statement that what was

6     the basis for your assertion that it was a rifle stock

7     and not a pistol brace.  You can continue your argument.

8     I interrupted you.

9          MS. CLARK:  So, Your Honor, while one analysis

10     may be how the firearm is actually used, the type of

11     device placed on the firearm is also dispositive of what

12     type of firearm, whether it's a rifle or whether it is a

13     pistol and so the ATF letters do correctly state that

14     they consider a firearm with a pistol brace to not be a

15     rifle under the NFA for purposes of the NFA.

16          Does not make that distinction for stocks.  In

17     fact, stocks are known to be incorporated into firearms

18     for firing from the shoulder.  Firearms with stocks are

19     considered rifles under the NFA, so that distinction what

20     is really about what Mr. Kamali put on that firearm.

21          In this case, he put a stock.  A piece that was

22     approved as a stock.  It was marketed as a stock by a

23     manufacturer and his subsequent modification it is our

24     position does not change the fact it was stock.  Not only

25     was it the opinion of the examiner that it included a

1    stock, but in the firing of this firearm like Agent

2    Macksoud just demonstrated, he was able to be fired from

3    the shoulder consistent with the other rifles that Mr.

4    Kamali had been selling.

5         I would note to the fact that Mr. Kamali himself

6    refers to this particular firearm as a short-barreled

7    rifle twice during the controlled purchase.  When he

8    first gets into the vehicle, he explains that it is

9    already put together.  It is a short barrel so it can fit

10   in any backpack.  I just want to show you the rifle

11   first.

12        After showing the different parts of the firearm

13   to the undercover, he then turns -- the undercover

14   specifically asks describe that stock to me.  That's

15   where Mr. Kamali turns and switches to the ATF letters to

16   justify his modification.  He explains it is not a stock

17   because I cut it off.  It is now considered a pistol

18   brace.  He pulls out the letters and explains because he

19   had modified the stock, it is somehow considered a pistol

20   brace and all completely lawful.

21        Not a minute later, they continue talking about

22   the purchase of the firearm and he confirms.  The

23   undercover says what do I owe you for all of this.  Mr.

24   Kamali responds immediately $500 for the rifle.  $10 for

25   the grip.  $110 for the magazine.

1          I think the Court can easily infer that Mr.

2   Kamali is trying to fit this firearm into a loophole, but

3   when he's talking about the firearm in passing with the

4   undercover twice, he concedes it is actually a rifle just

5   like all the other ones.  He's just modifying that stock

6   just enough so he can claim it fits into this pistol

7   brace loophole that doesn't truly exist.

8          THE COURT:  You say that the modification of the

9   rifle stock doesn't change it into a pistol or a brace.

10  Why not?

11         MS. CLARK:  Correct, Your Honor.  Well, because

12  there is some historical context of the NFA where the

13  Court can look at the intent of Congress as to why

14  modifying a shoulder stock is not appropriate.  In fact,

15  I trace in my memo very briefly the history of the NFA,

16  the purpose of it, how Congress sought to regulate very

17  dangerous firearms for the simple fact that they were

18  unusually dangerous and in other instances easy to

19  conceal and when the NFA was first designed, it defined

20  the term "firearm" and didn't define the term "rifle."

21  That created an inadvertent loophole.

22         To close that loophole, the NFA was amended to

23  include the definition of rifle which is very similar to

24  what it is today.  But in doing so, they inadvertently

25  created a liability for gun collectors of antique

1    firearms.  And to address this, what Congress did was

2    they sought to close that loophole by adding another type

3    of firearm that would be prohibited under the NFA, so no

4    longer is it a short-barreled rifle but a short-barreled

5    weapon made from a rifle.  I quote here what the

6    congressman who is introducing this amendment intended.

7          THE COURT:  Can I interrupt you?  I read the

8    legislative history.  You can argue it if you want.  I

9    don't see how this qualifies under (4), 5845(a)(4)

10   because it has to be an overall length of less than 26

11   inches and I think your expert's report measured it at 31

12   and an eighth, so I was confused about the release on

13   (a)(4) as a basis.

14         MS. CLARK:  So, Your Honor, to address that

15   specifically, under 5845(a)(4), the definition is a

16   weapon made from a rifle if such weapon as modified has

17   an overall length of less than 26 inches or a barrel or

18   barrels of less than 16 inches in length.  So by that --

19         THE COURT:  So it fits under the second aspect

20   of the definition.  Sorry.  Go on then with your argument

21   about the legislative amendments.

22         MS. CLARK:  To the extent the new section is

23   added, it does not prohibit a rifle with a barrel but a

24   weapon that's made from the rifle under 16 inches.

25         THE COURT:  The defendant's argument to that it

1  wasn't a rifle.  It was pieces.  Never was a rifle.

2          MS. CLARK:  It was a rifle in parts.  When it

3  was assembled, even if he had modified the stock before

4  he assembled it, when he assembled it, it is still made

5  from a rifle?

6          THE COURT:  When was it a rifle?  When it was

7  put together?  It was already modified when it was put

8  together?

9          MS. CLARK:  This discrepancy of when it was

10  assembled I did not brief it, but I'm prepared to briefly

11  discuss the liberal interpretation of what a rifle is

12  under the law.  I think that's helpful.  I did not

13  provide this to the Court in advance so I apologize.

14          In *United States versus Thompson/Center Arms*,

15  which is United States Supreme Court case issued in 1992

16  at 504 U.S. 505.  The Court specifically takes up the

17  issue as to whether or not unassembled parts in fact can

18  result in a finding of liability as possession of a

19  rifle.  In short, the answer is that yes, parts in close

20  proximity that might not be finally assembled but are

21  intended to be assembled together can make a rifle.

22          I'm directing the court to the plurality where

23  Justice Souter actually stated that Congress must have

24  understood "making" to cover more than final assembly and

25  some disassembled aggregation of parts must be included.

1          He goes on to say since the narrowest example of

2     a combination of parts that might be included is a set of

3     parts that could be used to make nothing but a short

4     barreled rifle, the aggregation of such a set of parts at

5     the very least must follow in the definition of making

6     such a rifle.   The pincite is 510.   I apologize for not

7     including this originally in my briefing.   It was not

8     raised by Mr. Kamali in his.   But I do think it is

9     relevant it is not just the fact it is completed firearm,

10    but it is the assembly of the firearm that really served

11    no purpose.   Even if did have all the parts near each

12    other, that could constitute a rifle in that sense.

13          In short, it is the Government's position that

14    it falls under either a short-barreled rifle or a

15    short-barreled weapon made from a rifle because the

16    congressional intent behind the second element made from

17    a rifle was specifically designed to address this

18    behavior.   The congressman who introduced this says very

19    much in the past criminals apprehended with such weapons

20    attempted to avoid prosecution on the ground the weapon

21    they created by cutting off the barrel and the stock of

22    the shotgun or rifle was a pistol since it was a

23    one-handed weapon.

24          That's exactly what Mr. Kamali did here is he

25    attempted to avoid liability under the NFA by cutting off

1    enough of the barrel, but then also part of the stock to

2    claim that it was no longer a rifle.  This section (a)(4)

3    specifically means to capture these type of

4    modifications.

5          THE COURT:  Right.  But it has to be made from a

6    rifle and with less than a 16-inch barrel and for it to

7    be a rifle, it has to be intended to be fired from the

8    shoulder.

9          MS. CLARK:  Yes, Your Honor.

10          THE COURT:  You are saying the parts lying on

11   his work bench or wherever they were when they came into

12   the house, that the stock if affixed to the other parts,

13   the barrel and whatever, I forget what that is called,

14   the receiver, the thing in the middle, and then the butt

15   I will call it that it was you say ordered as a

16   shoulder -- a rifle stock meant to be applied to the

17   shoulder when the firearm was fired, those are in close

18   proximity and you are telling me that this Thompson

19   decision by Justice Souter is going to say then it is a

20   rifle.  And so because that rifle stock it would have

21   made it comfortable to shoot from the shoulder.  Then you

22   say it falls under (a)(4) because  -- let me take a look.

23          MS. CLARK:  *United States versus Thompson/Center*

24   *Arms*, the central issue related to a gun manufacturer.  I

25   will let the Court review it, but what I'm referring to

 1    is in the plurality opinion of Justice Souter.  The issue

 2    in that case refers to a manufacturer's use of a kit, but

 3    I think what Justice Souter is doing he's contrasting

 4    that with an individual who purchases one set of parts

 5    with an other purpose than to put them together.

 6              THE COURT:  He's discussing the definition of

 7    "make".  Where will I find that?

 8              MS. CLARK:  Your Honor.

 9              THE COURT:  There it is in (i) the term "make"

10    in the various -- if the rifle needs a weapon designed to

11    redesign made or be made, intended to be fired.  He's

12    saying that -- I think you are suggesting if I accept

13    Justice Souter's analysis of the statute, then the only

14    question that would remain is whether with the shortened

15    rifle stock the cutting off of it, clearly you don't

16    dispute that's what Mr. Kamali did when he made it and

17    when he sold it, whether that prevents it from being used

18    or intended to be used from the shoulder.  In other

19    words, if he cut all of it, 90 percent of it off, I

20    would suspect it is too short to hold it like this

21    against the shoulder with your finger to fire, right?

22    The question is whether as a practical matter the amount

23    that was left there after he cut it off, a couple of

24    inches I think is what Attorney Hayes says, is sufficient

25    to make it comfortable to still be fired on the shoulder.

1          MS. CLARK:  Correct.  Even if he did take off

2     the majority of that stock, it would be our position

3     that's still an NFA firearm under prong (a)(4), a weapon

4     made from a rifle.

5          THE COURT:  Because it is a rifle even though

6     not yet assembled under Justice Souter's analysis.

7          MS. CLARK:  Correct.  Even though he claims it

8     was not assembled first as a rifle, it will still

9     constitute a rifle for the purpose of the statute.  It

10    looks like Page 513, Note Six of that opinion, it's

11    written The inclusion of the rifle stock in a package

12    brings the Contender and the carbine kit within the

13    intended to be fired from the shoulder language contained

14    in the definition of rifle in the statute.

15         THE COURT:  You are talking about Footnote Six.

16    I'm not sure I found that language.  It is not at the

17    beginning.  You were going so fast.  I don't know where

18    it is in six.

19         MS. CLARK:  I believe it is mid-sentence.  It

20    does note it says the inclusion of the rifle stock.

21         THE COURT:  There's no dispute from the defense

22    that he started with a rifle stock?

23         MS. CLARK:  Does not appear to be.

24         THE COURT:  But he cuts it down.

25         MS. CLARK:  Correct.  He himself says that.

```
 1              THE COURT:  He said that in the tape I believe.

 2              MS. CLARK:  Yes.

 3              THE COURT:  I want to be sure my recollection is

 4     correct.

 5              MR. HAYES:  Your Honor.

 6              THE COURT:  Hold on a second, counsel.  I'm

 7     discussing matters with Government's counsel.  You will

 8     have an opportunity to be heard.

 9              Anything further for the Government on the

10     issue?

11              MS. CLARK:  No, Your Honor.

12              THE COURT:  Do you wish to respond, sir?

13              MR. HAYES:  Yes.  If I'm not mistaken that

14     decision that the Court just reviewed the rifle came as a

15     kit.

16              THE COURT:  Understood.

17              MR. HAYES:  That's not what we have here.

18     That's why I started off with the parts arrived in this

19     case at different times and in different boxes from

20     different suppliers, if you will.

21              THE COURT:  Right.  But at some point, he sat at

22     his work bench and went to work.

23              MR. HAYES:  Right.  But again it wasn't sent as

24     a full kit to be made into a rifle.  That's not what we

25     have here.  If we have that here, I have no room to make
```

1    the argument.  That's the same thing as that decision.

2    But that's not what we have here.  The Government

3    indicated when the agents executed the search warrant,

4    found receipts and the like from what would be suppliers

5    and other stocks, what would be shoulder stocks,

6    they found no receipt.  There's no trace as the Court was

7    asking about any markings on that stabilizing brace.

8    There's nothing there.

9           What the Court saw from the Government's

10   demonstration, if the agent were to hold the firearm from

11   that stabilizing brace on his forearm on the crook,

12   that's how it is intended to be shot.  What we're looking

13   at in --

14           THE COURT:  What do you base that on?

15           MR. HAYES:  Because that's what a couple of

16   things.

17           THE COURT:  That's what you say.

18           It looked to me like it could be shot from the

19   shoulder.

20           MR. HAYES:  We get into that again.  Remember

21   that's what the expert said it doesn't matter.  The

22   original intention was that it was built to be shot, used

23   as a stabilizing brace and to be shot from the crook.

24           THE COURT:  Why didn't he apply a stabilizing

25   brace instead of shortened rifle stock?

1          MR. HAYES:  We don't know if that's what it was,

2     Your Honor.  We don't.

3          THE COURT:  If we recess, can you get me the

4     invoice for the thing attached to the back of the weapon

5     that show he ordered whatever it is called a pistol brace

6     or some kind of brace, that's what this part is?

7          MR. HAYES:  No.  Neither can the Government.

8     That's why they are trying to make a comparison by the

9     receipts and the items found in the house that led to

10    this receipt is for this stock.  This receipt for this

11    stock.  There's nothing for what we have the gun that

12    we're discussing now.

13         THE COURT:  Why did your client call it a rifle

14    repeatedly?

15         MR. HAYES:  He doesn't, Your Honor.  He says.

16    I'm sorry.  The Government is using that.

17         THE COURT:  You are sorry because what you just

18    said isn't correct?

19         MR. HAYES:  No.  I'm going to cite to.

20         THE COURT:  That's not my recollection.  You go

21    ahead.  He didn't say that?  You want me to play the

22    video?

23         MR. HAYES:  When he says it, it is a mistake.

24    When I say we're sorry.  I'm looking at what in my

25    sentencing filing what I'm looking at is page 12.  There

1    is extensive text between the agent and Mr. Kamali

2    regarding this firearm.  He describes.  He says.  He

3    denied that the firearm in question had a shoulder stock

4    characteristic that would have brought the firearm within

5    the ambit of the NFA.

6            What we see in the text messages, it literally

7    concludes so it is not a rifle at all.  That's what would

8    be the bottom of page 12.  What he says leading up to

9    making that conclusion that he did not intend to make a

10   rifle at all or that this firearm is not a rifle at all,

11   he says he starts off -- Mr. Kamali says those are the

12   ATF papers.  There's a letter.  I didn't print out.  I

13   will send it to you over the phone.  You can put it on

14   your computer or whatever.  The agent says so you said it

15   is CT legal?  Yes, CT legal right here.  Let me explain

16   why it is legal.  The agent says what kind of stock does

17   it have on it?  This is Mr. Kamali says this is not a

18   stock.  I cut it off so it is considered a pistol brace.

19   So this is the letter for the pistol brace.  It has a

20   picture like that.

21           So he hands him a letter which we included as

22   Exhibit D.  Then he says I found this online.  This is

23   Mr. Kamali.  These ATF letters are good for everyone and

24   this pointing to the brace you really cannot shoulder.

25   You see this, expletive, referring to its jagged edges so

1   that's not a stock.

2          Then says so it is not a rifle at all.  And

3   that's his conclusion so the mistake that he made by

4   saying rifle early on is cleared up by the description he

5   gives to the agent as well as the letter of the

6   guarantee.

7          THE COURT:  First, I would ask the Government to

8   tell me where the defendant says it is a rifle.  You have

9   said he did that on multiple occasions.  The defense said

10  no, he didn't.  He said it wasn't a rifle.

11         MS. CLARK:  Having reviewed the recordings, it

12  is the Government's position that Mr. Kamali refers to a

13  rifle twice.  Once when he first gets into the vehicle.

14  He refers to it as short barreled.  I want to show you

15  the rifle first.

16         He turns to the characteristics of the firearm

17  that Attorney Hayes correctly summarized, but then

18  immediately after that switching back to the sale of the

19  firearm, he again refers to it as a rifle.  It is the

20  Government's position that the middle exchange about the

21  ATF papers really lends itself to what was Mr. Kamali's

22  second argument.  Did he have the intent to create

23  something else doesn't matter if he intended to try to

24  take advantage of a potential loophole.

25         We submit that his attempts fail because he

52

```
 1   knows regardless of what he tries to believe by reading

 2   the ATF letter, the characteristics of the firearm fit

 3   squarely within the NFA.

 4            THE COURT:  I'm reading the ATF letter.  I'm

 5   confused because it seems pretty clear to me the ATF is

 6   referring to, quote, a specific arm-stabilizing brace

 7   dash marketed as a shooter's aid.  Okay.  So I don't

 8   understand how you can take what looks like a rifle butt

 9   and shorten it and have it be a specific arm-stabilizing

10   brace that's marketed as a shooter's aid.  How does he

11   get to do that?  This letter isn't talking about adapting

12   something.  It is talking about aids that or shooter's

13   aid that's marketed and a specific arm-stabilizing brace.

14   Could someone just put a rifle stock on the end of the

15   weapon and say this is an arm-stabilizing brace?  That's

16   how you should use this firearm, then transfer the weapon

17   and have no trouble under the NFA?

18            MR. HAYES:  I don't believe so.  That stock in

19   the Court's example that has the padding.  What the Court

20   doesn't see is a stock normally has padding.

21            THE COURT:  I understand that.  There is a rough

22   edge on this because he cut it off.

23            MR. HAYES:  Right.

24            THE COURT:  It is long enough to go into your

25   shoulder.
```

53

```
 1              MR. HAYES:  It is not intended to be shot from
 2    the shoulder.
 3              THE COURT:  Whose intent?  Whose intent?
 4              MR. HAYES:  His.  His intent, Mr. Kamali's
 5    intent.  He's the one who put the gun together.
 6              THE COURT:  If he sold a firearm that had a
 7    rifle stock on it, he said I don't intend you, the buyer,
 8    to use this from your shoulder.  I want you to use the
 9    brace position.  He would be out from under the NFA?
10              MR. HAYES:  No.  We don't have that here.
11              THE COURT:  Because he took two inches off?
12              MR. HAYES:  Consider the length of the entire
13    firearm.  It is the length of the entire firearm.
14              THE COURT:  The statute isn't happy with the
15    fact the barrel is short.
16              MR. HAYES:  The entire firearm.  When we look at
17    the length of the firearm itself.
18              THE COURT:  You don't have to because the
19    statute section is (a)(4) is an "or" so it has to be less
20    than 26 inches which this isn't or have a barrel of less
21    than 16 which this does.
22              MR. HAYES:  Right.
23              THE COURT:  So then the only question is is it a
24    rifle and that defaults to the question of is it intended
25    to be shot from the shoulder.
```

54

```
1              MR. HAYES:  It is not.

2              THE COURT:  You keep saying it is not.  I could

3    say I'm 35 but that doesn't make me 35.

4              MR. HAYES:  No.

5              THE COURT:  Have you any case law that says what

6    the word "intended" in the statute means?  No.

7              MR. HAYES:  Right.  What the Court referred to

8    earlier, it's the initial question about what the letter

9    that we're reviewing now that came from the ATF to a gun

10   manufacturer.  That letter described a specific stock, if

11   you will, brace, arm brace, stabilizing brace, if you

12   will, that manufacturer makes.  There's again no

13   prohibition of Mr. Kamali taking parts from different

14   places and then designing this firearm.  There's nothing

15   to say that you can't do that.

16             THE COURT:  No.  But the ATF says we haven't

17   addressed the question of whether this letter is somehow

18   going to define what the statute means. That's an

19   interesting question nobody has briefed or argued.  Let's

20   take the letter for the sake of discussion, it says that

21   and an accessory that can be attached to a firearm, in

22   any one of several configurations, must be evaluated to

23   determine whether attaching it to each of these

24   configurations constitutes making an NFA firearm under

25   both objective or  subjective analysis.
```

55

1          With the respect to the stabilizing brace, the

2     ATF concluded that attaching the brace to a handgun

3     doesn't not, quote, make a short-barreled rifle.  That

4     isn't what happened.  He didn't attach this to a pistol.

5          MR. HAYES:  No, Your Honor.  It is intended to

6     be shot as a pistol.

7          THE COURT:  Your basis for that statement?

8          MR. HAYES:  How it is made.  The Court did not

9     have an opportunity to view the agent using that as it

10    was intended.

11         THE COURT:  You go use it.  You use it the way

12    it was intended.

13         MR. HAYES:  Thank you.

14         MS. CLARK:  Your Honor, I will note ATF Macksoud

15    did pose for the Court with it as a potential pistol

16    brace.

17         THE COURT:  That's disabled, right?

18         MR. MACKSOUD:  Yes.

19         THE COURT:  It doesn't even go past.  There's

20    nothing it is bracing against.  Your arm.

21         MR. HAYES:  My forearm, Your Honor.

22         THE COURT:  Lift it up to your shoulder and hold

23    the front pin.  A little higher on your shoulder.

24         MR. HAYES:  That's not the intent, Your Honor.

25    That's not how this was intended to be used.  So a person

56

1   can say I don't intend this to be a 16-inch barrel rifle.

2   The fact it ends up being 15 and three-quarter inches.

3   Ooops.  My mistake.  I'm not liable under NFA.  I don't

4   think so.

5           MR. HAYES:  So that's not what we have from ATF

6   in terms of letters, in terms of what we have seen

7   online.  That's not what we have.

8           THE COURT:  You say your expert is here who did

9   the report.

10          MS. CLARK:  No.  He is not.  But I do have two

11  agents who are familiar with firearms for the purposes of

12  establishing the guideline range here.

13          THE COURT:  Do we have Exhibit 1 firearm here?

14          MS. CLARK:  Yes, I do, Your Honor.

15          THE COURT:  Could I see that one?

16          MS. CLARK:  Yes, you may.

17          THE COURT:  Could I ask the agent to hold it the

18  way it is intended which I gather is a brace opposed to a

19  stock.  You can come forward, Attorney Hayes, if you have

20  to so we can both see it.  So let me just describe what

21  I'm seeing.  If anybody sees anything different, let me

22  know.  This is Exhibit 1 to the expert's report attached

23  to the Government's filing.  The agent has his hand on

24  what I'll call the grip and his finger near the trigger.

25  Doesn't have it inserted.  But he could insert it if he

1    were to fire the weapon.  The back of the weapon ends

2    mid-forearm.  Would you agree with me, Attorney Hayes?

3          MR. HAYES:  I do.

4          THE COURT:  It has a metal.  It is open and it

5    looks like a ladder, got cross pieces, which the agent

6    has rested up against the inside of his forearm.  As I

7    said approximately halfway between his hand and what I'm

8    calling the crook or bend in his arm at the inside of his

9    elbow.  There is no forward of the trigger.  There's no

10   perpendicular metal handle for the nontrigger hand to

11   hold the front of the barrel which was the case in

12   Exhibit 9.

13         Now if I can ask the agent to hold Exhibit 9

14   again in the same position.  Before you do that, would

15   you bring the end of that weapon up to your shoulder?

16         MR. MACKSOUD:

17         THE COURT:  Up to the crook.  What I'm seeing is

18   the back of that weapon resting on the upper part of his

19   shoulder a little bit inside the crook of his shoulder.

20   His arm is completely folded up in order to keep his hand

21   on the grip and have his finger in the trigger portion

22   which he doesn't but he could.  Okay.  If you can do the

23   same two positions with Exhibit 9.

24         MR. HAYES:  Before we do that, I need to

25   represent what would be the stabilizing portion can be

58

1    extended.

2              THE COURT:  I don't understand what that means.

3              MR. HAYES:  You can pull this.

4              MR. MACKSOUD:  Yes, you can.

5              THE COURT:  You pulled it out?  It is like an

6    inch that you can pull it out.

7              MR. MACKSOUD:  On some you can.

8              THE COURT:  On that one you just did.  No?

9              Does it then retract?  Can you push it back in?

10             So I don't know what you mean, Attorney Hayes.

11   You made a statement that it can be extended or whatever

12   words you can pull it out.

13             MR. HAYES:  You can unscrew it and extend it.

14             THE COURT:  How far?

15             The agent is twisting the back portion of the

16   weapon that has the brace and it has now come apart.

17   Obviously not that far.  Looked to be maybe an inch or

18   two, but I don't know if that's an extension so I strike

19   that.  I don't know what you think it could do.

20             MR. HAYES:  I believe it is adjustable so you

21   can extend what would be the stabilizing portion.

22             MS. CLARK:  If anything, the extension would

23   make it more like a shoulder stock.

24             THE COURT:  That's what I'm just thinking.  And

25   the expert in his report didn't catch that it could be

59

1   extended?  Didn't he provide an opinion as to one --

2   let's see what he said.  One is a weapon.  He said it is

3   a firearm.  He didn't call it a rifle.

4        MS. CLARK:  In the report, he categorizes it as

5   a machine gun.

6        THE COURT:  Right.

7        MR. HAYES:  Then he described it is really not a

8   machine gun.  He has a binary.

9        MS. CLARK:  That's Mr. Kamali.  The expert's

10  conclusion said it is a machine gun.

11       THE COURT:  Could you pick up Exhibit 9 and hold

12  it in both positions.  So hold it down.  You have a dark

13  suit and the firearm is dark, so I can't see the, quote,

14  back end of the weapon what I guess Mr. Kamali would

15  argue is a brace, extended when your hand is on the grip

16  near the trigger, your firing hand, it only extends an

17  inch or two I guess.  Attorney Hayes, you should tell me

18  if I'm wrong.  Down the side of the arm again it extends

19  about halfway from the wrist to the crook of the arm.

20  And then put it up to your shoulder.  That's Exhibit 9.

21       MR. MACKSOUD:  Yes, Your Honor.

22       THE COURT:  Put your hand on the forward grip.

23  Thank you.  Okay.  Do you want to correct any

24  description, Attorney Hayes, that I have made?

25       MR. HAYES:  Your Honor, the actual stabilizing

1   brace, what was intended to be a stabilizing brace, looks

2   the same as what we have from Exhibit 1.

3          THE COURT:  I thought I observed that Exhibit 1

4   stabilizing brace extends farther down the inside of the

5   arm.  This one is only about an inch or two onto your

6   arm.  It strikes me the farther down it goes, it

7   stabilizes as a one arm.

8          MR. HAYES:  This was crudely made.  That was the

9   intention.

10         THE COURT:  Can you put that back on your

11  shoulder and your hand on the forward.  I should also

12  describe, as I did with Exhibit 1, his arm is bent but

13  doesn't appear that his shooting hand is as far back or

14  close to his shoulder as it was with Exhibit 1.  If you

15  want him to do one, Attorney Hayes, in case I'm mistaken.

16  That's my recollection.  When he was showing Exhibit 1,

17  his hand was very close to his shoulder.  Here his hand

18  is maybe at a 45-degree angle instead of almost 90-degree

19  angle to the shoulder, meaning at the bend of the elbow.

20  Anybody want to make any other observation or correct the

21  Court if I misdescribed it?

22         MR. HAYES:  No, Your Honor.

23         Ms. CLARK:  No, Your Honor.

24         THE COURT:  Thank you.  Could the agent hold the

25  two weapons on the table?  The back part of the weapon on

1    the table and the two pointing into the air?

2              MR. MACKSOUD:   (Complying).

3              THE COURT:   The one on the left as I'm looking

4    at it, Agent, is which exhibit?

5              MR. MACKSOUD:   The one on the left is 9.   The

6    one on the right is 1.

7              THE COURT:   Can you rotate them so I can see the

8    relative position?   Exhibit 9 seems to be a bit shorter

9    than Exhibit 1.   Starting from the back of the weapon,

10   the trigger on Exhibit 9 is farther forward of the

11   firearm than Exhibit 1 I'm describing than it is on

12   Exhibit 9.   In other words, coming from the table and

13   going to the ceiling, it looks like, they are actually

14   quite close. Could you put your finger, Attorney Clark,

15   where the trigger is?   Right there.   Then do it on the

16   other one.   They are the same.   I'm sorry.   And, of

17   course, Exhibit 9 has a forward handhold and Exhibit 1

18   does not.   Okay.   Thank you very much.   Anything further,

19   Attorney Hayes?

20             MR. HAYES:   Your Honor, what the Court described

21   as the grip, that forward grip, the handle, there's a

22   reason for that and I don't have.   I don't have here.

23   That's to make it what Mr. Kamali referred to as

24   Connecticut legal.   That allows it to fall within it

25   being legal here in Connecticut.   It being the entire

1    firearm.

2           THE COURT:  I'm confused.  I don't understand.

3    If his intention was for this not to be a rifle, but a

4    pistol, in effect, with an arm brace, why do you need

5    that handhold on the front of the weapon?

6           MR. HAYES:  So that it doesn't meet the

7    definition of the pistol, Your Honor.

8           THE COURT:  If it is not a pistol, what is it?

9           MR. HAYES:  That's the point.  It is just a

10   firearm.  It doesn't fall within the definition of a

11   pistol.  It is a firearm, Your Honor.

12          THE COURT:  I thought firearm was like cars and

13   then there were Cadillacs and Fords and I don't know

14   Audis and whatever.  I thought -- I didn't think firearm

15   was a classification of a type of firearm.  A rifle is a

16   type of firearm.  A pistol is a type of firearm.  You

17   tell me.  What am I missing?  I thought firearm was a

18   generic description of a class of what are weapons.

19          MR. HAYES:  When we say firearm, Your Honor,

20   there are different definitions.  So there's one

21   regarding what he pled to in this case.  But there's

22   different definitions of what and/or descriptions of what

23   makes a firearm.  So there's a more broader definition.

24          THE COURT:  Right.  It is in 5845(a).  It

25   defines firearm for the purposes of the federal statute

1    it does.  Maybe there's a different one in Connecticut.

2    But included in the definition is silencer, for example.

3    But it includes shotguns, rifle, destructive devices,

4    silencers, any other weapon defined in E which is a

5    device capable of being concealed on a person from which

6    can be discharged, explosive, pistol, a revolver.

7    There's all kinds of things are firearms.  I don't think

8    there's just a generic firearm that's separate from

9    rifles that are firearms or pistols that are firearms or

10    revolvers that are firearms.  I think my cars versus

11    Fords and GM's is a pretty good analogy.

12        MR. HAYES:  What I didn't bring was what would

13    be that Connecticut definition.  We're trying to see if

14    we can find that now.

15        THE COURT:  Well, he might have put it on there

16    for that reason, but it strikes me it very much makes it

17    into a weapon that's intended to be shot from the

18    shoulder.  Why else do you have that thing for holding?

19    If you are holding it in one hand and bracing it, you are

20    not going to stick the other arm out here to hold it,

21    right?  It might be uncomfortable.  It is a little bit

22    shorter than maybe you might like it.  But yeah.  So, you

23    know, if to get within a Connecticut definition, you cut

24    the barrel to less than 16 inches, the fact of the matter

25    is, by doing that, he falls under the section of a

64

```
1    federal statute.  I don't know that the Connecticut law

2    is a reason to do something.  Still means it wasn't

3    intended to be fired from the shoulder or could be fired

4    from the shoulder.

5           MR. HAYES:  Your Honor, part of our research was

6    looking at this type of firearm.  The standard in the

7    community comes from the Franklin Armory what they call

8    the Franklin Armory XO-26.

9           THE COURT:  Would you say that again?

10          MR. HAYES:  The Franklin Armory XO-26.

11          THE COURT:  What is that?

12          MR. HAYES:  It is a type of firearm which what

13    he intended to make here.  So he molded his firearm,

14    that's Exhibit 9, after the Franklin Armory XO-26.

15          THE COURT:  What is that?

16          MR. HAYES:  It says the same thing here.  It has

17    a length exceeding 26 inches and the barrel approximately

18    11 and a half inches in length.  It does not conform to

19    the definition of handgun or pistol as provided in the

20    federal firearm statute since it is not designed to be

21    held and fired by the use of a single hand.  Meaning the

22    forward grip.  Meaning the forward grip.

23          THE COURT:  I think you just read to me a

24    description of a firearm you said he was trying to

25    replicate which basically said it is not a one-handed
```

1    gun.  It isn't meant to be held with one hand.  I'm

2    completely confused.

3             MR. HAYES:  This gun.

4             THE COURT:  This is an argument that's not in

5    your brief, right?

6             MR. HAYES:  No.  I didn't think the forward grip

7    would be at issue.  But I'm saying to the Court --

8             THE COURT:  Do you have a gun meant to be shot

9    from the shoulder that wouldn't have a way to hold the

10   front of the firearm?  The barrel gets hot, doesn't it,

11   when you fire?

12            MR. HAYES:  Right.  So, Judge, again that

13   specific gun what I'm referring to as a Franklin Armory

14   XO-26, that's the gun that Mr. Kamali intended to model

15   after.

16            THE COURT:  What does that prove in the context

17   of what we have been arguing for an hour?

18            MR. HAYES:  The forward grip.

19            THE COURT:  What do you mean?  You are being

20   much too elliptical.  I guess I may be stupid so why

21   don't you spell it out.  The forward grip.  I said

22   there's a forward grip.  Nobody is disputing there's a

23   forward grip.  Where does that get you in your argument?

24            MR. HAYES:  It says this weapon always features

25   a pistol grip in a vertical foregrip.  Therefore, it does

1   not conform to the definition of handgun or pistol as

2   provided in the federal firearm statutes.

3           THE COURT:  Does it continue to say it doesn't

4   conform to the definition of a rifle under the federal

5   firearm statute?

6           MR. HAYES:  Since it is not designed to be held

7   and fired by the use of a single hand so --

8           THE COURT:  If it is not intended to be fired by

9   the use of a single hand, how is it a pistol with a grip

10  which is what he's trying to make it into he says by

11  cutting off the stock.  It is not meant to go to the

12  shoulder and make use of a forward handle.  You're

13  telling me on his behalf this is meant to be held in one

14  hand with this brace, right?

15          You read me what he was trying to mimic a

16  firearm that just says by definition isn't meant to be

17  held by one hand.  I'm completely confused, Attorney

18  Hayes.

19          MR. HAYES:  It doesn't say that it's - it says

20  that's the way it is designed.  That's the design of this

21  firearm.

22          THE COURT:  Okay.  And that helps you how?

23          MR. HAYES:  It doesn't say that it is meant to

24  be held with two hands.  It says that you have to have

25  that forward grip.  That's what this definition is

```
 1   saying.  That's what the definition is saying, Your
 2   Honor.
 3            THE COURT:  It's a definition by a manufacturer
 4   of his weapon.
 5            MR. HAYES:  Which is the same type of weapon
 6   described here.
 7            THE COURT:  The fact that this manufacturer
 8   describes his weapon to be used a certain way and
 9   describes it a certain way is not a pistol, that's
10   controlling on me.  That proves your argument?
11            MR. HAYES:  Your Honor, in the sense that's what
12   was intended to be made in this case.  This type of
13   firearm.
14            THE COURT:  But again I go back to my example.
15   If he intended to make that barrel be 16 and a half
16   inches, he knows the law says once you get under 16, you
17   might get in trouble, but he cuts it shorter than he
18   meant to cut it.  He didn't measure the second time.  As
19   the carpenter's saw goes measure twice, cut once.
20   Instead he cuts it to 15 and a half.  He intended it to
21   be 16 and a half.  Are you telling me that that wouldn't
22   be treated as a barrel that's 15 and a half to the extent
23   it's covered by the federal statute that focusses on
24   under 16?  He would be scot-free because he would say
25   wait a minute, I didn't mean to cut it to 15 and a half.
```

1   I meant to cut it to 16 and a half.  That's a defense.

2   I'm sorry.  It's not a defense.  He pled guilty.  That's

3   an argument for why I shouldn't find this covered by a

4   preponderance of the evidence under the statute?

5          MR. HAYES:  That's not what we have here, Your

6   Honor.  There's no mistake made.  There's none.

7          THE COURT:  There could be a mistake.  He might

8   have intended this not to be shot from the shoulder but

9   it can be.  It could be a mistake on his part.

10          MR. HAYES:  He didn't make any mistakes with

11   this particular weapon.  That doesn't meet the Court's

12   example.  The stabilizing brace is not as well made as

13   what we see.

14          THE COURT:  What's the stock at the front for in

15   his design?  If it is a one-handed pistol, not a rifle,

16   why does he have the thing in the front?

17          MR. HAYES:  To meet the standards of the

18   Franklin Armory XO-26.  At some point, that gun is the

19   same as this gun.

20          THE COURT:  Anything further, Attorney Hayes?

21          MR. HAYES:  Your Honor, I could provide the

22   Court with a photo of that particular firearm which looks

23   exactly like this firearm.

24          THE COURT:  How is it classified under NFA?

25          MR. HAYES:  It doesn't.  It is not.  It is the

1   same thing we intended in this case.  That's why.

2          THE COURT:  Does that company, whatever Armory,

3   whatever, does it start with a barrel that's more than 16

4   and cut it down in order to make it a weapon?

5          MR. HAYES:  I don't know.  The only thing I can

6   say.

7          THE COURT:  I doubt it seriously.

8          MR. HAYES:  But the Court keeps bringing me

9   back.  It is not a kit.  We didn't make it from the kit.

10  They were parts then put together.

11         THE COURT:  He cut the barrel down.  He ordered

12  a rifle barrel and cut it down.

13         MR. HAYES:  No.  We're not saying that.  No.

14  Not at all.  Not at all.

15         THE COURT:  Does that make a difference,

16  Attorney Clark, if he didn't cut a barrel down?  It is

17  not disputed.  It is in your report.

18         MS. CLARK:  Speaking about the barrel length?

19         THE COURT:  Less than 16 inches. Did he buy a

20  barrel less than 16 inches.

21         MS. CLARK:  It is unclear whether it was already

22  under 16 or he cut it.

23         THE COURT:  How did he have the parts to have a

24  rifle?  Is it a rifle under 16 inches under the NFA?

25         MS. CLARK:  No.  A rifle barrel would be rifled.

1    The bore of it will have a spiral inside.  That will

2    indicate that it's a rifle barrel.

3           In this case, the firearm hasn't been challenged

4    by the defendant on this.  The firearm does have a rifle

5    bore.  So it is a rifled barrel.  Whether or not it was

6    shortened or came under 16 inches is relevant because

7    simply being in position of a barrel under 16 inches as

8    long as he knows it's under 16 inches which he said

9    multiple times in the controlled purchase would be

10   sufficient to find liability.  Whether he, in fact,

11   shortened it or he purchased it already shortened,

12   doesn't matter.

13          THE COURT:  Are your agents familiar with

14   firearm that counsel wants me to use as a precedent to

15   somehow support his argument?

16          MS. CLARK:  Excuse me, Your Honor.

17          THE COURT:  Are your agents familiar with the

18   Armory XO-26 or whatever the number is?

19          MS. CLARK:  The agent my understanding they have

20   not heard of it.  I believe it is irrelevant.  What he

21   intended to copy doesn't matter for the purposes of the

22   NFA liability.  It is only whether he knew the firearm he

23   created had those characteristics.

24          THE COURT:  Does that description of that

25   firearm describe the barrel as rifled or bored?

1          MR. HAYES:  I don't believe that it does, Your

2     Honor.

3          THE COURT:  So the answer is it is not.  Is that

4     the answer?

5          MR. HAYES:  Yes.  Can I just say the barrel here

6     when it was purchased, it doesn't say rifle barrel.

7          THE COURT:  Is it a rifle?  Is it a bored barrel

8     like the Government counsel just argued?

9          MR. HAYES:  This barrel here?

10         THE COURT:  The one on Exhibit 9.

11         MR. HAYES:  So, Your Honor, the actual barrel

12    here when it was sold it says pistol barrel, not rifle

13    barrel.  So that bore that the Government deferred to,

14    you would that in the pistol barrel as well as the rifle

15    barrel.

16         THE COURT:  I'm getting frustrated and confused.

17    Attorney Clark, what was your point in telling me that

18    the barrel was bored and thus, a rifle barrel if Attorney

19    Hayes is correct in what he just said?

20         MS. CLARK:  So, Your Honor, the report clearly

21    identified this firearm as having a rifle bore which is

22    relevant because to be a short-barreled rifle under the

23    NFA, one of the characteristics the rifle has to have a

24    rifle bore.

25         In the controlled purchase, Mr. Kamali

1    specifically tells the undercover, it has one eight

2    twist.  What he's referring to is, in fact, the one eight

3    rifling of that bore so that's evidence he understood

4    that it had a rifle bore.  A characteristic that the

5    firearm need to have to be classified as a short barrel

6    rifle under the NFA.

7              I'm not sure what type of, you know, barrel on

8    this Franklin Armory Xo26.  That's irrelevant.  What's

9    relevant is what Mr. Kamali knew he had at the time he

10   was in the vehicle with the undercover.

11             THE COURT:  Tell me where in the report I will

12   find the reference to what you just said about it had a

13   rifle?

14             MS. CLARK:  If you look at -- this is page 28 of

15   the photos that are attached to the report.  The title is

16   Exhibit 9 Barrel Marking and you will see on the barrel

17   it says 300 Blackout 1:8.  That refers to the rifling on

18   that barrel.  I believe that the ATF expert noted that it

19   was a rifle.

20             THE COURT:  At the top of the barrel, he notes

21   that picture shows.  He said it function tested and

22   designed as a semiautomatic rifle.

23             MS. CLARK:  Correct, Your Honor.

24             THE COURT:  What about counsel's statement when

25   he purchased the barrel, he brought a, quote, pistol

1   barrel, end quote?

2          MS. CLARK:  That would also be irrelevant.  When

3   he's in possession of the firearm, he specifically notes

4   that he understands this to have a rifle barrel when he's

5   talking to the undercover.  That's what the Government

6   must prove.

7          THE COURT:  That's what's in the audio of

8   Exhibit 9 to your memorandum?

9          MS. CLARK:  Yes.  He refers to a one eight

10  twist.

11         THE COURT:  Do you dispute that's on the audio

12  of Exhibit 9, Attorney Hayes, for the record please?

13         MR. HAYES:  No, Your Honor.  Again I add his

14  conclusion, Mr. Kamali's conclusion of what that firearm

15  was intended to be how he described it to the agent, the

16  specifics that he gave to the agent in particular in

17  his mind, Mr. Kamali's mind, would be his guarantee by

18  submitting letters to the agent, calling it Connecticut

19  legal.  And just in general saying that this firearm does

20  not fall within that definition of the NFA.

21         THE COURT:  Anything further?

22         MS. CLARK:  No, Your Honor.

23         THE COURT:  Okay.  This question of what I find

24  this firearm to be is really a question of the

25  guidelines' calculation for the base offense level.

74

1        The Government's position of what the firearm

2    is, what it qualifies as, calls for a base offense level

3    of 18 opposed to the defendant's position if I accept

4    their view of this firearm or weapon, it would be a base

5    offense level 12.  Does everybody agree that's the issue

6    I'm now addressing?

7        MR. HAYES:  That's correct, Your Honor.

8        THE COURT:  So the question is under level 18,

9    does the offense involve a gun that's described at 26 USC

10   5845(a).  And, of course, that's guideline 2K8.1(a)5.

11       So I turn to 5845(a) which is the National

12   Firearms Act and that section is a definition of the

13   firearm.  The Government relies I think on both

14   subsection 3 and 4.  It is a rifle having a barrel of

15   less than 16 inches.  I think the Government's position

16   this is a rifle and the barrel is less than 16 or

17   alternatively under subsection 4, that it was made from a

18   rifle.

19       If such weapon is modified with an overall

20   length of less than 26 inches.  That does not apply here.

21   Continuing the quote of subpart 4 for a barrel or barrels

22   of less than 16 inches in length.  So both of those

23   include the use of the word "rifle" so thus, we have to

24   go to subpart C of 5845 for the definition of rifle which

25   is the term "rifle" means a weapon designed or

1    redesigned, made or remade and intended to be fired from

2    the shoulder.

3                 Now, on November 2 or about November 2, Mr.

4    Kamali met with an undercover agent for the purposes of

5    him selling to that undercover officer a 300 Blackout

6    gun.  That firearm that Mr. Kamali transferred on that

7    day, clearly was modified at the rear of the gun, what I

8    will call the stock, by removing.  We haven't been

9    precise here today but somewhere in the neighbor of an

10   inch or two from the butt plate and also by shortening or

11   putting on a barrel under 16 inches in length.

12                I should have established this sooner.  Does the

13   defense contest that he assembled the firearm with the

14   stock and then modified the stock?

15                MR. HAYES:  Yes.

16                THE COURT:  So your position is that he built

17   the firearm having cut off the end of the butt and having

18   already cut down the barrel?

19                MR. HAYES:  Yes.

20                THE COURT:  At some point he had a full butt and

21   longer barrel that he modified before selling?

22                MR. HAYES:  Both, yes, Your Honor.

23                THE COURT:  The defendant argues that this is a

24   pistol brace and relies on an ATF letter which it had

25   stated or repeats it's previous position, that a pistol

1    brace, a specific arm-stabilizing brace marketed as a

2    shooter's aid to assist in shooting large buffered tube

3    equipped pistol.  It is not a shoulder stock and

4    therefore, not meant to be shot from the shoulder.

5            I think the defendant's arguments -- I mean

6    obviously the record will reflect all of them.  I will

7    focus on the fact that principally I would view his

8    arguments to be, without ignoring the rest of them, by

9    cutting off a portion of what would become the stock, he

10   turned the rifle stock into a pistol brace.  Therefore,

11   it is not a rifle under 5845.

12           He relies on the ATF opinion letters in

13   explaining to the undercover officer why the guns in

14   question are outside of the scope of 5845 and that

15   according to the ATF, a pistol-stabilizing brace is clear

16   evidence the gun was not meant to be shot from the

17   shoulder.

18           The Government's response to that is Kamali

19   repeatedly refers to the gun as a short-barrel rifle or a

20   rifle to the undercover officer on the videos that are

21   Exhibit 9 to the Government's memorandum.  That the

22   firearm, as constructed by Kamali, has a rifle stock.  It

23   may have been cut.  May have been shortened.  But it is

24   not a pistol brace and it can be and intended to be shot

25   from the shoulder and that he can't transform a rifle

 1   stock to a pistol brace by cutting off a few inches from

 2   it.

 3          There's really no case law on this to speak of.

 4   There's, of course, the language of the statute which I

 5   will note it was amended to include a weapon made from a

 6   rifle, a weapon as modified as an overall barrel length

 7   of less than 16 inches which reflected Congress's concern

 8   regarding short-barrel rifles including those made by

 9   cutting off the barrel and the stock.

10          I'm quoting from the Government's citation of

11   four statements during as part of the legislative history

12   of 5845 as amended.

13          It is the Court's conclusion that whether Mr.

14   Kamali cut off the few inches before or after he

15   assembled this weapon, what he put on this weapon, let's

16   take his position that he shortened the stock, what he

17   put onto the weapon was still long enough and configured

18   to be held at the shoulder.

19          In what I observed in the courtroom, I believe

20   that a person could comfortably shoot this weapon,

21   Exhibit 9 to the Government's report, from the shoulder

22   and indeed I believe it was built and intended to be shot

23   that way.  The forward hand grip supports that

24   conclusion.

25          If this is a one-handed pistol with merely a

 1   brace to stabilize it when it is shot by putting

 2   something solid against the inside of your arm as you

 3   fire with one hand, there would be no purpose to the

 4   forward grip.  And placing that type of weapon on your

 5   shoulder without a forward grip, it seems to me makes the

 6   weapon very unstable as opposed to the weapon at issue.

 7   I believe the stock is still long enough to be used as a

 8   shoulder stock and should be stabilized at the shoulder

 9   and also be held in the forward position with the

10   nonshooting hand by the perpendicular butt, I will call

11   it, whatever that is, handle at the forward portion of

12   the firearm.

13          I observed several things about the differences

14   between Exhibit 1 and Exhibit 9.  Probably to me the most

15   telling is the position of the arm when Exhibit 9 was

16   held on the shoulder which I described as about a

17   45-degree angle which in my view, is a comfortable

18   position to hold that firearm at your shoulder as opposed

19   to the Exhibit 1 which appeared to me where your hand --

20   our hand was literally almost at the shoulder and would

21   not present a comfortable way to fire that weapon.

22          Further, the pistol brace on Exhibit 1 was

23   longer such that it ran farther down the inside of your

24   arm providing more support or bracing.  Whereas Exhibit 9

25   what is claimed to be a brace by the defendant, barely

1    goes below the top of your arm and thus, provides really

2    not much bracing action.

3          Also I guess I need to address the second

4    argument that I heard at some length from the defense

5    counsel.  He reasonably relied on the ATF letters on the

6    publications.  He didn't intend it to be shot from the

7    shoulder.

8          It strikes me that under the law, he knew this

9    barrel was under 16 inches.  He knew the firearm

10   incorporated a rifle stock because he purchased it and

11   attached it, even if he altered it by shortening it a

12   couple of inches.  He knew the characteristics of the

13   firearm which qualifies under 5845(a).  Even if he

14   misunderstood the law or attempted to circumvent it,

15   that's not a defense to this statute and it doesn't

16   also -- I guess I'm in the guidelines calculation.  It

17   doesn't also mean that -- please be seated, Attorney

18   Hayes.  I'm still putting my ruling on the record.

19          It doesn't mean that his belief makes it

20   something different for purposes of the guidelines.  I'm

21   having to find by a preponderance of the evidence whether

22   this is a firearm described in 5845(a).  And the Court

23   concludes that is a rifle having a barrel of less than 16

24   inches because it's made and intended to be fired.  It is

25   a weapon made and intended to be fired from the shoulder.

1          Under 2K2.1(a)(5), I find by a preponderance of

2    the evidence that Exhibit 9, the 300 Blackout weapon,

3    Exhibit 9 to the Defendant's Expert Report, is indeed a

4    weapon under 2K2.1(a)(5).  That it qualifies under

5    subsection (5) as a base offense level 18.  Do you wish

6    to be heard, Attorney Hayes?

7          MR. HAYES:  Just very briefly, Your Honor.  What

8    was referred to as rifle stock actually was purchased as

9    a buffer tube.  It was a buffer tube, not a rifle stock.

10          THE COURT:  Do you have the evidence of that to

11    put in front me?  Because I don't think you.  We talked

12    an hour ago about receipts for shoulder stocks and I

13    didn't hear anything different.

14          So on the record before me, that's what I find.

15    I don't know what you want me to do.  You want me to

16    recess the hearing.  We'll come back next week and finish

17    the sentencing.  I will tell the Government to bring

18    their expert.  I think that's probably a better thing to

19    do.  We have to make a good record here, Attorney Hayes,

20    right?

21          MR. HAYES:  Yes.  May I ask if the Court does

22    recess, could we provide some additional filing?

23          THE COURT:  Why couldn't you have provided it on

24    your due date?

25          MR. HAYES:  I have no response to that.

1          THE COURT:  Clearly, this is a huge issue for

2    you.  Guidelines are only one factor.  We all should keep

3    that in mind, right?

4          You don't want me to sentence within the

5    guidelines if I start with 12, right?

6          MR. HAYES:  Yes.

7          THE COURT:  Putting that aside, the law requires

8    me to determine the guidelines.  That's what I'm trying

9    to do and I set a schedule and you clearly objected to

10   the probation officer.  That was -- was that in a timely

11   fashion, Officer?  No.  I don't think so.  Whatever.  She

12   made a Second Addendum and forwarded it, and then you

13   filed a memorandum.  Was that timely?  Probably was.

14   Diahann, what was the deadline for the defendant's memo?

15         THE CLERK:  Two weeks ago which would have been

16   10th.

17         THE COURT:  Whatever.  You filed it on the 12th.

18   I will not make an issue about that.  But clearly this is

19   a huge issue for you.  I don't understand why I'm going

20   to have a do-over for this hearing that we already spent

21   an hour and a half on this issue, and I have ruled based

22   on what you put in front of me.

23         MR. HAYES:  Respectfully, if I may say this.

24   The Court may recall.  Perhaps this is no issue for Your

25   Honor specifically.  This matter was supposed to be heard

82

1   tomorrow.  I have another sentencing before Your Honor

2   tomorrow.  Both of them involved a lot of research and

3   involved a lot of work.  That up until I don't know late

4   last night I was working on both so both items were due

5   the same day, the sentencing filings.  That's the only

6   thing I can represent to the Court.

7        THE COURT:  I'm trying to see did you ask me for

8   a continuance that I denied?

9        MR. HAYES:  At some point, I believe the Court

10  told us that this matter would not be continued.

11       THE COURT:  So you had two continuances so the

12  two sentencings wouldn't be back to back.

13       MR. HAYES:  One was scheduled sua sponte to the

14  same date.  Meaning they were both on the same date, the

15  25th, but I did not schedule them for the 25.

16       THE COURT:  So the original sentencing was July

17  9.  Then I changed that to the September 25.  You are

18  saying that's the Court's initiative?

19       MR. HAYES:  Yes.

20       THE COURT:  No.  There was a consent motion to

21  continue the sentencing filed by you.

22       MR. HAYES:  The other matter was scheduled

23  because there's a victim involved.

24       THE COURT:  I know that.  That's scheduled to

25  the 25th.

1              Why did you ask to continue?  Diahann, could you

2      bring up Number 83?  There was a consent motion to

3      continue the sentencing hearing.

4              It was supposed to be the 2nd of July.  You

5      wanted it on the 2nd of September.  I gave you an extra

6      two or three weeks.  Normally people don't complain about

7      that.

8              MR. HAYES:  Just if I may, the other matter was

9      going to be rescheduled.  In fact, I asked for that one

10     to have more time because I knew they would fall within

11     the same time period, meaning the due dates and the

12     sentencing itself.  It was scheduled for the 25th.

13             THE COURT:  I don't think I ever told you I

14     wouldn't give you more time on this one, did I?  The

15     order on the docket just says granted consent motion.  I

16     know I sometimes say this is the last extension because

17     certain defense counsel, whom I won't name, have been

18     known to ask for two, three and four extensions.

19     Sometimes I say no more.  Enough.  I don't think I said

20     that here.  Diahann, it says order granted and there's no

21     text.  Is that all I did.  Right?

22             THE CLERK:  Yes.

23             MR. HAYES:  Your Honor, I try not to be that

24     defense counsel to ask for too many continuances.

25             THE COURT:  You do?

84

1          MR. HAYES:  Try not to be.

2          THE COURT:  Oh, Attorney Hayes.  I was trying

3     not to name you as someone who does that.  It is not

4     important to this proceeding, so there's no point in

5     discussing it.

6          When counsel for the Government mentioned

7     receipts for rifle butts, all the time you've got up and

8     tit for tat at her.  You didn't think to mention no, this

9     is a butt or what else you called it?

10         MR. HAYES:  Buffer tube.

11         THE COURT:  It doesn't look like a tube.

12         MR. HAYES:  Well, not in its form here it does

13    not.  That's the original form.  That's what it was

14    purchased as, not a rifle stock, but a buffer tube.

15         THE COURT:  Sir, did he add anything to the

16    buffer tube?  It is not a tube.  It has a triangular

17    shape to it at the end.  How is it a tube?

18         MR. HAYES:  It is packaged and manufactured as a

19    buffer tube assembly.  That's the name of it, Your Honor.

20         THE COURT:  You might as well be saying the moon

21    is made out of green cheese.  I have no basis.  You have

22    no basis right now in front of me to support what you

23    just said.  It doesn't make any sense to me.  A buffer

24    tube isn't a tube.  You are completely obfuscating this.

25         MR. HAYES:  I'm not.  When the Court asked me

85

1   earlier, I thought I made my argument.  I thought that

2   was enough.

3            THE COURT:  Is that in the memo?  Did I see the

4   buffer tube?

5            MR. HAYES:  No.  No, it was not.

6            THE COURT:  Attorney Clark, what would you have

7   me do here to avoid a 2255 which I think Attorney Hayes

8   is attempting to establish.

9            MS. CLARK:  I would briefly note with respect to

10  what is on the record right now, you have an expert

11  report from ATF identifying the part as a stock.  You

12  also have the defendant himself in the vehicle referring

13  to the fact that it was a once a stock.

14           To the extent, though, that the Court feels that

15  additional information on the buffer tube is necessary to

16  find by a preponderance of the evidence, then we would be

17  amenable to a recess to do that.

18           But I do also stress that the evidence on the

19  record at present indicates that it was, in fact, a

20  stock.  Mr. Kamali understood it to be a stock.

21           THE COURT:  The Court is going to continue this

22  sentencing hearing until 9:00 on Tuesday, October 8.

23           The Court orders that any further record

24  evidence, exhibits or argument by defense will be put

25  before the Court by October 1. Obviously filed and copied

1   to the Government.  If the Government -- I would

2   appreciate if the Government could respond by the 5th.

3   That's the Friday.  I realize that's an extremely short

4   period of time.

5          I will order the defendant to make his filing by

6   the first at 1 p.m. and give the Government to close of

7   business on the 4th.  Friday, the 4th.

8          If the Government is unable to gather everything

9   it believes is responsive by the 4th, you should file

10  what you have and indicate in a motion to extend, I

11  assume to Monday, you will tell me what further you're

12  attempting to gather and why you can't have it by the

13  4th.  Then I will consider it submitted late.

14         I also think it might be advisable for the

15  Government to have their expert here available to

16  testify.  Is that possible?

17         MS. CLARK:  Your Honor, he is not in the local

18  area, but we will certainly try.

19         THE COURT:  All right.  Obviously I have a

20  report.  And the standard is preponderance of the

21  evidence and I can take evidence that otherwise might not

22  be admissible at trial.  So I'm not by asking the

23  Government to do that suggesting without his testimony,

24  somehow the report has less value, but I think we should

25  try to make as complete a record as possible.

1          If it is not possible, Attorney Clark, I would

2     still intend to rely on the report, subject, of course,

3     to any arguments that the defendant makes as to why the

4     report is not reliable which I guess I will wait to see.

5          I want to put the defendant on notice that on

6     the conditions that I would consider imposing, there is a

7     condition that's not in the probation officer's report

8     which I'm considering imposing and I should disclose and

9     give you notice, the opportunity to argue against it.

10          That is the defendant would be required to wear

11    a patch or some otherwise be monitored for the

12    consumption of alcohol. I can tell you the reasons, but I

13    will not do that today, so you are on notice that I'm

14    considering that condition subject to opposition or

15    arguments as to why it is not justified in this case.

16    Okay?

17          MR. HAYES:  Yes, Your Honor.  Thank you.

18          (Whereupon, the above hearing adjourned at 11:53

19    a.m.)

20

21

22

23

24

25

```
 1

 2            COURT REPORTER'S TRANSCRIPT CERTIFICATE.

 3    I hereby certify that the within and foregoing is a true

 4    and correct transcript taken from the proceedings in the

 5    above-entitled matter.

 6

 7    /s/  Terri Fidanza

 8    Terri Fidanza, RPR

 9    Official Court Reporter

10

11            .

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```