# EXHIBIT S

# ASHCROFT LAW FIRM™

March 13, 2020

**VIA E-MAIL**

Michael R. Curtis
Chief, Firearms Technology Industry Service Branch
The Bureau of Alcohol, Tobacco, Firearms, and Explosives
244 Needy Road Martinsburg, Suite 1600
West Virginia
Fire_tech@atf.gov

Re:     Draft Classification Letter 3311/311127

Dear Mr. Curtis:

SB Tactical, by and through counsel, hereby submits this letter in response to the non-final classification letter issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on March 3, 2020, file number 3311/311127 ("SBA3 Letter").[1]  The SBA3 Letter creates and applies arbitrary, non-public standards to determine that the SB Tactical SBA3 pistol stabilizing brace—as configured to a Ruger, model AR-556, 5.56 NATO caliber firearm—constitutes a "rifle" as that term is defined in the Gun Control Act ("GCA") and a "short-barreled rifle" as that term is defined in the National Firearms Act ("NFA").  The SBA3 is currently owned and configured on pistols by approximately **500,000 Americans**.  If the SBA3 Letter is finalized in its current form, up to a half million Americans could be charged by state or federal law enforcement for possession of an unregistered short-barreled rifle, a felony, and SB Tactical will be put out of business.

SB Tactical submits this letter in response to the SBA3 Letter for four reasons.  *First*, SB Tactical requests an in-person meeting, as contemplated at page 1 of the ATF's letter, in which it will present additional information.[2]  *Second*, SB Tactical provides relevant background on its extensive discussions about the agency's approach to its regulations and other correspondence with the ATF that is missing from—or incorrectly stated in—the SBA3 Letter.  *Third*, SB Tactical demonstrates that the SBA3 Letter, if issued in its current form, would violate President Trump's Executive Orders promoting transparency and fairness in agency decisionmaking because it (a) would result in "legal consequence," and (b) is based on standards that have not been "publicly stated."  ***SB Tactical has described these concerns about President Trump's Executive Orders in prior correspondence dated January 15, 2020, but the ATF's letter makes no mention of them*.**[3]  *Fourth*, as written, the SBA3 Letter violates the Administrative Procedure Act ("APA"),

---

[1] The ATF also issued Classification Letter 3311/311123 ("SBL-Mini Letter") on the same day, but SB Tactical does not contest this classification.

[2] *See SBA3 Letter*, at 1.

[3] *See* Exhibit 1 [SB Tactical Richardson Letter].

March 13, 2020
Page 2

5 U.S.C. § 551 *et seq.*, because it (a) fails to engage in reasoned decisionmaking, (b) treats similarly situations differently without explanation, (c) departs from prior agency policy *sub silentio*, (d) fails to consider relevant information, and (e) violates bedrock principles of fair notice.

The ATF's practice of using nonpublic letters to articulate standards for classification—not found in the GCA or NFA—has sown confusion among regulated entities.  The SBA3 Letter is one striking example of a practice that is fundamentally at odds with sound administrative practice and the rule of law, as reflected in the recent Executive Orders.  In its classification letters, the agency is not simply applying law to facts; it is arbitrarily creating—and changing—criteria that it treats as operative law, and simultaneously applying these shifting criteria in an inconsistent manner across similar products.  As explained below, this practice violates the law.

We look forward to discussing these matters with you in person to promote a resolution that complies with the GCA and NFA, administrative law, Executive Orders, and fundamental fairness to SB Tactical, other regulated entities, and the hundreds of thousands of citizens who own and use the arm braces that the ATF appears poised to misclassify.  In light of the fact that our Nation is under serious stress at the present time, and that the ATF's policy decisions would put in doubt the use of arm braces by millions of Americans relying on their firearms for personal security, we reserve the right to raise these issues with senior DOJ leadership from the Office of the Deputy Attorney General and the Office of the Associate Attorney General.  For purposes of continuity, I have copied the same DOJ personnel and others that Mark Barnes included on his January 15, 2020 letter.

## I.   IMPORTANT FACTUAL BACKGROUND AND CLARIFICATIONS

The ATF's accounting of events in the SBA3 Letter glosses over SB Tactical's persistent and good faith efforts to ensure its compliance with the GCA and the NFA and, in some cases, is simply incorrect.  It is important that the record be accurate for ATF decision makers and senior DOJ leadership.  To help clarify the factual background, we provide a comprehensive history of SB Tactical's extensive compliance-oriented correspondence with the ATF.  We trust that with these clarifications, errors in the SBA3 Letter will be rectified.

### A.  Early 2012:  Mr. Bosco Invents The Pistol Stabilizing Brace.

Alex Bosco is a veteran of the U.S. Marine Corps and the U.S. Army.  He is an avid shooter who regularly engages in target practice at the local range on the weekends.  It was here that Mr. Bosco met up with a friend and fellow military veteran that had lost an arm in combat.  While shooting, Mr. Bosco observed his friend struggling to fire an AR-style pistol.  The issue was so pronounced that the range officer ("RO") asked Mr. Bosco's friend to fire from the "benched" position—*i.e.*, shooting while seated.  The RO was concerned that others' safety could be put at risk, given his friend's inability to adequately handle the pistol with his disability.  Mr. Bosco decided to take action to help his friend and fellow veteran.

That evening, Mr. Bosco began work on what would eventually become the world's first pistol stabilizing brace, the SB15.  He initially fashioned the device from the foam of a camera case.  Later, Mr. Bosco molded a rubber prototype from a kit he purchased at a local hobby store.  Mr.

March 13, 2020
Page 3

Bosco brought the rubber prototype to the firing range. The RO suggested that Mr. Bosco contact the ATF to ensure that his brace was legal. Heeding that advice, Mr. Bosco called the agency and spoke with Max Kingery, who suggested that Mr. Bosco submit the brace—along with a written explanation—to the Firearms and Ammunition Technology Division ("FATD")[4] for review. Around November 12, 2012, Mr. Bosco submitted his prototype as the SB15. Two weeks later, he received an approval[5] letter from ATF.

### B. November 26, 2012: The ATF Unconditionally Approves The SB15 Stabilizing Brace.

The ATF's classification of the SB15 was straightforward. The ATF issued a five-paragraph letter (the "2012 SB15 Classification Letter") finding that the addition of the SB15 stabilizing brace to a firearm "does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm."[6]

The SBA3 Letter mischaracterizes the 2012 SB15 Classification Letter. In particular, the SBA3 Letter says that the 2012 SB15 Classification Letter "determined that *when used in accordance to the stated intent*, the SB15 accessory did not change the classification of an AR-type pistol when installed."[7] However, the 2012 SB15 Classification Letter makes no such representation that the classification of a pistol configured with the SB15 is contingent upon how the pistol is used. In fact, Mr. Bosco—who had received inquiries about this from potential customers—called FATD to confirm that the classification was not contingent on any particular usage. Mr. Kingery confirmed orally that misuse was not relevant where, as here, the product was deemed a brace. The ATF later confirmed that position in writing, explaining to another regulated party that "firing a pistol from the shoulder would *not* cause the pistol to be reclassified as an SBR [short-barreled rifle]."[8]

### C. September 2014: SB Tactical Confirms That No Further Classification Is Needed On Similarly-Designed Braces.

In September 2014, Sig Sauer—then SB Tactical's largest customer—requested that SB Tactical update the SB15. Mr. Bosco and his partner, Grant Shaw, called FATD and asked an agent whether it was necessary to submit further braces for classification if they maintained the original design of the SB15: *i.e.*, two flaps made of elastopolymer and a strap. FATD confirmed that further classification decisions were *not* necessary for new braces that retained these original

---

[4] At the time, FATD was known as the Firearms Technology Branch ("FTB"). *See SBA3 Letter*, at 2. For ease of reference, this document refers to FATD throughout.

[5] In this letter, we say "approve" and "approval" to refer to an ATF opinion that a brace's configuration to a pistol does not change its classification.

[6] Exhibit 2, at 1 [2012 SB15 Classification Letter].

[7] *SBA3 Letter*, at 2 (emphasis added).

[8] Exhibit 3, at 1 [Sgt. Joe Bradley Letter] (emphasis in original).

design features of the SB15.

### D. Late 2014 & Early 2015:  The ATF Changes Course And Makes Classification Contingent Upon Individual Use.

Not surprisingly, given the utility and popularity of the SB15, other companies entered the market for arm braces.  On December 15, 2014, the ATF issued a one-page classification letter finding that a competitor product to SB15—the Shockwave Blade—was a stabilizing brace and that attaching it to a pistol would not result in the creation of a short-barreled rifle.[9]  (Unlike the SB15, the Blade is a single fin that stabilizes firing without the use of a strap by creating friction against the user's arm.)  Notably, the ATF's classification letter for the Blade conditioned its approval on an individual shooter using the brace "as originally designed and NOT … as a shoulder stock."[10]  This was apparently[11] the first time ATF suggested that an individual user's behavior could change the classification of a brace.  A full month after making this landmark shift in policy in a private letter, the ATF announced the new policy publicly.

On January 16, 2015, the ATF posted an "open letter" to its website.  The open letter relied on—and quoted—non-public classification letters, including the SB15 classification letter from 2012.[12]  The letter made cursory references to "objective design characteristics" as an apparent attempt to provide background on its classification process, but it never specified any specific design characteristics nor where they come from or how they are analyzed.[13]  The open letter—interpreting the NFA's use of the word "redesign"—took the position that firing a pistol configured with a stabilizing brace from the shoulder "makes a NFA firearm[.]"[14]  This open letter was modified by a subsequent **private** letter in 2017—as explained in more detail below—and ultimately removed from its website at an unknown date.  Accordingly, the only public guidance on stabilizing brace classifications ever promulgated by the ATF is no longer public.

The SBA3 Letter erroneously implies that the ATF released the open letter following its second determination that configuring a pistol with an SB Tactical stabilizing brace did not result in a short-barreled rifle.[15]  It is unclear why the chain of events is misstated, but, in any event, this

---

[9] *See generally* Exhibit 4 [Letter 302672].

[10] *Id.* at 2 (emphasis removed).

[11] Because the ATF does not make its classification letters public, SB Tactical cannot independently confirm whether the ATF conditioned approval in this way prior to the Shockwave Blade classification.

[12] *See generally* Exhibit 5 [ATF 2015 Open Letter].

[13] *See generally id.*

[14] *Id.* at 2.

[15] *See SBA3 Letter* at 2 ("Following these letters, FTISB received an increase in requests for clarification from the public regarding the use of *"stabilizing brace"* accessories in order to fire pistols from the shoulder.  In January 2015, FATD issued the [open letter].") (emphasis in original).

implication is false.  The open letter was released nearly a full year *before* the MPX classification letter, discussed below.

### E.  December 22, 2015:  The ATF Approves SB Tactical's Second Stabilizing Brace.

In August 2015, SB Tactical submitted a letter inquiring about the classification of a second stabilizing brace, the MPX PSB.  The ATF sent a response in November 2015 that provided a tentative opinion but declined to make a "formal determination" without a "physical sample[.]"[16]  To help the agency's decisionmaking, SB Tactical provided the ATF with a physical sample on December 2, 2015.  On December 22, 2015, the ATF concluded that—subject to proper use and removal of raised ridges on the back of the device—a pistol configured with the MPX PSB would not be regulated by the NFA.[17]

The SBA3 Letter incorrectly implies that there was ambiguity around this classification.  The SBA3 Letter says that "it should be noted, that the actual MPX/MCX shoulder stock, on which the PSB accessory is based, was never submitted for comparison."[18]  The SBA3 Letter does not explain *why* this information "should be noted," nor is its relevance clear.  The ATF never asked SB Tactical to provide a shoulder stock for comparison.  Indeed, SB Tactical is not aware of *any* regulated party being asked to provide a shoulder stock for comparison as part of the classification process.[19]  The MPX PSB classification letter itself made no mention of any purported need for the physical submission of a shoulder stock.  It did not issue a preliminary determination, contingent upon further submissions—and the ATF easily could have done so, as it declined to issue a formal determination in its November 2015 opinion due to the need for a physical sample, which SB Tactical subsequently provided.  Finally, the ATF's own webpage on accessory classifications does not advise parties to provide shoulder stocks or other devices as part of the process.[20]

In sum, the ATF's vague implication in the SBA3 Letter that SB Tactical should not have relied

---

[16] Exhibit 6, at 4 [Letter 303984].

[17] Exhibit 7, at 4 [Letter 304296].

[18] *SBA3 Letter*, at 2.

[19] To be sure, it is possible that the ATF has asked a regulated party to do so at some point in the past—SB Tactical has no way to independently confirm this information because the ATF does not have any public classification standards, nor does it release classification letters to the public.

[20] *See Notice:  Discontinuance of Accessory Classifications*, ATF, https://www.atf.gov/firearms/notice-discontinuance-accessory-classifications (last visited Mar. 10, 2020).  As of 2018, the ATF requires submission of a *firearm* with any accessory but still makes no mention of sending shoulder stocks or other devices.  *Id.*

March 13, 2020
Page 6

on the ATF's classification of the MPX PSB is without any basis.

### F. January 21, 2016:   The ATF Introduces A New Standard Without Notifying Regulated Parties.

The ATF issued a private classification letter to a company called Steady Shot, LLC on January 21, 2016 that introduced a new standard it referred to as "length of pull," apparently for the first time.[21]  According to ATF:

> A 'length of pull' is a measurement found on shoulder fired weapons, generally measured from the center of the trigger to the center of the buttplate/buttstock.  FTISB personnel research has determined the average length of pull found on shoulder-fired weapons is approximately 13.5-14.5 inches.[22]

Applying this new standard, the ATF determined that the brace then being evaluated resulted in a "'length of pull' of approximately 14-1/16 inches" when configured to a pistol.[23]  Consequently, the ATF determined that this configuration would result in a NFA firearm because it "demonstrate[d] intent for the host weapon to be fired from the shoulder when incorporating a distinguishable length of pull similar to those of shoulder-fired weapons such as shotguns and rifles."[24]  In other words, the ATF's new length of pull analysis appeared dispositive.

The length of pull standard appeared to mark a sea-change in the ATF's classification regime.  Whereas prior letters had included only vague references to "objective design features," the length of pull criterion finally gave manufacturers an objective metric with which they could comply.  And the ATF appeared to treat this factor as dispositive in subsequent letters.  For example, in a pair of private letters issued on October 31, 2017 the ATF (1) recited the 13.5-14.5 inch figure, (2) recited the submitted brace's maximum length of pull, and (3) in the very next paragraph, concluded with no further analysis that configuration of the braces did not result in the creation of a short-barreled rifle.[25]

Despite the apparent primacy of this factor, the ATF has ***never*** issued public guidance that discusses the relevance of length of pull to classifying stabilizing braces.  It also failed to inform SB Tactical of the length of pull standard.  To be sure, the non-final SBA3 Letter attempts to walk back the importance of length of pull—without acknowledging that it is doing so—but this factor

---

[21] *See* Exhibit 8, at 2 [Letter 303907].  It is possible the ATF previously applied this standard, but SB Tactical cannot independently confirm this information because the ATF does not make its classification decisions public.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 3.

[25] Exhibit 9, at 5–6 [Letter 306285]; *See* Exhibit 10, at 5–6 [Letter 307364].

March 13, 2020
Page 7

nevertheless remains part of the ATF's current analysis.[26]

### G. April 2017: The ATF Clarifies Its 2015 Open Letter.

In April 2017, the ATF released a new *private* letter that modified its enforcement position from its 2015 open letter. In pertinent part, the ATF wrote:

> To the extent the January 2015 *Open Letter* implied or has been construed to hold that incidental, sporadic, or situational "use" of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute 'redesign,' such interpretations are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced.[27]

The ATF thus concluded that an individual's mere misuse of an arm brace does not alter the classification. Despite this important change to the only public guidance it had ever issued on classifying arm braces, the ATF did not make this letter public.

More importantly, at an unknown date, the ATF removed its 2015 open letter from the agency's website, so regulated parties have *no public guidance whatsoever* on how the ATF evaluates or classifies arm braces.[28]

### H. May 18, 2017: SB Tactical Asks For Clarity On The ATF's Arm Brace Classification Process.

SB Tactical's counsel—Mark Barnes and Michael Faucette—initiated a meeting with the ATF, seeking guidance for the company on how to remain in compliance with the ATF's rules. Prior to the meeting, SB Tactical submitted questions to glean additional clarity on the ATF's classification process.[29] The ATF participants at the meeting committed to provide more clarity on the agency's classification of stabilizing braces.[30] However, the ATF has yet to respond to SB Tactical's written questions submitted prior to the 2017 meeting.

SB Tactical also asked at the 2017 meeting if *any* of its current offerings concerned the ATF. SB Tactical brought samples of all its stabilizing braces to this meeting to facilitate this line of inquiry. The ATF meeting participants affirmatively said that they did *not* have concerns regarding any of

---

[26] *See, e.g.*, *SBA3 Letter*, at 8–10.

[27] Exhibit 11, at 3 [Letter 5000].

[28] *See generally Firearms Open Letters*, ATF, https://www.atf.gov/rules-and-regulations/firearms-open-letters?field_document_type_value%5Bopen_letter%5D=open_letter&og_group_ref_target_id%5B186%5D=186 (last visited Mar. 10, 2020).

[29] *See* Exhibit 12 [Draft FAQ submitted to ATF]

[30] While we did not insert the names of attendees in this letter, we can provide this information for this meeting and all other meetings referenced herein.

March 13, 2020
Page 8

SB Tactical's stabilizing braces. The purpose of the question was not to claim that such an affirmative response constituted a formal ATF classification approval, but rather it was an opportunity for the ATF to put SB Tactical on at least constructive notice that new classification submissions would be needed if the key decision makers present saw obvious problems with the products. The ATF at this meeting did not suggest further submissions or other actions from SB Tactical were necessary. Additionally, while not explicitly discussed, no participant at this meeting expressed any issue with SB Tactical's marketing practices.

### I. August 1, 2018:   SB Tactical Asks For Clarity On The ATF's Arm Brace Classification Process For The Second Time.[31]

SB Tactical's counsel—Mark Barnes—requested another meeting with the ATF after continued requests for guidance went unanswered. The ATF agreed to the meeting. Two days before the meeting was to occur, SB Tactical received a letter from the ATF objecting to the use of the phrase "ATF Compliant" on products that had not been reviewed by the ATF. This letter was the first time SB Tactical was made aware that the ATF might have concerns with its marketing practices. Contrary to the ATF's assertion in the SBA3 Letter, SB Tactical did not request a meeting "[a]s a result of" this letter[32]—the meeting was scheduled at the time SB Tactical received the letter.

There were three topics of discussion at the meeting, which was attended by more than half a dozen ATF employees: (1) SB Tactical's marketing materials, (2) whether SB Tactical needed to submit further products for classification, and (3) the need for further clarification as to how the ATF evaluates stabilizing braces. *First*, the parties came to an agreement whereby SB Tactical would remove from its marketing materials language stating that "ATF has reviewed this product," but **keep** the phrase "ATF Compliant." All parties agreed that a product could be "ATF compliant"— but not "reviewed" by the ATF—without submission to the ATF, as there is nothing precluding companies from self-classifying products with assistance of counsel. Mr. Faucette confirmed this understanding by crossing out the phrase "ATF has reviewed this product"—leaving the "ATF Compliant" language"—and passing the marketing materials around the room for review.[33] This portion of the meeting was short, and SB Tactical altered its marketing practices immediately following the meeting, removing from its materials the phrase "ATF has reviewed this product,"

---

[31] To the extent the ATF disputes our account of this meeting—or any other meetings described herein—we are willing to exchange any internal notes taken by meeting participants at the meeting(s).

[32] *See SBA3 Letter*, at 4.

[33] *See* Exhibit 13, at ¶ 2 [Faucette Sept. 10, 2018 email] (memorializing this understanding over email).

March 13, 2020
Page 9

and leaving the general statement as shown below.



*ATF has determined that attaching a Pistol Stabilizing Brace to a firearm does not alter the classification of the firearm or subject the firearm to NFA control.

sb-tactical.com

*Second*, SB Tactical once again asked the ATF if it had concerns with any of SB Tactical's arm braces. SB Tactical once again brought samples of its stabilizing brace products—including the SBA3—to facilitate this inquiry. The ATF once again explained that it did not have any concerns with SB Tactical's products, particularly the samples at the meeting. In response to questioning from Mr. Bosco, the ATF also explicitly agreed that SB Tactical did not need to submit its braces for classification so long as they contained the same basic elements as prior submissions: two flexible rubber flaps and a Velcro strap.

*Third*, SB Tactical asked the ATF if it could submit a letter asking specific questions regarding how the ATF evaluates stabilizing braces. The ATF welcomed the letter and committed to responding to it. SB Tactical sent the letter in October.[34] The letter asked practical compliance questions regarding length of pull, whether straps need to be included with braces, and more. To date, SB Tactical has not received a response.

### J. September 2018: The ATF Raises Unspecified Concerns Over SB Tactical's Website But Refuses To Discuss Further.

On September 10, 2018, a representative from the ATF mentioned on a phone call with SB Tactical's counsel, Michael Faucette, that he had heard from an attorney in the Office of Chief Counsel there was still be a problem with SB Tactical's use of legal disclaimers on its website. Mr. Faucette immediately checked the website to confirm that SB Tactical had removed the phrase "ATF has reviewed this product." After confirming, he sent an email to said ATF representative and an attorney from the Office of Chief Counsel, describing the language used on the website and asking them to "please let [him] know if there is still something online that is problematic."[35] The ATF never responded to this email with an indication the language was problematic, nor were numerous follow-up calls to ATF attorneys from Mr. Barnes' office ever returned.

### K. February 19, 2019: SB Tactical Asks For Clarity On The ATF's Arm Brace Classification Process For The Third Time.

SB Tactical requested—and the ATF agreed—to a third meeting to discuss the ATF's arm brace classification process. At this meeting, SB Tactical stressed its desire to work as a good faith partner with the agency to ensure that its products complied with the law, as might be reflected in

---

[34] *See* Exhibit 14 [Oct. Letter from SB Tactical to ATF].

[35] *See* Exhibit 13, at ¶ 3 [Faucette Sept. 10, 2018 email].

March 13, 2020
Page 10

the ATF's shifting approaches in non-public classification letters.  For the third time, SB Tactical provided samples of its products and explicitly asked the ATF whether it had any concerns about SB Tactical's products.  An ATF representative at the meeting told SB Tactical that he was aware of an evaluation where an SB Tactical brace—affixed to a firearm in such a way that it caused the firearm to discharge at a downward angle—converted the weapon to an NFA firearm.  When asked, the ATF representative confirmed that if the brace had not been affixed at this downward angle, the classification would not have come out this way.  The ATF meeting participants did not provide any further details on this evaluation.  This meeting was the ***first time*** the ATF informed SB Tactical that one of their products may have converted a weapon to an NFA firearm. Nevertheless, the ATF expressed that they viewed this evaluation as something of a fluke and did not request that SB Tactical submit any of its braces for classification.  The ATF also made no mention of SB Tactical's marketing practices at this time.

At this meeting, SB Tactical also requested that the ATF respond to its letter seeking guidance in October 2018,[36] pursuant to its prior commitment.  The ATF again confirmed it would respond. Nevertheless, more than a year later, SB Tactical has yet to receive a response.

### L. March & April 2019:  SB Tactical Learns That—Despite Prior Assurances—The ATF Has Begun Criminally Prosecuting Possessors Of Pistols With SB Tactical Braces.

In March 2019, defense counsel for a criminal case in the United States District Court for the District of Eastern California reached out to SB Tactical.[37]  The ATF had apparently submitted a report opining that an SBA3 stabilizing brace converted a pistol into a short-barreled rifle.  This revelation shocked SB Tactical given the numerous meetings in which SB Tactical asked the ATF if its products—including the SBA3—were of concern or needed to be submitted for classification.

On April 1, 2019, SB Tactical received an inquiry through its website from an individual in a second criminal case, this time in United States District Court for the District Connecticut, in which the ATF issued a determination that a pistol configured with an SB Tactical SBTEVO stabilizing brace constituted a short-barreled rifle.[38]  Given this revelation, Mr. Sullivan requested a meeting with then-Acting Director Thomas Brandon.

Importantly, the SBA3 Letter appears to falsely imply that SB Tactical had knowledge of these criminal cases as far back as August 2018 based on a "brace chart" prepared by SB Tactical.[39] That is incorrect.  The "brace chart" the SBA3 Letter references was prepared between the April 1 revelation and the April 19 meeting with then-Acting Director Thomas Brandon.  Moreover, SB Tactical at ***no point*** had "***clear knowledge*** that [certain] accessories did indeed change the

---

[36] *See* note 34, *supra*. [Oct. Letter from SB Tactical to ATF].

[37] *See* Exhibit 15, at 1 [Email from Patrick Robbins re SBA3].

[38] *See* Exhibit 16 [SB website inquiry re SBTEVO].

[39] *See SBA3 Letter*, at 4 & Attachment K.

classification of certain firearms when installed."[40]   Rather, SB Tactical knew that in two individual criminal cases the ATF had taken the position that the brace changed the classification of the pistols at issue in those cases.  The ATF had previously reassured SB Tactical that there were no compliance issues and had separately made clear that braces are classified only as affixed to specific guns.  Accordingly, SB Tactical had every reason to believe that these criminal cases were anomalies—consistent with past guidance from the ATF—and that attachment to most guns would be in compliance with ATF rules.

### M. April 19, 2019:  The ATF—For The First Time—Requests That SB Tactical Submit Its Products For Classification.

Shortly after SB Tactical became aware of the ATF's criminal prosecutions, it met with the ATF.  The meeting covered two topics: (1) surprisingly, SB Tactical's marketing practices, and (2) the potential classification of SB Tactical's products.

*First*, although not the reason behind SB Tactical's meeting request, the ATF expressed new concerns over SB Tactical's marketing, despite SB Tactical's compliance with the August 2018 agreement to remove the phrase "ATF has reviewed this product" but keep the phrase "ATF Compliant."[41]  Michael Faucette informed an ATF representative near the end of the meeting that SB Tactical was happy to remove any language that ATF deemed problematic and to call him if there were still issues with what was listed on the website.

*Second*, the ATF encouraged SB Tactical to submit all braces that the ATF had not yet classified.  SB Tactical had invited Omar Avila—a disabled veteran—to attend the meeting remotely so that he could explain how the SBA3 allows him to fire pistols despite his disability.  But the ATF had no interest in discussing the basis for its classification decision.  When pressed on why the agency did not provide SB Tactical with notice that it was evaluating the SBA3 contrary to its repeated assurances that there were no compliance issues, the ATF claimed that it was not authorized to notify people of classifications unless directly responding to a submission—even though there is no statute, regulation, or internal agency operating procedure containing any such prohibition, and the agency has on other occasions notified companies of such classifications.[42]   Despite SB Tactical's disappointment that its good faith compliance efforts had been for naught, it agreed to submit its braces for classification with a clear understanding that before anything was finalized, written, or sent, the ATF would advise SB Tactical's counsel of the outcome and provide SB Tactical an opportunity to meet and discuss the factors.  The agency confirmed this agreement with Mr. Barnes.  Nevertheless, no such meeting occurred prior to the ATF's release of the SBA3

---

[40] *Id.* at 4 (emphasis added).

[41] *See* Section I., *supra*.

[42] On July 17, 2018, the ATF sent out unsolicited letters to companies notifying them that it was classifying the upper receivers of .50 caliber AR-15 rifles as "firearms."  *See, e.g.*, Exhibit 17 [Letter 309129].

March 13, 2020
Page 12

Letter.

Importantly, the SBA3 Letter's suggestion that SB Tactical intentionally submitted an SBA3 sample with an abnormally long Velcro strap, and its decision to disregard strap length as a result, is not supported by the facts. When designing the SBA3, SB Tactical tested straps of various lengths and elasticity, with a goal of settling on a "one size fits all" strap. As SB Tactical informed the ATF at the April 19, 2019 meeting, the company made an error and ordered the wrong strap size for its initial production run. SB Tactical has long since instructed its contract manufacturer to assemble new SBA3s with longer straps. Customers with the shorter configuration who contact SB Tactical are sent a longer replacement strap at no charge.[43] In any event, the MPX PSB—described above—was submitted with the shorter Velcro strap, which the ATF did not flag as relevant when it classified the brace.[44]



*See shorter strap length on approved MPX/PSB (top) compared with longer strap on submitted SBA3 (bottom)*

### N.  May & July 2019:  The ATF Sends SB Tactical Cease And Desist Letters For Its Use Of "ATF Compliant" And Refuses To Advise SB Tactical On Compliant Language.

On May 21, 2019, Mark Barnes' received a letter from ATF that SB Tactical "must cease referring to [its] products as 'ATF Compliant' or in using any similar language that may cause confusion to consumers about ATF's official position as to your products."[45] In response to this letter, SB Tactical, through counsel, proposed new language to ATF via email which quoted language from ATF's 2015 open letter, described above.

> Legal Disclaimer: As a general matter, ATF has "determined that attaching a brace to a firearm does not alter the classification of the firearm or subject the firearm to National Firearms Act (NFA) control." However, not every arm brace product, including competitor products, can be attached to any firearm model in any configuration without falling under the NFA. Accordingly, you should consult an attorney or the ATF Technology Division

---

[43] *See, e.g.*, Exhibit 18 [Email from customer].

[44] *See* Section III.B, *infra*.

[45] Exhibit 19, at 3 [ATF Letter of May 21, 2019].

March 13, 2020
Page 13

before using your brace with a firearm model or configuration other than intended by a firearm or arms brace manufacturer.[46]

The ATF subsequently called Mark Barnes and said that it refused to opine on SB Tactical's proposed language.  To memorialize this, Mark Barnes' office sent a letter to ATF on July 19, 2019, stating that if the ATF did not object to the proposed language within five business days, "SB Tactical [would] take this as an indication from ATF [that a new cease and desist letter] will not be forthcoming and … proceed to post the new language."[47]

The ATF emphatically refused to advise SB Tactical on its proposed language.[48]  It took the bizarre position that 5 C.F.R. § 2635.702(b) precluded the agency from advising parties on how to comply with federal law.[49]  That federal regulation—which governs the use of public office for private gain—explicitly allows for federal agencies to "document[] . . . compliance with agency requirements or standards.[.]"[50]  As an example, it notes that "[t]he Administrator of the Environmental Protection Agency *may sign a letter* to an oil company *indicating that its refining operations are in compliance* with Federal air quality standards[.]"[51]  Nevertheless, the ATF concluded that it would "not endorse any language [that Mark Barnes] proposed on behalf of . . . SB Tactical, Inc."[52]  Using its erroneous reading of a federal regulation, the ATF wrote: "As

---

[46] Exhibit 20 [May 30, 2019 email].

[47] Exhibit 21, at 2 [Letter to ATF July 19, 2019].

[48] *See generally* Exhibit 22 [ATF Letter of July 24, 2019].

[49] *Id.* at 1 ("Federal regulation generally prohibits ATF or any employee of ATF from using their Government position or title in a manner that can be construed to imply ATF endorses the personal activities of another. *See* 5 C.F.R. 2635.702(b). In regards to the language for which you request an endorsement, this letter serves to inform you that ATF does not and will not endorse any language sent in from SB Tactical, Inc. for posting to their website."). This interpretation—were it correct—would also appear to preclude the ATF from issuing classification letters.

[50] 5 C.F.R. § 2635.702(c) ("An employee shall not use or permit the use of his Government position or title or any authority associated with his public office to endorse any product, service or enterprise except: . . . (2) As a result of documentation of compliance with agency requirements or standards[.]").

[51] *Id.* § 2635.702(c), example 3 (emphasis added).

[52] Exhibit 22, at 2 [ATF Letter of July 24, 2019].

March 13, 2020
Page 14

counsel for SB Tactical, Inc. you are responsible for providing such advice."[53]

## II. THE SBA3 LETTER WOULD VIOLATE THE PRESIDENT'S EXECUTIVE ORDERS.

### A. President Trump Issued Two Executive Orders Designed To Promote Transparency And Fairness In Agency Decisionmaking By Preventing Agencies From Making Decisions Based On Non-Public Standards.

The Administrative Procedure Act authorizes federal administrative agencies to engage in rulemaking and adjudication.[54] The APA also establishes safeguards to ensure that "administrative policies affecting individual rights and obligations [are] promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations."[55] Despite these statutory safeguards, the President found that some federal agencies were undertaking *ad hoc* decisionmaking based on unannounced standards, "undermin[ing] the APA's goals of promoting accountability and ensuring fairness."[56]

The President issued two Executive Orders designed to end this problem and to "protect Americans from out-of-control bureaucracy and stop regulators from imposing secret rules and hidden penalties on the American people."[57]  *First*, Executive Order 13891—Promoting the Rule of Law Through Improved Agency Guidance Documents ("Guidance Order")—provides that agencies must "treat guidance documents as non-binding both in law and in practice" and "may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process[.]"[58] The Guidance Order also imposes various procedural requirements on agencies, such as maintaining a central database of all guidance documents on the agency's website.[59]

*Second*, Executive Order 13892—Promoting the Rule of Law Through Transparency and Fairness

---

[53] Exhibit 22, at 2 [ATF Letter of July 24, 2019].

[54] *See* 5 U.S.C. §§ 553–58.

[55] 55 *See* Exec. Order 13892, 84 Fed. Reg. 55239, § 1 (Oct. 15, 2019) (citing *Morton* v. *Ruiz,* 415 U.S. 199, 232 (1974)) (internal quotation omitted) ("*Adjudication Order*").

[56] *Id.*

[57] *Remarks on Signing Executive Orders on Transparency in Federal Guidance*, 2019 Daily Comp. Pres. Doc. 00705 (Oct. 9, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900705/pdf/DCPD-201900705.pdf.

[58] Exec. Order 13891, 84 Fed. Reg. 55235, § 1 (Oct. 15, 2019) ("*Guidance Order*").

[59] *See id.*, *e.g.,* §§ 3 ("each agency or agency component, as appropriate, shall establish or maintain on its website a single, searchable, indexed database that contains or links to all guidance documents in effect from such agency or component"), 4(a)(i) (explaining that agencies must establish a requirement "that each guidance document clearly state that it does not bind the public, except as authorized by law or as incorporated into a contract"), 4(a)(ii) (requiring agencies to

March 13, 2020
Page 15

in Civil Administrative Enforcement and Adjudication ("Adjudication Order")—provides that when an agency "makes a determination that has legal consequence for a person, it may apply only standards of conduct that have been publicly stated in a manner that would not cause unfair surprise."[60]  With regard to agency guidance, the Adjudication Order provides that agencies may not treat "noncompliance with a standard of conduct announced solely in a guidance document as itself a violation" of law or matter of "legal consequence" and must instead apply only the "statutes or regulations" themselves.[61]

### B. The SBA3 Letter Would Violate The Adjudication Order Because Its Determination Establishes Legal Consequence Based On Non-Public Standards.

The Adjudication Order provides that federal agencies may not issue decisions with "legal consequence" based on standards they have not "publicly stated."[62]  The SBA3 Letter, if finalized in its current form will impose "legal consequence[s]" based on standards that the ATF has never "publicly stated."[63]  The SBA3 Letter would thus violate the Adjudication Order.

#### 1.   The SBA3 Letter would constitute a decision with "legal consequence."

The Adjudication Order defines "legal consequence" consistent with "final agency action" under the APA.  The Order states that "legal consequence" is "the result of an action that directly or indirectly affects substantive legal rights or obligations" as "informed by the Supreme Court's discussion in *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813–16 (2016)[.]"[64]  In *Hawkes*, the Supreme Court confirmed that an agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."[65]  The SBA3 Letter would

---

[60] *Adjudication Order*, § 4.

[61] *Id.* § 3.

[62] *Adjudication Order*, § 4 ("When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it may apply only standards of conduct that have been publicly stated in a manner that would not cause unfair surprise.").

[63] The SBA3 Letter is not yet final and thus lacks legal consequence in its current form.  *See SBA3 Letter*, at 1 ("This letter is not a final classification letter and does not constitute final agency action.").

[64] *See Adjudication Order*, § 2(d).

[65] *Hawkes*, 136 S. Ct. at 1813; *see id.* ("In *Bennett v. Spear*, we distilled from our precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA. 'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights

March 13, 2020
Page 16

meet both elements if finalized in its current form.

*First*, the final SBA3 Letter will mark the consummation of the ATF's decisionmaking process. The SBA3 Letter notes it will culminate in a "final classification letter" and makes no mention of any further administrative process.[66]  Indeed, the First Circuit in *Sig Sauer v. Brandon*—citing the ATF's own National Firearms Act handbook—explained that after the issuance of a classification letter, "there are no further steps in ATF's administrative process."[67]  The final Letter will thus meet the first prong of the test for "final agency action."

*Second*, the classification letter will result in legal consequence.  The current draft of the SBA3 Letter unambiguously "classifie[s] [the submitted sample] as a 'short-barreled rifle' and a 'firearm' as defined in the GCA and NFA, respectively."[68]  This classification will trigger significant reporting obligations for vendors that sell guns configured with the SBA3 and consumers who purchase such guns, including submitting fingerprints to the ATF and paying a $200 tax.[69]  The First Circuit held that the imposition of these requirements constitutes legal consequence under the APA's test for final agency action.[70]  The SBA3 Letter will thus meet the second prong of the test for "final agency action" if it is finalized in its current form.

In addition to meeting the Adjudication Order's test for legal consequence, the final SBA3 Letter will also be precisely the type of agency action that the Adjudication Order is intended to reach. The Adjudication Order offers several illustrative examples of actions with "legal consequence," including "agency ***letters***" that "specif[y] which commodities are subject to or exempt from regulation under a statute[.]"[71]  The SBA3 Letter would do exactly that by determining that the SBA3 is regulated by the NFA and GCA.

Finally, the ATF itself has consistently taken the position before the courts that its classification

---

or obligations have been determined, or from which legal consequences will flow.' (internal quotations and citations omitted)).

[66] *SBA3 Letter*, at 1.

[67] *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016).

[68] *SBA3 Letter*, at 27.

[69] *See* 26 U.S.C. § 5841(b); 27 C.F.R. § 479.101(b); *How can I make and register an NFA firearm?*, ATF (revised Jan. 23, 2020), https://www.atf.gov/firearms/qa/how-can-i-make-and-register-nfa-firearm (citing 27 C.F.R. §§ 479.62–65).

[70] *Sig Sauer, Inc.*, 826 F.3d at 600 n.1 ("And should ATF's classification decision stand, Sig Sauer will have to go through with the NFA's stringent requirements in order to sell its firearm—as the classification letter states.  In consequence, we agree with the parties that ATF's classification decision is a 'final agency action' and thus reviewable under the APA." (citations omitted)).  *See also Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014) (analyzing firearms classification letter as "final agency action").

[71] *See Adjudication Order*, § 2(d) (citations omitted) (emphasis added).

letters have legal consequence.  In *Sig Sauer*, for example, the First Circuit observed that the ATF had expressly "agree[d]" in its papers that "issuance of a classification letter is a 'final agency action' that is reviewable under the Administrative Procedure Act."[72]  Similarly, in *Innovator Enterprises, Inc. v. Jones*, the ATF sought *Chevron* deference for a classification letter, signaling the agency's view that the letter was final and imposed binding legal obligations.[73]  Because the ATF's position before the courts is that its classification letters are final actions from which rights or obligations are determined, or from which legal consequences will flow, the agency must agree that the final SBA3 Letter will have legal consequence within the meaning of the Adjudication Order.

### 2.   The SBA3 Letter applies standards that have not been "publicly stated."

The Adjudication Order prohibits ATF from taking actions with "legal consequence" based on standards that have not been "publicly stated."[74]  But the current draft of the SBA3 Letter relies on non-publicly stated standards.  Page 7 of the SBA3 Letter, in particular, provides a non-exhaustive list of "objective design features" and other discretionary factors the ATF used to classify the SBA3 as subject to NFA and GCA regulation.  Those factors do not appear in ***any*** document made public by the agency, nor are they contained in any statute, regulation, or Federal Register publication.  The agency has not explained the derivation of these standards, how they were identified, or how they reasonably and faithfully apply the operative provisions of either the NFA or GCA. The Adjudication Order thus prohibits the ATF from relying on the never-before-publicly-stated-standards contained in the letter.

To be sure, the ATF issued an open letter in 2015 that mentioned "objective design characteristics" in the abstract.  But that letter cannot satisfy the Adjudication Order.  To begin, the 2015 letter does not explain what it means by "objective design characteristics," nor does it contain reference to ***any*** of the factors that appear on page 7 of the SBA3 Letter.  And even if the 2015 letter did contain such guidance, the Adjudication Order would prohibit the ATF from relying on it as the basis for the SBA3 Letter because the Order provides that such letters must rely on "statutes or regulations."[75]  Finally, because the 2015 letter has been withdrawn from the ATF's website, there

---

[72] *Sig Sauer, Inc.*, 826 F.3d at 600 n.1

[73] *See* Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment at 11, *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014) (No. 1:13-cv-00581).  It also noted that "[w]ithin ATF, the Firearms Technology Branch determines what is or is not a 'firearm' under the NFA and GCA."  *Id.* at 8.

[74] *Adjudication Order*, § 4 ("When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it may apply only standards of conduct that have been publicly stated in a manner that would not cause unfair surprise.").

[75] *Id.*, § 3 ("When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it must establish a violation of law by applying statutes or regulations.  The agency may not treat noncompliance with

is no basis for the agency to even contend that it is being made publicly available by the agency.[76]

In sum, because the final SBA3 Letter will carry "legal consequence" and creates and purports to apply standards that have not been "publicly stated," it violates the President's Adjudication Order.

### C.  The SBA3 Letter Would Also Violate The Guidance Order If It Applies.

The Guidance Order defines a "guidance document" as "an agency statement of general applicability, intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory, regulatory, or technical issue, or an interpretation of a statute or regulation[.]"[77]  For the reasons explained above, SB Tactical believes that the final SBA3 Letter is governed by the Adjudication Order and would violate that Order.  However, to the extent the ATF believes that the final SBA3 Letter is a "guidance document" governed by the Guidance Order, the letter would separately violate that Order.

*First*, the SBA Letter is not "an agency statement of general applicability" so does not come within the definition of guidance provided by the Guidance Order.  *Second*, the ATF does not publish classification letters on its website in "a single, searchable indexed database" as the Guidance Order requires.[78]  *Third*, the SBA3 Letter will not disclaim binding effect[79] but, in fact, will do the opposite.[80]  Accordingly, even if the SBA3 Letter is analyzed under the Guidance Order, it violated that Order.

### III.   THE SBA3 LETTER WOULD VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things (1) "arbitrary, capricious, an abuse of discretion, or otherwise

---

a standard of conduct announced solely in a guidance document as itself a violation of applicable statutes or regulations.").

[76] *Id.* ("An agency may cite a guidance document to convey [its] understanding in an administrative enforcement action or adjudication only if it has notified the public of such document in advance through publication, either in full or by citation if publicly available, in the Federal Register (or on the portion of the agency's website that contains a single, searchable, indexed database of all guidance documents in effect)."); *cf. Guidance Order*, § 3 (directing "each agency" to "establish or maintain on its website a single, searchable, indexed database that contains or links to all guidance documents").

[77] *Guidance Order*, § 2(b).

[78] *Id.*, § 3.

[79] *Id.*, § 4(a)(i) (providing that agencies must define a process for promulgating guidance that includes "a requirement that each guidance document clearly state that it does not bind the public, except as authorized by law or as incorporated into a contract").

[80] *See supra* Sec. II.b.1.

not in accordance with law;"[81] or (2) "contrary to constitutional right, power, privilege, or immunity."[82]   The ATF's issuance of the SBA3 Letter in its current form would violate the APA in at least five ways:

- The SBA3 Letter fails to articulate a satisfactory explanation for the ATF's decision.

- The SBA3 Letter treats similar situations differently.

- The SBA3 Letter departs from agency precedent without explanation.

- The SBA3 Letter fails to examine all of the relevant information.

- The ATF failed to provide fair notice to regulated parties.

### A.   The SBA3 Letter Fails To Articulate A Satisfactory Explanation For The ATF's Decision.

To survive APA review, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[83]   Accordingly, the ATF must "provide[] a clear and coherent explanation for its classification" of products under the GCA or NFA.[84]  That is, in order to facilitate effective review, an agency must provide sufficient information "to allow the court to determine whether its judgment reflects reasoned decisionmaking."[85]  The current draft of the SBA3 Letter fails to meet this threshold showing in two key ways.

*First*, the SBA3 Letter fails to articulate a satisfactory explanation as to how it applied relevant factors holistically.  In *Innovator Enterprises v. Jones*, the United States District Court for the District of Columbia held that the ATF violated the APA where it set out a non-exhaustive list of factors but failed to explain how many of those factors were necessary to classify a given firearms accessory as a silencer.[86]   The court explained:

> [T]he agency did not perform a scientific or rigorous comparison of physical characteristics.  Instead, it consulted a list of six characteristics that are allegedly common to "known silencers," and then, if the submitted device has some (unstated) number of

---

[81] 5 U.S.C. § 706(2)(A).

[82] *Id.* § 706(2)(B).

[83] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

[84] *See Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006).

[85] *Id.*

[86] *Innovator Enters.,* 28 F. Supp. 3d at 25–26.

those characteristics (here, three out of six was enough), it is a "firearm silencer." . . . The agency never explains whether there are other common characteristics that do not appear on its list. And the agency never explains how many characteristics in common are necessary to be classified as a "firearm silencer." What if a device has an "encapsulator" and an "end cap"—is it a silencer? What about a device that is attached to the muzzle of a rifle, and is full of "sound dampening material," but has none of the other five physical characteristics—is it a silencer? The agency's approach leaves Innovator (as well as other regulated parties, and reviewing courts) guessing.[87]

Here, just as in *Innovator*, the SBA3 Letter fails to explain how it applies the factors holistically to come to its ultimate conclusion. In fact, the SBA3 Letter adopts precisely the same approach as in *Innovator*. On page 7, the ATF recites an inexhaustive, bulleted list of "objective design features" that supposedly are relevant to determining whether an accessory is a stabilizing brace or a stock. On page 26, the agency makes several findings about the SBA3 that roughly correspond with that list and which appear to point in contradictory directions. The next paragraph then recites a subset of the findings from the bulleted list and concludes, without explanation, that the "submitted configuration" constitutes a short-barreled rifle.[88] Just as in *Innovator Enterprises*, the ATF fails to explain **which** or **how many** factors are dispositive, or how the agency assigns weight to factors that point in differing directions. Accordingly, "[t]he agency's approach leaves [SB Tactical] (as well as other regulated parties, and [potentially] reviewing courts) guessing."[89]

*Second*, the SBA3 letter fails to articulate a satisfactory explanation as to how it applied the factors individually. The SBA3 letter identifies the following factors as relevant to the classification of stabilizing braces:

- "The type and caliber of firearm to which the 'stabilizing brace' accessory is installed;"[90]

- "The weight and length of the firearm used with the 'stabilizing brace;'"[91]

- "The 'length of pull' when installed on a firearm[;]"[92]

- "The attachment method of the 'stabilizing brace' accessory, to include modified stock

---

[87] *Id.*

[88] *See SBA3 Letter* at 26–27.

[89] *Innovator Enterprises*, 28 F. Supp. at 25–26.

[90] *SBA3 Letter*, at 7 (emphasis removed).

[91] *Id.* (emphasis removed).

[92] *Id.*

March 13, 2020
Page 21

attachments, extended receiver extensions, and the use of spacers;"[93]

- "Function of the accessory when utilized as a 'stabilizing brace' compared to alternate use as a shouldering device;"[94]

- "Design of the 'stabilizing brace' compared to known shoulder stock designs;"[95]

- "Rear contact surface area of the 'stabilizing brace;'"[96]

- "Material used to make the accessory;"[97]

- "Shared or interchangeable parts with known shoulder stocks;"[98]

- "Appropriate aim point when utilizing the 'stabilizing brace' accessory, no upward or downward slant;"[99]

- "Presence of a secondary grip, demonstrating the weapon is not designed be held and fired by one hand;"[100]

- "Incorporation of sights/scopes that possess eye relief incompatible with one-handed firing;"[101]

- "Installation of other peripheral accessories, to include bipods/monopods, large capacity magazines/drums, etc."[102]

- "[T]he marketing of both the accessory and the firearm to which it is assembled, compared to the manufacturer's stated intent when submitting an item;"[103]

- "[H]ow the device is actually being utilized by members of the Firearms Industry [sic],

---

[93] *Id.* (emphasis removed).

[94] *Id.* (emphasis removed).

[95] *Id.* (emphasis removed).

[96] *Id.* (emphasis removed).

[97] *Id.*

[98] *Id.*

[99] *Id.* (emphasis removed).

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

March 13, 2020
Page 22

Firearm Writers [sic], and the general public."[104]

Under the APA, agencies must adequately explain how the factors they rely upon inform its decision.  For example, in *Tripoli Rocketry Association, Inc. v. ATF*, the ATF said that it classified a material as an explosive because it deflagrated.[105]   But the ATF "never reveal[ed] how it determine[d] that a material deflagrate[d]."[106]   While the record suggested the determination was based on burn velocity, "the agency never define[d] a range of velocities within which materials will be considered to deflagrate."[107]   And the burn velocities in the record differed by "order[s] of magnitude[.]"[108]   While the ATF is accorded some discretion to account for gray areas, a reviewing court needs "***some*** metric for classifying materials . . . especially when . . . the agency has not claimed that it is impossible to be more precise in revealing the basis upon which it has made a scientific determination."[109]

For the factors that the ATF analyzed in the SBA3 Letter,[110] it fails to do so in accordance with its obligations under the APA:

a.     The ATF's analysis of "length of pull" is particularly problematic.  The ATF says—for the first time[111]—that the 13-1/2 to 14-1/2 average figure that it has cited on past occasions is in fact not the standard but is instead an "extreme limit indicator."[112]   It also notes—for the first time[113]— that a maximum length of pull of "as little as ***7 inches***" could evince an intent for a weapon to be fired from the shoulder.[114]   It then concludes that a length of pull under 13-1/2 inches actually

---

[104] *Id.*  Note that several of the factors in the list subsume one another or otherwise simply reframe the inquiry.  For example, "function of the accessory when utilized as a 'stabilizing brace' compared to alternate use as a shouldering device" would seem to include within it "[r]ear contact surface area," "[a]ppropriate aim point," "[p]resence of a secondary grip," and many others on the list.  *See SBA3 Letter*, at 7.  As another example, the list of "objective design features" includes the "objective design features of the attached 'stabilizing brace' accessory[.]"  *Id.* at 7.

[105] *Tripoli*, 437 F.3d at 81.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 82.

[109] *Id.* at 81 (emphasis in original).

[110] As explained *infra*, the SBA3 Letter fails to analyze each of these factors, which is an independent basis for finding the SBA3 letter arbitrary and capricious.

[111] To the best of SB Tactical's knowledge.  SB Tactical cannot independently confirm if the ATF has used the "extreme limit indicator" in prior classification letters because the ATF does not make classification letters public.

[112] *See SBA3 Letter*, at 10.

[113] *See* note 111, *supra*.

[114] *SBA3 Letter*, at 7 (emphasis in original).

*supports* its conclusion because that length of pull "is in line with common AR-type rifles."[115] While this analysis both alters the existing length of pull analysis without acknowledging a change[116] and treats the SBA3 different than similar braces,[117] it has also rendered the entire length of pull analysis meaningless.  Just as in *Tripoli*, the relevant standards in the record differ by "order[s] of magnitude[.]"[118]  Thus, "there is such a wide potential for disparity among the [lengths of pull] that the [agency's standard] conveys no information at all."[119]

b.      The ATF fails to articulate a satisfactory explanation as to how it analyzed the attachment method.  The ATF argues that the ability to lock the SBA3 into place—rather than allowing it to slide "freely"—suggests that the submitted sample was intended to be fired from the shoulder.[120] This is false.  As explained below, this mechanism is a common feature of arm braces.  Locking the brace on the horizontal plane provides better support and increases accuracy by preventing the pistol from succumbing to recoil and sliding closer and further away from the brace.

c.      The ATF fails to articulate a satisfactory explanation as to how it analyzed the ability to secure the SBA3 around the shooter's arm.  The ATF erroneously contends that the "rubber flaps which wrap around a shooter's arm have been greatly reduced," reducing the effectiveness of the SBA3 in "wrapping around a shooter's arm."[121]  However, the pictures proffered by the ATF on pages 15 and 16 show that the flaps—*in conjunction with the Velcro strap*—wrap completely around the shooter's arm.[122]   The ATF does not explain why wrapping the flaps and strap completely around the shooter's arm is less effective than merely wrapping the flaps around the user's arm.

Indeed, other approved designs—such as the Minimal Arm Brace ("MAB"), the "Safe Pistol Arm Brace," and the BP15—use *only* straps and no rubber flaps.[123]   Additional designs such as the KAK Industries Shockwave Blade, use neither flaps nor a strap.[124]  Accordingly, the ATF fails to draw a rational connection between the facts and its conclusion.

d.      Relatedly, the ATF's analysis of the Velcro strap is deficient.  The ATF disregarded the

---

[115] *Id.* at 9–10.

[116] *See* Section III.C, *infra*.

[117] *See* Section III.B, *infra*.

[118] *Tripoli*, 437 F.3d, at 82.

[119] *Id.*

[120] *SBA3 Letter*, at 10–12.

[121] *Id.*, at 14.

[122] *See id.* at 15–16.

[123] *See* Exhibit 23, at 2 [Letter 304425]; Exhibit 24, at 2 [Letter 307313]; Exhibit 25, at 6 [Letter 308618].

[124] *See* Exhibit 10 [Letter 307364]; Exhibit 9 [Letter 306285].

March 13, 2020
Page 24

Velcro strap submitted with the SBA3 and instead analyzed a strap 4 inches shorter because it supposedly had observed two SBA3 samples with shorter straps.[125]   As explained *supra*, the observed samples were the result of an ordering error with the initial production run.  SB Tactical submitted a sample with the proper Velcro strap, and the ATF's failure to consider the sample as submitted is arbitrary and capricious for that reason alone.   Indeed, on page 27, the ATF "reiterate[s] that this analysis for the classification of the firearm/accessory configuration is based on the sample *as submitted*."[126]

e.      The ATF fails to articulate a satisfactory explanation as to how it analyzed the second method for using the SBA3.  The ATF erroneously states that "the 'second method' could only be attempted on the left arm, as the attachment of the Velcro strap did not provide the ability to wrap the shooter's right arm to the outside of the accessory."[127]  This is demonstrably false.  The video SB Tactical provided to ATF on how to use the SBA3 clearly shows a user utilizing the second method while shooting with his right hand.[128]  This reasoning is the only "objective design characteristic" the ATF analyzes with regard to the second firing method.[129]  It is arbitrary and capricious where, as here, an agency's reasons supporting its conclusions are factually incorrect.[130]

f.      The ATF failed to articulate a satisfactory explanation as to how it analyzed the SBA3's alleged similarity to shoulder stocks.  The ATF says that the SBA3 shares features common to shoulder stocks because it (1) has a lever, (2) has a QD socket for the attachment of a sling, (3) uses "polymer/plastic material, similar to common shoulder stocks," and (4) looks like a stock by "outward appearances."[131]  Despite these standards being applied to the SBA3, almost all of the ATF-approved designs share these four features, yet none were mentioned in their respective classification letters.  Furthermore, the ATF does not explain why these shared characteristics show an intent for the SBA3 to facilitate firing from the shoulder.  And mere commonality is not

---

[125] *SBA3 Letter*, at 22.

[126] *Id.* at 27 (emphasis added); *see also id.* at 1 ("The objective design features of the firearm, *as submitted*, are consistent with weapons designed and intended to be fired from the shoulder." (emphasis added)).  *See also ANR Storage Co. v. Fed. Energy Regulatory Comm'n*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) (where a "decision is internally inconsistent, it is arbitrary and capricious").

[127] *SBA3 Letter*, at 16.

[128] *See SBA3*, SB Tactical, https://www.sb-tactical.com/product/sba3/ (last visited Mar. 10, 2020).

[129] *SBA3 Letter*, at 16–17.  The Letter also notes several non-objective design characteristics, including the stated intent of SB Tactical in its patent and in is original submission and the surface area of the SBA3 as compared to the Shockwave Blade.  *Id.*  None of these factors inform the functionality of the second method and are thus analyzed separately *infra*.

[130] *See, e.g.*, *Nat'l Treasury Emps.  Union v. Fed. Labor Relations Auth.*, 942 F.3d 1154, 1158 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where its "reasons for finding the proposal nonnegotiable were flatly wrong").

[131] *SBA3 Letter*, at 18–21.

March 13, 2020
Page 25

enough.  The *Innovator Enterprises* court explained the fallacy in this kind of reasoning:

> A mouse is not an "elephant" solely because it has three characteristics that are common to known elephants: a tail, gray skin, and four legs. A child's bike is not a "motorcycle" solely because it has three characteristics common to known motorcycles: two rubber tires, handlebars, and a leather seat. And a Bud Light is not "Single-Malt Scotch," just because it is frequently served in a glass container, contains alcohol, and is available for purchase at a tavern. To close with a firearm-related example: a hockey puck is not a "rubber bullet," just because it has rounded sides, is made of vulcanized rubber, and is capable of causing injury when launched at high speeds. Learning that one object has three characteristics in common with some category may not be very helpful in determining whether the object in question belongs in that category.[132]

In other words, simply pointing out common features—without explaining why that overlap matters—is insufficient for the ATF to meet its burden under the APA.  And, like many of these features, experience has shown that the "outward appearance" factor is applied in confusing and arbitrary ways (see image below).



*The Shockwave Blade (right) and Shockwave Blade 2.0 (left) are almost identical to an M4-style shoulder stock (center).  The ATF nevertheless concluded that neither product creates an NFA weapon when attached to an AR-pistol, even without straps.[133]*

g.      The ATF fails to articulate a satisfactory explanation as to how it analyzed surface area.  The ATF claims that the SBA3 "provides an ample amount of rear shouldering surface area, similar to known shoulder stock designs[.]"  The ATF's treatment of surface area is directly analogous to the impermissible burn velocity analysis in *Tripoli* discussed *supra*.  The ATF "never define[d] a range of [surface area] within which [stabilizing braces] will be considered to [provide adequate surface area for shouldering]."[134]  While the ATF may have some leeway for defining what constitutes an impermissible amount of surface area, a reviewing court needs "***some*** metric for classifying materials . . . especially when . . . the agency has not claimed that it is impossible to be

---

[132] *Innovator Enters.*, 28 F. Supp. 3d, at 25–26.

[133] *See* Exhibits 9 & 10 [Letters 306285 & 307364].

[134] *Tripoli*, 437 F.3d at 81.

more precise[.]"[135]   Here, the ATF can be more precise:  it can provide a metric—in square inches—of how much surface area would suggest an intent for shouldering.  Just as the ATF failed to define a permissible range of burn velocity in *Tripoli*, here the ATF failed to define a permissible range of surface area and has thus acted arbitrarily and capriciously.

h.      The ATF fails to articulate a satisfactory explanation as to how it analyzed SB Tactical's marketing materials.  The ATF correctly explains that SB Tactical's marketing materials noted that the SBA3 adds a "third point of contact."[136]   The ATF, however, is factually incorrect in concluding that "[a] 'third point of contact' is not consistent with the original stated intent of SB Tactical's 'stabilizing brace' accessories[.]"[137]   First, users can fire pistols configured with the SBA3—as they can any pistol—using two hands, as shown in the photograph from SB Tactical's website below.[138]   In this example, the three points of contact are a point of contact for each hand and a point of contact where the brace attaches to the forearm.  Second, an SBA3-configured pistol could be used as a cheek rest, as advertised by SB Tactical.[139]   In this example, the three points of contact are the hand, the brace, and the cheek; the ATF has previously approved this method of firing a pistol.[140]



*The ATF appears to take the position that SB Tactical's marketing materials that mention "three points of contact" must be a reference to shouldering.  For large sized pistols that require braces, it is common for individuals to use a second hand to provide additional support.  This creates three points of contact.*

Likewise, the ATF's assessment of SB Tactical's use of the phrase "Stiff Arm The Establishment"

---

[135] *Id.* (emphasis in original).

[136] *SBA3 Letter*, at 12, 17, 18 (internal citations omitted); (emphasis removed).

[137] *Id.* at 17.  SB Tactical made clear in its original submission for the SB15 that "one hand supported" is an intended use of the product.  This method of firing includes the use of two hands.

[138] The photograph is available at https://www.sb-tactical.com/gallery/.

[139] *See, e.g.*, *Pistol Stabilizing Brace Shooting Techniques*, Youtube (SB Tactical's channel) https://youtu.be/FoTHRWsCz64?t=77 (last visited Mar. 12, 2020).

[140] *See* Exhibit 26, at 2 [Letter 302787] ("Saddle devices designed for 'cheek enhancement' generally would not change a pistol's classification to a 'short-barreled rifle.'  FTISB finds that the submitted saddle devices are not designed to support the AR-type pistol in the shoulder of the shooter during firing but, rather, to rest against the shooter's cheek.").

March 13, 2020
Page 27

is arbitrary and capricious. The ATF appears to contend that through those four words, the SBA3—which has always been advertised as a "pistol stabilizing brace"—was actually being advertised as a stock in disguise that customers could use to skirt the law.[141] First, and most obvious, that is not what those four words say. Second, that is not what those words imply. Rather, the phrase is a play on words: "stiff arm" is a method of shooting the brace. One method of firing a pistol is to fully extend your arm and lock your elbow, thereby stiffening your arm. And, in any event, an anti-establishment company slogan is no basis for denying a federal benefit—as the Supreme Court has repeatedly made clear.[142]

i.    Finally, the ATF fails to articulate any satisfactory explanation as to how it analyzed third-party materials. Much of the ATF's reasoning concerning SB Tactical's supposed intent comes not from SB Tactical's materials but from third party publications.[143] The ATF cites six instances where third parties said or demonstrated that the SBA3 could function as a stock.[144] However, the ATF has previously stated that "incidental" or "sporadic" improper use of an arm brace does not change its classification.[145] Here, the ATF does not explain why those six instances elevate the misuse of the SBA3 from "sporadic" to probative. And accepting these statements—without a rigorous review of other third party statements that confirm SB Tactical's description[146]—is arbitrary and conflicts with the ATF's stated policy of refusing to "simply accept" parties' statements about the intended use of a given product, particularly in the face of evidence to the contrary.[147] Indeed, as shown below, there is significant evidence that the **_proper_** use of the SBA3—as an arm brace—is prevalent among third party publications.

## B. The SBA3 Letter Treats Similar Accessories Differently.

"'A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.'"[148] Indeed, "[t]he disparate

---

[141] *See SBA3 Letter*, at 23.

[142] *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019) (holding government could not deny federal trademark registration to "a clothing line that uses the trademark FUCT"); *Matal v. Tam*, 137 S. Ct. 1744, 1754 (2017) (same regarding registration of "THE SLANTS"); *see Cohen v. California*, 403 U.S. 15, 25 (1971) ("one man's vulgarity is another's lyric").

[143] *Id.* at 24–25.

[144] *Id.*

[145] *Id.* at 3.

[146] *See* Exhibit 46, discussed *infra*.

[147] The ATF has explained that it does not "simply accept" manufacturers' statements on the intended use of their weapon, particularly when contradicted by objective evidence. *SBA3 Letter*, at 6 (citing *Sig-Sauer v. Brandon*, 826 F.3d 598 (1st Cir. 2016)). As with manufacturers, the ATF should not "simply accept" statements of third parties that promote the misuse of a product.

[148] *Doe v. United States Citizenship & Immigration Servs.*, 239 F. Supp. 3d 297, 307 (D.D.C. 2017) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

March 13, 2020
Page 28

treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious."[149]  For example, in *Braeburn v. FDA*, the United States District Court for the District of Columbia vacated an FDA letter decision where the FDA rendered ***one*** decision for a drug based on a limited patient group but then rendered ***another*** decision for a similar drug using a different, less-limited patient group, without explaining the discrepancy.[150]

Here, the ATF treats similar situations differently without explaining the discrepancy.  The MPX PSB is nearly identical to the SBA3 in almost every way the ATF recited as relevant.  For example, the MPX PSB:

- Utilizes the same smaller flap design as the SBA3;

- Attaches around the forearm using a Velcro strap like the SBA3 – in fact, the MPX PSB as submitted used the shorter strap that is no longer used with the SBA3;

- Locks into place on the horizontal plane like the SBA3;

- Is physically similar in appearance to the SBA3;

- Has a similar length of pull as the SBA3; and

- Contains similar rear surface area to the SBA3.

---

[149] *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997) (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996)); *Doubleday Broad. Co. v. FCC*, 655 F.2d 417, 423 (D.C. Cir. 1981)).

[150] *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 28–30 (D.D.C. 2019).

March 13, 2020
Page 29

The following photograph illustrates the similarities:



*SBA3 – (Current Product at Issue)*          *MPX/PSB – (Approved by ATF in 2015)*

  

*The ATF took no issue with the flap coverage of the MPX PSB (right) and, in fact, included the picture on the right in its classification letter. It now takes issue with the SBA3's flap coverage (left), even though it is functionally indistinguishable from the MPX PSB—and makes no attempt to acknowledge, let alone reconcile, these contradictory positions. Moreover, many classification letters neglect to include these kinds of photographs or even mention attachment methods.*

March 13, 2020
Page 30

 

*The SBA3 (left) has nearly identical flap coverage to the MPX PSB (right). The ATF approved the latter and is proposing to reclassify the former, without acknowledging or attempting to reconcile the apparent contradiction.*

Likewise, the ATF's decision is irreconcilable with the "Tailhook Mod 2," a brace the ATF classified in 2016.[151] The Tailhook Mod 2 is "[a] forearm brace made of a polymer that incorporates a folding clamp design which, when placed in the open position, is intended to provide support to the firing hand by providing additional leverage."[152] The Tailhook 2 contains a nearly identical outward appearance and surface area to the SBA3, shown in the photograph below.

 

*Tailhook MOD 2 – (Approved by ATF)*   *SBA3 – (Current Product at Issue)*

 

The similarities are more than surface-level. Like the SBA3, the Tailhook Mod 2 attaches to a "buffer tube" and can thus be locked in place on the horizontal plane.[153] The Tailhook Mod 2's

---

[151] *See generally* Exhibit 27 [Letter 304679].

[152] *Id.* at 2.

[153] *Id.*

March 13, 2020
Page 31

maximum length of pull is actually slightly *longer*—12.75 inches[154]—than the SBA3, putting it closer to the shoulder-fired weapon average.  And third-party publications readily attest to the Tailhook Mod 2's utility as a shoulder stock.[155]  The ATF makes no attempt to distinguish the SBA3 Letter from the Tailhook Mod 2 classification, despite the two braces sharing essentially every feature that the ATF flagged as a negative for the SBA3.

The ATF also fails to adequately distinguish the SBA3 Letter's conclusion from the SBL-Mini Letter's conclusion.  Those two designs also share the vast majority—if not all—of the features that the ATF found relevant in classifying the SBA3.  Likewise, the ATF's attempts to distinguish the SB15 fail to recognize any principled distinction.  For example, as explained above, the mere fact that the flaps do not fit around the user's arm is not particularly relevant, given that the Velcro strap—in tandem with the flaps—***does*** fit around the user's arm.  Indeed, the ATF itself recognized this point in the SBL-Mini Letter.[156]

Finally, the ATF has applied several factors differently to the SBA3 than it has done in prior classifications of similar products and, in some instances, has applied new factors that it did not use in prior classifications of similar products.  For example, as explained in the next section, the SBA3 Letter applies its length of pull analysis differently than it applied it to other, similar products in the past.[157]  It also applies factors that it did not apply to other, similar products in the past, such as third-party marketing materials and information in the accessory's patent.[158]  The ATF makes no attempt to reconcile these discrepancies.  For example, the ATF has apparently not analyzed third party marketing materials in other classification decisions, even where—unlike here—the ***manufacturers themselves*** publicized their products' use as shoulder stocks.[159]  Ultimately, it seems safe to say that ***most*** prior classifications do not apply ***most*** of the factors the ATF applies in the SBA3 Letter, even where they would have clearly been relevant.  For this reason and others, SB Tactical reserves for inclusion in the administrative record all of the ATF's stabilizing brace classification letters—including those in the criminal context, such as ATF

---

[154] *See Gear Head Works Tailhook Mod 2 Pistol Stabilizing Brace AR-15 Polymer*, Midway USA, https://www.midwayusa.com/product/1021340230 (last visited Mar. 12, 2020).

[155] *See, e.g.*, Jeremy S., *Gear Review:  Gear Head Works Tailhook Pistol Braces (New Release)*, The Truth About Guns (Dec. 31, 2016), https://www.thetruthaboutguns.com/gear-review-gear-head-works-tailhook-pistol-braces/ ("From the rear, if you're thinking 'gosh, that looks like it would be a great stock' you're darn right. As my CZ Scorpion Evo is a registered SBR I could legally shoulder the Tailhook and, I gotta say, the flat back and solid aluminum build make for as good of a shoulder stock as anything.").

[156] *See SBL-Mini Letter*, at 13 ("The result of this redesign are flaps which are much less comfortable, no longer fully 'cuffing' the arm of the shooter, yet still effectively providing 'stabilizing' support." (emphasis removed)).

[157] *See* Section III.C, *infra*.

[158] *See id.*

[159] Exhibits 28–37 [Third party materials attesting to shouldering of braces that the ATF has determined do not constitute short-barreled rifles when configured to pistols].

reports, FTCB ## 2017-562 and 2018-563.

Because the ATF treats similar situations differently—without explanation—the SBA3 Letter is arbitrary and capricious under the APA.

### C.  The SBA3 Letter Departs From Agency Precedent Without Explanation.

The Supreme Court in *FCC v. Fox* held that an agency changing a preexisting policy must acknowledge such a change and "show that there are good reasons for the new policy."[160]  Here, because the ATF proceeds in secret, refuses to make its classification rulings public, and often provides only cursory reasoning, it is difficult to define ATF's policies.  Nevertheless, the SBA3 Letter departs from known precedents—without acknowledging that it is doing so—in several ways.

*First*, the ATF has apparently changed its policy regarding the significance of length of pull without acknowledging the change.  SB Tactical is not aware of a single instance prior to the issuance of the SBA3 Letter in which the ATF *either* (1) referred to the 13-1/2 inch metric as an "*extreme limit* indicator," or (2) suggested that weapons with a length of pull "as little as 7 inches" may indicate that a weapon is designed for shoulder firing.[161]  Instead, despite the ATF's assertions to the contrary, the agency has long treated the 13.5-14.5 inch "length of pull" analysis as highly probative or even dispositive.  Take the following examples:

- <u>June 7, 2016</u>:  (1) the ATF notes that the sample's maximum length of pull was below 13.5 inches, (2) the ATF recites the 13.5-14.5 inch average, and (3) the ATF concludes that the sample is not a short-barreled rifle.[162]

- <u>October 3, 2016</u>:  (1) the ATF notes that the sample's maximum length of pull was below 13.5 inches, (2) the ATF recites the 13.5-14.5 inch average, and (3) in the very next paragraph, the ATF concludes that the sample is not a short-barreled rifle.[163]

- <u>October 31, 2017</u> (two separate letters): (1) the ATF recites the 13.5-14.5 inch average, (2) the ATF notes that the sample's maximum length of pull was below 13.5 inches, and (3) in the very next paragraph, the ATF concludes that the sample is not a short-barreled rifle.[164]

- <u>January 5, 2018</u>:  (1) the ATF recites the 13.5-14.5 inch average, (2) the ATF notes that the sample's maximum length of pull was above 13.5 inches, and (3) the ATF concludes

---

[160] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[161] *See SBA3 Letter*, at 7 (emphasis altered).

[162] *See* Exhibit 38, at 3 [Letter 304484].

[163] *See* Exhibit 39, at 2–3 [Letter 304892].

[164] *See* Exhibit 9, at 5–6 [Letter 306285]; Exhibit 10, at 5–6 [Letter 307364].

March 13, 2020
Page 33

that attachment of the sample to a pistol would result in a short-barreled rifle.[165]

- July 5, 2018:  (1) the ATF recites the 13.5-14.5 inch average, (2) the ATF notes that the sample's maximum length of pull was above 13.5 inches, and (3) the ATF concludes that attachment of the sample to a pistol would result in a short-barreled shotgun.[166]

- November 30, 2018:  (1) the ATF recites the 13.5-14.5 inch average, (2) the ATF notes that the sample's maximum length of pull was above 13.5 inches, and (3) the ATF concludes that attachment of the sample to a pistol would result in a short-barreled rifle.[167]

To be sure, there have been **some** occasions where the ATF deviated from the 13.5-inch cutoff—but in those cases it explained its reasons for doing so and provided a similarly-circumscribed alternative length of pull range that was applicable under the relevant circumstances.  For example, in June 2018, the ATF found that a brace configured with a pistol that resulted in a length of pull of "approximately 13-1/4 inches" was intended to be fired from the shoulder.[168]  But the ATF explained that this finding was due to the fact that (1) the brace was "designed to attach to an **AK-type** handgun," and (2) "the average length of pull found on **AK-type** shoulder-fired weapons [wa]s approximately 12-1/2 to 13-1/2 inches."[169]

The analysis in the SBA3 letter, by contrast, renders this factor meaningless.  Under the ATF's new theory, the agency no longer relies on well-established average ranges but instead will base findings on a handful of rifles—in this case, four—that are in the same ballpark as the submitted sample.[170]  Indeed, the ATF suggests that lengths of pull as low as **7 inches** may now show an intent to create a shoulder-fired weapon.[171]  The ATF fails to acknowledge this change, let alone provide justifications for it.

*Second*, the SBA3 Letter identifies and considers several apparently new factors without acknowledging any change in policy:

- The ability to lock a brace into position on the horizontal plane.[172]  While it is impossible to tell which factors drove the ATF's decision—because of the agency's failure to explain how it holistically applies the various factors—the ATF devotes a significant amount of space to the discussion of this factor.  As an initial matter, as explained *supra*, the reasons

---

[165] *See* Exhibit 40, at 5 [Letter 307597].

[166] *See* Exhibit 41, at 5–6 [Letter 309181].

[167] *See* Exhibit 42, at 3–5 [Letter 308298].

[168] *See* Exhibit 43, at 2–4 [Letter 308480].

[169] *See id.* at 1–2 (emphasis altered).

[170] *See SBA3 Letter*, at 9.

[171] *See id.* at 7.

[172] *See SBA3 Letter*, at 10–12.

March 13, 2020
Page 34

for attaching the SBA3 in this fashion have nothing to do with increasing the ability to fire a weapon from the shoulder.  Moreover, SB Tactical is not aware of a single other decision in which the ATF has even considered this factor, much less made it one of the focal points of a classification analysis.  And this design characteristic is hardly novel.  The ATF has approved numerous braces that lock into place on the horizontal plane.[173]  Accordingly, the ATF has changed policy without acknowledging that it is doing so.[174]

- Third-party publications.[175]  Again, this factor appeared important to the ATF's analysis in the SBA3 Letter, and, again, SB Tactical is not aware of any decision in which the ATF has previously applied this factor.  Accordingly, the ATF has changed policy without acknowledging that it is doing so.[176]

- The contents of a patent.[177]  The ATF compared the SBA3's functionality stated in the submission to the functionality stated in the patent twice in the SBA3 Letter.[178]  Again, SB Tactical is not aware of any decision in which the ATF has previously applied this factor.  Accordingly, the ATF has changed policy without acknowledging that it is doing so.[179]

### D.  The SBA3 Letter Fails To Examine All Of The Relevant Information.

An agency must "examine the relevant data" when making a decision, and failing to do so "is an independent basis for setting aside agency action."[180]  The SBA3 Letter omits and fails to consider the following relevant information:

- The type and caliber of firearm to which the SBA3 was attached.  The ATF itself notes that this factor was relevant on page 7 of the SBA3 Letter but fails to subsequently examine it.[181]  While the ATF does recite the type and caliber of the firearm on page 8, it does not say how those factors affected its analysis.[182]  The ATF should have explained that a large-

---

[173] *See, e.g.*, Exhibits 9 [Letter 306285], 10 [307364], 25 [308618], 44 [304511], 45 [304679].

[174] And to the extent the ATF *does* acknowledge this change, it would likely need to reopen its classifications in dozens of other cases, given the prevalence of fixed braces.

[175] *See SBA3 Letter*, at 23–25.

[176] *See* note 174, *supra*.

[177] *See SBA3 Letter*, at 16, 22.

[178] *See id.*

[179] *See* note 174, *supra*.

[180] *Innovator Enters.,* 28 F. Supp. 3d at 26 (quoting *State Farm*, 463 U.S. at 43).

[181] *SBA3 Letter*, at 7.

[182] *Id.* at 8.  The ATF does note correctly that the firearm is "larger and heavier than standard sized handguns, validating the use of a 'stabilizing brace' accessory to assist with one-handed firing."

caliber AR-type rifle supported the SBA3's use as a brace.[183]  The failure of an agency to examine factors deemed relevant by the agency itself is arbitrary and capricious.[184]

- <u>The aim point of the SBA3</u>.  The ATF itself notes that this factor was relevant on page 7 of the SBA3 Letter but fails to subsequently examine it.  The ATF should have explained that—when fired from one hand—the SBA3 has an appropriate aim point with no upward or downward slant, which supports SB Tactical's stated use of the SBA3.  The failure of an agency to examine factors deemed relevant by the agency itself is arbitrary and capricious.

- <u>Marketing materials that support the use of the SBA3 as a stabilizing brace.</u>  Exhibit 46 demonstrates that there are numerous publications—from both SB Tactical and third parties—that shows that the firearms community views the SBA3 as a stabilizing brace.[185]  The ATF failed to even *consider* materials such as these, let alone engage in any kind of nuanced balancing or rigorous comparison between competing publications.[186]  Instead, the ATF appears to have simply plucked a handful of examples that happen to support its conclusion.  "Such cherry-picking embodies arbitrary and capricious conduct."[187]

- <u>Testimony from disability experts and individuals with disabilities that use the SBA3 as a stabilizing brace.</u>  Exhibits 47–49 demonstrate that individuals with disabilities, including wounded combat veterans, use the SBA3 as a stabilizing brace to help them safely fire pistols.  While the ATF discusses how various third parties view the SBA3, it includes ***no*** discussion of how individuals with disabilities use the SBA3.  Considering that, at its core, the SBA3 was designed to help individuals with disabilities, these individuals' perspective is critical.  The ATF makes no mention of this perspective in the SBA3 letter.  An agency's failure "to consider an important aspect of the problem" is "prototypically arbitrary and capricious."[188]

---

*Id.* (emphasis removed).  However, "weight and length" are distinct factors from "type and caliber[.]"  *See id.* at 7 (listing them as separate factors).

[183] *See, e.g.*, Exhibit 50, at 4 [Letter 307578] (finding use with AR-type semiautomatic pistols is consistent with purpose of stabilizing braces).

[184] *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (noting that agency did not examine "the relevant data" when it examined "only 50 turbo-charging hospitals" when ***the agency's own*** *NPRM* identified "123 hospitals").

[185] *See also Rick Cicero Shoots QC10 Highlight SOB Brace*, YouTube (Nov. 2, 2017), https://www.youtube.com/watch?v=nh5JnKlSZ1Y.

[186] *See SBA3 Letter*, at 23–25.

[187] *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016) (citations omitted).

[188] *Landmark Hosp. of Salt Lake City v. Azar*, No. CV 1:19-01227 (TNM), 2020 WL 999454, at *6 (D.D.C. Mar. 2, 2020) (citations and internal quotations omitted).

March 13, 2020
Page 36

- The reliance interests of SB Tactical, its business partners, and law-abiding American gun owners.  SB Tactical and its business partners have invested significant time and money in the development and manufacture of the SBA3.  Hundreds of thousands of law-abiding American gun owners have purchased the SBA3.  Classification of AR-type handguns configured with the SBA3 as short-barreled rifles would subject these parties to onerous new costs and regulations that are far afield from their reasonable expectations based on past ATF assurances that the SBA3 did not raise any compliance issues.  A "failure to consider the substantial reliance interests at play," particularly in light of "[t]he agency's own delinquency" is "arbitrary and capricious in violation of the APA."[189]

- The practical consequences and workability of its decision.  The SBA3 Letter—if finalized in its current form—will effectively render approximately *half a million Americans* felons in possession of an unregistered short-barreled rifle.  This result would present the ATF with a myriad of enforcement and other practical workability issues.  Failure to consider an important aspect of the problem is arbitrary and capricious.[190]

- Alternatives solutions, such as a grandfathering solution.  While the SBA3 should not be classified as a short-barreled rifle at all, the ATF should have at the very least considered grandfathering the hundreds of thousands of SBA3 accessories already in circulation.  The agency has done this in the past when its regulatory pivots risk massive disruption or fundamental unfairness.  As explained above, there are serious reliance interests at stake vis-à-vis these products, and grandfathering would at least partially cushion the blow to these reliance interests.  Failing to consider "reasonable alternative[s]" is arbitrary and capricious.[191]

In sum, the ATF fails to consider a number of different relevant factors and consequences that could and should have impacted its analysis.  These failures are arbitrary and capricious.

### E.  The ATF Failed To Provide Fair Notice To Regulated Parties.

"Due process requires that parties receive fair notice before being deprived of property."[192]  This

---

[189] *Moncrief v. United States Dep't of Interior*, 339 F. Supp. 3d 1, 10 (D.D.C. 2018) (citations omitted), *appeal dismissed sub nom. Moncrief v. United States Dep't of the Interior*, No. 18-5340, 2019 WL 2263348 (D.C. Cir. Apr. 12, 2019), and *appeal dismissed sub nom. Moncrief v. United States Dep't of the Interior*, No. 18-5340, 2019 WL 5394058 (D.C. Cir. Oct. 8, 2019).

[190] *Landmark Hosp. of Salt Lake City*, 2020 WL 999454, at *6.

[191] *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 577 (D.C. Cir. 2016) ("[B]ecause the Service in these circumstances did not consider any other reasonable alternative . . . the Service's issuance of the ITP was arbitrary and capricious[.]").

[192] *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995), *as corrected* (June 19, 1995) (citation omitted).

requirement extends to the administrative context.[193]   Where, as here, "sanctions are drastic," "elementary fairness compels clarity in the statements and regulations setting forth the actions with which the agency expects the public to comply."[194]   These are bedrock principles of the justice system:  "The idea of secret laws is repugnant.  People cannot comply with laws the existence of which is concealed."[195]

The ATF has failed to provide clarity in the statements and regulations setting forth the actions with which it expected SB Tactical to comply.  The ATF rendered the SBA3 Letter based on factors that have ***never*** been publicly announced.  When it has applied those secret factors, it has done so haphazardly and in ways that have left regulated parties guessing.[196]  And it has frequently changed its mind.  Such arbitrary behavior is routinely criticized by the Supreme Court for failing to give regulated parties certainty about what an agency's interpretation of the law requires.[197]  Indeed, Justice Gorsuch recently chastised the ATF for similar "bureaucratic pirouetting" with regard another popular firearms accessory, the bump stock:

> The agency used to tell everyone that bump stocks don't qualify as "machineguns."  Now it says the opposite.  The law hasn't changed, only [the ATF's] interpretation of it…. How, in all this, can ordinary citizens be expected to keep up—required not only to conform their conduct to the fairest reading of the law they might expect from a neutral judge, but forced to guess … the agency's initial interpretation … and to guess again … a later and opposing agency interpretation[?][198]

These concerns are especially apparent here, where the ATF consistently assured SB Tactical that the SBA3 was in compliance with its secret, ever-shifting standards.  The ATF's eleventh-hour decision to change course has thus failed to provide SB Tactical—or the hundreds of thousands of Americans that own SBA3s—with fair notice.  It is precisely this sort of positional shifting and inconsistent guidance that the APA forbids, the Executive Orders attempt to stop, and the courts

---

[193] *Id.* at 1329 ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context.").

[194] *Id.* (citations and internal quotations omitted).

[195] *Torres v. I.N.S.*, 144 F.3d 472, 474 (7th Cir. 1998).

[196] *See* Section III.A–D.

[197] *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 & n.15 (2012) (collecting cases).

[198] *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 589 U.S. __, 3 (2020) (Statement of Gorsuch, J.).

March 13, 2020
Page 38

routinely enjoin.[199]

\*       \*       \*

In sum, the SBA3 Letter in its current form excludes—and in some cases misstates—relevant background information, violates President Trump's Executive Orders promoting transparency and fairness in administrative decisionmaking, and runs afoul of the APA in a myriad of ways. Accordingly, SB Tactical urges the ATF to reconsider its planned issuance of the SBA3 Letter and—pursuant to the Letter—we request an in-person meeting to discuss these issues. While we are available and able to attend an in-person meeting within the next 10 days, we are cognizant of the anticipated government office closures due to the current health crisis. Thus, in the event government personnel are not able to hold an in-person meeting within the next 10 days, we would respectfully request an extension.

Best regards,

Mike Sullivan
Outside Counsel to SB Tactical

Attachments

cc:     Office of the Deputy Attorney General
        Patrick Hovakimian, Patrick.hovakimian4@usdoj.gov
        Chief of Staff

        Office of the Associate Attorney General
        Stephen Cox, Stephen.J.Cox@usdoj.gov
        Deputy Associate Attorney General

        Megan L. Brown
        Wiley Rein LLP
        mbrown@wiley.law
        202.997.7903 (cell)

---

[199] In one recent judicial example, the ATF was subjected to intense questioning about these standards in a criminal prosecution.  After the ATF's witness conceded that "length of pull" was not "published" in "ATF regulations" or "any guidelines," a jury acquitted the defendant in less than an hour.  *See* Exhibit 51, at 85 [Kelland Wright Transcript].