**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

FIREARMS REGULATORY
ACCOUNTABILITY COALITION, INC., *et al.*,

      *Plaintiffs*,

    v.

MERRICK B. GARLAND, *et al.*,

      *Defendants*.

No. 1:23-cv-24-DLH-CRH

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

I.     Statutory and Regulatory Background ............................................................................ 2

II.    ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ........................................................................................................ 4

III.   The Rule ........................................................................................................................... 7

IV.  This Lawsuit .................................................................................................................. 11

LEGAL STANDARDS ............................................................................................................... 11

ARGUMENT .............................................................................................................................. 12

I.     Plaintiffs are unlikely to succeed on the merits of their claims ................................... 12

      A.   The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions ................................................... 12

      B.   The Rule is neither arbitrary or capricious. .................................................... 24

            1.   The Rule's factors are reasonable when considered together. ............ 25

            2.   The factors are individually reasonable. ............................................. 26

            3.   The cost-benefit analysis is not arbitrary. .......................................... 31

            4.   The Rule is not impermissibly retroactive. ........................................ 32

      C.   The Commercial and Non-Commercial Guidance issued by ATF are not final agency actions under the APA, and Plaintiffs lack standing to challenge them *en masse*. ....................................................................................................... 33

            1.   The Commercial and Non-Commercial Guidance are not final agency actions under the APA. ...................................................................... 34

            2.   Plaintiffs' challenge is premature, and they lack standing to challenge the Commercial and Non-Commercial Guidance *en masse*. .................... 36

            3.   The Commercial and Non-Commercial Guidance do not show that the Rule is arbitrary. ..................................................................................... 37

II.    Plaintiffs will not suffer irreparable harm in the absence of an injunction. ................. 37

III.   The equities and the public interest weigh against a preliminary injunction. .............. 39

IV.    In all events, any relief should be limited to redress Plaintiffs' alleged injuries............................40

CONCLUSION ..............................................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Abraham Lincoln Mem'l Hosp. v. Sebelius,*
   698 F.3d 536 (7th Cir. 2012) ........................................................................................35

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .........................................................................................41

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
   515 U.S. 687 (1995) ......................................................................................................24

*Bennett v. Spear,*
   520 U.S. 154 (1997) ......................................................................................................13

*Bittner v. United States,*
   598 U.S. __, 2023 WL 2247233 (U.S. Feb. 28, 2023) ..................................................23

*Cal. Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019) ......................................................................................35

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) .........................................................................................23

*Catawba Cnty. v. EPA,*
   571 F.3d 20 (D.C. Cir. 2009) ........................................................................................25

*Chapman v. U.S.,*
   500 U.S. 453 (1991) ......................................................................................................21

*Conf. Grp. v. FCC,*
   720 F.3d 957 (D.C. Cir. 2013) ......................................................................................35

*Donnell v. U.S.,*
   765 F.3d 817 (8th Cir. 2014) ........................................................................................21

*Everett v. United States,*
   158 F.3d 1364 (D.C. Cir. 1998) ....................................................................................35

*FCC v. Prometheus Radio Proj.,*
   141 S. Ct. 1150 (2021) ..................................................................................................24

*FedEx Freight, Inc. v. NLRB,*
   816 F.3d 515 (8th Cir. 2016) ........................................................................................25

*FERC v. Elec. Power Supply Ass'n,*
   577 U.S. 260 (2016) ......................................................................................................27

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ...................................................................................40

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ......................................................................................13

*Gov't of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ..............................................................38, 40

*Guedes v. ATF,*
    356 F. Supp. 3d 109 (D.D.C. 2019) ..............................................................13

*Gun Owners of Am., Inc. v. Garland,*
    19 F.4th 890 (6th Cir. 2021) .........................................................................15

*Haynes v. United States,*
    390 U.S. 85 (1968) ........................................................................................19

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ...........................................................................27

*Huddleston v. United States,*
    415 U.S. 814 (1974) ........................................................................................3

*Indep. Equip. Dealers Ass'n v. EPA,*
    372 F.3d 420 (D.C. Cir. 2004) .......................................................................35

*Innovator Enterprises, Inc. v. Jones,*
    28 F. Supp. 3d 14 (D.D.C. 2014) .............................................................25, 32

*Int'l Tel. & Tel. Corp., Comm. Equip. Sys. Div. v. Local 134, IBEW,*
    419 U.S. 428 (1975) .......................................................................................35

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) .......................................................................32

*Kanarr Corp. v. United States,*
    188 Ct. Cl. 1051 (1969) ...........................................................................16, 19

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
    846 F.3d 857 (6th Cir. 2017) .........................................................................18

*Lomont v. O'Neill,*
    285 F.3d 9 (D.C. Cir. 2002) .............................................................................2

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .......................................................................................36

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)......................................................................................38, 40

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997)...............................................................................................12

*Michigan v. EPA,*
  576 U.S. 743 (2015)...............................................................................................31

*Morehouse Enters., LLC v. ATF,*
  2022 WL 3597299 (D.N.D. Aug. 23, 2022)........................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).........................................................................................15, 22

*Muscarello v. U.S.,*
  524 U.S. 125 (1998)...............................................................................................21

*Nat'l Multi Hous. Council v. Jackson,*
  539 F. Supp. 2d 425 (D.D.C. 2008)......................................................................37

*Nat'l Nutritional Foods Ass'n v. Mathews,*
  557 F.2d 325 (2d Cir. 1977)..................................................................................18

*Nat'l Rifle Ass'n v. Brady,*
  914 F.2d 475 (4th Cir. 1990).................................................................................14

*Nken v. Holder,*
  556 U.S. 418 (2009)...............................................................................................40

*Novus Franchising, Inc. v. Dawson,*
  725 F.3d 885 (8th Cir. 2013).................................................................................38

*Oljirra v. Mayorkas,*
  No. 12-cv-0994, 2013 WL 1490261 (D. Minn. Apr. 11, 2013).........................25

*Padda v. Becerra,*
  37 F.4th 1376 (8th Cir. 2022)...............................................................................38

*PDK Lab'ys Inc. v. DEA,*
  438 F.3d 1184 (D.C. Cir. 2006)............................................................................25

*Posters 'N' Things, Ltd. v. United States,*
  511 U.S. 513 (1994)...........................................................................17, 18, 30, 31

*Rare Breed Triggers, LLC v. Garland,*
  __ F. Supp. 2d __, 2022 WL 17175089 (D.N.D. Nov. 4, 2022)........................36

*Richmond Boro Gun Club, Inc. v. City of New York,*
    97 F.3d 681 (2d Cir. 1996) ................................................................................................ 31

*Romag Fasteners, Inc. v. Fossil, Inc.,*
    140 S. Ct. 1492 (2020) ................................................................................................ 19, 20

*S.F. Herring Ass'n v. Dep't of the Interior,*
    946 F.3d 564 (9th Cir. 2019) ............................................................................................ 34

*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022) ............................................................................................ 36

*Sierra Club v. United States Army Corps of Engineers,*
    446 F.3d 808 (8th Cir. 2006) ............................................................................................ 36

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016) ............................................................................................ 18

*Sipes v. United States,*
    321 F.2d 174 (8th Cir. 1963) ............................................................................................ 19

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .......................................................................................................... 13

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ............................................................................................ 25

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...................................................................................................... 40

*U.S. v. Davis,*
    139 S. Ct. 2319 (2019) ...................................................................................................... 21

*U.S. v. Pfeifer,*
    371 F.3d 430 (8th Cir. 2004) ............................................................................................ 33

*U.S. v. Royce,*
    No. 1:22-cr-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ......................................... 24

*United States v. Fix,*
    4 F. App'x 324 (9th Cir. 2001) ......................................................................................... 21

*United States v. Hayes,*
    555 U.S. 415 (2009) .......................................................................................................... 18

*United States v. Rose,*
    695 F.2d 1356 (10th Cir. 1982) .................................................................................... 16, 19

*United States v. Santoro,*
  242 F. App'x 627 (11th Cir. 2007)........................................................................16

*United States v. Schuhmann,*
  963 F.2d 381 (9th Cir. 1992)...............................................................................19

*United States v. Spy Factory, Inc.,*
  951 F. Supp. 450 (S.D.N.Y. 1997)......................................................................30

*United States v. Syverson,*
  90 F.3d 227 (7th Cir. 1996).................................................................................18

*United States v. Thompson/Center Arms Co.,*
  504 U.S. 505 (1992)...........................................................................2, 14, 16, 19

*United States v. Zeidman,*
  444 F.2d 1051 (7th Cir. 1971).............................................................................16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982).............................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)..........................................................................................11, 22

**Statutes**

5 U.S.C. § 551(13)........................................................................................34, 35

5 U.S.C. § 704.....................................................................................................34

5 U.S.C. § 706(2)(A)...........................................................................................24

5 U.S.C. § 706(2)(C)...........................................................................................12

18 U.S.C. § 921.....................................................................................................3

18 U.S.C. § 921(a)(7)....................................................................................*passim*

18 U.S.C. § 921(a)(8)...........................................................................1, 5, 12, 20

18 U.S.C. § 921(a)(25).........................................................................................20

18 U.S.C. § 922.....................................................................................................3

18 U.S.C. § 922(r)................................................................................................33

18 U.S.C. § 926(a)....................................................................................4, 13, 22

26 U.S.C. § 5801...................................................................................................2

26 U.S.C. § 5841 ...................................................................................................... 1, 3

26 U.S.C. § 5845(a) ..................................................................................................... 3

26 U.S.C. § 5845(a)(1) ................................................................................................ 2

26 U.S.C. § 5845(a)(3) ................................................................................... 5, 12, 14

26 U.S.C. § 5845(a)(7) .......................................................................................19, 22

26 U.S.C. § 5845(b) ..................................................................................................23

26 U.S.C. § 5845(c) ............................................................................................*passim*

26 U.S.C. § 7801(a)(1) ..............................................................................................13

26 U.S.C. § 7805(a) ..................................................................................................14

26 U.S.C. § 7801(a)(2)(A) ...................................................................................4, 22

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) .............................................................................2, 16

**Rules**

Federal Rule of Civil Procedure 5(b)(2) ..................................................................42

**Regulations**

27 C.F.R. § 478.11 ...............................................................................................8, 15

28 C.F.R. § 0.130 .................................................................................................4, 22

28 C.F.R. § 0.130(a) .................................................................................................13

*Objective Factors for Classifying Weapons With "Stabilizing Braces,"*
    85 Fed. Reg. 82,516 (Dec. 18, 2020) ...............................................................8

*Objective Factors for Classifying Weapons With "Stabilizing Braces," Withdrawal of Guidance*
    85 Fed. Reg. 86,948 (Dec. 31, 2020) ...............................................................8

86 Fed. Reg. 30,826 (June 10, 2021) ........................................................................8

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
    88 Fed. Reg. 6,478 (Jan. 31, 2023) .......................................................*passim*

**Other Authorities**

*Accessibility Policy,*
  https://perma.cc/YB35-BNQS.................................................................................38

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
  https://perma.cc/MRR9-ZBJ2...............................................................................10

ATF, *FAQs for Final Rule 2021-08F,*
  https://perma.cc/H8YD-AXXE...............................................................................33

Classic Firearms, Manufacturer Review SB Tactical, YouTube (Feb. 14, 2022),
  https://www.youtube.com/watch?v=mC3M8T4lLSM.............................................37

CNN*, 10 killed in Colorado grocery store shooting,*
  https://perma.cc/HG5S-3NAF...................................................................................8

Commercial Guidance; *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY.............................................................11

*Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles,*
  https://perma.cc/BK6C-BRGQ...................................................................................4

Conklikov, Review: SB tactical TF1913 pistol stabilizing brace for Ak style pistols, YouTube
  (Nov. 10, 2022), https://www.youtube.com/watch?v=gBr1uXkKdew...............................37

*Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023),
  https://perma.cc/96PV-KRB9...................................................................................32

*FINAL RULE 2021R-08F,*
  https://perma.cc/W6ZW-8FUL..............................................................................14

Minimalist Moto Life, AR357 build pt1 blowback 357 Sig AR pistol PDW PCC, YouTube (May
  16, 2020), https://www.youtube.com/watch?v=biELjHkkGCM...........................................37

*NFA Handbook* § 7.2.4 (Apr. 2009),
  https://perma.cc/P3NL-G35G...................................................................................4

OMB, *Circular A-4,*
  https://perma.cc/F3AR-RKYP...................................................................................32

USA Today*, Dayton shooter used a modified gun that may have exploited a legal loophole,*
  https://perma.cc/89XK-SNVR.....................................................................................8

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it judged especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from

the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs are a firearms trade and advocacy association, a stabilizing brace manufacturer, an individual who uses stabilizing braces, a federally licensed firearms importer and manufacturer, and twenty-five states. Plaintiffs seek to preliminarily enjoin the Rule but fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when pistols with "stabilizing braces" become "rifles," as defined under federal law. The Rule comports with the relevant statutory provisions and is reasonably explained. Moreover, the factors adopted by the Rule and the interim classification guidance ATF has issued following the Rule's publication are lawful. And the merits aside, Plaintiffs will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.      Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see, e.g., Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S.

2

505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

    2.  In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–31, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–23.

    Among these were specific controls on the interstate transport of "short-barreled rifles" and the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ ("Commercial Guidance") (providing images of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm, "stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a

4

"stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. *See* ECF No. 1-15; 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. ECF No. 1-15. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.*; 88 Fed. Reg. at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. 88 Fed. Reg. at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g.*, *id.* at 6,529 (comparing two "stabilizing braces" to similarly designed

shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters (and a 2015 Open Letter) suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or shoulder fire. *Id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped weapons as short-barreled rifles after considering, *e.g.*, whether the "brace" device served any purpose other than to extend the rear surface to enable shouldering, *id.* at 6,485, or whether the device created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's

incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.    The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted that particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles

7

without complying with NFA requirements, *see id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *see supra* at p. 3.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot.[2] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.

**2.** In light of its pre-existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces." *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. 86 Fed. Reg. 30,826.[3] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, *id.* at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

---

[2] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.
[3] In December 2020, ATF published a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516, but withdrew it weeks later, 85 Fed. Reg. 86,948.

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

(i)   whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)  whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)   the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)  information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. For example,

9

an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

 (i) filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

 (ii) removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

 (iii) turning the firearm into a local ATF office; or

 (iv) destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

 *Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's publication. *Id.* at 6,571. Individual possessors, for instance, will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

 *Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[4]

 **3.** Although ATF believes possessors of "brace"-equipped firearms can apply the Rule themselves, to provide extra guidance, the Rule stated that ATF would publish "information simultaneously with" the Rule to inform the public of "common weapon platforms" and "examples of commercially available firearms equipped with a 'stabilizing brace' that are short-barreled rifles." *Id.*

---

[4]ATF also issued additional guidance in conjunction with the Rule's announcement, including answers to frequently asked questions regarding the Rule and registration guidance. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

at 6,481. To that end, and using the Rule's criteria, ATF posted on its website for illustrative purposes photos of a sampling of weapons that it considers short-barreled rifles. *See* Commercial Guidance; *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles* ("Non-Commercial Guidance"), https://perma.cc/JZB3-9CUY; Declaration of William J. Ryan ("Ryan Decl.), Ex. A, ¶¶ 7–8. These illustrative examples neither formally classify the weapons in question nor purport to convey ATF's individualized analysis of particular weapons; instead, "ATF's intention was and is to issue formal classification letters to manufacturers explaining its reasoning and analysis behind each classification decision." *Id.* ATF needed additional time to issue these letters, and it is in the process of drafting and reviewing them. *Id.* ¶¶ 8–9. Also, while ATF considers the samples of non-commercial common weapon platforms identified in the guidance to be short-barreled rifles, individuals must submit their firearm to ATF for classification to receive a definitive determination. *Id.* ¶ 11. Because any number of factors can affect weight, length, and other relevant criteria, ATF cannot issue a general classification applicable to all weapons using a specific platform or "brace" device. *Id.*

## IV.    This Lawsuit

Plaintiffs—a firearm manufacturer, a stabilizing-brace manufacturer, an association, an individual who possesses weapons equipped with stabilizing braces, and twenty-five states—claim that the Rule and ATF's interim guidance violate the Administrative Procedure Act ("APA"). Compl. ¶¶ 199–229, ECF No. 1. They have moved to preliminarily enjoin ATF from enforcing the Rule and its interim classification guidance. ECF No. 7.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable

harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## ARGUMENT

I.   **Plaintiffs are unlikely to succeed on the merits of their claims.**

   A.   **The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.**

Plaintiffs claim that ATF lacked authority to promulgate the Rule because it "misinterprets" the statutory definition of "rifle" and "regulates" weapons that are not regulated under the NFA or the GCA. Compl. ¶¶ 200–04 (citing 5 U.S.C. § 706(2)(C)); Mot. at 8–21, ECF No. 7-1. On the contrary, the Rule fits squarely within ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' arguments run contrary to basic principles of statutory construction.

**1.** As a threshold matter, a facial APA challenge to the Rule is ill-suited for redressing Plaintiffs' alleged injuries. One would expect Plaintiffs to bring concrete challenges to ATF's actual classifications of the *particular* "brace"-equipped weapons that they possess or manufacture. After all, Plaintiffs' alleged injuries stem from whether *their* weapons are short-barreled rifles subject to NFA and GCA controls. But no Plaintiff brings a legal claim to have the Court resolve whether its particular weapons are properly classified as "short-barreled rifles" under 26 U.S.C. § 5845(a)(3), (a)(4) or 18 U.S.C. § 921(a)(8). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any Plaintiff's "brace"-equipped weapon under the terms of the statute (save, perhaps, a few facts regarding an unspecified "SB-Mini-equipped AR-type pistol," Mot. at 36). That omission is telling: if the Court were to conclude that a Plaintiff was in possession of a short-barreled rifle within the meaning of the NFA, any purported "injury" to the Plaintiff would not be traceable to the Rule at all, but would instead stem solely from the statute—as the Rule is purely interpretive. Indeed, though Plaintiffs raise abstract challenges to the Rule, it is the statute—not the Rule—that would impose the relevant obligations on Plaintiffs. For purposes of this motion, then,

12

Plaintiffs have failed to demonstrate standing to facially challenge the Rule. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]n injury" must be "fairly traceable to the challenged conduct.").[5]

**2.** But setting that aside, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500. And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

---

[5] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined").

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *see also Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers some measure of discretion" to ATF "to determine what regulations are in fact 'necessary'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having a barrel or barrels of less than 16 inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *supra* p. 6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices, as the need for ATF to determine these weapons' classifications was obvious from the beginning. While "stabilizing braces" are purportedly meant to assist single-handed fire by stabilizing against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

14

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**3.** Plaintiffs do not dispute that ATF has the statutory authority to interpret the NFA's and the GCA's provisions. Instead, they suggest that ATF lacked authority to promulgate the Rule because these statutes "unambiguously exclude" pistols equipped with "stabilizing braces" from controls applicable to short-barreled rifles. Mot. at 10–21. The Rule reaches a different conclusion, they say, by misinterpreting the NFA's definition of "rifle," 26 U.S.C. § 5845(c), and by "overlooking" the definitions of short-barreled rifles, *id.* at § 5845(a)(3), (4). But their arguments do not comport with the statute's text or purpose, prior judicial constructions, or any canon of construction they invoke.

The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.

*"Rifle" under § 5845(c).* Start with the statutory definition of "rifle." *Id.* § 5845(c). Though Plaintiffs contend that a pistol equipped with a "stabilizing brace" can never be a *short-barreled* rifle, Mot. at 9, 12, 19, they do not dispute that a pistol can be modified into a "rifle," as defined by the NFA. Indeed, this interpretation of § 5845(c) is not only supported by the provision's use of the broad and inclusive term "weapon," but it is confirmed by the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (plurality op.) (quoting 26 U.S.C. § 5845(c)); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *See, e.g., United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as one of the component parts, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[6]

Although Plaintiffs appear to accept this understanding of the statutory definition of "rifle," they nevertheless suggest that the Rule misconstrues that definition in two ways, neither of which have merit. *First*, Plaintiffs contend that the Rule misinterprets the term "intended," as used in § 5845(c).

---

[6] That is why even weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *E.g., Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is a "rifle." H.R. Rep. No. 83-1337, at A395. Moreover, ATF has long recognized that pistols can be modified into "rifles." *E.g.*, IRS, Rev. Rul. 61–45, 1961 WL 12798 (Jan. 1, 1961).

But they rest this argument on two false premises: that ATF determines the intended use of a weapon based solely on marketing materials and other information "produced by third parties" and by "attribut[ing] third-party intent to" manufacturers. Mot. at 15. The Rule belies both assertions. First of all, nothing in the Rule suggests that ATF imputes the intent of third parties onto the manufacturer. On the contrary, the Rule makes quite clear that ATF may consider, *inter alia*, the "*manufacturer's own marketing materials*," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the *manufacturer's* intent with regard to that weapon. 88 Fed. Reg. at 6,544. Discerning intent from this type of evidence has been countenance by courts in numerous contexts. *See, e.g., Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 521 n.11 (1994) (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use").

Moreover, Plaintiffs' suggestion that ATF determines a weapon's intended use by looking solely at third-party marketing materials and information simply ignores a sizeable portion of the Rule. As it explains, to properly apply the statutory definition of "rifle," ATF considers, in addition to a manufacturer's description of the weapon and information indicating its likely use, the weapon's objective design features to determine whether it is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. In this particular context, where the record shows that manufacturers' descriptions of "brace"-equipped weapons are often at odds with the weapons' design features and common use, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47, this objective approach is especially sensible. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) would lead to absurd results, and (iii) would permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at

6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g., United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court reasoned, "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g., Posters 'N' Things*, 511 U.S. at 517–22 (adopting an objective construction of the statutory phrase "primarily intended . . . for use" (citation omitted)).[7]

*Second*, Plaintiffs argue that the Rule misconstrues the term "design," as used in § 5845(c). Mot. at 14–15. This argument also embraces a false premise: that ATF "excludes" from consideration

---

[7] *See also, e.g., Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

"evidence" that a "stabilizing brace" can be used to assist single-handed fire in determining a weapon's classification. But again, nothing in the Rule supports that assertion. As it explains, the fact that a particular "brace"-equipped pistol may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued (like Plaintiffs) that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schumann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.[8]

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing.[9] 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the same provision how to impose such a limitation by defining a "silencer" to include a "part *intended only for use* in [the] assembly or fabrication" of a firearm silencer or muffler. 26 U.S.C. § 5845(a)(7)

---

[8] Plaintiffs ignore this authority, and instead draw an inapt analogy from *Thompson/Center*. There, the Court held that a manufacturer did not "mak[e]" a short-barreled rifle by packaging a pistol with a kit containing a shoulder stock and 21-inch barrel, because the kit could be used to create either a short-barreled or a long-barreled rifle. 504 U.S. at 509–18. But here, Plaintiffs argue something entirely different: that when a pistol equipped with a "stabilizing brace" can be used for a purpose "other than shouldering," it cannot be a "rifle" under § 5845(c), *even if* the weapon is designed, made, and intended to be fired from the shoulder. Nothing in *Thompson/Center* supports that argument; in fact, the § 5845(c)'s plain language and cases construing it compel the opposite conclusion.
[9] Plaintiffs suggest that ATF "agrees" that a "brace"-equipped weapon used for single-handed fire "is not NFA regulated." Mot. at 14. Not so. The language they cite is taken from the Rule's description of the factors that "previous classifications" had incorrectly analyzed. 88 Fed. Reg. at 6,479.

(emphasis added) (cross-referencing 18 U.S.C. § 921(a)(25)); *Romag Fasteners*, 140 S. Ct. at 1495 (noting that courts should be "doubly careful" not to read words into statutes when Congress used "the term in question elsewhere in the very same" provision). But Congress chose to define "rifle" to mean a weapon designed, made, and intended to be fired from the shoulder, irrespective of alternate use.

*Short-barreled rifle under § 5845(a)(3), (4).* Because the Rule correctly determined that a pistol equipped with a "stabilizing brace" can be a "rifle" under § 5845(c), there is little question that these weapons can also be short-barreled rifles under the NFA. Section 5845(a)(3) includes within the NFA's definition of "firearm" any "*rifle* having a barrel or barrels of less than 16 inches in length." The GCA includes the same category of weapons within its definition of "short-barreled rifle." 18 U.S.C. § 921(a)(8). The plain language of these provisions compels the conclusion that any weapon meeting the statutory definition of "rifle" with a barrel shorter than 16 inches in length is subject to the NFA's and the GCA's controls for short-barreled rifles.

Plaintiffs suggest that the Rule "overlooked" the statutory definitions under § 5845(a)(3) and (a)(4), and therefore failed to appreciate that neither can encompass a pistol equipped with a "stabilizing brace." Specifically, Plaintiffs claim that § 5845(a)(3) is limited to short-barreled rifles made by "an NFA qualified manufacturer," while § 5845(a)(4) pertains only to long rifles that were "subsequently cut down" to create a short-barreled rifle. But nothing in the statutory text supports their cramped reading of either provision. Indeed, § 5845(a)(3) could not be clearer: any "rifle having a barrel . . . less than 16 inches in length" is an NFA "firearm." Plaintiffs reading of that provision would inject into the text words—*i.e.*, "made by an NFA qualified manufacturer"—"that aren't there." *See Romag Fasteners*, 140 S. Ct. at 1495. At any rate, contrary to what Plaintiffs suggest, the Rule does not turn on any distinction between § 5845(a)(3) and (a)(4). The Rule clarifies the proper construction of the statutory term "rifle" as applied to weapons equipped with "stabilizing braces." Determining whether a weapon is (or was made from) a "rifle" is an essential inquiry to determining whether the

weapon satisfies either § 5845(a)(3) or (a)(4), and the Rule does not attempt to delineate when a weapon equipped with a "stabilizing brace" will satisfy one or the other provision.[10]

**4.**  Plaintiffs next contend that the rule of lenity requires that the Rule be set aside. *See* Mot. at 18-21. The rule of lenity is a principle of statutory construction providing that ambiguities within "a criminal statute should be resolved in the defendant's favor." *U.S. v. Davis*, 139 S. Ct. 2319, 2333 (2019). "To invoke the rule, [a court] must conclude that there is a grievous ambiguity or uncertainty in the statute," and it applies, "only if, after seizing everything from which aid can be derived, [the court] can make no more than a guess as to what Congress intended." *Donnell v. U.S.*, 765 F.3d 817, 820 (8th Cir. 2014) (citations omitted). Lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient[.]" *Chapman v. U.S.*, 500 U.S. 453, 463 (1991). The "simple existence of some statutory ambiguity, however, is not sufficient to warrant the application of [the] rule, for most statutes are ambiguous to some degree." *Muscarello v. U.S.*, 524 U.S. 125, 138 (1998).

Plaintiffs take issue with the NFA and GCA's definition of "rifle"; however, that definition is not so ambiguous as to leave the Court merely guessing what Congress intended. As set forth above, *see supra* pp. 16–20, the NFA and GCA define "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . ." and define a "short-barreled rifle" as a rifle "having one or more barrels less than sixteen inches in length." 88 Fed. Reg. 6,478–79 (quoting 18 U.S.C. § 921(a)(7), (8); 26 U.S.C. § 5845(c)). From this text, a court can easily surmise that Congress intended for weapons with a barrel of less than 16 inches in length and intended to be fired from the

---

[10] Plaintiffs' reliance on *United States v. Fix*, 4 F. App'x 324 (9th Cir. 2001), for the proposition that the NFA does not permit ATF to consider "modifications of the weapon by the owner," Mot. at 12 (citation omitted), is misplaced. In *Fix*, the court merely rejected the government's argument that a particular weapon satisfied the definition of "any other weapon" under § 5845(e), 4 F. App'x at 326; it never suggested that a possessor's modification of a weapon cannot be considered in determining whether the weapon is a "rifle" under § 5845(c) or a "short-barreled rifle" under § 5845(a)(3) or (a)(4).

shoulder to fall within the NFA's purview. The Rule tracks the statutory definition and merely clarifies *how* ATF will determine whether a "brace" equipped weapon is "intended to be fired from the shoulder." Nothing in this regulatory framework suggests a grievous ambiguity.

Plaintiffs make much of ATF's change in position. *See* Mot. at 19-21. They contend that for ATF to "fundamentally change its longstanding position demonstrates at the very least that the NFA is ambiguous with respect to whether it covers brace-equipped pistols," and therefore, lenity should invalidate the Rule. *Id.* at 20. But how and why ATF has changed course demonstrates that the NFA is not grievously ambiguous.

To begin, Plaintiffs' argument that ATF has "fundamentally change[d] its longstanding position" misapprehends the relevant regulatory history. *Id.* Contrary to Plaintiffs' suggestion, prior to the Rule, ATF had not uniformly classified "brace"-equipped weapons as *not* subject to the NFA. *See supra* pp. 4–7. ATF had not even adopted a standardized analysis for determining whether a stabilizing brace changes a weapon's classification and had issued varied classification determinations for "brace"-equipped weapons, classifying some as short-barreled rifles and others as not. *See supra* pp. 6–7. The most significant change the Rule represents, then, is a shift from a system of inconsistent *ad hoc* analysis to a consistent analytical framework. This change pertains solely to how ATF administers and enforces the NFA, which is well within its regulatory prerogative and suggests no grievous statutory ambiguity. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 28 C.F.R. § 0.130.

Second, to the extent ATF's position regarding the classification of "brace"-equipped weapons has shifted, this shift in no way reflects that the NFA is a grievously ambiguous statute; instead, it evinces a clear statute ATF has reasonably applied differently to changing circumstances. *See State Farm*, 463 U.S. at 42 ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). ATF's approach to classification, while at times variable, has always properly focused on the clear statutory command to consider whether the

weapon is designed, made, and intended to be fired from the shoulder. As the Rule explains, in 2012, ATF considered the first classification request regarding a forearm brace; the design was modest, and the brace "did not convert [the] weapon to be fired from the shoulder[.]" 88 Fed. Reg. at 6,483. But today, ten years later, stabilizing braces have proliferated in the market, and they look and function very differently from earlier versions. *Id.* at 6,484, 6,494. In recent years, manufacturers have designed and marketed various "brace" devices to convert heavy pistols into shoulder-fired weapons— mimicking stock-equipped weapons or traditional rifles—and individual possessors have widely used these devices for that purpose, *see supra* pp. 4–5. Thus, to the extent the Rule's analytical framework classifies more "brace"-equipped weapons as short-barreled rifles within the NFA's purview, this shift is attributable to changing designs, not a grievously ambiguous statute.

Plaintiffs' citation to *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) does not advance their argument. There, the court determined that the definition of "machinegun" under 26 U.S.C. § 5845(b) was "plain" and "unambiguous," *see id.* at 451, 464, thus obviating any need to resort to the rule of lenity. But the court nonetheless proceeded to discuss how lenity would apply assuming that § 5845(b) was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "'guess' at its definitive meaning." *Id.* at 469. As already explained, no such grievous ambiguity exists in the statutory provisions relevant to this case. Moreover, and contrary to Plaintiffs' suggestion, nothing in *Cargill* suggests that an agency's change in position on the proper application of a statute is sufficient to trigger the rule of lenity.

Additionally, as highlighted by Justices Gorsuch and Jackson, one of the principles underlying lenity is to ensure criminal defendants have fair notice of what the law requires. *See Bittner v. United States*, 598 U.S. ___ , 2023 WL 2247233, at *10 (U.S. Feb. 28, 2023). Here, although Plaintiffs invoke lenity to invalidate the Rule, fair notice is served better by the Rule than by setting it aside. In part, ATF initiated the rulemaking process because the prior system of individual classification

determinations provided insufficient notice to regulated parties. The 98-page Rule thoroughly explains how ATF will now approach classification determinations. Moreover, ATF has published interim guidance identifying pistol-brace combinations likely to be considered SBRs under the Rule. *See* Commercial Guidance. ATF is also in the process of drafting and issuing formal classification letters that will be sent directly to manufacturers. *See* Ryan Decl. ¶¶ 8–9. And the Rule expressly provides that "an individual may contact ATF to receive a determination of whether their firearm equipped with a 'stabilizing brace' is a rifle as defined by the GCA and NFA." 88 Fed. Reg. 6,481; *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (regulations subject to relaxed scrutiny when a party may "clarify the meaning of the regulation by its own inquiry"). Thus, the Rule, and not lenity, better serves the aim of fair notice.

Because lenity is properly invoked only as a fail-safe, when a criminal defendant might otherwise be convicted under a grievously ambiguous statute, it has no application here, as a first line of attack against a final agency rule. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (lenity not standard for "facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement.").[11]

**B.      The Rule is neither arbitrary nor capricious.**

Plaintiffs are also unable to show that the Rule is arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). Judicial review under the APA's arbitrary-and-capricious standard is highly deferential, requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 141 S. Ct. 1150, 1158 (2021).

---

[11] Plaintiffs also suggest the Rule must be invalidated based on principles of "constitutional avoidance," hinting it might "implicate core Second Amendment protections." *See* Mot. at 21. But Plaintiffs assert no Second Amendment claim and cannot invalidate a final rule by speculating it implicates a constitutional interest. Also, this Court has held "that short-barrel rifles fall within the historical tradition which prohibits the carrying of dangerous and unusual weapons," and "are not protected by the Second Amendment." *U.S. v. Royce*, No. 1:22-cr-130, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023) (Hovland, J.).

1.   The Rule's factors are reasonable when considered together.

The Rule describes in detail all factors ATF considers when evaluating whether a particular "brace"-equipped weapon is a "rifle." As outlined above, the agency first considers whether the weapon provides surface area that permits shoulder fire. If it does, the agency then evaluates six relevant criteria to determine whether the weapon is designed, made, and intended to be fired from the shoulder, as required under the statutory definition of "rifle."

Plaintiffs assert that this analytical framework is too "malleable," and that its criteria are "holistically arbitrary" because they are not weighted and none are "outcome determinative." Mot. at 22. Setting aside that the Rule's analysis is *less* malleable than ATF's prior approaches, agencies routinely apply multi-factor tests in applying statutory requirements, where the factors are not weighted. *E.g., FedEx Freight, Inc. v. NLRB*, 816 F.3d 515, 521–22 (8th Cir. 2016); *Oljirra v. Mayorkas*, 2013 WL 1490261, at *2–3 (D. Minn. Apr. 11, 2013). Plaintiffs point to no requirement that an agency's analysis must be tethered to specific weights or quantified requirements, especially when an analysis cannot achieve mathematical precision, like determining whether a firearm is designed and intended to be fired from the shoulder. *See Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"); *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained."). Indeed, a multi-factor analysis "must simply define and explain the criteria" applied, *Catawba Cnty*, 571 F.3d at 39, which the Rule does in exacting detail.

Plaintiffs' reliance on *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014), Mot. at 23, is misguided. For one thing, that case concerned a challenge to ATF's classification of a specific silencer, not a facial challenge to a rule. Moreover, the court in that case faulted ATF for relying "*solely* on the physical characteristics of the device*" to determine its classification. *Id.* at 25. But here the Rule

25

identifies multiple criteria that ATF evaluates in addition to a weapon's objective design features, like marketing materials and information indicating the likely use of the firearm.

Finally, although Plaintiffs claim the Rule will require possessors to "guess" how ATF's analysis should apply to a particular weapon, that fear is speculative and unfounded. Setting aside the fact that the Rule thoroughly explains each criteria, ATF also issued interim guidance showing how dozens of weapons will be classified under this analysis, as well as other explanatory materials. *Supra* p. 10 & n.4. The Rule and its related guidance provide far greater clarity than the status quo ex ante. At bottom, Plaintiff cannot show that ATF's multi-factor analysis is irrational.

2.   The factors are individually reasonable.

Plaintiffs are no more successful in targeting individual factors that ATF considers in assessing whether a particular weapon with a stabilizing brace is a short-barreled rifle. 88 Fed. Reg. at 6511–12.

*Surface area.* Plaintiffs assert that the Rule is arbitrary for not specifying the exact amount of "surface area" that permits a weapon to be fired from the shoulder. *See* 88 Fed. Reg. at 6,575. True, the agency considers "whether there is any surface area on the firearm that can be used to shoulder fire the weapon," without reducing the analysis to a simple measuring game. But that's a feature, not a bug. As the Rule explains, assessing whether a weapon's rear surface area allows shouldering is necessarily a fact-specific inquiry that does not turn solely on the *amount* of surface area. Other considerations also impact the analysis, like whether a weapon possesses a "design feature that prevents shouldering" (*e.g.*, an "attached protrusion that would dig into a shooter's shoulder"). 88 Fed. Reg. 6,530. Plaintiffs' argument that ATF should have eschewed a weapon-specific analysis and instead drawn a sharp, arbitrary line at a specific measurement is hardly a reasonable suggestion.

What's more, Plaintiffs argument again embraces the meritless proposition that a standard must be tied to a precise metric. As explained above, agencies frequently apply standards that do not

use specific numeric thresholds.[12] And courts routinely reject arguments (like Plaintiffs') that a broad standard offends the APA. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 458 (5th Cir. 2021). Rather, the "relevant question" for examining the "rationality" of a given standard is "whether the agency adequately explained why it adopted it." *Id.* Therefore, Plaintiffs' mere preference for a precise metric to evaluate a weapon's surface area does not render the Rule irrational.[13] *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives.").

*Weight, length, and length of pull.* Plaintiffs' arguments concerning ATF's assessment of a particular weapon's weight, length, and length of pull likewise miss the mark by ignoring most of ATF's analysis and explanation in the Rule.

Plaintiffs criticize the Rule for including a list of rifles serving as points of comparison that range broadly in weight, length, and length of pull (*e.g.*, "2 points to 10 pounds"), 88 Fed. Reg. at 6,514–18, 6,535–37, without explaining "what it considers 'comparable' to these ranges." Mot. at 26, 27. But that misconstrues how ATF evaluates the weight, length, and length of pull of a particular "brace"-equipped weapon. Contrary to what Plaintiffs suggest, *id.*, ATF does not compare a specific weapon to the entire "range" of rifles in its database or listed in the Rule. Instead, for a weapon "marketed as a pistol that is a variant of a rifle," ATF compares its weight, length, and length of pull

---

[12] *Tripoli Rocketry*, cited by Plaintiffs, is not to the contrary. That case "involve[d] an agency's failure to explain how a broad standard applied to a particular case," not a "facial" vagueness attack on a rule. *Huawei Techs.*, 2 F.4th at 458.

[13] Plaintiffs also argue that the Rule "contradicts" the agency's own reasoning, suggesting that ATF abandoned Worksheet 4999 because it "did not provide a particular metric to quantify the rear surface area." Mot. at 25-26. But Plaintiffs omit the remainder of the quoted sentence, which explains that the worksheet did not "provide a particular metric to quantify the rear surface area *to indicate when the firearm would accrue the number of points assigned.*" 88 Fed. Reg. 6,522 (emphasis added). The Rule thus explains that one problem with the worksheet was the absence of criteria by which the surface area could be quantified to meet sufficient point thresholds. *Id.* This supports (rather than contradicts) ATF's adoption of a general standard to evaluate whether a firearm has sufficient surface area to allow shouldering.

"against the original rifle design" (*e.g.*, AR-15-type pistol equipped with a "stabilizing brace" compared to a "similarly designed" AR-15 standard rifle). 88 Fed. Reg. 6,514, 6,518, 6,535. And "[f]or a firearm that is not a variant of a rifle (*e.g.,* a Glock-type pistol)," ATF compares the weapon's weight and length to those "of variants designed, made, and intended to be fired from the shoulder (*e.g.*, a Glock-type pistol with a shoulder stock or installed into a carbine conversion kit)." *Id.*[14]

Plaintiffs are also incorrect to suggest that the agency has failed to explain why the weight, length, and length of pull of a "brace"-equipped weapon is relevant to the analysis. As the Rule explains, it is reasonable "to compare the characteristics of a firearm" equipped with a "stabilizing brace" "to similar firearms that are designed, made, and intended to be fired from the shoulder to determine if the first firearm is a rifle." 88 Fed. Reg. 6,514. That's because, if "the weight and length of the firearm in question is consistent with the weight or length of similarly designed rifles, then this would be an indicator that shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed, made, and intended to be used this way." *Id.* Similarly, regarding length of pull, "[a] shoulder-fired weapon generally will have a length of pull that allows the placement of the firearm's shouldering device against the shooter's shoulder while also ergonomically allowing the shooter to engage the firearm's trigger." *Id.* at 6,512.

*Whether a rearward component is necessary for the cycle of operations.* To determine whether a particular "brace"-equipped weapon is designed and intended to be fired from the shoulder, ATF considers whether the rear surface area of the weapon is created by a component that "is necessary for the cycle of operations." 88 Fed. Reg. at 6,569. As the Rule explains, this factor acknowledges variations in

---

[14] Plaintiffs again suggest that it is unreasonable for ATF to determine whether a particular "brace"-equipped weapon is consistent with the weight, length, and length of pull of a similarly designed rifle rather than "quantifying" precise "metric[s]" that will satisfy these factors. Mot. at 26–27. But ATF's approach accounts for the considerable variations in rifle designs, which cannot be reasonably reduced to a universally applicable "metric" or "range" of weights and lengths. In any event, as already explained, nothing in the APA requires an agency to adopt a metric-based approach. *Supra* pp. 26–27.

firearm designs, and that some weapons may incorporate a rearward component that is integral to the firing cycle and is not installed for purposes of shouldering. For example, an AR-type pistol utilizes a buffer tube that houses a spring that drives the bolt forward after the bolt is driven into the tube during the firing cycle. *Id.* at 6,538. Assuming no other attachment or material is added to that buffer tube, the rear surface area that it creates would not alone indicate that the weapon is designed and intended to be fired from the shoulder. *Id.*

Plaintiffs do not dispute the reasonableness of this factor. Instead, they suggest that it is inconsistent with a statement in another section of the Rule, Mot. at 28, that whether a "brace" device makes firing a weapon "more accurate or more enjoyable" is not a relevant consideration in determining whether the weapon is designed, made, and intended to be fired from the shoulder, 88 Fed. Reg. at 6,557.[15] But Plaintiffs fail to explain how this unrelated statement is inconsistent with ATF's consideration of whether a rearward component is necessary for the cycle of operations.

*Marketing/promotional materials and likely use of the weapons in the general community.* Finally, Plaintiffs take issue with the remaining two factors: "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community." *Id.* at 6,575. Once more, Plaintiffs aver that the agency "does not explain how [it] will assess this information," Mot. at 29, without addressing the portions of the Rule which do precisely that.

As an initial matter, and as already explained, *supra* pp. 17–18, the Rule correctly concluded that, although a manufacturer's stated intent may be relevant in determining a weapon's intended use, relying solely on a manufacturer's statements would frustrate Congress's purpose in enacting the NFA

---

[15] ATF made this statement in response to a public comment that a "stabilizing brace" can make single-handed shooting more accurate and enjoyable. 88 Fed. Reg. at 6,557. But as already explained, *supra* pp. 18–20, the fact that a "brace"-equipped weapon's design may also allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. *See* 88 Fed. Reg. at 6,501.

and the GCA and would render federal controls on short-barreled rifles toothless. For that reason, ATF considers not only the manufacturer's marketing materials, but also indirect marketing and promotional materials and relevant information indicating the likely use of the weapon by the general community." 88 Fed. Reg. at 6,544. And again, *supra* pp. 17–18, courts repeatedly evaluate this type of information in determining the intended use of an item. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521–22 & n.11 (construing a statute to require an objective analysis of whether an item is "primarily intended" for a specific use and assessing the "likely use" of the item by "customers generally" and "the circumstances of [its] display and sale").[16]

Although Plaintiffs suggest that the Rule does not explain how ATF considers a manufacturer's marketing and promotional materials, their only substantive criticism is with ATF's assessment of one SB Tactical advertisement. Mot. at 29. But their arguments on this score are unpersuasive. As the Rule explains, for nearly two years, SB Tactical's website featured a banner suggesting that stabilizing braces are a way to avoid NFA controls and to "Stiff Arm the Establishment." 88 Fed. Reg. 6,544. While Plaintiffs maintain that this statement was an innocuous reference to a "one-handed precision stance," PI Mot at 29, they omit the fact that the invitation to "Stiff Arm the Establishment" was placed directly under a heading referring to regulatory "Compliance Applications & Advantages," 88 Fed. Reg. at 6,545. But even setting that aside, Plaintiffs cannot show that it is irrational for ATF to *consider* this "marketing material" in evaluating the design and intended use of an SB Tactical "brace"-equipped weapon. *Cf. Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 686 (2d Cir. 1996) (explaining that the "Court is persuaded from many of the submitted advertisements for semiautomatic rifles that the objective features of at least some of these firearms bring them within the 'designed' standard" of a state firearms law).

---

[16] *Cf. United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 477 (S.D.N.Y. 1997) (Sotomayor, J.) ("The Supreme Court has noted that the 'primary' use of an item may be discernable in part from where it is sold and how it is marketed.").

ATF also explained how it assesses the likely use of a "brace"-equipped weapon in the general community. For example, the Rule includes numerous examples of firearms publications indicating the widely accepted use of pistols equipped with "stabilizing braces" as shoulder-fired weapons. 88 Fed. Reg. 6,545. Indeed, with respect to the SBA3, ATF examined multiple examples of major publications or advertisements describing or showing the SBA3 as useful way to convert an AR-style pistol into a shoulder-fired weapon. *Id.* at 6,546–47. Plaintiffs do not seriously dispute that this information is relevant in determining how the general public uses a particular weapon equipped with "stabilizing braces," which is a material consideration in evaluating that weapon's design and intended use. *See Posters 'N' Things*, 511 U.S. at 521–22 & n. 11; *supra* p. 17–18. And contrary to what Plaintiffs suggest, Mot. at 29–30, nowhere does the Rule suggest that ATF "ignores" marketing materials or other information indicating a "brace"-equipped weapon's use for single-handed firing.

3.   The cost-benefit analysis is not arbitrary.

Plaintiffs contend that the Rule's cost-benefit analysis is arbitrary. Mot. at 30–32; *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015) (explaining that reasoned decision-making often "requires at least some attention to cost"). Specifically, they argue that ATF failed to (1) consider stabilizing braces sold in 2020–2022 in calculating the relevant costs and reliance interests, (2) consider "foregone 'consumer surplus,'" and (3) quantify the Rule's benefits. Mot. at 31. Each argument is meritless.

As an initial matter, ATF's cost-benefit analysis is reasonable: in addition to the Rule's discussion of cost and benefits, *e.g.*, 88 Fed. Reg. at 6,571–73, ATF also issued a Final Regulatory Impact Analysis. *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023), https://perma.cc/96PV-KRB9 ("RIA"). The RIA includes a 40-page discussion of costs, *id.* at 28–67, and explains in detail how ATF determined the number of stabilizing braces in circulation, *id.* at 18–22. Based on its best estimate and relying largely in part on evidence from brace manufacturers, ATF estimated there were 3 million braces in circulation. *Id.* at 18. Still, ATF calculated anticipated costs

using an estimate of 7 million braces in circulation—over 2x that estimate—to be sure "to account for uncertainty regarding the full cost of the rule." *Id.* This number, which Plaintiffs ignore, Mot. at 31, more than accounts for additional braces in circulation attributable to 2020–2022 sales.

Next, Plaintiffs critique ATF for failing to consider "foregone 'consumer surplus.'" Mot. at 31. But ATF's analysis relies on average market price, which accounts for both producer and consumer surplus, and thus, ATF did not fail to consider it. RIA at 59 ("This lost value would be equal to the consumer and producer surplus from these forgone sales . . . . Lacking data on producers' costs, this might be proxied with an estimate of the expected reduction in future sales revenues[.]").

The Rule and regulatory analysis also address the Rule's benefits to public safety. *See* 88 Fed. Reg. at 6,481 ("This rule enhances public safety by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.'"). By properly classifying "brace"-equipped weapons as short-barreled rifles subject to the NFA, the Rule makes them "less attractive for criminals to obtain and use," and therefore, they are "less likely to be used in criminal activity." RIA at 68. Benefit to public safety is difficult to quantify, and thus, it is sufficient for the agency to "exercise [its] professional judgment" to determine the importance of "non-quantified benefits . . . in the context of the overall analysis," as it did here. OMB, *Circular A-4*, at 2, available at https://perma.cc/F3AR-RKYP. "[T]he law does not require agencies to measure the immeasurable," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013).

### 4.   The Rule is not impermissibly retroactive.

Plaintiffs also assert that the Rule is impermissibly retroactive because it "retroactively criminalizes" prior assembly of certain weapons. Mot. at 32–33; *cf.* 18 U.S.C. § 922(r) ("It shall be unlawful for any person to assemble from imported parts any semiautomatic rifle[.]"). Not so.

As an initial matter, the Rule does not criminalize any conduct at all; rather, the Rule is purely interpretive, and as it explains, all relevant criminal prohibitions flow directly from the NFA and GCA,

both of which long-pre-date the Rule and the development of stabilizing braces. *See* 88 Fed. Reg. at 6,478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and GCA."); *see also id.* at 6,552–53.

In any event, the Rule expressly states that ATF will *not* retroactively criminalize past conduct. *See* 88 Fed. Reg. at 6,554 ("[ATF] has determined that any criminal liability for failure to take the necessary action to comply with Federal law for weapons that *have already been made* will result *only for conduct occurring after the time period to register ends*.") (emphasis added); *id.* at 6,480 ("Any penalties for failure to take the necessary action for these existing firearms to comply with Federal law would result *only from conduct occurring after this time period to take action ends*.") (emphasis added). As these statements indicate, the Rule will not apply retroactively to past conduct, and there is no retroactive effect. Instead, the Rule addresses the continued or future possession of a firearm, which courts have held is not impermissibly retroactive. *See U.S. v. Pfeifer*, 371 F.3d 430, 436–37 (8th Cir. 2004).

Plaintiffs nonetheless point to a handful of irrelevant statements in the Rule and supporting guidance to suggest a retroactivity problem. The first relates only to the Rule's tax forbearance provision, which has no application to imagined criminal liability for past assembly under 18 U.S.C. § 922(r). Mot. at 32 (citing 88 Fed. Reg. at 6,553 n.149, 6,571). The second refers to language in the Rule that merely clarifies one aspect of ATF's cost calculation. 88 Fed. Reg. at 6,564. And the third quotes ATF's answer to a FAQ confronting a distinguishable scenario with no bearing on § 922(r) assembly. ATF, *FAQs for Final Rule 2021-08F*, at 4-5, https://perma.cc/H8YD-AXXE.

Thus, the Rule is not impermissibly retroactive because it does not retroactively criminalize past conduct at all. And for this same reason, ATF's failure to consider any limitation on its retroactive rulemaking authority was not arbitrary because this consideration was not relevant. Mot. at 33.

C. **The Commercial and Non-Commercial Guidance issued by ATF are not final agency actions under the APA, and Plaintiffs lack standing to challenge them *en masse*.**

Apart from the Rule, Plaintiffs challenge under the APA what they describe as "dozens of adjudications, expressly outlawing" certain weapons equipped with stabilizing braces.[17] Mot. at 7, 33–36 (capitalization omitted). The "adjudications" that Plaintiffs describe are two slideshow documents, released following the Rule, that provide guidance on "how ATF will apply the definition of 'rifle' to firearms that are equipped with a 'stabilizing brace.'" ECF No. 1-6, 1-7; 88 Fed. Reg. at 6,481. But the Commercial and Non-Commercial Guidance are not final agency actions and are thus not reviewable under the APA. In addition, Plaintiffs' claims are not ripe, nor do they have standing to challenge the guidance *en masse*.

> 1. The Commercial and Non-Commercial Guidance are not final agency actions under the APA.

Section 704 of the APA only permits judicial review of "final agency action." 5 U.S.C. § 704. This analysis focuses on two elements: first, whether the act in question qualifies as an agency "action" under the APA; and second, whether that action is final. *See, e.g., S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575–78 (9th Cir. 2019). ATF's guidance satisfies neither element.

Agency action under the APA is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "Order" is defined as "the whole or a part of a final disposition." *Id.* § 551(6). And an adjudication is an "agency process for the formulation of an order." *Id.* § 551(7). An "order" must have "some determinate consequences for the party to the proceeding." *Int'l Tel. & Tel. Corp., Comm. Equip. Sys. Div. v. Local 134, IBEW*, 419 U.S. 428, 443 (1975). While these definitions are broad, they are "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts,

---

[17] As already explained, *supra* pp. 9–10, Plaintiffs are incorrect in suggesting that the NFA, the Rule, or ATF's interim guidance "outlaw" any weapons. If a weapon qualifies as a short-barreled rifle, a possessor or manufacturer need only comply with the NFA's and the GCA's requirements.

J.) (quotation omitted). Examples of adjudications include licenses, permits, and procurement decisions. *See, e.g., Everett v. United States*, 158 F.3d 1364, 1368 (D.C. Cir. 1998).

Plaintiffs challenge ATF's guidance as "adjudications" under the APA. But these documents were not released as part of any "proceeding." There were no "parties" to them, nor do they have any legally determinative consequences. *See Conf. Grp. v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 559 (7th Cir. 2012). Rather, ATF issued them for illustrative purposes to give members of the public further guidance in advance of the 120-day compliance deadline, pending ATF's issuance of final classification letters. Ryan Decl. ¶¶ 7–8. Accordingly, they are not "adjudications" (or any other type of "agency action") under the APA.

In any event, ATF's Commercial and Non-Commercial Guidance are not "final" for APA purposes. These documents are "*representative*" of how ATF "*will apply* the definition of 'rifle' to firearms that are equipped with a 'stabilizing brace,'" ECF Nos. 1-6 at p.2, 1-7 at p.2 (emphasis added), and thus merely forecast ATF's position on a particular weapon. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) (finding no final agency action where agency memo merely "forecasted" a "definitive" statutory interpretation but "had no direct and appreciable legal consequence"). Indeed, ATF intends to take further action with regard to some of the weapons addressed in these documents. Ryan Decl. ¶¶ 8, 11. The culmination of ATF's decision-making process regarding each commercially available weapon identified in the guidance will be encompassed in a classification letter, which may ultimately be challenged. Ryan Decl. ¶¶ 8, 11; *see also, e.g., Rare Breed Triggers, LLC v. Garland*, __ F. Supp. 3d __, 2022 WL 17175089, at 1 n.2 (D.N.D. Nov. 4, 2022) (describing classification process). Because the Commercial and Non-Commercial Guidance are not the culmination of ATF's decision-making process regarding any particular configuration, they are not final agency actions and the Court lacks jurisdiction to review them. *See Sierra Club v. United States Army Corps of Engineers*, 446 F.3d 808, 811–15 (8th Cir. 2006).

2.  Plaintiffs' challenge is premature, and they lack standing to challenge the Commercial and Non-Commercial Guidance *en masse.*

Plaintiffs' challenge to ATF's Commercial and Non-Commercial Guidance also are not ripe for review, and Plaintiffs lack standing to challenge them. Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022). ATF has not issued classification letters to any Plaintiffs in this litigation and has not yet had the opportunity to formalize its determinations or provide its reasoning for the vast majority of stabilizing brace and pistol platform classifications. The dispute would therefore benefit from further factual development, and Plaintiffs' claims are unripe. *See id.*

Beyond ripeness, Plaintiffs also lack standing, which requires them to have (1) suffered an injury in-fact (2) that is fairly traceable to Defendants' challenged action (3) that a favorable ruling would redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). *First*, Plaintiffs have not shown any injury traceable to ATF's guidance. Their motion addresses only one of 67 configurations referenced in the guidance: the SB-mini attached to an AR-style pistol. They address no other configuration. Plaintiffs do not establish ownership of this particular weapon, nor do they show that they are improperly classified as short-barreled rifles under the NFA. In fact, Plaintiff B&T concedes it does not manufacture or sell any of the configurations covered in the Commercial and Non-Commercial Guidance. Ex. H to Compl. ¶ 10 ("Luce Decl."), ECF No. 1-11.

*Second*, Plaintiffs cannot show that the relief they seek—vacatur of the guidance—would redress any of their alleged injuries. Indeed, "vacating" the Commercial and Non-Commercial Guidance would provide Plaintiffs with no legal benefit. Rather, the unregistered possession or making

36

of a short-barreled rifle configured of a heavy pistol with an attached stabilizing brace outside of the relevant compliance periods puts Plaintiffs at risk of an enforcement action under the NFA "with or without the guidance." *Nat'l Multi Hous. Council v. Jackson*, 539 F. Supp. 2d 425, 432 (D.D.C. 2008).

> 3.   The Commercial and Non-Commercial Guidance do not show that the Rule is arbitrary.

Lastly, as part of their premature "adjudications" challenge, Plaintiffs argue that the Commercial and Non-Commercial Guidance "confirm that the Rule is arbitrary." Mot. at 35. But again, they address only one configuration: an AR-style pistol equipped with an SB-mini stabilizing brace.[18] Plaintiffs do not even attempt to address any of the others of dozens of configurations contained in the guidance. As explained, *supra* Part I.B, the Rule is not arbitrary and capricious, and the Court should reject this cursory attempt to discredit it.

## II.   Plaintiffs will not suffer irreparable harm in the absence of an injunction.

To warrant a preliminary injunction, the moving party must demonstrate that it is likely to suffer irreparable harm absent relief. *Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022). This requires the movant to show more than the mere possibility that irreparable harm will occur. *Id.* "[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such

---

[18] Plaintiffs argue that the "SB-Mini Adjudication confirms that its Rule is standardless." Mot. at 36. As explained above, the inclusion of the SB-Mini and AR-pistol configuration in Commercial Guidance is not an adjudication. If and when a particular configuration is submitted to ATF for classification, ATF will apply the statutory definition, as interpreted by the Rule, to determine whether the configuration is a short-barreled rifle. At that time, ATF will fully explain its classification. Defendants note, however, that at the time of filing, information exists in the community suggesting that SB-Tactical braces, including the SB-mini, are made and intended to be fired from the shoulder. *See, e.g.*, Minimalist Moto Life, AR357 build pt1 blowback 357 Sig AR pistol PDW PCC, YouTube (May 16, 2020), https://www.youtube.com/watch?v=biELjHkkGCM (firing from the shoulder at 1:27 using what is described as an "SB mini brace"); Classic Firearms, Manufacturer Review SB Tactical, YouTube (Feb. 14, 2022), https://www.youtube.com/watch?v=mC3M8T4lLSM (firing from the shoulder at 2:00, 3:21, 4:08, 5:00, 5:45 using various SB Tactical braces); Conklikov, Review: SB tactical TF1913 pistol stabilizing brace for Ak style pistols, YouTube (Nov. 10, 2022), https://www.youtube.com/watch?v=gBr1uXkKdew (at 5:55, stating that an SB Tactical brace "does work well for its intended purpose ... also it works well for other purposes … in terms of shouldering...").

imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation omitted). Failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction. *Padda*, 37 F.4th at 1384. Here, some Plaintiffs attempt to demonstrate irreparable harm.[19] None succeeds.

*Richard Cicero.* Plaintiffs argue that Mr. Cicero faces irreparable harm because he will "be prevented from using his firearms unless and until he is able to comply with the Rule." Mot. at 38–39. But the Rule does not prevent Mr. Cicero from using existing weapons equipped with stabilizing braces, even if they are short-barreled rifles under the NFA. Rather, he is considered in compliance if he timely submits a registration request and can possess his pistol and stabilizing brace during the pendency of his application. 88 Fed. Reg. at 6,480–81.[20]

Plaintiffs further argue that Mr. Cicero's alleged harm is "compounded because the Rule interferes with the exercise of [his] constitutional rights." Mot. at 39 (internal citation omitted). But Plaintiffs have not brought a constitutional claim, much less shown a likelihood of success on one. Mr. Cicero has thus failed to show that he will likely suffer irreparable harm absent a preliminary injunction.

*The States.* Plaintiffs argue that the States will suffer unrecoverable compliance costs "from surveying existing law enforcement inventories and removing or registering affected firearms and accessories." Mot. at 38. But "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Morehouse Enters., LLC v. ATF*, 2022 WL 3597299, at *12 (D.N.D. Aug. 23, 2022).

---

[19] The Firearms Regulatory Accountability Coalition does not articulate any particular harm and therefore presents no grounds for any form of relief.

[20] Mr. Cicero states in his declaration that because of his traumatic brain injury and loss of dexterity in his left hand, registering his six firearms under the NFA is "too onerous of a task." ECF No. 1-13 ¶ 25. ATF is committed to making every effort to ensure that all electronic and information technology developed, procured, maintained, or used by ATF is accessible to people with disabilities, including the customers it serves. *Accesibility Policy*, https://perma.cc/YB35-BNQS, and Mr. Cicero does not aver that any request to ATF for disability accommodation in the registration process has been denied.

Moreover, no State has offered evidence substantiating the allegation that any of its law enforcement agencies possess pistols with stabilizing braces in their inventories. Nor have they shown the estimated compliance costs of surveying existing law enforcement inventories to identify these weapons.

The States' allegation that "the Rule threatens safe and timely law-enforcement responses" is similarly conclusory and insufficient to establish irreparable harm. Mot. at 38. Plaintiffs fail to explain, let alone demonstrate, how the Rule might delay law-enforcement responses to crime.

*SB Tactical and B&T.* B&T avers that it faces irreparable injury because it will have to "convert" its products "into items not affected by this Rule." Luce Decl. ¶ 16, ECF No. 1-11. But these allegations of future economic injury, or loss of "consumer goodwill," are speculative at best. SB Tactical relies on claimed loss of business that dates to 2021, when ATF issued the NPRM, alleging that sales of its braces have trended down for years. ECF No. 1-10 ¶ 43. It avers that it "may close its business" if this "trend continues," though it does not explain whether it may seek to "convert" its products, like B&T, into items not covered by the NFA. But the possibility of future injury—especially any injury stemming from events that predate the Rule—is insufficient to show a likelihood of irreparable harm caused by the Rule absent an injunction. And again, "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Morehouse Enters.*, 2022 WL 3597299, at *12.

## III.   The equities and the public interest weigh against a preliminary injunction.

As Plaintiffs acknowledge, the third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

Leaving the Rule in place benefits public safety. Congress passed the NFA for the express purpose of regulating specific firearms, like short-barreled rifles, which Congress determined posed a greater risk to public safety, as "gangster type" weapons of an especially unusual and dangerous nature.

88 Fed. Reg. at 6,566. The risk posed to public safety by these weapons was identified by Congress, and this Rule enhances public safety by preventing circumvention of the NFA. *Id.* Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety and facilitate the circumvention of the NFA. Any harm to Plaintiffs in complying with the NFA's registration requirements is, by comparison, minimal.

## IV.    In all events, any relief should be limited to redress Plaintiffs' alleged injuries.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted).[21] Nationwide injunctions, on the other hand, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Further, the Rule has been challenged in several other cases, underscoring why this Court should not attempt to decide its legality for all parties.[22] *See Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

---

[21] Although the State Plaintiffs purport to bring this suit to protect their citizens and business within their borders, Compl. ¶¶18–42, they cannot seek relief on behalf of these third parties under a *parens patriae* theory of standing. *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–183 (D.C. Cir. 2019).

[22] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 3:23-cv-232 (N.D. Tex.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

Dated: March 6, 2023            Respectfully submitted,

                                BRIAN M. BOYNTON
                                Principal Deputy Assistant Attorney General

                                BRIGHAM J. BOWEN
                                Assistant Branch Director

                                /s/ Taylor Pitz
                                TAYLOR PITZ (CA Bar No. 332080)
                                MICHAEL DREZNER (VA Bar No. 83836)
                                JODY D. LOWENSTEIN (MT Bar No. 55816869)
                                FAITH E. LOWRY (TX Bar No. 24099560)
                                Trial Attorneys
                                U.S. Department of Justice
                                Civil Division, Federal Programs Branch
                                1100 L Street NW
                                Washington, DC 20005
                                Phone: (202) 305-5200
                                Email: taylor.n.pitz@usdoj.gov

                                *Attorneys for Defendants*

41

## CERTIFICATE OF SERVICE

On March 6, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, District of North Dakota, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/  Taylor Pitz*

Trial Attorney
U.S. Department of Justice