**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| FIREARMS REGULATORY ACCOUNTABILITY, COALITION, ET AL., <br> *Plaintiffs,* <br><br> v. <br><br> MERRICK B. GARLAND, ET AL., <br><br> *Defendants.* | Civ. No: 1:23-cv-24-DLH-CRH |

<u>**AMICUS BRIEF OF ROBERT M. MILLER IN SUPPORT OF PLAINTIFFS'**</u>

<u>**COMPLAINT AND MOTION FOR INJUNCTIVE RELIEF**</u>

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

March 10, 2023

rulemaking and other regulatory analysis for compliance with laws, executive orders, and Office of Management and Budget Circular A-4 ("OMB Cir. A-4"). *Amicus*' economics expertise will greatly assist the Court in understanding how the Agency failed to meet its burdens.

*Amicus* is a firearms expert with more than forty-years experience shooting firearms, including 21 years in the United States Army and its reserve components. *Amicus* owns more than 100 firearms, including at least five braced pistols and twenty-four short-barreled rifles ("SBR") regulated by the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474 and the Gun Control Act of 1968 ("GCA"), Pub. L. 90-618. *Amicus* is a licensed firearm seller in Virginia working for a federal firearms licensed dealer ("FFL") that pays a Special Occupational Tax ("SOT") to manufacture and deal in NFA-regulated firearms. *Amicus* has personal experience with braced pistols and SBRs that will shed light on the arbitrariness of the factors the Agency uses in determining whether a braced pistol is an SBR. *Amicus* is actively involved in the firearms community, and he has personal knowledge of the evolution of the Agency's classifications of braces since 2012 and the impacts those classifications have had on industry participants.

*Amicus* submitted a public comment in opposition to Agency's *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478 ("Rule") that included economic and legal arguments described in his brief. *Amicus* also submitted public comments opposing Agency's rule *Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514 and *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 based on the Agency's faulty regulatory analysis, to which Agency responded at great length. Directly because of *Amicus'* economic arguments, Agency withdrew the economic basis for two of their rules, including the rule at issue in this case. In these three rules, Agency employed similar tactics to escape statutory requirements. *Amicus'* brief discusses issues and facts not raised by the

2

parties or other *amici*, and it will greatly aid this Court's determination to set aside this rule as unlawful under 5 U.S.C. §706.

## **INTRODUCTION**

The Rule must be held unlawful and set aside because it is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law; contrary to constitutional rights, in excess of the Agency's statutory authority, without observance of procedure required by law, and unsupported by substantial evidence and unwarranted by facts. 5 U.S.C. § 706. The Rule's regulatory analysis failed to identify a significant problem requiring regulation. It failed to monetize or quantify Rule benefits and did not explain the causal chain from the Rule's provisions to the benefits claimed. The Rule vastly underestimated its costs. The Rule failed to adequately address public comments and to reasonably consider alternative regulatory approaches. The Rule violated the APA and the Congressional Review Act by failing to delay its effective date. The factors upon which Defendants classify braced pistols as rifles are not found in the NFA and GCA, and Defendants' criteria are arbitrary, vague, and subjective. The Rule's choice to regard braced pistols as rifles instead of pistols, when arguably they could meet the definition of either, violates the Rule of Lenity.

The Rule, NFA, and the GCA violate the Second Amendment because they regulate bearable arms in common use for lawful purposes long before the ratification of that amendment, and Defendants can show no historical analogues of regulating these guns. Short-barreled rifles and shotguns are not "dangerous and unusual" and are less dangerous than their longer-barreled counterparts because they have lower velocity projectiles with less kinetic energy. Braced pistols are *less* concealable than otherwise identical pistols without braces. There are no historical analogues to the Founding regulating *concealable* weapons, as opposed to *concealed* weapons.

3

## ARGUMENT

**A.   The Rule's Regulatory Analysis Was Fatally Deficient.**

1.   The Rule Failed to Prove the Need for Rulemaking and Net Benefits.

The Administrative Procedure Act, Pub. L. 79-404, requires federal agencies to *prove* a rule is ***necessary and appropriate***. See 5 U.S.C. § 701 et seq., 26 U.S.C. § 7805(a); 18 U.S.C. § 926. The underlying purpose of the APA, Office of Management and Budget Circular A-4 (Exh. 1), and Executive Orders 12866 and 13563 (Exhs. 2, 3) is to prevent agencies from burdening the public with costly regulations that are not justified by need or benefits.

Every rule must identify a "significant" or "compelling" problem requiring federal regulation. OMB Cir. A-4 at 3—4; Executive Order 12866 at 1. It is insufficient to identify light, rare, or sporadic harms affecting relatively few people. By "relative," these requirements imply a *national scale* of importance; while the harm sought to be prevented may be devastating to some individuals, this does not imply a necessity for federal regulation.

To show a rule is appropriate, the agency must: (1) identify a problem of national significance, (2) *prove* the rule will solve the problem identified, (3) *prove* that the benefits of the rule outweigh its costs, (4) demonstrate that there are no other less burdensome but effective alternatives, and (5) demonstrate that regulation at the federal level is necessary. *Id.*

Supporting its "need" for rulemaking, Agency argues that pistols with stabilizing arm braces were used in mass shootings in Boulder, Colorado, and Dayton, Ohio, and that "since 2015, ATF reports that approximately 63 firearms with stabilizing braces have been traced in criminal investigations, and that it has "105 firearms cases or investigations involving stabilizing brace devices." Rule at 6499. With all due respect to the tragic losses in Boulder and Dayton, two mass

shootings using braced pistols over an eleven-year period fails to identify the need to regulate the *millions* of braced pistols used for lawful purposes.

All economic analysis is made *at the margin*. Defendants do not get to assume that if the Rule were in effect prior to the Boulder and Dayton shootings, that those incidents would not have happened. *First* – expected benefits must be reduced by the amount of non-compliance, which the Agency did not estimate. People intending to commit murder are unlikely to comply with the Rule or NFA. *Second* – even if the shooters complied with the Rule, they could have used pistols without braces, rifles, handguns, and shotguns. A rule may only claim benefits for the *difference* between a world with the rule and the counterfactual world without it. *Third* – the Agency would have to control for all other factors contributing to those deaths to obtain the *marginal* impact of using a brace against the shoulder, i.e., the braces were far from the only and most important reasons why the victims were harmed. Once the Agency calculates the expected reduction in incidents, victims, or damages from the Rule, then it multiplies those numbers times the *Value of a Statistical Life* ("VSL") or the expected value of medical costs and capital repairs. Calculating such benefits, while possibly very difficult, is a straightforward economic exercise. That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).

Defendants provided only a handful of anecdotes about crimes *possibly* involving braced pistols. Rule at 6499. A mere 169 potential criminal uses over an ***eleven-year period***, out of *millions* of braces used for lawful purposes is not a significant problem requiring regulation. Rifles

are known to be used in 2.6% of homicides each year, and SBRs (or braced pistols) are a small fraction of those.[2]

The Rule claims benefits: "(1) to prevent manufacturers and individuals from circumventing the requirements of the NFA; (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders." Rule at 6572. Defendants do not attempt to monetize these benefits as required by the APA, OMB Circular A-4, and Executive Orders 12866 and 13563. Monetization is a rigorous process that ensures agencies do not do what Defendants do here – claiming benefits by proclamation.

If an agency cannot monetize benefits then it may quantify benefits, but only after *explaining why* it cannot monetize benefits, which Agency did not do. Quantification puts the benefits in numerical terms but without a dollar figure, which might be necessary if there is no market-based system for determining the value of goods affected. The Rule identified one-hundred sixty-nine known or suspected criminal uses of braced pistols over an eleven year period, an average of only 15.4 incidents per year. Dividing by the low estimate of three million braced pistols means only 0.0005% of braced pistols are used in crimes annually. Even if such crimes were underestimated by a factor of 1000, only 0.5% of braced pistol owners will have committed crimes. Using the low or high estimate or the Congressional Research Services estimates of 10 to 40 million, the share of braces used in crimes is ***not significantly different than zero***. It is little wonder Defendants did not monetize or quantify Rule benefits, because doing so as shown above demonstrates the Rule has almost no benefits.

If an agency cannot quantify benefits, it must explain *why* it cannot do so, and only then may it describe benefits qualitatively. OMB Cir. A-4 at 10. But the agency must do more than

---

[2] FBI, Uniform Crime Report, *Crime in the United States,* 2019 (sum of states).

assert a rule "enhances public safety." It must provide some description of the scale or scope of the purported benefits to weigh against costs. The rule must also explain the causal chain of events from the provisions of the rule to the purported benefits, which Agency did not do. The Rule did not articulate 'at least a general grasp of the rule's benefits." *Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). The first purported benefit of enforcing the NFA fails to *prove* regulating braced pistols as SBRs will have benefits exceeding its costs. While Congress can make conclusory claims the NFA works miracles, Defendants cannot rely on bald assertions. Next, Defendants claim the Rule will "enhance public safety." But *how* will the Rule do that? Agency does not even attempt to explain, and neither the public nor this Court are obliged to guess. Because this Court decides this case on the administrative record, Defendants cannot salvage their poor economic analysis with additional evidence, testimony, or a "do-over." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Agency tangentially asserts that the Rule is necessary to "clarify" the definitions in the NFA and GCA. Rule at 6500. In this Rule and the *Receiver* rule, Agency claimed to "clarify" what was, in fact, a redefining of terms to make itself right from legal cases they lost. *United States v. Rowold*, 429 F. Supp. 3d 469, 475–76 (N.D. Ohio 2019); *U.S. v. Wright*, 3:18-CR-162, (N.D. Ohio 2018) [sealed].

In the *Brace*, *Receiver*, and *Bump Stock* rules, Defendants claimed there were *negative externalities* from the criminal use of firearms or devices the Agency sought to regulate. See, e.g., NPRM at 30845, 86 FR 27738, 87 FR 24715, 83 FR 66544. A negative externality is the adverse economic effect that the production or consumption of a good has on third parties who are neither the buyer nor seller of the good, and who do not receive payment for the damages in the market. After Amicus submitted public comments showing the *Bump-Stock* rule and the *Receiver* rule had

no negative externalities, Defendants withdrew their reliance on negative externalities in both the *Receiver* rule and the *Brace* rule. See Rule at 6559. This literally withdrew the economic basis for their rule.

Defendants grossly undercounted the number of braced pistols in circulation, Rule at 6573, by counting only sales of pistols and failing to account for braced pistols made from transferrable receivers or privately made receivers. Agency issued no Advance Notice of Proposed Rulemaking (ANPR) to obtain a more accurate count of ownership of braced pistols and otherwise did not rely on reliable sources. EO 12866, Sec. 1(b)(7). Defendants made no effort to seek the CRS's sources of information. The Rule relied on "anecdotal commentary from the manufacturers, information gleaned from ATF field offices throughout the United States, and subject matter experts' conclusions" without substantiating any of those claims. Rule at 6561. Appeals to its own expertise fails to justify the Agency's conclusions. This Court could not possibly discern from the Rule the capacity of unidentified Agency experts or field offices to know the information the Rule asserts.

The reason why this Rule and every other gun control rule fails cost-benefit analysis is obvious: the rules sweep too broadly to adversely affect *tens of millions* of law-abiding gun owners because of the actions of a few criminals. Defendants have never, and certainly did not in this Rule, prove their measures will save lives, reduce injuries, or benefit "public safety."

2. The Rule Failed to Analyze All Economic Effects

The Rule failed to follow the CRA and Executive Orders requiring agencies to analyze all policy effects, including increases in costs or prices for consumers and individual industries; Federal, state, and local agencies; and the impact of the rule on employment, investment, productivity, economic growth, innovation, competition, and job creation. 5 U.S.C. § 804. Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of*

*Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012). The need to analyze the effects on innovation is particularly acute for this Rule because stabilizing arm braces were an important innovation in the firearm industry during the past decade. Defendants' prior classifications created enormous reliance interests for millions of people for more than a decade before a policy reversal. Such actions have a severe chilling effect on innovation, especially after Agency banned bump stocks too after initially classifying them as not being machineguns.

    3.   <u>The Rule Violated SBREFA</u>

By failing to properly analyze Rule costs, benefits and alternative regulatory approaches, Defendants violated the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), codified in 5 U.S.C. § 601 et seq., to assess the impact of the Rule on small businesses, such as many firearm retailers and manufacturers, including Plaintiffs SB Tactical and B&T, USA.

    4.   <u>The Rule Failed to Adequately Consider Regulatory Alternatives</u>

Courts invalidate rules for failure to consider regulatory alternatives also achieving rule objectives. *Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702, 714 (D.C. Cir. 1985); *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005). Where a party raises facially reasonable alternatives, the agency must either consider those alternatives or give some reason for declining to do so. *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). "It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline." OMB Cir. A-4, p. 16.

Defendants gave short shrift to the *status quo* or "no change" alternative by claiming it has no costs or benefits, RIA at 7, which is an improper analysis Defendants use repeatedly in rules. While the status quo is a proper baseline for comparison, the Agency must consider whether the

status quo will eventually solve the problem without regulation and whether the status quo has quantitative or qualitative advantages or disadvantages. The biggest advantage of the status quo is not imposing hundreds of millions of dollars in new costs on the regulated industry for minimal benefits. Another advantage was the mutual understanding the Agency and the regulated industry had on the legality of braces, which the instant Rule throws into complete chaos.

Defendants failed to consider and explain why they should not let Congress decide whether to amend the NFA and GCA to include braced pistols or otherwise clarify the definition of a rifle. Defendants did not consider allowing states, local, and tribal governments to regulate braced pistols. Defendants' justifications for the Rule and rejection of feasible alternatives boil down to nothing more than an assertion that "Braced pistols are SBRs." This is not reasoned rulemaking.

B.   **The Rule's Immediate Effective Date Was Unlawful**

Title 5, Section 801(a)(3), U.S. Code, and 5 U.S.C. § 553(d) required Agency to postpone the effective date of this "major rule" for 60 and 30 days, respectively. The CRA provides Congress an opportunity to pass a joint resolution of disapproval. Agency concedes this is a "major rule." Rule at 6567, 6574. Agency tries to evade this requirement with a 120-day period of non-enforcement. Rule at 6481. Postponing *enforcement* is not equivalent to postponing the *effective date*. Some Rule provisions became immediately effective without this *nolle prosequi*, such as restrictions on transferring braced pistols as Title I firearms or carrying them across state lines.

Agency also tried to evade these requirements by claiming the Rule is an interpretative rule. Rule at 6480. "Interpretive rules…do not have the force and effect of law and are not accorded that weight in the adjudicatory process. *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019). "A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative

power by speaking with the force of law." *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up). Yet it is clear the Rule is intended to have the force and effect of law from the sweeping provisions of the Rule and its broad threats of felony prosecutions against millions of people.

**C.   Agency's Classifications Are Arbitrary and Capricious.**

Agency's Rule relies on numerous purportedly "objective" factors to determine whether a braced pistol is a rifle, including (1) rear surface area, (2) weight of the firearm, (3) length of pull, (4) sights or scopes with eye relief that require shouldering of the firearm in order to be used as designed, (5) necessity for the cycle of operations, (6) marketing and promotional materials, and (7) likely use by the community. Rule at 6480. An "objective" factor is one based on observable phenomena for which there is no reasonable disagreement, i.e., uninfluenced by emotions or personal prejudices.[3] Objective means "of, relating to, or being an object, phenomenon, or condition in the realm of sensible experience independent of individual thought and perceptible by all observers; reality independent of the mind."[4]

None of these factors are, as the Rule asserts, "objective." The Rule provides no measure of how much surface area passes the first gateway factor. Defendants do not set upper or lower limits on the weight of the firearm, and those limits in any event would be arbitrary since shooters of varying strength and level of disability could use or need stabilizing braces. The length of pull is arbitrary because the Rule does not account for – and summarily rejected comments saying – that different arm lengths, finger lengths, and forearm sizes would require braces of varying lengths to be useful. The Rule does not state how length of pull will be measured. The Rule does

---

[3] American Heritage Dictionary.
[4] Merriam-Webster.

not state how eye relief will be measured or how much loss of scope function would indicate the scope is unusable unless the brace were placed against the shoulder. The Rule does not explain why the lack of necessity of a rearward protrusion for the cycle of operations indicates a firearm will likely be used as a stock rather than a brace. It is obviously arbitrary that marketing materials do not affect the classification as a pistol or rifle, and this is purely subjective Agency judgment.

Finally, how the Agency subjectively perceives the likely use by the community has no bearing on how *Amicus*, or anyone else similarly situated, will use those guns. Indeed, the Rule flatly rejects classifying "weapons based on how a particular individual uses a weapon," Rule at 6484, while holding the contradictory belief that a handful of anecdotes of people using braces as stocks justifies a "likely use in the general community." Rule at 6479, n. 8.

In numerous classification letters from 2012 until 2020, ATF repeatedly affirmed that adding a stabilizing arm brace to a pistol *did not* convert that pistol into an SBR. Agency reversed some early letters claiming that braces were illegal if they could not be used as a brace, could only be used as a stock, and were actually used as a stock. Rule at 6491—92, n. 50. Even that adverse determination gave the public some clarity. Without any new information it did not know in 2012, the Agency reversed that decision too, and now reverses again – the very definition of capricious.

### D.  <u>Agency Relied on Factors Congress Did Not Intend for It to Consider</u>

Neither the NFA nor GCA define rifles based on any of the seven factors identified in the Rule. Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh.*

*Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

**E.   Amicus's Guns Show the Rule Is Arbitrary and Based on False Conclusions.**

Amicus owns a Q Honey Badger (QHB) pistol that Defendants *expressly* consider an SBR. Rule at 6514. Amicus's QHB is equipped with a Nikon P-300 scope with a published eye relief of 3.8 inches. Exh. 4, Fig. 5. The QHB weighs 9.14 pounds with a loaded 30-round magazine, a scope, a visible and infrared laser, a bipod, and a suppressor. *Id.* Fig. 12, 15—16. It has an overall length of more than 32 inches with the suppressor and more than 24 inches without the suppressor. Plaintiff can easily hold the nine-pound gun with one hand by using the stabilizing arm brace. *Id.* Fig. 13. Amicus's QHB weighs more than 99 of the 100 guns Defendants list in their Rule as typical weights for rifles, Rule at 6514—15, and it is equal to or longer than 25 of the 74 firearms Defendants list in the Rule. *Id.*

Amicus can obtain a crystal clear sight picture from his Nikon scope with his eye more than 20 inches from the ocular lens, despite only a 3.8" published eye relief. Exh. 4, Fig. 6, 7. Using the brace with his supporting hand and tilting the gun 90 degrees to the left, Amicus can easily obtain a full field of view with a crystal-clear reticle. *Id.* Fig. 14. Thus, Defendants' vague reliance on "eye relief," fails to demonstrate that magnified optics with low eye relief cannot be used with a braced pistol. Amicus' QHB also has an aiming laser, thus he does not need to use his scope. *Id.* Fig. 12. Using a bipod with the brace collapsed, *Amicus* can obtain full field of view on the scope without putting the brace anywhere near his shoulder. *Id.* This is the same configuration as the Ruger 10/22 Charger designed to hunt small game using a bipod and scope. *Id.* Fig. 46.

Depending on how length of pull is measured, which the Rule does not state, *Amicus*' QHB has a length of pull of 8.5 inches with the brace fully collapsed, about 13 inches when measured

horizontally to the midpoint of the fully extended brace, about 13.5 inches when measured flush with the rearmost part of the brace, and about 13.7 inches when measured diagonally. *Id.* Fig. 8—10. Even small measurement errors, the position of the measurer's eye relative to the gun and measuring tape, and arbitrary choices on where to measure to and from could result in *Amicus* being a felon or not. If the length of pull were two inches longer (15—15.7"), *Amicus* could still attach the brace to his forearm. *Id.* Fig. 7.

### F.   <u>The Rule Violates the Second Amendment</u>

1.   <u>Braced Pistols and SBRs are Bearable Arms Presumptively Protected by the 2A.</u>

Short-barreled weapons have been in common use for lawful purposes since before the Second Amendment and long into the 19th and early 20th centuries. Exh. 4, Figs. 24—32. Defendants cannot identify any historical regulation of SBRs from the Founding until the NFA. While persons and militaries in the Founding era preferred long-barreled weapons, there is no evidence they ever *restricted* short-barreled weapons. The requirement for longer-barreled muskets for militia service was to ensure uniformity among the weapons used by military units, and to maximize the velocity of the heavy projectile in an ill-fitting barrel that allowed propellant gases to bypass the ball; the requirement was practical, not a matter of law. Long barreled weapons also facilitated the use of bayonets, for which length confers a distinct advantage.

By Defendants' admission, between three and seven million people own pistols with stabilizing arm braces. Rule at 6560; RIA 18. While the parties may dispute the number of braced pistols in circulation, the U.S. Supreme Court did not rely on something as banal as counting guns when it determined "that handguns are weapons 'in common use' today for self defense." *New York State Rifle & Pistol Assn., Inc. v. Bruen* ("*Bruen*"), No. 20-843, at *2 (June 23, 2022). "Common use" is not defined in numbers or percentages, as if the public is voting on which

weapons are most useful for their purposes. The word "common" has two relevant senses. The first is "of or relating to a community at large."[5,6] That is, the word common means guns that are possessed by "law-abiding citizens with ordinary self-defense needs" *Bruen* at *1. The second sense of "common" means "widespread; prevalent,"[7] and "occurring or appearing frequently,"[8] "happening often; existing in large numbers or in many places,"[9,10] "occurring, found, or done often; prevalent."[11] Millions of braced pistols plus half a million registered SBRs is "common."

2.   <u>SBRs Are Neither Dangerous Nor Unusual</u>

Firearms use the energy from an explosive charge to push a projectile down the barrel toward its target. As soon as the projectile exits the barrel, it begins to lose velocity because hot gases are no longer pushing it from behind. Generally, the longer the barrel, the higher the velocity of the projectile. Kinetic energy is equal to one-half the mass of the projectile times the velocity squared ($KE = 0.5 \ mV^2$). Because velocity is squared, increases in velocity will have a proportionally larger effect on kinetic energy. For example, firing a 55-grain bullet (3.56 grams) from a 5.56mm rifle with a 10.5-inch barrel will have a muzzle velocity of 2,739 feet per second[12] (fps) and 1,240.6 joules of energy.[13] The same bullet fired from a 16-inch barrel would have a muzzle velocity of 3,132 fps and 1,622.2 joules of energy – a 14.3 percent increase in velocity results in 30.8 percent more kinetic energy. Thus, a projectile from a firearm with a shorter barrel

---

[5] Merriam-Webster.
[6] *Ibid.*
[7] American Heritage Dictionary.
[8] Merriam-Webster.
[9] Oxford Dictionary
[10] Wiktionary
[11] Google Dictionary
[12] https://theprepperinsider.com/ar-15/barrels/length-velocity-chart/
[13] https://www.calculatorsoup.com/calculators/physics/kinetic.php

has *less* kinetic energy, and less terminal effects on the target. Slower projectiles also have less range because the vertical force of gravity is independent of the horizontal rate of travel.

By mere assertion, Defendants attempt in their Rule to shoehorn the "dangerous and unusual" language in *Bruen* and *Heller* into their basis for concluding braced pistols can be lawfully regulated, simply because the NFA regulates SBRs. Rule at 6481. Yet neither Defendants nor Congress can declare by executive or legislative fiat that particular weapons are "dangerous and unusual." Otherwise, they could simply declare that handguns are "dangerous and unusual" and ban the very instruments that *Heller* and *Bruen* said were protected by the Second Amendment. Nothing in the text or legislative history of the NFA stated short-barreled rifles were especially dangerous or unusual. Defendants' original draft of the NFA contained no regulation of SBRs. NFA hearing testimony reveals Minnesota Congressman Harold Knutson suggested adding rifles to the language of the NFA under the mistaken belief doing so would protect hunters in his state, when in fact it did the opposite. The sole remaining argument Defendants have about the "danger" of SBRs is that they are "easily concealable." Pistols without a brace are much more easily concealed than an SBR or braced pistol. Exh. 4, Fig. 37 (Pistol top, braced pistol second from top, SBR bottom). While there is arguably some history of government regulation prohibiting *concealed* weapons, Defendants can cite no historical analogues prohibiting weapons that are *concealable*. Congress has no police powers to regulate crime in the several states. *United States v. Lopez*, 514 U.S. 549, 558–559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

## G.   Defendants Cannot Rewrite the NFA or GCA.

"When a court is confronted with a clear need for regulatory action under a statute which did not anticipate the condition which created the regulatory problem or provide the means for dealing with it, there is a temptation to approve good-faith agency efforts despite the agency's

apparent lack of statutory authority. But this temptation must be avoided, for it is the Congress, not the judiciary, which must act to provide the regulatory agencies with the tools they require. The Court 'is neither empowered to rewrite the language of statutes which may be antiquated in dealing with the most recent technological advances, nor [is it] empowered to make a policy judgment as to whether [the regulations are] in the overall public interest. Therefore, [the Court has] no option but to set aside the regulations . . . as being in violation of the statute." *American Bankers Association v. Connell*, 686 F.2d 953 (D.C. Cir. 1979). Accordingly, an Order granting summary judgment to plaintiffs and setting aside the challenged regulations is filed herewith." *Faic Securities, Inc. v. United States*, 595 F. Supp. 73, 79 (D.D.C. 1984).

That the eighty-nine year old NFA and fifty-five year old GCA failed to anticipate the innovation of braces and modern firearms does not authorize Defendants to unilaterally declare they are encompassed by the NFA and GCA. It is up to *Congress*, not the Agency, to decide whether to regulate braced pistols.

This is the third President in a row who sought to enact through regulation what he could not pass through Congress. President Obama responded to the deadlock in a divided government over his preferred policies by saying, "I've got a pen, and I've got a phone."[14] President Trump ordered rulemaking to outlaw bump stock devices saying, "I don't care if Congress does it or not, I'm writing it out myself.[15] Now, President Biden seeks to regulate braced pistols "without having to go through Congress."[16] The Supreme Court struck down rules where agencies attempted to enact provisions expressly rejected by Congress. *West Virginia v. EPA*, No. 20-1530, at *5 (June

---

[14] https://www.npr.org/2014/01/20/263766043/wielding-a-pen-and-a-phone-obama-goes-it-alone
[15] Public remarks of President Donald J. Trump, Feb. 26, 2018.
[16] President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298.

30, 2022); *Ala. Ass'n of Realtors v. United States Dep't of Health*, 557 F. Supp. 3d 1, 3 (D.D.C. 2021).

## H.   The Rule Attempts to Answer a Major Question Reserved to Congress

The Rule's scale and scope are so widespread, its economic and political significance so great, and the burden on the right to keep and bear arms so heavy, that Congress could not have intended to vest Defendants with so much authority. *West Virginia v. EPA*, No. 20-1530, at *3 (June 30, 2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000). See, e.g., *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U.S. \_\_, \_\_, 141 S.Ct. 2485 (2021); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *National Federation of Independent Business v. OSHA*, 595 U.S. \_\_, \_\_.

## I.   Lenity and Vagueness Militate against the Rule's Interpretations.

"In light of the criminal aspect [of the NFA], the rule of lenity could be deemed to be in play." *City of Mesquite v. Aladdin's Castle. Inc.*, 455 U.S. 283, 289-90 (1982); *Hill v. Coggins*, 867 F.3d 499, 513 (4th Cir. 2017). A statute is void-for-vagueness if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Beason*, No. 11-4676, 2013 WL 1694541, at *2 (4th Cir. Apr. 19, 2013). *United States v. Brewer*, 533 F. App'x 234, 9 (4th Cir. 2013). What Defendants decry as a "loophole" actually means "lawful." Free citizens can do anything not specifically proscribed by law. *Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332, 343 (1900). The NFA and GCA are to be enforced according to their own terms. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be ***held and fired by the use of***

*a single hand*…" [emphasis added] 18 U.S.C. § 921(a)(30). A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels *when held in one hand* …" [emphasis added] *See* 27 C.F.R. 478.11 and 479.11. A rifle is defined as "a weapon *designed or redesigned, made or remade, and intended to be fired from the shoulder* …." [emphasis added] 18 U.S.C. § 921(a)(7).

If a braced pistol was designed to be fired with one hand, then it is a pistol. Agency argues that the brace redesigns the pistol to be fired from the shoulder, i.e., a rifle. Assuming *arguendo* Agency's argument is correct, then a braced pistol fits into *both* the rifle and pistol definitions. The Rule of Lenity demands the Court rule favorably for the party allegedly violating the law.

In *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 511 (1992), the Supreme Court held that the mere *possibility* a kit could be made into an SBR was insufficient for a conviction when a Title I pistol or rifle could be made with the kit. This, the Rule concedes. Rule at 6500, n. 78. Similarly, the mere possibility that a shooter can place a braced pistol against his shoulder does not constitute the making of an SBR when unshouldered shooting is possible.

### J.   Agency's Interpretations Are Not Deserving of Deference.

The NFA and GCA are not silent or ambiguous about the definitions of a pistol or a rifle, thus, Agency's interpretation is not entitled to deference. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Braces were designed *by patent* to facilitate the firing with one hand. That closes the matter. If the Court determines the NFA and GCA are vague or ambiguous, the Agency's interpretation is not a permissible construction of the statutes. *Id.* As stated above, if a braced pistol could meet both the definition of a pistol and a rifle, the Rule of Lenity demands the Court interpret the statute to mean they are pistols. Also, because of all the procedural errors in this rulemaking, the Court should give Agency no deference to its

interpretations. "Chevron deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

### K.   SBRs and Braced Pistols Are Used for Sporting Purposes and Home Defense.

SBRs are used for sporting purposes in United States Practical Shooting Association (USPSA) competitions. "For all long guns (R, SG, and PCC), Short Barreled Rifles (SBR's) are permitted provided the competitor is in full compliance with all state and federal laws and regulations concerning ownership and transport of the SBR and the PCC otherwise complies with Divisional requirements."[17] Exh. 4, Figs. 39—40. Amicus uses SBRs and braced pistols in his home defense, which are easier to wield through narrow doorways and corridors than rifles, and they can accommodate silencers and lights (useful at night) without making the firearms too heavy.

## II.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for injunctive relief and hold in their favor in this case.

I hereby certify and verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746. No attorney has prepared or assisted in the preparation of this brief.

EXECUTED ON March 10, 2023.

-s- _/Robert M. Miller/_

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

---

[17] USPSA Rifle, Shotgun and Multigun Rules, March 2023, p. 99.

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 10, 2023, a copy of the foregoing

**AMICUS BRIEF OF ROBERT M. MILLER IN SUPPORT OF PLAINTIFFS'**

**COMPLAINT AND MOTION FOR INJUNCTIVE RELIEF** was sent to the Court by certified

Priority U.S. Mail.

I caused a copy of this filing to be served on all Plaintiffs and Defendants by CM/ECF.


_____
Robert M. Miller, Ph.D.
*Amicus*